7 World Trade Center, 34th Floor
New York, New York 10007

646.200.6166 Main
212.808.8100 Reception
646.839.2682 Fax
www.cdecastrolaw.com

THE LAW FIRM OF

# CÉSAR DE CASTRO, P.C.

ATTORNEY AT LAW

March 25, 2020

*Via* ECF

The Honorable Brian M. Cogan
United States District Judge
U.S. District Court for the Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:    *United States v. Genaro Garcia Luna,* 19 Cr. 576 (BMC)
>        Renewed Application for Release Pending Trial

Dear Judge Cogan:

We respectfully submit that Mr. Garcia Luna should be released pending trial. Following a bail hearing conducted over two days on February 27 and 28, 2020, Magistrate Judge Robert M. Levy considered the defense's proposed bail package consisting of a one million dollar fully secured bond that would be co-signed by seven financially responsible individuals and three individuals for moral suasion. After hearing lengthy argument and conferring with Pretrial Services, Magistrate Judge Levy concluded that there could be conditions that would reasonably ensure Mr. Garcia Luna's return to court but he felt that the package needed to be more robust.

Accordingly, Mr. Garcia Luna now proposes that he be released on a two million dollar personal recognizance bond secured by ten individuals (seven financially responsible and three for moral suasion) all of which have been approved by Pretrial Services as appropriate co-signers, a property owned by Mr. Garcia Luna worth approximately $1.2 million, and four properties owned by co-signers (three of which are their residences) worth approximately $2.2 million collectively. Mr. Garcia Luna would also be subject to standard Pretrial Services supervision with the addition of location monitoring. Mr. Garcia Luna would reside in the Washington, D.C. area (or New York City if the Court required it) with his family. This strong bail package is more than sufficient to ensure Mr. Garcia Luna's return to court.

Mr. Garcia Luna's release pending trial is also necessary to protect his physical health in light of the devastating toll the COVID-19 pandemic is having on the world and will certainly on the detainee community at the Metropolitan Detention Center where Mr. Garcia Luna is being housed.

Further, we respectfully request that the Court refer this request to Magistrate Judge Levy in order to conserve judicial resources. As noted above, Magistrate Judge Levy conducted the prior lengthy bail hearings on February 27 and 28, 2020. *See* ECF Nos. 27 and 28. Accordingly, he is familiar with the facts and issues relevant to this application. Many defendants in this district are making bail applications in light of the COVID-19 pandemic and directing this matter back to Magistrate Judge Levy could alleviate the burden on the duty magistrate judge who would have to become familiar with the matter.

1.     The Prior Bail Proceedings

On February 25, 2020, Mr. Garcia Luna moved this Court to be released on bail pending trial. *See* ECF No. 25. Mr. Garcia Luna proposed being released on a $1 million personal recognizance bond secured by the signature of three financially responsible individuals, one moral suasion co-signer, and fully secured by real estate owned by Mr. Garcia Luna worth approximately $1,200,000. *Id.* We fully incorporate that submission herein. By letter dated February 27, 2020, the government opposed that request. *See* ECF No. 26. In its original detention memo and in its February 27, 2020 submission, the government conceded that Mr. Garcia Luna was not a danger to the community but moved for his detention based solely on risk of flight. *See* ECF No. 4 (detention memo); ECF No. 26; *see also* Transcript of Feb. 27 Bail Hearing at 17:14-16 ("Your Honor, at this time our position is about the risk of flight which I think is sufficient to support our position.")

The bail hearing commenced on February 27, 2020, and after the government raised some questions regarding the willingness of two of the proposed co-signers to follow-through as suretors, the matter was adjourned until the next day to resolve that issue and for the defense to "present the strongest package" we could in order for the Court to evaluate it at one time. *See* Transcript of Feb. 27 Bail Hearing at 17:2-7. Accordingly, following the hearing, the defense resolved the dispute regarding two of the potential co-signers and further secured six new co-signers willing to co-sign the bond on behalf of Mr. Garcia Luna. Each co-signer completed the Pretrial Services' Suretor Declaration Form and those forms, as well as personal and financial documentation, were provided to Pretrial Services and the government.

