

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MPR:EMR/RCH          *271 Cadman Plaza East*
F. #2019R00927         *Brooklyn, New York 11201*

March 30, 2020

By ECF

The Honorable Ramon E. Reyes
United States Magistrate Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:    United States v. Genaro Garcia Luna
             Criminal Docket No.19-576 (BMC)

Dear Judge Reyes:

      The government respectfully submits this memorandum in opposition to the defendant's application for pretrial release dated March 25, 2020. See Dkt. Nos. 31-32. The defendant has previously submitted two applications for pretrial release, which the Court has denied. See Dkt. Nos. 25-30. For the reasons detailed (1) in the government's original motion for pretrial detention dated December 10, 2019, attached hereto as Exhibit A; (2) the government's memorandum in opposition to the defendant's previous application for pretrial release dated February 27, 2020, attached hereto as Exhibit B; (3) the reasons discussed on the record, during the detention hearings held on February 27 and 28, 2020, the transcripts of which are attached hereto as Exhibits C and D, respectively; and (4) for the reasons set forth below, the government respectfully submits that there is no condition or combination of conditions that will reasonably assure the defendant's future appearance before Judge Cogan as required, a position also taken by Pre-Trial Services.

      In the alternative, the government respectfully submits that the combination of conditions proposed by the defendant for his pretrial release is inadequate to ensure his continued appearance before Judge Cogan and that the Court should thus continue to detain him pending trial. Indeed, as detailed below, since the defendant submitted this bail application, two of his proposed suretors have advised the government that they are not willing to sign the bond. The defendant's bail package therefore is considerably weaker than the package initially proposed, and the Court should reject that proposal as insufficient.

I.      Background

        A summary of the relevant factual background surrounding the defendant's criminal conduct and the nature of the government's criminal investigation is set forth in the government's motion for pretrial detention dated December 10, 2019, which the government incorporates herein by reference. See Ex. A. In summary, the defendant is the former Mexican Secretary of Public Security and is charged with using his official position to assist the Sinaloa Cartel, one of the world's most powerful and violent criminal organizations, in exchange for millions of dollars in bribes.

        This Court has scheduled a detention hearing in this matter for March 31, 2020. This will be the third detention hearing in this matter. As set forth in detail below, the Court has denied the defendant's prior applications for pretrial release.

        A.      The February 27, 2020 Detention Hearing

        On February 27, 2020, the parties appeared before the Court for a detention hearing. During the course of that hearing, it became apparent that the defendant's application, which he had filed just two days earlier, had since become much weaker. See Dkt. No. 25.

        At the hearing, defense counsel advised the Court that this application for his pretrial release included a "$1 million bond[,] which would be cosigned by three financially responsible individuals and one moral suasion person," and would be secured by real estate owned by the defendant valued at approximately $1,200,000. Ex. C at 2. However, as the defendant subsequently acknowledged, two of the three proposed financially responsible suretors, identified here as Suretor E and Suretor F,[1] had advised the government and defense counsel the previous evening that they were no longer willing to sign as suretors. As a result, as defense counsel acknowledged, he did not "have all the suretors [in court] or a package ready." Id. at 3. Defense counsel nonetheless argued that his proposed combination of conditions was sufficient "in the abstract." Id. Defense counsel contended that, although several of the proposed suretors did not make substantial incomes, they were nonetheless suitable to act as financially responsible suretors on a bond set at $1,000,000. See id. at 3-4. Defense counsel further contended that the defendant's real estate property was sufficient to secure his future appearance before Judge Cogan, despite the government's contention that the property likely would be subject to forfeiture in this matter and thus provided no additional

---

        [1] In his most recent application, the defendant attached financial records for each of the proposed suretors as Exhibits A through J. To protect the privacy interests of the proposed suretors, the government will identify the suretors by the letter of their respective exhibit, rather than by name (e.g., the suretor whose financial records were contained in Exhibit A will be identified as Suretor A).

incentive for the defendant to appear.  See id.  While acknowledging that the defendant was subject to a statutory presumption of detention under 18 U.S.C. § 3142(e)(3)(A), defense counsel nonetheless asserted that the defendant was not a risk of flight given, inter alia, that he and his family had resided in the United States since 2012 and that he had remained in the United States after public criminal allegations were raised against him in during the trial of Joaquin Guzman Loera, also known as "El Chapo," prior to the defendant's arrest in this matter.  See Ex. C at 5-7.

In response, the government asserted that there was no combination of conditions that could reasonably assure the defendant's continued appearance before Judge Cogan and, in any event, the defendant's application was woefully inadequate to assure his appearance or rebut the presumption that he should be detained pending trial.[2]  See id. at 9. The government advised the Court that Suretor E and Suretor F, two of the defendant's proposed suretors, had communicated to the government and defense counsel through their attorney the previous evening that they were no longer willing to act as suretors for the defendant.  See id. at 9-10.  As such, the government noted that the defendant's application now included only one financial suretor, whose annual income was approximately $45,000 and who thus could not satisfy a bond of $1,000,000.  See id. at 10.

At the conclusion of the detention hearing, the Court declined to make a determination without the defendant presenting a concrete application with willing suretors. See id. at 15.  The Court noted that Pretrial Services had recommended the defendant's detention and that, in its view, there was no combination of conditions sufficient to reasonably assure the defendant's future appearance, but advised that it had not yet reached that conclusion.  See id.  The Court then advised defense counsel, "given the adamance of the Government's position and the position that Pretrial Services has taken[,] that you try to present the strongest package that you can so the Court can evaluate that at one time.  So if that means more suretors or more property, that's what you need to do."  Id. at 17.

