

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MPR:EMR/RPH
F. #2019R00927

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 10, 2019

<u>By ECF</u>

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Genaro Garcia Luna
              <u>Criminal Docket No.19-CR-576 (BMC) (E.D.N.Y.)</u>

Dear Judge Cogan:

        The government respectfully submits this letter in support of its motion for a permanent order of detention for the defendant Genaro Garcia Luna.[1]  The defendant held the position of Secretary of Public Security in Mexico from 2006 to 2012.  The defendant abused that public position, and other positions of public trust that he previously held, to help the Sinaloa Cartel traffic cocaine into the United States, including New York City.  In exchange for multimillion-dollar bribes, he permitted that Cartel—one of the largest and most violent criminal organizations in the world—to operate with impunity in Mexico.  To this day, he profits from his crimes, and he has lied about them to the United States in an attempt to secure U.S. citizenship.

        In connection with his crimes, on December 4, 2019, a grand jury sitting in the Eastern District of New York returned an indictment charging the defendant with: (i) conspiracy to distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841 and 846; (ii) cocaine importation conspiracy, in violation

---

      [1] Yesterday, the government filed a letter requesting that this case be reassigned from Judge Raymond J. Dearie to this Court pursuant to Rules 50.3.2 and 50.4 of the Guidelines for Division of Business Among District Judges, because this case is presumptively related to <u>United States v. Joaquin Guzman Loera, et al.</u>, 09-CR-466 (S-4) (BMC).  To the extent that the Court decides not to reassign the case, the government respectfully requests that this letter be forwarded to Judge Dearie for consideration.

of Title 21, United States Code, Sections 952 and 963; (iii) international cocaine distribution conspiracy, in violation of Title 21, United States Code, Sections 959 and 963; and (iv) making false statements, in violation of Title 18, United States Code, Section 1001. That same day, U.S. Magistrate Judge Ramon E. Reyes, Jr. issued a warrant for the defendant's arrest. Federal agents arrested the defendant yesterday in Dallas, TX. He is scheduled to make his initial appearance on a removal complaint in the Northern District of Texas today, and the government expects that he will be transported to the Eastern District of New York and arraigned on the indictment in the coming weeks. For the reasons set forth below, at his arraignment, the Court should enter a permanent order of detention, as no combination of conditions can secure the defendant's appearance at trial.

I.      Procedural and Factual Background

        A.      Overview

                Between 2001 and 2012, the defendant was a high-ranking official in the Mexican government.[2] Specifically, from 2001 to 2005, the defendant was the head of Mexico's Federal Investigation Agency. From 2006 to 2012, the defendant served as Mexico's Secretary of Public Security and, in that capacity, controlled Mexico's Federal Police Force. While holding public office in Mexico, the defendant used his official positions to assist the Sinaloa Cartel, a notorious Mexican drug cartel, in exchange for multimillion-dollar bribes.

                In 2012, the defendant relocated from Mexico to Miami, Florida. Following his relocation to the United States, the defendant obtained lawful resident status. In 2018, he submitted an application for naturalization to the Department of Homeland Security. In that paperwork, which investigators in the Eastern District of New York have reviewed, the defendant made materially false statements denying his past criminal conduct.

        B.      Background on the Sinaloa Cartel

                From approximately 1989 to the present, the Sinaloa Cartel has been one of the world's largest and most prolific drug trafficking organizations. At various points during this time period, among others, Joaquin Archivaldo Guzman Loera, also known as "Chapo Guzman," Ismael Zambada Garcia, also known as "Mayo Zambada," Jesus Zambada Garcia, also known as "Rey Zambada," Rafael Caro Quintero and Arturo Beltran Leyva, were leaders

---

[2] As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention. See infra Section II; United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000); United States v. Ferranti, 66 F. 3d 540, 542 (2d Cir. 1995). As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all of the evidence of which the government is aware or will seek to introduce at trial.

of the Sinaloa Cartel.  From at least 2001 until 2016, Chapo Guzman and Mayo Zambada were the preeminent leaders of the Sinaloa Cartel.

