

| | |
|---|---|
| | **U.S. Department of Justice** |
| | *United States Attorney*<br>*Eastern District of New York* |
| MPR:EMR/RCH<br>F. #2019R00927 | *271 Cadman Plaza East*<br>*Brooklyn, New York 11201* |

February 27, 2020

<u>By Hand Delivery and ECF</u>

The Honorable Robert M. Levy
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Genaro Garcia Luna
             <u>Criminal Docket No. 19-576 (BMC)</u>

Dear Judge Levy:

      In advance of the detention hearing scheduled for February 27, 2020, the government respectfully submits this reply in opposition to the defendant's application for pretrial release dated February 25, 2020. <u>See</u> Dkt. No. 25. For the reasons detailed in the government's motion for pretrial detention dated December 10, 2019, <u>see</u> Dkt. No. 4, and as set forth below, the government respectfully submits that the combination of conditions proposed by the defendant for his pretrial release is woefully inadequate to ensure his continued appearance before Judge Cogan and that the Court should detain him pending trial.

I.      The Court Should Enter a Permanent Order of Detention

      In his application for release pending trial, the defendant has requested that the Court release the defendant on a $1,000,000 bond, secured by three "financially responsible" suretors, real estate valued at $1,200,000, and his wife as a moral suasion suretor. Dkt. No. 25 at 1. However, the attorney for two of the "financially responsible" suretors has today advised the government and defense counsel that his clients are unwilling to serve as suretors for the defendant. The remaining suretor, according to records provided by defense counsel to the government, does not have the financial resources to satisfy a $1,000,000 bond. The

defendant's proposed bond was already woefully deficient in light of the defendant's flight risk, and the current iteration cannot withstand even minimal scrutiny.

As part of this application, the defendant argues that he has overcome the statutory presumption that he is a risk of flight because: (1) he has sufficient ties to the United States; (2) he does not have the ability to flee; (3) he did not previously flee after he was publicly accused of corruption during the trial of Joaquin Guzman Loera, also known as "El Chapo," in November 2018; and (4) his pretrial detention at the Metropolitan Detention Center limits his ability to meet with counsel and adequately assist his defense. See Dkt. No. 25 at 1.

The Court should reject these arguments and deny the defendant's motion, for three reasons.  First, contrary to his assertions, the defendant has both the ability to flee and an overwhelming incentive to do so.  Second, the evidence of the defendant's crimes is significant.  Third, the defendant's proposed combination of conditions for his pretrial release —a $1,000,000 bond secured by the defendant, his wife, a suretor who is employed by the defendant with an annual income of $45,000, and real estate that is likely already subject to forfeiture in this matter—is woefully inadequate to assure his future appearance before Judge Cogan.   For all of these reasons, the Court should detain the defendant pending trial.

    A.    The Defendant Poses an Unacceptable Risk of Flight

As discussed in the government's detention memorandum, see Dkt. No. 4 at 6-7, the defendant poses an unacceptable risk of flight and has a strong incentive to flee from the United States.  The defendant faces a ten-year mandatory minimum sentence of imprisonment on each of the three counts in the indictment, all of which carry the statutory presumption for detention.  See 18 U.S.C. § 3142(e)(3).  In addition, assuming he falls within Criminal History Category I, the government's preliminary estimate of the defendant's range of imprisonment under the United States Sentencing Guidelines for the charged crimes is life imprisonment.  The defendant has every incentive to ensure that he does not spend the rest of his life in prison by fleeing from justice.  This incentive is only further amplified by the strength of the government's evidence in this case, which, as previously set forth in the government's memorandum dated December 10, 2019, is significant.  Notably, the strength of the government's case has only increased since its previous filing, as the government has subsequently identified additional witnesses who will testify at trial that the defendant agreed to assist the Sinaloa Cartel in exchange for millions of dollars in bribes.  The defendant also has strong connections to Mexico, where he lived his entire life until 2012.  The defendant and his entire family are citizens of Mexico and could easily return; indeed, the defendant himself has done so numerous times, traveling to Mexico more than thirty times in the last five years.  Moreover, the defendant has access to powerful resources in Mexico, including a host of

corrupt Mexican government officials and members of the Sinaloa Cartel, one of the world's most powerful criminal organizations, who can ensure that he is never captured.

The defendant argues that he cannot flee to Mexico because the government has seized his passport and green card. However, as the defendant well knows, Mexican citizens entering Mexico from the United States by vehicle or on foot are frequently not required to present a passport or other official identification to pass through an official border crossing, let alone via other means. The defendant also argues that he has no incentive to flee to Mexico, as he could face separate criminal charges there based on the same criminal conduct alleged here. This argument ignores the fact that powerful criminal actors, such as the defendant, who have access to corrupt Mexican officials and the resources of the Sinaloa Cartel have been able to evade capture or prosecution in Mexico for years. For example, Joaquin Guzman Loera, the former leader of the Sinaloa Cartel, was a fugitive in Mexico for nearly fifteen years, despite his arrest being sought for criminal prosecution both in the United States and in Mexico. Similarly, Rafael Caro Quintero, another leader of the Sinaloa Cartel, currently remains a fugitive in Mexico, despite his arrest being sought for criminal prosecution in both the United States and Mexico since 2013. These are just two of innumerable examples of fugitives who, with the assistance of the Sinaloa Cartel and corrupt Mexican law enforcement officials, have evaded apprehension for years. There is no reason to believe that the defendant would fare any differently.

