1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

2

3  -------------------------------X
                         :

4  UNITED STATES OF AMERICA,   :
                         :  19-CR-00576 (BMC-1)

5         v.            :
                         :  February 28, 2020

6  GENARO GARCIA LUNA,       :  Brooklyn, New York
                         :

7               Defendant.  :
                         :

8  -------------------------------X

9

        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION

10         BEFORE THE HONORABLE ROBERT M. LEVY
               UNITED STATES MAGISTRATE JUDGE

11

12  APPEARANCES:

13

   For the Government:       MICHAEL ROBOTTI, ESQ.

14                    United States Attorney's Office
                     Eastern District of New York

15                    271 Cadman Plaza East
                     Brooklyn, New York 11201

16

17  For the Defendant:        CESAR DeCASTRO, ESQ.
                     VALERIE GOTLIB, ESQ.

18                    7 World Trade Center, 34th Floor
                     New York, New York 10007

19

20  Spanish Interpreter:      MICHAEL MICHELENA

21

22  Court Transcriber:        MARY GRECO
                     TypeWrite Word Processing Service

23                    211 N. Milton Road
                     Saratoga Springs, New York 12866

24

25

   Proceedings recorded by electronic sound recording,
  transcript produced by transcription service

2

1  (Proceedings began at 2:59 p.m.)

2          THE CLERK:  Criminal Cause for a Bail Application for

3  case No. 19-CR-576, <u>USA v. Luna</u>.  Counsel, please state your

4  appearance for the record.

5          MR. ROBOTTI:  Good afternoon, Your Honor.  Michael

6  Robotti for the United States.

7          THE COURT:  Good afternoon.

8          MR. DeCASTRO:  Good afternoon, Judge.  Cesar DeCastro

9  for Mr. Garcia Luna who's standing to my left.

10          THE CLERK:  Previously sworn Spanish interpreter also

11  present.

12          THE COURT:  Is it working?

13          THE CLERK:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. ROBOTTI:  Judge, I'd like to start by addressing

16  an issue that was raised yesterday.  I wasn't here yesterday.

17  Ms. Reid was here.  But my understanding is that defense

18  counsel represented that Mr. Garcia Luna had paid rent on the

19  mansion that he owned in South Florida once he moved to the

20  United States.  Mr. Luna said to the Government during his post

21  arrest statement that he lived there rent free.  So the

22  Government would like to hear from the defense whether it is

23  the position that Mr. Garcia Luna lied to the Government during

24  his post arrest statement because we think that's highly

25  relevant to the fact as to whether Mr. Garcia Luna will stand

3

1  by his word to the Court that he is going to show up for his

2  court appearances when he signs this bond.

3          THE COURT:  All right.  So specifically what was the

4  statement that he made that you believe is untruthful?

5          MR. ROBOTTI:  He said that he lived at this residence

6  rent free and yesterday defense counsel said the exact

7  opposite.

8          THE COURT:  Okay.  And which residence is that?

9          MR. ROBOTTI:  It's the residents at 274 South Island

10  Drive.

11          THE COURT:  In?

12          MR. ROBOTTI:  In Golden Beach, Florida.

13          THE COURT:  And who does it belong to?

14          MR. ROBOTTI:  It was owned by a corporation that

15  purchased it in 2012.  Our position is that that corporation

16  purchased it on behalf of Mr. Garcia Luna.  It's a $3.3 million

17  5,900 square foot residence.

18          THE COURT:  And it belongs to the corporation at this

19  time?

20          MR. ROBOTTI:  No, it was sold in 2016.

21          THE COURT:  Sold in 2016.  And where did the proceeds

22  of the sale go?

23          MR. ROBOTTI:  The Government doesn't have that

24  information, Your Honor.  My understanding from the interview

25  with Mr. Luna's wife is that their contention is it went to the

4

1  corporation.

2       THE COURT:  Okay.  Does he have any interest in the

3  corporation at this time?

4       MR. ROBOTTI:  His name is not on the corporate

5  documents, Your Honor.  But our understanding is, you know, he

6  was involved in the selection of that property while he was

7  still in office in Mexico in 2012.  And I suppose that's

8  another issue we should address about his post arrest

9  statement, Your Honor, is that in his post arrest statement to

10 the Government, Mr. Luna said that he was not involved in

11 selecting that property, he didn't know when it was purchased.

12 We interviewed one of Mr. Garcia Luna's suretors today, Ivan

13 Ramirez, who recalls in fact that Mr. Garcia Luna was involved

14 in the selection of that property prior to the purchase.  We've

15 also interviewed the prior owner of that property who recalls

16 that Mr. Garcia Luna and his family were involved in the

17 selection of that property prior to its purchase.  So again

18 here now we have Mr. Garcia Luna making a statement that is

19 directly contradicting a statement that one of his proposed

20 suretors is making.  So the Government again would like to know

21 whether it's Mr. Garcia Luna's position that he lied during his

22 post arrest or that his proposed suretor is lying to the

23 Government about what happened during the course of the sale.

24      THE COURT:  And what is -- in addition to the alleged

25 untruthfulness, is there other significance to the answer to

5

1   that question?

