1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    19-CR-576(BMC)

       Plaintiff,        :

                     United States Courthouse
   -against-             :    Brooklyn, New York

GENARO GARCIA LUNA,          :

                     March 31, 2020
      Defendant.          :    10:30 o'clock a.m.

- - - - - - - - - - - - - - X

TRANSCRIPT OF BAIL APPLICATION VIA TELECONFERENCE
BEFORE THE HONORABLE RAMON E. REYES
UNITED STATES MAGISTRATE JUDGE.

APPEARANCES:


For the Government:          RICHARD P. DONOGHUE
                             United States Attorney
                             BY: RYAN C. HARRIS
                                 MICHAEL P. ROBOTTI
                                 ERIN REID
                             Assistant United States Attorneys
                             271 Cadman Plaza East
                             Brooklyn, New York


For the Defendant:           CESAR DE CASTRO, ESQ.

                             VALERIE A. GOTLIB, ESQ.


Court Reporter:              Charleane M. Heading
                             225 Cadman Plaza East
                             Brooklyn, New York
                             (718) 613-2643

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1          (All present via teleconference.)

2          (Defendant not present.)

3          THE CLERK:  This is a criminal cause for bail

4     application, USA versus Genaro Garcia Luna.  The case number

5     is 19-CR-576.

6          Counsel, state your names for the record starting

7     with the government.

8          MR. HARRIS:  Ryan Harris for the United States.

9     Good morning, Your Honor.  With me are Michael Robotti and

10    Erin Reid also for the United States.

11         THE CLERK:  Thank you.

12         For the defendant?

13         MR. DE CASTRO:  Good morning, Your Honor.  Cesar

14    De Castro and Valeria Gotlib for Mr. Garcia Luna.

15         THE COURT:  Good morning.

16         THE CLERK:  Thank you.

17         THE COURT:  Okay.  Mr. Harris?

18         MR. HARRIS:  Yes, Your Honor.

19         THE COURT:  Why don't you summarize the government's

20    position with respect to bail for Mr. Garcia Luna.

21         MR. HARRIS:  Sure, Your Honor.

22         So as an initial matter, it's our view that the risk

23    that this defendant will flee if he is released under any

24    conditions are unacceptably high.

25         The first question I think for the Court to consider

1    is does this defendant have a motive to flee.  Absolutely, he

2    does.  Charged with multiple drug trafficking conspiracy

3    charges, they all involve the most powerful and violent drug

4    trafficker --

5              THE COURT:  Right.  One moment, Mr. Harris.

6              If you are not government counsel or defense

7    counsel, you must mute your lines.  Thank you.

8              Continue, Mr. Harris.

9              MR. HARRIS:  Thank you.

10             He faces a minimum of 10 years in prison, that's the

11   guidelines range, to life.  That potential life sentence is an

12   incredibly strong incentive to flee and the evidence of his

13   guilt here is damming in the government's view.  It includes

14   testimony from numerous witnesses including multiple firsthand

15   witnesses who personally bribed the defendant, drug seizures

16   and financial records.  And so question for the court is does

17   the defendant have a motive to flee the United States.  The

18   answer unequivocally is yes.

19             The second question for the Court is does he have

20   the means to flee and, again, the answer is absolutely he

21   does.  First, he has extremely strong ties to a foreign

22   country:  Mexico.  He was born in Mexico.  He was raised in

23   Mexico.  He is a citizen of Mexico.  He lived there his entire

24   life until 2012.  He has extended family in Mexico.  He

25   traveled there more than 30 times in the last five years.

4

1        In addition, crossing the border to Mexico for a

2    Mexican citizen is not challenging.  He can cross by car, by

3    foot without even showing official documents.  At least that's

4    our understanding.

5        In Mexico, he would not just have the support of

6    family.  He would have the support of former --

7        (Inaudible.)

8        THE COURT:  Mr. Harris, just a second.

9        Sui-May, do me a favor.  E-mail me the host

10   password.  Not the access code but the host password.

11       MR. HARRIS:  I was saying he can cross by car or on

12   foot without even needing to show any official documents.  At

13   least that's the government's understanding.

14       THE COURT:  Thank you, Mr. Harris.

15       MR. HARRIS:  Yes, Your Honor.

16       THE COURT:  One second, Mr. Harris.  Bear with me.

17       (Pause.)

18       THE CLERK:  Do you need me to do something, Judge?

19       THE COURT:  What I did is I pulled up all of the

20   people who are calling in and I've muted who doesn't have it

21   on mute.

22       I just want to be clear.  If you are not muted and I

23   hear you and you are not defense counsel or government

24   counsel, you are going to get muted and you may get kicked off

25   the call.  This is a public proceeding but we have to operate

1    like we were in court.  Anyone in the gallery has to shut up.

2    So if you have it on speaker and not mute, we're going to hear

3    you and you are going to get kicked out.

4         Sorry, Mr. Harris.  You can continue.

5         MR. HARRIS:  Thank you, Your Honor.

6         So what I was just saying or discussing was the ease

7    with which he could cross into Mexico.

8         Now, once he arrives in Mexico, this defendant would

9    not have the support of his extended family.  He would have

10   the support of a web of corrupt former Mexican officials and

11   members of the Sinaloa cartel which are the two most powerful

12   institutions in Mexico.  This is a web he has built over

13   decades during his time in Mexico and this web of a

14   combination of corrupt former officials and Sinaloa cartel

15   members has helped other individuals, powerful individuals

16   escape capture of prosecution for years.  Chapo Guzman has

17   evaded capture for 15 years.  Gabriel Cantero is currently at

18   large and has been evading capture for seven years.  This web

19   can assist him in doing the same and it would be powerfully

20   motivated to ensure that he never returns to an American

21   courtroom where the full details of his crimes would be

22   unveiled.

