**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

v.

GENARO GARCIA LUNA,   19 Cr. 576 (BMC)

                Defendant.

**GENARO GARCIA LUNA'S MEMORANDUM OF LAW IN OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

**PRELIMINARY STATEMENT**

The government's motions *in limine* should be denied. The government is attempting to admit uncharged, irrelevant, incredible, and unduly prejudicial "other act" evidence under Federal Rule of Evidence 404(b). The allegations are unrelated to the charged conduct and the supporting evidence to corroborate these allegations is so weak it destroys any of its questionable probative value. These alleged Rule 404(b) evidence: (1) is not within the scope of the alleged conspiracy or intertwined with any of the allegations; (2) is not necessary to complete a story or provide any necessary background; (3) is not within the same time frame as the allegations in the Indictment; and (4) does not help the government show that Mr. Garcia Luna was a member of any narcotics conspiracy. Furthermore, this alleged evidence is irrelevant, unduly prejudicial and its only purpose is to try and demonstrate Mr. Garcia Luna's bad character. This Court must vigilantly protect the potential prejudicial impact of other act evidence because it can so easily distract a jury from the conduct charged in the case and cause the defendant to be convicted by propensity evidence.[1]

**BACKGROUND**

In 1989, at the age of twenty-one, Genaro Garcia Luna started working for the Mexican government. Mr. Garcia Luna is trained as an engineer, with a Bachelors of Science degree in mechanical engineering. Initially, he was tasked with using those skills in the Center for National Security and Investigation ("CISEN"). In 2000, Mexican President Vincent Fox dissolved the Mexican Federal Judicial Police ("PJF") due to the rampant corruption among its members. In that same year, President Fox appointed Mr. Garcia Luna to serve as the Director

---

[1] With regards to the government's motions to exclude a selective prosecution defense, or references to potential punishment, at this time the Defense does not intend to introduce a selective prosecution defense or refer to Mr. Garcia Luna's sentencing exposure should he be convicted of the charged crimes.

1

of the newly established Federal Investigation Agency (known as the "AFI"). As AFI Director, with the help of the United States government, Mr. Garcia Luna investigated and fired over 3,000 corrupt police officers, largely on the grounds of corruption involving the numerous and notorious Mexican drug cartels. With Mr. Garcia Luna as Director of the new AFI, the ties between the law enforcement agencies in Mexico and the United States were so strong that the members of AFI were sent to FBI headquarters in Quantico, Virginia to receive training.

In 2006, Mr. Garcia Luna was appointed by President Felipe Calderón as Secretary of Federal Public Security, a cabinet level position. President Calderón tasked Mr. Garcia Luna with spearheading his government's aggressive war against drugs and the cartels. Mr. Garcia Luna became the face of that war. President Calderón grew the federal police from 6,000 to 37,000 members to combat the Mexican drug cartels and he put Mr. Garcia Luna in charge of them operationally. With financial aid and the expertise of United States government personnel, Mr. Garcia Luna was able to develop a world-class intelligence platform to fight the cartels and attempt to capture Mexico's number one public enemy, Joaquín Archivaldo Guzmán Loera, a.k.a. "El Chapo." In 2010, with this new platform, Mexican authorities were able to arrest and extradite the government's chief witness against Mr. Garcia Luna, Jesus Zambada, along with the son and the nephew of Ismael "El Mayo" Zambada. This platform also led to the eventual arrest and extradition of El Chapo himself, who has since been convicted and is currently serving a sentence of life imprisonment.

Also as part of his responsibilities as Secretary of Public Security, Mr. Garcia Luna was in charge of the Mexican federal prison system. While Mr. Garcia Luna was Secretary, there were no escapes from any federal prisons. It has been well publicized that El Chapo escaped from Mexican federal prisons twice, in 2001 and 2015. The former occurred prior to Mr. Garcia

2

Luna's oversight of the prisons, and the latter occurred after he left his post in the Mexican Government.  In fact, as part of his role as Director of AFI, before he became Secretary, Mr. Garcia Luna's team was responsible for arresting the guards responsible for El Chapo's 2001 escape, and he personally arrested El Chapo's brother Arturo Guzmán Loera.

