

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SK/EMR/PP/MED/AA　　　　　　　　　　　　*271 Cadman Plaza East*
F. #2019R00927　　　　　　　　　　　　　　*Brooklyn, New York 11201*

January 12, 2023

<u>By ECF and Email</u>

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

　　　　　　　Re:　　United States v. Genaro Garcia Luna
　　　　　　　　　　<u>Criminal Docket No. 19-576 (S-1) (BMC)</u>

Dear Judge Cogan:

　　　　The government respectfully submits this opposition and cross-motion in response to the defendant's motion <u>in limine</u> filed January 9, 2023.  In his motion, the defendant seeks to preclude the government from introducing evidence related to his "activities as a private citizen after he moved to the United States, including evidence of wealth he amassed or acquired after 2012" as irrelevant and unduly prejudicial.  ECF No. 161 at 1.  The defendant's motion is puzzling given that it comes on the heels of the defendant having moved to dismiss the indictment on the grounds that he withdrew from any conspiracy with the Sinaloa Cartel when he left public office in 2012.  <u>See</u> ECF No. 123 at 1.  Particularly in the face of that recent motion, and for the reasons set forth below, evidence of the defendant's activities after 2012 is critical and direct evidence of the crimes charged in the indictment.  It is also powerful evidence of the defendant's motive for accepting bribes from the Sinaloa Cartel and of the defendant's knowledge, ability, opportunity, and preparation for secreting those bribes.  Accordingly, the Court should deny the defendant's motion and permit the government to introduce evidence of the defendant's post-2012 activities—as both direct evidence and "other acts" evidence under Federal Rule of Evidence 404(b)—in the government's case-in-chief, on cross-examination should the defendant or related witnesses testify in a defense case, and in any government rebuttal case.

　　　　I.　　<u>Relevant Background</u>

　　　　Between 2001 and 2012, the defendant was a high-ranking official in the Mexican government.  He was first the head of Mexico's Federal Investigation Agency and then served in a cabinet-level position as Mexico's Secretary of Public Security and, in that capacity, controlled Mexico's Federal Police Force.  While holding public office, the defendant used his official positions to assist the Sinaloa Cartel, a notorious Mexican drug cartel, in exchange for multi-million-dollar bribes.  At trial, the government expects that numerous witnesses, including

several former high-ranking members of the Sinaloa Cartel, will testify about bribes paid to the defendant in exchange for protection.

In exchange for these bribes, the defendant provided the Sinaloa Cartel with, among other things, safe passage for its drug shipments, sensitive law enforcement information about investigations into the cartel, and information about rival drug cartels. These payments allowed the cartel at times to receive warnings in advance of law enforcement efforts to apprehend cartel members and to allow cartel members to be released if arrested. During the time that the defendant protected the Sinaloa Cartel in exchange for bribes, the cartel was able to send multi-ton drug loads to the Eastern District of New York, including Brooklyn and Queens.

In 2012, the defendant left public office and relocated from Mexico to Miami, Florida. He started a consulting firm through which he continued to do business in Mexico (and in Sinaloa), with former colleagues and officials in the Mexican government (some of whom he hired), and continued to travel back and forth to Mexico on a regular basis. He retained and continued to use homes and other assets that he had acquired while accepting bribes from the Sinaloa Cartel, and he moved assets from Mexico to the United States.[1]

He also acquired new assets and properties as a direct result of his conduct while in office. For example, while serving as a cabinet secretary, and receiving millions of dollars from the U.S. to fight the drug cartels, the defendant facilitated the extension of government surveillance and technology contracts to a company associated with certain international businessmen. After he left office and moved to the United States in 2012, the defendant lived a comfortable lifestyle with the assistance of those same businessmen, who immediately provided him with a multi-million-dollar home and yacht in Miami and a lucrative consulting contract so that he could continue facilitating the extension of Mexican government contracts to their companies.[2]

The defendant conducted all of these activities through an opaque constellation of shell companies, straw buyers, foreign bank accounts, cash businesses, and proxies. The

---

[1] In his motion, the defendant states: "Through its interviews of witnesses . . . the government knows that when he arrived in Miami in late 2012, early 2013, [the defendant] had no wealth to speak of, and could not afford a luxurious lifestyle." ECF No. 161 at 1-2. The government disputes this statement, as it reflects a selective view of the witness interviews and other evidence obtained during this investigation and provided to the defense in discovery.

[2] The defendant concedes many of these facts:

> [H]e went into business with established partners, offering security consulting to foreign governments and companies. His primary client was the government of Mexico. Over the course of the next several years, [the defendant] and his partners were paid significant sums for their consulting work and the security/intelligence platforms they offered to the Mexican government. These earnings allowed [the defendant], over time, to become wealthy and to acquire substantial assets.

ECF No. 161 at 1.

defendant never turned his back on the Sinaloa Cartel or his fellow corrupt government officials who worked for the Cartel. Instead, he spent his time peddling the influence he had gained while participating in the conspiracy to create wealth for himself in the United States.

