1

<pre>
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
 2

 3     - - - - - - - - - - - - - X

 4   UNITED STATES OF AMERICA,     :   19-CR-576(BMC)

 5             Plaintiff ,         :
                                       United States Courthouse
 6        -against-                :   Brooklyn, New York

 7   GENARO GARCIA LUNA,           :
                                       January 23, 2023
 8             Defendant.          :   9:30 a.m.

 9     - - - - - - - - - - - - - X

10           TRANSCRIPT OF CRIMINAL CAUSE ON TRIAL
              BEFORE THE HONORABLE BRIAN M. COGAN
11       UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

12   APPEARANCES:

13

     For the Government:         BREON PEACE
14                               United States Attorney
                                 BY: SARITHA KOMATIREDDY,
15                                    ERIN REID,
                                      PHILIP PILMAR,
16                                    MARIETOU DIOUF,
                                      ADAM AMIR,
17                               Assistant United States Attorneys
                                 271 Cadman Plaza East
18                               Brooklyn, New York

19
     For the Defendant:          CESAR DE CASTRO, ESQ.
20                               VALERIE GOTLIB, ESQ.
                                 FLORIAN MIEDEL, ESQ.
21                               SHANNON MCMANUS, ESQ.

22
     Court Reporter:             Andronikh M. Barna
23                               225 Cadman Plaza East
                                 Brooklyn, New York
24                               (718) 613-2178

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
</pre>

1          THE COURTROOM DEPUTY:  All rise.  Honorable

2    Brian M. Cogan now presiding.

3          THE COURT:  Good morning, everyone.  Have a seat,

4    please.

5          Prosecution ready?

6          MS. KOMATIREDDY:  Yes, Your Honor.

7          THE COURT:  Defense ready?

8          MR. DE CASTRO:  We are, Your Honor.

9          THE COURT:  All right.  Let's have the jury, please.

10         MS. KOMATIREDDY:  Your Honor, may we have a brief

11   sidebar with the Court before the jury comes in.

12         THE COURT:  Didn't my deputy ask you if you needed

13   to talk to me first?

14         MS. KOMATIREDDY:  I apologize, Your Honor.

15         THE COURT:  Now that the jury is being lined up and

16   brought in.

17         See if you can stop them from lining them up.

18         Does this have to be at sidebar?

19         MS. KOMATIREDDY:  Yes, please, Your Honor.

20         THE COURT:  Okay.  You understand sidebars are not

21   publicly stated, but the transcript is public.

22         MS. KOMATIREDDY:  I understand, Your Honor.

23         THE COURT:  Let's have a sidebar, please.

24         (Sidebar.)

25         (Continued on the next page.)

Sidebar                                                    3

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          MS. KOMATIREDDY:  Promise this will be brief.

5          Your Honor, I want to make sure the Court was aware.

6    For a very few brief minutes Thursday, one of the orders of

7    the Court was opened to the public.  The Court sealed it.

8    Immediately, members of the press posted on Twitter.

9          THE COURT:  I am well aware.

10         MS. KOMATIREDDY:  Okay.  And I wondered if it might

11   be appropriate to ask the jury if they had seen any media

12   generally or just re-admonish them not to pay attention to any

13   media.

14         THE COURT:  Well, I am certainly going to instruct

15   them not to pay any attention to anything they may have seen.

16         Are you proposing that I ask them as a group?  Are

17   you proposing that I ask them one at a time?  Are you leaving

18   it to my discretion?  What would you like to do?

19         MS. KOMATIREDDY:  We defer to the Court.

20         THE COURT:  Okay.  I think there are going to be

21   things in the press all through the trial that we do not want

22   the jurors to see, and I do not see why anything special needs

23   to be done now, assuming -- and you will tell me.  When

24   Judge Kuo picked the jury, did she, in fact, tell them, stay

25   away from publicity?

Sidebar                                          4

1          MS. KOMATIREDDY:  Your Honor, it wasn't done in open

2     court.  It was on the questionnaire.  They would have to stay

3     away from publicity.  It wasn't a blanket instruction.  I know

4     the juror got a briefing by the U.S. Marshal privately

5     afterwards, and I'm not sure what occurred during that

6     briefing.

7          MR. DE CASTRO:  Judge, it was definitely part of the

8     questionnaire.  And it's sort of the theme throughout anyway,

9     I don't think you need to draw attention to it.

10          THE COURT:  You mean the defense does not want me to

11     draw attention to it, right?

12          I'm not going to do anything further except give

13     them the very specific instruction I gave them about staying

14     away from all publicity, disregarding anything they may have

15     heard, that kind of thing.

16          MS. KOMATIREDDY:  Thank you, Judge.

17          (Sidebar ends.)

18          (Continued on the next page.)

19

20

21

22

23

24

25

Proceedings                                          5

1          THE COURT:  We will rise when the jury comes in, but

2     hang on a few minutes because it will take a minute to line

3     them up.

4          Can everybody hear me okay?

5          MR. DE CASTRO:  Yes, Judge.

6          THE COURT:  In the back, can you hear me okay?

7          AUDIENCE MEMBERS:  Yes.

8          (Pause in proceedings.)

9          THE COURTROOM DEPUTY:  Jury entering.

10         (Jury enters.)

11         THE COURT:  You can all be seated because we are

12    standing for you.

13         All right.  Everybody be seated, please.

14         Ladies and gentlemen, now that you have been

15    comfortably seated, I am going to ask you to stand up so that

16    Mr. Scott can administer the oath to you.

17         Quadri.

18         (Jury sworn.)

19         THE COURTROOM DEPUTY:  Please be seated.

20         THE COURT:  Okay.  Good morning, ladies and

21    gentlemen.

22         I am Judge Cogan.  You may wonder why you got to see

23    two judges in this case, the very nice Judge Kuo who presided

24    over the jury selection, and now you get to see me, who is

25    presiding over the trial.

Proceedings                                                        6

1          We have two kinds of judges in this courthouse.  One

2    are district judges, like me, we try the cases.  And the other

3    are magistrate judges, like Judge Kuo, who does pretrial

4    things and selects juries and things like that.  And it just

5    frees me up so that I can do other cases.  That is why you saw

6    two judges today.

7          Now that you have been sworn in as members of the

8    jury, I am going to start by telling you briefly about your

9    duty as jurors and giving you some very preliminary

10   instructions.  When the evidence is done and I give my final

11   instructions to you, it is going to be your duty to decide the

12   facts from the evidence in this case and decide whether the

13   government has proven beyond a reasonable doubt that the

14   defendant has committed the crimes with which the government

15   has charged him.  In doing that, please remember you have to

16   follow the law, whether you like the law or not.  When the

17   trial is over, like I said, I am going to give you much more

18   detailed instructions than I am giving you now.  This is just

19   for purposes of introduction.

20         Now, if you have served on a jury before, this may

21   be a little different experience than you have had.  You might

22   have noticed that we are only going to refer to you by your

23   numbers and not your names, and we have asked you do not

24   volunteer your names to us.  Obviously I have access to them

25   and I could look them up if I wanted to, but I have no reason

Proceedings                                                    7

1    to.  We had the jury service downstairs remove your names from

2    the questionnaires.  So the lawyers do not know your names,

3    nobody in the courtroom knows who you are.

4          The reason that we do that is because it is a

5    high-publicity case.  And because of that, reporters, who in

6    doing their constitutionally permitted job, tend to be

7    aggressive sometimes, and we want to make sure that you are

8    not bothered by those kinds of distractions when the trial is

9    going on.  That is why nobody is going to know your names

10   while you are sitting here.

11         Now, you have also noticed that you are being

12   escorted to and from the courthouse every morning by the

13   marshals.  It is for the same reason, we do not want you to be

14   confronted by the press when you come in.  I am not knocking

15   the press in any way.  Like I say, they are doing their jobs

16   and it is an important job, but we want to make sure you are

17   focused entirely on this case and not anything else.

18         Now, also, we are in the late stages, I had call it,

19   of the COVID-19 problem that we have all suffered through.

20   You are all welcome to wear masks if you want to.  I will tell

21   you I have tried cases, I tried a case last fall for two

22   months, I think maybe three of the jurors wore masks.  Nobody

23   else in the courtroom wore masks.  Nobody got sick.  That is

24   not to say I am giving you a guarantee that you will not, but

25   I am saying I leave it entirely up to you if you want to go

Proceedings                                                8

1    ahead and wear a mask.

2             Now, the defendant has been charged with crimes in a

3    document that we call an indictment.  The indictment does not

4    in any way mean that he is guilty.  Instead, he starts this

5    trial with a clean slate.  He does not need to prove to you

6    that he is innocent.  The law presumes that he is innocent of

7    all the charges against him as we start this trial.  That

8    presumption of innocence stays with him and it is alone

9    sufficient to acquit him, unless the government presents

10   evidence here in court that overcomes the presumption and

11   convinces all of you beyond a reasonable doubt when you do

12   your deliberations that he is guilty.

13            Now, let me just summarize for you briefly what

14   kinds of evidence there are that you can expect to hear.  It

15   is going to consistent of several things.  The testimony of

16   witnesses, documents and other things received into evidence

17   as exhibits, any facts on which the lawyers agree, and the

18   inferences that you may reasonably draw from all of this

19   evidence.

20            Now, you have probably heard that evidence can be

21   direct, or circumstantial.  Direct evidence, circumstantial

22   evidence.  Direct evidence is testimony about what that

23   witness personally saw, heard or did, or evidence in a

24   document about something that happened.  Circumstantial

25   evidence is evidence that you can reasonably infer from the

Proceedings                                                    9

1   direct evidence.

2         Now, direct evidence is not any better or worse than

3   circumstantial evidence.  You may consider both direct and

4   circumstantial evidence in deciding the case.  It is going to

5   be up to you, entirely up to you, to decide how much weight to

6   give any particular piece of evidence.  You have to determine

7   which of the witnesses you believe, what portion of their

8   testimony you want to accept, what may reasonably be inferred

9   from what they saw, heard or did and what weight you want to

10  attach to each aspect of the evidence and to the evidence as a

11  whole.

12        Now, you also need to understand what is not

13  evidence.  The questions that the attorneys ask is not

14  evidence.  If an attorney says, well, isn't it true that, it

15  is not true unless there is some evidence that shows it is

16  true.

17        The objections that the attorneys have a duty to

18  make, that is also not evidence.  And sometimes at trial there

19  may be some testimony that I at first let in and then I decide

20  that is not appropriate for the jury to hear and I will order

21  you to disregard it.

22        Also, you are about to hear opening statements from

23  the lawyers and you will hear closing statements at the end of

24  the case.  Those also are not evidence.  The only evidence for

25  you to consider is evidence that I admit here in open court in

Proceedings                                              10

1    the presence of the parties and all of you, the jurors.

2          Now, during the trial I am probably going to sustain

3    objections to questions that the attorneys ask.  When that

4    happens, I will not permit the witness to answer.  Or if the

5    witness is too fast for me and gets out an answer, then I will

6    order you to disregard it or I will say it is stricken.

7          The law requires you to decide this case solely

8    based on what happens in this courtroom.  You have to let

9    common sense be your guide, subject to and aided by the

10   instructions that I am going to give you at the end of the

11   case about the law.

12         You are bringing with you, for your role here, all

13   of the experience and background you have had in your lives.

14   That is why we want you here.  Use the same reasoning and

15   tests that you use in your everyday dealings with people to

16   determine who is telling the truth, who to believe and who not

17   to believe, and how to reason, understand and weigh the

18   documents and exhibits.  Watch every witness carefully and

19   listen to everything that every witness says.

20         Now, I also want to caution you about certain

21   principles that will govern your conduct as jurors.  In doing

22   that, I am not in any way trying to scare you or intimidate

23   you, but, you know, there are consequences for not following

24   the oath that you just took.  So I want to make sure you

25   understand the rules and what is behind that oath so you do

1    not make any mistakes and be sure to comply with it.

2              First, it is very important to you not to talk to

3    each other about this case until all the evidence has been

4    presented and you go back in the jury room to decide the case.

5    That is probably the hardest instruction to follow because

6    when you hear evidence, you are going to go in the back and

7    you are going to feel like, oh, what did you think about that.

8    Please do not do that.  Talk about the weather, talk about

9    what bad taste I have in ties, talk about whatever you want

10   but not the case.

11             And there will be a number of breaks, and of course

12   there will be a daily adjournment when you have an opportunity

13   to talk about the case and you cannot.  Only during your

14   deliberations can you talk about the case.

15             In addition, for the same reason, it is very

16   important that you do not talk to anybody else about the case

17   or about anything having to do with the case until the trial

18   is over, the verdict has been read and you have been

19   discharged.  That includes members of your family and your

20   friends, no matter how close they are.  It also includes

21   people you do not know, like, for example, reporters.  You can

22   tell your family and friends that you are sitting in a

23   criminal trial in federal court as a juror and that is all you

24   can tell them, nothing else.

25             Give me one second here.

1              As I have told you, you are going to be anonymous in

2       this case, so you need to be as diligent as you can not to let

3       your identity slip to anybody who might be interested in

4       knowing what this case is about.

5              In addition, do not talk -- do not let anyone talk

6       to you about the case or about anyone who has anything to do

7       with the case.  If somebody should come up to you and say,

8       hey, what did you think of this or what do you think about

9       this case in general, you should report it to me immediately

10      by reporting it to Mr. Scott here.  Just tell him.  I do not

11      think it is going to happen, but I just need to give you this

12      advice in advance.  That includes members of the press who

13      might come up to you.  If anybody approaches you, anybody,

14      members of the press or not, please just let Mr. Scott know

15      about it.  And if it happens -- again, I don't think it will,

16      but if it does -- do not even talk to each other about it.

17      Just talk to Mr. Scott.  It will probably be nothing if it

18      happens at all, but we will take care of it if it does happen.

19             Third, do not speak to any of the lawyers, nor the

20      defendant, nor any of the witnesses.  Do not even pass the

21      time of day with them or say good morning, hello.  You know,

22      if you are waiting to get into an elevator and the elevator

23      door is open and one of the lawyers is in there, the lawyer

24      will get out so you can get in.  If you walk down the hall and

25      you pass a lawyer, the lawyer will probably not make eye

Proceedings                                                    13

1   contact with you and will look like -- give you that

2   thousand-mile stare, just look right by you.  It does not mean

3   they are rude people.  These lawyers are not rude people.

4   They are very good lawyers, they are very nice lawyers.  But I

5   have instructed them not to have any contact with you because

6   there can't be any appearance that somebody is trying to curry

7   favor or to subtly influence or to show the jury outside the

8   courtroom what a nice person they are.

9            So please do not hold it against them if you think

10  they do not treat you as nicely as they should.  They will

11  ignore you because that is what they have been told to do.

12  Everybody has to make a point of avoiding even the appearance

13  of impropriety so that there's no impression by anyone about

14  what happened between jurors and lawyers and witnesses.

15           Fourth, and this one is critical, there will be --

16  already has been -- a lot of press coverage about this case.

17  You have to stay away from it completely.  If you go on the

18  internet and, you know, you are looking at some page and you

19  say, oh, that looks like it is about this case, please click

20  somewhere else.  Do not click on that.  If you are watching TV

21  and you hear something that sound like, oh, this might be

22  about the case, hit your remote control, go to another

23  channel.  If anybody still reads newspapers out there and you

24  open a newspaper and you see something that looks like it

25  might be about this case, flip the page.  That is because your

1    verdict has to be based only on the evidence I admit here in

2    court.  You cannot be influenced by anything besides that

3    evidence.

4              Now, I recognize that, you know, like I said, there

5    has been some publicity about the case beforehand.  It is

6    possible that you ran into something despite your best efforts

7    not to.  If you did, we need to be absolutely assured that you

8    are able to disregard anything you heard or might have seen.

9    If you think you saw something and you have got a problem

10   disregarding that, please let Mr. Scott know privately and we

11   will take it up with you individually.  But going forward,

12   please do not look at anything that has anything to do with

13   this case.

14             For the same reason, and it is even -- it is equally

15   important, do not do any research about this case on your own.

16   I will tell you, when you go home at night, you will be

17   tempted to go on Google and look something up.  Please do not.

18   That would violate your oath if you do that.  Do not post

19   anything about the case on Facebook.  No Tweets.  No

20   TikToking.  Do not send any texts or e-mails to anyone that

21   refers to this case.  Again, the reason for that is the only

22   information about which this case can be decided is what you

23   hear and see here in this courtroom.

24             Now, I know that is hard because we are so used to

25   turning to our computers to find things out, but you have

Proceedings                                                    15

1   taken an oath here to do a special job.  It is a very special

2   job, and you have got to believe you can act like the special

3   people that we think you will be.

4              Now, finally, let me tell you the stages of the

5   trial and how that is going to work.

6              The first thing that is going to happen is that the

7   government is going to make an opening statement.  An opening

8   statement is not evidence.  It is an outline of what the party

9   intends to prove or show.  It is offered to help you follow

10  the evidence that is going to come in that you will see and

11  hear during the trial.

12             Then the defense will make an opening statement.

13  And it is the same thing.  It is not evidence; it is just to

14  give you an idea of how the defense sees the case and what the

15  defense thinks you ought to be looking for in the case.

16             Then, after opening statements, the government will

17  present witnesses, and the defendant may cross-examine those

18  witnesses.

19             Then, if the defendant wants to -- the defendant

20  does not have to because he has no burden to produce anything,

21  any evidence in this case at all, he again is presumed

22  innocent, but he can if he wants to, present witnesses.  And

23  then the government will have the right to cross-examine those

24  witnesses.

25             Finally, it is possible that the government will

Proceedings                                                    16

1   have brief rebuttal witnesses at the end of the case.  I do

2   not know if that is going to happen or not.

3          Again, the most important principle of our system

4   that you should keep in mind when listening to the evidence is

5   that the defendant does not have to prove his innocence.  He

6   is not required to present any evidence at all.  He is not

7   required to take the stand at all.  You may not consider the

8   fact if he chooses not to take the stand as indicating any

9   kind of guilt.  It does not and you may not consider that.

10          Then, after all the evidence has been submitted, the

11  attorneys will make their closing arguments to summarize and

12  give you their interpretation of the evidence that you have

13  seen and heard.  Like the opening statements, the closing

14  arguments are not evidence.  They are, again, offered just as

15  guides to help you understand the issues and let you hear each

16  side's perspective on what they believe has been proven or not

17  proven.

18          Then after the closing arguments, I will give you

19  instructions on the law.  Those will be lengthy and

20  complicated, but do not worry, we will give you a copy in the

21  jury room so you can refer to them.

22          Then you go into the jury room and you start your

23  deliberations on your verdict.

24          Please do not make up your mind about what the

25  verdict should be until after you have heard all the evidence,

Proceedings                                         17

1   after I have instructed you on the law at the end of the case

2   and after you have deliberated with your fellow jurors.

3   Please keep an open mind until then.  That is extremely

4   important.  The parties deserve, and the law requires, that

5   you give them an opportunity to be fully heard and that you

6   not make up your mind until you and your fellow jurors have

7   heard all the evidence and instructions and you have completed

8   your deliberations.

9          Last, let me give you the schedule and some details

10  for the trial.  On a normal day, we will begin at 9:30 in the

11  morning, and we will go until about some time between noon or

12  one, and we will take a short mid-morning break.  I think my

13  experience is that jurors need to break every hour and

14  15 minutes to every hour and a half, so that you can figure

15  when we will take the breaks that we will have, one in the

16  morning and one in the afternoon.