The parties returned to court on February 28, 2020, to continue the hearing. The two co-signers at issue flew from Florida to be present and were interviewed by Pretrial Services and the government. Both parties agreed to be co-signers for Mr. Garcia Luna. In addition, one of the other proposed co-signers, retired FBI Agent Carlos Villar, had agreed to offer a rental property that he and his wife own outright, as collateral. Therefore, the package ultimately considered by Magistrate Judge Levy was a personal recognizance bond secured by: (a) the signature of three moral suasion co-signers all approved as appropriate co-signers by Pretrial Services; (b) the signature of seven financially responsible individuals all approved as appropriate co-signers by Pretrial Services; (c) a property owned by Mr. Garcia Luna valued at approximately $1.2 million; and (d) a property owned by Carlos Villar valued more than $300,000. Additionally, he proposed that Mr. Garcia Luna be subject to standard Pretrial Services supervision with the addition of location monitoring.

After considering the package proposed by the defense, Magistrate Judge Levy ruled that while there could be conditions that would reasonably ensure Mr. Garcia Luna's return to court, he did not think the defense's proposed bail package was sufficient. *See* Transcript of Feb. 28 Bail

Hearing at 32:9-11 ("I'm not saying that there are no conditions that could ensure his return to court, but this bond doesn't quite do it. So that's my ruling."). Magistrate Judge Levy explained that what he found "particularly [] troubling about the package is that it relies solely on income but not on assets.[1] And residential assets, assets that would actually cause some kind of pain to the individual that's greater than mere garnishment of wages[.]" *Id*. at 32:2-5. He further explained that as he was considering the proposed bail package the "one thing that was missing to [him] was there wasn't any real property that the suretors themselves were posting, residences that they lived in that if he fled they would lose. That's a strong incentive. A rental property is an investment. It's something different." *Id.* at 24:23-25:3.

2.    New Proposed Bail Package

To ameliorate Magistrate Judge Levy's concerns, Mr. Garcia Luna has modified the proposed bail package to include the residences of three of the proposed suretors as well as a rental property owned by one proposed suretor to serve as collateral. Therefore, Mr. Garcia Luna requests that he be released on a $2 million personal recognizance bond secured by: (1) the signature of three moral suasion co-signers who have all already been approved as appropriate co-signers by Pretrial Services; (2) the signature of seven financially responsible individuals who have all been approved as appropriate co-signers by Pretrial Services; (3) a property owned by Mr. Garcia Luna valued at approximately $1.2 million; (4) the residence of retired FBI Agent Carlos Villar valued at approximately $1 million in which he has approximately $900,000 in equity; (5) the property owned outright by Carlos Villar valued at approximately $300,000; (6) the residence of Cesar Giraldo valued at approximately $489,000 in which he has approximately $175,000 in equity; and (7) the residence of Andres Merro valued at approximately $440,000 in which he has approximately $91,000 in equity. The documents relating to each proposed suretor, including information regarding the real property are annexed hereto at Exhibits A-J.[2] Mr. Garcia Luna would also be subject to standard Pretrial Services supervision with the addition of location monitoring. And Mr. Garcia Luna would reside in the Washington, D.C. area (or New York City if the Court required it) with his family.

This enhanced proposed bail package will sufficiently ensure Mr. Garcia Luna's return to Court. Mr. Garcia Luna does not pose an actual risk of flight. There is virtually no risk that he will flee should he be released. Since 2012, Mr. Garcia Luna has spent the majority of his time in the United States. He moved his entire family here, both his children are United States citizens and attending United States universities, he owns property in this country, is a lawful permanent resident, and intended to secure his United States citizenship. The government's argument for detention is extremely weak. Even though this is a presumption matter, the ultimate burden of persuasion rests with the government and it cannot simply rely on the alleged commission of a serious crime, potential lengthy prison sentence, and specious arguments about Mr. Garcia Luna's connections to El Chapo to justify his detention. Mr. Garcia Luna is eager to proceed to trial to defend himself against the government's unfounded allegations against him.

---

[1] The income of the proposed suretors equals greater than $1 million annually.
[2] We ask that the Court refrain from publicly docketing Exhibits A-J in order to safeguard the privacy of the proposed suretors.