B.    The February 28, 2020 Detention Hearing

The following day, the defendant presented a new application for pretrial release, which he contended was sufficient to assure his future appearance before Judge Cogan. This new application included a bond of $1,000,000 signed by the defendant's wife, son and

---

[2] In his most recent filing, the defendant incorrectly contends that the government conceded that the defendant is not a danger to the community.  See Dkt. No. 31 at 2.  The government does not concede that the defendant is not a danger to the community, and it reserves the right to argue for detention based on that ground.  At this stage, however, the government continues to contend that the defendant's significant "risk of flight . . . is sufficient to support our position" that his pretrial detention is warranted.  Ex. C at 17.

daughter for moral suasion, as well as seven other suretors, and secured by the defendant's real estate valued at $1,200,000 and a rental property owned by a suretor, identified herein as Suretor A, valued at $300,000. As outlined by the government, this new application, like the application presented the previous day, suffered from serious defects, given the defendant's significant risk of flight.

As an initial matter, the government argued that the defendant lacked credibility, having made statements during his post-arrest interview that materially contradicted representations made to the Court by defense counsel and statements made by one of his suretors to the government. See Ex. D at 2-5. Thus, the government contended, the Court could not rely on the defendant's representation that he would appear before the Court in the future, if released on bond. See id. at 5.

The government further advised the Court that its investigation had revealed that the defendant had access to significant funds held in the names of third parties, which could facilitate his flight from the United States. See id. at 3. For example, as the government noted, in 2012, a third-party company purchased a real estate property in Florida for more than $3,000,000 and a yacht for approximately $700,000, both for the defendant's exclusive use.[3] See id. In addition, other third parties have made significant payments for the benefit of the defendant and his family. For example, in recent years, one of the defendant's proposed suretors, identified herein as Suretor C, made an approximately $40,000 tuition payment to a private school for one of the defendant's children, while another third-party company made a similar tuition payment. See id. Thus, the government asserted, the defendant did have access to significant assets held in the names of third parties that could facilitate his flight. See id.

More importantly, the government noted that the defendant did not need significant assets to get in a car and flee across the border to Mexico, which he could likely cross without travel documents. See id. at 7. Thus, even without his access to significant assets held by third parties, the defendant would be able to flee the United States. Once in the Mexico, the government contended, the defendant could then rely on his extended family members or "his web of former corrupt officials who[m] he worked with [and] who[m] are co-conspirators in this case" or members of the Sinaloa Cartel to shield him from capture. Id.

_____

[3] Although a rental contract was signed for the defendant and his family to inhabit this real estate property, the government's investigation to date has revealed only two monthly rental payments during a four-year period, reflecting that the defendant and his family may have lived in this multi-million dollar home largely rent-free. The government's investigation has further revealed that, when this real estate property was sold in approximately 2016, the defendant ultimately received the proceeds from the sale, despite holding no ownership interest in the third-party company that originally purchased the real estate property.

4

The government indicated that fugitives from justice in Mexico are often able to rely on such legitimate and illegitimate networks to avoid capture in Mexico.  See id.

The government then explained the significant deficiencies in the defendant's application.  See id.  It noted that it had been attempting to contact one of the defendant's suretors, Suretor C, for over a month without success.  See id. at 8.[4]  The government further noted that the annual income of Suretor D and Suretor G, two of the defendant's additional suretors, at $60,000 and $25,000 per year, respectively, was insufficient to support or meaningfully satisfy a bond of $1,000,000.  See id.

As to the remaining suretors, the government highlighted that they had no financial stake in the proposed bond, which, the government explained, absolved the suretors of any financial obligation in the event that he fled, by including his real estate property valued at $1,200,000 to secure the proposed bond of $1,000,000.  As the government articulated, the government will seek to forfeit this real estate property upon the defendant's conviction at trial.  See id. at 9.  Practically speaking, the forfeiture of this real estate property would satisfy the proposed bond of $1,000,000, and alleviate the suretors of any financial obligation.  See id.  Indeed, for at least some of the proposed suretors, this financial calculus appeared critical to their willingness to act as suretors.  One of the defendant's proposed suretors, Suretor E, stated to the government that he would not sign the bond if the defendant did not post the real estate property, as he could not afford to pay a bond of $1,000,000.  See id. at 9.

Further, the government contended that the defendant's proposal to secure the bond with his real estate property offered no real incentive for the defendant to appear as required, because he would likely lose the property as a result of forfeiture proceedings in any event.  See id. at 9, 18.  As the government articulated, the defendant would be "more than comfortable walking away from that property because he knows he's going to lose it any event if he's convicted," especially considering that he faces a potential sentence of life imprisonment if convicted.  Id.

In response, the defendant argued, inter alia, that he was not a risk of flight and that his proposed combination of conditions was sufficient to ensure his future appearance before the Court.  See id. at 10-17.  In particular, the defendant noted that: (1) Suretor E and Suretor F, who had previously expressed unwillingness to sign the bond, were now willing to do so; (2)  the defendant had located additional suretors since the previous day; (3) Suretor A

---

[4] At the time of the hearing, based on its review of the suretor's travel records, the government understood that the suretor had traveled to Cancun, Mexico on January 17, 2020, and booked a return flight to the United States on January 26, 2020, but was not on the return flight.  See id.  Subsequent investigation, however, indicated that the suretor did, in fact, return to the United States on that flight.