In 2016, Mexican authorities captured Chapo Guzman in Mexico.  The following year, Mexico extradited him to the United States to face charges.  In 2019, following a four-month jury trial in the Eastern District of New York, a jury convicted Chapo Guzman of leading a Continuing Criminal Enterprise, in violation of Title 21, United States Code, Section 848, and related charges.  See Guzman Loera, 09-CR-466.  Since 2016, among others, Mayo Zambada, Caro Quintero, and several of Chapo Guzman's sons, including Ivan Archivaldo Guzman Salazar and Jesus Alfredo Guzman Salazar, have led the Sinaloa Cartel. Notably, Mayo Zambada, who paid bribe payments to the defendant and is one of his coconspirators, has been a continuous leader of the Sinaloa Cartel over the past several decades.

During the entire time it has been in operation, the Sinaloa Cartel has directed a large scale narcotics transportation network involving the use of land, air and sea transportation assets, shipping multi-ton quantities of cocaine from South America, through Central America and Mexico, and finally into the United States.  In addition, the Cartel has manufactured and imported into the United States multi-ton quantities of heroin, methamphetamine and marijuana.  At the same time that it has maintained this international and multibillion-dollar drug trafficking empire, the Cartel has engaged in horrific violence in order to protect against challenges from rivals, to fight for territory and to silence those who would cooperate with law enforcement.

The Sinaloa Cartel has used corruption of public officials, including bribes to the defendant while he was a high-ranking Mexican official, as a means and method of achieving the goals of its drug trafficking enterprise.  In exchange for these bribes, the Sinaloa Cartel obtained, among other things, safe passage for its drug shipments, sensitive law enforcement information about investigations into the Cartel and information about rival drug cartels.  During the time that the defendant protected the Sinaloa Cartel in exchange for bribes, the Sinaloa Cartel, at the direction of Chapo Guzman, Mayo Zambada and other leaders, sent multi-ton drug loads to the Eastern District of New York, including Brooklyn and Queens.

C.    The Defendant's Criminal Conduct

Evidence obtained by law enforcement has revealed that, while he was a public official in Mexico, the defendant received millions of dollars in bribes from the Sinaloa Cartel in exchange for providing protection for its drug trafficking activities.  Because of the defendant's corrupt assistance, the Sinaloa Cartel conducted its criminal activity in Mexico without significant interference from Mexican law enforcement and imported multi-ton quantities of cocaine and other drugs into the United States.

Several former high-ranking members of the Sinaloa Cartel have provided a wealth of information about bribes paid to the defendant in exchange for his protection of the Sinaloa Cartel. For example, at the trial of Chapo Guzman, Rey Zambada, one of the former leaders of the Cartel and the brother of its current leader Mayo Zambada, testified about multimillion-dollar bribes that he and Mayo Zambada paid the defendant to facilitate the Sinaloa Cartel's drug trafficking operations in the mid-2000s. See Guzman Loera, 09-CR-466, Trial Tr., Feb. 20, 2019, 1102-05. Specifically, Rey Zambada testified that, on at least two occasions, he personally brought the defendant briefcases containing between three and five million dollars, in exchange for the defendant's assurance that he would assist the Sinaloa Cartel. See id. The government has interviewed numerous other cooperating witnesses who have confirmed that the Cartel paid the defendant tens of millions of dollars over several years, in exchange for the defendant's protection of the Cartel.

In addition, law enforcement officials have obtained financial records related to the defendant that reflect that, by the time the defendant relocated to the United States in 2012, he had amassed a personal fortune of millions of dollars that was inconsistent with a civil servant's salary in Mexico. These financial records reflect that the defendant continues to live off the millions of dollars in bribes that the Sinaloa Cartel paid him as part of his role in the drug trafficking conspiracy.