Even assuming that the defendant determined that the risk of capture by Mexican law enforcement officials remained too high, he would still have a strong incentive to flee to Mexico and then, with the assistance of the powerful resources of corrupt Mexican officials and the Sinaloa Cartel, travel to another country, one without an extradition treaty to the United States. It should also be noted that the Sinaloa Cartel and, in particular, corrupt Mexican officials have strong incentives to ensure the defendant's flight is successful, and thus avoid the public disclosure of these criminal acts at trial. If the defendant were released and successfully traveled to Mexico, it is likely that he would never face justice in a United States courthouse.

The defendant also argues that he does not have the financial assets to flee, claiming that he has no liquid assets. Dkt. No. 25 at 4. As an initial matter, the defendant's claim of financial hardship strains credulity when he has simultaneously offered to secure his bond with real estate valued at $1,200,000 as collateral. Notably, the government's investigation has revealed that the defendant has, in addition to the aforementioned real estate, acquired multiple other real estate holdings in the last several years that, in total, are valued at nearly four million dollars. And, yet, the defendant is claiming that he does not have the financial resources to drive across the border to Mexico.

Moreover, it should be noted that the government's investigation has revealed that, over the course of several years, the defendant has used various techniques to disguise

the size of his true financial holdings, including by using shell companies and straw purchasers to acquire assets for his use. By way of example, in October 2012, while the defendant remained a Mexican official, the defendant used a Florida-based company ("Company 1") to purchase a 5,099 square-foot residence in Golden Beach, Florida for more than three million dollars, paid in cash. The defendant was not listed anywhere on the public filings for Company 1, but nonetheless moved into the Golden Beach residence upon its purchase and, subsequently acquired a private yacht, disguising his ownership interest through its acquisition via Company 1. Similarly, in 2016, the defendant used another Florida-based company ("Company 2") to pay for private school tuition for his children. The defendant was not listed anywhere on the public filings for Company 2. The government's investigation has revealed that the defendant has used this strategy for years, masking his assets and his acquisition thereof with the use of shell companies and straw purchasers.

In addition, the government's investigation has revealed that the defendant has consistently received millions of dollars in funds, both through companies with which he is publicly affiliated and through shell companies, that originate from outside the United States and Mexico. By way of example, the funds used by Company 1 to purchase the Golden Beach residence originated from a company in Panama. It is thus likely that, should he flee the United States, the defendant would be able to easily support himself and his family financially through funds originating outside either the United States or Mexico.

In light of these significant financial resources and the defendant's troubling efforts to disguise his assets, the Court should view the defendant's claim of a financial inability to flee with great skepticism, skepticism that should only be further amplified by the defendant's significant ties to the Sinaloa Cartel, a sophisticated criminal organization well-versed in techniques to disguise the movement of significant illicit funds.

The defendant also claims that he does not pose a risk of flight because he did not flee the United States after a witness testified about his corrupt assistance to the Sinaloa Cartel during the Guzman Loera trial in November 2018. As an initial matter, the defendant's criminal activities were not first publicly disclosed in November 2018, as numerous individuals have accused him of corrupt assistance to the Sinaloa Cartel for more than a decade.[1] During this same time period, the defendant continued to engage in the criminal conduct with which he is charged, despite such activity receiving public scrutiny. The fact that the defendant did not flee the United States following the Guzman Loera trial is not evidence of an innocent conscience, but rather reflective of his years-long belief that he could

---

[1] See, e.g., Mark Stevenson and Maria Verza, "Ex-Mexico Security Chief Long Haunted by Corruption Claims," AP News (Dec. 11, 2019), available at https://apnews.com/f757530103fcf1e145e985c13acee4fe (last visited Feb. 27, 2020).

engage in criminal activity with impunity and without consequence. Such brazenness and hubris should not inure to his benefit.

Finally, the defendant also raises a number of complaints about his conditions of confinement, arguing that those conditions require him to be released to assist in his defense. See Dkt. No. 25 at 4.  Conditions of a confinement are not a statutory factor to be considered under the Bail Reform Act, see 18 U.S.C. § 3142(g), and is wholly irrelevant to the Court's determination of the defendant's risk of flight. See United States v. Dettelis, No. 03CR62, 2004 WL 7332667, at *7 (W.D.N.Y. Dec. 2, 2004)  ("Defendant provides no authority for the proposition that the conditions of confinement (to the point of hindering assertion of defense) requires a pretrial detainee's release").