2               MR. ROBOTTI:  About whether or not that --

3               THE COURT:  He was involved in the purchase.

4               MR. ROBOTTI:  Yes, Your Honor, because one of the

5   contentions that Mr. Garcia Luna is making is that he does not

6   have access to sufficient funds.  And it is our position that

7   he does in fact have access to funds in the names of other

8   people.  For instance, this property, this $3 million property

9   was purchased on behalf of he and his family under the name of

10  a corporation that he is not tied to on any corporate

11  documents.  This same corporation bought Mr. Garcia Luna a

12  $700,000 yacht that same year for his exclusive use.   In

13  addition to that, there are other payments that have been made

14  in the names of third parties that have gone to benefit Mr.

15  Garcia Luna.  For instance, one of Mr. Garcia Luna's proposed

16  suretors is Caesar Geraldo I believe.  Yes, Caesar Geraldo.  He

17  made payments to the -- of about $40,000 to the private

18  institutions that Mr. Garcia Luna's children are going to.

19  Again, I think that was in -- I think that was recently in 2016

20  or 2017.  And there have been other instances of another

21  corporation that was tied to this same corporation, the owners

22  of the same corporation that purchased the mansion and that

23  purchased the yacht.  Another corporation tied to the owners of

24  that one also made a significant payment to a private school on

25  behalf of Mr. Garcia Luna.  So what we're seeing here, Your

6

1   Honor, is that although Mr. Luna is claiming that he does not

2   have access to these assets, there is a pattern here of assets

3   in other people's names being used for his benefit which goes

4   directly to the question of bail here.

5          In addition, while we're on the topic of assets he

6   has access to, there is some discrepancy that the Government

7   would like clarified about whether or not Mr. Garcia Luna and

8   his wife continued to own Augie [Ph.] Café.  According to Mr.

9   Garcia Luna's wife, this is a café that's in Florida that the

10  family has owned for the past few years.  According to Mr.

11  Garcia Luna's wife, that was sold last year.  According to the

12  accountant that works for Mr. Garcia Luna and his family, that

13  sale never actually went through and as far as he knew, the

14  family still owned the property.  We spoke to the manager of

15  Augie Café today who indicated that as far as he knew, no sale

16  had been completed.  He was not aware of whether -- he admitted

17  there could have been a sale without his knowledge.  The last

18  he knew, the family continued to own the café.  So we are

19  concerned, Your Honor, about the fact that Mr. Garcia Luna does

20  have access to assets.  You know, I think whether or not he has

21  access to these assets I'm happy to go into further.  It really

22  doesn't matter that much in terms of what it would take him to

23  actually flee.  You know, I do find it hard to believe that

24  he's coming into court saying that he has $4 million worth of

25  properties but that he doesn't have access to any cash.  But

7

1   even if we are to assume that that is true, what we're talking

2   about in terms of flight here is him getting into a car and

3   driving to the Mexican border that he knows he can cross

4   without travel documents.  Or getting into a boat, perhaps the

5   yacht that he had bought for him for $700,000 and taking a boat

6   to a different country that doesn't have extradition or to

7   Mexico where he could then flee.  So it's not like this will

8   take a significant amount of assets for him to actually flee,

9   Your Honor.  And once he's in Mexico, it's the Government's

10  position that either his family members, he has extensive

11  extended family there, or his web of former corrupt officials

12  who he worked with who are his co-conspirators in this case, or

13  the [inaudible] cartel will shield him.  And this happens

14  repeatedly in Mexico where fugitives are shielded from justice.

15          MR. ROBOTTI:  Your Honor, excuse me, I do have some

16  specific issues with the suretors too which I'm happy to go

17  over.

18          THE COURT:  Yes, why don't you?  And then I'll let

19  the defense speak after that.

20          MR. ROBOTTI:  So with respect to Caesar Geraldo, I'm

21  interested to know if defense counsel has actually spoken to

22  him.  The Government has been trying to contact Mr. Geraldo for

23  well over a month.  He hasn't answered his phone once.  We

24  tried him yesterday, we tried him today.  Travel records show

25  that he last left the United States last year.  He was

8

1  scheduled to come back to the United States on January 26, 2020

2  on a flight back from Cancún.  He was not on that flight.  So

3  as far as the Government knows, he's not in the United States

4  and shouldn't be considered as a suretor unless the defense can

5  come forward with some information otherwise.

6          Andres Miro [Ph.], Your Honor, it's the position of

7  the Government that, you know, someone with an income of about

8  $60,000 is not a sufficient suretor in this case for a $1

9  million bond.  The same thing with Paula Perez.  She makes

10  about $25,000 per year.  Again, it's hard to see how someone

11  making that amount of money would be able to satisfy a $1

12  million bond.  So therefore, we think there's little assurance

13  here.

14          And then with respect to the remaining suretors, Your

15  Honor, and I think this is important here to consider when we

16  are thinking about the structure of this package, these

17  suretors really don't have any financial stake here.  These

18  suretors have no skin in the game for whether Mr. Garcia Luna

19  is going to show up or not.