23        So he has the strong motive to flee and the means he

24   needs to do so and these risks, in the government's view, are

25   unacceptably high.  That's why we believe there are no

6

1   accommodations or conditions that will ensure his continued

2   appearance service.

3          Pretrial Services has reached this same conclusion

4   twice, both when he was originally arraigned in the Western

5   District of Texas and as recently as February 27th in

6   connection with the last bond application, Pretrial Service

7   reached the same conclusion.  This is obviously also a case

8   where there is a fact driven presumption that the defendant

9   should be detained due to the nature of the crimes he's

10  charged with and we believe the facts here just echo the

11  presumption and that conclusion.  So the government feels that

12  a permanent order is necessary.

13         We also have, as outlined in our brief, significant

14  concerns and believe there are substantial defects in the bond

15  application that's being proposed here.

16         Now, as an initial matter, the defendant presents

17  this as a $2 million bond but, Your Honor, in reality, it's

18  more of an $800,000 bond.  That's because he's proposing to

19  secure the bond with a real estate property worth

20  $1.2 million.  That property the government is already going

21  to seek to forfeit at the conclusion of this criminal

22  prosecution and so he knows he's going to lose it if he's

23  convicted.  It provides no incentive for him to stay and

24  that's precisely what courts would have to apply in the 3142,

25  subsection (g)(4), statute that includes that properties that

1   are subject to forfeiture may not be appropriate collateral

2   for a bond proceeding.

3          So he knows that he's going to lose this property

4   whether he's convicted or whether he flees.  There's nothing

5   to deter him from fleeing to preserve this property, but what

6   the property being posted does do is it significantly reduces

7   the financial exposure of the suretors here.  So they, in

8   effect, only have $800,000 worth of exposure, not $2 million

9   worth of exposure.

10          More so, Your Honor, because the value of the

11   properties proposed to be posted by two of the suretors,

12   Carlos and Maria Villar, exceed $800,000, the remaining

13   suretors have no financial exposure under this proposed bond

14   because it's going to be satisfied by those properties.  So

15   although it's presented as a $2 million ten suretor bond

16   package, in reality, Your Honor, it's more of an $800,000 two

17   -suretor bond package.

18          Now, those two suretors, Carlos and Maria Villar, in

19   our view, cannot exercise the necessary moral suasion to

20   ensure that the defendant returns to court.

21          I saw in the defendant's latest filing last night

22   that Mr. Villar now represents that he saw the defendant a

23   year ago in January 2019.  I would note that we interviewed

24   Mr. Villar twice this past week and in connection with the

25   February 27th bond proceeding and both times, he had said that

1   he had not seen the defendant in two years which is just not

2   consistent with what he's saying.  His wife gave the same

3   number, that she had not seen him in about two years.  And in

4   addition, both of them separately said that they had only seen

5   the defendant about ten times since 2012 so that's about once

6   a year.

7          Now, under the way this bond is structured, these

8   are the only two people that are going to have real financial

9   exposure here and these two people who live hundreds of miles

10  away from him with no ability to monitor firsthand, they're

11  not going to be able to see him every day, every week, every

12  month, and they already have not seen him more than a year or

13  possibly two years depending on which version of the facts you

14  believe based on Mr. Villar's representation to the various

15  parties.  You can count the number of times he's seen them in

16  the past eight years on two hands.  It's not a lot.  This is

17  not the type of close relationship, somebody who lives in the

18  community with him that can monitor him.

19         Now, given the seriousness of the charges here, the

20  defendant's strong incentive to flee, the significant ties to

21  a foreign country with a close border and, in fact, if he were

22  to return to Mexico, it's obvious these two suretors don't

23  provide the sufficient assurance that he's going to return to

24  the court and they cannot exercise the sufficient supervision

25  and moral situation.

1          Now, the remaining eight suretors, because of this

2    property being posted, they have no financial exposure under

3    the proposed bond.  It's going to be fully satisfied by

4    Mr. Villar's property and the defendant's already forfeitable

5    property.

6          Now, the government has endeavored to interview each

7    of those witnesses and, frankly, Your Honor, it's raised

8    additional concerns putting aside what I've just said.  Two of

9    the remaining suretors, Cesar Giraldo and Andres Merro, are

10   former employees of the defendant.  Carla Perez was also a

11   former employee of the defendant and apparently she's no

12   longer willing to sign the bond.

13         Just with respect to Ms. Perez, Your Honor, we want

14   to correct the record.  In the defendant's last filing

15   yesterday, there was a reference or an insinuation that

16   Ms. Perez had been pressured not to sign the bond because it

17   had been communicated to her that it would jeopardize her

18   son's citizenship application.

19         As far as the government is aware, that is out of

20   our control.  I personally spoke to Ms. Perez.  I never

21   brought up the son's citizenship application.  It never came

22   up at all in any of our interviews with her.  In fact,

23   Your Honor, I didn't even know she had a son, let alone a

24   citizenship application was pending until I saw the file last

25   night.  So any impression that the government pressured her

1   not to sign the bond is categorically false.

2           The remaining two suretors that I mentioned, Cesar

3   Giraldo and Andres Merro, as I said, they're former employees

4   of the defendant.  They depended on the defendant for their

5   financial livelihood for years.  They called the defendant and

6   his wife their boss.

7           We spoke to Cesar Giraldo specifically this morning,

8   Your Honor.  He told us that for the last several years, he's

9   derived 90 percent of his income from the defendant.  The

10  relationship with a boss to an employee with Cesar Giraldo

11  being the employee.  He said it was not a social relationship.