During Mr. Garcia Luna's tenure as Secretary of Federal Public Security, the United States government not only assisted the Mexican government with fiscal and investigative aid, but it also offered the support of top policy makers spanning multiple presidential administrations.  Officials ranging from Janet Napolitano, Robert Muller, Eric Holder and Hillary Clinton came to Mexico City to meet with Mr. Garcia Luna.  Members of Congress from both parties also came to visit Mr. Garcia Luna and affirmed the United States government's support for his efforts against the cartels and, most importantly, his assistance in the hunt for El Chapo.  While a candidate for President of the United States, Senator John McCain also met with Mr. Garcia Luna to reaffirm the United States government's support in the fight against the cartels.

Mr. Garcia Luna's position put him in the public eye like he had never been before.  Like all government officials before him tasked with fighting the drug cartels, he made many enemies including those aligned and/or benefitting from the drug cartels upon which the Calderón administration had declared war.  Not surprisingly, as the Calderón administration aggressively waged war against the cartels, allegations of corruption were publicly made against Mr. Garcia Luna. Mr. Garcia Luna stayed the course and, in close partnership with the United States, continued to take the fight to the cartels.  Allegations of corruption have persisted for decades and despite his opponents' fervent attempts to do so, have never been substantiated.  Politicians from opposition parties have even made these allegations at public hearings.  The United States

government was fully aware of these allegations when they partnered with Mr. Garcia Luna in combatting the cartels. It was also aware of these allegations when it sent top diplomats and government officials to not only assist Mr. Garcia Luna with his on-the-ground work, but also when they posed for public photographs with him as a show of the United States government's support of his efforts.

In 2012, after the election of Mexican President Enrique Peña Nieto, Mr. Garcia Luna left the Mexican government and entered the private sector. Utilizing his expertise in engineering and public security, he founded a security consulting company. The new Mexican administration shifted away from the war on drugs that Mr. Garcia Luna and the United States government had been fighting in Mexico, and instead took a more conciliatory approach to dealing with the cartels, seemingly ending the focus on arresting cartel leaders.[2] The current Mexican President has continued this conciliatory policy. For example, President Andrés Manuel López Obrador supported the release of El Chapo's son when he was arrested in 2019, and went on to personally meet with El Chapo's mother in 2020.[3]

After leaving his government post, like many former government officials, Mr. Garcia Luna started consulting. He also moved to the United States and applied for citizenship. In December 2019, Mr. Garcia Luna was arrested in Texas on the current charges. Since his arrest he has been detained primarily at the Metropolitan Detention Center in Brooklyn, New York ("MDC"). While housed at the MDC, the government began using a jailhouse informant to obtain information about Mr. Garcia Luna as detailed in its motions *in limine*.

---

[2] *See* Patrick Corcoran, *What Mexico's Elections Mean for Crime Policy: Part I*, IN SIGHT (June 25, 2012), https://web.archive.org/web/20120704094118/http://www.insightcrime.org/insight-latest-news/item/2811-what-mexicos-elections-mean-for-crime-policy-part-i.

[3] *See* Carrie Kahn, *Mexico's President Greets El Chapo's Mom and Lawyer, Ignoring Coronavirus Rules*, NPR (Mar. 30, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/03/30/823928857/mexicos-president-greets-el-chapo-s-mom-and-lawyer-ignoring-coronavirus-rules.

In its motions, however, the government provides little to no detail regarding the circumstances surrounding the government's use of the jailhouse informant, and the circumstances of his charges, both of which bear directly on his credibility. Ruslan Mirvis, the government's jailhouse informant who told Mr. Garcia Luna that he was part of the Russian mafia is not, in fact, in the Russian mafia but rather a child pornographer. He was arrested in April 2017, and charged with Sexual Exploitation of a Child in violation of 18 U.S.C. § 2251(a). In May 2017, he was indicted for a violation of 18 U.S.C. § 2251(a) and Receipt of Child Pornography in violation of § 2252(a)(2). If convicted, those charges carry a mandatory minimum sentence of fifteen years and a maximum potential sentence of life imprisonment in a system that has abolished parole.