    II.        Legal Standards

Evidence of "other crimes, wrongs, or acts" is not limited under Federal Rule of Evidence 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted); accord United States v. Reed, 576 F. App'x 60, 61 (2d Cir. 2014) (summary order). In addition, the Second Circuit has explained that, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997). Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id.; see also Fed. R. Evid. 401, 402. Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

In addition, Rule 404(b) provides that evidence of "other crimes, wrongs, or acts" may be admitted for purposes other than to prove bad character, such as to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). The standards governing the admissibility of evidence under Rule 404(b) are well established:

> First, the district court must determine if the evidence is offered for a proper purpose, one other than to prove the defendant's bad character or criminal propensity. If the evidence is offered for a proper purpose, the district court must next determine if the evidence is relevant to an issue in the case, and, if relevant, whether its probative value is substantially outweighed by the danger of unfair prejudice. Finally, upon request, the district court must give an appropriate limiting instruction to the jury.

United States v. Pitre, 960 F.2d 1112, 1119 (2d Cir. 1992) (citation omitted); see also Huddleston v. United States, 485 U.S. 681, 685 (1988); United States v. Tarricone, 996 F.2d 1414, 1421 (2d Cir. 1993).

The Second Circuit has long viewed Rule 404(b) as an inclusive rule allowing "other acts" evidence if the evidence is offered to prove something other than criminal propensity, is relevant to the crime for which the defendant stands trial, and satisfies the balancing test of Federal Rule of Evidence 403. See, e.g., Carboni, 204 F.3d at 44; United States v. Germosen, 139 F.3d 120, 127 (2d Cir. 1998). And the Second Circuit has afforded "significant leeway" regarding such evidence in conspiracy cases. United States v. Nektalov, 325 F. Supp. 2d 367, 371 (S.D.N.Y. 2004).

III.   Discussion

Evidence of the defendant's activities after he left office—from December 2012 until his arrest in December 2019—is admissible as direct evidence, inextricably intertwined with the evidence regarding the charged offenses, and necessary to complete the story of the crime on trial. It is also admissible for purposes of proving the relationships formed while he and other members of the Mexican government conspired with the Sinaloa Cartel, the duration of the conspiracy and the defendant's failure to withdraw from it, and the defendant's knowledge, ability, opportunity, preparation, and motive for participating in the conspiracy.

First, the government anticipates that the defendant will argue at trial that he was not a member of the charged enterprise—in other words, that he did not conspire with the Sinaloa Cartel. However, evidence of the defendant's activities after he left office provides proof of his membership in the conspiracy while he was in office because his ability to continue to do business in Mexico and in Sinaloa, with former colleagues who remain in the Mexican government, and his hiring of former Mexican government officials into his consulting firm, establish the nature and strength of the relationships he cultivated with his co-conspirators.[3]

Second, the government anticipates that the defendant will argue at trial—as he has in pretrial briefing—that there is a lack of evidence that the charged conspiracy and the defendant's participation in it extended into the statute-of-limitations period.[4] However, evidence of the defendant's activities after he left office, including his retention and continued use of homes and other assets that he acquired while accepting bribes from the Sinaloa Cartel, his ability to safely travel back and forth to Mexico, and his ability to conduct business in Mexico, in Sinaloa, and with the Mexican government, establish conduct within the statute-of-limitations period, show how the defendant continued to receive benefits from the conspiracy years after he left office, and refute a withdrawal defense.[5]

Third, the government anticipates that the defendant will argue at trial that there is a lack of evidence related to the location of the bribe money that the defendant received and

---

[3]   See, e.g., United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) (admitting other acts evidence to explain the development, evolution, and mutual trust of relationship between co-conspirators); United States v. Bumagin, 136 F. Supp. 3d 361, 369 (E.D.N.Y. 2015) (admitting evidence of prior robbery as direct evidence that shows nature and existence of conspiracy and defendant's leadership in conspiracy, and as other acts evidence that shows identity, relationship between co-conspirators, and intent).

[4]   See ECF No. 123-1 at 4 (defendant arguing that "[f]or the first four counts of the superseding indictment not to be foreclosed by the statute of limitations, the government has to point to activities by [the defendant] after December 4, 2014, that furthered the objectives of the alleged conspiracy"); id. at 6 (arguing that the defendant's "move to the United States" was sufficient to communicate abandonment to co-conspirators); id. at 10 (arguing that because he "left the country and entered private life," the defendant was disabled from further participation).