17         After lunch, we will do the same thing.  We will

18  have, like I said, an afternoon break and we will continue

19  until 4:30 each day.  We do not meet on Fridays.  That is so

20  you can keep up with your lives, schedule any appointments you

21  need and, you know, do things you need to do.

22         It has been projected that this trial can go eight

23  weeks.  I cannot guarantee you it will not.  I have a feeling

24  it will not.  It may go longer, I could be wrong.  You know,

25  you have got to remember a trial is not a Broadway play where

Proceedings                                                    18

1    everybody knows exactly what is going to happen and how long

2    things are going to take, so my feeling is it will be less,

3    but I am not making any promises.  It could be eight weeks,

4    could be a little bit more.

5             Okay.  Hang on one second.

6             Now, as you know, the marshals will be collecting

7    you and bringing you to the courthouse each morning, so we

8    should not have any delays, just make sure you are at your

9    designated collection point at the right time.  Because I do

10   not know which one of you it was, one of you was a little late

11   today, and we had to send a marshal out to make a special

12   trip.  I do not think that will happen again now that you know

13   the procedure.  But make sure you are 100 percent ready to go,

14   you are where you need to be when you need to be picked up,

15   and do not do anything that would delay the trial or your

16   fellow jurors.

17            When you arrive each day, you can go right into this

18   room where you came from right now.  Okay?  Right behind me.

19   And then when you are all there, then Mr. Scott will bring you

20   into the courtroom.  You might have already noticed this, but

21   when you enter and leave the courtroom, everyone here is going

22   to rise in deference to the solemn and important duty that you

23   have undertaken to judge the case fairly and honestly under

24   the law.

25            The only other thing I want to mention and we will

Proceedings                                                19

1    get started, I promise, is note-taking.  I see Mr. Scott has

2    given you notepads and pens, and that is fine.  I want you to

3    feel free to take notes if you want to.  But keep a couple of

4    things in mind.

5               Number one, we have excellent court reporters here.

6    You see this lady right here who is typing everything?  They

7    make what is called a verbatim transcript.  So if in your

8    deliberations there is something you do not remember or want

9    to have clarified, we can have it arranged to have you rehear

10   that testimony.  So I do not want you to feel you have to

11   write everything down or it is gone forever; it is not.

12              I will tell you, one of the dangers in note-taking

13   is, like, you know, I get these new law clerks every year and

14   shortly out of law school and they are used to writing down

15   everything the professor says.  And the first thing I say is,

16   do not write down what I am saying, just listen to me.  And my

17   concern, the reason I tell them that, is because you can be

18   figuring out how to write down something you just heard and

19   the next thing will go right over your head.  So it is fine to

20   take notes, but make sure you do the primary task, which is

21   listening carefully to all the evidence that you hear.

22              In addition, you will see that from time to time I

23   might even be typing and making some notes.  Do not think to

24   yourself, oh, the Judge is typing, that must be an important

25   point.  It does not mean that at all.  I am making notes about

1    a point of law that I need to rule on or that I think the

2    attorneys might ask me about, and I am keeping a record of

3    those things, and I am annotating the transcript as the

4    witnesses testify so I can do that.  So it might be important

5    to me, but that does not at all mean it is important to you.

6              So again, take notes if you want, I am not

7    discouraging you in any way, but please, most importantly,

8    listen to the testimony.

9              All right.  At this point we will begin with the

10   government's opening statement.

11             MS. PILMAR:  May I proceed, Your Honor?

12             THE COURT:  Please.

13             MR. PILMAR: I want to tell you about the man who was

14   the top law enforcement officer in Mexico.  While entrusted to

15   work for the Mexican people, he also had a second job, a

16   dirtier job, a more profitable job.  He took millions of

17   dollars in cash bribes to enable the biggest drug cartel in

18   Mexico to operate freely so they could send tons, literal

19   tons, of cocaine to the United States.  That man I'm talking

20   about, he's sitting right over here today.  It's the

21   defendant, Genaro Garcia Luna.  Because he controlled his

22   country's entire federal police force, the defendant thought

23   he was above the law.  But we are here today in this courtroom

24   because no one is above the law.

25             Good morning, members of the jury.  My name is

1   Philip Pilmar.  I am an assistant United States attorney here

2   in the Eastern District of New York.  Alongside, my colleagues

3   from the U.S. Attorney's Office, the Drug Enforcement

4   Administration and Homeland Security Investigations, we have

5   the privilege of representing the government in this case.

6           The defendant started his career working for Mexican

7   government intelligence.  Over the years, he rose to the

8   ranks, becoming the head of Mexico's premiere law enforcement

9   agency, kind of like our FBI.  In 2006, the president of

10  Mexico even appointed the defendant to the presidential

11  cabinet, giving him powers over the whole country's federal

12  police force.  He grew his force with tens of thousands of

13  officers under his command.  His responsibilities stretched

14  even further from the seaports, to the airports, to the

15  highways.  It's actually a little hard for me to explain how

16  powerful he really was because we do not have any law

17  enforcement officers in the United States who have

18  consolidated this much power under them.

19          And you know who knew that better than anyone else?

20  Mexico's most powerful trafficking organization, the Sinaloa

21  Cartel.  The Sinaloa Cartel is one of the world's most

22  sophisticated criminal organizations.  It buys cocaine in

23  Colombia at cheap prices where it's grown, brings it up into

24  Mexico, and then smuggles it over the border into the

25  United States.  The success of the cartel is based on the fact

1    that that cocaine can go for nearly ten times its price here

2    in New York City than it's bought for in Colombia.  As you

3    would expect from such a profitable business, there are other

4    cartels fighting for power and territory.  Sometimes these

5    cartels make alliances.  Sometimes they engage in deadly wars,

6    even civil wars between factions of the cartel run by

7    different families.

8            You may have heard of one of the leaders of the

9    Sinaloa Cartel, El Chapo Guzman.  But you'll learn during this

10   trial about his cousin, Arturo Beltran Leyva, and El Mayo

11   Zambada, leaders who were just as powerful.  With thousands of

12   members, this drug trafficking organization had a structure.

13   Each person had a different role to make it a success.  From

14   the leaders to the drug smugglers to the hit men.  In total,

15   they made billions of dollars.

16           What's the best way to ensure this illegal billion

17   dollar business can continue to smuggle its cocaine to the

18   United States?  To buy off the federal police, to put them on

19   the payroll, to make them part of the organization.  So the

20   drug traffickers, they paid, and they paid a lot from the

21   bottom to the top.  The defendant took their money and

22   betrayed his oath to his country.

23           So what did the defendant and his corrupt

24   lieutenants do for these bribes?  Federal police leaked

25   sensitive law enforcement information.  Federal police gave

1    the green light to let cartel members and their cocaine go

2    through police checkpoints.  Federal police acted as body

3    guards, escorting senior members of the cartel.  They even let

4    cartel members wear police uniforms that have badges.  Federal

5    police themselves unloaded cocaine from drug cartel planes,

6    landing in Mexico City's airport and hand delivered it to the

7    cartel.  Federal police served as armed mercenaries to take

8    out the enemies that cartel leaders wanted removed.

9            Meanwhile, despite all of this, the defendant

10   portrayed himself as a law enforcement hero.

11           You will learn during this trial that the American

12   Drug Enforcement Administration has agents based in Mexico to

13   work with the local government.  The two countries are

14   supposed to be trusted partners.  The defendant and these

15   federal police officers, they vowed to work with American law

16   enforcement to go after these violent cartels.  The defendant

17   took some steps not to get caught and keep up appearances.  He

18   made some arrests.  He let his underlings do much of the dirty

19   work.  That vow to go after the Sinaloa Cartel, that was a

20   lie.  The defendant kept taking dirty drug money and the

21   cocaine kept flowing into the United States.

22           For his assistance over more than a decade to the

23   Sinaloa Cartel, the defendant is charged with federal drug

24   trafficking crimes.  And he's also charged with lying and

25   concealing those crimes when he moved to the United States and

1   tried to become an American citizen.

2          It's our burden to prove these charges beyond a

3   reasonable doubt, and we will meet that burden.  You are going

4   to have a unique opportunity during this trial because you are

5   going to hear from the people on the inside, some of the most

6   powerful and notorious drug traffickers.  These people were at

7   the top of their groups in the Sinaloa Cartel.  They're going

8   to sit right over there on the witness stand, and they will

9   tell you how essential part of their illegal drug enterprise

10  was the payment of bribes to Mexican government officials like

11  the defendant.

12         Not only that, witness after witness after witness

13  will testify that they or their bosses paid the defendant.

14  Sometimes they paid him directly, sometimes they paid him

15  through other corrupt officers.  And these witnesses are going

16  to tell you what they received in return for those payments.

17         Now, before I go further, it's important I say

18  something up front.  You are going to hear these witnesses

19  testify about horrible things they did as members of the

20  cartel, about their own cocaine trafficking, about bribes,

21  about torture, about murder.  Really, really terrible crimes.

22  There are witnesses who have pled guilty.  They took

23  responsibility for their crimes, and they cooperated with the

24  government in exchange for leniency.

25                  (Continued on the next page.)

1          (Continued.)

2          MR. PILMAR:  But members of the jury, you will

3  learn that these are the people the defendant chose to work

4  with, chose to take bribes from, chose to partner with so

5  they can send their cocaine here and so he could profit.

6  They will tell you how they cannot have done all of this

7  without the defendant's direct support.

8          Next, you're going to see and hear evidence of the

9  massive amount of drugs this cartel smuggled under the

10  protecting of the defendant.  Planes full of cocaine,

11  submarines full of cocaine, ships and trains hidden with

12  hundreds of millions of dollars of cocaine; including tens

13  of millions of dollars of the cartel's cocaine found within

14  a couple of miles from this courthouse right here in

15  Brooklyn.

16          You're going to hear from law enforcement officers

17  who seized these drugs.  You will see photographs of these

18  drugs, you will see videos of American law enforcement

19  intercepting drug ships on the high seas, and some of that

20  cocaine that was seized will be right here in this

21  courtroom.  And throughout this trial, you're going to hear

22  from both American and Mexican law enforcement officers who

23  actually tried to go after the cartel.  They will tell you,

24  because they saw it firsthand, how the defendant and his

25  federal police force protected the cartel and its cocaine.

1   Members of the jury, the evidence will show that the

2   defendant, the person who is supposed to be in charge of

3   fighting the Sinaloa Cartel, was actually it's most valued

4   asset.  The defendant took millions of dollars of bribes

5   again, and again, and again.  And with his help, the cartel

6   made billions.  And that is why when you've heard all of the

7   evidence in this case, we will ask you to find the

8   defendant, a man who betrayed both his country and ours,

9   guilty on all counts.

10          THE COURT:  All right.  Thank you, Mr. Pilmar.

11   Mr. De Castro.

12          MR. DE CASTRO:  No money.  No photos.  No video.

13   No texts.  No e-mails.  No recordings.  No documents.  No

14   credible, believable, plausible evidence that Genaro Garcia

15   Luna help the cartels.  The credible, believable, and

16   plausible evidence will show that Mr. Garcia Luna, for over

17   two decades, did his job to arrest, extradite, and

18   incapacitate organized crime in Mexico.  That is really what

19   this case is about, ladies and gentlemen.  This case is

20   really about the Government's lack of any objective evidence

21   that Genaro Garcia Luna, the man that represented the public

22   face for the all-out war against the Mexican drug cartels

23   for both Mexico and the United States, accepted bribes 10 to

24   20 years ago.

25          This will be a very public and angry display by

1    your government abandoning its strategic partners for years

2    that helped to arrest, extradite, and prosecute cartel

3    members responsible for selling billions of dollars of

4    illegal drugs to our communities.  Thousands, yes thousands

5    of murders and countless other crimes.  The Government will

6    help the cartel exact the ultimate revenge against those

7    responsible for their capture.

8            You will see that the Government's case is built

9    on the shakiest of foundations.  Their evidence is based on

10   rumors, speculations, and the words of the some of the

11   biggest criminals of the world.  Killers, drug dealers, and

12   kidnappers that were arrested and extradited to the United

13   States by Genaro Garcia Luna.  As you know, this is going to

14   be a long trial.  The Government will call dozens of

15   witnesses and present hundreds of exhibits to you.  It will

16   be a lot of quantity, but we all know that quantity is not

17   quality, and what do you do when you don't have quality?

18   You try to overwhelm with quantity.  But if you take one

19   thing away from my opening statement this morning, it's

20   this:  Throughout the testimony of the scores and scores of

21   witnesses, ask yourself where in all of that quantity is the

22   quality, the actual evidence of Genaro Garcia Luna's guilt.

23   You will be left asking where's the money?  Where are the

24   photos?  Where are the videos, where are the recordings,

25   where are the e-mails, where are the texts, where are the

1  documents.  Where is the believable evidence of this man's

2  guilt?

3          My name is Cesar de Castro and along with Valerie

4  Gotlib, Florian Miedel, and Shannon McManus.  We are honored

5  to have been appointed by the Court to represent Mr. Genaro

6  Garcia Luna.  Helping us as part of our team are our trial

7  assistants Kimberly Tabares and Austin Dean.  Most

8  importantly, let me introduce to you Genaro Garcia Luna.

9  Who is he?  He is not a politician.  He's a trained engineer

10  he was a public servant in Mexico for more than 20 years

11  working more than two decades in Mexican national security

12  and public security.  He sent his career systematically

13  fighting all kinds the criminal organizations.  We talked a

14  bit during jury selection about drugs, and I think it's safe

15  to say that we all agree that drugs destroy our communities.

16  They destroy all communities.  And the considerable evidence

17  will show that Mr. Garcia Luna spent his entire public

18  service career trying to keep communities safe from illegal

19  organizations and drugs.

20          Mr. Garcia Luna worked his way up the ranks as

21  Mr. Pilmar said.  He started his public service career in

22  1989.  From 1989 to 1997, he was first an analyst, then

23  Deputy Director of CISEN; The Center of Investigation and

24  National Security.  That's kind of like our NSA.  From 1998

25  to 2000, he was a supervisor in the Preventive Federal

 1   Police.  From 2000 to 2001; he was the Director of Planning

 2   and Operations for the Federal Judicial Police.  That's

 3   called the PJF, you may hear that from the witness stand.

 4   Then new president, Vicente Fox Quesada, had Mr. Garcia Luna

 5   dissolve the Federal Judicial Police and instead, create the

 6   Federal Ministerial Police; tasked with fighting corruption

 7   and organized crime.  That was known as AFI.  You are going

 8   to hear that a lot AFI.

 9        In an effort to clean up what had been a corrupt

10   organization, Mr. Garcia Luna removed thousands of agents.

11   The federal police reform resulted in the loss of jobs to

12   individuals not meeting higher standards, and we expect you

13   will hear from at least one of those who lost their position

14   because of those higher standards.  Who lost their job

15   because of Mr. Garcia Luna.

16        From 2001 to 2006, Mr. Garcia Luna was the

17   Director AFI.  In 2006, as the Government said, president

18   Felipe Calderon was elected president in Mexico, and he

19   selected Mr. Garcia Luna to be the minister of public

20   security; a position he held until the Calderon

21   administration ended in 2012.

22        In 2012, Mr. Garcia Luna left the government.  In

23   fact, he left Mexico and moved to the United States and

24   became a private citizen.

25        Under President Felipe Calderon, the Mexican

1  Government waged an all-out war against organized crime, and

2  primarily, the most violent Mexican drug cartels.  It

3  involved, first, revamping the federal police to clamp down

4  on corruption.  He ordered the reorganization of the federal

5  place and a massive increase in the police force.  President

6  Calderon increased the federal police force from 6,000 to

7  37,000 federal police officers.  Then the war involved the

8  tedious and extremely dangerous task of targeting the

9  numerous Mexican drug cartels.  Mexico needed new tools.

10  That was the Merida Initiative.  A United States aid program

11  to help Mexico fight narcotics trafficking and organized

12  crime.  It was the result of discussions between President

13  George Bush and President Felipe Calderon 2006 or 2007.

14  Under the Merida Initiative, the United States provided

15  equipment, technology, and training to Mexico.  Equipment

16  like helicopters, surveillance aircraft, drones, vehicles,

17  artillery, computer, systems, database, technology.

18  Everything you need for a war.

19          The president and his cabinet oversaw the Merida

20  Initiative and the fight against the cartel.  His cabinet,

21  not just Mr. Garcia Luna, the president's cabinet, consisted

22  of The Minister of the Interior, The Minister of the

23  Treasury, The Minister of the Army, The Minister of the

24  Navy, The Mexican Attorney General, The Director of Mexico's

25  Intelligence Agency, CISEN, that I mentioned earlier, and

1   the National Minister of Public Security; who would be in

2   charge of the federal police and the federal prisons, and

3   would also be the public face for that war.  And as I

4   mentioned from 2006 to 2012, that was Mr. Garcia Luna.  The

5   face to that war.

6           As Minister of Public Security, Mr. Garcia Luna

7   would be that very public face of the war, and it would be

8   extremely dangerous.  He would be the public face of a

9   dangerous war against very, very dangerous and powerful

10  people.  He would make enemies on every possible side.  He

11  would be a target for all criminals, all of them.  He would

12  be the enemy of all of the cartels.  An enemy of those

13  police working with and for the cartels.  He would also be

14  the enemy of the politicians who did not support the efforts

15  or would were corrupt himself.  He would need a full-time

16  and substantial security detail.  Nonetheless, Mr. Garcia

17  Luna had the courage to accept that assignment.

18          Mr. Garcia Luna was tasked with coordinating all

19  of Mexico's efforts under, most importantly, under the

20  Merida Initiative initiate.  Under that role, he strategized

21  with U.S. officials at the most senior levels.  The head of

22  the DEA, Karen Tandy; Administrator of the DEA and Genaro

23  Garcia Luna.  The attorney general.  Genaro Garcia Luna and

24  Eric Holder, the United States Attorney General.  Homeland

25  Security, FBI, Congress.  This is Genaro Garcia Luna and

1   Senator John McCain.  The Department of State, Genaro Garcia

2   Luna and Hillary Clinton; Secretary of State.  And even

3   United States presidents.  Genaro Garcia Luna and President

4   Barrack Obama.  Mr. Garcia Luna needed to integrate the

5   efforts of the Army, Navy, and federal police for all-out

6   assault on the drug cartels and organized crime.  They would

7   mobilize CISEN, they would create special units that would

8   work closely with and be vetted by the United States.  They

9   would use advanced technology.  Mr. Garcia Luna oversaw a

10  technological overhaul from Mexican law enforcement and

11  intelligence gathering and sharing.  They created something

12  called Plaraforma Mexico.  Plataforma was an integrated

13  technology platform that centralized and consolidated

14  information about the cartels and organized criminals.  It

15  allowed for the sharing of information between different

16  federal agencies and even the United States.  It was a huge

17  database, not unlike the U.S. Law Enforcement Criminal

18  Justice Database here.  Hundreds of Mexican and U.S.

19  personnel from law enforcement worked on it for years.  He

20  also oversaw the implementation of the incredible amount of

21  equipment Mexico received from the United States as part of

22  the Merida Initiative every year.  But even before the

23  Merida Initiative was signed or maybe even contemplated,

24  under Mexican President Fox, Mr. Garcia Luna, as head of the

25  AFI, worked with U.S. law enforcement partners and showed

1    how successful joint efforts could be.  In the early 2000's

2    Mexico and United States DEA and FBI conducted a joint

3    operation.  It was the first big step towards dismantling

4    the Sinaloa Cartel that Mr. Pilmar was talking to you about.