3.       The COVID-19 Pandemic Also Compels Mr. Garcia Luna's Release Pending Trial

Mr. Garcia Luna is at high risk of death if he contracts COVID-19.  Mr. Garcia Luna is fifty-one-years-old and has a history of respiratory issues.  We are facing a serious and urgent public health crisis.  On March 11, 2020, the World Health Organization officially classified COVID-19, a new strain of coronavirus, as a global pandemic.[3]  On January 21, 2020, Washington State announced the first confirmed case of coronavirus in the United States.[4]  Only two months later, COVID-19 has infected over 52,215 people across the United States, leading to at least 675 deaths.[5]

The exponential rate of coronavirus infection is unparalleled.  The first case of coronavirus in New York State was announced on March 1, 2020.  Less than two weeks later, New York State reported 325 positive cases.  To date, the state has amassed 25,665 confirmed cases of the virus, with 210 deaths.[6]  In a five-day period between March 15 and March 20, New York State experienced a 1,064% increase in new confirmed cases of COVID-19.[7]  As of March 24, 2020 in New York City, there are 15,597 positive cases and 192 deaths resulting from the virus.[8]  Thirteen days ago, New York City had only 53 confirmed cases.[9]  New York now has more confirmed cases of coronavirus than any other state in the country.  In fact, New York has 5% of coronavirus cases worldwide.[10]  And the majority of those cases are in New York City, making it an epicenter of the pandemic.[11]

In response to this public health crisis, Governor Andrew Cuomo declared a State of Emergency in New York State on March 7, 2020.[12]  Mayor Bill de Blasio declared a State of Emergency in New York City on March 12, 2020, banning gatherings of over 500 people.[13]  On March 20, 2020, Governor Cuomo directed all non-essential workers to work from home, requiring

---

[3] *WHO Characterizes COVID-19 as a Pandemic*, World Health Organization (Mar. 11, 2020), at https://bit.ly/2W8dwpS.
[4] *First Patient With Wuhan Coronavirus Is Identified in the U.S.*, The New York Times (Jan. 21, 2020), at https://www.nytimes.com/2020/01/21/health/cdc-coronavirus.html.
[5] *Coronavirus Map: Tracking the Spread of the Outbreak*, The New York Times (Mar. 24, 2020), at https://nyti.ms/2U4kmud (updating regularly).
[6] *Id.*
[7] *Watch How the Coronavirus Spread Across the United States*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/interactive/2020/03/21/us/coronavirus-us-cases-spread.html.
[8] *Coronavirus*, New York City Health (Mar. 24, 2020), at https://on.nyc.gov/39ME7wU (updating regularly).
[9] *Id.*
[10] *Coronavirus Live Updates*, The New York Times (Mar. 25, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html (updating regularly).
[11] *Coronavirus in N.Y.C.: Region Is Now an Epicenter of the Pandemic*, The New York Times (Mar. 23, 2020), at https://www.nytimes.com/2020/03/22/nyregion/Coronavirus-new-York-epicenter.html?action=click&module=Spotlight&pgtype=Homepage.
[12] *At Novel Coronavirus Briefing, Governor Cuomo Declares State of Emergency to Contain Spread of Virus*, New York State (Mar. 11, 2020) *at* https://on.ny.gov/2TKzIoz.
[13] *DeBlasio Declares State of Emergency in NYC, and Large Gatherings Are Banned*, The New York Times (Mar. 12, 2020).

individuals to maintain 6 feet of distance between each other.[14]  The same day, the Federal Emergency Management Agency (FEMA) declared New York "a major disaster."[15]

While adults over sixty years old and people with chronic medical conditions are at heightened risk for COVID-19, young, otherwise healthy individuals are not immune from infection.  Data from the Centers for Disease Control and Prevention (CDC) shows that nearly 40% of patients hospitalized from coronavirus were 20 to 54 years old.[16]  In New York, 18- to 49-year-olds comprise more than half of all cases in the state.[17]  With thousands of confirmed cases in New York City that indicate community spread, we must take every necessary action to protect vulnerable populations and the community at large.