5

had offered to secure the bond with a rental property valued at $300,000; (4) the defendant did not have access to cash; (5) the defendant would not leave his suretors "holding the bag"; and (6) the defendant did not have access to his travel documents.  See id.

The government replied that these arguments lack merit.  Specifically, based on information provided by a former U.S. Customs and Border Patrol agent (who is a current DEA agent), the government advised the Court that the defendant would likely be able to cross the border into Mexico via car without showing any travel documents.  See id. at 17. Moreover, given the limitations of electronic monitoring, the defendant could likely flee to Mexico before the government would be able to stop him.  See id. at 18.  The government further reiterated that two of the suretors, Suretor E and Suretor F, were not willing to sign the bond unless the defendant posted his real estate property, which would satisfy the bond in the event that he fled.  See id.  The government thus argued that the suretors had no financial stake in the proposed bond, as the bond would be fully satisfied by a real estate property that was likely already subject to forfeiture.  See id.  As the government summarized, "[a]ll Mr. Garcia Luna has to be willing to do is . . . flee to Mexico and give up these properties that he's going to lose anyway . . . to avoid going to jail for potentially the rest of his life."  Id.

As to the defendant's ties to the community, the government explained that, up until 2012, the defendant had spent his entire life in Mexico, and his extended family continued to reside in Mexico.  See id.  Furthermore, the government noted, his immediate family members residing in the United States are Mexican citizens, who could easily leave the United States with the defendant to avoid the defendant's potential life imprisonment.  See id. at 18-19.  Finally, the government stated that, based on its investigation, it was aware that the defendant was connected to a web of corrupt former Mexican government officials bribed by the Sinaloa Cartel and other Mexican drug cartels.  See id. at 19.  The government asserted that these former officials would facilitate the defendant's flight "to avoid a public trial where their names will come out on the record."  Id.  The government closed by reiterating that the statutory presumption of detention applied to the defendant, and that the defendant had failed to rebut the presumption with his proposed bond.  See id. at 28-29.

Thereafter, Magistrate Judge Levy denied the defendant's application for pretrial release.  See id.  Recognizing that both Pretrial Services and the government had concluded that there was no combination of conditions that would reasonably assure the defendant's future appearance as required, Judge Levy concluded that the defendant's proposed bond was insufficient.  See id. at 31.  Judge Levy stated:

> Ultimately, my view is that this package is not strong enough at this point to ensure his return to court.  And there are a number of reasons why, but I think what particularly is troubling about the package is that it relies solely on income but not on assets.  And residential assets, assets that would actually cause some kind of

6

pain to the individual that's greater than mere garnishment of wages, particularly as the Government noted after a house would have been confiscated and used to pay the amount of the bond. So that's a brief summary of my reasons I think the bond is not strong enough. I'm not saying there are no conditions that could ensure his return to court, but this bond doesn't quite do it. So that's my ruling.

Id. at 31-33.

II.      The Instant Application for Pretrial Release

The defendant now is submitting his third application for pretrial release. The proposed conditions of the bond mirror in large part those set forth in the prior application, which the Court rejected, except that the defendant now proposes to include three real estate properties owned by suretors as collateral. As detailed further herein, this application suffers both from the same defects as the earlier application and from new defects, including that at least two of the proposed suretors are no longer willing to sign the bond. In the alternative, the defendant seeks his temporary pretrial release on bond pursuant to 18 U.S.C. § 3142(i) on the basis of the COVID-19 pandemic impacting the United States. Although he contends that he falls into a high-risk category for death if he contracts COVID-19, his own submission belies that claim. For the reasons set forth below, the Court should deny the defendant's third application for pretrial release.

A.      The Defendant Poses an Unacceptable Risk of Flight

As discussed in the government's prior detention memoranda, see Exs. A, B, the defendant poses an unacceptable risk of flight and has a strong incentive to flee from the United States. The defendant faces a ten-year mandatory minimum sentence of imprisonment on each of the three counts in the indictment, all of which carry the statutory presumption for detention. See 18 U.S.C. § 3142(e)(3). The government's preliminary estimate of the defendant's range of imprisonment under the United States Sentencing Guidelines for the charged crimes is life imprisonment. The defendant has every incentive to ensure that he does not spend the rest of his life in prison by fleeing from justice.

This incentive is only further amplified by the strength of the government's evidence in this case, which, as previously set forth in the government's prior detention memoranda, is significant. Numerous cooperating witnesses, including several former high-ranking members of the Sinaloa Cartel, are expected to testify about millions of dollars in bribes paid to the defendant in exchange for his protection for its drug trafficking activities. The strength of the government's case has continued to increase since its prior filings, as the

7

government has since identified additional witnesses, who will testify at trial that the defendant agreed to assist the Sinaloa Cartel in exchange for millions of dollars in bribes.

The defendant also has strong connections to Mexico, where he had lived his entire life until 2012. The defendant and his immediate family are citizens of Mexico and could easily return; indeed, the defendant himself has done so numerous times, traveling to Mexico more than thirty times in the last five years. In addition, the defendant's flight to Mexico would neither require significant resources nor significant planning. Mexican citizens entering Mexico from the United States by vehicle or on foot are frequently not required to present a passport or other official identification to pass through an official border crossing, let alone via other means.