Further, the defendant has continued to take active steps to conceal his corrupt assistance to the Sinaloa Cartel. After moving to the United States in 2012, the defendant submitted an application for naturalization in 2018, in which he affirmatively lied about his past criminal conduct on behalf of the Sinaloa Cartel.

As noted above, on December 4, 2019, a grand jury in the Eastern District of New York returned an indictment charging the defendant with: (i) one count of conspiracy to distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841 and 846; (ii) one count of cocaine importation conspiracy, in violation of Title 21, United States Code, Sections 952 and 963; (iii) one count of international cocaine distribution conspiracy, in violation of Title 21, United States Code, Sections 959 and 963; and (iv) one count of making false statements, in violation of Title 18, United States Code, Section 1001. Federal agents arrested the defendant yesterday in Dallas, TX.

II.     The Court Should Enter a Permanent Order of Detention

        A.      Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3142 et seq., in cases where a defendant is charged with "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act," a court must presume, "subject to rebuttal by the person," that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community," if the court finds

4

probable cause to believe that the person committed such offense. 18 U.S.C. § 3142(e)(3)(A). Regardless of whether the presumption applies, such probable cause may be established by an indictment, such that there is no need for an independent judicial probable cause determination. See United States v. Contreras, 776 F.2d 51, 54-55 (2d Cir. 1985).

If a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that he does not pose a danger to the community or risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted). In any event, the government must ultimately persuade the court by a preponderance of the evidence that the defendant is a flight risk. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). Detention based on danger to the community must "be supported by clear and convincing evidence." 18 U.S.C. § 3142(f).

The Bail Reform Act lists four factors to be considered in the detention analysis whether for risk of flight or dangerousness: (1) the nature and circumstances of the offense charged; (2) the history and characteristics of the defendant; (3) the seriousness of the danger posed by the defendant's release; and (4) the evidence of the defendant's guilt. See id. § 3142(g). At a detention hearing, the government may proceed by proffer, Ferranti, 66 F.3d at 541; United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. See [ ] LaFontaine, 210 F.3d at 131. This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." United States v. Acevedo-Ramos, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in LaFontaine, 210 F.3d at 131). Indeed, § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n. 7 (2d Cir. 2004).

Courts in this district have been troubled by private jail proposals in lieu of detention, in recognition of the Second Circuit's dim view of alternatives to confinement. See, e.g., United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (internal quotation marks and citations omitted) (private jail proposals "at best elaborately replicate a detention facility without the confidence of security such a facility instills"); United States v. Bruno, 14-CR-556 (WKF), 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) (noting that even if a defendant had the financial capacity to "replicate a private jail within his own home," among other things, the Court was not convinced that such "disparate treatment based on wealth is permissible under

the Bail Reform Act"). Indeed, a recent Southern District of New York decision denied a defendant's proposal for a "very expensive form of private jail or detention," holding that "it is contrary to underlying principles of detention and release on bail that individuals otherwise ineligible for release should be able to buy their way out by constructing a private jail, policed by security guards not trained or ultimately accountable to the government, even if carefully selected." United States v. Zarrab, 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016) (quoting Borodin v. Ashcroft, 136 F. Supp. 2d 125, 134 (E.D.N.Y. 2001)).

B.    A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure the defendant's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, the drug trafficking offenses charged in Counts One through Three, each of which prescribes a mandatory minimum term of imprisonment of ten years, carry the presumption for detention. See id. Accordingly, the defendant bears the initial burden of showing that he is not a flight risk. For the reasons set forth below, he cannot sustain that burden.

C.    The Defendant Poses a Significant Risk of Flight

The defendant poses a significant risk of flight. The defendant faces a ten-year mandatory minimum sentence of prison on Counts One through Three of the indictment. Moreover, assuming he falls within a Criminal History Category I, the government's preliminary Guidelines estimate for the charged crimes is life imprisonment. As noted above, the evidence supporting these serious charges is strong, including testimony from multiple cooperating witnesses regarding the defendant's bribe payments from the Sinaloa Cartel— testimony corroborated by financial records showing the defendant's personal wealth. Given the substantial jail time the defendant faces upon conviction, he has a strong incentive to flee the jurisdiction. See United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond to Mexico); United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses whose maximum combined terms of 105 years' imprisonment created potent incentives to flee); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) ("[P]ossibility of a severe sentence" heightens the risk of flight).