      B.      <u>The Evidence of the Defendant's Crimes is Strong</u>

The strength of the evidence against the defendant also weighs heavily in favor of detention.  As described in the government's memorandum dated December 10, 2019, see Dkt. No. 4, numerous cooperating witnesses, including several former high-ranking members of the Sinaloa Cartel, are expected to testify about millions of dollars in bribes paid to the defendant in exchange for his protection for its drug trafficking activities.  Among other things, these witness accounts are corroborated by the defendant's financial records, which reflect that the defendant continued to live off the millions of dollars in bribes that the Sinaloa Cartel paid him as part of his role in the drug trafficking conspiracy.  Since the defendant's arrest, the government's case has only grown stronger, as it has identified additional witnesses against the defendant and numerous additional financial records associated with him.

The defendant seeks to sow doubt in the strength of the evidence against him by attacking the credibility of Jesus Zambada Garcia, also known as "Rey Zambada," who testified during the trial of Guzman Loera. Dkt. No. 25 at 3.  At that trial, Rey Zambada testified that, on at least two occasions, he personally met the defendant at a restaurant and delivered briefcases containing between $3,000,000 and $5,000,000, in exchange for the defendant's assurance that he would assist the Sinaloa Cartel.[2]  See United States v. Guzman Loera, 09 CR 466 (S-4) (BMC), Trial Tr., Feb. 20, 2019, 1102-05.  The defendant questions the veracity of this testimony, claiming, without any apparent basis, that the Sinaloa Cartel would not have access to $100 bills in Mexico, making the alleged cash payments too bulky to deliver to the defendant. See Dkt. No. 25 at 3.  The idea that the Sinaloa Cartel—the world's largest drug trafficking organization, which exists solely to funnel drugs into the United States

---

[2] Notably, the jury in that case credited Rey Zambada's testimony, which was made under penalty of perjury and subject to vigorous cross-examination.  The jury convicted Guzman Loera based, in part, on Rey Zambada's testimony, including finding two Continuing Criminal Enterprise violations proven that were based largely on his testimony.

in exchange for billions of U.S. dollars—does not have ready access to $100 bills is absurd on its face.[3]

### C. The Defendant's Proposed Bail Package is Wholly Inadequate

Finally, as previously discussed, the Court should deny the defendant's motion for pretrial release because his proposed bond is simply inadequate to assure his future appearance before Judge Cogan. The defendant has requested to be released on a $1,000,000 personal recognizance bond secured by three financially responsible suretors, his wife as a moral suasion co-signer, and by real estate owned by the defendant worth approximately $1,200,000. As previously discussed, two of the defendant's financially responsible suretors have indicated they will not sign a bond for the defendant, and the third financially responsible suretor does not have the financial resources to meaningfully satisfy a $1,000,000 bond.

Specifically, the remaining financially responsible suretor is a long-standing employee of the defendant, who has worked at several different companies owned by the defendant and whose sources of income appear to be limited to those companies, which defense counsel maintains have ceased operations after the defendant's arrest in December 2019. As a result, the current source of this suretor's income are unclear. Moreover, it is hard to imagine what kind of financial contribution this suretor can make to the proposed $1,000,000 bond when a review of his financial records reveal that, as recently as 2018, his adjusted gross income was approximately $45,000.

In addition, the real estate that the defendant has proposed to secure the bond is highly unlikely to secure his future appearance, as it is likely subject to forfeiture in this matter. Upon the defendant's conviction at trial, the government expects to seek a multi-million dollar forfeiture order against the defendant, which will dwarf the value of this real estate. Thus, this real estate provides no additional incentive to the defendant to remain in the United States—if he flees, the property will be forfeited; if he stays, the property likely will be forfeited. The defendant is not going to remain in the United States to hold onto a piece of property that he likely will lose in any event. See 18 U.S.C. § 3142(g)(4) ("In considering the conditions of release . . . , the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation,

---

[3] The defendant also argues that it is implausible that he would meet with Rey Zambada publicly in a restaurant. To the contrary, the government expects to introduce evidence at trial, including multiple witnesses, establishing that, as part of its standard practice, the Sinaloa Cartel insisted on meeting face-to-face with corrupt officials for certain bribe payments, so that the it could ensure that the bribe payments were, in fact, being used to pay the desired official. Often times, these meetings took place in private areas of restaurants.

or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."); cf. United States v. Hill, No. 10–CR–00191–A, 2011 WL 5403276, at *8 (W.D.N.Y. Nov. 7, 2011) (denying defendant's request for pretrial release on grounds that property defendant proposed to post as security for his appearance was named as subject to forfeiture in his indictment).

II. Conclusion

   For the foregoing reasons, the government respectfully requests that the Court issue a permanent order of detention.

              Respectfully submitted,

              RICHARD P. DONOGHUE
              United States Attorney

         By: /s/
              Michael P. Robotti
              Ryan Harris
              Erin Reid
              Assistant U.S. Attorneys
              (718) 254-7000

cc: Defense Counsel (by email)