20          THE COURT:  You mean there's no property posted?

21          MR. ROBOTTI:  Well, the property -- there's property

22  being posted.  It's Mr. Garcia Luna's property --

23          THE COURT:  Right.

24          MR. ROBOTTI:  -- of about $1 million.  And it's a $1

25  million bond.  And this property which we talked about before

9

1   is likely subject to forfeiture when he's convicted anyway.   So

2   I don't think that his property offers any real incentive for

3   him to stay in the United States.   But just holding out what

4   will happen here if Mr. Garcia Luna in fact absconds is that

5   the Government is going to forfeit the $1 million property and

6   the rest of the suretors are going to be off the hook.   They

7   don't have any financial risk here.   So I don't see how them

8   signing this bond is offering the Government or the Court any

9   assurance that he's going to show up.   And in fact, when we

10   spoke to Mr. Ramirez this afternoon he indicated that if this

11   property, Mr. Garcia Luna's property was not being put up, he

12   would not sign this bond because he said frankly I don't have

13   $1 million to pay.   So you know, it's the understanding of

14   these suretors that they're not going to have to pay because

15   this property is going to be forfeited.   So I don't think that

16   the suretors offer any additional assurance to the Court that

17   he's going to show up besides the mere posting of this property

18   which as I said Mr. Garcia Luna is going to be more than

19   comfortable walking away from that property because he knows

20   he's going to lose it in any event if he's convicted.

21          So Your Honor, we think that this package for those

22   reasons is wholly inadequate and we also think that this

23   particular defendant has serious credibility problems which

24   should lead the Court to be incredibly skeptical of his

25   assurance that he's going to show up to court as he's supposed

10

1   to.

2          THE COURT:  All right.  Thank you."

3          MR. DeCASTRO:  So what can I address first if there's

4   a particular order the Court would want?

5          THE COURT:  Up to you.

6          MR. DeCASTRO:  There's a lot there.  I guess I'll

7   start with what they started with which is his home in Florida

8   that they're talking about which is 274 South Island, Golden

9   Beach, Florida.  The claim is that he picked it out, they

10  purchased it for him, some shell company I guess.  The

11  Government knows that it was purchased by this company that is

12  not owned by Mr. Garcia Luna.  They know who owns it.  They're

13  real people, they're real individuals and they have a real

14  business.  In fact, what I said yesterday said that the Garcia

15  Lunas were renting that property.  What was my basis of that?

16  I didn't pull that out of thin air.  I was looking at a

17  residential lease agreement.  And that residential lease

18  agreement is between that company and the defendant's wife and

19  it has the exact address of the location and how much the rent

20  is.  I can provide that to the Court if they want.  The

21  Government has this because this was on Mr. Garcia Luna's

22  laptop that they seized at the time of his arrest and which

23  that he provided the password to, did not make them go get a

24  warrant.  He said here, you can have it, go ahead and look.

25  All these documents are there.  So that's the basis that they

11

1  wanted to start with, what is my basis for saying that?

2  There's my basis.  That house did have a boat on it that is

3  owned by that company.  That company said here, you can -- his

4  employers are saying you can live in this house.  You can live

5  in this house and it's with rent.  There are times where that

6  rent would not be charged monthly because they owe him money

7  from work being done.  He was employed and working very hard.

8  So that's the issue with the home.

9         The issue -- well, first I'd like to start with

10  instead of the Government asking me questions, I'd like to just

11  point out to the Court what happened since yesterday.  So

12  obviously there was an issue that the Government came in here

13  with and said oh look, two suretors, they're no longer

14  available.  They don't want to do it.  Okay.  And I said to the

15  Court, you know, this was strange, I was getting mixed

16  messages.  So went back to my office and counsel finally

17  returned my call.  We had a long conversation.  He counseled

18  his client into the conversation.  We had a conversation

19  regarding the surety issue.  And so that cleared up.  That

20  lawyer immediately emailed the Government saying they are

21  willing to cosign the bond.  In fact, they are here today

22  sitting in the front row.  Both of those people are here this

23  morning on a drop of a dime to come here to clear up that

24  issue.

25         I then reached out because I understood to have

12

1   backup I said well, let's just have every cosigner possible,

2   what we can present to this Court, they're willing to sign a

3   bond.  Members of his community living in Florida, these are

4   people that are friends of the family, people that work around

5   him, with him.  They're friends and they're willing to sign.

6   The Government has issues with some of those suretors because

7   they don't make enough money.  Well add it up, they make over

8   $1 million annually together.  So first -- so we cleared up

9   that issue.  I provided the names, the phone numbers, the

10  relationship to Mr. Garcia Luna, every person and email about 3

11  o'clock, 3:30, 4 o'clock yesterday to Pretrial Services.  I

12  talked to the Government on that information and I said they're

13  all ready to be interviewed, whatever you want.  The response I

14  got from Pretrial was please have them fill out a suretor

15  declaration form.  I immediately went, got a suretor

16  declaration form filled out for everyone except the two

17  individuals that are here today because I hadn't spoken to

18  counsel about that issue.  That was all done.  I've been

19  forwarded to Pretrial Services the Housing and Urban

20  Development closing statements, or HUD statements, for the

21  three properties that Mr. Garcia Luna is prepared to offer, a

22  combination of which I don't think all three are necessary, but

23  we're willing to put up all three.  The Court should have HUD

24  statements on all three.  I sent them also to the Government.