12  It was a strictly business relationship.  It is not the type

13  of relationship where he can exercise moral suasion or

14  authority over him to ensure that he returns to court.

15          Moreover, it's not clear that Cesar Giraldo has any

16  current source of income now that the defendant has been

17  arrested and he depended on him until he was arrested in

18  December for 90 percent of his income.  I tried to get a

19  better sense of his finances when we spoke and I asked him how

20  much money he was making now and he would not give me a

21  figure.  He just said not much, not much at all, so it's not

22  even clear he has any income to help satisfy the bond.

23          In the defense's submission, they represented that

24  Mr. Giraldo was willing to secure the bond with his house

25  which they represented was worth $489,000 and he had $175,000

1    in equity.  Now, when I spoke with Mr. Giraldo this morning,

2    it raised significant questions about that representation.

3    What he told me, Your Honor, was that he bought this house in

4    2015 for a little north of $300,000.  His down payment was

5    only $11,000.  He told me that he still owes $313,000 on that

6    mortgage meaning he has not acquired substantial more equity

7    in the home due to payments on his mortgage.

8            So when the defense said that he has $175,000 equity

9    in a home valued at $489,000, there's not a real basis for

10   that.  There was no appraisal of this house done.  There was

11   no assessment of his house done.  It was essentially based on

12   their view that this house is now worth $489,000 or almost

13   $200,000 more than when he purchased it five years ago.  It's

14   kind of pulling a number out of a hat.  He's not put down

15   $175,000 in a down payment or otherwise invested in the

16   property.  It's purely based on their assessment of the market

17   and not backed by any documentation as far as the government

18   is aware.

19           The second suretor that Your Honor we reference is

20   Andres Merro, also an employee of the defendant, and we tried

21   to speak with him numerous times in connection with this bond

22   application.  He has not returned our call.  We've called and

23   left voicemails numerous times.  We haven't been able to

24   confirm whether he's willing to sign the bond, whether he's

25   willing to secure his residence or how much equity value he

1   actually has in the residence or whether it's based on this

2   kind of assessment of the current market value of his home or

3   not.

4            When we did interview Mr. Merro a month ago in

5   connection with the prior bond application, he advised the

6   government that he had not seen the defendant in two years and

7   he had only met him approximately ten times.  So, again, Your

8   Honor, this is not the kind of relationship where he has the

9   necessary moral suasion over the defendant, the kind of social

10  relationship.  He is someone who reported to the defendant and

11  his wife.  He's dependent on them for his financial

12  livelihood.

13           So it's hard to come to any conclusion when you look

14  at these two suretors.  Other than that, they are signing,

15  they feel pressured because it's their former employers and

16  because they don't have any real financial exposure under the

17  bond because it's going to be satisfied by other properties

18  posted by Mr. Villar.

19           So that leaves two remaining financially exposed

20  suretors, Ivan Ramirez and Monica Sarmiento.  They have not

21  agreed to post any collateral.  In prior applications and in

22  connection with this application, they repeatedly expressed

23  hesitancy about signing the bond that would give them real

24  financial exposure and their willingness to sign on properties

25  being posted that wouldn't satisfy the bond.  I believe that

1  their current willingness to sign the bond is at least

2  predicated on the understanding that because this $1.2 million

3  forfeited property being posted by the defendant and there's

4  another property by Mr. Villar, they don't really have

5  financial exposure.

6          So, Your Honor, I think that what you're really

7  looking at here is an $800,000 bond signed by two suretors who

8  are hundreds of miles away and don't have the kind of

9  relationship to exercise moral suasion over him.  As I

10  mentioned to you earlier, there is no combination of

11  conditions that would secure his release, but certainly this

12  package raises significant questions about the true value of

13  the properties, the current income of the suretors and whether

14  they actually have any financial exposure and are going to be

15  sufficiently motivated to have skin in the game in order to,

16  in order to ensure the defendant returns to court.

17          Now, there's a separate application, Your Honor, in

18  connection with whether he should be temporarily released for

19  purposes of COVID-19 which I'm happy to address now or if we'd

20  like to focus on this application as an initial matter and

21  then we can turn to COVID-19, I'm also happy to do that.

22          THE COURT:  Let's take them one at a time.

23          Mr. De Castro, do you want to respond?

24          MR. DE CASTRO:  Yes, Judge.  Thank you.

25          Well, I guess let me start with the following.  So

1    it seems in the government's view that you cannot be friends

2    with the defendant, you cannot be his family, you cannot be

3    his current business associate or former business associate.

4    So I really don't know who in the government's view could ever

5    sign a bond to then qualify as, you know, what they're saying

6    is an appropriate moral suasion witness.

7           First -- I mean, second, with respect to Ms. Perez,

8    our application does not say that the government said anything

9    about his immigration, her son's immigration applications.

10   What was communicated by Ms. Perez to my client's family was

11   that her counsel had informed her that signing on the bond

12   could jeopardize that application in some sort of way, I

13   guess, given the high profile nature of the case.  So we've

14   withdrawn her at her request as a potential cosigner.  And as

15   we made clear in our reply last night, that removed -- she

16   has, I think she reports about $19,000 in salary and she was

17   not putting up a property.

18          So all the co-signers in this case collectively --

19   the government likes to focus upon each individual person and

20   they do not want to focus on this package as a whole and the

21   reason they don't want to do that is because it's a very

22   strong package which, as a whole, people with moral suasion,

23   people with financial responsibility, property.