Mr. Mirvis was denied bail twice before coming to the government with his plan. At one of his unsuccessful bail hearings, the Magistrate Judge stated that his case involved "the most heinous series of allegations relating to child pornography that" she had ever seen. *United States v. Mirvis*, 17 Cr. 273 (FB) (Dkt. No. 17 at 3). Based on the materials publicly available and those provided to the defense by the government, Mr. Mirvis's motives were clear. After twice being denied in desperate attempts at bail and after suffering abuse within the jail by inmates and guards alike at the MDC, when he was housed in a cell next to Mr. Garcia Luna he saw an opportunity. He would try to setup Mr. Garcia Luna in order to lessen his inevitably long sentence. He befriended Mr. Garcia Luna and did his best to gain his trust.

While housed with Mr. Garcia Luna, Mr. Mirvis had access to all of Mr. Garcia Luna's discovery and personal items. As the government has already noted, Mr. Mirvis was able to copy Mr. Garcia Luna's personal notes. In addition, he could read the names of all the people

5

involved in Mr. Garcia Luna's case.  Mr. Mirvis saw his opportunity and had his counsel call the government – he could help them with a big fish.

After meeting with Mr. Mirvis, the government agreed to fit him with a recording device and it had the Bureau of Prisons move the two men into the special housing unit ("SHU") at the Essex County Correctional Facility.  While together, the device was recording 24 hours a day, 7 days a week, for over a 20-day period, resulting in over 500 hours of recordings.  Of those over 500 hours, the government has directed the court to two minutes of recordings as proof of Mr. Garcia Luna's willingness to tamper with witnesses.  The government argues that this evidence is somehow reliable, coming from the most unreliable of sources, but notably it did not charge Mr. Garcia Luna with any crimes associated with these alleged acts.

In the over 500 hours of recordings provided by the government, it cites only a two-minute clip as proof of witness tampering.  Of those two minutes, approximately half is incomprehensible and largely inaudible.  The government makes claims that Mr. Mirvis tried to call an undercover agent posing as a Russian mobster on behalf of Mr. Garcia Luna later, but there are no allegations that Mr. Garcia Luna spoke with anyone posing as a Russian mobster.

A review of the majority of the 500 hours of recordings reveals that, when there are actually audible conversations, Mr. Mirvis is pestering Mr. Garcia Luna with questions and details about the allegations in his case, the intent of which is now clear.  Mr. Mirvis was trying to duplicitously get Mr. Garcia Luna to make inculpatory statements.  Instead, what Mr. Mirvis was only able to record was Mr. Garcia Luna mentioning the name of his co-defendant in the case, and a man that Mr. Garcia Luna arrested and who later testified about Mr. Garcia Luna at the trial of El Chapo, a fact which has been widely reported by the media.  It is not surprising that Mr. Garcia Luna knew the names of both men, as one was his subordinate in Mexico, and

the other was part of a cartel that Mr. Garcia Luna was tasked with destroying and who Mr. Garcia Luna hunted and arrested. After 20 days of recordings, all the government could come up with was Mr. Garcia Luna mentioning the government's witness and his codefendant.

In its motions, the government also seeks to admit 404(b) evidence related to alleged threats made to a Mexican journalist. Like the claims related to Mr. Mirvis, the government provides the Court with little to no context regarding the allegations. While these baseless allegations are new to the Court, they are not new to the international community. These claims have been made for decades and never substantiated. While the government does not provide specifics of the identity of the journalist, it is likely that it is referring to Anabel Hernández, and her decade old public claim that she heard that someone threatened her on behalf of Mr. Garcia Luna. These old claims were investigated and found incredible.

Ms. Hernández first started writing about Mr. Garcia Luna in a 2007 book, and continued her personal vendetta against him in the press for years. Despite the fact that the two have never met, Ms. Hernández continues to claim that she was threatened by Mr. Garcia Luna.