[5]   See United States v. Eppolito, 543 F.3d 25, 48-49 (2d Cir. 2008) (no withdrawal if the defendant "receive[s] any additional benefits from the conspiracy"); United States v. Berger, 224 F.3d 107, 119 (2d Cir. 2000) ("the defendant still may remain a part of the conspiracy if he or she continues to do acts in furtherance of the conspiracy and continues to

4

therefore reasonable doubt that he received any at all.[6]  In other words, the defendant will ask that most basic question—where is the money?—and insist that the jury cannot convict without a satisfactory answer.  However, evidence of the defendant's activities after he left office powerfully rebuts this premise by showcasing the defendant's incredible sophistication in his ability to move cash within Mexico and to countries around the world using shell companies, straw buyers, real estate transactions, cash businesses, foreign bank accounts, and family members and employees.  This sophistication and these capabilities explain why the bribes the defendant received from the Sinaloa Cartel are difficult to trace.[7]

       Fourth, the government anticipates that the defendant will argue at trial that the defendant held high-level law enforcement positions in the Mexican government with a sincere interest in serving the public and enforcing the law.[8]  However, evidence of the defendant's activities after he left office demonstrate his true interest—the defendant used his public office to hand out valuable government contracts, curry favor with wealthy and powerful international businessmen, and acquire future benefactors, who then returned the favor by providing the defendant with a luxury home and yacht and a lucrative consulting contract immediately after the defendant left office.  In other words, the defendant pursued positions of power in the Mexican government not to serve the public or enforce the law, but rather to accumulate money, power, and connections in service of himself—a motive that helps to explain his duplicitous membership in the Sinaloa Cartel.[9]  Evidence of this motive does not give rise to any unfair prejudice that substantially outweighs its probative value, as the conduct it refers to is not any more sensational or disturbing than the charged crimes: certainly, using one's official position to

---

receive benefits from the conspiracy's operations"); see also United States v. Acuna, 313 Fed. App'x 283, at *11-*12 (11th Cir. 2009) (no withdrawal where defendant continued to conceal source of ill-gotten gains after he resigned from enterprise).

[6]     See ECF No. 123-1 at 14 (defendant arguing that "[t]he government has not provided discovery that establishes the existence of these alleged funds, let alone traces them to [the defendant]"); id. at 15 (arguing that "[t]he government has yet to produce any evidence of payments . . . [or] laundered funds").

[7]     See, e.g., United States v. Zedner, 401 F.3d 36, 49-50 (2d Cir. 2005) (reversed on other grounds) (affirming admission of other acts evidence to prove financial sophistication and ability to execute complex schemes, as well as ability to form intent to defraud).

[8]     See ECF No. 106 at 2-3.

[9]     See United States v. Leigh, 104 F.3d 356 (2d Cir. 1996) (in mail fraud and embezzlement prosecution, evidence of defendant's other acts to acquire money admissible under Rule 404(b) to prove that greed was the defendant's motive); United States v. Reifler, 446 F.3d 65, 93-94 (2d Cir. 2006) (in case involving fraud and kickbacks, evidence of parallel scheme to manipulate stock admissible to show defendant's knowledge and intent); United States v. Wilbern, No. 17-CR-6017, 2019 WL 4926290 (W.D.N.Y. Oct. 7, 2019) (evidence of defendant's financial circumstances admissible under Rule 404(b) to prove motive for robbery); see also United States v. Zackson, 12 F.3d 1178, 1182 (2d Cir. 1993) (evidence of the defendant's other-acts is admissible "to prove that the defendant acted with the state of mind necessary to commit the offense[s] charged").

curry favor from (and obtain money from) defense contractors and other businessmen is less sensational that currying favor from (and obtaining money from) murderous leaders of violent drug cartels.[10]  Furthermore, this evidence does not invite the jury to make an unfair inference and does not shift any burden to the defense because the government will present evidence that fairly and accurately describes the sources of the defendant's post-2012 wealth—not seek to mislead the jury or leave a "false impression" as the defendant contends.  ECF No. 161 at 4.

In sum, at trial the defendant will put at issue his membership in the conspiracy, the duration of the conspiracy and his involvement in it, the location of the bribe money he is alleged to have accepted, and his motive and intent in holding public office.  Evidence of the defendant's activities after he left office—the facts of which are generally undisputed—is highly probative on each of these matters and critical for the government to meet its burden of proving the defendant guilty beyond a reasonable doubt.  Furthermore, that evidence poses minimal prejudice to the defendant, and any prejudice can be cured with an instruction reminding the jury that all persons—wealthy or not, powerful or not, connected or not—are equal under the law.

IV. Conclusion

For the foregoing reasons, the Court should deny the defendant's motion in limine and grant the government's cross-motion in limine.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
Saritha Komatireddy
Erin M. Reid
Philip Pilmar
Marietou E. Diouf
Adam Amir
Assistant U.S. Attorneys
(718) 254-7000

cc: Defense Counsel (by ECF)
     Clerk of Court (BMC) (by ECF)

---

[10] See United States v. Roldan-Zapata, 916 F.2d 795, 804 (2d Cir. 1990) (Rule 403 balancing test satisfied where the other-acts evidence is not "any more sensational or disturbing" than the charged crimes).