5    It resulted in the arrest of El Chapo's brother, Arturo, who

6    was running El Chapo's drug empire while El Chapo was in

7    prison and before they could break him out.

8         With the help of the Merida Initiative, President

9    Calderon embarked on an all-out war against an enemy that

10   was as heavily armed and prepared as some nations.  The

11   United States provided more sophisticated instruments of

12   war.  Black Hawk helicopters, surveillance planes, drones,

13   artillery, computer systems, and United States training.

14        I expect that the evidence will show that the

15   Government's witnesses, certainly all of its crucial

16   witnesses, were casualties of President Calderon's war

17   against the cartels.  Casualties of the Merida Initiative.

18   Countless cartel members were arrested by the Calderon

19   administration, then extradited, prosecuted.  And

20   incapacitated here in the United States.  Mr. Garcia Luna

21   took down scores of cartel members and bosses, including the

22   very cooperating witnesses we expect the Government to call

23   and testify in this trial.

24        You will hear about multiple cartels, the brutal

25   wars between those cartels, the violence in the streets of

1    Mexico, terrifying their citizens.  Bloody, savage wars

2    wages by the Government's cooperating witnesses.  People who

3    ordered and participated in thousands of murders, tortures,

4    kidnappings, fraud, forgery, you many it.  The organization

5    and sophistication of the cartels will floor you.  But it

6    won't surprise you.  This is a multi-billion dollar industry

7    driven largely by U.S. demand, and the cost that a kilo of

8    cocaine and other drugs fetches in the United States.

9            In this illegal business, people will go to jail.

10   But they would need an exit strategy.  You will see their

11   exit strategy on display in this courtroom up close and

12   personal.  Commit crimes for which they can receive a life

13   sentence in the U.S.  and cooperate you're way out.  Give

14   the Government information that can't be verified in the

15   hopes of getting a reduced sentence, and maybe get to stay

16   in the United States and have your family brought here as

17   well.  And also, unite against your common enemy.  Those

18   responsible for the loss of their business and imprisonment.

19   What better revenge than to bury the man that led the war

20   against the cartel.  Bury the U.S.'s main ally against the

21   drug cartels.  The man they see as responsible for

22   countless, billions of dollars in drug losses, and the

23   arrest of hundreds of their coconspirators.  These murders,

24   torturers, kidnappers literally get to kill two birds with

25   one stone.  They get greatly reduced sentences from crimes

1    that people would get life sentences for, and they get to

2    exact revenge against the person they hate most; Genaro

3    Garcia Luna.

4           The Government told you that you're going to see

5    an inside view of the cartels.  You will.  You're going to

6    get an inside view of their operations from that witness

7    stand.  All of these cooperating witnesses.  You will not

8    only learn how they make their money, but you will also

9    learn where they spend their cash profits.  They will tell

10   you they bought beach homes, they bought ranches, they

11   bought mansions, apartments, private jets, cars, yachts,

12   boats trips, watches, some even owning sports teams.  Now

13   these murderers and kidnappers and drug traffickers will say

14   they paid or they heard others paid Mr. Garcia Luna millions

15   of dollars in cash bribes.  Depending on who is testifying,

16   these supposed bribes supposedly went into the hundreds of

17   millions.  As you listen to these crazy stories, you will

18   need to ask yourself two questions.  Where is the

19   corroboration for those purported bribes?  And two; where

20   are the supposed hundreds of millions of dollars?  You're

21   not going to get an answer to those questions.  And without

22   that, all you have is the worst criminals in the world with

23   overwhelming motive to lie.  That's it.

24           Let's talk about corroboration.  As I said, you'll

25   get an up close view of the operation of the drug cartels

1    and, as you would expect, it's a super high stakes

2    environment of rampant crime filled with distrust,

3    informants, cooperators, and the deadly consequences for

4    those would cross the cartels.  Every meeting, every phone

5    call, every text, every money transfer 0involving narcotics

6    is fraught with danger.  Those involved need a guarantee, a

7    back up that they are going to get what they paid for.  They

8    need an insurance to guard against disloyalty, and if they

9    were dealing with a public official or a powerful member of

10   law enforcement, they needed some incriminating evidence on

11   them.  They needed a get out of jail free card.  Common

12   sense dictates that when you pay someone millions of

13   dollars, you would have some proof of payment.  Take a

14   photo, secretly video or audio record the person, something.

15   Especially if the payment is a bribe to a powerful

16   government official that could put you in jail for the rest

17   of your life.  But in this trial, you won't see or hear any

18   of that.

19           The Government will expect you to believe that the

20   cartel's ran multi-billion dollar operations, hundreds of

21   millions of profits per load, and millions upon millions

22   paid in bribes to officials where they recorded them in

23   ledgers and spreadsheets, they had accountants.  But in this

24   case, there will be virtually no objective proof.  Just the

25   words of killers, kidnappers, thieves, and some of the

1   biggest drug dealers this world has ever seen.  And the

2   evidence will show that most of these witnesses were

3   investigated, arrested, and handed over to the United States

4   to serve decades in U.S. prisons during Mr. Garcia Luna's

5   tenure.

6          So let me talk to you about where the money --

7   where is the money.  So what exactly do you do with hundreds

8   of millions of dollars in suitcases?  We know what the

9   cartel leaders did.  They bought ranches, houses, yachts,

10  airplanes.  All of the things I mentioned earlier.  But

11  where is the money supposedly paid to Mr. Garcia Luna?  What

12  is the evidence going to show you about Mr. Garcia Luna's

13  riches?  You will learn that for most of his time in

14  government service, he publicly made financial disclosures.

15  You will see some or all of those disclosures.  I'm sure you

16  will see his salary.  What you will see is that Mr. Garcia

17  Luna was one of the highest paid public servants in Mexico.

18  He was a cabinet member, after all.  And all you will see is

19  that he owned a 4 bedroom home in Mexico City, a 3 bedroom

20  vacation home, his wife had restaurants that were not

21  particularly profitable, a couple motorcycles and a few

22  cars; mostly financed.  Then there's the question of what

23  exactly did the cartels get for these bribes?  That's a lot

24  of money to spend.  They expect results.  These are the most

25  dangerous cartels in the world, as the Government said to

1    you.  The evidence will show that the cartels did not get

2    anything that they claimed to have paid for with their

3    bribes.  I expect the cartel members will tell you that they

4    paid bribes in return for assistance and protection.  But

5    with any business deal, with any contact, each side gets

6    something out of it.  Their testimony is not going to make

7    any sense to you, ladies and gentlemen.  It will demonstrate

8    a gaping hole in the Government's theory.  A fundamental

9    flaw.  The cartels did not get what they allegedly paid for.

10          So what do I expect the evidence will tell you

11   they were paying bribes for?  In general, 3 things.  One;

12   leave our drugs alone.  No drug seizures, do not affect our

13   profits.  Two; leave us and our people alone.  No arrests,

14   definitely no extraditions to the U.S. where we will be

15   jailed for decades or life in prison.  And three; if we're

16   arrested in Mexico, let us and help us escape.  Let's go

17   through each of those and what I expect the evidence will

18   show.

19          Drug seizures.  You will learn that Felipe

20   Calderon and his administration waged an all-out war on the

21   cartels that our client led.  They seized tons of cocaine

22   and other drugs worth billions.

23          Arrests and extraditions.  Under President

24   Calderon, they arrested countless cartel narcotic

25   traffickers, leaders of those cartels.  Not only did they

1   arrest them, but they worked with this government and

2   extradited them here where they were incapacitated.

3          And if we are arrested, let us escape.  As I just

4   mentioned, thousands of traffickers were arrested and

5   extradited.  But what about those big ones that got away

6   because Mr. Garcia Luna helped them escape from prison

7   because he was in charge of the prisons.  Well, there aren't

8   any.  You will learn that Mr. Garcia Luna oversaw the entire

9   federal prison system as chief of public security, where

10  most of the Government witnesses, their cooperating

11  witnesses were housed.  They're here.  I expect lots will be

12  made of El Chapo Guzman's escapes from Mexican prison.

13  Those occurred in 2000-2015.  Mr. Garcia Luna had nothing to

14  do with the prison system in the first, and was not even a

15  member of the government in the second.  So while you're

16  listening to the Government's evidence and watching men

17  testify that are in jail as a result of Mr. Garcia Luna's

18  duties as minister of public security, ask yourself what did

19  they get for these alleged hundreds of millions of dollars?

20         The evidence will show, ladies and gentlemen, that

21  the Government's key witnesses have played on societies

22  prejudices.  Their witnesses will try to take advantage of

23  beliefs, myths, rumors that all police, Mexican politicians,

24  and the military are corrupt.  It will be clear to you that

25  the cartels need and want to undermine the publics

1   confidences in its institutions so they can continue to

2   operate with impunity.  It helps them to play into the

3   stereotype that movies foster.  Made for Hollywood stories

4   that the general, the head of public security playing both

5   sides of the cartel for personal enrichment.  The problem

6   is, ladies and gentlemen, those are movies.  They're made

7   for mass consumption, but this is real life, and the

8   Government must bring real evidence.  Not rumor, hearsay

9   upon hearsay and myth.  The story is simple.  The cartels

10  Mr. Garcia Luna hunted, or those policemen or policiticans

11  who were affected by his tireless efforts to combat the

12  cartels want to get the last laugh, and they want your help

13  doing it.  They want you to condemn this man; a lifetime

14  public servant, a family man, to prison.  Don't let them do

15  it, don't let the cartel play you.  They're career criminals

16  and professional criminals.

17          At the end of this trial, the Government will want

18  you to conclude that at the same time that Mr. Garcia Luna

19  was meeting with American presidents, diplomats, members of

20  our congress, and the highest levels of U.S. law enforcement

21  about their joint war against the cartels, he was really

22  just a member of those cartels.  They will ask you to

23  condemn a man based on rumors speculation, and the words of

24  killers, drug dealers, kidnappers, who we're hunted and

25  captured as a result of this man's tireless work.  On the

1  word of murderers who have the greatest possible motive to

2  lie, getting their freedom despite their horrific crimes as

3  long as they help the government here.

4          Mr. Garcia Luna served more than 20 years as a

5  Mexican public servant, and the Government has no objective

6  evidence that corroborates their tale.  No money, no photos,

7  no video, no texts, no e-mail, no recordings, no documents

8  no credible, believable, plausible evidence that any

9  payments were made to him.  The evidence will show that

10  Mr. Garcia Luna is not guilty.  Thank you.

11          THE COURT:  All right.  Thank you, Mr. De Castro.

12  I think we should probably take our morning break now,

13  ladies and gentlemen.  Let's take 15 minutes.  Please stay

14  back there in the corridor behind the room, if not in the

15  jury room itself.  Please remember not to talk about the

16  case amongst yourself.  We'll see you in 10 to 15 minutes.

17          (Jury exits the courtroom.)

18          THE COURT:  Before we take our break, is this

19  going to be one of those where we have to clear the

20  courtroom or the jury before you bring in your witness or

21  can you just call the witness?

22          MS. KOMATIREDDY:  We can just call the witness,

23  your Honor.

24          THE COURT:  Okay.  So I'll see you at 11:15.

25          MS. KOMATIREDDY:  Thank you, Judge.

Proceedings                                          42

1             (A recess was taken at this time.)

2             THE COURT:  Have a seat, please.  We've got some

3    preliminary issues before we start, so if you want to take

4    witnesses back, you can do that.  Okay.  Jury issues.

5    Number one, although I did not mention any numbers during my

6    opening remarks, I did note the fact that we were a little

7    late today because one juror missed their designated point.

8    That juror is annoyed for being called out because it was

9    not her fault.  There was confusion with the marshal pick

10   up.  There was a general consensus that the pickups did not

11   go smoothly.  I will ask the marshal's to please be sure

12   that when you talk to the jurors that everyone knows what

13   they're supposed to do so it goes smoothly.  In addition,

14   juror number five has severe migraine headaches for which he

15   needs to take pills.  I'm not sure why he's not just taking

16   pills, it's fine.  Alternate number four needs this Thursday

17   off and also Tuesday, February 14th through Tuesday

18   February 16th.  How do the parties propose that I address

19   each of these jurors problems, if at all?

20            MS. KOMATIREDDY:  Your Honor the parties have

21   conferred.  With respect to the juror who is annoyed, I'm

22   not sure there is anything to be done.  We defer to the

23   Court to make an effort to make comments about how well --

24   as to the extent that it goes better tomorrow.

25            THE COURT:  I'd like to talk privately with that

Proceedings                    43

1   juror and apologize and ask her if she wants me to say,

2   generally, that although I didn't name the juror, the juror

3   that was late this morning it wasn't their fault, there was

4   confusion with the pick up.  Any problem with that?

5            MR. CASTRO:  No problem.

6            MS. KOMATIREDDY:  No, your Honor.

7            THE COURT:  So I will talk to number one.  How

8   about number five?

9            MS. KOMATIREDDY:  As your Honor noted, we don't

10  see an issue with it.  If they needs to take medication,

11  we're able to take appropriate breaks.  I don't think either

12  party sees an issue with that juror.

13           THE COURT:  Think I need to talk to him privately?

14  Find out more?

15           MR. CASTRO:  I would think because I'm not sure if

16  it's I need another break to take the meds or I can't take

17  them.  So we would defer to your Honor to speak with the

18  juror, for sure.

19           MS. KOMATIREDDY:  We also defer it to the Court.

20  We think it can be worked out.

21           THE COURT:  And alternate four?

22           MS. KOMATIREDDY:  With respect to alternate four,

23  I think this is something we were going to raise with your

24  Honor.  We believe alternate one also has a prior commitment

25  on Thursday afternoon and we were going to ask the Court if

Proceedings                    44

1    it made sense to take that day off anyway.  So given that

2    the two alternates have an issue that day, the parties are

3    fine with taking Thursday off.

4              THE COURT:  Okay.  And then what about the

5    February Tuesday through Thursday February for alternate

6    four?

7              MS. KOMATIREDDY:  That was new information to us,

8    your Honor.  Our thinking was to get more information about

9    that, perhaps, at the end of the day and try to understand

10   how this just came up.  And also, just to see how the trial

11   is going at that time.  A lot could happen, so it may make

12   sense to keep him on until that date.

13             THE COURT:  Okay.  My proposal is that we continue

14   the recess now and I take 1 and 5 separately in the jury

15   room and talk to them.  And then, at the end of the day in

16   open court, we can ask juror four to stay behind about the

17   February dates.  How is that?

18             MS. KOMATIREDDY:  That works, your Honor.  Thank

19   you.

20             MR. CASTRO:  That's fine.

21             THE COURT:  I just want to make absolutely sure

22   that both sides waive presence for me to talk to 1 and 5

23   myself right now.

24             MS. KOMATIREDDY:  The Government waives.

25             MR. CASTRO:  We do waive that.

Proceedings - Jury Room                    45

1          THE COURT:  We'll do that and get back as fast as
2    we can.  Figure another ten minutes, maybe 15.  Thank you.
3          (A recess was taken at this time.)
4          (In jury room.)
5          THE COURT:  How are you have a seat please.  First
6    of all, I'm sorry I didn't mean to call you out this morning
7    and I specifically didn't refer to the number.  But I
8    understand the other jurors were thinking of oh, you know --
9          THE JUROR:  She's the one.
10         THE COURT:  So the question is what would you like
11   me to do?  I can do nothing or I can say to the whole
12   courtroom without mentioning I can say, without identifying
13   any juror, this morning I said that someone was late and it
14   wasn't their fault.
15         THE JUROR:  It's fine.
16         THE COURT:  I can say that to the whole jury too,
17   just tell them it wasn't your fault.
18         THE JUROR:  It's okay.
19         THE COURT:  I appreciate you putting up with me
20   because there's a lot of moving pieces and this one I got
21   wrong, so I'll be more careful.
22         THE JUROR:  Thank you so much.
23         (Juror exits the jury room.)
24         (Juror enters the jury room.)
25         THE COURT:  How are you?

Proceedings - Jury Room                    46

1            THE JUROR:  Good, how are you?

2            THE COURT:  Good.  Have a seat, please.  You have

3       a headache problem?

4            THE JUROR:  Yes.  I have migraines depending on

5       the lighting, hours, things like that.

6            THE COURT:  You take a medication for that?

7            THE JUROR:  Yes.  I take medications.  Usually pop

8       2, 3, but sometimes I can get nausea.  So that's the only

9       thing.

10           THE COURT:  How ask I help?  Do you want to take

11      pills while you're in the jury box.

12           THE JUROR:  Yes.  Usually they work but sometimes

13      they don't.  So as long as I have a little bit of coffee.

14      That usually tends to help out.

15           THE COURT:  Certainly we have coffee for lunch.  I

16      think there's probably a machine in the jury room.  But if

17      you run into a problem, keep telling us during the break.  I

18      assume you can still sit.

19           THE JUROR:  Yes.  It's not, it's like -- you know.

20      We usually take our one hour breaks or whatever.  I can feel

21      it coming or whatever.

22           THE COURT:  If you know, just signal to Mr. Scott

23      and we'll try to accommodate you.

24           THE JUROR:  Okay.  Thank you very much.

25           THE COURT:  No problem.

Proceedings                                47

1                    (Proceedings concluded in jury room.)

2                    (In open court.)

3          THE COURT:  Have a seat just a minute.  The report

4   is on the juror who felt a little insulted, she's fine.  I

5   apologized, I told her I would make it a public apology, she

6   said it's really not necessary and she's okay.  On the juror

7   with the migraine headaches.  He's okay, he just wanted to

8   warn us that sometimes this happens.  He will stay on his

9   pills, if he needs it, but sometimes they don't always work.

10  And if he gets really sick, he will let us know.  I made

11  sure, you'll see the transcript, but I made sure it's not

12  affecting his ability to concentrate and he feels well able

13  to follow what's going on.  He just wanted to give us a

14  heads up.  And then when we bring the jury in now, I will

15  tell them we're not sitting Thursday, but we'll talk as a

16  group to alternate four before we break for the day.  Okay.

17  Let's have the jury, please.  Are these witnesses going to

18  be using pseudonyms?  Is that what we decided?

19          MS. KOMATIREDDY:  This first witness we not be

20  using a pseudonyms.  Will also have interpreters and the

21  interpreters are available to be sworn when your Honor

22  wishes.

23          THE COURT:  We'll wait until the jury is here and

24  then we will swear them.

25                    (Jury enters the courtroom.)

1          THE COURT:  All right, everyone be seated.  Just

2     for the sake of clarification, ladies and gentlemen, I know

3     I couple of you have conflicts with this Thursday that were

4     disclosed to Judge Kuo.  That's fine.  We're not going to

5     sit this Thursday so you're okay.  I know there's one of you

6     that has some subsequent problems and we'll talk about that

7     later.

8          All right, the Government may call its first

9     witness.

10          MS. REID:  Your Honor, the Government calls Sergio

11     Villarreal Barragan.

12          (Witness Sworn.)