     A.  *Conditions of pretrial confinement create the ideal environment for the transmission of coronavirus*

"Prisons are petri dishes for contagious respiratory illnesses."[18]  Inmates cycle in and out of Bureau of Prisons (BOP) pretrial facilities from all over the world and the country, and people who work in the facilities leave and return daily, without screening or testing.  On March 21, 2020, an inmate at Metropolitan Detention Center (MDC) tested positive for the coronavirus.[19]  The individual "complained of chest pains on Thursday, a few days after he arrived at the facility."[20]  Yesterday, March 24, 2020, we learned that an inmate at the Metropolitan Correctional Center in Manhattan tested positive and he was being housed in a unit with all of the inmates that it had deemed at risk.  When he first arrived at the facility, according to authorities, he was asymptomatic.  The effect on the population at MDC remains to be seen, but as the chief physician at Rikers Island cautioned, "[a] storm is coming."[21]

Given what we know about COVID-19, the BOP's quest to contain the infection seems futile. Coronavirus is highly contagious.  On average, one person with the coronavirus will infect

---

[14] *Novel Coronavirus (COVID-19),* New York State Department of Health (Mar. 21, 2020), at https://on.ny.gov/2vfFQvy (updating regularly).

[15] President Donald J. Trump Approves Major Disaster Declaration for New York, FEMA (Mar. 20, 2020), at https://www.fema.gov/news-release/2020/03/20/president-donald-j-trump-approves-major-disaster-declaration-new-york.

[16] *Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.*, The New York Times (Mar. 20, 2020), at https://www.nytimes.com/2020/03/18/health/coronavirus-young-people.html.

[17] *Coronavirus Live Updates*, The New York Times (Mar. 22, 2020) at https://www.nytimes.com/2020/03/22/world/coronavirus-updates-world-usa.html (updating regularly).

[18] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration. *See also* Joseph A. Bick (2007). Infection Control in Jails and Prisons. *Clinical Infectious Diseases* 45(8):1047-1055, at https://doi.org/10.1086/521910.

[19] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

[20] *Id.*

[21] *'A Storm Is Coming': Fears of an Inmate Epidemic as the Virus Spreads in the Jails*, The New York Times (Mar. 21, 2020), at https://www.nytimes.com/2020/03/20/nyregion/nyc-coronavirus-rikers-island.html.

between two to three other individuals.[22]  But public health experts agree that incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[23]

Internationally, prisons have proven ripe for the rapid spread of COVID-19.  In China, officials confirmed 500 cases of coronavirus in prisons.[24]  Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[25]  Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[26]

On March 20, 2020, the New York City Department of Correction announced that one inmate and seven staff members in the city jails had been diagnosed with coronavirus.[27]  One day later, on March 21, 2020, it became clear that no fewer than 38 people had tested positive.[28]  At least 58 additional people are being held in contagious disease and quarantine units in the city's jail system.[29]  But the cases are not abating.  The chairwoman of the New York City Board of Correction urged, "The best path forward to protecting the community of people housed and working in the jails is to rapidly decrease the number of people housed and working in them."[30]

Indeed, on March 17, 2020, New York City Board of Corrections issued a statement calling on the City to "immediately remove from jail all people at higher risk from COVID-19 infection" and in particular individuals such as Mr. Garcia Luna who "are over 50" and "who have underlying heath conditions."[31]

Mr. Garcia Luna is at a higher risk because of his age and his underlying health conditions.  He is fifty-one-years-old, and in 2015 and 2019 he suffered from respiratory issues.  *See* Letter from Dr. Enrique Herrera Ascencio Annexed Hereto at Exhibit "K."  Because of his age and

---

[22] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3.

[23] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (Mar. 2, 2020), at https://bit.ly/2W9V6oS.

[24] Rhea Mahbubani, *Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials*, Business Insider (Feb. 21, 2020), at https://bit.ly/2vSzSRT.

[25] Claudia Lauer and Colleen Long, *US Prisons, Jails On Alert for Spread of Coronavirus*, The Associated Press (Mar. 7, 2020), at https://apnews.com/af98b0a38aaabedbcb059092db356697.

[26] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak*, CNN (Mar. 10, 2020), at   https://cnn.it/2W4OpV7.

[27] *38 positive for coronavirus in NYC jails, including Rikers*, ABC News (Mar. 21, 2020), at https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911.