Moreover, the defendant has access to powerful resources in Mexico, including a host of former corrupt Mexican government officials and members of the Sinaloa Cartel, one of the world's most powerful criminal organizations, who can ensure that he is never captured. Indeed, powerful criminal actors, such as the defendant, who have access to corrupt Mexican officials and the resources of the Sinaloa Cartel have been able to evade capture or prosecution in Mexico for years. For example, Joaquin Guzman Loera, the former leader of the Sinaloa Cartel, was a fugitive in Mexico for nearly fifteen years, despite his arrest being sought for criminal prosecution both in the United States and in Mexico. Similarly, Rafael Caro Quintero, another leader of the Sinaloa Cartel, currently remains a fugitive in Mexico, despite his arrest being sought for criminal prosecution in both the United States and Mexico since 2013. These are just two of the innumerable examples of fugitives who, with the assistance of the Sinaloa Cartel and corrupt Mexican law enforcement officials, have evaded apprehension for years. There is no reason to believe that the defendant would fare any differently.

Even assuming that the defendant determined that the risk of capture by Mexican law enforcement officials remained too high, he would still have a strong incentive to flee to Mexico and then, with the assistance of the powerful resources of former corrupt Mexican officials and the Sinaloa Cartel, travel to another country, one without an extradition treaty to the United States. It should also be noted that the Sinaloa Cartel and, in particular, such Mexican officials have strong incentives to ensure the defendant's flight is successful, and thus avoid the public disclosure of these criminal acts at trial. If the defendant were released and successfully traveled to Mexico, it is likely that he would never face justice in a United States courtroom.

As a result, the government respectfully submits that there are no combination of conditions that can reasonably assure the defendant's future appearance before Judge Cogan, a position concurred in by Pretrial Services.

8

B.     The Defendant's Proposed Bond Conditions are Insufficient

Even if the Court declines to find that there is no combination of conditions that could reasonably assure the defendant's future appearance, it should nonetheless conclude that the combination of conditions presented by the defendant are insufficient.  In his application, the defendant proposes that the Court release him on a bond of $2,000,000 secured by: (i) a real estate property owned by the defendant valued at approximately $1,200,000; (ii) seven financial suretors, referred to herein as Suretor A, Suretor B, Suretor C, Suretor D, Suretor E, Suretor F and Suretor G; (iii) two real estate properties owned by Suretor A, in which he purportedly has approximately $1,200,000 in equity value; (iv) a real estate property owned by Suretor C, in which he purportedly has approximately $175,000 in equity value; (v) a real estate property owned by Suretor D, in which he purportedly has approximately $91,000 in equity value; and (vi) the defendant's wife, son and daughter as moral suasion suretors.

As set forth below, Suretor C's attorney and Suretor G have informed the government that they are not, in fact, willing to sign the bond; thus, they should not be considered as part of this bail package.  As for the remainder of the bail package, the government has significant concerns with these proposed bond conditions, and it respectfully urges the Court to conclude that this combination of conditions is insufficient to ensure the defendant's continued appearance before Judge Cogan.

i.     Real Estate Property

As the government previously explained in its memorandum dated February 27, 2020, see Exhibit B, the real estate property owned by the defendant likely will be subject to forfeiture in this matter.  As a result, it is highly unlikely to secure the defendant's future appearance, and is not sufficient collateral to secure a bond for the defendant's pretrial release. See 18 U.S.C. § 3142(g)(4) ("In considering the conditions of release . . ., the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."); cf. United States v. Hill, No. 10–CR–00191–A, 2011 WL 5403276, at *8 (W.D.N.Y. Nov. 7, 2011) (denying defendant's request for pretrial release on grounds that property defendant proposed to post as security for his appearance was named as subject to forfeiture in his indictment).

Specifically, upon the defendant's conviction at trial, the government intends to seek a multi-million dollar forfeiture order against the defendant, which will dwarf the value of this real estate property.  As a result, collateralizing this real estate property provides the defendant with no real incentive to remain in the United States—if he flees, the property will be forfeited; if he stays, the property will be forfeited.  The defendant has no incentive to

9

remain in the United States to maintain temporary ownership of real estate property he will likely lose in any event.[5]  The government raised these same concerns in the defendant's prior application for pretrial release, which the Court denied.  See Dkt. No. 30 at 18 ("[T]he properties that Mr. Garcia Luna is offering to put up are meaningless.  They offer no assurance here that he's going to show up because those properties are going to be subject to forfeiture in any event.").  Courts have previously concluded that properties potentially subject to forfeiture do not constitute appropriate collateral for pretrial bonds.  See United States v. Baig, 536 F. App'x 91, 93 (2d Cir. 2013) (upholding district court's denial of application for pretrial release and noting that the "district court was legitimately concerned that two of the properties [the defendant] offered to secure bail were alleged by the Government to . . . be subject to forfeiture").

            The collateralizing of this real estate property not only provides little incentive for the defendant to stay in the United States, but it minimizes the financial exposure of the suretors under the terms of a bond.  Practically speaking, if the defendant flees, the government will forfeit the defendant's $1.2 million property, which would leave only $800,000 of the bond remaining to be satisfied.  As discussed below, that remaining $800,000 would be satisfied by the property owned by Suretors A and B (who lack sufficient moral suasion over the defendant).  Thus, although the remaining suretors are technically liable under the bond, in effect, they face no financial loss if the defendant flees; they do not risk the kind of financial "pain" that Magistrate Judge Levy said should be required of suretors here.  Ex. D at 32.  That minimal financial exposure appears to have contributed to at least one suretor's willingness to sign the earlier proposed bond.  Indeed, during the defendant's prior application for pretrial release under a bond of $1,000,000, Suretor E advised the government that he would not be willing to sign as a suretor on the bond without the defendant's property securing the bond as collateral, because doing so would expose him to real financial hardship that he could not afford.  It is unclear how many, if any, of the defendant's proposed suretors would be willing to sign as suretors on a bond of $2,000,000 without his real estate minimizing their actual risk. The government previously raised this serious defect in the bail package before Magistrate Judge Levy during the prior application for pretrial release, and it continues to be a serious defect here.  See Dkt. No. 30 at 26, 29.  To avoid potentially spending the rest of his life in jail, the defendant need only be willing to give up one of his properties, which is likely subject