Moreover, the defendant is a citizen of Mexico and has strong continuing ties to Mexico, which demonstrate his ability to flee and the significant risk that he will do so. Indeed, border crossing records reveal that the defendant regularly travels to Mexico. In 2019, he traveled there at least five times, including as recently as November 17, 2019. Over the past five years, he has traveled there more than 30 times. In total, from 2002 to the present, the defendant has traveled back and forth between the United States and Mexico at least 280 times. See Zarrab, 2016 WL 3681423, at *8 (citing the defendant's extensive international travel as one factor supporting detention); see also United States v. Seif, 2001 WL 1415034, at *2-3 (D.

6

Ariz. Nov. 8, 2001) (denying bail for a defendant who was a foreign national, had no family ties to United States, and was an experienced international traveler with substantial connections in countries that did not have extradition treaties with the United States).

        The massive wealth that the defendant accumulated from his corrupt assistance to the Sinaloa Cartel also provides him with the ability to orchestrate his flight to Mexico and sustain himself in hiding. See Zarrab, 2016 WL 3681423, at *8 (citing the defendant's "significant wealth and his substantial resources" as another factor that supported detention). In addition, the defendant has connections to high-level Sinaloa Cartel members in Mexico, as well as former high-level corrupt government officials, who are likely willing to assist him in fleeing from U.S. law enforcement and shelter him in Mexico. See Bruno, 89 F. Supp. 3d at 432 (observing, in a case involving both serious flight risk and danger to the community, that where a defendant's "alleged ties to a large criminal syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction," that favors denying bail). While the United States and Mexico have an extradition treaty, it will be extremely difficult to apprehend the defendant in Mexico if the Sinaloa Cartel and powerful former government officials shield him. Moreover, even if he is captured, extradition proceedings in Mexico may take years to complete, if the defendant contests his extradition. There is therefore a significant risk that the defendant's flight to Mexico would ensure he does not face justice in an American courtroom. Cf. Seif, 2001 WL 1415034, at *2-3 (citing the defendant's connections to countries that did not have extradition treaties with the United States as a factor supporting detention); United States v. Epstein, 155 F. Supp. 2d 323, 326 (E.D. Pa. 2001) (finding a defendant's extensive ties to Brazil, a county with which the United States has no extradition treaty, to be the "crucial factor" in denying bail for a defendant with "significant wealth").

        Although the defendant does not have a criminal history, the defendant's personal history and characteristics demand detention, and demonstrate that he is a significant flight risk. As the instant investigation has revealed, the defendant prioritized his personal greed over his sworn duties as a public servant, and assured the continued success and safety of one of the world's most notorious trafficking organizations. As the defendant's criminal conduct makes clear, he has no respect for public authority or the rule of law, and he has previously lied on government forms to avoid being held accountable for his crimes. Thus, there is no reason to believe that the defendant would obey the Court's orders or conditions of release if the Court grants bail.

        Finally, any proposed use of home detention and/or electronic monitoring in lieu of detention is insufficient here in light of the defendant's risk of flight described above. Such a proposal "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills." Orena, 986 F.2d at 632; see Zarrab, 2016 WL 3681423, at *10. Here, such an arrangement is wholly inadequate to ensure that this defendant will not flee from justice.

III.     <u>Conclusion</u>

        For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention.

                          Respectfully submitted,

                          RICHARD P. DONOGHUE
                          United States Attorney

By:       /s/
                          Michael P. Robotti
                          Ryan Harris
                          Erin Reid
                          Assistant U.S. Attorneys
                          (718) 254-7000

cc:     Defense Counsel (by email)