25              So I'd like -- and so one of the -- so that means

13

1  that I propose the original four suretors plus the six more,

2  three of which are moral suasion, all of which Pretrial

3  Services has indicated a suitable surety in terms of either

4  moral suasion or just a suitable surety.

5          So one of those suretors I might add is a former FBI

6  agent.  The Government has spoken to that person today.  He is

7  willing if necessary -- one of the questions that Pretrial had

8  for me yesterday was are there any properties that are owned by

9  someone else that you could put up?  My answer was I don't

10  that's necessary.  However, I endeavored to speak to the

11  proposed suretors and that former FBI agent indicated sure, I

12  have a property, it's worth $300,000, I'd be willing to put it

13  up.  I have the address of that property.  I don't have yet the

14  documents of it because I've just been speaking to him this

15  morning or this afternoon about it.  But that is available.

16          THE COURT:  Is it a residence or a business property?

17          MR. DeCASTRO:  It's a residence I believe.

18          THE COURT:  Where he lives?

19          MR. DeCASTRO:  I think it's a rental income

20  residence.

21          THE COURT:  A rental income.

22          MR. DeCASTRO:  I'm not 100 percent sure.

23          THE COURT:  And what's the value?

24          MR. DeCASTRO:  About 300,000 I believe.  Maybe a

25  little -- he said maybe a little shy of 300 depending on the

14

1   market.

2           Now, addressing a couple of the things that the

3   Government raised, the issue of the restaurant.  I mean first

4   of all, I take a little bit of issue in this being a discovery

5   exercise but fine, the restaurant issue, my understanding is

6   that it was sold.  It was sold -- and my understanding is based

7   on the same understanding they have.  I spoke to the accountant

8   as well.  I know exactly what's going on.  I know that the

9   Government has subpoenaed the accountant.  He shared that with

10  me and the details of the subpoena.  And so what I was informed

11  was that he doesn't know yet about booking that.  His

12  understanding he was told that it was sold.  He's just working

13  on getting the documents in order to [inaudible] Mr. Garcia

14  Luna's been arrested.

15          THE COURT:  He's the accountant?

16          MR. DeCASTRO:  He's the accountant, yes.  So he could

17  not give me any clarity on that in terms of -- his

18  understanding was that it was sold but he has an accountant for

19  that.

20          THE COURT:  Did he say how much it was selling for?

21          MR. DeCASTRO:  No.  I can find out though.

22  [Inaudible] if the Court wants me to.

23          MR. ROBOTTI:  Your Honor, just on that point, my

24  understanding from the accountant is there may have been some

25  contracts signed but the deal fell through and no money was

1  ever transferred in connection with the sale.

2         MR. DeCASTRO:  They're mistaken.  I think they're

3  mistaken on that.  I think the Government is in the middle of

4  their investigation.  They can't just assume the worst.  That's

5  not my understanding.  They assume that he wasn't renting a

6  property and I have a lease.  So --

7         MR. ROBOTTI:  Just on the rental point, the point I

8  made earlier was not about whether he was paying rent or not.

9  I think it's perfectly plausible that he was paying rent to try

10 to cover the fact that he had this house purchased for him.  My

11 point was that he told the Government during his post arrest

12 interview that he was living there rent free and that

13 materially contradicts what counsel is saying here today.

14        MR. DeCASTRO:  First, I think that's not what he

15 said.  I think that they are trying to make something black and

16 white that is not black and white.

17        You know, so the other issue is the Government's

18 disbelief that he has no cash available.  They don't believe

19 it.  But they don't give you any evidence that he has cash

20 available to him.  I have provided you with specific evidence

21 of that and that he's blocked from the financial system in

22 Mexico.  He cannot sell his property.  I don't think the

23 Government is going to deny that they are not willing to tell

24 any proposed purchaser of property that they are not going to

25 seek it from forfeiture, but they have not said whether they

16

1  will or not.  No one is buying the property with that

2  potential, even potential.  They continue to say that he has a

3  web, there was a web of former corrupt officials.  Let me

4  repeat what I said yesterday which is the Government cannot

5  just ask for a human being to be detained without bail, to be

6  deprived of his liberty and just say it's because we think

7  there's this web out there of people that will help him and

8  then say who they are and try to identify for this Court these

9  are the people that we know are going to help him.  Of course

10 assuming the absurdity that he's somehow going to walk to Texas

11 and walk over the border or get into a vehicle over the border,

12 there is -- with location monitoring that's not happening.

13 Okay?  He's not leaving his wife and children here.  He's not

14 leaving his life that he built here.  The Government says

15 there's no risk to any of the suretors, no risk at all.  So

16 then they should just say don't put up the property.  There's

17 tons of risk to the suretors.  And I bet you many of them are

18 willing to sign still because I spoke to almost all of them

19 that understand.  And the reason they understand is because

20 these are members of this community.  The Government wants to

21 attack people as improper suretors who work in a restaurant,

22 that manage the restaurant that [inaudible] own.  These are

23 people that know the family.  They know the family.  They are

24 willing to do it because this is their community, these are

25 their friends.  Right?  He's not going to want to leave this

17

1  group of people holding the bag.  This group of ten suretors

2  includes his family.  He's going to leave his wife, his two

3  children who are in college here in the United States who are

4  starting their -- who we hope are starting their career very

5  soon?  All of his friends?  He's going to leave them holding

6  the bag?  I just don't see it happening.  And the Court can

7  certainly impose conditions that can assure his appearance.  I

8  think that addressed [inaudible].