24          What the government just gave you in a very lengthy

25   sort of summary was that, okay, now they're still not enough

1    skin in the game for the cosigners.  We're dammed if we do.

2    We're dammed if we don't.  If we put up properties of the

3    co-signers, now they're saying there's not enough, they don't

4    have enough skin in the, game so a $2 million bond is not

5    appropriate.  Fine, increase the bond to 3 million, but then

6    when we don't have both properties, they say that the

7    co-signers have no skin in the game.  So I don't really know

8    what to do there.

9            We decided to do a combination where we're putting

10   up the defendant's property which is valued we believe around

11   $1.2 million, and that property, as I said in the prior bail

12   applications and I know the Court read the transcripts, I'm

13   sure, the government talks as if they won a forfeiture on

14   traceable assets here.  Number one, these aren't assets they

15   have listed in an indictment as frozen or forfeitable.  These

16   are substitute assets that they're talking about.  They have

17   to win a trial and then they have to actually succeed in a

18   forfeiture proceeding.

19           So I think it's a little bit presumptuous to say

20   that these are properties that are, will be forfeited in our

21   multi-million dollar judgment that we haven't obtained yet.

22           The issue of Mr. Villar, Carlos Villar is a former

23   FBI agent that worked with Mr. Garcia Luna years ago.  They

24   remain close friends.  I've been in contact with him

25   throughout this process.  He's very concerned about his friend

1    and former, I guess, colleague.  They didn't work for the same

2    organization but they were colleagues.  And the version -- I

3    don't know, I don't know what notes the government has, but

4    any time I've spoken with Mr. Villar, you know, he's expressed

5    a real concern with Mr. Garcia Luna and I think he expressed

6    that in the e-mail that we attach to our reply.

7             The government has this issue with where he is, that

8    he's in Utah.  Okay.  Well, you know, we're in 2020.  We are

9    all sitting -- there are 16 people participating in a

10   telephone conference for a bail proceeding.  I talked to my

11   family via Zoom because we're all in, you know, we're all

12   hunkering down.  I'm still very close with my family.  I'm

13   still very close with people I speak on the telephone that I

14   see on occasion because people are traveling or working or

15   decided to retire in different places.  I think that's just a

16   red herring and they're just coming up with some excuse or

17   reason to try to disqualify someone who is an extraordinarily

18   strong suretor.

19             With respect to -- I mean, I think we put our

20   positions very clear on the record.  I don't -- every

21   defendant who is charged in a federal case has a, quote,

22   unquote, or is a flight risk in some sort of way, has a motive

23   to flee, as the government puts it.  This defendant is not

24   fleeing.  He's not going anywhere.  All these people have,

25   will have skin in the game.  His community in Florida, his

1  business community, his former colleagues, all these people

2  will be at risk.  The thought that he's going to somehow get

3  in the car and drive from Washington, D.C. or if he's living

4  in New York, drive to the border and, you know, somehow walk

5  across the border or be in a car or something like that and

6  then make his way is --

7           (Inaudible interruption.)

8           THE COURT:  Hold on.  Muted.

9           Go ahead, Mr. De Castro.

10          MR. DE CASTRO:  Thank you, Judge.

11          And this web that the government continues to allude

12  to, no one's asking them to disclose targets, but they can't

13  then say with just this crowd, there's this web of people.  No

14  one knows -- we only know who it is who are going to help him,

15  this web of people that are going to help him financially and

16  somehow physically get him to safety somewhere.  That web of

17  people, have they hired counsel for him?  No.  Does the

18  government talk about all the money Mr. Garcia Luna has in his

19  account?  No.  He has no money.  He has no ability to do this

20  and no one is coming to his, quote, unquote, "rescue."

21          Meanwhile, he's sitting in the MDC in a unit that is

22  directly next to the unit where they are allegedly

23  quarantining inmates and, which we can talk about later, does

24  have a higher risk for contracting COVID-19.  He is not a

25  flight risk here.  I think Judge Levy was clear and I think

1    right to say that this is a bailable case.  He said what do we

2    need.  We need some people with more skin in the game.  Fine.

3    So we did that.  People are willing to come to his aid and

4    they are.

5            With respect to this issue of property value, so

6    I've been doing this for a little while.  I've been a

7    prosecutor and now I've been a defense lawyer for over a

8    decade in the federal court and I think when we have an

9    appraisal available, we try to get them.  It's difficult when

10   the entire country has been on lockdown and has been preparing

11   for this since January.  We are basing the market value on the

12   people, the individuals who say, I think my house is worth

13   this amount, and then just looking around at sort of listings

14   to get a sense for the market.

15           So I think that, in the government's submission, I

16   think there's something about how the potential suretors have

17   only paid, paid interest.  Well, welcome to the banking world.

18   I wish I was JPMorgan Chase or some other bank because for the

19   first 10 years, you pretty much only pay interest and that's

20   why it's a 30 year mortgage, but I think this is his

21   community.  These are his friends, this is his family, that

22   are willing to sign on this bond and put themselves at risk.

23   I think it is very telling that someone who's a waiter, a

24   waitress, a manager in a restaurant, is willing to do this

25   because of their connection to the family.  Right?  Because

1   Mr. Garcia Luna, it's not just him, it's his wife, his two

2   children, all three of them.

3          Mr. Garcia Luna is a lawful permanent resident of

4   the United States.  His wife and two children are United

5   States citizens.  They moved here in 2012.  His kids are in

6   college.  They are remotely learning right now.  They are all

7   living together and they, they are all trying to -- and

8   they're renting an apartment.