Ms. Hernández has been accusing the leaders of the Mexican Government of working with the cartels over multiple administrations. After Ms. Hernández made the claim that current Mexican President Andrés Manuel López Obrador and his party is supporting the Sinaloa Cartel, Mexican Senator Citlalli Hernandez described Anabel Hernández's work "as writing gossip without rigor."[4]

This is not the first time that Ms. Hernández has had the integrity of her work attacked. She has been sued for defamation multiple times by subjects of her reporting. In 2012, Mexican

---

[4] *See ¿Anabel Hernández decepciona a Morena y la Cuarta Transformación?,* SDPNOTICIAS (June 4, 2022), https://www.sdpnoticias.com/mexico/anabel-hernandez-decepciona-a-morena-y-la-cuarta-transformacion/.

attorney Jorge Carpizo McGregor, who passed away the same year, sued Ms. Hernández for claims made about him in her book *Los Señores del Narco*.[5] In 2021 it was reported that Mexican singer and actress Ninel Conde and television host Galilea Montijo planned to sue Ms. Hernández over accusations made in Hernández's book *Emma y Las Otras Señoras del Narco*.[6][7]

## DISCUSSION

### THE GOVERNMENT'S ATTEMPTS TO ADMIT UNTRUE, INCREDIBLE, IRRELIVENT, AND UNDULY PREJUDICIAL ALLEGATIONS THAT STRAY FAR FROM THE CHARGES IN THE INDICTMENT, AND ARE SIMPLY DESIGNED TO PREJUDICE THE JURY AGAINST MR. GARCIA LUNA, SHOULD BE DENIED

The government's claims of witness tampering and threatening Ms. Hernández are unsubstantiated, incredible, and transparent attempts by the government to prejudice the jury against Mr. Garcia Luna. These allegations stray far from the allegations in the indictment and are irrelevant, will confuse the jury, create trials within a trial, and are unduly prejudicial. With respect to the claims of Mr. Mirvis, the government is relying on incomprehensible recordings made by a child pornographer with the clear incentive to entrap Mr. Garcia. With respect to the claims of the journalist, they are made by a journalist with a personal axe to grind against Mr. Garcia Luna and who has been accused of making defamatory statements throughout her career. Furthermore, her claims are not based on any interactions or conversations with Mr. Garcia Luna but on hearsay and likely double and triple hearsay, as well as her assumptions. Assuming

---

[5] *See* Emir Olivares Alonso, *La demanda por daño moral, por afirmaciones falsas: Carpizo*, PERIÓDICO LA JORNADA (Mar. 5, 2012), https://www.jornada.com.mx/2012/03/05/politica/014n1pol.

[6] *See* Leslie Carrasco, *Aseguran que Ninel Conde ya puso una denuncia contra Anabel Hernández,* DIARIO PRONTO (Mar. 19, 2022), https://www.diariopronto.com/espectaculos/2022/3/19/aseguran-que-ninel-conde-ya-puso-una-denuncia-contra-anabel-hernandez-18122.html.

[7] *See* Karen Robledo, *Galilea Montijo demandará por difamación, busca sanciones contra Anabel Hernández en Estados Unidos y México,* PLUMAS AUTOMICAS (Dec. 1, 2021), https://plumasatomicas.com/noticias/galilea-montijo-demandara-por-difamacion-busca-sanciones-contra-anabel-hernandez-en-estados-unidos-y-mexico/.

*arguendo* that the two claims were substantiated, they would still be inadmissible because neither pass the 404(b) test nor are they inextricably intertwined with the charges against Mr. Garcia Luna.