13          **S E R G I O   V I L L A R R E A L**

14     **B A R R A G A N**,.

15          called as a witness having been

16          first duly sworn, was examined and testified

17          as follows:

18          THE COURTROOM DEPUTY:  Please, state and spell

19     your name for the record.

20          THE WITNESS:  Sergio Villarreal Barragan.

21     S-E-R-G-I-O, V-I-L-L-A-R-R-E-A-L, B-A-R-R-A-G-A-N.

22     DIRECT EXAMINATION

23     BY MS. REID:

24     Q    Good morning, Mr. Villarreal Barragan.

25     A    Good morning.

1    Q    In what country did you live for most of your life?

2    A    In Mexico.

3    Q    Have you pled guilty to any crimes in the United

4    States?

5    A    Yes.

6    Q    What crimes were those?

7    A    A conspiracy to traffic more than five kilos of cocaine

8    and money laundering.

9            MS. REID:  And I have what's marked as Government

10   Exhibit 1 for identification.  Your Honor, may I approach

11   the witness?

12           THE COURT:  You can't just show him on the screen?

13           MS. REID:  I can show him on the screen if your

14   Honor would like.

15           THE COURT:  Whatever saves you the most walking.

16   I mean if you need to walk, you can walk.  But if you can do

17   it on the screen, we can show it to him privately on the

18   screen.

19           MS. REID:  Yes, your honor.  So may I first have

20   the screen, Mr. Scott, for the witness?

21           (Exhibit shown to the witness.)

22   Q    Mr. Villarreal Barragan, do you recognize this?

23   A    Yes.

24   Q    And what is this?

25   A    It's Genaro Garcia Luna.

Barragan - Direct - Reid                    50

1    Q    How do you recognize government Exhibit 1 to be a
2    photograph of Genaro Garcia Luna?
3    A    I saw him at several meetings.
4    Q    And does this picture fairly and accurately depict
5    Genaro Garcia Luna?
6    A    Yes.
7              MS. REID:  Your Honor, at this time I'd ask that
8    Government Exhibit 1 be admitted into evidence.
9              MR. CASTRO:  No objection.
10             THE COURT:  Received.
11             MS. REID:  And may I publish to the jury, your
12   honor?
13             THE COURT:  It will be done as soon as I say
14   received.
15             (Government's Exhibit 1 received in evidence.)
16             (Exhibit published to the jury.)
17             MS. REID:  Your Honor, I'm going to approach, if
18   that's okay, to our board.
19             THE COURT:  That's okay.
20             MS. REID:  Thank you.
21             (Continued on the next page.)
22
23
24
25

1    BY MS. REID:

2    Q    Mr. Villarreal Barragan, just briefly, for what purpose

3    did you meet with the defendant Genaro Garcia Luna?

4    A    It was in order to pay bribes on behalf of the Sinaloa

5    cartel.

6    Q    Are you familiar with the Sinaloa cartel?

7    A    Yes.

8    Q    How are you familiar with it?

9    A    I was part of the Sinaloa cartel.  I was a high-ranking

10   person within it.

11   Q    For approximately how long were you part of that cartel?

12   A    From 2001 when I first joined them until it broke apart

13   with the Beltran Leyvas.

14   Q    Are you referring to a separation within the Sinaloa

15   cartel?

16   A    Yes.

17   Q    After that separation, did you continue to work for

18   members of the cartel?

19   A    Yes.

20   Q    For about how long?

21   A    Until the day I was arrested.

22   Q    What year were you arrested?

23   A    2010.

24   Q    Briefly, what is the Sinaloa cartel?

25   A    It's an organization in Mexico made up of top-level

1  bosses who are engaged in drug trafficking.

2  Q    During your time in the cartel, what roles did you play?

3  A    Well, I started out, I had different roles.  I designed,

4  I came up with operations to be carried out against enemies of

5  the cartel.  And then after that, per instructions by Arturo

6  Beltran, I came up with a route, a drug trafficking route,

7  from the south of the country to the center.  And I was

8  responsible for paying bribes at different levels.

9  Q    Over time, did your responsibilities grow within the

10 Sinaloa cartel?

11 A    Yes.

12 Q    At the end of your time with the cartel, what was your

13 role?

14 A    One of the main leaders of the cartel.

15 Q    You mentioned someone named Arturo Beltran, who is that?

16 A    He was a friend of mine, a very good friend, a compadre,

17 leader of the Beltran Leyva faction.

18 Q    Was that a group within the Sinaloa cartel?

19 A    Yes.

20 Q    During your time within the cartel, did you come to know

21 other leaders of the cartel?

22 A    Yes.

23 Q    Who were some the leaders of the Sinaloa cartel?

24 A    Ismael Mayo Zambada, Juan Jose Esparragoza, Nacho

25 Coronel, the Valencias, and all of the Beltrans, also Vicente

```
                    Villarreal Barragan - Direct - Reid              53
```

 1    Carrillo.

 2    Q    Are you familiar with someone named Joaquin Guzman Loera?

 3    A    Yes.

 4    Q    Who is that?

 5    A    Chapo Guzman, one of the leaders.

 6    Q    Did you ever meet him?

 7    A    I never met him in person.

 8    Q    Did you meet the other leaders that you just described?

 9    A    Yes.

10    Q    I want to go through more pictures with you.  I'll start

11    with the screen, if I may.  I'd like to show what you is

12    marked as Government Exhibit 6 for identification.  Do you

13    recognize this?

14    A    Yes.

15    Q    Who is this the person in this picture?

16    A    Arturo Beltran Leyva.

17    Q    Does Government Exhibit 6 fairly and accurately depict

18    Arturo Beltran Leyva?

19    A    Yes.

20              MR. DE CASTRO:  No objection.

21              THE COURT:  Received.

22              (Government Exhibit 6, was received in evidence.)

23    Q    I want to show you what is marked Government Exhibit 7

24    for identification.  Do you recognize the person in Government

25    Exhibit 7?

Villarreal Barragan - Direct - Reid                54

1    A    Yes.

2    Q    Who is that?

3    A    Hector Beltran Leyva.

4         MR. DE CASTRO:  No objection.

5         THE COURT:  Received.

6         (Government Exhibit 7, was received in evidence.)

7    Q    I want to show what you is marked as Government Exhibit

8    26 for identification?

9         THE COURT:  Can I suggest that you're moving too

10   quickly from one picture to the another.  Let the jury see it,

11   then after the five seconds go to the next one.

12        MS. REID:  If I may publish those to the jury, I'll

13   just come up to the board.

14        THE COURT:  Go ahead.

15   BY MS. REID:

16   Q    What, if any, relationship was there between Arturo

17   Beltran and Hector Beltran?

18   A    They were brothers.

19   Q    Did Hector Beltran Leyva have any nicknames?

20   A    Yes.

21   Q    What were those?

22   A    H or Elegante.

23   Q    I want to show you what is marked for identification as

24   Government Exhibit 26.  Do you recognize this?

25   A    Yes.

Villarreal Barragan - Direct - Reid                55

```
 1   Q    Who is that?
 2   A    Alfredo Beltran Leyva.
 3              MR. DE CASTRO:  No objection.
 4              THE COURT:  Received.
 5              (Government Exhibit 26, was received in evidence.)
 6   BY MS. REID:
 7   Q    Did Alfredo Beltran Leyva have any relationship with
 8   Arturo and Hector?
 9   A    Yes, they were brothers.
10   Q    Did Alfredo Beltran Leyva have any nicknames?
11   A    Yes.
12   Q    What was that or were those?
13   A    Mochomo or Seven.
14   Q    I want to show you now what is marked as Government
15   Exhibit 5 for identification.  Do you recognize this?
16   A    Yes.
17   Q    Who is that?
18   A    Ismael Zambada Mayo.
19              MR. DE CASTRO:  No objection.
20              THE COURT:  Received.
21              (Government Exhibit 5, was received in evidence.)
22   Q    Is Mayo a nickname for Ismael Zambada?
23   A    Yes, Mayo.
24   Q    Briefly, what was Ismael Zambada or Mayo Zambada's role
25   within the Sinaloa cartel?
```

1   A    He was also one of the main leaders as high up as Arturo

2   Beltran was.

3   Q    I want to show you now Government Exhibit 13 for

4   identification.  Do you recognize this?

5   A    Yes.

6   Q    Who is this?

7   A    Ray Zambada.

8           MR. DE CASTRO:  No objection.

9           THE COURT:  Received.

10          (Government Exhibit 13, was received in evidence.)

11  Q    Did Ray Zambada -- do you know his full name?

12  A    I think it's Jesus Reynaldo Zambada.

13  Q    Did Ray Zambada have any relationship to Mayo Zambada?

14  A    Yes.

15  Q    What was that?

16  A    They are brothers.

17  Q    I want to show you Government Exhibit 12 for

18  identification.  Do you recognize this person?

19  A    Yes.

20  Q    Who is that?

21  A    Nacho Coronel.

22          MR. DE CASTRO:  No objection.

23          THE COURT:  Received.

24          (Government Exhibit 12, was received in evidence.)

25  BY THE COURT:

Villarreal Barragan - Direct - Reid                57

1    Q    Do you know Nacho Coronel's full name?

2    A    Ignacio Coronel.

3    Q    I have one more picture to show you, it's Government

4    Exhibit 17 for identification.  Do you recognize this person?

5    A    Yes.

6    Q    Who is that?

7    A    It's me, Sergio Villarreal.

8                MR. DE CASTRO:  No objection.

9                THE COURT:  Received.

10               (Government Exhibit 17, was received in evidence.)

11   Q    Do you have any nicknames?

12   A    Yes.

13   Q    What is that?

14   A    Grande.

15   Q    When you were a member of the Sinaloa cartel, did you

16   work closely with any of its leaders?

17   A    Yes.

18   Q    Who did you work closely with?

19   A    With Arturo Beltran.

20   Q    In your role with the Sinaloa cartel, did you become

21   familiar with the objectives of the cartel?

22   A    Yes.

23   Q    In summary, what were those objectives?

24   A    The growth and expansion of the cartel and to eliminate

25   enemies of the cartel.

Villarreal Barragan - Direct - Reid                58

1    Q    Was the Sinaloa cartel involved in drug trafficking?

2    A    Yes.

3    Q    What drugs did the cartel traffic?

4    A    Cocaine, heroin, marijuana, and methamphetamine.

5    Q    I want to focus on the cocaine that was trafficked by the

6    Sinaloa cartel.  Generally, where was that cocaine grown?

7    A    In Colombia and other countries.

8    Q    Where were those other countries generally?

9    A    Next to Colombia like Bolivia and Peru.

10   Q    After it came to Mexico, where was the cocaine that the

11   Sinaloa cartel bought ultimately destined for?

12   A    Most of it was for the United States, and a small portion

13   for Europe.

14   Q    Where within the United States, did the Sinaloa cartel

15   send cocaine?

16   A    Practically the entire United States.

17   Q    What were some of the ways the cartel transported cocaine

18   into the United States?

19   A    Each part or each member of the cartel had different ways

20   of doing it.  Some of them did it by plane, some by road, in

21   trucks, buses or cars.  Some of them through bridges, through

22   rivers, and some of them had tunnels.

23   Q    How was the cartel paid for the cocaine it trafficked to

24   the United States?

25   A    U.S. dollars.

1  Q    Turning the ten or so years that you were a member of the

2  Sinaloa cartel, approximately how much money did the cartel

3  make?

4  A    Many millions.

5  Q    Was it billions?

6  A    Yes.

7  Q    What are some of the things that the Sinaloa cartel did

8  to make sure it was successful in trafficking cocaine to the

9  United States?

10 A    To make sure through corruption in Mexico that we would

11 have no problems or obstacles.

12 Q    Did the cartel ever pay Government authorities in Mexico?

13 A    Yes.

14 Q    Were you ever involved in payments to Government

15 officials?

16 A    Yes.

17 Q    Generally, what levels of Government officials did the

18 cartel pay?

19 A    Municipal level, state level, federal level, and also the

20 military.

21 Q    Were all of those Government officials paid the same

22 amount of money?

23 A    No.

24 Q    Did all of those Government officials have the same level

25 of participation in the cartel's work?

1    A    No.

2    Q    Can you describe for the jury some of the differences?

3    A    There were two types of corruption in the Government.

4    One of them is when you pay an officer and they look the other

5    way and let something through.  And the other type is when the

6    officers take part in the activities of the organization.

7    Q    Did the Sinaloa cartel pay the defendant Genaro Garcia

8    Luna?

9    A    Yes.

10   Q    What level of participation did the defendant Genaro

11   Garcia Luna have with the Sinaloa cartel's activities?

12   A    A very important one.

13   Q    Of the two kinds of participation that you just described

14   for us, how would you characterize the defendant's

15   participation with the Sinaloa cartel?

16   A    As the second description that I mentioned.

17   Q    Was the defendant Genaro Garcia Luna a Government

18   official?

19   A    Yes.

20   Q    What role did he have within the Mexican Government?

21   A    When I came in in 2001 he was the director of the federal

22   investigative agency.  Afterwards he was the secretary for

23   public security at the federal level.

24   Q    So let's start with the federal investigative agency.

25   What was that?

Villarreal Barragan - Direct - Reid                61

1  A    It was the police force that was in charge of dealing

2  with federal crimes.  It was what previously known as the

3  judicial federal police.

4  Q    Did that federal investigative agency have an acronym or

5  short name that it was commonly referred to by?

6  A    Yes.

7  Q    What was that?

8  A    AFI.

9  Q    What was the defendant, Garcia Luna's role in AFI?

10  A    He was the AFI director.

11  Q    What years did he do that?

12  A    From 2000 to 2006.

13  Q    You also mentioned the secretary of public security, what

14  is that?

15  A    It was a secretariat that President Calderon created as a

16  new agency and it absorbed the previous preventive federal

17  police.

18  Q    Generally, what did the secretary of public security have

19  control over in Mexico?

20  A    He was national level secretary, the entire country.

21  Q    What kinds of things within Mexico did the secretary of

22  public security control?

23            MR. DE CASTRO:  Objection.

24            THE COURT:  What is the objection?

25            MR. DE CASTRO:  Basis.

1           THE COURT:  Foundation?

2           MR. DE CASTRO:  Yes.

3           THE COURT:  Sustained.

4    BY MS. REID:

5    Q    During your time with the Sinaloa cartel, who was

6    primarily in charge of paying the defendant, Genaro Garcia

7    Luna, on behalf of the cartel?

8    A    Arturo Beltran.

9    Q    Were you present for some of those payments?

10   A    At some points I was, yes.

11   Q    During what time period did Arturo Beltran pay the

12   defendant Genaro Garcia Luna on behalf of the Sinaloa cartel?

13   A    When I came in, he was already getting paid.  And he was

14   paid until the last day of Arturo Beltran, the last day of his

15   life.

16   Q    When did Arturo Beltran die?

17   A    I believe it was 2008.

18   Q    Can you remind us what year you started working with the

19   Sinaloa cartel?

20   A    2001.

21   Q    Over the course of those years, how did the payments to

22   Genaro Garcia Luna impact the Sinaloa cartel?

23   A    Well, they were of -- he was of great help because we

24   were able to grow and also minimize our rivals.

25   Q    Can you briefly explain that to us?

1  A    Well, with the help of the Government, the cartel was

2  able to grow in terms of territory, we call them plazas.  Also

3  in the quantity of drugs that were able to be brought into

4  Mexico.  And also in eliminating rival groups.

5  Q    At the time of your arrest in 2010, how did the Sinaloa

6  cartel compare in size and power with other drug cartels in

7  Mexico?

8  A    The Sinaloa cartel was already divided, but it was still

9  strong.

10 Q    How did it compare with other cartels?

11 A    There was no rivals.

12 Q    During the period you've just described, generally what

13 kinds of support did the defendant, Genaro Garcia Luna,

14 provide to the cartel?

15 A    He would give us information about operations and

16 investigations against the organization.  He helped us put in

17 and take out commanders and agents in any plaza in Mexico.

18 And we shared information so that we could hit our rivals.

19 Q    I want to show you now on the screen what is marked as

20 Government Exhibit 325.  Do you recognize this?

21 A    Yes.

22 Q    What is it?

23 A    It's the country of Mexico, it's the map.

24 Q    Does this appear to be a fair and accurate map of the

25 country of Mexico?

Villarreal Barragan - Direct - Reid                64

1   A      Yes.

2          MS. REID:  Your Honor, I'd ask that Government

3   Exhibit 325 be admitted in evidence.

4          THE COURT:  Well, since you've already shown it to

5   the jury.

6          MS. REID:  I apologize.

7          MR. DE CASTRO:  No objection.

8          THE COURT:  Received.

9          (Government Exhibit 325, was received in evidence.)

10         MS. REID:  We'll publish it to the jury.

11  BY MS. REID:

12  Q    Mr. Villarreal Barragan, I want you to start in the 2001

13  time period when you first joined the Sinaloa cartel.  At that

14  time, can you show us on this map what areas of Mexico the

15  Sinaloa cartel had control over?  And you can draw on the map.

16  A      Sonora, Chihuahua, Sinaloa.

17  Q    Could I ask you to stop and use your finger to actually

18  draw on the screen?

19         THE COURT:  Unfortunately, I'm told the annotation

20  feature is not working.

21         MS. REID:  Your Honor, in that case with your

22  permission, I'd ask the witness to step down and show us on

23  the big map.

24         THE COURT:  That's fine.

25         MS. REID:  Thank you.

1   A     Sonora, Chihuahua, Sinaloa, Durango, and a small strip

2   here that goes from Torreon to a part of Monterrey.  And they

3   were fighting over the plaza de Nuevo Laredo and Miguel

4   Aleman.

5   Q     Mr. Villarreal Barragan, can you show us what areas of

6   Mexico the Sinaloa cartel had over time as its power grew?

7   A     North and south Baja California, Sonora, Chihuahua,

8   Sinaloa, Durango, Zacatecas, Nayarit, Jalisco, parts of New

9   Leon, Colima, Guanajuato, Queretaro, the State of Mexico,

10  Guerrero, Puebla, Jalapa, Tabasco, Chiapas, Quintanaroo, and

11  part of Yucatan.

12  Q     You may have a seat.  Did the payments to the defendant,

13  Genaro Garcia Luna, play a role in this growth that you've

14  just described?

15  A     Yes.

16  Q     Just briefly can you tell us about that?

17  A     The payments grew as the cartel grew; without that

18  support it, would have been practically impossible.

19  Q     I'd like to talk a little bit about your background.

20  A     Yes.

21  Q     Where did you primarily grow up?

22  A     In Torreon Coahuila, Mexico.

23  Q     How far did you go in school?

24  A     Second year of law school.

25  Q     Did you finish law school?

Villarreal Barragan - Direct - Reid                66

1  A    No.

2  Q    Why not?

3  A    I started to work.

4  Q    What did you do?

5  A    I started working for the state judicial police.

6  Q    Approximately what year did you start working as a police

7  officer?

8  A    In around the 90s approximately, 1990.

9  Q    Briefly, what is the state judicial police?

10  A    Well, so that police agency is responsible for -- each

11  state has one, and this police body has responsibility for

12  common civil crimes for each state.

13  Q    At some point did you change positions?

14  A    Yes.

15  Q    When was that about?

16  A    In approximately mid '92.

17  Q    What did you do?

18  A    So the office of the Attorney General held competition

19  exams and made that known to all of the state agencies, the

20  prosecutor agencies, and this was to train and to have agents

21  join the federal police office.