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *New York City Board Of Correction Calls For City To Begin Releasing People From Jail As Part Of Public Health Response To Covid-19*, (Mar. 17, 2020)*, at* https://www1.nyc.gov/assets/boc/downloads/pdf/News/2020.03.17%20-%20Board%20of%20Correction%20Statement%20re%20Release.pdf

respiratory issues, Mr. Garcia Luna is at higher risk of death if he contracts COVID-19 and he should be released on bail pending trial.

B. *The MDC remains unprepared for a coronavirus outbreak*

As detailed in the attached affidavit of Jonathan Giftos, M.D., the former Clinical Director of Substance Use Treatment for NYC Health & Hospitals, Division of Correctional Health Services at Rikers Island, conditions in correctional settings, and especially the specific conditions at the MDC in particular, "increase the risk of infection substantially." Affidavit of Jonathan Giftos Annexed Hereto at Exhibit "L" at ¶15.

Inmates at the MDC—a massive pretrial detention facility housing approximately 1,700 people—are at serious risk of contracting the virus.[32] The medical care at the MDC has repeatedly failed to adequately address even routine medical conditions, in times of crisis, the medical care at the facility has halted entirely.[33] There are only three doctors at MDC available to care for all 1,700 inmates, none of whom are available on weekends or evenings.[34]

Because there is currently no vaccine or cure for COVID-19, the primary focus is on preventing the spread of the virus. To prevent new infections, the CDC strongly recommends the following actions: thorough and frequent handwashing, cleaning surfaces with Environmental Protection Agency approved disinfectants, keeping at least 6 feet of space between people, and social distancing.[35] To date, the MDC has not met even the most basic recommendations of the CDC for preventing the spread of coronavirus.

Maintaining six feet of distance from other inmates is all but impossible in a correctional facility where most individuals are housed either in small two-man cells (designed to hold a single inmate) with a single shared toilet and sink or in large open dormitory units housing up to 70 inmates with shared toilets and sinks.[36] Windows in the units do not open and inmates cannot go outside.[37]

Adequate handwashing and basic hygiene are stymied by the fact that no hand sanitizer is available to inmates at MDC Brooklyn.[38] Further exacerbating the problem, tissues are not readily available and inmates use toilet paper to blow their noses.[39] Each inmate is provided

---

[32] *See* Ex. L ¶ 15.
[33] Nick Pinto, *The Power Is Back On At Brooklyn Jail, But a Visiting Federal Judge Found Untreated Gunshot Wound, "Black Blotchy Mold," and Ongoing Crisis*, THE INTERCEPT (FEB. 6, 2019), https://theintercept.com/2019/02/06/mdc-brooklyn-metropolitan-detention-center-federal-judge-tour/. *See Fed. Defs. of N.Y. v. Fed. Bureau of Prisons, 416 F. Supp. 3d 249, 250 (E.D.N.Y. 2019)* ("Plaintiff also has proffered evidence that [BOP's] representations regarding conditions in MDC have been incomplete or inaccurate."). We note that following the crisis regarding the conditions at the MDC last year, the warden of the facility at the time was *promoted* by the BOP to a supervisory regional position.
[34] Ex. L ¶ 16.
[35] *Id.* ¶ 15.
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*

only one roll of toilet paper per week.[40]  Shockingly, MDC severely limits inmates access to one of the most critical weapons in preventing the transmission of COVID-19, *i.e.*, soap.  Each inmate is given one small bar of soap a week, at most.[41]  Some units at MDC have received no soap since the lockdown of the facility began on March 13, 2020.[42]  Access to additional soap is limited to those inmates who have sufficient commissary funds to purchase it, and dependent on the commissary being open; it is routinely closed during lockdowns.[43]

In addition to unhygienic living conditions, the high volume of people in and out of MDC further increases the likelihood that COVID-19 will spread rampantly throughout the institution.  On March 13, 2020, nearly two weeks after the first confirmed case of coronavirus in New York State, the Bureau of Prisons announced a 30-day suspension of all visits to all federal correctional facilities.  But prohibiting visits to correctional facilities is insufficient to stem the spread of illness. "[T]here is no way to stop the daily flow of guards, teachers, food service and healthcare workers.  Someone is certain to bring the virus in and take it back out while they are asymptomatic."[44]