---

[5] It should further be noted that the defendant's future ownership interest in this real estate property is unclear.  Indeed, the government has been contacted by counsel for the defendant's company representing that they are in the process of selling real estate property located at 2980 NE 207th Street, Unit 507, Aventura, Florida.  Based on the information provided by defense counsel to the government, that is the only the property the defendant owns worth $1.2 million.  It thus appears that the property the defendant's company is seeking to sell is the same property the defendant seeks to use to collateralize his bond.  If that is correct, that property is unavailable to serve as collateral for his bond.  See Exhibit F.

to forfeiture in any event, and one property owned by Suretor A and Suretor B.  As discussed below, those conditions are not sufficient to ensure the defendant's appearance before the court.

      ii.      <u>Suretor A and Suretor B</u>

      The defendant has proposed Suretor A and Suretor B, a married couple, as financially responsible individuals who will secure the bond of $2,000,000 with two real estate properties, in which they collectively have approximately $1,200,000 in equity value.[6]  These properties cannot themselves satisfy a bond of $2,000,000, and the remaining suretors, as detailed below, are either unwilling or unable to endure the financial exposure that would be required to satisfy the remainder of the bond.

      More importantly, however, Suretor A and Suretor B have only a tenuous relationship with the defendant.  Although Suretor A worked with the defendant approximately fifteen years ago, Suretor A has not seen the defendant in two years, and, prior to that, only saw the defendant a handful of times in the prior six years.  Suretor B did not meet the defendant until 2010; since then, she has only seem him a handful of times, and she likewise has not seen him in the last two years.  Moreover, both Suretor A and Suretor B reside in Utah, far away from the area that the defendant has historically resided (<u>i.e.</u>, Florida) or where the defendant proposes to reside upon his pretrial release (<u>i.e.</u>, Washington, D.C.), which makes them unlikely to be able to ensure the defendant will show up to court.

      Given the tenuousness of this relationship, the lack of recent contact, and the physical distance, the government does not believe that Suretor A and Suretor B can exercise the necessary moral suasion over the defendant to ensure that he returns to Court, rather than flees the United States.  <u>See</u> <u>United States v. Martinez</u>, 151 F.3d 68, 71 (2d Cir. 1998) (noting that suretires are assessed for "their ability to exercise moral suasion" over the defendant, "should he decide to flee").  In <u>United States v. Batista</u>, 163 F. Supp. 2d 222 (S.D.N.Y. Apr. 10, 2001), the district court discussed this necessity, stating that, "[i]n addition to the requirement of financial responsibility, a defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial."  <u>Id.</u> at 224.  "Appropriate factors to consider when weighing whether a proposed suretor exercises moral suasion vary from case to case, but may include the strength of the tie between the suretor and defendant (i.e. family or close friend, close or estranged), the defendant's roots in the community, and the regularity of contact between suretor and defendant."  <u>Id.</u>  Here, Suretor A and Suretor B have not seen the defendant in two years, and they do not even live in the same time zone, let

---

      [6] Notably, one of these two properties is a rental income property, which, as Magistrate Judge Levy noted at the prior detention hearing, does not provide the requisite financial incentive that a primary residence would.  <u>See</u> Ex. D at 24-25.

alone the same community as the defendant.  They cannot exercise the necessary moral suasion to ensure the defendant returns to court.  The willingness of Suretor A and Suretor B to secure the bond with their real estate properties, one of which is a rental property, does not alter that calculus.  See United States v. Rodriguez, 84 Cr 841, 1984 WL 1380, at *2 (S.D.N.Y. Dec. 27, 1984) ("There is absolutely no showing on the record before this Court that the Florida real estate belonging to a corporation which is held by a cousin-in-law of the defendant will in any way serve as a catalyst to aid the appearance of the defendant when wanted.").

      iii.       Suretor C

      The defendant submits that Suretor C is a financially responsible individual who is willing to secure his bond with a real estate property in which Suretor C holds approximately $175,000 in equity value.  As an initial matter, the government was advised on March 26, 2020, by an attorney representing Suretor C that Suretor C is unwilling to serve as a suretor on the defendant's bond, much less secure the bond with his own real estate holdings.  See Mar. 26, 2020 Email, attached herein as Exhibit E.

      Even if Suretor C were willing to serve as a suretor on the defendant's bond, the government would have significant concerns.  To begin with, the government has been attempting to speak with Suretor C since January 2020 without success.  In connection with the defendant's previous applications for pretrial release, the government attempted to interview Suretor C, again without success.  It therefore has not been able to gather critical information regarding his circumstances, whereabouts or relationship with the defendant to assess his suitability as a suretor.  Second, Suretor C cannot meaningfully satisfy a $2,000,000 bond, or any significant portion thereof.  His reported annual income in 2018 was $45,000, all of which apparently was derived from his employment by the defendant.  Given that the defendant has been incarcerated and his businesses have ceased operations, it is unclear whether Suretor C has a present source of income.  Although the defendant represents that Suretor C has a $175,000 equity stake in a real estate property, the financial records submitted by the defendant do not substantiate that representation, only reflecting that Suretor C has paid approximately $6,000 in principal on a mortgage of approximately $330,000.  Moreover, the financial records appear to reflect that Suretor C has less than $3,000 in his bank account.  Suretor C is clearly not financially capable of satisfying a bond of $2,000,000, or any meaningful portion thereof.  Indeed, as his attorney represented to the government, Suretor C "is of minimal assets and in no position to cosign any bond for Mr. Luna."  Ex. E.