9         I mean I guess the only thing I should say is, you

10 know, the Government has his passport and his green card.  Why

11 do they have that?  Not because someone asked him to, he gave

12 it to them.  So they arrested him, they seized him, they can

13 have it.  They have it.  It's in place.  So they know exactly

14 where one of the suretors has been going.  They know where he

15 is, they know when he's scheduled to fly.  He's not going

16 anywhere.

17        MR. ROBOTTI:  Judge, just to address a few points, I

18 mean short of the fact that he doesn't have the green card or

19 the passport is going to prevent him from getting on a flight

20 to Mexico, of course.  But there's other ways to get out of the

21 country.  And one of the way -- I spoke to a Border Patrol

22 agent this morning who said to me that he can drive across the

23 border without showing any documents.  So it's not hard to get

24 into a car and drive from Florida to the border in Texas.  It's

25 within a day.  On top of that, he can get on a boat, take the

18

1  boat outside the country.  We can't stop him.  And electronic

2  monitoring has its limitations, Judge.  Sure we would ask for

3  him to be on a bracelet but he can slip that off and be gone

4  before we even know about it.

5          You know, in terms of the package that's been

6  proposed, I would point out that, as I said before, the

7  properties that Mr. Garcia Luna is offering to put up are

8  meaningless.  They offer no assurance here that he's going to

9  show up because those properties are going to be subject to

10  forfeiture in any event.  And my understanding from speaking

11  with the two suretors who are in court today, or at least Mr.

12  Ramirez, he is not willing to sign the bond without those

13  properties.  So I think that we need to take that into

14  consideration here when we're looking at this proposed package

15  because as I said before, the suretors don't in fact have any

16  financial stake in this package right now.  All Mr. Garcia Luna

17  has to be willing to do is give up these properties, flee to

18  Mexico and give up these properties that he's going to lose

19  anyway.  I bet that he's willing to do that to avoid going to

20  jail for potentially the rest of his life.

21          In terms of his ties to the community, Mr. Garcia

22  Luna up until 2012 had spent his entire life in Mexico.  His

23  family, his extended family is there.  His family that resides

24  in the United States right now also are Mexican citizens.

25  Easily leave the United States as well if their father is going

1   to avoid spending potentially the rest of his life in United

2   States custody.  So I think these are things we need to be

3   looking at seriously here which are his ties back to Mexico and

4   the lack of significant ties that he's had in the United States

5   up until 2012.

6           In terms of the corrupt officials that will assist

7   him, as Your Honor knows, we're not going to stand up here and

8   name officials that are under investigation.  There's a DOJ

9   policy against naming unindicted co-conspirators.  But we are

10  entitled to stand up here and proffer based on our

11  investigation and interviews with numerous other cooperating

12  witnesses that Mr. Garcia Luna was connected to an entire web

13  of corrupt officials who were being paid off by the [inaudible]

14  cartel.  Many of those officials are still in Mexico.  Many of

15  them still hold powerful positions in the private sector.  And

16  they would be willing, we believe, to facilitate his flight

17  from justice if nothing else to avoid a public trial where

18  their names will come out on the record.

19          And on top of that, Your Honor, you know, I think

20  we've gone back and forth about whether or not he still has

21  title to this company, the Augie Café.  I think it is important

22  to know whether or not, they should be able to answer whether

23  or not that is still their asset.  If they do still have access

24  to that corporation, you know, it is an ongoing concern, it is

25  a business that is still operating and that is another source

20

1  of assets that he could be using here.  But again, just

2  stepping back, Your Honor, I think the assets question whether

3  he has access to it or not, you know, I just don't want to lose

4  sight of which I do think is a critical point is it doesn't

5  take a lot of money for him to flee.  He has an extensive

6  network in Mexico, legitimate and illegitimate.  And I think

7  he's going to be able to take advantage of that to get out of

8  the country.

9          MR. DeCASTRO:  Judge, if I could just on --

10         THE COURT:  Let me just ask a question.  I think I

11  asked it yesterday but if the suretors had posted property,

12  would that change your view?

13         MR. ROBOTTI:  No, Your Honor.  It's the Government's

14  position that there's no package that is sufficient here.  But

15  certainly this package is not sufficient.

16         THE COURT:  Okay.  So think back to the

17  [indiscernible] prosecutions, and I don't know if they're

18  exactly analogous but I was trying to think of some analogous

19  situation where there were people who were high officials in

20  foreign governments who had been accused of either taking or

21  giving bribes and who came to the US and many of them were

22  released on bond, not all, but many of them were.  How would

23  you describe the difference between this defendant and those

24  defendants?  If you know.  If you're familiar enough with those

25  cases.

21

1          MR. ROBOTTI:  Sorry, Judge, offhand I don't know all

2     the details of the bond packages in the [indiscernible] case.

3     I try to keep up on all the office's prosecutions but I can't

4     say that I'm intimately familiar with what happened there.

5          THE COURT:  Yes.  Because I had a number of those

6     before me and there were many, many, many people released on

7     substantial bonds who had holdings and extensive ties in other

8     countries.  I suppose some of the differences would be that

9     they came and self-surrendered in the US.  Some of them did.