9          So I think this is a very strong bail package.  I

10  don't know what else the government would want.  What they

11  have said to you Your Honor is, well, the suretors don't have

12  enough in the game.  Okay.  So the bond should be 3 million

13  then according to them.  Then that's it.  Fine.

14         Then I'll address COVID, I guess, after the

15  government.  Thank you, Judge.

16         THE COURT:  I'm just looking at the surety report

17  that was given to Judge Levy.

18         Mr. De Castro, does his wife, Ms. Flores Alvarez,

19  and his son and daughter, do they all have passports?

20         MR. DE CASTRO:  Yes, and they are all, and they're

21  all willing to provide them to the Court.

22         MR. HARRIS:  Your Honor, just to address that

23  point -- I know you're reviewing documents.  I'm happy to

24  wait.  I just wanted to reiterate that, you know, it's our

25  understanding that an American citizen can cross into Mexico

1  without a passport, without official documents, by vehicle or

2  by car.  So I don't think that turning in passports provides

3  any kind of deterrent or assurance that they're not going to

4  cross.

5          I'm happy to address some of the other points but if

6  Your Honor is focused on that, I'm happy to focus where Your

7  Honor would like clarity.

8          MR. DE CASTRO:  If I may, on that point of the

9  crossing, I mean we're proposing location monitoring and, you

10  know, sometimes -- you know, the government in a violation of

11  supervised release, for example, will say how amazing location

12  monitoring is and how, how we can pinpoint that this defendant

13  left here and violated supervised release, but then in a

14  proceeding like this, they want to say location monitoring is

15  not sufficient.  I don't understand.  There's a notification

16  immediately if someone leaves a particular area that is

17  designated and, you know, I've experienced it all over the

18  district and --

19          THE COURT:  I assume Mr. Harris is referring to his

20  family and not Mr. Garcia Luna in that last comment.

21          MR. HARRIS:  It's both, Your Honor, and the question

22  is not, I think, the ability of location monitoring to

23  determine if the defendant has left the district.  It's the

24  ability of if, to do so and the appropriate resources to be

25  mobilized in extremely short order in light of a pandemic and

1   government overload, where this defendant only needs a few

2   hours to get in the car and drive straight to the border and

3   the question will be if that's a sufficient amount of time for

4   the appropriate notifications to be made and once they have

5   been made, he can be stopped.

6               THE COURT:  A few hours from Washington, D.C. to get

7   to Mexico or to Canada even?

8               MR. HARRIS:  I certainly think it can be done in

9   less than a day, Your Honor.

10              THE COURT:  And the borders are closed.

11              MR. HARRIS:  Well, Your Honor, I think we all well

12  know that border is a porous border and it is not one that,

13  you know, if the official border crossing is closed, that

14  forebodes people from crossing the border.

15              THE COURT:  Hold on just one second.

16              It's a pretty good trek from DC to Mexico, to the

17  border.  It's at least a day.  It's 1,800 miles.

18              MR. DE CASTRO:  Judge, Google Maps tells me that it

19  would be one day and one hour by car to Laredo, Texas,

20  1,722 miles.

21              MR. HARRIS:  Well, Your Honor, if he cuts off his

22  ankle bracelet and flees, it's going to be very difficult to

23  locate him within one day and one hour, especially given the

24  current state of the country.  That's all it takes.

25              MR. DE CASTRO:  Not to belabor this point, but I

1  think it would be easier to find someone when you have the

2  entire resources of the federal government agencies and the

3  fact that most people are inside their homes.

4          THE COURT:  Didn't this just happen yesterday or the

5  day before where it was someone that Judge Orenstein released

6  and within an hour, he cut off his anklet and they got him?

7          MR. HARRIS:  So, Your Honor, I don't know the

8  specifics of the case.  I do know that he cut off his ankle

9  monitor.  I don't know whether he remained in his home.  I

10  don't know whether he remained in his community.  I certainly

11  do not have any reason to believe that he cut off his ankle

12  bracelet and started driving to the border.

13          THE COURT:  If you cut it off, it triggers.

14          MR. LONG:  Your Honor, this is Robert Long with

15  Pretrial.  I can speak to that case if necessary.

16          THE COURT:  Go ahead, Mr. Long.

17          MR. LONG:  Yes.  So that defendant was scheduled to

18  go into drug treatment the next day.  He did not flee.  We

19  were notified immediately of the bracelet being cut.  We were

20  able to -- yes, he picked up the phone, and it just doesn't

21  have any connection to the idea of fleeing the community or

22  risk of flight.  There's other noncompliance issues involved

23  in that case.

24          THE COURT:  But if someone cuts their anklet off,

25  notification is immediately sent to Pretrial Services,

1  correct?

2          MR. LONG:  That's correct.  We receive an immediate

3  tamper bracelet alert.

4          THE COURT:  And if they keep it on and just leave

5  the premises, then you get an alert as well, yes?

6          MR. LONG:  Correct.  So if the bracelet is on, they

7  leave the house without authorization, we're also notified as

8  well.

9          MR. HARRIS:  So, Your Honor, I do think that case is

10  materially different in that the defendant did not attempt to

11  flee or leave the home.

12          Pretrial Services may be notified that he has cut it

13  off, but the question is not notification.  Again, it's the

14  ability to locate him within short order if he chooses to flee

15  and I don't know that the resources can be mobilized that

16  quickly to locate him in time.

17          THE COURT:  So it's the government's position that

18  this is not just a bailable case at all; is that fair to say?