Uncharged acts evidence, or "other-act" evidence may be admissible as evidence of a charged conspiracy if that evidence falls within the scope of the conspiracy. *See United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) (citing *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983)). If the other-act evidence arose out of the same series of transactions as the charged offenses, is inextricably intertwined with the evidence regarding the charged offenses, or is somehow necessary to complete the story of the crimes on trial, it may be admissible as background of the conspiracy. *See United States v. Baez*, 349 F.3d 90, 94 (2d Cir. 2003) (citing *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997)). Other-act evidence may be properly admitted as background evidence if it also involved the same participants as the charged offense(s) and occurred within the same time-frame, however, the court must carefully limit the scope of the testimony in order to avoid any undue prejudice. *See United States v. Needham*, 377 Fed. Appx. 84, 86 (2d Cir. 2010).

Courts view "inextricably intertwined" narrowly. *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (where the uncharged offense of adding fictional items to defendant's company's inventory was considered inextricably intertwined with the charged crime of making false statements to secure advances on a line of credit for that company). The courts factor whether "[the] details of the uncharged transaction are necessary to understand the charged transaction." *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007); *see also United States v. Elias*, No. 18 Cr. 33 (NGG), 2022 U.S. Dist. LEXIS 42826, at *3 (E.D.N.Y. Mar. 10, 2022) (where the court denied the government's motion because the information that the

9

government moved to admit was "not necessary to understand" the charges). In *United States v. Gonzalez*, 110 F.3d 936 (2d Cir. 1997), the district court admitted evidence of the defendants' connection to an uncharged attempted burglary which occurred in the vicinity of their arrest. The Second Circuit affirmed, saying "[t]he burglary evidence in this case provide[d] crucial background evidence that gave coherence to the basic sequence of events that occurred on the night" the charged crime was alleged to have occurred. *Id.* at 942.

Besides using uncharged evidence strictly to fill in gaps on a timeline, courts have allowed evidence that showed an amount of familiarity or knowledge required by the defendant that is necessary to understand the charged conduct. In *United States v. Tracy,* 12 F.3d 1186, 1195 (2d Cir.1993), the uncharged evidence went to show that defendant "was a member of the conspiracy and played a role that gave him … familiarity with [its] operation" and was thus properly admitted. Other kinds of familiarity with a conspiracy that allow the government to introduce uncharged conduct would be efforts to protect the conspiracy, not efforts for a defendant to protect themselves. *See United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992); *United States v. Herron*, No. 10 Cr. 0615 NGG, 2014 U.S. Dist. LEXIS 65131 at *13-14 (E.D.N.Y. May 12, 2014).

As with all evidence, to be admitted, it must pass the analysis in Federal Rule of Evidence 403, which states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The Advisory Committee's notes describe unfair prejudice as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note to FED. R. EVID. 403.

If other-act evidence is not background evidence, the government can attempt to introduce it through Rule 404(b), however, it is still subject to the analysis of unfair prejudice under Rule 403. Federal Rule of Evidence 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motives, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) evidence is admissible unless it is: (1) introduced to show the defendant's criminal propensities or bad character; (2) overly prejudicial under Rule 403; or (3) not relevant under Rule 402. *See United States v. Pena*, No. 09 Cr. 341 (VM), 2013 WL 5693831 *2 (S.D.N.Y. Oct. 11, 2013).

Even evidence that is offered for a proper 404(b) purposes is not admissible if it does not meet the threshold requirement of relevancy. *United States v. Gilan*, 967 F.2d 776, 781 (2d Cir. 1992) (quoting *United States v. Gonzalez-Lira*, 936 F.2d 184, 190 (5th Cir. 1991)). Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. FED. R. EVID. 401. Accordingly, evidence proffered to prove a fact not in dispute is irrelevant. *Cf. United States v. McCallum*, 584 F.3d 471 at 475-76 (2d Cir. 2009) (finding the district court erred by admitting evidence that, while relevant as it went to an issue in dispute, was unduly prejudicial); *United States v. Garcia*, 291 F.3d 127, 137 (2d Cir. 2002) (noting that even where the evidence is offered for a proper 404(b) purpose "the government still must establish the relevance of the evidence to the issue in dispute.").