22  Q    Did you train to join the federal police?

23  A    Yes.

24  Q    Did you take a training course for that?

25  A    Yes.

1    Q      What was your standing in that course at the end?

2    A      I finished as Agent A at that time.

3    Q      What does that mean?

4    A      Two levels lower -- sorry, two levels above just an

5    agent.

6    Q      After your training, were you assigned somewhere?

7    A      Yes.

8    Q      Where was that?

9    A      Ciudad Juarez Chihuahua.

10   Q      What were you assigned to do there?

11   A      I was assigned to a shift as a check point on a highway.

12   Q      What was your role at that check point?

13   A      I was responsible for the shift and this was in

14   Samalayuca, Chihuahua.

15   Q      What kind of things was the check point set up for?

16   A      It was set up to detect drugs, weapon, people without

17   identity papers, at the time there were a few of those.

18   Q      What happened after you started working at the check

19   point?

20   A      We started work normally, conducting a few seizures.

21   Q      Did anything significant happen shortly after you began

22   your work there?

23   A      Yes.

24   Q      What happened?

25   A      Some SUVs pulled up to the check point one day.  And

Villarreal Barragan - Direct - Reid                    68

1   people who were wearing uniforms just like ours and who were

2   armed, got out.  It was Amado Carrillo.

3   Q     Who was Amado Carrillo?

4   A     The leader of the Juarez cartel.

5   Q     What is that?

6   A     It was a cartel, which at the time during those years,

7   was the most powerful cartel in Mexico.

8

9                (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MS. REID:   (Continuing)

3    Q     And just to be clear, the people who were wearing Federal

4    Judicial Police uniforms with Amado, did they work for the

5    Federal Judicial Police?

6    A     No.

7    Q     Who did they work for?

8    A     For the Juarez Cartel.

9    Q     So what happened when they came to your checkpoint?

10   A     They pointed their guns at us.  And then Amado Carrillo

11   introduced himself to us and said, well, you either ally

12   yourself with us or you get out of here.

13   Q     And what did you say?

14   A     We all said yes.

15   Q     And what happened next?

16   A     We started working with the Juarez Cartel.  I did so in a

17   more direct way.

18   Q     When you started working for the Juarez Cartel, did you

19   continue your work with the Federal Judicial Police?

20   A     Yes.

21   Q     Were you paid by the Juarez Cartel?

22   A     Yes.

23   Q     And can you describe for us what things you did for the

24   Juarez Cartel?

25   A     I would help receive planes that were loaded with

1   cocaine, refuel them so they could take off again.  And I

2   would go around with the person responsible for the Juarez

3   Cartel at the time, just to go around the city with him.  And

4   that was during my free time after I left the checkpoint.

5   Q    And who did you work closely with or accompany that you

6   referred to?

7   A    Arturo Hernandez, a/k/a Chaky.

8   Q    And is Chaky a nickname?

9   A    Yes, it's a nickname.  It was his nickname.

10  Q    How many years did you work for Amado Carrillo and the

11  Juarez Cartel?

12  A    Until I retired -- I got out of the Federal Judicial

13  Police.

14  Q    And when was that?

15  A    In approximately 1997.

16  Q    And why did you get out of the Federal Judicial Police?

17  A    There was a change in top person of the Federal Judicial

18  Police, a general came into office, General Alvarez.  And he

19  started investigating people, those of us who were close to

20  Amado Carrillo.  Among them was me.

21  Q    And what did you do?

22  A    I quit.

23  Q    And why did you stop working with the Juarez Cartel after

24  you quit the Federal Judicial Police?

25  A    I was no good to them anymore.

1    Q    Did there come a time when you started working for

2    another drug trafficker?

3    A    Yes.

4    Q    Who was that?

5    A    Arturo Beltran.

6    Q    And approximately what year was that?

7    A    In approximately 2001.

8    Q    And what did Arturo Beltran do at that time?

9    A    He was the person in charge or represented the Sinaloa

10   Cartel in Monterrey, Nuevo Leon; Miguel Aleman, Tamaulipas.

11   Q    I want to talk about that in more detail, but just

12   briefly, how did you begin working for Arturo Beltran?

13   A    So in approximately 2000, the Gulf group arrived in

14   Nuevo Laredo, which is where I was living.  They wanted to

15   extort me.  I did not fall for their tricks.  They took my

16   businesses.  And then the final blow of all was that they

17   killed my brother-in-law, which was when I sought out Arturo

18   to talk to him.

19   Q    And who was the Gulf group?

20   A    It was the group headed by Osiel Cardenas-Guillen.

21   Q    Was that another drug cartel in Mexico?

22   A    Yes.

23   Q    And why did you reach out to Arturo Beltran for help?

24   A    I knew Arturo had held an important level in the Sinaloa

25   Cartel, so my intention was, he was friends with Osiel, I

1   wanted him to intervene on my behalf because of the problems

2   he had with me.

3   Q    And what happened when you asked for help from Arturo?

4   A    Arturo told me he couldn't talk to him because he was his

5   enemy.  A better idea was for me to join forces with him and

6   then we would fight him together.

7   Q    And what did you say?

8   A    That I would.

9   Q    And is that when you started working for the Sinaloa

10  Cartel?

11  A    Yes.

12  Q    When you started working for the cartel, what was

13  Arturo's relationship with other leaders within the Sinaloa

14  Cartel?

15  A    All of the leaders were at the same level, and they were

16  partners in various deals, drug deals.

17  Q    And how did Arturo get along with Joaquin Guzman, also

18  known as El Chapo?

19  A    At that time?  Well.

20  Q    Was there any relationship other than a work relationship

21  between them?

22  A    They called each other cousin.  I don't know if they

23  actually were cousins.

24  Q    And how did Arturo get along with El Mayo Zambada when

25  you joined the cartel?

Barragan - Direct - Ms. Reid                      73

1   A    Well.

2   Q    So when you started working for Arturo, I think you said

3   he was in Monterrey; is that right?

4   A    Arturo was, yes.

5           MS. REID:  Can we have 325 back on the screen,

6   please.

7   Q    And can you tell us where Arturo was working when you

8   first started working with him?

9   A    In Monterrey.

10          MS. REID:  You can get down if that's helpful, if

11  the Court will allow that.

12          THE COURT:  Yes, please.

13  A    In this small area of Monterrey, it was called San Pedro

14  Garza Garcia, Nuevo Leon.  And these two drug routes were

15  constantly being fought over, Nuevo Leon and Miguel Alemán,

16  Tamaulipas.  You can't see it here on the map.

17  Q    Thank you.  You can have a seat.

18          Who was fighting over the areas in Nuevo Leon and

19  Miguel Aleman?

20  A    The people from the Sinaloa Cartel against people from

21  Osiel Cardenas's cartel.

22  Q    And what was Osiel Cardenas's group called again?

23  A    The Gulf Cartel.

24  Q    What did you do when you started working for Arturo in

25  the Sinaloa Cartel?

1  A    Arturo knew how familiar I was with police matters, so he

2  asked my help in coming up and planning, creating operations

3  to attack his enemies in Nuevo Laredo and Miguel Aleman.

4  Q    And just to be clear, who were those enemies?

5  A    People from the Gulf Cartel, Osiel Cardenas-Guillen's

6  people.

7  Q    When you started working for the Sinaloa Cartel, did the

8  cartel have relationships with law enforcement?

9  A    Yes.

10  Q    How did you learn about that?

11  A    I asked Arturo which government we would be able to

12  rely -- we had been able to rely on to get those plazas.  So

13  he told me that they only relied on the AFI, but that was with

14  respect to the whole country.  Because the municipal and state

15  police in Tamaulipas worked with Osiel Cardenas.

16  Q    And was AFI the Federal Investigative Agency you told us

17  about earlier?

18  A    Yes.

19  Q    When you started working for Sinaloa, did any members of

20  the cartel have equipment from AFI?

21  A    Yes.

22  Q    What kinds of things did the cartel members have from

23  AFI?

24  A    We had cloned SUVs and uniforms.

25  Q    And what did those uniforms look like?

1  A    Ones that were just like the AFI ones.  They were blue,

2  they had white letters on them.  There was an insignia, the

3  logo, and the coat of arms of the country of Mexico.

4  Q    Did you ever have an AFI uniform after you joined the

5  cartel?

6  A    Yes.

7  Q    You also mentioned cloned SUVs.  What do you mean by

8  that?

9  A    They were SUVs, and we would put magnets on them with the

10  Federal Investigative Agency logo.  And also we would put red

11  and blue lights on them like the real SUVs.

12  Q    Did members of the Sinaloa Cartel have any credentials?

13  A    Some of them.

14  Q    Did you have credentials?

15  A    Yes.

16  Q    And can you tell us, what were your -- what were those

17  credentials?

18  A    The credential is an official ID for the police with a

19  photo on it.  It also has the permit to carry firearms.  And

20  it also has a kind of metal badge on it.

21  Q    And was your credentials specifically from AFI?

22  A    Yes.

23  Q    And what name did your credential have?

24  A    Gerardo Maynes Leal.

25  Q    And what position did your credentials say that you have?

1    A     Second commander.

2    Q     Is that an AFI second commander?

3    A     Yes.

4    Q     How did you get a credential saying that you were an AFI

5    second commander?

6    A     Arturo gave it to me.

7    Q     Did anyone within the cartel have bodyguards?

8    A     Yes.

9          THE COURT:  Counsel, at a convenient point, does not

10   have to be now, probably break for lunch.  Could be five,

11   ten minutes, now, whenever you want.

12         MS. REID:  We could do now, Your Honor.  That's

13   fine.

14         THE COURT:  All right, ladies and gentlemen, we are

15   having lunch brought in for you.  We are taking an hour, so

16   please be back into the courtroom at a quarter to two.  Please

17   remember, do not talk about the case.

18         Can I have someone from the government move the

19   easel, please, so the jury can get out.

20         Okay, ladies and gentlemen.

21         (Jury exits.)

22         THE COURT:  Okay.  1:45.  Recess.

23         (Recess taken.)

24         (Continued on the next page.)

25

1                         AFTERNOON SESSION

2                 (In open court; jury not present.)

3                 THE COURT:  All right.  Let's wait for the

4      defendant.

5                 MS. KOMATIREDDY:  Your Honor, would you like us to

6      have the witness step outside?

7                 THE COURT:  No.

8                 (Jury enters.)

9                 THE COURT:  All right.  Everyone be seated.  Welcome

10     back, ladies and gentlemen.  Hope you had a nice lunch.

11                Let's proceed.

12     DIRECT EXAMINATION

13     BY MS. REID:  (Continuing)

14     Q    Now, did anyone within the Sinaloa Cartel have

15     bodyguards?

16     A    Yes.

17     Q    And where were those bodyguards from?

18     A    Most of them were hit men, the cartel's hit men.

19     Q    And where were other bodyguards from?

20     A    Some were state police officers, others were federal

21     police officers.

22     Q    And those that were federal police officers, who did they

23     work for?

24     A    The ones who were federal officers were members of the

25     AFI.

1              THE COURT:  Before you continue, ladies and

2    gentlemen, are you hearing the interpreter okay?

3              You can hear?

4              THE JURY:  Yes.

5              THE COURT:  Okay.  Good.

6              Go ahead.

7    Q    Now, after you started working for Arturo Beltran, did he

8    ever introduce you to anyone from AFI?

9    A    Yes.

10   Q    Who did he introduce you to?

11   A    A commander.

12   Q    And who was that?

13   A    His name was Domingo.

14   Q    Do you know Commander Domingo's full name?

15   A    I do, but I don't remember it.

16   Q    About how long after you started working for

17   Arturo Beltran did he introduce you to Commander Domingo?

18   A    Very soon after.  I think a week, week and a half,

19   something like that later.

20   Q    And tell us about your first memory of meeting AFI

21   Commander Domingo.

22   A    I met him at one of Arturo Beltran's offices in

23   Monterrey.  I explained to him this project, the one that I

24   had come up with, to have more of a presence in Nuevo Leon and

25   Miguel Aleman.  I asked him what he could tell me about the

1    support that we could get from AFI agents.  And his answer to

2    me was:  Total.

3    Q    All right.  So I want to break a few things down.

4              First, you said you met at an office.  What do you

5    mean by that?

6    A    Offices are safe houses, they're referred to as offices,

7    and that's what the cartel uses, the drug organization does to

8    discuss matters that have to do with it.  And that includes

9    sometimes sleeping there and sometimes living there.

10   Q    Now, you said that when you first met Commander Domingo,

11   you explained to him about a project you were working on.

12             What do you mean by that?

13   A    It was the plan that I had come up with -- well, that

14   Arturo Beltran had asked me to come up with so we could have

15   more of a presence in the plazas of Nuevo Laredo and

16   Miguel Aleman.

17   Q    And what was the plan?

18   A    The original plan was to mingle people, actual agents

19   from the AFI, with Sinaloa Cartel hit men, everybody wearing

20   the same uniform with the AFI logo type and everything,

21   vehicles as well.  These gunmen or hit men would raid

22   residences of ours.

23             And then the actual AFI agents would create a

24   perimeter around those locations in case the municipal or

25   state police came, they would ask them to leave.  And then

1    anybody who had been arrested or any items that had been

2    seized during those raids would be turned over to the office

3    of the local prosecutor by the real AFI officers.

4    Q    And who are the individuals that you planned to arrest or

5    seize property from?

6    A    They were members of the Gulf Cartel.  They were our

7    rivals.

8    Q    After you discussed this plan, what, if anything, did

9    Commander Domingo say?

10   A    That we had his full support to do it.  He was there,

11   available to us.

12   Q    Did anyone pay Commander Domingo at the meeting?

13   A    Yes.

14   Q    Who did that?

15   A    Arturo Beltran.

16   Q    And were you present for that?

17   A    Yes.

18   Q    And how much money did he pay Commander Domingo?

19   A    I don't remember if it was a million, a million and a

20   half dollars.

21   Q    Did you see that money?

22   A    Yes.

23   Q    In what form was it in?

24   A    It was in packets, in a bag.

25   Q    What currency was it in?

1    A    U.S. dollars.

2    Q    And why was it in U.S. dollars?

3    A    Because that's how -- that's what the money is that you

4    get from drug trafficking, it comes from the sale of the

5    drugs.

6    Q    And what was your understanding of who that payment was

7    for?

8    A    For the bosses in Mexico, Domingo's bosses.

9    Q    Who were Domingo's bosses?

10   A    The general director and the other directors.

11   Q    And who was the general director of AFI at that time?

12   A    Garcia Luna.

13   Q    And how did you understand that this payment to

14   Commander Domingo was for these other people?

15   A    I would hear the conversations that Domingo would have

16   with Arturo.

17   Q    And during those conversations, was there ever any

18   mention of the defendant, Genaro Garcia Luna, by name?

19   A    Not at the beginning.  He was referred to as the

20   director.  At least Domingo said that, director.

21   Q    Over time, did you ever hear Arturo Beltran and

22   Commander Domingo reference the defendant by name?

23   A    Yes.

24   Q    And after that first meeting with Commander Domingo, did

25   he meet with Arturo other times?

Barragan - Direct - Ms. Reid                          82

1    A    Yes.

2    Q    Generally, where did those meetings occur?

3    A    In safe houses in San Pedro Garza Garcia in Nuevo Leon.

4    Q    And were you present for those meetings?

5    A    For some of them.

6    Q    How often did those meetings take place?

7    A    They were often.  Sometimes once, twice a week, sometimes

8    three times a week.  It would vary.

9    Q    And generally, what happened at the meetings that you

10   were present for?

11   A    Well, they would talk about the projects, how the taking

12   over of the plazas was going, the fact that the Sinaloa Cartel

13   heads were happy.  Commander Domingo also said that his bosses

14   in Mexico were happy.

15   Q    And who did you understand that to be a reference to?

16   A    To the general director.  There are other directors in

17   the area.

18   Q    And is that the general director of AFI?

19   A    Yes.

20   Q    After you started working with Arturo Beltran, did you

21   learn whether he was in touch with anyone higher than

22   Commander Domingo at AFI?

23   A    Yes.

24   Q    Who was he in touch with?

25   A    With Cardenas Palomino and Garcia Luna.

Barragan - Direct - Ms. Reid                            83

1    Q     And who was Cardenas Palomino?

2    A     He was like Garcia Luna's right-hand man.

3    Q     Did he work at AFI?

4    A     Yes.

5    Q     And do you know his full name?

6    A     I think it's Luis Cardenas Palomino.

7    Q     And if I could, I would like to show you on the screen

8    what's marked as Government Exhibit 2 for identification.

9          Do you recognize this person?

10   A     Yes.

11   Q     And who is that?

12   A     Luis Cardenas Palomino.

13         MR. DE CASTRO:  No objection.

14         THE COURT:  Did you say no objection?

15         MR. DE CASTRO:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibit 2 received in evidence.)

18         MS. REID:  If we could just publish it.

19         Thank you.

20         (Exhibit published.)

21   Q     So how was Arturo Beltran in touch with

22   Genaro Garcia Luna back in 2001 when you first started working

23   with Arturo?

24   A     Oh, by using radios.

25   Q     And what do you mean by radios?

1  A    Communication radios.

2  Q    Did Arturo speak to other people by radio at this time?

3  A    Yes.

4  Q    And did other people in the Sinaloa Cartel use radios to

5  communicate?

6  A    Yes.

7  Q    Why was that?

8  A    Because they were supposedly safer and nobody could

9  listen in.

10  Q    How long after you started working directly for

11  Arturo Beltran did you learn that he was in radio

12  communication with the defendant, Genaro Garcia Luna?

13  A    A short time after.  I'm not sure how long.

14

15              (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

1            (Continued.)

2     Q    What do you remember, if anything, about that?

3     A    I remember this one time when Arturo Beltran sent a

4     gift to Garcia Luna.

5     Q    Okay.  And what, tell us about that.

6     A    Arturo had his brother-in-law, Carlos, buy a special

7     edition Harley Davidson motorcycle in Mexico City and he

8     sent it as a gift to Garcia Luna.

9     Q    And what did you hear?  Did you hear any more about

10    that?

11    A    Well, there were 2 things that stood out to me with

12    respect to that call.

13    Q    Sorry.  When you're talking about a call, what are you

14    referring to?

15    A    The radio call.

16    Q    Who was that call between?

17    A    Between Arturo and Garcia Luna.

18    Q    And by the way, how could you hear a conversation

19    between Arturo and Garcia Luna by radio?

20    A    Arturo had the habit of talking to people on his radio

21    on speaker.

22    Q    So what stood out to you when you heard this

23    conversation between Arturo Beltran and the defendant?

24    A    How familiar the tone was that they were using to talk

25    to each other as if they were friends.  And the person that

Barragan - Direct - Reid                              86

1   he, Arturo, was talking to, had a speech problem, he would

2   trip over his words.

3   Q    Who are you referring to that had a speech problem?

4   A    Garcia Luna.

5   Q    And during this conversation, did Arturo or the

6   defendant reference the motorcycle?

7   A    Yes.

8   Q    What do you remember about that?

9   A    Thanking him for his thoughtfulness, it was really

10  nice.