New inmates arrive at MDC from all over the world each week.[45]  With each additional arrest comes increased risk of spreading the virus in MDC.  Individuals who are newly arrested and potentially exposed to coronavirus, if they are not symptomatic, will be brought into the facility.  There, they are held with the existing population, potentially transmitting COVID-19 to a populace held in close quarters with unsanitary conditions. These conditions are ripe for the spread of infection: The individual who tested positive for coronavirus at the MDC on March 21 first became incarcerated only a few short days before becoming symptomatic.[46]

>      C.   *The federal judiciary has begun to set bail conditions for previously detained*
>           *individuals in light of the coronavirus*

The judiciary has recently begun to recognize and address this exceptional crisis.  On March 12, 2020, Magistrate Judge Orenstein denied a remand application, holding that increasing the population of the Metropolitan Detention Center could present a "danger to the community"— the staff and inmates inside the jail—by potentially bringing the virus into the facility.  *United States v. Raihan*, 20-CR-68 (BMC) (Mar. 12, 2020).  A week later, conditions worsened exponentially.

On March 19, 2020, thirteen days after having remanded defendant Dante Stephens, Judge Nathan reversed herself "in light of circumstances that have changed since the March 6 hearing," namely, "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic."

---

[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*
[44] *Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.
[45] Ex. L ¶ 15.
[46] *1st fed inmate tests positive for coronavirus*, A.P. News (Mar. 21, 2020), at https://apnews.com/ec49cc7f4d1b00bc5010dfb6d935e042.

*United States v. Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020).  In setting bail, Judge Nathan noted that "[a] comprehensive view of the danger the Defendant poses to the community requires considering all factors," including COVID-19.  *Id.*  Similarly, on March 19, 2020, the threat of coronavirus led Judge Ramos to release a formerly detained individual on bail.  *See United States v. Santiago Ramos*, 20-CR-04 (ER).

In the throes of this public health crisis, the Court must release Mr. Garcia Luna, a 51-year-old individual with a history of respiratory issues, to protect his physical health.

4.      At a Minimum, the Bail Reform Act Requires Mr. Garcia Luna's Temporary Release

The above proposed bail package is more than sufficient to ensure Mr. Garcia Luna's appearance before this Court.  Ten co-signers and four properties are more than sufficient.  However, if the Court were to conclude that Mr. Garcia Luna should be detained pending trial, his temporary release is necessary to protect his physical health.

When an individual is in custody, the Bail Reform Act "permit[s] the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  There is no greater necessity for the preparation of a "person's defense" than access to counsel.  And there is no more "compelling reason" than a person's physical health.

Indeed, Judge Nathan recognized that "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason [to release the Defendant] under 18 U.S.C. § 3142(i)."  *Stephens*, 15-CR-95 (AJN) (Mar. 19, 2020) (releasing the defendant concluding that in light of changed circumstances, Mr. Stephens does not pose a danger to the community); *see also United States v. Perez*, 19-CR-297 (PAE) (Mar. 19, 2020) (concluding "compelling reasons exist for temporary release of the defendant from custody during the current public health crisis").

In *United States v. Rodriguez*, the Court held that with respect to an accused's need to consult with counsel, "Section 3142(i)(3) reaches above the minimum" standards set by the Sixth Amendment.  2014 WL 4094561, at *4 (W.D.N.Y. 2014) (Scott, M.J.).  The subsection's plain text "mandates the removal of any impediment to 'private consultations' [between attorney and client] that are qualitatively and quantitatively 'reasonable.'"  *Id.*; *cf. Falcon v. United States Bureau of Prisons*, 52 F.3d 137, 139 (7th Cir. 1995) ("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, [the court] has the statutory authority to protect [defendant's] access to counsel.").

At the very least, the Bail Reform Act demands that Mr. Garcia Luna be released for the duration of the coronavirus outbreak.

Respectfully submitted,

/s/

César de Castro
Valerie A. Gotlib


cc:     Michael P. Robotti
        Ryan Harris
        Erin Reid
        (Assistant United States Attorneys *via* ECF)