      Finally, it should further be noted that Suretor C appears to have been an employee of the defendant for the last seven years, and he has derived his entire livelihood from the defendant during that time period.  Given this significant power imbalance, it does not appear that Suretor C would be able to exercise the necessary moral suasion over the defendant to ensure that the defendant continued to appear before the Court.  See United States v. Collazo, 90 CR 824, 1991 WL 89637, at *4 (S.D.N.Y. May 21, 1991) (denying application

12

for pretrial release and noting that "there was now showing that [the suretor] has the sort of relationship with and power of moral suasion over [the defendant] that would give a great deal of weight to his willingness to supervise [the defenadnt's] release").  Indeed, this power imbalance raises significant concerns that Suretor C could be directed or pressured to sign a bond for the defendant in order to ensure his financial livelihood.

> iv.     Suretor D

The defendant submits that Suretor D is a financially responsible individual who is willing to secure his bond with a real estate property in which Suretor D holds approximately $91,000 in equity value.  As an initial matter, Suretor D has an annual income of approximately $57,000 and is thus unable to meaningfully satisfy a bond of $2,000,000, or any significant portion thereof.  Although the defendant represents that Suretor D has $91,000 in equity value in the proposed real estate property, the financial records provided by the defendant reflect that Suretor D has paid only interest and no principal on a mortgage of approximately $350,000.  The financial records also appear to reflect that Suretor D has approximately $3,000 in his bank account.  Suretor D is clearly not financially capable of satisfying a bond of $2,000,000, or any meaningful portion thereof.  The government has made repeated unsuccessful attempts to contact Suretor D in connection with the defendant's latest application for pretrial release, and has not been able to confirm his willingness to serve as a suretor on a bond of $2,000,000 or to secure that bond with his residence.

It should further be noted that Suretor D has had only minimal contact with the defendant.  Indeed, in an interview with the government in connection with his previous bail application, Suretor D advised that he had met the defendant no more than ten times in his life, and has not seen the defendant for approximately two years.  The only connection to the defendant appears to be that Suretor D has been an employee of their restaurant for several years, and thus has derived his entire livelihood from them during that time period.  Given this significant power imbalance and the only tenuous relationship to the defendant, it does not appear that Suretor D would be able to exercise the necessary moral suasion over the defendant to ensure that the defendant continued to appear before the Court.  See Collazo, 1991 WL 89637, at *4.  Indeed, this power imbalance raises significant concerns that Suretor D could be directed to or pressured to sign a bond in order to ensure his financial livelihood.

> v.     Suretor E and Suretor F

The defendant has also proposed that Suretor E and Suretor F, a married couple, constitute financially responsible individuals who are willing to sign the defendant's bond for $2,000,000.  However, the government's prior interviews of Suretor E and Suretor F have revealed that they are unwilling to sign a bond that would subject them to significant financial exposure, if the defendant fled.  Specifically, in connection with the defendant's prior

13

application for pretrial release, the government interviewed Suretor E and Suretor F. During his interview, Suretor E advised the government that he was only willing to sign as a suretor on a proposed bond of $1,000,000 if the bond would first be secured by the defendant's real estate property valued at $1,200,000, because he himself could not materially satisfy a bond of $1,000,000. See Dkt. No. 30 at 9 ("And in fact, when we spoke to [Suretor E] this afternoon he indicated that if this property, Mr. Garcia Luna's property was not being put up, he would not sign this bond because he said frankly I don't have $1 million to pay."). Suretor F similarly advised the government that they would be unable to satisfy a bond of $1,000,000, stating that she had no way to satisfy a bond of $1,000,000. The government has unsuccessfully attempted to confirm whether Suretor E and Suretor F are willing to serve as suretors on a bond of $2,000,000. However, given that the proposed bond here is twice the amount previously proposed and that, as previously discussed, the government submits that the defendant's real estate property does not constitute appropriate collateral to secure the bond, the government expresses significant skepticism that Suretor E and Suretor F would be willing to sign as suretors on a bond that would actually subject them to significant financial exposure. Notably, the defendant's proposed bond does not require Suretor E or Suretor F to secure the bond with any property.

vi.      <u>Suretor G</u>

The defendant has proposed that Suretor G constitutes a financially responsible suretor who can secure the defendant's proposed bond of $2,000,000. However, on March 27, 2020, Suretor G informed the government that she is unwilling to sign the bond. In any event, the financial records provided by the defendant belie the claim that she has sufficient assets to secure the bond. Suretor G reported an annual income of $25,000. She has no ability to meaningfully satisfy even a portion of such a bond.

Moreover, Suretor G appears to have served as a waitress at a restaurant owned by the defendant and his wife for the last eight years, and thus has derived her entire livelihood from the defendant and his family during that time period. As with Suretor C and Suretor D, with this significant power imbalance, it does not appear that Suretor G would be able to exercise the necessary moral suasion over the defendant to ensure that he returned to court. See Collazo, 1991 WL 89637, at *4. Indeed, this power imbalance raises significant concerns that Suretor G could be directed or pressured to sign a bond to ensure her financial livelihood.