10    But there are some similarities to this defendant.  I suppose

11    the other question would be whether or not there's -- what you

12    describe as -- whether there was what you describe as a web of

13    corrupt officials who would have protected them had they gone

14    back to their country and fled.  So that may be the difference.

15    I'm not sure.

16         MR. ROBOTTI:  And I do think we have to be looking at

17    this particular defendant here, Your Honor.  I don't know what

18    property was posted.  I don't know what suretors were involved,

19    what would be the case.  But looking at this particular package

20    that's being offered here, especially when this property that's

21    within the United States that he's offering to put up, this $4

22    million, as I said, that doesn't carry any weight at all, so

23    we're basically left with, you know, his ability to just give

24    up these forfeitable properties if he's willing to flee to

25    avoid a life sentence.  I just don't think that's sufficient

22

1    here, Judge.  Nobody has any stake in this.

2              THE COURT:  All right.  Thank you.

3              MR. DeCASTRO:  So Judge, I guess let me address that

4    issue.  The Government talks to you on forfeiture issues as if

5    they won at trial.  We're talking about substitute assets that

6    they say they are going to seek when they win a trial.  We are

7    at the early stages of a trial.  Mr. Garcia Luna is presumed

8    innocent.  He is fighting these charges.  Yet the Government

9    acts as if he's pled guilty already or they've proven him

10   guilty or -- excuse me.  So first of all, there's that.  And to

11   say that he doesn't have -- it's meaningless is based on what I

12   don't know.  These properties are his.  They're his retirement

13   essentially and they are worth a lot of money.  It's not just

14   one property as I said.  The potential for three if the Court

15   wants that.

16             In terms of him just getting on a boat, number one,

17   as I think I indicated to Pretrial a number of times, that he

18   would reside in Washington, DC.  He would not be residing in

19   Florida.  But he would be residing with his wife who is living

20   with their daughter in college, in her college apartment.

21   They're living together.  They would reside in Washington.

22   Should the Court want him to rent an apartment here in New

23   York, he would do that if it was necessary.  He's not going to

24   be on the border.  He's not walking across, jumping in a car.

25   You know, we're talking about days and days of travel.  And you

1   know, on Fifa [Ph.], I'm a little familiar with some of the

2   defendants in Fifa.  I don't think a single defendant -- I'm

3   not aware of any single defendant who was released fleeing in

4   that case either.  So I don't think that would be the case here

5   as well.  And I do think the Government made allegations that

6   they have all these connections all abroad and they're all very

7   high level officials.  None of those people came [inaudible].

8   His ties to the community are strong.  This is where he wanted

9   to make his life.  His family is here.  They have remained her

10  since his arrest.  They're living in Washington and the son is

11  not in Washington but they are all United States citizens, all

12  three of them.  And so I don't see how the drastic remedy of

13  detention is appropriate here.

14          MR. ROBOTTI:  Judge, you know, again, it's hard to

15  talk about Fifa without knowing the specifics, but I can

16  guarantee that the people who were detained in Fifa didn't flee

17  and that's what we should be doing here.

18          In terms of the forfeiture, Judge, I think these are

19  potentially substitute assets but the point is what we're

20  looking at in terms of incentives to stay in the United States.

21  And if somebody's sitting here and saying if I stay in the

22  United States is a good chance that I lose these properties,

23  these $4 million properties, there's a good chance I go to jail

24  for the rest of my life, or I can just give up those properties

25  that I'm likely to lose anyway and go to Mexico, I think that

24

1   there's a strong incentive to go to Mexico rather than stay in

2   United States with respect to those properties.  So that's the

3   point where making is that these properties he's offering to

4   put up don't give an incentive to stay here because they're

5   likely to be forfeited anyways.

6          MR. DeCASTRO:  And Judge, and ruin the lives of ten

7   of his closest friends.

8          MR. ROBOTTI:  But that's not true.  That's not

9   accurate under this bond.  Under this bond, the $1 million

10  property would be forfeited and all these other suretors would

11  be off the hook.  They don't have any financial stake in this.

12         MR. DeCASTRO:  So then remove the properties and

13  people will sign.  Mr. -- as I indicated, the former FBI agent

14  would put up his house.  And do a combination and he'll put up

15  his home.  I don't see what the issue is.

16         THE COURT:  That's Mr. Villar [Ph.]?

17         MR. DeCASTRO:  Yes.

18         THE COURT:  Would any of the other suretors put up

19  their property, their homes?

20         MR. DeCASTRO:  I don't think they own homes.

21  Properties that [inaudible] available [inaudible].  I believe

22  that home is also owned outright.

23         THE COURT:  Right.  As I was looking at this, there

24  was one thing that was missing to me was there wasn't any real

25  property that the suretors themselves were posting, residences

25

1  that they lived in that if he fled they would lose.  That's a

2  strong incentive.  A rental property is an investment.  It's

3  something different.

4          MR. DeCASTRO:  But as the Government has pointed out

5  to suretors, or at least as they've reported to me, that it's

6  not.  They're saying that now in court.  They're saying to

7  suretors that well no, well if we're forfeiting those

8  properties then you're going to be on the hook for that money,

9  for that $1 million bond.  So it's not nothing.  And they've

10 all been informed of that that yes, the property might be split

11 up but if the Government is correct that they are going to

12 forfeit that property, they will be on the hook.  They will be

13 on the hook.  That's -- I've been clear to say that to them.