19          MR. HARRIS:  It is fair to say, Your Honor, and

20  that's because of a number of reasons which I think we

21  discussed earlier.  This defendant faces potentially life

22  imprisonment.  That's an extremely powerful motivator.  He has

23  a place to flee, resources to assist him when he arrives there

24  and every incentive to do so.  So it's our view that this is

25  just not a bailable case and, again, Pretrial Services reached

1  the same conclusion.

2        THE COURT:  I --

3        MR. DE CASTRO:  I'd like to add that Pretrial

4  Services reached that conclusion without ever talking to any

5  of the co-signers and that's because when I asked to provide,

6  when I asked them to provide that information, they didn't

7  want it and then they were received that information after

8  Judge Levy required it.  And then I spoke to Pretrial Services

9  that afternoon and I said, What would you like, do you want

10  telephone numbers, do you want time?  They said, Well, we have

11  this new form.  So then they sent me the new form, the suretor

12  declaration form.  I immediately had every single person fill

13  it out except for Ivan Ramirez and Monica Sarmiento because

14  they had counsel and that counsel needed to communicate that

15  to them and they immediately filled them out, sent it back.

16  They didn't call -- and then we set up times, a window of

17  times for them to call.  They didn't call a single person.

18        MR. LONG:  I'm sorry.  Once again, Robert Long,

19  Pretrial Services.

20        I'm not privy to the exact timeline, but the idea

21  this we didn't speak to people, I'm a little confused.  We did

22  surety reports that were submitted to the Court so I'm not

23  quite sure what that means, that we didn't speak to anyone.

24        MR. DE CASTRO:  Pretrial spoke to two people, Monica

25  Sarmiento and Ivan Ramirez in person.  Everyone else, they

1    relied on the suretor declaration form.  That's what I was

2    informed of, that they did not need to speak to them.  I have

3    e-mails that say it.

4             MR. HARRIS:  Your Honor, that's because Pretrial

5    Services reached the same conclusion, that there are no

6    combination of conditions of here, just the fact of the nature

7    of the crime charged, potential exposure, defendant's ties to

8    a foreign country that is just next door.  If there are no

9    combination of conditions here, then the particulars of the

10   suretors is not, is not relevant because there are no

11   combination of conditions.

12            MR. DE CASTRO:  Well, I sent an e-mail to Judge Levy

13   and he asked them to do the report.  They chose not to speak

14   to anyone.

15            THE COURT:  I disagree with Judge Levy so I am going

16   to reject the bail package that is been presented.

17            I don't believe there are any conditions or

18   combination of conditions that can ensure Mr. Garcia Luna's

19   presence in court when necessary, not to minimize the package

20   that's been offered, but I don't think that it is sufficient.

21   I am not sure that, given the seriousness of the charges that

22   Mr. Garcia Luna faces and the potential should he be found

23   guilty for a significant sentence, that he could resist the

24   urge to flee.  I reject the bail package.

25            That doesn't mean that the temporary release is not

1   in order so why don't you address that, Mr. Harris.

2          MR. HARRIS:  Yes, Your Honor.

3          So the defendant has asked for temporary release

4   under Section 3142(i).  He claims that he is in a high risk

5   category for susceptibility to COVID-19.  That's just not the

6   case.

7          In the defendant's own submission, the medical

8   doctor represented that people who are over 60 years old and

9   have a chronic medical condition are in a high risk category.

10  The defendant is not over 60 years old.  He does not have a

11  chronic medical indication.  They indicate that five years

12  ago, he had some kind of condition that required some sort of

13  treatment and that's the only document of a medical condition.

14  I think there's a reference to some other condition from 2019

15  but there's no medical documentation for that or anything to

16  kind of provide any kind of substantiation for that, for that

17  claim.

18         As the Court, I'm sure, is aware, the MDC has

19  compiled an extensive list of all inmates that fall into a

20  high risk category for COVID-19.  The defendant is not on that

21  list.

22         Now, the government, of course, takes the threats of

23  COVID-19 extremely seriously.  We are in daily contact with

24  the MDC and the BOP.  As of right now, my understanding is

25  there's only one inmate at MDC who had a confirmed case of

1   COVID-19.  That inmate is isolated.  That defendant has access

2   to hot water and soap and that's without video contact to

3   confirm that's the defendant's particular situation.  The BOP

4   has issued a number of procedures to ensure the health and the

5   safety of the inmates including requiring inmates to self

6   seclude.

7          We think this inmate does not have, fall into a high

8   risk category.  There's no medical documentation to support

9   that.  We do take this seriously and the MDC is taking extra

10  precautions to ensure the safety of the defendants.  The U.S.

11  Attorney's Office is not opposing bond petitions categorically

12  with respect to all inmates.  We are doing it on a case by

13  case basis and, as appropriate, releasing genuine high risk

14  inmates.  The defendant is just not one of those inmates.  He

15  does not fall into a high risk category and so he should not

16  be granted temporary release.

17          THE COURT:  Mr. De Castro?

18          MR. DE CASTRO:  Thank you, Judge.

19          So in the government's response to our bail

20  application and I think even today, they are extraordinarily

21  minimizing the danger that COVID-19 poses to the population

22  inside the MDC including Mr. Garcia Luna.

23          We are today, March 31, 2020, nearing or we have

24  1,218 deaths in New York City, 250 yesterday alone.  The

25  Javitz Center is a hospital.  Central Park has a military

1    style tent hospital.  A military ship has arrived and docked

2    in New York City for emergency beds to assist in a crisis.

3    Mayor de Blasio is essentially begging the United States

4    Government for more resources every single day and FEMA has

5    started to make makeshift morgues in New York City.