"The government may not invoke Rule 404(b) and proceed to offer, carte blanche, any prior act of the defendant [simply because it is] in the same category of the crime." *Id.*; *see also*

11

*McCallum*, 584 F.3d at 475. When the government seeks to introduce Rule 404(b) evidence, it must explain, "in detail the purposes for which the evidence is sought to be admitted." *United States v. Levy*, 731 F.2d 997, 1002 (2d Cir. 1984). Additionally, the government must establish that the other-act evidence "closely parallel[s]" the charged crimes. *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (internal citations omitted); *United States v. Mercado*, 573 F.3d 138, 143 (2d Cir. 2009).

Even if the evidence is otherwise admissible under Rule 404(b), as with "other acts" evidence, Rule 403 requires the Court to determine if the evidence has probative value that outweighs its prejudicial impact. *See Levy*, 731 F.2d at 1002. If, after this analysis, the Court deems that the evidence is admissible, as a final precaution and "protection against unfair prejudice to the defendant", it must instruct the jury that it cannot consider the offered evidence simply for propensity. *Id*. The Rule 403 test serves as a safeguard against overly prejudicial evidence, with limiting instructions being unable to fully insulate the defendant from prejudice.

Finally, as amended in 2020, Rule 404(b) requires notice not only of the non-propensity purpose of the evidence, but also the basis for concluding the evidence is relevant in light of the purpose. Here given the incomprehensible nature of the proffered evidence, the government is lacking a basis for concluding that the evidence is relevant for the offered purpose.

In this case, the government seeks to introduce propensity evidence under Rule 404(b) that: (1) is not within the scope of the alleged conspiracy or intertwined with any of the allegations; (2) is not necessary to complete a story or provide any necessary background; (3) is not within the same time frame as the allegations in the Indictment; and (4) does not help the government show that Mr. Garcia Luna was a member of any narcotics conspiracy. Furthermore, this alleged evidence is irrelevant, unduly prejudicial and its only purpose is to try

12

and demonstrate Mr. Garcia Luna's bad character.  This Court must vigilantly protect the potential prejudicial impact of other act evidence because it can so easily distract a jury from the conduct charged in the case and cause the defendant to be convicted by propensity evidence.

The recorded conversations between Mr. Mirvis and Mr. Garcia Luna are not admissible under 404(b) because they do not properly relate to the conspiracy or provide necessary background.  The evidence is also inadmissible and unduly prejudicial because Mr. Mirvis's clear motives, his credibility, and the sound quality of large swaths of these recordings, renders them unintelligible and incomprehensible.  Mr. Garcia Luna is being charged with conspiring to import cocaine into the United States.  The accusations of witness tampering are not only made years after the conspiracy was alleged to take place, but do not relate in any way to the conspiracy.  *See Thai*, 29 F.3d 785.  To be inextricably intertwined with the conspiracy, the government would have to allege that these recordings are somehow necessary to understand the charged offense.  *See Stein*, 521 F. Supp. 2d 266.  The recordings do nothing to help the jury understand the charged offense of conspiring to import drugs.  The allegations being made by the government make the charged conduct less understandable, not more, and will only serve to confuse the jury and create a trial within the trial unrelated to the charged conduct.

The justification the government relies on to admit the recordings is that it somehow evidences Mr. Garcia Luna's knowledge of the conspiracy.  In support, the government cites *Tracy,* where the other evidence was admissible because it showed how the defendant was able to identify people that provided information that was reflected in Tracy's criminal complaint.  12 F.3d at 1195.  Mr. Garcia Luna was assigned by the Mexican President, and aided by the United States government, to eliminate the drug cartels.  He would have been derelict in his responsibilities if he did not have knowledge of Jesus "El Rey" Zambada.  Mr. Garcia Luna was