11  Q    Who was saying that?

12  A    Garcia Luna.

13  Q    Did you ever hear other conversations between Arturo

14  Beltran and the defendant, Garcia Luna, after that?

15  A    Yes.

16  Q    About how often did you hear those?

17  A    On average, possibly once a month.

18  Q    And were there times when Arturo spoke with the

19  defendant, Garcia Luna, but you were not present?

20              MR. CASTRO:  Objection.

21              THE COURT:  Hang on a second.  Rephrase it,

22  please.

23  Q    Did Arturo ever talk you to about other conversations

24  he had with the defendant you were not present for?

25  A    Yes.  Yes.

Barragan - Direct - Reid                    87

Q    Did you ever hear Arturo Beltran discuss money or
payments with the defendant?

A    The payments were up-to-date, everything was fine.

Q    And the money that was paid to the defendant through
Comander Domingo, who did that money come from?

A    It was a pool of money.  It was a collection from
various heads that were made towards that payment.  Heads of
the Sinaloa Cartel.

Q    Who are some of those heads of the cartel that you're
referring to?

A    Arturo Beltran, El Mayo Zambada, Chapo Guzman, Azul
Paragosa, and the Valencias.

Q    How do you know that the money came from those people?

A    I overheard the conversations that Arturo Beltran had
with the different cartel leaders.

Q    And what did they say, if anything, about the
defendant?

A    That all of them were happy.  That everything was going
smoothly.

Q    By the way, how did Arturo Beltran refer to the
defendant when he talked with other members of the cartel?

A    Well usually the buddy, the buddy, the compa.  Or
sometimes he would use a derogatory form to refer to him.

Q    And what was that?

A    Referring to the speech problem he had, he would call

1   him tartamudeo.

2   Q    What does that mean?

3   A    A person who stutters, who trips over his words when he

4   speaks.

5   Q    Did you ever hear other members of the Sinaloa Cartel

6   refer to the defendant as tartamudeo?

7   A    Yes.

8   Q    Did you ever use that term?

9   A    Not as far as I remember.

10  Q    About how long was this time period that you were in

11  Monterrey with Arturo Beltran?

12  A    Approximately until about 2003.

13  Q    And between 2001 and 2003, did Arturo Beltran make

14  payments to the defendant through Domingo?

15  A    Yes.

16  Q    About how frequently did he make those?

17  A    They were monthly payments.

18  Q    Generally what are the amounts?

19  A    I don't remember exactly.  It was about a million to a

20  million and a half.  Something like that.

21  Q    During that two-year period or so, what was the Sinaloa

22  Cartel doing in that area?

23  A    They were entering their drug transit through the

24  Tamaulipas border.

25  Q    Earlier you described a plan to fight against the Gulf

Barragan - Direct - Reid                    89

1    Cartel.  Did the cartel carry out that plan?

2    A    For a time, yes.

3    Q    During that time, what, if any, role did AFI have in

4    the plan?

5    A    For a while, everything worked as planned.  They were

6    taking care of the perimeter and they were also having some

7    people to be of service to them until they broke out from

8    that plan.

9    Q    So while the plan was going well, can you just explain

10   to us in a bit more detail what happened on these

11   operations?

12   A    The hit men together with the AFI members, they would

13   get to a ranch, for example, to raid it.  And they would

14   search, they would make sure to ensure the area and if there

15   were any people they would arrest them, or if anything had

16   been seized they would bring it to the local prosecutor's

17   office.  And the AFI people would be taking care of the

18   perimeter and they would bring those who are arrested as

19   well as the items that were seized to the local prosecutor's

20   office.

21   Q    Just to be clear, who were the people that were being

22   arrested for this plan?

23   A    People who were part of the Gulf Cartel.

24   Q    When AFI members made a perimeter around a ranch that

25   you described, could they see what Sinaloa Cartel members

1    were doing?

2    A    Yes.  Because the perimeters were very close by.

3    Q    And did AFI members ever interfere with the Sinaloa

4    Cartel members detaining Gulf Cartel members?

5    A    No, no.

6    Q    And what were the Sinaloa Cartel members wearing during

7    these operations?

8    A    AFI uniforms.

9    Q    And how important was AFI's support to the cartel's

10   efforts in Monterrey at this time?

11   A    It's very necessary.  Otherwise we wouldn't have been

12   able to go in.

13   Q    During this time, did Arturo Beltran speak with

14   Comander Domingo about these operations?

15   A    Yes.

16   Q    Did Arturo Beltran speak to the defendant about these

17   operations?

18   A    Yes.

19   Q    I believe you mentioned that at some point something

20   may have changed with the plan.  What happened?

21   A    The hit men who were in charge of operations for the

22   Sinaloa Cartel, together with the AFI agents, they decided

23   that instead of bringing the people they had arrested to the

24   local prosecutor's office, they started killing them and

25   they made them disappear.

1  Q     Were you aware that this was going on?

2  A     Yes.

3  Q     Ultimately, did this impact the Sinaloa Cartel's

4  efforts in Monterrey?

5  A     Things heat up.  It heat up because of those actions.

6  Q     At some point, did you leave the Monterrey area?

7  A     Yes.

8  Q     Around when was that?

9  A     Approximately 2003.

10  Q     Where did you go?

11  A     I had instructions, well, to Chiapas.

12  Q     And I want to go back, if I can, to 325 on the screen

13  and, with the Court's indulgence, we may also set it up for

14  the jury.

15         (Document published for the jury.)

16         So looking at 325 and if the Court permits, maybe

17  you can come down and show us where Chiapas was.

18  A     It's right here (indicating).

19  Q     Why were you sent to Chiapas?

20  A     Arturo trusted me and he knew whatever he asked me to

21  do, that I could do it.

22  Q     Using the map in front of you, can you point to us any

23  areas that you were focused on when you went to Chiapas?

24  A     Here.  Tapachula, Tove La, in this area, (indicating).

25  Q     You can have a seat, thank you.

1           And the areas you just described, what were

2   you doing in those areas?

3   A    In those areas, well we started grabbing them for the

4   cartel so that we could do the drug trafficking for the

5   cartel.

6   Q    What specifically did you do when you got to Chiapas?

7   A    I spoke to the attorney general for the state, whom I

8   knew, and also for the attorney general for the state.  I

9   spoke to the municipal police officers.  And I explained to

10  them the reason why the Sinaloa Cartel was expanding to

11  those areas.  And I also bribed them.

12  Q    During this time, was the Sinaloa Cartel still making

13  payments to the defendant?

14  A    Yes.

15  Q    And can you explain why, if you had payments already to

16  AFI, why did the cartel pay these other levels of

17  government?

18  A    Well, those payments were so that they would commit to

19  us.  We would usually say so that they are with us

20  100 percent.

21  Q    Was it important to the cartel to pay government

22  officials at different levels?

23  A    Yes.

24  Q    Why was that?

25  A    Well, because at the time in those areas, the Gulf

1   Cartel was present.  We were there, we were armed, we were

2   patrolling the area.  And we were trying to fight them.

3   Q     And did different government officials help you with

4   that effort?

5   A     Yes.

6   Q     When you were in Chiapas, where was Arturo Beltran?

7   A     He was in Monterrey for a time and then some other

8   time, in Mexico City.

9   Q     Did you keep in contact?

10  A     Yes.

11  Q     And how did you do that?

12  A     Through the communication equipment, through radios.

13  And I would travel constantly to see him.

14  Q     While you were in the Chiapas area, did you ever meet

15  the defendant, Genaro Garcia Luna in person?

16  A     Yes.

17  Q     Can you tell us about that?

18  A     One time I went to Mexico City to speak to Arturo and

19  to report to him all of the news from our expansion efforts.

20  And Borrado, a leader with the Beltran Leyva, he had

21  information about a drug shipment.  That belonged with the

22  Gulf Cartel together with the Michoacana family.  Both were

23  our rivals.  Arturo asked me to intercept that and to take

24  it away from them.  We installed a checkpoint on the highway

25  that goes to Morelos together with the AFI people, and is

Barragan - Direct - Reid                    94

1  the actual road that goes from Veracruz to Mexico City.  We

2  grabbed that from them and we transported them to a

3  warehouse that belonged to MP, his brother, and Borrado.

4  Q    And I just want to stop you right there.  You've

5  mentioned a couple of names.  You've mentioned someone named

6  Borrado.  Who is that?

7  A    That is Alberto Pineda Villa.

8  Q    Who is that?

9  A    He was a leader with the Sinaloa Cartel and he reported

10  to Mario and Arturo.

11  Q    And if I could -- sorry, I didn't mean to interrupt

12  you.

13  A    He was the person in charge of receiving the fast boats

14  on the Guerrero coast line.  With cocaine.

15  Q    What is a fast boat?

16  A    Well, fast boats are vehicles.  They are fast boats

17  where they load up the shipments and they bring them close

18  to the coast.

19  Q    And I want to show you, if I could, on the screen,

20  Government Exhibit 45 for identification.

21            Do you recognize that person?

22            (Exhibit published for the witness.)

23  A    Yes.

24  Q    Who is that?

25  A    That's Borrado.

1          MR. CASTRO:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 45 received in evidence.)

4          (Exhibit published for the jury.)

5    Q    Did you tell us his full name?

6    A    Yes.

7    Q    What was that again?

8    A    Alberto Pineda Villa.

9    Q    And did Alberto Pineda Villa, also known as Borrado,

10   have any relatives in the cartel?

11   A    Yes.

12   Q    I believe you mentioned someone named MP.  Who is that?

13   A    His brother.

14   Q    And what is MP's full name?

15   A    Mario Pineda Villa.

16   Q    What role did Mario Pineda Villa have in the Sinaloa

17   Cartel?

18   A    He was the person in charge of the City of Cuernavaca

19   and the state of Morelos.

20   Q    So go back to this occasion when you intercepted drugs

21   that belongs to Sinaloa's rivals.  What was the amount of

22   the drugs you intercepted?

23   A    Two tons.

24   Q    And what was it?

25   A    Cocaine.

Barragan - Direct - Reid                    96

1   Q    After you intercepted that cocaine, what did you do?

2   A    We brought them to a warehouse, we emptied the trailers

3   out.  We found the trap which was a double side wall and we

4   got the cocaine out.

5   Q    What is a trap?

6   A    A trap is a hidden compartment in a particular place.

7   Q    What happened next?

8   A    After that, I notified Arturo.  I notified Arturo of

9   the amount there was.  And the AFI commander, the regional

10  AFI commander, was with us.  And so Arturo and some people

11  came to the warehouse.  Garcia Luna came, Cardenas Palomino,

12  Comander Domingo, other people, gunmen.

13  Q    What happened after the defendant, Cardenas Palomino,

14  Domingo, and others came to the warehouse?

15  A    They saw the amount of drugs that were there.  There

16  was an agreement that had been made previously between the

17  AFI and the Sinaloa Cartel.  50 percent of the seizure would

18  go to AFI, 50 of the seizure would go to the Sinaloa Cartel.

19  Q    And just to be clear.  Is that an agreement -- had

20  Sinaloa made seizures or interceptions like this before?

21  A    Yes.  But smaller amounts.

22  Q    And when you say the agreement was that half would go

23  to the Sinaloa Cartel and half to AFI, do you mean that

24  Sinaloa would give drugs to AFI?

25  A    They weren't going to give them the drugs.  They would

1   give them the money, the value of it.

2   Q    What happened on this occasion?

3   A    Arturo got in touch with someone whose code name was R.

4   He asked him to bring that amount of money that had to be

5   given as payment to a warehouse that he was going to tell

6   him where it was.  He took him a while to get there.  The

7   payment was made.  And then they left, Garcia Luna and his

8   people left, Arturo and his people left.  The drugs were

9   sent to the warehouse.  Everything was good.

10  Q    Okay.  So you mentioned someone named R.  Who is that?

11  A    That was someone by the name of Roberto.  He was like

12  Arturo's secretary.

13  Q    When Arturo asked R to bring money to the warehouse,

14  how much money was it?

15  A    I don't remember if it was 14 or $16 million.  It was a

16  good amount.

17  Q    Did you see the money?

18  A    Yes.

19  Q    How was it packaged?

20  A    In cardboard boxes.  You know, the kind that's used for

21  office papers.

22  Q    Why was it in boxes?

23  A    That is how Arturo would package his money, arrange it

24  for the payment for drugs.

25  Q    Was that different in any way from the way that Arturo

1  made bribe payments to government officials?

2  A    Yes.

3  Q    How did it differ?

4  A    The bills that were used to pay for any kind of a drug

5  deal were 20s.  $20 bills.  And in this manner that I was

6  just explaining to you when they used the boxes, and then

7  with respect to bribes to government officials, that would

8  be in $100 bills.

9  Q    And in this occasion, how many boxes or quantities of

10  $20 bills were there?

11  A    There were many of them.  They didn't fit in their SUV.

12  Q    Whose SUV?

13  A    The one that Garcia Luna, Cardenas Palomino and Domingo

14  came in.

15  Q    What happened when all of the boxes didn't fit in the

16  car?

17  A    They used one of their Suburbans that we used at the

18  office.

19  Q    Was that one of Arturo Beltran's cars?

20  A    Yes.

21  Q    And were the boxes put into those cars?

22  A    Yes.

23  Q    And ultimately, after the defendant left, what did the

24  cartel do with the cocaine in the warehouse?

25  A    It was then sent to the warehouse.  After that, to

1   Monterrey, and then after that, to the United States.

2   Q    And did you get anything extra for intercepting those

3   drugs?

4   A    I did.

5   Q    I'm sorry what was the answer?

6   A    I did.

7   Q    What was that?

8   A    Arturo gave me money.

9   Q    How much money?

10  A    About a million dollars.

11  Q    Now, while you were in Chiapas, were you generally

12  successful in what you set out do for the cartel?

13  A    Yes.

14  Q    Did you establish some drug routes?

15  A    Yes.

16  Q    And did the payments that you were making to AFI help

17  you do that?

18  A    Yes.

19  Q    How?

20  A    Well, we could go around freely.  We could set up and

21  take down checkpoints however we wanted to, whenever we

22  wanted to.  And if there was any information about the

23  observation in the plaza or anything going on, they would

24  have to let us know about the operation in time so that we

25  would be able to empty the houses or the warehouses.

Barragan - Direct - Reid                    100

1   Q    And were there occasions when you did receive

2   information that led to that?

3   A    Not with respect to the route.

4   Q    Okay.  Were there times that you took action based on

5   information you received from AFI?

6   A    Yes.

7   Q    What did you do?

8   A    What would usually happen was that we would empty the

9   offices where we had been told they were going to come and

10  do their raid.

11  Q    And how long were you in Chiapas?

12  A    For approximately nine months.  Less than a year.

13  Q    At the end of your time there, let's say around 2003,

14  2004, what volume of cocaine was the Sinaloa Cartel

15  trafficking?

16  A    It was around 800 kilos, 1,000 kilos, 1,200, 1,500kilo

17  loads.

18  Q    And how frequently were 800 to 1,200 kilo loads being

19  trafficked to the cartel?

20  A    Several times a week.

21  Q    I want to talk a little bit more about Arturo Beltran.

22  How did he typically dress?

23  A    Very flashy.

24  Q    Can you describe some of his clothes to us?

25  A    Very expensive clothes.  Very flashy clothes.  Lot of

Barragan - Direct - Reid                101

1   jewelry that had been made by exclusive designers.  Similar

2   to what rappers rap artists wear, those colors.

3   Q    Did he ever wear clothing from the United States?

4   A    Yes.

5   Q    Was there any particular company that he liked?

6   A    Yes.

7   Q    What did he like?

8   A    At the time, there was a line of clothing that was very

9   out there, very expensive.  It was Eddie something, I don't

10  know the rest of the name.  The pants had sparkly things on

11  them and the shirts had prints that had very loud colors.

12  Q    And did Arturo ever wear any unusual shoes?

13  A    Yes.

14  Q    What kind?

15  A    Dress shoes, very expensive brands.

16  Q    What kind of houses or properties did Arturo have?

17  A    Top luxury.

18  Q    What kind of cars did Arturo drive?

19  A    Rolls Royce, Mercedes, Lamborghini, Ferrari, BMW.

20  Q    Did Arturo have any unusual pets?

21  A    Yes.

22  Q    Like what?

23  A    Black panthers, white tigers.  Black horses.  They were

24  Portuguese.  I don't remember what they were called, what

25  breed.  They were the kind that dance.

1  Q    Did you ever travel with Arturo to see family members

2  of his?

3  A    Yes.

4  Q    Where did you go?

5  A    To Nayarit.

6  Q    Who was in Nayarit?

7  A    His dad was there.

8  Q    And during the time that you worked with the Sinaloa

9  Cartel, what cartel or group was in control of Nayarit?

10  A    It was the Sinaloa Cartel.  The Beltran-Leyva faction.

11  Q    I want to talk about some other people that you worked

12  closely with in the cartel.

13              Are you familiar with someone named Edgar

14  Valdez Villarreal?

15  A    Yes.

16  Q    Who is that?

17  A    A high ranking member of the Beltran Leyva group.

18  Well, the Sinaloa Cartel also.  He and I were friends at one

19  time.  Barbie and I.

20  Q    And who is Barbie?

21  A    Edgar Valdez Villarreal.  That's his nickname.

22  Q    Why he was called Barbie?

23  A    People said because he was so pretty looking.

24  Q    I also want to show you on the screen, if I could,

25  Government Exhibit 43A.  Do you recognize this person?

1                    (Exhibit published to the witness.)

2    A    Yes.

3    Q    Who is that?

4    A    Indio.

5    Q    Who, how do you recognize it to be that person?

6    A    I know him well.

7                    MR. CASTRO:  No objection.

8                    THE COURT:  Received.

9                    (Government's Exhibit 43A received in evidence.)

10                   (Exhibit published to the jury.)

11   Q    Do you know Indio's full name?

12   A    Yes.  I think it's her Gerado Vasquez.

13   Q    Was what his role in the Sinaloa Cartel?

14   A    He was one of the leaders of the cartel.  He was

15   partners and friends of Barbie.

16   Q    And you already told us about Alberto Pineda Villa,

17   Barrado.  Did you work closely with him?

18   A    Yes.  I knew them all.

19   Q    Did you work closely with his brother, Mario Pineda

20   Villa, or MP?

21   A    Yes.  With all of them.

22   Q    And the person you mentioned earlier, R or Roberto, I

23   believe you said he was Arturo's secretary; is that right?

24   A    Yes.

25                   (Continued on the next page.)

1    BY MS. REID:

2    Q    Did you see him regularly?

3    A    Every day, just like Arturo.

4    Q    So what happened after your time in Chiapas, where did

5    you go?

6    A    We put the final touches on the drug route through

7    different states ending in Mexico City.  And then I went to

8    Mexico City to be with Arturo Beltran.

9    Q    About what year did you get to Mexico more permanently?

10   A    Around 2004, I think.

11   Q    When you refer to Mexico City, what are you referring to?

12   A    To the areas in downtown Mexico City where we worked.

13   Q    What was your role in the Sinaloa cartel at this point?

14   A    I was the one in charge of the southern route to Mexico

15   City, and to distribute the bribe money for that route.

16   Q    When you got to Mexico City in 2004, was Arturo Beltran

17   still paying the defendant on behalf of the Sinaloa cartel?

18   A    Yes.

19   Q    About how frequently?

20   A    Monthly.

21   Q    Did Arturo Beltran ever pay the defendant personally at

22   this time?