Finally, the government notes that, when it initially contacted Suretor G to inquire as to her willingness to sign the proposed bond, Suretor G advised the government that she was not even aware of the proposed bond or its terms or conditions.

14

vii.        Moral Suasion Suretors

The defendant proposes that his wife, his son and his daughter will exercise moral suasion and ensure that the defendant returns to Court. The government respectfully disagrees. These proposed suretors are the defendant's immediate family members and their interests are inextricably intertwined with his. They have every incentive to flee with the defendant across the border to Mexico and thereby ensure that the defendant does not spend the rest of his life in prison. They have no incentive to ensure that the defendant continues to return to Court, if that path will result in him serving a minimum of ten years in prison and a maximum of life.

C.        The Defendant Should Not Be Temporarily Released from Custody

The defendant also seeks temporary release from custody because, he claims, he falls within a high-risk category for contracting COVID-19, a respiratory illness that can spread from person to person. Under 18 U.S.C. § 3142(i), the Court may "permit the temporary release of [a] person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." Certain extreme medical circumstances may present "compelling reasons" warranting a highly circumscribed release. For example, the Honorable Jack B. Weinstein agreed to the release of Colombo family captain Gregory Scarpa, when that defendant was terminally ill with AIDS, was not expected to live until trial and his medical condition could not be managed appropriately by prison medical facilities. United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993). Even in those extreme circumstances, the court conditioned release on the defendant being confined to a hospital under 24-hour guard of the United States Marshal Service, to be reimbursed by the defendant's family. Id. at 92.

As of March 27, 2020, there is one confirmed case of COVID-19 at the Metropolitan Detention Center ("MDC"), where the defendant is detained, and the facility is now under quarantine. According to information received from the Bureau of Prisons, the defendant is currently housed in a cell with access to hot water and soap. However, the Bureau of Prisons has implemented national measures to mitigate the spread of COVID-19 within prisons. See Federal Bureau of Prisons COVID-19 Action Plan, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.

These measures, which have been implemented at the MDC, include the following:

- Suspension of all social and legal visits: Social visits and legal visits have been suspended for 30 days, with case-by-case accommodations for

15

attorney visits and legal calls.[7]   Inmates will be provided additional inmate telephone minutes each month.

- Inmate movement:  All inmate facility transfers have been suspended for 30 days, with exceptions permitted for forensic studies or medical or mental health treatment.

- Screening and testing of inmates:  All newly-arriving Bureau of Prisons inmates are screened for COVID-19 exposure risk factors and symptoms.  Inmates with exposure risk factors are quarantined.  In addition, inmates exhibiting flu-like symptoms are isolated (either to single rooms or with other patients) and tested for COVID-19 in accordance with local health authority protocols.

- Modified Operations:  The Bureau of Prisons is implementing modified operations nationally to maximize social distancing and limit group gatherings in Bureau of Prisons facilities, among other modifications specific to each facility.

In addition, counsel at the MDC, after consulting with the relevant staff, have advised the government that inmates incarcerated at the MDC, including the defendant, are permitted to take additional steps to self-seclude by remaining in their cells.  The Bureau of Prisons is monitoring the status of the COVID-19 virus closely and is taking emergency steps to ensure the safety of its staff, inmates and the public.

The defendant claims that he is "at a high risk of death," if he contracts COVID-19, noting that "the two groups of people at higher risk of contracting and succumbing to COVID-19 are adults over 60 years old and people with chronic medical conditions."  Dkt. No. 31 at 4-5, Ex. L. at 4.  The defendant falls into neither category.  He is 51 years old and does not have a chronic medical condition.  The defendant does provide a doctor's note representing that, five years ago, he took medication for several weeks for a respiratory condition caused by exposure to air conditioning, but this passing illness five years ago does not constitute an ongoing chronic medical condition.[8]  See Dkt. No. 31 at Ex. K.  Simply put, the defendant is not uniquely situated with respect to the risk of infection of COVID-19, and

---

[7]   In his application, defense counsel does not represent that he has unsuccessfully attempted to visit the defendant at the MDC.

[8] The defendant also claims that he suffered from respiratory issues in 2019, but provides no evidence to substantiate that claim and has never previously informed the government of any respiratory or other health issues.

his personal circumstances do not overcome the significant risk of flight he would pose if released.

All district judges within the Eastern District of New York that have addressed the question of bond based on COVID-19 have thus far concluded that these circumstances do not justify release. This case is similar to United States v. Hamilton, 19 CR 54 (MRB) (E.D.N.Y.), where a 61-year-old defendant with a history of heart disease, stroke, dementia and lupus made a bond application pursuant to 18 U.S.C. § 3142(i), citing the risk of COVID-19 at the MDC. In denying that application, the Honorable Margo K. Brodie noted that the defendant had not had any recent respiratory problems or other health issues that placed him in a high-risk category. Judge Brodie explained that "MDC has taken measures in the same fashion that the Court has and both local, state and federal governments have. . . . [N]othing has changed, I appreciate that everyone is concerned and that your client is scared like a lot of people are but the MDC and the [Bureau of Prisons] generally has taken a number of steps to ensure the safety of all inmates during this time." Dkt. No. 44 at 3, 5. Similarly, in United States v. Cohen, et al., 17 CR 544 (NGG), Judge Garaufis denied, without a hearing, an application to reduce a sentence in light of the risk of COVID-19 at a facility operated by the Bureau of Prisons by an inmate who was not of advanced age and did not fall into a high-risk category. See Mar. 25, 2020 Dkt. Entry.