14 It's not just oh yeah, don't worry, sign because there's

15 property.  That's not what the message has been.  That's not

16 [inaudible].

17         THE COURT:  Well, how are they on the hook?  I mean

18 their wages could be garnished over a period of time, 10

19 percent, whatever the percentage is.

20         MR. DeCASTRO:  The Government could move on any of

21 their property they had, right?  And I mean in my experience,

22 the Government when they go after a bond, they go after that

23 bond.  That's why it's very, very difficult for the person's

24 loved ones.

25         MR. ROBOTTI:  But practically speaking, Judge, if

26

1    there is a $1 million property tied to this bond --

2              THE COURT:  Right, they'll go after that first.

3              MR. ROBOTTI:  -- the defendant flees, the Government

4    is going to forfeit that $1 million property and the bond will

5    be satisfied.  Therefore, all these other suretors, their lives

6    aren't going to be ruined as defense counsel says.  They're

7    going to be off the hook.

8              THE COURT:  How much is Mr. Luna's property worth?

9              MR. ROBOTTI:  My understanding is that there's about

10   $4 million worth of properties.

11             THE COURT:  Would your concerns be alleviated if the

12   bond were $5 million?

13             MR. ROBOTTI:  No, Judge.  I mean I think we have the

14   same concerns.  I mean the property is, again, $4 million of

15   properties don't matter because he's going to be willing to

16   give up those properties because he knows he's likely to lose

17   them anyways.  In terms of the additional $1 million, it's one,

18   not clear to me that any of these suretors are going to sign

19   under those circumstances but I think the defense has an

20   obligation to have figured that out and come back to the Court

21   with a package that indicates who's willing to sign in the

22   absence of these properties.  On top of that, I do think that

23   most of these suretors cannot satisfy a $1 million bond.  And

24   look, the one person who is potentially offering property lives

25   in Utah.  He doesn't see the defendant and his family very

27

1  often.  It's not clear to me at all that the defendant is not

2  willing to leave him holding the bag to avoid a potential life

3  sentence.

4          THE COURT:  Okay.

5          MR. DeCASTRO:  So someone who has served the

6  Department of Justice as an agent, is retired and still

7  working, told me today this morning he had no problem, whatever

8  you need because I trust him, I know him, I've worked with him.

9  He is a good honest person.  What's happening to him is unfair

10 and unjust.  Whatever you need from me, just let me know.  You

11 know, I don't think that's a person that -- and the only reason

12 I know about that person is from my client.  And so, you know,

13 the Government's suggestion if the Court set a $5 million bond

14 [inaudible] oh no one's going to sign.  Well, you know, just to

15 say give it more time, give it more time so that he can stay

16 detained, we could try to jump through some more hoops and

17 figure it out and they'll just keep saying detention anyway is

18 just not fair.  It's just not fair.  It is not what the Bail

19 Reform Act talks about.

20         MR. ROBOTTI:  It is, Your Honor.  It's a presumption

21 case.

22         THE COURT:  It's not whether or not the Government

23 agrees.  I mean that would make life easier for you if the

24 Government agreed.  It's whether or not the Government's

25 argument that there would be no pain suffered by the suretors

28

1   would be [indiscernible].

2          MR. DeCASTRO:  So I think your solution, I mean it

3   would be the Court's solution, you know, if -- and you can ask

4   the suretors, and my understanding is they would, from my

5   conversations with them, that most if not all would sign the

6   bond.  Even if four decided not to sign the bond, you have six

7   people signing the bond.  I can't remember the last time I've

8   had more than five people sign the bond in this court or the

9   Southern District.

10         MR. ROBOTTI:  Well, Your Honor, let's talk about what

11  that means.  So three of those people would be the defendant's

12  family who do not have any assets different here --

13         THE COURT:  Well, that depends who signed it.

14         MR. ROBOTTI:  And then depending on who the other

15  three are, I mean the other couple then who clearly cannot meet

16  any financial eligible requirement here -- and just with

17  respect to the suretor in Utah, I'm sure he had lots of nice

18  things to say about Mr. Garcia Luna but he obviously doesn't

19  know all the evidence that the Government has about Mr. Garcia

20  Luna's extensive crimes over the last 20 years.  So I don't

21  think that that really adds much value here.  And I do think

22  that somebody who's facing a potential life sentence may be

23  willing to leave an acquaintance behind holding the bag for a

24  $300,000 property to avoid that jail sentence.

25         So look, Your Honor, this is a presumption case.  The

29

1   burden is here, is on the defense in the first instance to come

2   forward with a package that rebuts that presumption.  Right now

3   we have a lot of speculation that even if these properties were

4   not put up by Mr. Garcia Luna that some people might be willing

5   to sign this bond.  We don't have anything concrete about that.

6   Yet either way, it is the Government's position that the bond

7   is not sufficient here.  But certainly in these circumstances

8   here the defense has not rebutted the presumption.

9           THE COURT:  And which suretors are here today?

10          MR. DeCASTRO:  Mr. Ramirez, Ms. -- I mess up her last

11  name, [indiscernible], and the defendant's wife and father

12  also.