6            The government's response to our application in this

7    regard is the same as their response has been in almost all of

8    these applications, citing the BOP's action plan.  Those

9    action plans are under, which they say they have started in

10   January of 2012, are very, very, very questionable.

11           THE COURT:  I have to cut you off.  I have to cut

12   you off Mr. De Castro, because that isn't true.

13           I've been for the past week dealing with

14   applications for temporary release and the government does not

15   merely fall back on BOP's efforts to make the facility as safe

16   as it can be.  Where someone has a medical condition, the

17   government has, if not consented for temporary release, at

18   least not objected.  So they do take this seriously.  They are

19   responding appropriately.  We had a defendant earlier this

20   morning who has a documented health condition that makes him

21   at higher risk for developing complications related to

22   COVID-19.

23           MR. DE CASTRO:  I don't mean to suggest

24   categorically.  I mean, in terms of those that they are

25   opposing, they are opposing many, because I know, I'm doing

1   them, I have also a client who was released from the MDC and

2   so what I'm talking about is that I think the information

3   coming out of the MDC and -- withdrawn.

4          When the government is opposing an application, what

5   you see is look the BOP's action plan, look at how great the

6   BOP's action plan is.

7          Number one, yes, the MDC is apparently reporting

8   only one inmate that is positive.  This is also a facility

9   that has only has nine, nine, according to Warden Edge, nine

10  kits in order to test people.  They have identified 537

11  inmates as potentially vulnerable but yet, the Federal

12  Defenders, myself, others have asked what is the basis.  No

13  one has informed anybody of that basis because I have two

14  clients on that list and I am trying to figure out what the

15  basis is, they won't even tell us and, furthermore, for even

16  those clients that are at high risk, I am now on day six, six

17  awaiting a telephone call with my client.

18         It is clearly an emergency situation at the BOP.

19  There are not only inmates that we think are positive and are

20  just not symptomatic right now and are probably shedding the

21  virus and infecting others, but there are staff members that

22  are positive.  As Representative Velazquez had reported at the

23  end of March, there were 3 staff members that were positive.

24  Since then, two more are positive and, in fact, I believe the

25  Representative is also positive now, too.

1          So there is, according to the Federal Defender for

2    the Eastern District, Deirdre von Dornum, in her affidavit

3    filed yesterday in a class action for at-risk defendants at

4    the MDC, they have spoken to greater than 100 clients at the

5    MDC, I certainly haven't spoken to that many, I don't have

6    that many in jail, but that there has been very little

7    sanitation changes.  Some units have soap.  There has been

8    basically a ten minute presentation made to the inmates

9    regarding safety procedures and COVID.  The staff and the

10   units are -- some are wearing masks.  Some are not wearing

11   protective gear.  It's up to them individually.

12          And that -- sorry, Judge.  One second.

13          I think that the wave is coming as is the wave at --

14   I hope it's not and I hope they are putting in procedures, but

15   what I'm seeing is that the wave is probably coming which is

16   the wave that is happening at the New York City jails right

17   now where it is running rampant.

18          Judge Engelmayer in the Southern District of

19   New York yesterday issued an opinion in a case which is United

20   States versus McKenzie.  In that, in considering the similar

21   application, McKenzie, he was released on bail pending

22   sentencing.  So he was a convicted defendant on a plea on a

23   mandatory remand case for aiding and abetting and assault with

24   a dangerous weapon.  He was at the MCC and his high risk was

25   simply that he had asthma and Judge Engelmayer held --

1        THE COURT:  That's not -- that is not such a simple

2   thing.  I mean, asthma is a respiratory problem that can be,

3   could prove deadly if someone has COVID-19 and this person who

4   you are pointing to is in a very different situation than your

5   client.  He is awaiting sentencing so there's even less

6   incentive for him to flee or to violate the terms of his

7   release than someone with Pretrial.  So that's -- it's almost

8   an apples and oranges comparison.

9        MR. DE CASTRO:  Well, Judge, I would submit that

10  it's the opposite.  Someone who knows that they're about to

11  serve a significant amount of jail time for being convicted

12  versus someone who is planning on fighting the charges, is

13  presumed innocent and plans on prevailing.  There's a big

14  difference there, I would submit.

15       But I think what I wanted to quote from

16  Judge Engelmayer, and I agree with you, asthma is very serious

17  but, unfortunately, that's not the position I'm being told by

18  the BOP and in my other clients with asthma, unless it's

19  serious, serious asthma where they take medication on top of

20  an inhaler.

21       But in that case, Judge Engelmayer, you know,

22  recognized that, quote, "Several courts have already

23  recognized the heightened threat posed by COVID-19 to an

24  inmate with a documented respiratory condition in a detention

25  facility with multiple confirmed cases, that that presents a

1   unique set of circumstances."  He goes on to say and conclude

2   that it's self-evident to the court that Mr. McKenzie is at

3   greater risk of contracting COVID-19 while confined at the MCC

4   and will be safer at home.  But I think what's also

5   interesting is that in, in that opinion, Judge Engelmayer, and

6   the government's response is very similar to the government's

7   response here, citing --

8             THE COURT:  I'm sorry.  I think Judge Engelmayer is

9   wrong.  Okay.  Someone who has asthma is not at greater risk

10  for contracting COVID-19.  Someone who is immunodepressed is.

11  So the problem with asthma and other respiratory problems is

12  not that because of that, you are going to get COVID-19.  It's

13  that if you get COVID-19, it's much more devastating because

14  you already have respiratory problems and COVID-19 attacks,

15  leads to pneumonia and other things that cause breathing

16  problems.

17            And, you know, all of this is besides the point.

18  Your client doesn't have a health condition, I haven't heard,

19  really that is problematic.