13

Secretary of Public Security when Mr. Zambada, brother of Sinaloa cartel co-leader Ismael Zambada, was arrested and extradited to the United States. And even if Mr. Garcia Luna, the head of Mexican national security and the face of the war on drugs, was somehow not aware of Jesus Zambada, then he would have been aware of him after Zambada testified about Mr. Garcia Luna taking bribes during the highly publicized trial of El Chapo in 2018 and 2019. Similarly, any audios of Mr. Garcia Luna mentioning his co-defendant Luis Cardenas Palomino shows no such special familiarity with the conspiracy. Mr. Palomino appears on the indictment with Mr. Garcia Luna and was his subordinate for many years in Mexico. Mr. Garcia Luna's statements on the recordings go to show that he knew Mr. Palomino, not that he had any knowledge about the conspiracy or Mr. Palomino's role in it. These statements are not surprising nor are they necessary to provide any clarity of the charged crime. Familiarity with the alleged acts of a co-defendant are categorically different than a defendant being able to identify an anonymous cooperating witness.

Mr. Garcia Luna is not accused of being a member of the cartel and is not accused of being an "enforcer" like the defendant in *Tracy*. He also did not make any inculpatory statements about the alleged crimes, despite Mr. Mirvis's best attempts at coercing him to do so. *See United States v. Quinones,* 511 F.3d 289, 309 (2d Cir. 2007). In *Quinones,* death threats were admissible because they contained an admission to the charged murder in the case. Mr. Garcia Luna made no admissions to being a member of any conspiracy on any of the recordings. Additionally, any comments made on the recordings were outside of the time period of the conspiracy, and Mr. Garcia Luna would have had no interest in the cartel's continuance, even if he was a member of the conspiracy at some point. Further, he is not accused of these acts to protect the cartel. *See Herron*, 2014 U.S. Dist. LEXIS 65131 at *13-14.

The government's proffered evidence, taken in its proper context, shows a desperate man learning everything he can about Mr. Garcia Luna's case. The recordings that can be made out are largely Mr. Mirvis trying to get Mr. Garcia Luna to talk about his case and Mr. Garcia Luna changing the subject. Mr. Mirvis, as an agent of the government, would not, and could not, leave it alone and pressed and pressed Mr. Garcia Luna.

With regards to the audibility of the recorded evidence the government intends to introduce, the sound quality is barely audible. Even attempting to follow along with the draft transcripts provided by the government, it takes multiple listens to understand any of what was said. And for every word that you might be able to decipher, there is a word that you cannot. Using the two-minute snippet provided by the government as an example, about half of the clip falls in the Unintelligible/Inaudible category. In order to try and understand the conversation, the listener is forced to make assumptions to fill in the large gaps in the conversations.

Further, the circumstances regarding the creation of this evidence destroys any alleged probative value. To start, the government took the word of a man desperate to be released that had full access to Mr. Garcia Luna's discovery. It then had the Bureau of Prisons bus the two men out of state and house them together in the Essex County Correctional Center's SHU for twenty days. Out of those twenty days of recordings, the government never obtained the smoking gun that it wanted, and instead can only point to two minutes of largely incomprehensible recordings as the spoils of its labor.

Finally, nothing cited by the government actually shows Mr. Garcia Luna doing anything in furtherance of this alleged plot. There is no allegation or evidence that Mr. Garcia Lune even spoke with any of these alleged mobsters, and the government does not allege that it has any recordings or additional evidence.

With respect to the claims regarding the alleged harassment of Ms. Hernández, they are untrue, decades old, irrelevant, unduly prejudicial and likely double and triple hearsay of sources that Ms. Hernández will likely refuse to disclose. Without knowing more than the cursory allegation made by the government of a "campaign of harassment and threats", the defense does not know how such threats can be inextricably intertwined with the charged conduct.