23   A    Yes.

24   Q    Where did those payments occur?

25   A    In different offices that belonged to the organization.

1  Q    Were you ever present for meetings between Arturo Beltran

2  and the defendant?

3  A    Yes.

4  Q    About how many times?

5  A    Well, I would estimate about 20 times.

6  Q    Where were Arturo's offices located in Mexico City?

7  A    Usually the south of the city.

8  Q    About how long after you got to Mexico City more

9  permanently did you attend a meeting with the defendant?

10 A    I would say the same month in which I arrived.

11 Q    Tell us what you remember about this first meeting, or

12 the first meeting you attended?

13 A    I remember they would go pick him up at a shopping center

14 that was close to an office.  They would arrive.  They would

15 be taken to the office with Arturo Beltran.  They would talk,

16 they would hang out.  They were paid, then they would leave.

17 Q    Who is "they"?  Who came to the meeting?

18 A    It was almost always Cardenas Palomino and Domingo went

19 on a few occasions.

20        THE COURT:  You're talking about one meeting, the

21 first meeting.  He's talking about as a general matter what

22 the meetings were like.

23        Go one way or the other.

24 BY MS. REID:

25 Q    Do you remember who came to the first meeting that you

Barragan - Direct - Ms. Reid                    106

1   were at?

2   A    Well, exactly what you mean from the organization's side?

3   Q    Let's start with people from the Government.  Other than

4   the defendant, who came to the first meeting from the

5   Government?

6   A    Garcia Luna, Cardenas Palomino and Commander Domingo.

7   Q    Who do you remember being there from the Sinaloa cartel?

8   A    Roberto, Arturo, meaning Arturo Beltran.  I think that

9   Roberto was there, possibly Barbie.

10  Q    I think you mentioned a shopping center.

11  A    Yes.

12  Q    What area of Mexico City was this in?

13  A    In the southern part of Mexico City.

14  Q    What shopping center are you referring to?

15  A    Perisur.

16  Q    I want to show you on the screen what is marked as

17  Government Exhibit 331.  Do you recognize this?

18  A    Could you zoom in, please?

19  Q    Yes.

20  A    Yes.

21  Q    What is this?

22  A    That's the shopping center I was referring to.

23  Q    Does this appear to be a map of that area?

24  A    Yes.

25  Q    Does this map appear to be a fair and accurate map of

Barragan - Direct - Ms. Reid                    107

1   that area?

2              MR. DE CASTRO:  No objection.

3              THE COURT:  Received.

4              (Government Exhibit 331, was received in evidence.)

5   Q    Just looking at 331, do you see on there the shopping

6   center you referred to?

7   A    Yes.

8   Q    Can you just indicate where it is on the screen?

9   A    It's where you have the red dot.

10  Q    Okay.  Is it kind of in the middle to lower half of the

11  screen?

12  A    Yes.

13  Q    Is there a marking for Perisur?

14  A    Yes.

15  Q    Where was the office or safe house you described?

16  A    About three blocks away, you go around, like coming from

17  this road, the Periferico, you turn right, then on the

18  left-hand side, almost right in front of the shopping center.

19  Q    About how far from the shopping center was the safe

20  house?

21  A    Three, four blocks.

22  Q    Were there any significant landmarks near the safe house

23  other than the shopping center?

24  A    A church where Arturo used to go often.

25  Q    If I could show the witness.  I'd like to show you what

Barragan - Direct - Ms. Reid                    108

1   is marked for identification as 426.  Do you recognize this?

2   A     Yes.

3   Q     What is this?

4   A     That's the church I was referring to.

5   Q     Is it a fair and accurate picture of that church?

6   A     Yes.

7              MR. DE CASTRO:  No objection.

8              THE COURT:  Received.

9              (Government Exhibit 426, was received in evidence.)

10  Q     How far was this church generally from the safe house?

11  A     Same thing, about three or four blocks away.

12  Q     I want to go back to 331, if I can.  Generally, or at

13  this first meeting, how did the defendant, Cardenas Palomino

14  and Commander Domingo get to the meeting?

15  A     Roberto went to pick them up at the parking lot at the

16  shopping center.

17  Q     How did they get to the parking lot?

18  A     In a vehicle, I don't know which one.

19  Q     What happened to their vehicle when Roberto came to get

20  them?

21  A     They left it there.

22  Q     I now want to show you what is marked as Government

23  Exhibit 405 for identification.  Do you recognize this?

24  A     Yes.

25  Q     What is it?

1   A    It's a map of the location and the layout of the house

2   where they usually hold their meetings.

3   Q    When you describe this first meeting, was that at this

4   house?

5   A    Yes.

6   Q    Who created this map and diagram?

7   A    I did.  I drew it.

8   Q    When did you do that?

9   A    When I was in custody at SIEDO in Mexico.

10  Q    When was that?

11  A    In 2010.

12  Q    I'd ask to move Government Exhibit 405 into evidence?

13          MR. DE CASTRO:  We have an objection.

14          THE COURT:  One word?

15          MR. DE CASTRO:  Hearsay on the document itself.

16          THE COURT:  I'm not seeing that.  Do you want a

17  sidebar?

18          MR. DE CASTRO:  Yes.

19          (Continued on the next page.)

20

21

22

23

24

25

1              (Sidebar conference.)

2              MR. DE CASTRO:  I don't have a problem with the

3     map, I suppose.  But this is contains his writings, all of

4     his.

5              THE COURT:  You mean extraneous matter on it that

6     has not been authenticated.

7              Is it in Spanish?

8              MS. REID:  We have a translation too, your Honor.

9              MR. DE CASTRO:  They do.  We reviewed the

10    translation.

11             THE COURT:  If you want the commentary, you have to

12    explain how it got there.

13             MR. DE CASTRO:  My concern is just trying to do this

14    because he said it way, way back when they are trying to

15    elicit the date back in 2010, sort of address.

16             THE COURT:  You think the statements themselves

17    would be hearsay.