In United States v. Campbell, 18 CR 467 (LDH) (E.D.N.Y.), the Honorable LaShann DeArcy Hall denied a motion for bond filed by a defendant who had been convicted after trial of attempted possession of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(C), and had been detained pending sentence given, among other things, various violations of his supervised release. Judge DeArcy Hall noted that the defendant did not fall into a high-risk category because he did not "suffer from any medical conditions that make him particularly susceptible to contracting the virus and, at 53, his age is also not particularly concerning." See March 25, 2020 Dkt. Entry.

Similarly, in United States v. Pitts, 19 CR 502 (LDH) (E.D.N.Y.), Judge DeArcy Hall denied a motion for bond filed by a defendant charged with narcotics trafficking conspiracy and firearms-related offenses. The defendant had previously been detained, despite presenting an application for pretrial release with multiple suretors, after Magistrate Judge Steven Tiscione found the defendant to constitute a risk of flight and a danger to the community. See Dkt. Nos. 2, 3. After the defendant applied for temporary release under 18 U.S.C. § 3142(i) due to the COVID-19 pandemic, Judge DeArcy Hall denied the application, despite the defendant's advanced age of 61 years-old, ten years older than the defendant in the instant matter.

In fact, one instance cited by the defendant where a defendant was permitted to remain at liberty in the Eastern District of New York due to concerns over COVID-19, the defendant was subsequently remanded, after violating the conditions of his release.

17

Specifically, in United States v. Raihan, 20 CR 68 (BMC) (E.D.N.Y.), Magistrate Judge James Orenstein permitted a defendant, who violated the terms of his pretrial release by testing positive for drug use while on home detention, to remain at liberty.  In doing so, Judge Orenstein stated that "[t]he more people we crowd into [the MDC] the more we're increasing the risk to the community.  I'm really hesitant to respond to drug usage with incarceration given that risk." Dkt. No. 20 at 10.  The assigned Pretrial Services Officer opined: "I don't think [continuing pretrial release is] an added danger to the community.  My concern is for his [the defendant's] health and well being." Id. at 10-11.  The day after his release, the defendant in that case promptly cut off his GPS monitoring bracelet, was rearrested and then ordered detained by Magistrate Judge Lois Bloom.  See Dkt. Nos. 21-22.  In any event, a revocation of supervised release based on a failed drug test is not analogous to the instant defendant, who is facing a statutory mandatory minimum of ten years in prison for his corrupt assistance to one of the world's most powerful criminal organizations.[9]

The only other cases cited by the defendant in support of his pretrial release are easily distinguishable.  For example, in United States v. Stephens, 15 CR 95 (AJN) (S.D.N.Y.), the Honorable Alison J. Nathan ordered the release of a defendant who had been accused of violating the terms of his supervised release, citing "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic." Dkt. No. 2798.  However, in Stephens, the strength of the evidence cited in support of the defendant's detention had weakened, and the defendant's ability to prepare for his upcoming violation hearing, scheduled for just a week later, would have been impaired by remaining in custody.  By contrast, here, the strength of the government's case has only improved and there is no upcoming hearing creating a temporal exigency for his release.  Moreover, the defendant here does not face potential punishment stemming from a violation of supervised release, but from serious narcotics trafficking conspiracy charges that carry a ten-year mandatory minimum and a potential life sentence— his incentive to flee is therefore significantly greater than that in Stephens.[10]

---

[9] Although not cited by the defendant, the government notes that, in United States v. Eli, 20 CR 50 (E.D.N.Y.), this Court permitted the defendant to be temporarily released from custody pursuant to 18 U.S.C. § 3142(i) due to concerns of COVID-19.  However, in that case, the defendant was suffering from an extremely serious chronic medical condition that clearly placed him into a high-risk category if he contracted COVID-19.  That is simply not the case here.

[10] The defendant also claims that in United States v. Ramos, 20 CR 04 (ER) (S.D.N.Y.), "the threat of coronavirus led [the district court] to release a formerly detained individual on bail." Dkt. No. 31 at 9.  However, that is not correct, as the defendant in that case was never detained.  In Ramos, the defendant was arrested on November 12, 2019, and released on a $100,000 bond.  See Dkt. No. 4.  On March 4, 2020, the defendant's bond was revoked and his conditions of release were modified to home confinement.  See Dkt. No. 16.

18

While the government recognizes the seriousness of COVID-19, the risk of potential exposure to COVID-19 in a Bureau of Prisons facility cannot alone form the basis to release a prisoner who moves for pretrial release, particularly, in a case where, as here, the defendant does not fall into a high-risk category.  Accordingly, the defendant has not presented a "compelling reason" for temporary release under 18 U.S.C. § 3142(i).  Given that the defendant poses an extremely serious risk of flight, the permanent order of detention in this matter should remain in effect.

III.   Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's third application for pretrial release and continue the existing permanent order of detention.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:      /s/
Michael P. Robotti
Ryan Harris
Erin Reid
Assistant U.S. Attorneys
(718) 254-7000

cc:   Defense Counsel (by email)

---

On March 19, 2020, the defendant's conditions of release were again modified to require the defendant to allow Pretrial Services to access his electronic devices.  See Dkt. No. 21.

19