13          THE COURT:  Okay.

14          MR. DeCASTRO:  All are available by phone because

15  they're all in different places.  In this one issue, I just

16  don't understand why the Government is hammering on this as if

17  all the suretors have to -- they have to be financially

18  responsible.  They don't have to be able to get $1 million from

19  them to [inaudible] where it has to be fully secured.

20          MR. ROBOTTI:  Well, of course, Your Honor, a $1

21  million bond is meaningless if there's no way to satisfy it.

22          THE COURT:  Well, except that it would present an

23  obligation to the signers that could potentially go for the

24  rest of their lives.

25          MR. ROBOTTI:  Of course, Judge, but the likelihood of

30

1   the Government recovering $1 million is of course very minimal.

2   And you know, if somebody realizes they're going to be on the

3   hook for 10 percent of their wages for the rest of their lives

4   versus actually having to pay $1 million, that's a different

5   incentive.

6           MR. DeCASTRO:  I don't know anyone anywhere that

7   wants to have their wages garnished when people have to pay

8   their bills.

9           THE COURT:  Okay.  All right.  I'm going to reserve

10  decision.  I'm going to think about this.  I'll take a short

11  recess.  I may or may not want to speak to the suretors.  But I

12  think we have a couple of other cases to do at this point.

13          MR. ROBOTTI:  Okay.  Thank you, Judge.

14          MR. DeCASTRO:  Stick around?

15          THE COURT:  Yes, stick around.

16  (Off the record at 3:41 p.m.)

17  (Back on the record at 4:32 p.m.)

18          THE CLERK:  Second call for case No. 19-CR-576, US v.

19  Garcia Luna.  Counsel, please state your appearance for the

20  record.

21          MR. ROBOTTI:  Good afternoon again, Your Honor.

22  Michael Robotti for the United States.

23          MR. DeCASTRO:  Cesar DeCastro for Mr. Garcia Luna.

24  Good afternoon.

25          THE CLERK:  Previously sworn Spanish interpreter also

31

1   present.

2          THE COURT:  All right.  We've had three sets of

3   arguments in this case and counsel on both sides have presented

4   what I think are strong arguments.  This is not an easy case.

5   It's a case where I believe that reasonable people could

6   disagree.  Pretrial Services has recommended that there are no

7   conditions or combinations of conditions that will reasonably

8   assure the appearance of the defendant as required and the

9   safety of the community and recommends detention.  The

10  Government also takes that position and the defense believes

11  that there are reasonable conditions and combinations of

12  conditions that could ensure his return to court.

13          I don't see this as much as a danger to the community

14  argument as a risk of flight argument that's the key issues

15  here.  I don't go as far as the Government does to say that

16  there are no conditions or combinations of conditions that

17  could ensure his return.  Similarly, I don't agree with

18  Pretrial Services to that extent although I think I understand

19  the position.  I've looked at the factors under the Bail Reform

20  Act, the nature and characteristics of the defendant, the crime

21  charged, the evidence, et cetera, et cetera and I've looked at

22  the package very carefully and I'm not going to go through all

23  the reasons and the arguments that both sides made.  I think

24  the record's pretty clear on that.  Ultimately, my view is that

25  this package is not strong enough at this point to ensure his

32

1   return to court.  And there are a number of reasons why, but I

2   think what particularly is troubling about the package is that

3   it relies solely on income but not on assets.  And residential

4   assets, assets that would actually cause some kind of pain to

5   the individual that's greater than mere garnishment of wages,

6   particularly as the Government noted after a house would have

7   been confiscated and used to pay the amount of the bond.  So

8   that's a brief summary of my reasons I think the bond is not

9   strong enough.  I'm not saying that there are no conditions

10  that could ensure his return to court, but this bond doesn't

11  quite do it.  So that's my ruling.

12              MR. DeCASTRO:  I [inaudible].

13              MR. ROBOTTI:  Thank you, Judge.

14              MR. DeCASTRO:  Your Honor, if, for example, we were

15  to put up some residential properties, can we come back to

16  court or do we --

17              THE COURT:  You can always come back to court any

18  time to be heard.  Right.

19              MR. DeCASTRO:  Right.  I mean do we come back to Your

20  Honor or do we start this process all over again?

21              THE COURT:  Whoever's on duty at the time you come

22  back to.  But if whoever's on duty is asked what my ruling was,

23  my ruling wasn't that there's no combination of conditions.

24  It's that this package was troubling for the reasons that the

25  Government mentioned and for the particular fact that there's

33

1   not any solid assets behind it.  I don't see a rental property

2   as being the kind of asset that would make me comfortable.  But

3   again, another judge may see it differently.

4          MR. DeCASTRO:  Thank you, Judge.

5          THE COURT:  Okay.

6          MR. ROBOTTI:  Thank you, Judge.

7          THE COURT:  All right.  Thank you.

8   (Proceedings concluded at 4:36 p.m.)

9                     *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

34

1      I certify that the foregoing is a court transcript from an

2 electronic sound recording of the proceedings in the above-

3 entitled matter.

4

5                              _Mary Greco_____

6                                   Mary Greco

7 Dated:  March 23, 2020