20            MR. DE CASTRO:  His respiratory issue which we're

21  able to get documentation from 2016 but he had a recent attack

22  in 2019, is something that his doctor says potentially was

23  hereditary.  His father passed way of a respiratory issue,

24  that, yes, the change in the season and air conditioning and

25  things trigger an attack.  What are his symptoms?  As

1    described by him and his family, shortness of breath, high

2    fever exacerbated by the anxiety of having it.  He was given

3    naproxen, acetaminophen, ibuprofen, and those are his

4    respiratory issues.

5              So I think were he to -- I appreciate the judge's

6    comment, yes, I think that that's right, and none of us are at

7    higher risk of getting it, right?  Everybody can just get it.

8    That's the scary part of it.  It's just spreading to everyone.

9    It's the risk of complications should you contract it which,

10   you know, I submit I think is, it is going to run rampant

11   within the MDC and MCC.  I hope I am wrong about that, but

12   what we see happening seems to be to the contrary, so I

13   resubmit that we think his respiratory issue is sufficient

14   enough to temporarily release him.

15             THE COURT:  Can you point me to where in Dr. Giftos'

16   affidavit it describes his respiratory condition?

17             MR. DE CASTRO:  We don't -- it's not in his

18   affidavit, Judge.  I'm sorry.  One second.  My apologies.  I

19   wasn't able to print everything.  I'm in a printerless spot so

20   I'm just looking electronically at an exhibit.

21             Valerie, do you have it handy?

22             MS. GOTLIB:  Yes.  Exhibit K is the letter from our

23   client's doctor and Exhibit L is the affidavit from Dr. Giftos

24   and it is in Exhibit K that we have information specific to

25   our client's particular respiratory issues.

1          THE COURT:  One second.  Bear with me, please.

2          MS. GOTLIB:  And this was the initial submission

3    filed on March 25th, Your Honor, not the reply.

4          THE COURT:  I can't find it.  I don't have access.

5          MR. DE CASTRO:  Judge, I have it open.  I can read

6    it to you, if you like.

7          THE COURT:  Yes, please.

8          MR. DE CASTRO:  So it's from Dr. Enrique Herrera

9    Ascencio, A-S-C-E-N-C-I-O, a translated version.  It was in

10   Spanish originally.  The translated version reads as follows.

11         "Through this channel, it is stated that on June 26,

12   2015, I examined Ing Genaro in the office of the undersigned

13   below for a respiratory condition characterized by cough and

14   whitish expectoration, mild respiratory distress and

15   occasional wheezing.  I referred him after exposure to air

16   conditioning.  Bronchodilators were prescribed.  Aipatropium

17   bromide for three days, with a parenthetical that it is

18   Atrovent, and Aclidinium for six weeks as well as symptomatic

19   ibuprofen and Vartalon.

20         THE COURT:  That was in 2015?

21         MR. DE CASTRO:  Correct.

22         THE COURT:  And was there an exacerbation or

23   recurrence of that in 2019?

24         MR. DE CASTRO:  Yes, in November of 2019.

25         THE COURT:  Where in the record is there an

1    indication of his father having the same or similar

2    conditions?

3            MR. DE CASTRO:  It's not in the record, Judge.  I

4    haven't been able to obtain any documentation of that.  I'm

5    just proffering it, Your Honor, that the family has informed

6    me of that.

7            MR. HARRIS:  And, Your Honor, this is Ryan Harris.

8    Just to also be clear, other than this one paragraph about the

9    condition for a few weeks in 2015, there is no documentation

10   substantiating the claim that there was a recurrence of his

11   condition in 2019.  As far as the medical documentation is

12   concerned, all it shows is that he had mild respiratory

13   distress in June of 2015 and he took medication for a few

14   weeks.

15           MR. DE CASTRO:  I think also the CDC indicator is

16   that it's people over 50, not 60.  He is 51.

17           MR. HARRIS:  Well, Your Honor, the defendant's own

18   affidavit from the medical doctor indicated that it was over

19   60 and, again, the MDC has not made a high risk, this is

20   not -- in the document submitted by the doctor, there's no

21   reference that this is a chronic condition which is the real

22   concern here.  The concern is not whether in the past, years

23   ago, you had a respiratory illness but whether you had a

24   chronic respiratory or otherwise related condition now, not

25   something that you had five years ago.

1          THE COURT:  Last word, Mr. De Castro.

2          MR. DE CASTRO:  So I wouldn't know if he's having

3     any respiratory conditions because I can't speak to my client

4     anyway.  I don't even know -- no matter what we do to request

5     it and I appreciate the BOP's issues.  I don't know, I don't

6     know what, what's happening.  I know he's very scared and is

7     very concerned that he will contract the virus and if he does,

8     it will have a very significant effect.

9          THE COURT:  The application for temporary release is

10    denied absent some definitive indication that Mr. Garcia Luna

11    suffers from a chronic respiratory condition or some other

12    medical condition that places him at a higher risk for

13    complications related to COVID-19.  I find that there is

14    insufficient grounds to release him temporarily.  So those are

15    my rulings.

16         Mr. De Castro, if you would like to appeal that to

17    Judge Cogan, you're free to do so.

18         MR. DE CASTRO:  Thank you, Judge.

19         THE COURT:  Is there anything else?

20         MR. HARRIS:  Not from the government, Your Honor.

21         MR. DE CASTRO:  No, Your Honor.

22         THE COURT:  Thank you.

23         THE CLERK:  Okay.  Thank you.  Thank you, everyone.

24         (Teleconference ended.)

25

CMH     OCR     RMR     CRR     FCRR

*I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*
/s/ Charleane M. Heading  April 10, 2020