Further, the general allegations of tampering with a journalist, are not inextricably intertwined, with the alleged drug trafficking. *See Elias*, 2022 U.S. Dist. LEXIS 42826, at *3; *but see Carboni*, 204 F.3d at 44 (where the uncharged offense of adding fictional items to defendant's company's inventory was considered inextricably intertwined with the charged crime of making false statements to secure advances on a line of credit for that company.) Additionally, the allegations do not complete the story at trial. *Id.*

The government argues that the alleged testimony of Ms. Hernández would prove how Mr. Garcia Luna was able to go undetected. But there were many journalists, and even Ms. Hernández, that were writing contemporaneous articles critical of Mr. Garcia Luna throughout his career. If the journalist the government wishes to call is indeed Ms. Hernández, it should be noted that in 2013 she stated, "As a consequence of this journalistic investigation, the former head of the SSP began to harass me and retaliate against my sources. Fear did not stop me from continuing my work as a journalist", which was evidenced by her consistent recounting of this story while promoting her books.[8] By her own admission, Ms. Hernandez did not withhold any of her stories because of any threats, nor has there been any alleged retribution. If the stories were all published, the government cannot claim that Mr. Garcia Luna somehow flew under the

---

[8] *See* Anabel Hernandez, *After years of threats, Mexican journalist fights to keep armed protection*, LATAM JOURNALISM REV. (Mar. 28, 2013), https://latamjournalismreview.org/articles/after-years-of-threats-mexican-journalist-fights-to-keep-armed-protection-by-anabel-hernandez/.

16

radar while taking bribes from the cartel.  This evidence would not fill in any gaps in the government's timeline, and the court's reasoning in *Carboni* does not apply.

The government also cites *Concepcion* for the proposition that evidence of bribing a journalist is admissible to show the lengths taken to conceal Mr. Garcia Luna's involvement in the conspiracy.  983 F.2d 369.  In *Concepcion,* the defendant offered to kill a rival of the criminal enterprise to protect the enterprise's operation.  The government does not claim that any threats here made on behalf of Mr. Garcia Luna were made to protect the cartel, but rather were made to protect himself.

In its motions *in limine*, the government also cites *United States v. Khan,* 591 F. Supp. 2d 202, 205 (E.D.N.Y. 2008), to argue that "intimidation, violence, and the payment of debts is generally understood to be intertwined with the management and operation of narcotics conspiracies".  This may be true with regards to the management and operation of narcotics conspiracies, but it is not applicable here where no management or operation is alleged.  Mr. Garcia Luna is not accused of managing or operating the cartel.  Nor are the charged allegations against him of a violent nature.  The charged crimes are that of *accepting* bribes, not offering any, and the application of *Khan* too is misplaced.

Finally, unless the witness in question is able to testify that Mr. Garcia Luna spoke to her personally, any proposed evidence would be inadmissible hearsay.  In 2013, Ms. Hernández made these allegations against Mr. Garcia Luna while promoting her book that had been recently translated into English.  When asked how she knew that Mr. Garcia Luna threatened her, she said "Because I have an informant that called me suddenly in that December of 2010.  He called me.  'It's really urgent to see you.'  I met him.  And he told me, 'I'm coming from a meeting of police, and that police were talking about that Genaro Garcia Luna are trying to contract some

17

police to kill you, simulating a car accident or something like that. And he's offering better salaries and better positions in the police if they do it.'"[9] This statement is not just hearsay, it is hearsay within hearsay, and not admissible through any exceptions in Rule 803.

Furthermore, neither the recordings made by Mr. Mirvis, nor the allegations made by Ms. Hernández, meet the test outlined in Federal Rule of Evidence 403. Rule 403 states that "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." The de minims probative value of both allegations are substantially outweighed here by the immense prejudicial effect against Mr. Garcia Luna.

For the foregoing reasons, the Court should deny the government's motions *in limine*.

---

[9] *See Narcoland: Journalist Braves Death Threats to Reveal Ties Between Mexican Government & Drug Cartels,* DEMOCRACY NOW *(Sep. 27, 2013)*
https://www.democracynow.org/2013/9/27/narcoland_journalist_braves_death_threats_to.

Dated: July 13, 2022

               /s/
César de Castro
Valerie Gotlib
Shannon McManus
**The Law Firm of César de Castro P.C.**
111 Fulton Street – 602
New York, NY 10038
(631) 460-3951
cdecastro@cdecastrolaw.com
vgotlib@cdecastrolaw.com
smcmanus@cdecastrolaw.com

*Attorneys for Defendant,
Genaro Garcia Luna*