18             MR. DE CASTRO:  Yes.

19             THE COURT:  What about that?

20             MS. REID:  Well, your Honor, I think he's, if the

21    Court is concerned about that we can just rely on the Spanish

22    version without translating it.  I think what is relevant

23    mostly is just --

24             THE COURT:  Which do you want?  Do you want the

25    words in or just the picture?

```
                          Sidebar                        111

1            MS. REID:  The picture is fine.

2            THE COURT:  Take the words out.

3            MS. KOMATIREDDY:  Just to be clear, your Honor, the

4    words taken out, there are some that are labels of streets.

5            THE COURT:  Those are okay.

6            MS. REID:  This might be a good time for a break

7    then and we can do that.  Thank you, your Honor.

8                 (End of sidebar conference.)

9                 (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (In open court.)

2           THE COURT:  Ladies and gentlemen, we're going to

3    take our afternoon break, fifteen minutes, until 3:25.

4           Please don't talk about the case amongst.

5    Yourselves we'll see you in 15 minutes.

6           (Jury exits the courtroom.)

7           THE COURT:  Ms. Reid, and all counsel, if the last

8    words at a sidebar are "this is a good time to take a break,"

9    put those words first instead of last.

10          MS. REID:  Yes, your Honor.

11          THE COURT:  So we can talk about what we want to

12   talk about.

13          Break for 15 minutes.

14          (Brief recess.)

15          THE COURTROOM DEPUTY:  All Rise.

16          THE COURT:  Let's have the jury, please.

17          (Jury enters the courtroom.)

18          THE COURT:  Everyone be seated.  Please continue

19   Ms. Reid.

20   BY MS. REID:

21   Q    When we broke we were looking on the screen at 405 for

22   identification.  Next to it is 405T, which is a true and

23   accurate translation of Government 405.  I ask that both

24   exhibits be admitted into evidence?

25          MR. DE CASTRO:  No objection.

1            THE COURT:  Received.

2            (Government Exhibits 405, 405T, were received in

3    evidence.)

4    Q    If we can look at page one of 405, what are we looking at

5    here?

6    A    It's the diagram that shows how to get to the safe house

7    that I mentioned before.

8    Q    Where on this diagram is the safe house?

9    A    Where there is an arrow that is pointing to a black dot.

10   Q    Are you referring to a black box in the lower, left side

11   of the drawing?

12   A    Yes.

13   Q    Is that marked with the word safe house?

14   A    Yes, that's what it says.

15   Q    Going to -- I just -- going to page two of both, what are

16   we looking at here?

17   A    We are seeing here some sketches that I made of the

18   layout of the house.  This is the second floor.

19   Q    Generally, what was on the second floor of the safe

20   house?

21   A    The kitchen, the dining room, the living room, one

22   bathroom, and a small foyer.

23   Q    Did Arturo Beltran ever keep money in this house?

24   A    Yes.

25   Q    Where did he keep that?

1   A     In a bedroom on the third floor.

2   Q     Where in the bedroom was it?

3   A     In a false wall.

4   Q     Was it common for Arturo to have false walls in safe

5   houses?

6   A     Yes.

7   Q     I want to go back to the first meeting with the defendant

8   at this house.   Did Arturo pay the defendant at that meeting?

9   A     Yes.

10  Q     How much money did he pay him?

11  A     At that time, same thing, approximately one and-a-half

12  million, the payments grew over time.

13  Q     At this first meeting, were you involved in packing the

14  money for the defendant?

15  A     No, not for this first meeting.

16  Q     Who did that?

17  A     Roberto, R.

18  Q     Did you see any of the money?

19  A     Yes.

20  Q     How did you see it?

21  A     Normally they would put the bag on the table, open up the

22  zipper, show the contents, and close up the zipper again.

23  Q     Did that happen at the first meeting with the defendant?

24  A     Yes.

25  Q     What currency was the payment in?

1   A    U.S. dollars.

2   Q    What denominations, if you know?

3   A    100-dollar bills.

4   Q    How was it packaged?

5   A    I would make bundles of $10,000.  They were tied with a

6   band, and so there would be packets of 10,000.  So five of

7   these bundles would make these packets of 50,000.

8   Q    Then what kind of container was it in?

9   A    They are black bags.  We call them chorizos in Mexico,

10  like a duffel bag for luggage.

11  Q    Were black bags used to give money to the defendant at

12  this first meeting?

13  A    Yes.

14  Q    Where within the house did the defendant spend time

15  during this meeting, referring to 405?

16  A    Both in the dining room and in the living room; but he

17  spent a longer amount of time in the living room.

18  Q    If I can, I'd like to go back to Government Exhibit 2 in

19  evidence.  And can you remind us who this is?

20  A    Luis Cardenas Palomino.

21  Q    Who is that?

22  A    Garcia Luna's right-hand man, also a high-level

23  Government official.

24  Q    Was he present at the meeting you just described?

25  A    Yes.

1    Q    What was his role in Government at that time?

2    A    At that time he was an area director for AFI, but I don't

3    remember which specific area it was.

4         MS. DIOUF:  With the Court's indulgence I'll come up

5    to our board?

6         THE COURT:  Yes.

7         MS. REID:  Thank you.

8    BY MS. REID:

9    Q    After the meeting that you described just now, were you

10   ever present for other meetings with the defendant?

11   A    Yes.

12   Q    Where were those?

13   A    Normally they would be at that house.

14   Q    Were they ever at other locations?

15   A    I'm not sure.

16   Q    About how frequently did you see the defendant meet with

17   Arturo Beltran?

18   A    It would be about once a month on average.

19   Q    I believe you said the first meeting you attended was

20   around 2004; is that right?

21   A    Yes.

22   Q    About how long did this go on for these regular or

23   semi-regular meetings with the defendant?

24   A    They would last quite a while, three or four hours,

25   sometimes longer.

1   Q    About how many months or years did this pattern of

2   meetings between Arturo Beltran and the defendant go on for?

3   A    Until about the middle of 2006.

4   Q    For those meetings, did Cardenas Palomino come?

5   A    Yes.

6   Q    Were you present for every meeting that Arturo had with

7   the defendant?

8   A    No.

9   Q    Were there times that you heard about other meetings that

10  he had with the defendant?

11  A    Yes.

12  Q    Generally, how did the defendant and Cardenas Palomino

13  get to meetings with Arturo?

14  A    They were generally picked up at a parking lot, usually

15  at Perisur, and they were taken to the office.

16  Q    Were you ever involved in transporting the defendant to

17  meeting with Arturo?

18  A    Not usually, but I did.

19  Q    Who typically would transport the defendant to those

20  meetings?

21  A    Normally it would be Roberto, R; or once in a while it

22  would be Borrado.

23  Q    At the meetings that you attended, did Arturo pay the

24  defendant?

25  A    Yes.

1   Q     How much did he pay?

2   A     The payments increased in amount as the cartel grew.

3   Q     Why was that?

4   A     Because the volume of drugs and the growth was greater,

5   that meant that the profits were also greater.

6   Q     Now who is the money from when it was given to the

7   defendant by Arturo?

8   A     For sometime it came out of the pool that the Sinaloa

9   cartel would put together.  Then after an internal breakup

10  within the Sinaloa cartel it was only Arturo's money.

11  Q     Before that internal break, were all of the payments to

12  the defendant pool payments on behalf of the whole cartel?

13  A     Yes.

14  Q     During this period of time from 2004 for a couple of

15  years, did you hear Arturo discuss payments to the defendant

16  with others in the cartel?

17  A     Yes.

18  Q     What did you hear about that?

19  A     They had sent in their part for the pool.  That

20  everything was going very smoothly.  That it was the best

21  investment they had of their money.

22  Q     What were they referring to?

23  A     We had absolutely no problems with our activities.

24  Q     What do you mean when you say problems?

25  A     Problems would be seizures or not being able to go in or

1    out of a location.

2    Q    In addition to what you just described, were there other

3    things that the cartel were getting from these payments to the

4    defendant?

5    A    Yes, information so we couldn't be arrested and so the

6    assets of the organization could not be seized.

7    Q    Can you give us an example of the kind of information

8    that you were receiving from the defendant?

9    A    Yes.  For example, if there was a house in Cuernavaca,

10   Acapulco, Culiacan or anywhere we worked we would get

11   information that the Government was coming.  It was either

12   information that had been called in anonymously or information

13   from other foreign Governments.

14   Q    What did you do when you got information like that?

15   A    Normally we would empty out the houses that the

16   Government told us -- that we were told that the Government

17   was going to hit.

18   Q    Generally, where was the information coming on those

19   occasions -- where was it coming from?

20   A    Regularly it was at that time from the federal

21   investigation agency.

22   Q    Is that AFI?

23   A    Yes.

24   Q    Earlier today you told us about someone named Arturo

25   Hernandez also known as Chucky.

1  A    Yes.

2  Q    Can you remind us who that is?

3  A    He was the person in charge of Ciudad Juarez for Amado

4  Carrillo in the 90s.

5  Q    Did you work with him when you worked for Amado Carrillo?

6  A    Yes.

7  Q    Did there come a time when Arturo Hernandez was arrested?

8  A    Yes.

9  Q    When was that?

10  A    I believe it was 2003, I'm not sure of the date.

11  Q    At the time of his arrest, who did Arturo Hernandez work

12  for?

13  A    For Mayo Zambada and Vicente Carrillo.

14  Q    Was Vicente Carrillo related to Amado Carrillo?

15  A    It was his brother.

16  Q    Before Arturo Hernandez's arrest, did the Sinaloa cartel

17  receive any information?

18  A    Yes.

19  Q    How did the cartel receive that info?

20  A    Barbie called me.  And he told me to tell Chucky to move

21  right from where he was because the AFI people were coming

22  after him.

23  Q    Did Barbie tell you how he had this information?

24  A    He told me after the fact.

25  Q    What did he tell you?

1   A    That the AFI people had told him.

2   Q    What did you do when you learned about this upcoming

3   arrest?

4   A    I told him about it; I warned him.

5   Q    Who did you tell?

6   A    Arturo Hernandez, El Chucky.

7   Q    And what happened?

8   A    He didn't believe it.  He didn't believe me.  He was

9   drunk, he was high, so he stayed where he was.

10  Q    And what happened?

11  A    The AFI arrested.

12  Q    Did you ever speak with any members of Arturo Hernandez

13  or Chucky's family after the arrest?

14  A    Yes.

15  Q    Did you also ever speak with Arturo Beltran about his

16  arrest?

17  A    Yes.

18  Q    Just briefly, what did you and Arturo speak about?

19  A    That the commander who arrested Chucky had slapped

20  Chucky's mother in the face, and that that was wrong.

21  Q    What did Arturo say about that?

22  A    He told me that the commander who had arrested him, he

23  told me his name.  He told me he was one of Mayo and Chapo's

24  people, where he was Chapo's compadre and one of Mayo's

25  people.

Barragan - Direct - Ms. Reid                122

1   Q    Who was the commander?

2   A    Armando Espinosa de Benito.

3   Q    What if anything did it mean when Arturo said that

4   Armando Espinosa de Benito was Mayo and Chapo's person?

5   A    That he was untouchable.  I was upset because of what he

6   had done to Chucky's mom.

7   Q    What did Arturo say to you, if anything, about that?

8   A    That he was untouchable.  He was Chapo's compadre and

9   Mayo's friend, meaning that they themselves had fingered

10  Chucky.

11  Q    What do you mean by fingered?

12  A    That Chucky had already a lot of problems with Vicente

13  and with Mayo because of his drug addiction.  And that Mayo

14  and the others, they provided the information to Espinosa de

15  Benito for his detention.

16  Q    Did you ever meet Armando Espinosa de Benito?

17  A    Yes.

18  Q    How did that occur?

19  A    Arturo Beltran and Mayo Zambada coordinated a meeting so

20  I would meet him and he would meet me, and so that we could

21  cool down on that issue.

22  Q    And then what happened?

23  A    I met him.  We shook hands.  And nothing happened.

24  Q    I want to show you on the screen what is marked as

25  Government Exhibit 20 for identification.  Do you recognize

1    this person?

2    A    Yes.

3    Q    Who is that?

4    A    That's Armando Espinosa de Benito.

5              MR. DE CASTRO:  No objection.

6              THE COURT:  Received.

7              (Government Exhibit 20, was received in evidence.)

8              MS. REID:  If I can come up?

9              THE COURT:  Okay.

10   BY MS. REID:

11   Q    At the time of this incident, do you have an

12   understanding of who Armando Espinosa de Benito reported to?

13   A    He was Garcia Luna's people.

14   Q    Did you ever meet other individuals who worked with or

15   under the defendant, Genaro Garcia Luna?

16   A    Yes.

17   Q    I want to talk through some people.  Are you familiar

18   with someone named Edgar Millan?

19   A    Yes.

20   Q    Who is that?

21   A    He was someone who helped the federal judicial police in

22   the 90s in Tijuana.  He was later on commissioner with the

23   federal police, and one of Garcia Luna's people.

24   Q    Did he, Edgar Millan, have a relationship with the

25   Sinaloa cartel?

1   A    Yes.

2   Q    What was that relationship?

3   A    He worked for the Sinaloa cartel but he was for the

4   faction that belonged to Mayo, Chapo, Ray, and all of them.

5            (Continued on next page.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Barragas - Direct - Ms. Reid                          125

1    DIRECT EXAMINATION

2    BY MS. REID:   (Continuing)

3    Q     And I want to show you on the screen what's marked as

4    Government Exhibit 21 for identification.

5            Do you recognize this person?

6    A     Yes.

7    Q     Who is that?

8    A     That's Millan.

9            MR. DE CASTRO:   No objection.

10           THE COURT:   Received.

11           (Government Exhibit 21 received in evidence.)

12   Q     Are you familiar with someone named Ivan Reyes?

13   A     Yes.

14   Q     Who is that?

15   A     He was a federal police officer whose rank was in between

16   middle to high level, and he also worked for the Sinaloa

17   Cartel.

18   Q     And do you have an understanding of who within the

19   government he reported to?

20   A     Yes.

21   Q     Who is that?

22   A     To Garcia Luna.

23   Q     Were you ever in the same place as Ivan Reyes?

24   A     Yes.

25   Q     About how many times?

Barragas - Direct - Ms. Reid                                126

1  A    Four or five, or maybe a few more.

2  Q    And did you ever see Ivan Reyes meet with Arturo Beltran?

3  A    Yes.

4  Q    And I'd like to show you what's marked as Government

5  Exhibit 18 for identification.

6           Do you recognize this person?

7  A    Yes.

8  Q    Who is that?

9  A    That's Ivan Reyes.

10          MR. DE CASTRO:  No objection.

11          THE COURT:  Received.

12          (Government Exhibit 18 received in evidence.)

13  Q    Now, did Ivan Reyes have a nickname?

14  A    Yes.

15  Q    What was that?

16  A    Reina.

17  Q    What does that mean?

18  A    Well, that was his nickname, his code, that's how we knew

19  him.

20  Q    And what does Reina mean?

21  A    Well, you know, that's how they had called him, queen.

22  That was his code word.

23  Q    Are you familiar with someone named Ramon Pequeno?

24  A    Yes.

25  Q    Who is that?

1    A    A federal police officer, also one of Garcia Luna's

2    people.  He was high ranking.

3    Q    Did Ramon Pequeno have a connection with the Sinaloa

4    Cartel?

5    A    Yes.

6    Q    And what was it?

7    A    He also worked for the Sinaloa Cartel.

8    Q    And did you ever meet him?

9    A    Yes.

10   Q    Did you ever see him meet with Arturo Beltran?

11   A    Yes.

12   Q    And is there anything you remember about Ramon Pequeno's

13   appearance?

14   A    Yes.

15   Q    What is that?

16   A    That he had dark spots on his skin.

17   Q    And where were those spots?

18   A    In his face.

19   Q    Are you familiar with someone named Victor Garay Cadena?

20   A    Yes.

21   Q    Who is that?

22   A    Also a commander.  He worked with AFI and later on with

23   the federal police.  He was a corrupt police officer.  He also

24   worked for the Sinaloa Cartel with Mayo's, Chapo's faction.

25   Q    And I want to show you what's marked on the screen as

Barragas - Direct - Ms. Reid                                    128

1   Government Exhibit 36.

2           Do you recognize this person?

3   A    Yes.

4   Q    Who is that?

5   A    That's Garay Cadena.

6   Q    Does it fairly and accurately depict him?

7   A    Yes.

8           MR. DE CASTRO:  No objection.

9           THE COURT:  Received.

10          (Government Exhibit 36 received in evidence.)

11  Q    Are you familiar with someone named Edgar Bayardo?

12  A    Yes.

13  Q    Who is that?

14  A    A federal police officer.

15  Q    And did he have any connection with the Sinaloa Cartel?

16  A    Yes.  He had a mid-to-high-level rank, and he was one of

17  Mayo's and Reyes's people.

18  Q    And do you have any understanding of who within the

19  government he reported to?

20  A    Yes.

21  Q    Who is that?

22  A    To Garcia Luna as well.

23  Q    I want to show you what's marked as Government

24  Exhibit 19-A for identification.

25          Do you recognize this?

1   A     Yes.

2   Q     Who is that?

3   A     That's Commander Bayardo.

4         MR. DE CASTRO:  No objection.

5         THE COURT:  Received.

6         (Government Exhibit 19-A received in evidence.)

7   Q     Are you familiar with someone named Gomez Mesa?

8   A     Yes.

9   Q     Who is that?

10  A     He was a regional deployment director for AFI who also

11  worked for the Sinaloa Cartel.

12  Q     And what does it mean that he was a regional deployment

13  director for AFI?

14  A     He was the one in charge of placing and transferring

15  commanders all over the country and agents as well.

16  Q     I want to show you on the screen Government Exhibit 39

17  for identification.

18        Do you recognize this?

19  A     Yes.

20        MR. DE CASTRO:  No objection.

21        THE COURT:  Received.

22        (Government Exhibit 39 received in evidence.)

23  Q     Who is in Government Exhibit 39?

24  A     Gomez Mesa.

25  Q     What kinds of things did Gomez Mesa do for the Sinaloa

1   Cartel?

2   A    He worked for the Beltran Leyva faction.  And the person

3   he was in communication with was me.  And I would tell him

4   which commanders and agents to place at the plazas that belong

5   to us, the ones that we paid for.

6   Q    Who were some of the commanders that the Sinaloa Cartel

7   requested to be placed in certain areas?

8   A    There were many.  There was some guy Vigueras; another

9   one by the last name Batres, Rubicel.  There were many.

10  Excuse me.  Eloy was another one.

11  Q    Was it important for the cartel to have certain

12  commanders placed in certain areas?

13  A    Yes.

14  Q    Why was that?

15  A    We needed people we trusted, people who or were with us

16  100 percent.

17  Q    And I think you mentioned someone named Vigueras; is that

18  right?

19  A    Yes.

20  Q    I want to show you what's marked as Government Exhibit 44

21  for identification.

22           Do you recognize this?

23  A    Yes.

24  Q    Who is this?

25  A    Commander Vigueras.

1           MR. DE CASTRO:  No objection.

2           THE COURT:  Received.

3           (Government Exhibit 44 received in evidence.)

4    Q    And where was Commander Vigueras placed at your request?

5    A    He went to different plazas, Coahuila, Durango, Sinaloa.

6    And I don't remember the others.

7    Q    I think you also mentioned someone named Eloy; is that

8    right?

9    A    Yes.

10   Q    Who is that?

11   A    He was the regional commander for AFI in the state of

12   Sonora.

13   Q    Did you ever speak directly with Commander Eloy for any

14   reason?

15   A    Yes.

16   Q    Can you tell us about that?

17   A    In those years, there was a seizure of drugs that

18   belonged to Alfredo Beltran, Mochomo, in the state of Sonora.

19   Q    And sorry, before you continue, can you just remind us

20   who Alfredo Beltran, also known as Mochomo, was?

21   A    He was Arturo Beltran's brother, one of the leaders of

22   the Sinaloa Cartel, which was under the Beltran Leyva faction.

23   Q    You can continue.

24           What happened when this seizure happened in Sonora?

25   A    The AFI people from Sonora had seized, meaning they had

1    identified a shipment that belonged to Alfredo, and they had

2    stopped it on the road.

3    Q    And what happened?

4    A    Alfredo calls Arturo Beltran, his brother, and he --

5    Arturo gives me the order to talk to the regional commander,

6    or Yankee, as we knew them, who was the regional commander in

7    Sonora.  Spoke to Eloy, and I reminded him that he was there

8    because of orders from the cartel and that he had to release

9    that shipment right away.

10   Q    And what happened?

11   A    He released them.

12   Q    I think you referenced the word "Yankee."  What does that

13   mean?

14   A    It is a word that we use to identify regional commanders,

15   Yankee.  Or we also call them JR, like for junior.  So junior

16   or Yankee is the same thing.

17   Q    Now, earlier you told us about Commander Domingo of AFI

18   who you met in Monterrey?

19   A    Yes.

20   Q    I want to go back to your meetings with the defendant in

21   Mexico City.  Did you ever see Commander Domingo at any of

22   those meetings?

23   A    Yes, some of them.

24   Q    While you were in the Mexico City area, did anything that

25   happened to -- did anything happen that affected Domingo's

1    status with the government?

2    A    Yes.

3    Q    What happened?

4    A    In Guerrero state, in the city of Ixtapa Zihuatanejo,

5    there was a war between the Sinaloa Cartel and the Gulf

6    Cartel.  The AFI from Ixtapa Zihuatanejo, together with gunmen

7    from the Sinaloa Cartel, arrested a group of Zetas from the

8    Gulf Cartel who were going to go fight over the plaza.  They

9    were also with women and children.

10              They were kidnapped.  They were taken to Acapulco.

11   In Acapulco they were interrogated.  The hit men for the Gulf

12   Cartel were interrogated.  They were executed.  The women and

13   the children were let go.  The women went to place a complaint

14   at the SIEDO with Licenciado Vasconcelos.  So a big problem

15   came out of it.  The AFIs from Guerrero were arrested.  And

16   due to that situation, Domingo had an arrest warrant against

17   him.

18   Q    And what was your understanding of why Domingo had an

19   arrest warrant as a result of this incident?

20   A    Because of the SIEDO investigations.

21   Q    Did you ever hear the defendant, Garcia Luna, talk about

22   this incident involving Domingo?

23   A    Yes.

24   Q    When did you hear that?

25   A    Right after the problem came up when we were in the

Barragas - Direct - Ms. Reid                              134

1   middle of the problem.

2   Q    And where was this when you heard the defendant speaking

3   about this?

4   A    At one of the safe houses.

5   Q    Was Arturo present?

6   A    Yes.

7   Q    And what, if anything, do you remember the defendant

8   saying about this?

9   A    I remember that neither Arturo nor Garcia Luna nor anyone

10  was worried about this.  The only thing that Garcia Luna said

11  is that he would have to deal with it himself.

12  Q    And who did you understand the defendant to be referring

13  to?

14  A    To Commander Domingo.

15  Q    And what did it mean to you when the defendant said

16  Domingo would have to deal with this himself?

17  A    That the entire problem would be on him.

18  Q    After that incident, did Arturo Beltran continue to meet

19  with the defendant, Garcia Luna?

20  A    Yes.

21  Q    And after there was an arrest warrant issued for

22  Commander Domingo, did you see him again?

23  A    Yes.

24  Q    And where did you see him?

25  A    At the AFI offices in Toreo and on the street and in

1  meetings with Arturo.

2  Q    And was it a frequent occurrence for you to go to AFI

3  offices during this time?

4  A    Yes.

5  Q    Why would you go there?

6  A    I knew a lot of people there.  I had worked in the

7  Federal Judicial Police, what used to be AFI, and I knew a lot

8  of people there.

9          MS. REID:  Your Honor, I realize it's a little

10  early, but we are going to switch to a new topic now.  I don't

11  know if the Court wants me to continue or take a break for the

12  day.

13          THE COURT:  I was going to tell you to look for a

14  break in three minutes, so I think you are on time.

15          Ladies and gentlemen, we are going to let you go for

16  the evening.  Before I do that though, I have got to remind

17  you of the things I told you this morning a little bit.

18          Most importantly, do not read any coverage of this

19  trial.  Flip the dial, click the internet, whatever you need

20  to do.  Do not communicate with anyone about this case, not

21  even your family and friends, and keep your mind clear of the

22  case until we see you tomorrow morning at 9:30.

23          Have a very good and restful evening.  9:30.  Thank

24  you.

25          (Jury exits.)

1            THE COURT:  Okay.  Recess 9:30 a.m.  See you

2    tomorrow.

3            MR. DE CASTRO:  Your Honor, one issue.

4            THE COURT:  We are back in session.  Let's have the

5    witness step down.

6            Not sit down.  Step down.

7            (Witness steps down.)

8            THE COURT:  Okay.  Everyone be seated.

9            MR. DE CASTRO:  Ms. Gotlib is going to handle this.

10           THE COURT:  Okay.

11           MS. GOTLIB:  Thank you, Your Honor.

12           We just had a -- we asked the government yesterday.

13   We have not received any of the 5K letters of cooperating

14   witnesses who have been sentenced, and we believe that

15   pursuant to *Giglio*, that that's something that should be

16   disclosed to us.  So we wanted to raise it with Your Honor so

17   that we would have time to be able to review that for

18   Mr. Villarreal Barragan before tomorrow in case they do

19   conclude their direct tomorrow.

20           MS. KOMATIREDDY:  Your Honor, for the individuals

21   who have been sentenced where the government moved pursuant to

22   5K, that fact that the government did provide that motion has

23   been disclosed and the sentencing transcripts for those

24   individuals have been disclosed.

25           We are reviewing the 5K letters themselves to see if

1   there's additional *Giglio* information there for the defense.

2   Those letters typically contain information about multiple

3   cases, some ongoing investigations and other matters.  So we

4   were just in the middle of reviewing that, which is why we

5   hesitated to provide them wholesale.

6            THE COURT:  You are not saying there is any

7   distinction as to their qualification as *Giglio* material

8   depending on whether or not the defendant has been sentenced,

9   right?  That does not change anything.  It is just that the

10  content of someone who has not been sentenced may be sensitive

11  and not *Giglio* material, right?

12           I mean, the way you articulated it, it sounded like

13  you were making a distinction between those who have been

14  sentenced and those who have not.  And I am seeing a possible

15  need to redact part of the information, but I am not seeing it

16  turning on whether the defendant has been sentenced or not.

17           MS. KOMATIREDDY:  Right, Your Honor.  So if the

18  defendant has not been sentenced, there's no 5K letter to turn

19  over, just --

20           THE COURT:  No, that is not necessarily true.  The

21  defendant could be awaiting sentence and there could be a 5K

22  letter.

23           MS. KOMATIREDDY:  I don't think we have any --

24  someone in that situation, but I can double-check that,

25  Your Honor.

1          THE COURT:  Okay.

2          MS. KOMATIREDDY:  So in that situation my focus was

3    on the folks who have been sentenced.  And we understand, of

4    course, providing a 5K is a benefit, which we've disclosed.

5    It's not clear to us that any details about it are further

6    *Giglio* once we've already provided the fact that we have, in

7    fact, moved under the -- and stated to a Court that that

8    individual provide substantial assistance.

9          THE COURT:  I think they are just looking for the

10   letter.

11         MS. KOMATIREDDY:  I understand, Your Honor.  As I

12   said, we're reviewing them to provide appropriate redactions.

13         THE COURT:  Okay.

14         Go ahead, Ms. Gotlib.

15         MS. GOTLIB:  I'm sorry, Your Honor.  I just wanted

16   to provide the Court with some case law standing for the

17   proposition that 5K letters, I believe the way they --

18         THE COURT:  I do not think anyone is quarreling --

19         MS. GOTLIB:  Okay.

20         THE COURT:  -- the 5K letters are *Giglio*.

21         I think what the government is saying is, there may

22   be a 5K letter that either has non-*Giglio* material in it, or

23   if it is a *Giglio* letter, it has already been produced to you

24   in another form.

25         Is that what the government is saying?

1            MS. KOMATIREDDY:  That's right, Your Honor.

2            THE COURT:  So you will have the information one way

3      or the other.

4            MS. GOTLIB:  May I have one second, Your Honor?

5            THE COURT:  Sure.

6            MR. DE CASTRO:  Our position is that the 5K letter

7      itself should be produced.  There's case law support for it.

8      In fact, in this District --

9            THE COURT:  Are you going to tell me that there is

10     case law saying that a 5K1 letter has to be produced even if

11     other things have been produced that contain everything in the

12     5K1 letter?  If you are going to tell me there is case law

13     saying the 5K1 letter is *Giglio*, sure, I got that.  But the

14     question is, if it is duplicative, does it still have to be

15     produced?

16           MR. DE CASTRO:  I mean, having reviewed hundreds of

17     5K letters, I don't know what -- where would it be exactly the

18     same unless someone read that into the record at sentencing

19     or -- I mean, nothing we have received that I know would be a

20     5K for those people.

21           THE COURT:  Okay.  Let me ask the government this.

22           If it is a duplication issue, because they already

23     have the information, then what is the harm in giving the 5K1

24     letter?

25           MS. KOMATIREDDY:  That is exactly what we're

1  reviewing right now, Your Honor.  Like I said, many of those

2  letters contain information about other targets, some who

3  remain at large.

4           THE COURT:  Okay.

5           MS. KOMATIREDDY:  And second, most, if not all, of

6  these letters continue to be under seal.  In this case we have

7  individuals who are sentenced in other courts, and we are just

8  going through the permissions of ensuring that we can get what

9  we need to get to the defense.

10          We did get those permissions to the sentencing

11  transcripts which contain extensive advocacy by government

12  attorneys regarding the 5K substantial assistance.  And I

13  wanted to just note that for the record, that we have provided

14  them.

15          THE COURT:  I understand.  I mean, I am not sure why

16  we are disconnecting on this.  If there is other sensitive

17  material that's not *Giglio*, then you can redact it.  That is

18  fine.  If there is duplication, because you are saying what is

19  in the *Giglio* is essentially in the prosecution's presentation

20  at sentencing, then I am saying you should still disclose the

21  *Giglio* without any information that needs to be redacted.

22  Okay?

23          MS. KOMATIREDDY:  Yes, Your Honor.

24          THE COURT:  Because it does not hurt to give it

25  twice.  And there may be a nuance in the prosecutor saying it

1    one way on the transcript and another way in the letter.  So

2    give the letters to the extent you can, and please give

3    that -- that is, to the extent you do not have to redact them,

4    and give them to the defense as soon as you can so that they

5    can plan on cross.

6              MS. KOMATIREDDY:  Yes, Your Honor.

7              THE COURT:  Okay?

8              MS. KOMATIREDDY:  Thank you.

9              THE COURT:  We are all in agreement.

10             Have a good night.  See you tomorrow.

11

12             (Matter adjourned to January 24, 2023, at 9:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

142

1

<u>I N D E X</u>

2

3

<u>WITNESS</u>                                                      <u>PAGE</u>

4

  OPENING STATEMENTS

5

     MR. PILMAR                                         20

6

     MR. DE CASTRO                                      26

7

  SERGIO VILLARREAL BARRAGAN

8

     DIRECT EXAMINATION BY MS. REID                     48

9

10

<u>E X H I B I T S</u>

11

  GOVERNMENT EXHIBIT 1

12

                                                       50

13

  GOVERNMENT EXHIBIT 6                                 53

14

  GOVERNMENT EXHIBIT 7                                 54

15

  GOVERNMENT EXHIBIT 26                                55

16

  GOVERNMENT EXHIBIT 5                                 55

17

  GOVERNMENT EXHIBIT 13                                56

18

  GOVERNMENT EXHIBIT 12                                56

19

  GOVERNMENT EXHIBIT 17                                57

20

  GOVERNMENT EXHIBIT 325                               64

21

  GOVERNMENT EXHIBIT 2                                 83

22

  GOVERNMENT EXHIBIT 45                                95

23

  GOVERNMENT EXHIBIT 43A                               103

24

  GOVERNMENT EXHIBIT 331                               107

25

  GOVERNMENT EXHIBIT 426                               108

  GOVERNMENT EXHIBITS 405, 405T                       113

143

**E X H I B I T S** (CONTINUED)

GOVERNMENT EXHIBIT 20                           123

GOVERNMENT EXHIBIT 21                           125

GOVERNMENT EXHIBIT 18                           126

GOVERNMENT EXHIBIT 36                           128

GOVERNMENT EXHIBIT 19-A                         129

GOVERNMENT EXHIBIT 39                           129

GOVERNMENT EXHIBIT 44                           131

\* \* \* \* \* \*