294

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - - - X

4    UNITED STATES OF AMERICA,    :    19-CR-576(BMC)

5             Plaintiff ,         :
                                       United States Courthouse
6        -against-                :    Brooklyn, New York

7    GENARO GARCIA LUNA,          :
                                       January 25, 2023
8             Defendant.          :    9:30 a.m.

9    - - - - - - - - - - - - - X

10                    TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE BRIAN M. COGAN
11      UNITED STATES SENIOR DISTRICT JUDGE, and a jury.

12   APPEARANCES:

13

14   For the Government:         BREON PEACE
                                 United States Attorney
15                               BY: SARITHA KOMATIREDDY,
                                     ERIN REID,
16                                   PHILIP PILMAR,
                                     MARIETOU DIOUF,
17                                   ADAM AMIR,
                                 Assistant United States Attorneys
18                               271 Cadman Plaza East
                                 Brooklyn, New York
19

20   For the Defendant:          CESAR DE CASTRO, ESQ.
                                 VALERIE GOTLIB, ESQ.
21                               FLORIAN MIEDEL, ESQ.
                                 SHANNON MCMANUS, ESQ.

22

23   Court Reporter:            Andronikh M. Barna
                                225 Cadman Plaza East
24                              Brooklyn, New York
                                (718) 613-2178
25   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.

Proceedings                                                        295

1          THE COURTROOM DEPUTY:  All rise.  Honorable
2    Brian M. Cogan presiding.
3          THE COURT:  Good morning.  Have a seat, please.
4          Okay.  You all have something to say to me?
5          MS. KOMATIREDDY:  Just wanted to make a record,
6    Your Honor, to close the loop on the 5K discussion.  The
7    government did provide 5Ks for Mr. Villareal Barragan before
8    his cross and Mr. Tirso Martinez Sanchez.  A couple more are
9    going to be going over in the next -- this weekend.  They're
10   just going through the redaction process, but just to close
11   the loop on that.  That should be done.
12         THE COURT:  Okay.  That is fine.
13         I take it at this point the defense does not have
14   anything to add to that?
15         MR. DE CASTRO:  No, Judge.
16         MS. KOMATIREDDY:  And we do expect to put in a
17   stipulation later today.  It's rather lengthy.  Our plan is
18   not to read the entire thing into the record, but read in
19   relevant portions as they become relevant to the jury.
20         THE COURT:  Okay.  One thing I will ask you to do
21   with that is, just please --
22         MR. DE CASTRO:  One second.  I'm sorry.
23         THE COURT:  Yes.
24         MR. DE CASTRO:  Just having an audio issue.  I know
25   this is ministerial, but...

Proceedings                                    296

1          THE COURT:  It is not crucial phase, but I know.

2          MR. DE CASTRO:  It's good.  He can hear now.

3          THE COURT:  Okay.  With regard to reading the

4    stipulation, I will, of course, give the jury an instruction,

5    but please skip the preamble.  Okay?  Just say the parties

6    have agreed as follows so that we do not have to read all that

7    in.

8          MS. KOMATIREDDY:  Yes, Judge.

9          THE COURT:  Okay.  We have a juror question today.

10   It was from -- Quadri, 4 or Alternate 4?

11         THE COURTROOM DEPUTY:  Alternate 4.

12         THE COURT:  Judge Kuo had told me in advance that

13   there were four jurors, and I do not know whether they

14   survived peremptories, who needed different Thursdays off, and

15   that the parties were willing to accommodate that.  And I said

16   if the parties are willing to, I am willing to as well.

17         I think what this juror is requesting is some

18   assurance; in other words, they are nervous about it.  So I am

19   just going to tell them that those who have asked for a

20   particular Thursday because they have an obligation, during

21   the selection, that that is being granted, but that does not

22   mean that we are going to grant subsequent requests.  Okay?

23         MS. KOMATIREDDY:  Works for us, Your Honor.  And to

24   the extent that it gives everyone some comfort, by our

25   estimate we're ahead of schedule.  Even taking tomorrow off,

Proceedings                                              297

1    we're still ahead of schedule.

2              THE COURT:  Okay.  Thank you.

3              MR. DE CASTRO:  That's great.

4              THE COURT:  Okay.  Let's have the jury, please.

5              You can't be cold.  It is 72.

6              THE INTERPRETER:  No, I'm not, Your Honor.

7              THE COURT:  You are still bundled up.

8              By the way, I am sure everyone has noticed, but

9    these interpreters, they are really good.  Really good.

10             THE INTERPRETER:  Thank you, Your Honor.

11             (Jury enters.)

12             THE COURT:  All right.  Everyone be seated.

13             Good morning, ladies and gentlemen.  I hope you had

14   a good evening.

15             I know there were a couple of you that, during the

16   jury selection, asked for a particular Thursday off or said

17   you would need a Thursday off, and Judge Kuo and the parties

18   told you that would be fine.  And that is going to be fine.

19   All right?  Just let Mr. Scott, as soon as you can, know what

20   that day is.  That is why we are not sitting tomorrow, because

21   one of you needs that.

22             At the same time, please keep in mind that we cannot

23   accommodate post jury selection requests for the most part.

24   There are 18 of you.  And if you started saying, oh, I need

25   this day and I need that day, we would be here until next

1   September.  And I do not want that, nobody wants that.  So

2   please keep that in mind.  We will accommodate you as best we

3   can.  But for now this is your primary responsibility, as it

4   is all of ours.

5           All right.  Let's continue, please.

6           MS. PILMAR:  Yes, Your Honor.

7           I recall Tirso Martinez-Sanchez, please.

8           THE COURT:  Okay.

9           Have a seat, please.

10          Okay.  Please continue, Mr. Pilmar.

11          MS. PILMAR:  Thank you, Your Honor.

12  **TIRSO MARTINEZ-SANCHEZ,** having been first duly sworn/affirmed,

13  was examined and testified as follows:

14  DIRECT EXAMINATION

15  BY MR. PILMAR:  (Continued)

16  Q    Good morning, sir.

17  A    Good morning, sir.

18  Q    You testified yesterday about a train route that you ran

19  for the Sinaloa Cartel; is that correct?

20  A    That's correct.

21  Q    Did the Sinaloa Cartel send drugs to Brooklyn and Queens

22  via your train route?

23  A    Yes.

24  Q    Can you remind us what kind of drug it is again?

25  A    Cocaine.

1    Q    Now, you testified yesterday that you placed drugs in a

2    false wall of those trains; is that right?

3    A    Yes, that's correct.

4    Q    Did you wrap the drugs in any particular way when you

5    placed them into that false wall?

6    A    Yes.

7    Q    How so?

8    A    Well, I would wrap it up with -- with a plastic.  And

9    then I would cover it with grease.  And then afterwards I

10   would cover it again with tape that would be colored.  That

11   way it would identify who it was going to.  And then I would

12   shrink wrap it.

13   Q    Why did the color tape identify who it was going to?

14   A    Yes, because Vicente Carrillo told me that this one is

15   Chapo's, this one belongs to Mayo Zambada, this one is mine.

16   And so we put different color to identify whose it was.

17   Q    Once the drugs were packaged in the false wall and the

18   false wall is closed, what did you do next?

19   A    Well, after that, we'd finish it.  We'd use a steel

20   plastic epoxy that would turn into steel after it would dry.

21   And then after that we would paint it to finish it so that it

22   would look similar to the walls of the inside of the tank.

23          After the paint dried and it didn't smell so much,

24   we would put a little bit of oil into the tanker -- into the

25   tank.  We would call the train station to have them pick it up

1  and take it to its destination.

2  Q    Why did you put a little oil into the train?

3  A    Yes, we put a little bit of oil in it so that when it

4  would go into the United States, that the people who worked in

5  Customs would see it and would be scared of slipping.  And

6  that's why we put a little oil in there.

7  Q    So what happened when the cocaine got to New York City?

8  A    After that, we would break the fake wall where the secret

9  compartment was.  We removed the drugs.  We would put them in

10  a short cargo truck that had a second wall, that had a second

11  wall, a secret compartment.  And then we would move it to a

12  different warehouse, different from the train.

13  Q    Why did you have a different warehouse from the train?

14  A    Oh, and then we would distribute it from there.

15  Q    Thank you.

16        Why did you have a different warehouse from the

17  train warehouse?

18  A    Yes, we had two warehouses, one for where the drugs would

19  come in from Mexico on the train and then the distribution

20  warehouse.  Why do we have that?  So that if somebody was

21  coming and if -- with the drugs and was being followed by the

22  police, they wouldn't get to where the drugs were coming from

23  Mexico, and they wouldn't be discovered.

24  Q    So did you have one warehouse in the New York City area

25  or more than one warehouse in the New York City area?

1  A    Yes, I had two.  I started with the first one in

2  New Jersey and the second one in New York.

3  Q    How did you get these warehouses in the New York area?

4  A    Through a worker of mine.

5  Q    What was the worker's name?

6  A    Well, his name is Jose Gudino, and he had another name,

7  Manuel Silva.

8  Q    What do you mean by "another name"?

9  A    A name, an alias.

10  Q    How much did you charge for these train shipments?

11  A    I charged a thousand dollars per kilo.

12  Q    How were you paid?

13  A    Sometimes I was paid in cash.  The majority of the time I

14  was paid in drugs.

15  Q    What would you do with the drugs after you were paid in

16  drugs?

17  A    Yes, part of it I would sell in Mexico, and part of it I

18  would bring to the United States.

19  Q    In total, how much money did you make from the train

20  route before expenses?

21  A    Yes, about an average of 25 to $30 million.

22  Q    Were you engaged in other drug trafficking besides this

23  train route from the years 2000 to 2003?

24  A    Yes.

25  Q    Can you tell us about that?

1    A    Of course.

2         I would bring cocaine from Colombia to Mexico in

3    fast boats, in fast boats.

4    Q    How often did you do this?

5    A    Yes, I would do it every month, every two months.

6    Q    About how much money did you make from that drug

7    trafficking before expenses?

8    A    About $30 million.

9    Q    So in total it sounds like you made well more than

10   $50 million before expenses from 2000 to 2003?

11   A    Effectively, yes.

12   Q    Were you paid in dollars or Mexican pesos?

13   A    In dollars.

14   Q    So about, what was your profit from 2002 -- excuse me.

15   Withdrawn.

16        About what was your profit from 2000 to 2003 after

17   deducting your expenses?

18   A    From the drugs that I'll bring from Colombia and the ones

19   that I would transport, about, about 30 to $35 million,

20   approximately.

21   Q    How did that compare with how much your bosses in the

22   Sinaloa Cartel made?

23   A    Well, mine was a minimal amount, maybe about 5, 5 percent

24   of what they earned.

25   Q    How did you spend the money you made?

1    A    Yes, I spent it, the majority, on football teams, on --

2    of cock fighting, on parties, women, cars.  I bought a plane,

3    properties.

4    Q    You said cock fighting?

5    A    Yes, sir.

6    Q    What's that?

7    A    Well, it's where two roosters are placed to fight after

8    putting knives on their feet until one dies.

9    Q    And did you gamble on that?

10   A    Yes, sir.

11   Q    How much did you win or lose on that?

12   A    I lost a lot of money.

13   Q    How did you hide your money?

14   A    Well, I would hide it in compartments in my house, in my

15   houses and in the bathroom fixtures and in the furniture that

16   the TV would go on.  I have secret compartments and -- and

17   secret compartments in cars.

18   Q    I want to move back to something I skipped over by

19   accident.

20        MS. PILMAR:  Can we show the witness for

21   identification what has been marked as Government Exhibit 42?

22   Q    Do you see a photo on your screen?

23   A    Not yet.

24        Yes.

25   Q    Do you recognize this person?

1    A    Yes.

2    Q    Who is this?

3    A    Jose Gudino; alias, Manuel Silva.

4         MS. PILMAR:  Your Honor, I offer to move Government

5    Exhibit 42 into evidence.

6         MR. DE CASTRO:  No objection.

7         THE COURT:  Received.

8         (Government Exhibit 42 received in evidence.)

9    Q    Can you just remind us again who this is?

10   A    Yes.  He was a worker.  He worked for me.  And he was in

11   charge of starting the businesses here in the United States

12   and getting the warehouses where the drugs would be stored.

13   Q    I want to move on to another topic.

14        Have you directly participated in violence?

15   A    No.

16   Q    Indirectly?

17   A    Yes.

18   Q    How so?

19   A    On two occasions.

20        Yes.  One time a worker robbed me, who robbed me and

21   my partner, about a million dollars from the drug sale.  And

22   my partner wanted me to pay him the money.  And afterwards, he

23   said:  Hey, you know him, let's go -- you find him.  And I

24   took on the task of looking for him.  He said that you know

25   him, and I'll get the money from him.  And so I went to look

1   for him.  I found his whereabouts.  I told my partner where

2   his whereabouts were.

3           I told him his whereabouts.  Well, he sent people

4   and had him killed.

5   Q    So you provided the location of that person?

6   A    Yes.

7   Q    What did you think was going to happen to that person?

8   A    Well, I thought he was going to beat him to get out of

9   him where the money was, but no, not to kill him.  But yes, I

10  feel guilty of that.

11  Q    And you told us there was a second time.  Can you tell us

12  about that?

13  A    Yes.  Yes, of course.

14          Santos, my brother-in-law, worked for Cuate, selling

15  drugs and making him secret compartments.  One time, he made a

16  secret compartment for him that was badly made.  The money

17  that he was transporting it in was seized.  He blamed him.

18  Then he gave him drugs for him to sell.  He lost it, he didn't

19  get paid for it.  And he was indebted to Cuate for about a

20  million dollars.

21          Cuate called me and asked me if I was going to pay

22  him that money because I was the one who introduced him to

23  him.  Of course I told him that I wasn't.  I went to Santos

24  and told him that it would be best for him to go and

25  straighten out that situation.  And I pushed him so that he

1    would do it.  And Cuate killed him.

2    Q    Did you know he was going to be killed?

3    A    No.

4    Q    Have you ever threatened a person in connection with drug

5    trafficking?

6    A    Yes.

7    Q    How many times?

8    A    Several times, four or five times or more.

9    Q    Over what?

10   A    Yes, it was over drugs.  I wouldn't be paid for drugs

11   that I had given on consignment.  And I sent, I sent two

12   people to threaten the person.

13   Q    Did you ever possess guns?

14   A    Yes.

15   Q    Including in the United States or just in Mexico?

16   A    Including in the United States.

17   Q    Did the Sinaloa Cartel use violence?

18   A    Yes, a lot.  A lot.

19   Q    Did that violence benefit you in any way?

20   A    Yes, of course.

21   Q    How so?

22   A    Well, it was because how so, the people who knew I

23   belonged to the cartel would obviously not do anything to me.

24   They respected me.

25   Q    I'd like to show you a few photos.

1           I'd like to show you what's already in evidence as

2    Government Exhibit 10.

3           Do you recognize this person?

4    A    Yes.

5    Q    Who is this?

6    A    Conejo.

7    Q    I assume Conejo is a nickname?

8    A    Yes.  His name is Harold Poveda.

9    Q    And how do you know him?

10   A    Well, I met him because we both were working together

11   bringing drugs in from Colombia to Mexico.  And then I also

12   was taking his drugs into the United States from Mexico.

13   Q    When was the last time you spoke to him?

14   A    In approximately 2005, 2006.

15   Q    I'd like to show you what's already in evidence as

16   Government Exhibit 13.

17          Do you recognize this person?

18   A    Yes.

19   Q    Who is this?

20   A    Rey Zambada.

21   Q    How do you know who that is?

22   A    Well, because I met him this one time.

23   Q    Did he have a role, if any, in the Sinaloa Cartel?

24   A    Yes.  He was a member of the Sinaloa Cartel.

25   Q    Why did you meet him?

1   A     Well, yes, as I said yesterday, there was this one time

2   when I met Mayo Zambada.  Rey and his wife, Patty, picked me

3   up at the agreed-upon location where they were going to be --

4   where I was going to be picked up to be taken to

5   Mayo Zambada's house.

6   Q     When was the last time you spoke to him?

7   A     Well, it was that time, in approximately 2001.

8   Q     I'd like to show you what's in evidence as Government

9   Exhibit 17.

10             Do you recognize this person?

11  A     Yes.

12  Q     Who is that?

13  A     Grande.

14  Q     Do you know his real name?

15  A     No.

16  Q     Did you ever meet him?

17  A     No.

18  Q     So how do you know what he looks like?

19  A     Well, I saw him this one time when he was arrested.  But

20  I knew of him from my compadre, Esteban Rodriguez.  He told me

21  that Grande worked for the Beltran-Leyva brothers.

22  Q     So you said you never met him.  Have you ever spoken to

23  him on the phone or anything like that?

24  A     I don't remember.  I didn't meet him in person, but I

25  don't remember having spoken to him.

1  Q    Did you ever pay the defendant, Genaro Garcia Luna, money

2  directly?

3  A    No.

4  Q    Did you ever pay bribes in connection with drug

5  trafficking to other members of the federal police?

6  A    Yes.

7  Q    Why did you do that?

8  A    To protect my drugs.

9  Q    Was this your drugs that you brought in through fast

10 boats or your train route drugs?

11 A    No.  The drugs I was receiving on go-fasts.

12 Q    Focusing on the years 2000 to 2003, who were the federal

13 police officials that you paid?

14 A    Yes, it was a captain in Chiapas, a commander in

15 Guadalajara, and an officer but I don't know what rank he had.

16 So an officer in Leon, Guanajuato.

17 Q    Let's focus first on Chiapas.

18 A    Of course.

19 Q    Do you know the name of the person you paid?

20 A    No.  We just called him Capi.

21 Q    How much did you pay?

22 A    Yes, it was between 150- and $200,000.  It depended on

23 the amount of drugs that came in.

24 Q    How often would you pay this money?

25 A    Well, any time I received a boat.  So as I mentioned

1  previously, every month, every two months.  That's how often I
2  was receiving these motor boats.
3  Q    So just to make sure I'm understanding, are you saying
4  every time you received a motor boats in or near Chiapas, you
5  had to pay?
6  A    That is correct.
7  Q    Why?
8  A    Because he was protecting my drugs so that nobody would
9  steal that from me or so that any other agency would seize it.
10 Q    You also mentioned payments to someone in Guadalajara?
11 A    Yes.
12 Q    Who did you pay?
13 A    A commander.
14 Q    Do you know their name?
15 A    No.  He was only known as Jaguarcito.
16 Q    How much did you pay this person?
17 A    Between 100- and 200,000.  It depended on the type of
18 drugs that was being transported from Mexico City to
19 Guadalajara.
20 Q    Why did you have to pay this person when drugs were being
21 transported from Mexico City to Guadalajara?
22 A    Yes, because at this time there were a lot of federal
23 checkpoints along the highway.  And by means of this payment I
24 was making to him, my drugs would be safe, would arrive at
25 their destination safely.

1   Q     And was that true, would they arrive at their destination

2   safely?

3   A     Always.

4   Q     You mentioned a third person near Leon, Guanajuato.  Can

5   you tell us about that?

6   A     Yes.  So this person was an agent who was at a toll

7   booth.  To be exact, at the -- a toll booth in Leon,

8   Guanajuato.  You know, I would just happen to go through and

9   he would bother me.  He'd start asking me questions.

10         So then finally this one time I said to him:  Okay,

11  how much would you like per month so you don't bother me and

12  you let my people go through without bothering them?

13  Q     And how much did you pay?

14  A     Well, I was paying him $20,000, $25,000 a month.  It

15  depended on the favors he was doing for me.

16  Q     Did you ever pay bribes in connection with personal

17  matters, not drug trafficking?

18         MR. MIEDEL:  Objection.

19         THE COURT:  Sustained.

20  Q     Are you -- did you personally pay any bribes to protect

21  the train route?

22  A     Not personally.

23  Q     Are you aware if other members of the cartel paid bribes

24  to protect your train route?

25  A     Yes.

1    Q    How are you aware of this?

2    A    Well, I know this from three different people.

3    Q    Does that mean through conversations with them?

4    A    Yes.

5    Q    Can you tell us about the first conversation, who was

6    that with?

7    A    Yes.  With Alfredo Vasquez.

8    Q    And can you remind us who Alfredo Vasquez is?

9    A    Yes.  A member of the Sinaloa Cartel.

10   Q    Did he have anything to do with the train route?

11   A    Yes.  He was in charge of it before I was.

12   Q    So can you tell us about the conversation.  What did he

13   say and what did you say?

14   A    Well, when I took over the train route, I asked him what

15   the situation was with these arrangements made with the

16   authorities.  Because I was afraid that if something happened,

17   I was going to be made responsible.  And he said to me:  We

18   have made arrangements with all of the authorities, the feds,

19   the military, the judicial police and the municipal police.

20   Q    What did you say?

21   A    Well, I felt a little more at ease.

22   Q    Can you tell us about the second conversation?

23   A    Yes.  The second conversation was with my good buddy,

24   Compadre, Alvarez-Tostado.

25   Q    Who was that?

1    A    A member of the cartel.

2    Q    About how long after the first conversation was the

3    second conversation?

4    A    Approximately months later.  I don't remember exactly.  A

5    few months later.

6    Q    So what happened during the conversation?

7    A    Well, we were talking about drugs, and my good buddy

8    wanted me to transport drugs up here to New York.  So I asked

9    him how true is it that all of these arrangements have been

10   made, meaning how true is it that Mayo has really made all of

11   these arrangements with the authorities.

12           And he said to me:  Buddy, Corajulo, referring to

13   Mayo Zambada, he has made all of the arrangements with

14   everybody, the feds, the military, everybody, the judicial

15   police, the judicial state police, the highway police, the

16   municipal police.

17   Q    Can you remind us who Mayo Zambada was again?

18   A    Of course I can.

19           One of the leaders of the Sinaloa Cartel.

20   Q    How did you feel after this conversation?

21   A    By then, at ease.  A lot more at ease.

22   Q    Why did this conversation make you feel at ease?

23   A    Because I knew I had protection against anything

24   happening in my warehouses where the drugs were.

25   Q    Are you talking about warehouses in Mexico or in the

1    United States?

2    A     In Mexico.

3    Q     Finally, can you tell us about the third conversation?

4    A     Yes.  Well, the reason that happened was because I got a

5    call this one time from Vicente Carrillo telling me that

6    Mayo Zambada was going to come to the warehouse with 14 tons

7    to be stored.  So two trucks arrived with the drugs.  I had

8    approximately three tons that I was going to bring up to the

9    United States, which made the total amount 17 tons.  My

10   workers were very nervous, they were very scared.  So I called

11   Vicente to ask him when his godfather, meaning Mayo Zambada,

12   was going to come to pick up the drugs.

13          The first thing he tells me is:  Mecanico, don't be

14   so scared, you son of a bitch.  He said:  My godfather's got

15   it all arranged with the high command at the federal police,

16   with the Army, with the judicial police.  He's got everything

17   under control.  He said:  Few sons of bitches have the

18   arrangements that he has.

19   Q     How did you feel after that conversation?

20   A     I felt more at ease, but I was relaxed when they picked

21   up the drugs.  But I was relaxed when he told me that he had

22   everything arranged, much more relaxed.

23   Q     Who picked up the drugs?

24   A     Mayo Zambada's workers.

25   Q     Were those drugs ever seized by the police in Mexico?

1    A    No.  They were taken as if they were boxes of oranges.

2    Q    Did you ever have any seizures of your drugs from the

3    train route in Mexico?

4    A    No, nothing ever happened to me.

5    Q    Did you stop trafficking drugs at some point?

6    A    Yes.

7    Q    When was the last time you trafficked drugs?

8    A    In approximately 2007.

9    Q    When were you arrested?

10   A    In February of 2014.

11   Q    Where were you arrested?

12   A    In Leon, Guanajuato, Mexico.

13   Q    Who arrested you?

14   A    The federal police.

15   Q    Did you try to bribe anyone to stop this arrest?

16   A    Yes.  The commander of the operation.

17   Q    What happened?

18   A    Well, I asked him how much he wanted to let me go.  He

19   answered, you bastard, I know you don't have any money.  I

20   said:  But I have property that I can let you have.  He told

21   me:  I can't this time because the U.S. government is

22   involved, the DEA is involved.

23   Q    Did you meet with U.S. law enforcement agents while you

24   were in jail in Mexico?

25   A    Yes.

1    Q     Who else was present?

2    A     There were Mexican federal agents there.

3    Q     Were you cooperating with the U.S. government at that

4    time?

5    A     No.

6    Q     Were you completely truthful at that time?

7    A     No.

8    Q     What did you say that was not true?

9    A     Well, the first thing that the U.S. agents asked me was,

10   when was the last time that I had seen my ex-wife.  I told

11   them that I hadn't seen her for a long time, but that was a

12   lie.  Because I had just seen my wife and kids weeks prior.

13   Q     Did you lie about anything else?

14   A     Yes.

15   Q     What's that?

16   A     The Mexican authorities, the federal police, asked me if

17   I had bank accounts; if I had properties.  And I told them no.

18   Q     And that was not true?

19   A     I lied to them.

20   Q     Why did you lie?

21   A     Well, I lied about the properties because I was scared

22   that they would be seized.

23   Q     What ended up happening to those properties?

24   A     Well, those properties, well, somebody took control of

25   them.  And at this time, well, I sold one of them, and right

1   now I'm working on the paperwork to recover them.

2   Q    Were you subsequently extradited to the United States?

3   A    Yes.

4   Q    When was that?

5   A    If I'm not mistaken, it was the 17th or 18th of December

6   of 2015.

7   Q    After your extradition, did you cooperate with the United

8   States Government?

9   A    Once I was here, yes.

10  Q    Were you truthful?

11  A    Yes.

12  Q    Did you plead guilty pursuant to a cooperation agreement

13  with the government on October 19, 2016?

14  A    Yes.

15  Q    What charge did you plead guilty to?

16  A    To the third charge of importing drugs from Mexico to the

17  United States.

18  Q    What was the maximum punishment you faced?

19  A    Life.

20  Q    Where was -- what was the minimum term of imprisonment?

21  A    Ten years.

22  Q    And when you were extradited to the United States, where

23  were you brought on the plane from Mexico to the

24  United States, where did you come to?

25  A    Could you repeat the question, please?

1    Q    When you were brought from Mexico to the United States,

2    where did your plane go?  Did it go here to New York or did it

3    go somewhere else?

4    A    Here to New York.

5    Q    Were you prosecuted in this district?

6    A    Yes.

7    Q    Have you been sentenced yet on your case?

8    A    My sentence, yes.

9    Q    Did you previously testify against a different defendant

10   on a different matter prior to your being sentenced?

11   A    Yes.

12   Q    Prior to being sentenced, when you testified in that

13   previous case, what did you hope to receive from the

14   government?

15   A    Yes, a 5K letter, one which would help reduce my

16   sentence.

17   Q    So you hope to receive a lower sentence from getting this

18   letter?

19   A    Yes.

20   Q    In general, what are you required to do as a cooperating

21   witness?

22   A    Well, mainly to tell the truth.

23   Q    Did your cooperation agreement require you to pay any

24   money?

25   A    Yes.

1  Q    How much?

2  A    $2 million.

3  Q    And did you pay that?

4  A    Not yet.

5  Q    Why not?

6  A    Because I'm just now working on that, to start paying.

7  Q    So after you testified in that other case, did you

8  receive that 5K letter from the government?

9  A    Yes.

10 Q    Did that letter recommend a particular sentence?

11 A    No.

12 Q    What sentence did you ultimately receive from the judge?

13 A    Seven years, but I did almost eight years in total for

14 everything.

15 Q    Why did you do eight years in total if you were sentenced

16 to seven years?

17 A    Counting the time that I served in Mexico.

18 Q    When did you get released from prison?

19 A    Yes, I was freed on December 3rd, 2021.

20 Q    What do you hope to get from the government for

21 testifying in this case?

22 A    To continue getting legal status here in the

23 United States.

24 Q    Do you currently live in the United States?

25 A    Yes.

1    Q    You said before that there were no seizures on your train

2    route in Mexico.  Were there seizures related to the train

3    route in the United States?

4    A    Yes.

5    Q    How many?

6    A    Three seizures.

7    Q    In what cities were these seizures?

8    A    Yes, two were here in New York and one in Chicago,

9    Illinois.

10   Q    Where in New York were those seizures?

11   A    Yes.  The first was here in Brooklyn, and the second was

12   in Queens.

13   Q    When, approximately, was the first seizure?

14   A    The first one, the first seizure was in about May, May of

15   about 2002.

16   Q    How much drugs were seized?

17   A    Approximately two tons.

18   Q    How did you learn about the seizure?

19   A    Through a worker of mine.

20   Q    About how long after the seizure did you learn about it?

21   A    Hours afterwards.

22   Q    Did you later meet with this worker in person?

23   A    Yes.

24   Q    And what did you find out about the seizure?

25   A    Yes, my worker told me that the police had come to the

1    warehouse.  He saw them from far away.  There was supposed to

2    be a delivery.  And my worker saw, was looking over the

3    warehouse, and he saw from far away and he saw that the police

4    came.  And Pedro, Pedro jumped in -- because he had forgotten,

5    he had forgotten his keys, and he jumped in through the

6    window.  That's what he told me.

7    Q    Were any people arrested, according to what your worker

8    told you?

9    A    Yes.

10   Q    Did you speak to Vicente Carrillo regarding the seizure?

11   A    Yes, of course.

12   Q    What did he say?

13   A    Well, starting the first day when I was told about the

14   seizure, I called him and I said:  Sir, the police came to the

15   warehouse where the drugs are.  And he told me -- well, he

16   asked me:  How did that happen?  How did that happen?  And I

17   said:  I don't know, sir.  Vicente Carrillo told me:  Let's

18   see if the godfather doesn't get upset, referring to

19   Mayo Zambada.

20   Q    And did the train route continue after this?

21   A    Yes.

22   Q    Did Vicente Carrillo tell you why the train route would

23   continue?

24   A    Yes, Vicente said:  Yeah, keep fucking going on, don't be

25   scared.

1   Q    Did you make any changes to the route after this seizure?

2   A    Yes.

3   Q    What did you change?

4   A    I changed warehouses where the train would come to and

5   another warehouse where the drugs would be distributed from.

6   Q    Let's talk about the second seizure.  Where was that and

7   when was that?

8   A    Excuse me.

9        Yes, it was in Chicago, Illinois in approximately

10  July/August of 2002.

11  Q    I'm sorry, did you say where?

12  A    Sorry.  In Chicago, Illinois.

13  Q    How did you learn about the seizure?

14  A    The worker, Rafael, called me.  He told me that the

15  police had come to the warehouse where the drugs were.  They

16  had gone to the house where he was, that they had taken him

17  also.  And he said that they let him go hours later because he

18  told them that all he did was make the food and clean the

19  house.

20

21            (Continued on the next page.)

22

23

24

25

1              (Continued.)

2    Q    Were other people arrested?

3    A    Yes.  Two.

4    Q    Who were they?

5    A    Andres Robles and Javier Cesena.

6    Q    How did you know them?

7    A    I knew them because we grew up.  We grew up in the same

8    neighborhood.

9              MR. PILMAR:  I'd like to show you what's been

10   marked for identification as Government Exhibit 27.

11             (Exhibit published for the witness.)

12   A    Yes.

13   Q    Who is this?

14   A    Javier Cesena.

15             MR. PILMAR:  Your Honor, the Government seeks to

16   admit Government Exhibit 27.

17             MR. MIEDEL:  No objection.

18             THE COURT:  Received.

19   Q    Can you remind us who that was?

20   A    Yes.  He was one of my workers.  Who, he was with me

21   for a long time.

22             MR. PILMAR:  I'd like to show for the witness only

23   what's been marked for identification as Government

24   Exhibit 28.

25             (Exhibit published for the witness.)

Martinez Sanchez - Direct - Pilmar                 324

1   Q    Do you recognize this person?

2   A    Yes.

3   Q    Who is that?

4   A    Andres Robles.

5            MR. MIEDEL:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibit 28 received in evidence.)

8   Q    What was received during the seizure in Chicago?

9   A    Cocaine.

10  Q    Did you talk to Vicente Carrillo after this seizure?

11  A    Yes.  Of course I did.

12  Q    What did he say?

13  A    Well, he said that, well, he said what happened.  My

14  answer to him was that I didn't know because I didn't yet

15  have exact information.  He said well, I hope Padre Cortez

16  doesn't get mad.  Which was a reference to Chapo Guzman.

17  Q    Did you want to stop the train route after this or keep

18  going?

19  A    No.  I wanted to stop.

20  Q    What did Vicente and Chapo want to do?

21  A    They wanted me to continue.  That I shouldn't be

22  afraid.

23  Q    Where and when was the final seizure?

24  A    Yes.  It was here in New York.  In Queens.  It was in

25  2003, at the beginning of 2003.

Martinez Sanchez - Direct - Pilmar                325

1    Q    How did you learn about this seizure?

2    A    In the same way.  One of my workers called me.  Telling

3    me that the police, the police had shown up at the warehouse

4    where the drugs were.  And they had also gone to his

5    apartment where he was staying.  But, he was able to get

6    down to the apartment below using some blankets to get down

7    there.  And the person in the apartment, the woman whose

8    apartment it was, got scared and he said hold on, I'm going

9    to pay you some money.  The police are after me.

10   Q    Were other people arrested at this time?

11   A    Yes.  Two other people -- two people were arrested.

12   They were at the warehouse.

13   Q    Had you ever met them?

14   A    No.

15   Q    What was seized from that warehouse in Queens?

16   A    Cocaine.

17   Q    Did you talk to Vicente Carrillo after this third

18   seizure?

19   A    Yes.

20   Q    What did he say?

21   A    Well, this time he got a little angry.  He said what

22   the fuck is happening, mechanico?  I don't know, I don't

23   know.  He said I wonder what my Godfather, Mayo Zambada and

24   El Chapo, are going to say because now we're talking three

25   times.

Martinez Sanchez - Direct - Pilmar            326

1   Q    Did Vicente Carrillo and Mayo and El Chapo want to

2   continue the route?

3   A    Yes.

4   Q    Did you continue the route?

5   A    No.  Despite the pressure they were putting on me, I

6   didn't want to do it.  But I said yes, let me check, let me

7   check, let me figure this out, how I'm going to do it.  But

8   I didn't continue.

9   Q    These three seizures we just discussed, how much was

10  their value worth at the time, approximately?

11  A    Approximately between 100 and $120 million.

12        MR. PILMAR:  May I have a moment, your Honor?

13        THE COURT:  Yes.

14  Q    Just one final question.

15        What's the benefit to the cartel to send drugs to

16  New York City as opposed to other places in America?

17  A    They make more money because it's more expensive.

18  Q    What's more expensive?

19  A    The cocaine.  The drugs are more expensive here in New

20  York.

21  Q    More expensive for who?

22  A    Well, users, and the cartel makes much more money.  It

23  benefits because it makes much more money.

24        MR. PILMAR:  No further questions, your Honor.

25        THE COURT:  Mr. Miedel, do you want to take a

1    break?

2              MR. MIEDEL:  We can take a break.

3              THE COURT:  15 minutes, ladies and gentlemen.

4    Please come back at five after 11:00.  Please remember not

5    to talk about the case.

6              (Jury exits the courtroom.)

7              THE COURT:  Okay.  Five after 11:00 recess.

8              (A recess was taken at this time.)

9              THE COURT:  Okay.  Let's have the jury, please.

10             (Jury enters the courtroom.)

11             THE COURT:  All right be seated.  Cross

12   examination.

13             MR. MIEDEL:  Thank you.

14   CROSS EXAMINATION

15   BY MR. MIEDEL:

16   Q    Good morning.

17   A    Good morning.

18   Q    Mr. Martinez, you testified this morning that you

19   profited perhaps 30 million or more dollars from your drug

20   activity between 2000 and 2003, correct?

21   A    That's right.

22   Q    So it's fair to say that from about 2003, you had sized

23   about a sizeable fortune, correct?

24   A    You can say so.

25   Q    You told us this morning that you spent some of that

1   money on parties, gambling, right?

2   A     That's right.

3   Q     You spent some of that money on drugs, right?

4   A     No.

5   Q     Okay.  You spent some of that money, I think you said

6   on women, right?

7   A     Yes.

8   Q     But, in addition to that, you also bought things,

9   correct?

10   A     Yes.

11   Q     You bought assets, right?

12   A     Yes.

13   Q     For example, you bought a restaurant in Tijuana,

14   correct?

15   A     During that time period, no.

16   Q     During the time period that you were involved in drug

17   activities in your life, you purchased a restaurant in

18   Tijuana, correct?

19   A     Yes.

20   Q     You bought four separate clothing stores, right?

21   A     Yes.

22   Q     You bought at least, at least, five properties in

23   Mexico, right?

24   A     Yes.

25   Q     You bought an airplane?

Martinez Sanchez - Cross - Miedel          329

1   A    Yes.

2   Q    You bought show horses?

3   A    Show horses, yes.

4   Q    Show horses.

5        You bought luxury cars?

6   A    Yes.

7   Q    Such as Lamborghinis, Ferraris, those things, right?

8   A    Yes.

9   Q    You bought a body shop in Los Angeles, right?

10  A    No.  I put a shop there, but I didn't buy the property.

11  Q    You put a shop there.  You bought a shop that you put

12  in that location, right?

13  A    Yes.

14  Q    You bought a restaurant in Rockford, Illinois, right?

15  A    Yes.

16  Q    You bought a car dealership in El Monte, California,

17  right?

18  A    Yes.

19  Q    And you bought not one, but four soccer teams in

20  Mexico, correct?

21  A    Yes, sir.

22  Q    And you did all of that because you had a lot of money

23  and you needed to spend it on something, right?

24  A    Yes.

25  Q    And these assets that we just talked about, these

1    assets they were identifiable they could be seized.  They

2    could be found, right?

3    A    Yes.

4    Q    Just going back to the properties that you bought in

5    Mexico.  Mr. Martinez, would you agree that buying land in

6    Mexico is cheap, especially if it's not on the coast or in

7    Mexico City?

8    A    Well, it depends.  In the bigger cities they're a

9    little more expensive.

10   Q    Would you agree that out in the country, for example,

11   generally speaking, it's quite cheap to buy land?

12   A    Yes.  It's cheaper.

13   Q    And you also would agree that labor, generally, is

14   quite cheap in Mexico to build houses, for example?

15   A    Cheaper than here, yes.

16   Q    Much cheaper than here, right?

17   A    Yes.

18   Q    So would it be fair to say that you can build a fairly

19   nice house in Mexico for not that much money, correct?

20             MR. PILMAR:  Objection to form.

21             THE COURT:  Overruled.

22   A    At this time, I don't know.  I don't know.

23   Q    Well, you had several properties and houses in Mexico,

24   correct?

25   A    Yes.

1    Q    And you still had a lot of money left over to buy

2    airplanes, and restaurants, and shops, and gamble and that

3    sort of thing, correct?

4    A    Not planes.  A plane.

5    Q    I apologize.  One plane.

6              When you got arrested in 2014, you also used

7    your money to pay for a private lawyer, right?

8    A    Yes.

9    Q    And that lawyer represented you for six years, correct?

10   A    Yes.

11   Q    And you paid him, right?

12   A    Yes.

13   Q    He wasn't appointed to you by the Court, right?

14         MR. PILMAR:  Objection.

15         THE COURT:  Overruled.

16   A    No.

17   Q    Now, Mr. Martinez, you testified earlier that you have

18   finished your jail sentence, correct?

19   A    Yes.

20   Q    But you continue to rely on the prosecutors for

21   assistance in this case, right?

22   A    What type of support?

23   Q    Well, you mentioned in your testimony that you're

24   currently staying in the country on a deferred action; is

25   that correct?

1    A    Yes.

2    Q    And a deferred action means that the immigration

3    authorities are not going to deport you back to Mexico while

4    that deferred action is in place, correct?

5    A    Yes.

6    Q    It's these prosecutors that applied for that deferred

7    action on your behalf, right?

8    A    No.

9    Q    It's the agents that work for you that applied for that

10   deferred action, correct?

11   A    Yes.

12   Q    And the agents work with the prosecutors, correct?

13   A    Yes.

14   Q    And you've also been told that the Government will ask

15   for what's called an S-Visa for you, correct?

16   A    Yes.

17   Q    And it's your understanding that an S- Visa, if you got

18   it, would allow you to stay in the country permanently,

19   correct?

20   A    That's what I understand.

21   Q    And you also testified that you promised before your

22   sentencing to pay $2 million to the Government, right?

23   A    Yes, sir.

24   Q    In fact, you promised to pay that before your

25   sentencing; didn't you?

Martinez Sanchez - Cross - Miedel          333

1   A    Yes.

2   Q    And you were sentenced in February of 2020, correct?

3   A    Yes.  I think so.

4   Q    That's three years ago, right?

5   A    Yes.

6   Q    And you still haven't paid that 2 million, have you?

7   A    No.

8   Q    Mr. Martinez, you -- the prosecutors showed you a

9   picture of other members of the Sinaloa Cartel on the

10  screen, right?

11  A    Yes.

12  Q    And one of those people that you saw up on the screen

13  was El Grande, correct?

14  A    Yes.

15  Q    And you talked about your knowledge of El Grande,

16  right?

17  A    Yes.  That he worked with the Beltran Leyvas.

18  Q    And you knew who he was, right?

19  A    Yes.

20  Q    And it's true, right, that El Grande had a reputation

21  as being one of the most violent members of cartel, correct?

22  A    I can't answer that question for you because I don't

23  know.

24  Q    You don't know, okay.

25               Let's -- I want to ask you a few questions

Martinez Sanchez - Cross - Miedel               334

1    about your early life.  You moved to the United States when

2    you were 18 or 19, correct?

3    A    That is correct.

4    Q    And you worked in a restaurant for a little while,

5    correct?

6    A    Yes.

7    Q    And then you started selling small amounts of drugs,

8    correct?

9    A    Yes.

10   Q    I think you testified that you starting selling half

11   grams and then grams, right?

12   A    That is correct.

13   Q    And that was cocaine?

14   A    Cocaine.

15   Q    And you've also testified that you used to use cocaine

16   yourself, right?

17   A    That is correct.

18   Q    And is it true that one gram of cocaine yields about 6

19   or 8 lines of cocaine?  Is that true?

20   A    Yes.

21   Q    And how many grams are there in one kilo?

22   A    One thousand.

23   Q    One thousand grams in just one kilo, right?

24   A    Yes, sir.

25   Q    And of course later you sold thousands of kilos, right?

Martinez Sanchez - Cross - Miedel            335

1   A    Yes.

2   Q    And after you began selling gram quantities, then you

3   moved and started, moved up and you started selling ounce

4   quantities, correct?

5   A    Yes.

6   Q    And one ounce has 28 grams, correct?

7   A    Yes.

8   Q    Now, living in Los Angeles in the -- sorry.  In the

9   late 80s early 90s and selling drugs, you knew that was

10  risky, correct?

11  A    Of course.

12  Q    People went to prison for selling grams of cocaine,

13  right?

14  A    Yes.

15  Q    People got long prison sentences for selling ounces of

16  cocaine, right?

17  A    I didn't have any understanding of how much time they

18  were getting.

19  Q    When you were selling -- you were selling cocaine in

20  Los Angeles and you had no idea what might happen to you if

21  you got caught?

22  A    Yes.

23  Q    You knew that you would, you could go to jail, right?

24  A    Of course.

25  Q    And you knew that you could, in fact, go to jail for

1  quite a long time, right?

2  A    I did not know how much time I could get in jail for

3  ounces of cocaine.

4  Q    Okay.  Did you know that if you got caught with one

5  kilo of cocaine you can spend 20, 30 years in prison.  Did

6  you know that?

7  A    I did not know.

8  Q    Okay.  Mr. Martinez, you testified at length about the

9  fact that you oversaw the trains bringing the metric tons of

10  cocaine into the United States for the Sinaloa Cartel,

11  correct?

12  A    Yes.

13  Q    You were responsible for 30 to 50 metric tons of

14  cocaine coming to Los Angeles, Chicago, and New York,

15  correct?

16  A    Yes, sir.

17  Q    You were crucial to the Sinaloan efforts to get cocaine

18  into the United States?

19  A    I couldn't answer that question for you with a yes or a

20  no.

21  Q    Well, you were the one who coordinated and set up the

22  train systems to allow the drugs to come to these cities,

23  right?

24  A    I did not come up with it.  I didn't invent it.

25  Q    I understand.  But you took over those routes and you

Martinez Sanchez - Cross - Miedel          337

1  rented warehouses and you hired workers and you did all of
2  those things, right?
3  A    Yes.
4  Q    So during those years, you were responsible for
5  flooding the American streets with cocaine, correct?  You,
6  personally.
7  A    Yes.
8  Q    And you also knew that once the cocaine arrived into
9  the United States, often times it would be cooked into
10 crack, right?
11 A    Yes.  It was my understanding that crack was being
12 made.
13 Q    So you also were responsible for flooding the American
14 streets with crack during the time you were doing this,
15 right?
16 A    Yes, yes.
17 Q    And your drugs, as you know, were eventually sold on
18 the streets, right?
19 A    Yes.
20 Q    By street dealers?
21 A    Yes.
22 Q    Often those were young kids sells drugs on the street,
23 right?
24 A    I don't know.  I couldn't tell you whether or not they
25 were young.

1  Q    But if they got caught, as you know, they would go to

2  jail, right?

3  A    Well, possibly so.  Yes.

4  Q    You think it was just possible that the street dealer

5  that were selling you drugs might go to jail?  Is that what

6  you're saying?

7  A    Yes.

8  Q    And it's also possible, Mr. Martinez, right, that they

9  might have gone to jail for a long time, right?

10  A    Could you please repeat that question?

11  Q    It's also possible that these street dealers ended up

12  going to jail for a long time if they got caught?

13  A    That, I don't know, sir.

14  Q    And they sold gram quantities like you used to in Los

15  Angeles, right?

16  A    Maybe.

17  Q    Maybe.  And you, you sold metric tons, right?

18  A    Yes.

19  Q    And you got seven years in jail?

20  A    Yes.

21  Q    Because you helped these prosecutors, right?

22  A    Yes.

23         MR. MIEDEL:  Nothing further, thank you.

24         THE COURT:  Redirect?

25         MR. PILMAR:  May I have one second, your Honor?

Martinez Sanchez - Redirect - Pilmar          339

1          THE COURT:  Yes.

2          MR. PILMAR:  Thank you, your Honor.  I'll be

3    brief.

4    REDIRECT EXAMINATION

5    BY MR. PILMAR:

6    Q    You were just asked on cross examination about the

7    sentence you received.  Do you remember that question?

8    A    Yes.

9    Q    Were you sentenced after testifying in a different

10   matter?

11   A    Yes.

12   Q    Were you sentenced prior to meeting with the

13   prosecutors in this case?

14   A    Yes.

15   Q    What would happen to you if you lied on the stand

16   today?

17   A    I would be convicted of perjury.

18          MR. PILMAR:  No further questions, your Honor.

19          MR. MIEDEL:  Your Honor, very briefly.

20          THE COURT:  Okay.

21   RECROSS EXAMINATION

22   BY MR. MIEDEL:

23   Q    Mr. Pilmar just asked you about the fact that you were

24   sentenced after your testimony at the other trial, right?

25   A    Yes.

Jury Trial                               340

1  Q    And you received a 5K letter as part of your

2  cooperation in that case, right?

3  A    Yes, sir.

4  Q    And a 5K letter is a letter that the prosecutors write

5  to the judge explaining all of your cooperation, right?

6  A    That's my understanding.

7  Q    And the 5K letter that the prosecutors submitted in

8  your case specifically mentioned your cooperation in this

9  case; isn't that true?

10 A    That, I don't know sir.

11         MR. MIEDEL:  Nothing further.

12         THE COURT:  All right.  All right.  You may step

13 down, thank you.  Government's next witness.

14         MR. PILMAR:  Your Honor, before calling our next

15 witness, the Government would seek to introduce stipulations

16 to Government Exhibit 901.

17         THE COURT:  Is this a fact stipulation or is it an

18 authenticity stipulation?

19         MR. PILMAR:  A fact and authenticity stipulation.

20         THE COURT:  You're getting in fact and you're

21 getting in evidence; is that right?

22         MR. PILMAR:  Yes.

23         THE COURT:  Ladies and gentlemen, sometimes the

24 lawyers agree on certain facts that are true, or certain

25 exhibits that are authentic.  And in order to save your

1   time, they put that agreement into writing and, rather have

2   witnesses testify to all of that, they will just read you

3   the stipulation of what they have agreed to.  When they have

4   stipulated that certain facts are true or certain exhibits

5   are authentic, that's binding on you.  You have to accept

6   that stipulation.  All right.  Please proceed.

7             MR. PILMAR:  Your Honor, if it's okay with the

8   Court, because it's a length stipulation, I would just move

9   to read the beginning and the end now and the exhibits, and

10  we will read the relevant parts as it comes up during the

11  trial.

12            THE COURT:  Okay.  That's fine.

13            MR. PILMAR:  Can we publish the stipulation

14  Government Exhibit 901 to the jury?

15            THE COURT:  Are we admitting the stipulation into

16  evidence?

17            MR. PILMAR:  Yes, your Honor.

18            THE COURT:  No objection?

19            MR. DE CASTRO:  No objection.

20            THE COURT:  Received.

21            (Government's Exhibit 901 received in evidence.)

22            MR. PILMAR:  The parties have agreed, and I'll ask

23  Ms. Donovan to go to the last page, which is page five.

24  Government exhibits 201-11, 202-19, 203-21.  203-28, 203-29,

25  204-19.  204-20.  205-34, 206-5, 206-7, 206-8, 206-9,

Jury Trial                                    342

1    207-22.  And this stipulation marked as Government

2    Exhibit 901 are admissible in evidence at trial dated

3    November 21, 2012, signed by defense counsel and myself.

4    Thank you, your Honor.

5              THE COURT:  All right.  The listed exhibits are

6    also received in evidence, along with the stipulation.

7              (Government's Exhibits 201-11, 202-19, 203-21.

8    203-28, 203-29, 204-19.  204-20.  205-34, 206-5, 206-7,

9    206-8, 206-9, 207-22 received in evidence.)

10             MS. DIOUF:  The Government calls Ernest Cain.

11             (Witness takes the witness stand.)

12             (Witness Sworn.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Cain - Direct - Diouf                              343

1    **ERNEST CAIN**,

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE COURTROOM DEPUTY:  Please, state and spell

6    your name for the record.

7              THE WITNESS:  Ernest Cain, C-A-I-N.

8              THE COURT:  Please proceed.

9    DIRECT EXAMINATION

10   BY MS. DIOUF:

11   Q    Good morning, Mr. Cain.

12   A    Good morning.

13   Q    What do you do for a living?

14   A    Presently retired.

15   Q    How long have you been retired for?

16   A    Approximately 16 years.

17   Q    Before you were retired, what did do you?

18   A    I was employed by the Chicago Police Department.

19   Q    What did do you at the Chicago Police Department?

20   A    I was assigned to the organized crime division,

21   narcotics section.

22   Q    Were you a police officer?

23   A    I'm sorry.  Yes, I was.

24   Q    How long did you work at the Chicago Police Department?

25   A    36 years.

1   Q    When did you retire as a police officer?

2   A    I retired the 15th of June of 2006.

3   Q    And you mentioned that you're in the organized crime

4   narcotics section.  How long did you work in that section?

5   A    A total of 19 years.

6   Q    What were your responsibilities as a narcotics police

7   officer?

8   A    As a narcotic police officers, I investigated crimes

9   that were related to narcotics.

10  Q    Approximately how many narcotics related crimes did you

11  investigate during your tenure as a narcotics officer?

12  A    Approximately, I was either the case officer or a

13  participating officer and I would estimate over 200 cases.

14  Q    What was the predominant drug you investigated?

15  A    Predominate drug was cocaine.

16  Q    Let's talk about the summer of 2002.  Were you working

17  as a police officer in the organized crime narcotics section

18  in Chicago?

19  A    Yes, I was.

20  Q    Directing your attention to August 16, 2002.  Were you

21  working on that day?

22  A    Yes I was.

23  Q    How did that day start for you?

24  A    That day started, I was on surveillance on the

25  southwest side of Chicago.

Cain - Direct - Diouf                                    345

1   Q    Were you looking for anything as part of your

2   surveillance?

3   A    Yes, I was.

4   Q    What were you looking for?

5   A    I was looking for a Hispanic male, approximately

6   30 years old.  Approximately six-foot tall, 240, 260 pounds.

7   He would be driving a green Ford with the first three

8   numbers of the license plate 377.

9   Q    What type of car was the green Ford?

10  A    It was a green Aerostar.

11  Q    What is an Aerostar?

12  A    I'm sorry.  A green Ford Aerostar van.

13  Q    When you received -- sorry.  Where did you set up

14  surveillance?

15  A    My initial surveillance I set up on 5900 South and 3200

16  West, Chicago.

17  Q    What, if anything, did you observe while you're

18  conducting surveillance on this area?

19  A    I observed a gentleman on a pay phone standing next to

20  a green Ford Aerostar van with the first three numbers 377.

21  Q    Was it the van you were looking for?

22  A    Yes, it was.

23  Q    What did you observe this gentleman doing at the pay

24  phone?

25  A    He was in conversation on the phone.

1  Q    Did anything about this draw you attention to him?

2  A    Yes.

3  Q    What was that?

4  A    He was on the pay phone and had a cell phone attached

5  to his waist to his belt.

6  Q    Remind us what year was that?

7  A    This was 2002.

8  Q    How prevalent were cell phones in Chicago at that time?

9  A    Cell phones had been out, but pay phones were still

10  mostly in the neighborhoods for use.  So it would be the

11  changing of from cell phone to, or from pay phone to cell

12  phone.

13  Q    So why did it seem odd to you that this man was on the

14  pay phone?

15  A    He was on a pay phone paying for a call that he could

16  have easily took the phone off his belt and made the same

17  call.

18  Q    What did you observe next?

19  A    After some time there, he hung up the phone, got into

20  his vehicle, and drove away.

21  Q    Did you follow him?

22  A    Yes, I did.

23  Q    Where?

24  A    He went approximately a mile and a half south to 63rd

25  Street and pulled into a laundromat parking lot.  Parked in

1    the back of the laundromat.

2    Q    Did you observe the man at the laundromat?

3    A    Yes, I did.

4    Q    What did you observe him do?

5    A    He got out of his vehicle, went into the laundromat

6    through a side door in the back.  I got out of my vehicle

7    and I walked on 63rd Street and I walked up to the windows

8    of the laundromat, looked in, and I could see him in the

9    back of the laundromat on his cell phone.  I'm sorry, on a

10   pay phone.

11   Q    What did you do next?

12   A    I then got back in my vehicle and waited see what he

13   would do next.

14   Q    What did the gentleman do?

15   A    He after a short time, he exited the laundromat, got

16   back into his -- the green Aerostar, and drove to a K-Mart

17   lot that was about half a mile away.

18   Q    Did you maintain surveillance on the green van during

19   this time?

20   A    Yes, I did.

21   Q    What did you observe in the K-Mart parking lot?

22   A    He was in the K-Mart parking lot and he made, appeared

23   to be making several phone calls on his cell phone.  After a

24   short time, he left the lot -- left the lot, parked again

25   and made more phone calls.  And after a short time, he went

1   back to the lot.

2   Q    Did you observe any other vehicles at this time in the

3   K-Mart parking lot?

4   A    Yes, I did.

5   Q    What was that?

6   A    A white panel van pulled into the parking lot and

7   parked close to him.

8   Q    And what happened when the white panel van pulled in

9   and parked close to the green van?

10  A    The driver of the green van and the driver of the white

11  van got out and stood behind the two vans and talked.

12  Q    And what happened after they talked?

13  A    The driver of the white van motioned to the white van

14  and someone exited the white van and got into the green van.

15  Q    And what -- did you continue to observe these vans?

16  A    Yes, I did.

17  Q    What happened next?

18  A    The, both drivers; the driver of the green van and the

19  driver of the white van got back into their vans and they

20  pulled out of the lot.

21  Q    Did you continue to follow the vans?

22  A    Yes, I did.

23  Q    Mr. Cain, you testified that you started the day with

24  your partner.  At this point when you see the two vans

25  leaving the K-Mart parking lot, how many members of the

1    surveillance team were there?

2    A    At this point, I asked for assistance and approximately

3    three more officers assisted in the surveillance.

4    Q    Where did you follow the green and white vans to?

5    A    The van went approximately 3 to 4 miles and got on I55

6    Interstate 55, South, westbound.

7    Q    Did you follow them to a specific location?

8    A    Yes, I did.

9    Q    What location was that?

10   A    They exited about 20 to 25 miles later at the

11   Bolingbrook Romeoville exit, which is Route 53.  They then

12   went South on Route 53 for a mile and a half.

13   Q    Did they stop at a specific location?

14   A    Yes.

15   Q    Where was that?

16   A    It was a gas station on the corner of Route 53 and

17   Joliet Road.  The green van pulled up to the pump and the

18   white van pulled into the gas station and parked

19   approximately 20 feet away.

20   Q    Are we in Chicago at this point?

21   A    No.  We're in a southwest suburb of Chicago.

22   Romeoville.

23   Q    What happened at the gas station?

24   A    The person who had gotten into the green van exited the

25   green van and got back into the white van.

1    Q    And what happened after this?

2    A    The driver of the green van and the driver of the white

3    van were in conversation outside the van.  And I saw the

4    driver of the green van point north, north, towards the

5    expressway where we had just driven from.

6    Q    And did the driver of the green van pull into a

7    specific location?

8    A    The driver of the green van at this point stayed.

9    Stayed and then gassed up his car.

10   Q    Okay.

11                   And did you observe this?

12   A    Yes.

13   Q    What happened next?

14   A    The white van went back on Route 53, back on Route 53

15   North going the same way we had just come from and they

16   ended up going into a McDonalds at Marquette and Route 53.

17   Q    Did you observe this?

18   A    I did not.

19   Q    What were you doing at this time?

20   A    I was on surveillance of the green van.

21   Q    Did the green van leave the gas station at any point?

22   A    Yes.

23   Q    Can you tells us about that?

24   A    After fueling his vehicle, the green van left the gas

25   station going back north on Route 53 towards the expressway.

Cain - Direct - Diouf                351

1    At Marquette and Route 53, he pulled into the McDonalds

2    parking lot.

3    Q    Did you surveil the green van while this is happening?

4    A    Yes, I did.

5    Q    Where did you go once the green van went into the

6    McDonalds parking lot?

7    A    On the -- the McDonalds parking lot would be on the

8    east -- or west side of Route 53, and directly across from

9    it, there is a building or maybe a warehouse.  They had a

10   parking lot there and I went into that parking lot.  So I

11   was facing west looking directly into the McDonalds lot.

12   Q    What did you observe from that vantage point?

13   A    I observed the driver of the green van get out and go

14   into the McDonalds.

15   Q    Did you observe anything new?

16   A    Yes.

17   Q    What did you observe?

18   A    Shortly after the driver went in, the passengers of the

19   white van walked out and an unknown male subject walked out

20   with them.

21   Q    Did any other cars enter your surveillance at this

22   point?

23   A    Yes.

24   Q    Can you describe that?

25   A    It was a tan van that was parked a few feet away from

1    the white van.

2    Q    So how many vans are you surveilling at this point?

3    A    At this point I'm -- three vans and they're all parked

4    in the general vicinity of each other.

5    Q    So the green van, the white van, the tan van?

6    A    Correct.

7    Q    Can you describe the tan van?

8    A    The tan van is a panel van and it has the words:

9    Valdez Wholesale Meats on the side of it.

10   Q    What did you observe next with respect to these vans?

11   A    The unknown subject got into the tan van and the three

12   subjects got into the white van.  The tan van left the lot

13   with the white van right behind it.

14   Q    And what did you do?

15   A    I stayed on surveillance of the green van.

16   Q    What did the green van do?

17   A    Shortly after those two vans left, the driver of the

18   green van and another unknown subject exited the McDonalds

19   and entered the green van.  And entered the green van.

20   Q    Did you follow the green van?

21   A    Yes.

22   Q    Did you maintain surveillance?

23   A    For most through, yes.

24   Q    Did you lose sight of it at any point?

25   A    Yes, I did.

Cain - Direct - Diouf                    353

1  Q    So at this point, where are the white, tan, and green
2  vans respectively?
3  A    The white and tan are heading North on Route 53 towards
4  I-55.  That's the last I saw them.
5  Q    Did you see the green van again that day?
6  A    Yes.
7  Q    Where?
8  A    The green van was found at 1277 Naperville Road.
9  Parked in a parking lot.
10 Q    What is at 1277 Naperville Road?
11 A    It is an office warehouse building.
12 Q    Where was this location relative to the McDonalds you
13 previously surveyed?
14 A    The location of the office warehouse was approximately
15 three quarters of a block away.
16 Q    What did you do after you saw the green van on
17 Naperville Road?
18 A    I drove, I drove past it, saw the van in the lot and I
19 kept on going north.  And then took a position of
20 surveillance north on Naperville Road.
21 Q    Were photos taken of that area that you were
22 surveilling?
23 A    Yes.
24 Q    Approximately when were they taken?
25 A    Approximately four years ago in December.

1   Q    Were you present when those photos were taken?

2   A    Yes.

3   Q    Did the area you just described; the McDonalds, the gas

4   station, the building on Naperville Road, did they look

5   similar to when you conducted surveillance back in 2002?

6   A    Yes, they did.

7             MS. DIOUF:  I'd like to show the witness what's

8   been marked for identifications a series of exhibits,

9   starting with Government Exhibit 205-31.  And Mr. Cain, if

10  you can let me know when you're ready for the next one.

11            (Exhibit published to the witness.)

12            MR. CAIN:  I'm ready.

13            MS. DIOUF:  205-29.

14            MR. CAIN:  I'm ready.

15            MS. DIOUF:  205-20.

16            MR. CAIN:  I'm ready.

17            MS. DIOUF:  205-23.

18            MR. CAIN:  I'm ready.

19            MS. DIOUF:  205-24.

20            MR. CAIN:  I'm ready.

21            MS. DIOUF:  205-28.

22            MR. CAIN:  And I'm ready.

23            MS. DIOUF:  And 205-26.

24            MR. CAIN:  I'm ready.

25  Q    Mr. Cain, what are these photos of?

1  A    These are the locations the McDonalds, the warehouse

2  and offices that I saw -- the street that they're on is

3  Naperville Road.  This is a Shell gas station just north of

4  I-55 on Route 53.  And the Denny's is right behind that gas

5  station.

6  Q    Were you present when these photos were taken?

7  A    Yes, I was.

8  Q    Do they fairly and accurately depict the area you

9  surveilled in 2002?

10  A    Yes.

11       MS. DIOUF:  I would move to admit them into

12  evidence and publish to the jury.

13       MR. MIEDEL:  No objection.

14       THE COURT:  Received.

15       (Government's Exhibits 205-31, 205-29, 205-20,

16  205-23, 205-24, 205-28, 205-26 received in evidence.)

17  Q    I would like to start with Government Exhibit 205-28 in

18  evidence.  What are we looking at, Mr. Cain?

19  A    This is a gas station on Route 53, just approximately a

20  block or half a block north of I-55.

21  Q    Is this the gas station that the green van pulled into?

22  A    Yes.  No.  This is not the gas station.  No.

23  Q    Okay.  Which gas station is this?

24  A    This is the gas station that the brown van pulled into.

25  Q    Showing you government Exhibit 205-26 in evidence.

Cain - Direct - Diouf                                      356

1              What are we looking at here?

2    A    This is the office warehouse building that I -- and

3    this is the lot where I observed the green van parked in.

4    Q    And if you can annotate on the screen where the

5    building on Naperville Road is?

6    A    Do I just put my finger on it?

7    Q    You can just draw on the screen.

8    A    This whole building is the building and then it goes

9    back (indicating.)

10             MS. DIOUF:  For the record, the witness drew a

11   circle around the middle right side of the screen.

12   Q    Mr. Cain, do you see the McDonalds in this photo?

13   A    Yes, I do.

14   Q    Can you circle where that is?

15   A    (Indicating.)

16             MS. DIOUF:  For the record, the witness circled on

17   the middle left of the screen.

18   Q    Where did you next observe the tan van, Mr. Cain?

19   A    I next observed the tan van pulling down Naperville

20   Road from the north, and then entering the rear of this

21   office warehouse building.

22   Q    I want to show you Government Exhibit 205-28.

23             Did you see the tan van at this location?

24   A    Yes, I did.

25   Q    And can you tell us about that?

1   A    After I saw the tan van pulling into the back, the rear

2   of the warehouse area, a short time later, the van pulled

3   back out following the green van.  And it drove north on 53,

4   just past I-55 to this gas station.  The green van pulled in

5   first and went along the side of the gas station and pulled

6   into the lot that's directly behind it.  The Denny's lot

7   there.

8   Q    Can you indicate on the screen where you see the

9   Denny's lot?

10  A    (Indicating.)

11       MS. DIOUF:  And for the record, the witness has

12  circled in the middle right portion of the screen.

13  Q    What did do you after you saw -- what happened next?

14  A    The tan van then pulled up to the pump and the driver

15  of the van got out and began fueling his vehicle.

16  Q    Did any of the vans leave that area at any point?

17  A    After the tan van fueled or when he was done fueling,

18  he exited the gas station and pulled into the Denny's lot.

19  Q    And then what happened next?

20  A    At that point, I took a position of surveillance about

21  a block or two away.  The next thing I saw was the tan van

22  being driven by a female exiting the Denny's lot and just

23  north of the gas station, there's a light there.  And they

24  were parked they light getting ready to make a left turn.

25  She was parked at the light.

1  Q    What, if anything, were you ordered to do with respect
2  to the tan van at this point?
3  A    My Sergeant ordered me to stop the tan van.
4  Q    Did do you that?
5  A    Yes, I did.
6  Q    Can you describe what happened?
7  A    I was directly behind the van as it was at the light.
8  I got out of my vehicle, I approached, I knocked on the
9  window.  The window of the van.  The person opened the door,
10 a female opened the door.  I announced that I was a police
11 officer.  And I related some of the investigation to that
12 point to her.  I then asked permission to look in the back
13 of the van.  She gave me permission verbally.  I looked in
14 the van and I saw boxes.  I saw boxes in the back and one of
15 the boxes were open.  In that box I could see what I
16 believed to be suspect cocaine.
17          MS. DIOUF:  Ms. Donovan, you can take this exhibit
18 down, please.
19 Q    What about the contents of the boxes made you suspect
20 that it was cocaine?
21 A    The cocaine was packaged in such a manner that I had,
22 I'm familiar with.  I've seen this many, many times.  When I
23 saw it, I knew that's the packing -- that's what cocaine is.
24 That's how that's packaged, that's how it's transported.
25 Q    How was it packaged?

Cain - Direct - Diouf                      359

1   A    The packages were wrapped heavily with cellophane or

2   plastic.  Many, many, many layers of it, so you see mostly

3   plastic.

4   Q    Were the contents of the packages tested at any point?

5   A    Yes.

6   Q    What were the results?

7   A    They were positive for cocaine.

8   Q    Approximately how many kilograms of cocaine had you

9   seen in your career prior to this event?

10  A    I would estimate at least 500.

11  Q    And how many kilograms of cocaine did you recover from

12  the tan van?

13  A    206.

14  Q    Did you return to the building on Naperville Road at

15  any point that day?

16  A    Yes, I did.

17  Q    For what purpose?

18  A    We had consent to search.

19  Q    And remind us.  Did you see the tan van at Naperville

20  Road at any point that day?

21  A    I saw the tan van going into the lot of Naperville

22  Road.

23  Q    I'm showing you, again, what's in evidence as

24  Government Exhibit 205-23.

25                   What is this?

Cain - Direct - Diouf                    360

1   A    This is the, this is the office and warehouse area at

2   1277 West Naperville Road.

3   Q    How many law enforcement officers were present when you

4   conducted the search of this building?

5   A    There were, there were six from Chicago Police

6   Department.  There were at least two from the Bolingbrook

7   Police Department and I believe two from the Romeoville

8   Police Department.  So about 9 to 10.

9                    (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MS. DIOUF:

2    Q     Did you go inside the building?

3    A     Yes, I did.

4    Q     Can you describe what you saw?

5    A     Went through the front door, and as you go in through the

6    front door there is a counter there that is, it was empty.  It

7    was, there was nothing but a counter there in that first room.

8    Then from there you open the door, you go into an office area.

9    In the office area there are desks, chairs and desks.  On the

10   desks are seal-a-meal and plastic that were probably stacked a

11   couple feet high.

12   Q     What is seal-a-meal?

13   A     Seal-a-meal is plastic that, it's used to put food in and

14   to preserve it.  It takes the air out and seals it.

15   Q     Besides the office, what else did you see in the

16   warehouse?

17   A     Also in the -- when you leave the office, you go into the

18   warehouse area, there was two International, I believe they

19   call them straight trucks or straight-body trucks, not semis.

20   Q     What are International trucks?

21   A     A brand name like Ford or Chevy.  It's a truck.  It has a

22   cab then a box in the back.

23   Q     What, if anything, did you do with respect to these two

24   trucks?

25   A     My sergeant had a member of our team who was a canine

1  officer do a scent search of the building and the trucks, and

2  the dog's name is Roxie.  Roxie alerted on the rear cab area

3  of one truck, and between the cab and the box and the back.

4  Q    What did you do after Roxie alerted to the area?

5  A    I went into the cab and I searched the cab as best I

6  could.  I didn't find anything.  I went under the truck

7  looking to see if I could see anything that was unusual.

8  Again I didn't find anything.

9          Then there was just the box in the back.  The doors

10 were open to the two trucks and they had nothing in them.  So

11 I went into the truck and I -- everything seemed to be in

12 order.  I walked out.

13 Q    What did do you next?

14 A    Searched the rest of the building.  We searched

15 everything.

16 Q    Did you find any cocaine?

17 A    No.

18 Q    So after you had searched the rest of the building, what

19 did you do next?

20 A    Well, at this point I thought that the 206 kilos that we

21 got out of the van was probably the last of the load or that's

22 all they had.  And we were preparing to exit, leave, we were

23 in there for quite a few hours and we were getting ready to

24 leave.

25 Q    Did you leave?

Cain - Direct - Ms. Diouf                            363

1    A    No.  I went back to the truck where the dog alerted.  And

2    I don't know why, but I walked heel to toe on the outside of

3    the truck from the front of the truck to the tailgate.  And

4    then I went inside the truck and I walked heel to toe.  And I

5    come to the conclusion there was a two to two and-a-half foot

6    difference.

7    Q    What do you mean there was a two, two-and-a-half foot

8    difference?

9    A    The inside of the truck was smaller than the outside of

10   the truck by two-and-a-half feet.

11   Q    What did do you after you noticed this discrepancy?

12   A    I ran and got a screwdriver and started unscrewing all

13   the screws on the wall.

14   Q    What did you find?

15   A    It was a false wall.  When I took the plywood off I saw

16   it was a two by four frame with some sort of insulation.  And

17   so I stuck my hand through the insulation to see what was in

18   there.

19   Q    Was there anything in there?

20   A    Yes.

21   Q    What did you find?

22   A    I felt bundles of plastic wrap, hot digs.

23   Q    Did you pull one out?

24   A    At that point, no.  I was able to see that there was a

25   latch, a mechanism, for the piece of plywood next to me.  I

1   worked the latch, and that was a door that you pull off.  Then

2   once the door was off, I could look in there and see there was

3   stacks and stacks of what I suspected to be cocaine.

4   Q    What did you do after you saw these stacks of what you

5   suspected to be cocaine?

6   A    I -- everybody else was getting ready to leave.  I called

7   them all back in.  I told them I had a screw gun in my car

8   parked in the parking lot and let me go get it.  By the time I

9   got back, they had the other plywood off and both trucks had

10   false walls and both trucks had multiple kilos in them.

11   Q    Was video taken of once the narcotics were found?

12   A    Yes.

13            MR. MIEDEL:  May I approach with an exhibit, your

14   Honor?

15            THE COURT:  Yes.

16   Q    I just showed the witness what is marked for

17   identification as Government Exhibit 205-17.

18            Mr. Cain, do you recognize this?

19   A    Yes, I do.

20   Q    What is it?

21   A    It's a CD taken the night of the seizure.

22   Q    How do you recognize?

23   A    I initialed it and put the date on it.

24   Q    Have you viewed the contents of this CD?

25   A    Yes, I have.

Cain - Direct - Ms. Diouf                    365

1   Q    Is it a true and accurate representation of what you saw

2   on August 16, 2022?

3   A    Yes, it is.

4             MS. DIOUF:  I move to admit 205-17 and --

5             MR. MIEDEL:  No objection.

6             THE COURT:  It's a DVD.

7             THE WITNESS:  My apologies.

8   BY MS. DIOUF:

9   Q    I want to play it from minute 1:11 to minute 1:40.  I

10  will ask you some questions after reviewing the clip.

11            (Video played.)

12  Q    Mr. Cain, what do we see in this clip?

13  A    This is the clip of one of the two trucks that was in

14  that garage at 1277 Naperville Road.

15  Q    If we could play from this time stamp minute 1:40 to

16  approximately 1:46.

17            (Video played.)

18  Q    What do we see in this clip, Mr. Cain?

19  A    This is the inside of the truck, part of the plywood is

20  taken off and you can see the two-by-four framing and the

21  insulation in the wall.

22  Q    If we can continue from 1:46 to minute 2:35.

23            (Video played.)

24  Q    What are we observing here, Mr. Cain?

25  A    This is the two-by-four frame structure with insulation

1    and on the bottom, I believe is the kilos of cocaine.

2    Q    Are those the shiny package materials?

3    A    Yes.

4    Q    If we continue from this time stamp 2:35 to minute four,

5    please.

6              (Video played.)

7    Q    Mr. Cain, what did we see in this clip?

8    A    This is the rear of the one of the two trucks that we

9    were unable to start.  They are unloading the cocaine from

10   this truck and putting it in the other truck that we were able

11   to start.

12   Q    If we can skip ahead to minute 12:30 and play to 13:30.

13             (Video played.)

14   Q    What do we see in this clip, Mr. Cain?

15   A    There is again the one of the two trucks and they are

16   removing the cocaine from the hidden compartment and

17   transporting the cocaine to the other truck.

18   Q    Do you recognize any of the individuals in this clip?

19   A    Everybody in this clip here is part of, except for one

20   gentleman, everybody in it is part of my team, the team that I

21   was on.

22   Q    Why are your colleagues wearing gloves?

23   A    Well, anytime we have anything to do with narcotics we

24   like to wear gloves so you're not getting it on your hands.

25   In addition to that, these kilos of cocaine -- when they wrap

1    it, they wrap it in many, many, many layers on the actual

2    cocaine and then in the bundles.  They put things like motor

3    oil or brake fluid or something, then they wrap that around

4    it.  So some of these, I'm imaging, some of these might have

5    leaked or something.  So that's why they are wearing gloves.

6    But they put the motor oil in there to disguise the smell so

7    the dogs can't hit on it.

8    Q    What does cocaine smell like?

9    A    Cocaine smells -- in the process of cocaine they use, I

10   believe, they use gasoline or some other agent to process the

11   cocaine.  It doesn't have a gasoline smell, but it does have a

12   chemical smell to it.  It's hard to explain; if you smell it

13   once, you would know the smell.

14   Q    If we can play from minute 14:30 to the end 14:58.

15             (Video played.)

16   Q    What did we see in this clip?

17   A    Those were the items that were in the office at 1277

18   Naperville Road when I entered.  It is seal-a-meal plastic,

19   rubber bands, and a calculator.

20   Q    I'd like to show the witness what is marked for

21   identification as series of exhibits and when you've reviewed

22   each exhibit let me know and I'll move on.

23             Starting with Government Exhibit 205-4.

24   A    Yes.

25   Q    205-16?

Cain - Direct - Ms. Diouf                    368

1    A    Yes.

2    Q    205-1?

3    A    Yes.

4    Q    205-2?

5    A    Yes.

6    Q    205-10?

7    A    That picture is upside down but I recognize it, yes.

8    Q    205-13?

9    A    Yes.

10   Q    And 205-15?

11   A    Yes.

12   Q    Generally, Mr. Cain, what are these photos of?

13   A    The first photos were pictures of the seizure sewer from

14   1277 Naperville Road and the seizure of the 206 kilos

15   together.

16   Q    Do these photos truly and accurately represent the items

17   that were seized that day?

18   A    Yes.

19            MS. DIOUF:  I move to admit and publish them to the

20   jury.

21            MR. MIEDEL:  No objection.

22            THE COURT:  Received.

23            (Government Exhibits 205-4, 205-16, 205-1, 205-2,

24   205-10, 205-13, 205-15, were received in evidence.)

25   Q    Starting at 205-4, what are we looking at briefly?

1   A     This is the seizure from that day, from 1277 Naperville

2   Road.

3   Q     Does this include the kilograms from the tan van?

4   A     Yes, the kilos from the tan van are on the right, the

5   smaller pile.

6   Q     Can we go to 205-16 now?  What is this briefly?

7   A     That is the cocaine seized from one of the trucks and

8   1277 Naperville Road.

9   Q     205-1?

10  A     That's the same view, that's cocaine seized that day from

11  the 1277 Naperville Road.

12  Q     205-2, please?

13  A     That is the door to get into the secret compartment.  You

14  can see that there is like two house locks, one on top of the

15  other.  Later we found that those locks are opened by

16  screwdrivers that were honed down to about a quarter of an

17  inch, or even less, and you stuck them through holes in the

18  door, they went into the locks they turn them and just like

19  opening up the door in your house.

20  Q     Who 205-10, please?

21  A     That is the structure -- it's upside down -- but the

22  stuff on the top there is cocaine.  It's the two-by-fours with

23  the insulation, and I believe that's the actual doorway to the

24  first truck I believe.

25  Q     205-13, please?

1  A    That is the cocaine that was in the van, the 206 kilos in

2  the tan van.

3  Q    And 205-15, please?

4  A    That's the picture of the same kilos in the van.

5  Q    In total between the tan van and the warehouse, how many

6  kilograms of cocaine did you recover that day?

7  A    1,927.

8  Q    Twenty-seven what?

9  A    Kilos of cocaine.

10 Q    What happened with the kilograms after you seized them?

11 A    I took them into our office, inventoried them, and sent

12 them to the Chicago police department crime lab.

13 Q    Were they tested?

14 A    Yes, they were.

15 Q    What was the result?

16 A    The samples tested of the entire load all tested positive

17 for cocaine.

18 Q    Mr. Cain, in 2002 what was the street value of a kilogram

19 of cocaine in Chicago?

20 A    Approximately 100 to 125,000 a kilo.

21 Q    Did you estimate the street value of the cocaine you

22 seized from the warehouse that day?

23 A    Yes.

24 Q    Approximately what is it?

25 A    $240 million.

1  Q    Did you arrest any of the individuals you surveilled that

2  day?

3  A    Yes, I did.

4  Q    Did you arrest the driver of the green van?

5  A    Yes.

6  Q    Did you come to learn the identity of the driver of the

7  green van?

8  A    Yes.

9  Q    What was his name?

10 A    Andres Robles.

11 Q    I'd like to show you what is in evidence as Government

12 Exhibit 28.  Do you recognize this person?

13 A    Yes, I do.

14 Q    Who is it?

15 A    Andres Robles.

16 Q    Did you arrest anyone associated with the tan van?

17 A    Yes, I did.

18 Q    Did you come to learn his identity or their identity?

19 A    Yes.

20 Q    What was their identity?

21 A    Javier Cecena.

22 Q    I'd like to show you what is in evidence as Government

23 Exhibit 27.  Do you recognize the person in this photo?

24 A    Yes, I do.

25 Q    Who is it?

1  A    Javier Cecena.

2          MS. DIOUF:  Just a minute, please.  Nothing further

3  thank you.

4          THE COURT:  Cross-examination?

5          MR. MIEDEL:  No cross.

6          THE COURT:  Is the Government's next witness long or

7  short.

8          MR. PILMAR:  Short, maybe a half hour.  I don't know

9  if you want me to go past one.

10          THE COURT:  Do you want to take lunch now or go

11  ahead?  Let's do lunch.

12          Don't talk about the case over your lunch.

13          (Jury exits the courtroom.)

14          THE COURT:  Recess until 1:30.

15          (Lunch recess.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Proceedings                                373

1              (Afternoon session.)

2              (In open court.)

3              THE COURT:  What can I do for you?

4              MS. KOMATIREDDY:  Good afternoon.  Two items to

5     raise with the Court.

6              During the cross-examination of Mr. Martinez

7     Sanchez's testimony, the defense asked various questions

8     regarding what hypothetical street-level dealers in New York

9     are sentenced to.  We ask for the Court for a curative

10    instruction on that.

11             I understand about flooding the streets of New York

12    with cocaine and crack.  We believe it went too far when the

13    jury is being asked to weigh in on the justness of the justice

14    system or inequalities in sentencing, which they are obviously

15    in every case there are reasons for a sentence, each case is

16    different.  Some of those individuals may be engaging in plea

17    agreements and cooperation agreements.

18             We would ask for an instruction to the jury that

19    they disregard and put out of their mind what is happening in

20    other cases and only pay attention to the evidence of guilt or

21    innocence in this case; and issues relevant to the witnesses'

22    credibility, obviously, but not to others.

23             MR. MIEDEL:  Your Honor, the Government had an

24    opportunity to object to those questions.  It didn't.

25             The witness didn't, in fact, answer those questions

Proceedings                              374

1    ultimately because he claimed he didn't know.  So you already

2    instructed the jury that questions that are not evidence, they

3    have to go with what the witness stated.

4         I think that to draw attention to that now, when the

5    Government didn't object to it at the time, puts the -- of the

6    Court on something that the Government could have raised

7    before.

8         THE COURT:  How is it different if they would have

9    objected and I would have sustained it then?

10        MR. MIEDEL:  It's not outside of the witness at the

11   time, a special instruction by the Court about something that

12   happened an hour and-a-half ago, and suggesting some sort of

13   impropriety by the defense.

14        MS. KOMATIREDDY:  Your Honor, defense counsel is not

15   offering an explanation for why it was proper.

16        THE COURT:  I understand.

17        MR. MIEDEL:  I can actually offer an explanation,

18   your Honor.

19        THE COURT:  But you're telling the Government they

20   should have objected and they didn't, and you didn't offer the

21   explanation before.  Go ahead.

22        MR. MIEDEL:  I think that if the witness -- I think

23   it's a fair topic of exploration.  If the witness knows that

24   people who are selling his drugs in gram quantities are

25   getting lengthy jail sentences, and he gets such a benefit

Proceedings                                          375

1   that even though he sells tons of cocaine he only got seven

2   years, that's something that obviously goes to his motive and

3   bias and it's relevant.

4           THE COURT:  At the end of the case, obviously, I'm

5   going to give the jury the instruction that they should not

6   worry about sentencing at all as to this defendant, that's not

7   part what they do here.  Sentencing is up to me.

8           It seems to me a very small step to say -- I won't

9   put it on defense counsel, I'll put it on the witness -- say,

10  some questions were asked that brought up the topic of other

11  defendants.  You should not regard the sentences that anyone

12  gets as having any relevance to this case.  It's really just

13  an extension of the instruction I'm going to give at the end

14  of the case.

15          Okay, that's what I'll do.  Let's have them, please.

16          MS. KOMATIREDDY:  Your Honor.

17          THE COURT:  There is a second.

18          MS. KOMATIREDDY:  During the opening statements, and

19  again with several witnesses' crosses, counsel has suggested

20  that an inference should be drawn from the fact that this

21  defendant has appointed counsel and that certain witnesses did

22  not have appointed counsel.  We would ask to preclude that

23  line of questioning.

24          THE COURT:  Does the jury know that defense counsel

25  is appointed?

1          MS. KOMATIREDDY:  They announced it in their

2   opening.

3          MR. DE CASTRO:  I opened on it.  I did open on it,

4   your Honor.  And it is relevant.

5          The Government is going to argue that he received

6   millions and millions and millions of dollars and, we have no

7   idea where it is.  And they, the jury, sees like a team of

8   lawyers over here.

9          Now this issue has been sort of addressed, it was

10  addressed I think a couple years ago in the Southern District

11  of New York before Judge Engelmayer.  Judge Engelmayer -- I

12  can send the Court the transcript -- discussed as to why it is

13  relevant and to not create a misimpression with the jury that

14  this huge team over here is private counsel and that our

15  client has millions and millions to spend on lawyers.

16         I should also say that in jury selection a juror,

17  that was ultimately struck, said:  You think this guy is

18  innocent, look at all this.  And he pointed at our entire

19  direction, our whole team here.

20         Not to mention there are Marshals over there, the

21  jury doesn't know that.  We have interpreters back here.  This

22  looks like they have the dream team, as Judge Engelmayer

23  referenced in that case.  There is also a case here as well

24  before Judge Donnelly, which was U.S. vs. Albert that I can

25  provide to the Court.  It's certainly relevant.  We're allowed

Proceedings                                    377

1    to go into through the witnesses and we can mention it.

2            THE COURT:  Here is what I think about it.  It is

3    one thing to diffuse the possible prejudice from having the

4    dream team there.  It's another thing to use it as a weapon to

5    say, aha, you had hired counsel and my client doesn't.  That

6    takes it too far.

7            I'm okay with you're mentioning it in opening.  But

8    I do not want you bringing it up with witnesses.  As you know,

9    Mr. De Castro, it happens sometimes that attorneys are

10   appointed for clients that have lots and lots of money.

11           MR. DE CASTRO:  Certainly.

12           We can certainly close on it too, right, your Honor?

13           THE COURT:  We'll cross that bridge when we come to

14   it.

15           MR. DE CASTRO:  Just so you know, I'm not doing

16   hours or anything.

17           THE COURT:  I let you remind them just to make sure

18   there is not that prejudice of a whole team.  I might.  But

19   I'm reserving on that until we get closer to closings.

20           THE COURT:  Let's have the jury, please.

21           (Jury enters the courtroom.)

22           THE COURT:  Everyone be seated.

23           Before we assume, ladies and gentlemen, just one

24   thing I wanted to mention to you.

25           I'm going to tell you at the end of the case that

Proceedings                                378

1    when you deliberate the possible sentences that might be

2    imposed on this defendant, if you were to find him guilty

3    beyond a reasonable doubt, should not enter into your

4    consideration.  Sentencing doesn't matter.  The same thing is

5    true for other people who might have been sentenced.

6              Sentences get imposed for a whole different kind of

7    reason, it's a balancing in every case.  You can't draw any

8    inferences about what went on with a particular defendant just

9    because a particular defendant was sentenced to a certain

10   amount.

11             So to the extent you got any kind of suggestion from

12   the witnesses that that might be appropriate, or from the

13   lawyers in their questions, please disregard that entirely.

14   Sentencing doesn't matter for your purposes.

15             Let's have the Government's next witness.

16             MR. PILMAR:  Before I call the witness, I'd like to

17   read one paragraph from that stipulation.

18             THE COURT:  Okay.

19             MR. PILMAR:  901.

20             THE COURT:  You recall the instruction I gave you

21   about the affect of a stipulation.

22             MR. PILMAR:  Paragraph five:

23             Hereby agreed between the parties.  On August 16,

24   2022, officers with the Chicago police department seized two

25   box trucks containing approximately 1,925 kilograms of cocaine

Proceedings                                          379

1    and a delivery van containing approximately 250 kilograms of

2    cocaine in Chicago Illinois.  Samples of the substance seized

3    were delivered to the Illinois state police division of

4    forensics services in substantially the same condition as at

5    the time they were seized.  Government 205-34 is a lab report

6    prepared by Jason George, a duly qualified chemist employed by

7    the DEA's northeast laboratory.  If called to testify on this

8    subject, Mr. George would testify that he performed a chemical

9    analysis of three samples of the substance seized on

10   August 16, 2022 and determined that they contained cocaine

11   hydrochloride, a Schedule II controlled substance.

12            Thank you, your Honor.

13            At this time the Government calls Jamal Hornedo.

14            THE COURT:  Okay.

15            (Witness takes the witness stand.)

16   **JAMAL HORNEDO,** having been first duly sworn/affirmed, was

17   examined and testified as follows:

18            THE COURTROOM DEPUTY:  State and spell your name.

19            THE WITNESS:  Jamal Hornedo, J-A-M-A-L,

20   H-O-R-N-E-D-O.

21            THE COURT:  Please proceed, Mr. Pilmar.

22            MR. PILMAR:  Thank you, your Honor.

23   DIRECT EXAMINATION

24   BY MR. PILMAR:

25   Q    Good afternoon, sir.

Proceedings                                                    380

1    A    Good afternoon.

2    Q    Where are you employed?

3    A    Drug Enforcement Administration.

4    Q    Is that commonly known as the DEA?

5    A    Yes.

6    Q    What is your title with the DEA?

7    A    Special Agent.

8    Q    How long have you been with the DEA?

9    A    Approximately 23 years.

10   Q    What are your current duties and responsibilities with

11   the DEA?

12   A    I'm currently assigned to the technical operations group.

13   I provide technical assistance to the groups in the New York

14   division.

15   Q    How long have you been doing that?

16   A    Approximately two years.

17   Q    What you were doing prior to that?

18   A    Prior to that I was signed to the New York Drug

19   Enforcement Administration Task Force.

20   Q    What did you do when you were on that Task Force?

21   A    I conducted investigations of mid- and high-level

22   narcotics traffickers.

23   Q    Were you working as a DEA Special Agent on May 23, 2002?

24   A    Yes.

25   Q    What was your assignment?

Proceedings                                          381

1   A    I was assigned as a case agent and part of the

2   surveillance team for a narcotics investigation in Brooklyn,

3   New York.

4   Q    Where were you conducting surveillance?

5   A    In the vicinity of 400 Third Avenue, Brooklyn, New York.

6   Q    What type of location is that?

7   A    It's an industrial warehouse.

8   Q    Why were you conducting surveillance at that location?

9   A    Based on intelligence, we believed there was narcotics

10  activity being conducted in that area.

11  Q    I'd like to show just for the witness what is premarked

12  for identification as Government Exhibit 206-1.  Do you see

13  this photo in front of you?

14  A    Not yet.  Yes.

15  Q    What is this?

16  A    It's a photo of the warehouse we were conducting

17  surveillance of.

18  Q    The one that you just mentioned in Brooklyn, New York?

19  A    Yes.

20  Q    Is this a fair and accurate depiction of how this

21  structure looked approximately on that day?

22  A    It is, except for the weather, there was no snow on the

23  roof.

24  Q    Other than that?

25  A    Yes.

Proceedings                               382

1          MR. PILMAR:  Your Honor, at this time the Government

2    seeks to admit Government Exhibit 206-1 into evidence.

3          MS. GOTLIB:  No objection.

4          THE COURT:  Received.

5          (Government Exhibit 206-1, was received in

6    evidence.)

7    Q    What time did you begin conducting surveillance on

8    May 23?

9    A    In the afternoon.

10   Q    Did anything unusual happen after you started conducting

11   surveillance?

12   A    Yes.  At approximately 8:20 p.m. we observed a green

13   Nissan Quest minivan being driven into the middle main gate of

14   that warehouse.

15   Q    Can you draw on your screen which gate you're talking

16   about?

17   A    Sure (indicating).

18   Q    For the record, the second gate in the center of the

19   photo, the witness just circled.

20          So what happened after you witnessed this car drive

21   into the warehouse?

22   A    We maintained surveillance at the warehouse.  At

23   approximately 10:00 p.m. the same green Nissan Quest was

24   driven out of the location.  The vehicle appeared to be much

25   heavily weighted, the rear of the vehicle was sagging down as

Proceedings                                        383

1    if a heavy substance or cargo was placed into the vehicle.

2    Q    Based on your training and experience, what can that

3    mean?

4    A    Based on my training and experience it can mean maybe

5    narcotics in the vehicle, were loaded into the vehicle.

6    Q    This is something you can physically see with your own

7    eyes without special equipment?

8    A    Yes.

9    Q    So what happened after you noticed the car drive out that

10   was weighted down?

11   A    We conducted surveillance of the vehicle and ultimately

12   conducted a car stop of the vehicle.

13   Q    What is a car stop?

14   A    We pulled over the vehicle, did a traffic stop, and

15   identified ourselves as police officers.

16   Q    What happened after that?

17   A    As I was approaching the vehicle, I had my flashlight and

18   I noticed very large duffel bags in the rear of the vehicle,

19   they appeared to be full.

20   Q    Approximately how many duffel bags did you see?

21   A    Several, I don't have the exact count.  I approached the

22   driver, asked for consent to search the vehicle as.  I

23   searched the vehicle, I opened one of the bags and observed

24   kilogram quantities of cocaine in the bags.

25   Q    So once you saw the cocaine, what did you do next?

Proceedings                         384

1   A    The driver and passenger of the vehicle were placed under

2   arrest.  And the cocaine and the vehicle was seized.

3   Q    What, if anything, did you do with respect to the

4   warehouse that the vehicle had come from?

5   A    The warehouse surveillance was maintained on the

6   warehouse, and ultimately a search warrant was obtained to

7   search the warehouse.

8   Q    About how long did it take to get that search warrant?

9   A    It took a couple hours; it was early the next morning

10  that we executed the search warrant.

11  Q    After you executed it, what happened?

12  A    After executing the search warrant, upon entering the

13  warehouse, two other individuals were arrested inside the

14  warehouse.  And there were three vehicles, which contained

15  additional kilogram quantities of cocaine were in the

16  warehouse that was also seized.

17  Q    Besides the cocaine and the vehicles, what else did you

18  see in the warehouse, if anything?

19  A    I saw two box trucks and one minivan.  The two box trucks

20  contained false compartments in the front of the cargo area.

21  It was use to conceal the cocaine.

22  Q    I'd like to show just for the witness what is premarked

23  for identification as Government Exhibit 206-2, 206-3, 206-4.

24  I'll let you look one at a time.  Let me know when you've

25  looked at it enough and we can look at the next photo.

Proceedings                                       385

1    A    Okay.  Okay.

2    Q    Is it there a way to clear the circle from the screen?

3    Can you hit the bottom left of your screen?  It might clear

4    the circle.  Never mind.

5         Do you recognize these photos?

6    A    Yes.

7    Q    Starting with 206-2, what is this?

8    A    That is a photo of one of the box trucks located inside

9    the warehouse.

10   Q    That day?

11   A    Yes.

12   Q    206-3?

13   A    The second box truck that was also located inside the

14   warehouse that day.

15   Q    And 206-4?

16   A    A photo of the all the kilograms of cocaine that were

17   seized that day, including the kilograms from the Nissan

18   Quest.

19         MR. PILMAR:  At this time I seek to introduce 206-2,

20   206-3, 206-4 into evidence.

21         MS. GOTLIB:  No objection.

22         THE COURT:  Received.

23         (Government Exhibit 206-2, 206-3, 206-4, were

24   received in evidence.)

25         MS. KOMATIREDDY:  May I approach to fix the screen?

Proceedings                                386

1              THE COURT:  Yes.

2              MR. PILMAR:  Thank you, your Honor.

3    BY MR. PILMAR:

4    Q    Let's go back to 206-2.  What are we looking at here?

5    A    We're looking at photos of the exterior of the box truck

6    and the interior cargo area of the box truck.

7    Q    Focusing on the bottom, right photo.  What are we looking

8    at there?

9    A    Towards the rear of the cargo area in that circle there

10   is the false wall that was built to conceal a void or hidden

11   space where the kilograms of cocaine were stored.

12   Q    Based on your training and experience, what is the point

13   of using these false walls?

14   A    The false walls are known to be utilized to transport

15   narcotics so they won't be seen if an inspection is done of

16   the vehicle, it will appear as if there is nothing behind that

17   wall.

18   Q    Moving to 206-3.  What are we looking at here?

19   A    Once again, you have the two top photos are the exterior

20   of the truck, and towards the bottom, two photos are the

21   interior of the cargo area with a false wall toward the front

22   of the truck.

23   Q    206-4?

24   A    Is the complete seizure for that day.  And towards the

25   left is a picture of the bags that were located inside the

Proceedings                                387

1   Nissan Quest.

2        MR. PILMAR:  Your Honor, I ask if the witness can

3   step off the stand and show the jury what is in evidence as

4   206-9, that box to the right of the jury, which contains a

5   sample of the cocaine that was seized on that day.

6        THE COURT:  Any problem?

7        MS. GOTLIB:  No objection.

8        THE COURT:  Go ahead.

9   A    These are the kilograms that are wrapped in a clear

10  cellophane, also a yellow cellophane.  There appears to be an

11  oily substance that is secreted between the wrappings.

12  Q    Approximately how many bricks of cocaine do you see in

13  the bag?

14  A    In this bag, approximately 10 kilograms of cocaine.

15  Q    How do the kilograms of cocaine look compare to how they

16  looked in 2002?

17  A    They are a little broken down, but this is pretty much

18  how they looked in 2002.

19  Q    Thank you.  You can put that back in the bag.

20        In total, how much cocaine was seized that day?

21  A    1,937 kilograms of cocaine.

22  Q    What did you do after seizing it?

23  A    After seizing it, transported it to the New York division

24  and processed it and submitted to the lab.

25  Q    How did this drug seizure compare in size to other drug

Proceedings                                      388

1   seizures in your career?

2   A    This was the biggest drug seizure I have seen in my

3   career that I myself have been part of.

4              MR. PILMAR:  May I have a moment, your Honor?

5              THE COURT:  Yes.

6              MR. PILMAR:  No further questions, your Honor.

7              THE COURT:  All right.  Cross?

8              MS. GOTLIB:  No.  Thank you, your Honor.

9              THE COURT:  You may step down.

10             (Whereupon, the witness was excused.)

11             THE COURT:  Next witness.

12             MR. PILMAR:  Before I call the next witness I want

13  to read another paragraph from stipulation Government Exhibit

14  901.

15             THE COURT:  Proceed.

16             MR. PILMAR:  Paragraph six:

17             On May 24, 2002, DEA agents seized approximately

18  445 kilograms of cocaine from a vehicle parked in a warehouse

19  in Brooklyn, approximately 657 kilograms of cocaine from a

20  vehicle parked in a warehouse in Brooklyn, approximately

21  371 kilograms of cocaine from a vehicle parked in a warehouse

22  in Brooklyn, and 464 kilograms of cocaine from a vehicle

23  stopped at the intersection of Third Avenue and Sixth Street

24  in Brooklyn.  Samples of the substances seized were delivered

25  to the DEA northeast laboratory in substantially the same

Proceedings                                389

1   condition as at the time it was seized.  Government Exhibit

2   206-9 are samples of the cocaine seized on May 24, 2002.

3   Government Exhibit exhibits 206-5, 206-7, 206-8, are lab

4   reports prepared by Todd Meinken, a duly qualified chemist,

5   employed by a DEA's northeast laboratory.  If called to

6   testify on this subject, Mr. Meinken would testify that he

7   performed a chemical analysis of four samples of substances

8   seized on May 24, 2002 and determined that they contain

9   cocaine hydrochloride, a Schedule II controlled substance.

10          Thank you, your Honor.

11          THE COURT:  Okay.  Next witness.

12          MR. PILMAR:  At this time your Honor the Government

13  calls Matthew Coleman.

14          (Witness takes the witness stand.)

15  **MATTHEW COLEMAN**, having been first duly sworn/affirmed, was

16  examined and testified as follows:

17          THE COURTROOM DEPUTY:  State your name for the

18  record.

19          THE WITNESS:  Matthew Coleman, M-A-T-T-H-E-W,

20  C-O-L-E-M-A-N.

21  DIRECT EXAMINATION

22  BY MR. PILMAR:

23  Q    Good afternoon, sir.

24  A    Good afternoon.

25  Q    What do you do for a living?

Proceedings                                    390

1   A    A Special Agent with the Drug Enforcement Administration.

2   Q    That's commonly referred to as the DEA?

3   A    Correct.

4   Q    How long have you worked for the DEA?

5   A    Over 23 years.

6   Q    What is your current assignment?

7   A    Currently I'm the associate deputy chief inspector for

8   office of security programs in our DEA headquarters.

9   Q    What did do you prior to this assignment?

10  A    I held a position as country attache, a supervisory

11  Special Agent, and then a Special Agent doing specific

12  investigations.

13  Q    Directing your attention to January 2003, what were your

14  responsibilities?

15  A    General enforcement group of agents investigating any

16  violations of the drug acts for the U.S.

17  Q    Day to day, what does that mean you do?

18  A    Criminal investigations in drug trafficking, money

19  laundering organizations.

20  Q    Do you recall an investigation in late 2002 early 2003,

21  called For Queen Soybean?

22  A    Yes.

23  Q    Briefly, how did that investigation begin?

24  A    That investigation started a couple months before that in

25  late 2002.  We received intelligence from the source of

Proceedings                                                     391

1    information that a drug organization was renting a warehouse

2    in Queens -- the address was 51-18 Grand Avenue, unit seven,

3    Queens, New York -- for the purpose of bringing drugs into

4    this warehouse to store and distribute to the greater New York

5    area.

6    Q    I want to direct your attention to January 28, 2003 were

7    you working at a Special Agent that day?

8    A    I was.

9    Q    What were you doing that day?

10   A    We were conducting surveillance at one of the residences

11   that we associated that that warehouse.

12   Q    Where did you start your surveillance?

13   A    At 7979 78th Avenue, Queens, New York, close to that

14   warehouse.

15   Q    Were you with other agents that day?

16   A    I was.

17   Q    When you were conducting surveillance on the residence,

18   what did you see?

19   A    We actually identified some individuals that were living

20   in that residence that were connected to that warehouse and a

21   vehicle which they had.  We started surveillance there to see

22   if the activities of those individuals, because we recognized

23   that the car was there that morning, so we were staying on

24   that to see when they would leave and where they would go.

25   Q    Did something happen at some point?

Proceedings                                     392

1    A    It did.  Later that afternoon, three individuals exited

2    the house, entered the vehicle.  They drove the vehicle right

3    to that particular warehouse at 51-18 Grand Avenue.

4    Q    What did do you next?

5    A    We surveilled that vehicle from there.  The vehicle

6    backed itself up against the big garage door of the warehouse.

7    An individual exits and entered the warehouse.  A minute or

8    two later, the doors opened up, a vehicle pulled out, one of

9    the other individuals jumped in, and both of those vehicles

10   left the warehouse area.

11   Q    When the vehicles left the warehouse area, what did you

12   do next?

13   A    We both, the whole team of agents, followed both of those

14   vehicles.

15   Q    Where did you guys go?

16   A    They stayed on Grand Avenue.  They went to a Stop & Shop,

17   which is located just down off of Grand Avenue.  The silver --

18   the vehicle that exited was a silver Plymouth Voyager.  It

19   entered the Stop & Shop, went up to the upper parking lot,

20   parked.  Two individuals exited and entered the Stop & Shop.

21   A few minutes later, the red Explorer showed up as well in the

22   general area of the minivan and entered Stop & Shop.

23   Q    What happened next?

24   A    They were in there for a few minutes.  Two individuals,

25   Mr. Gutierrez and Mr. Morales, exited, entered the Ford

Proceedings                                           393

1    Explorer.  We had surveillance at the third person who started

2    walking up Grand Avenue while on a cellphone.

3    Q    Was any of this unusual to you?

4    A    Typical of activities of those that are involved in the

5    drug business.

6    Q    Why is that?

7    A    Because you would see, two vehicles, one gets dropped

8    off, the other two get into the other vehicle, that other

9    vehicle is left there for a reason.

10   Q    So after you observed all this, what did you do next?

11   A    We continued to surveil.  We saw that the Ford Explorer

12   exit the Stop & Shop, made a right, picked up another

13   individual, unknown male in the car for a little bit, made a

14   quick U-turn, he got out.  The other person who was on foot on

15   the phone got in, they departed the area.  The person that was

16   in the car only for a few minutes, met with someone around the

17   Stop & Shop and that's when we saw this other person, UM4, who

18   we identified later on as Ramon Cava up on the parking lot

19   looking around.  Then he entered that minivan.

20   Q    You said UM4, what does that mean?

21   A    Unknown male.

22   Q    Thank you.  After you saw this, what did you do next?

23   A    So we continued to surveil that minivan.  He looked

24   around the top of the parking lot, entered the minivan, and

25   started to leave the parking lot of the Stop & Shop.

Proceedings                                          394

1   Q     Did anyone follow him?

2   A     The whole team was following him.

3   Q     What happened when you started following?

4   A     As soon as he exited the Stop & Shop, he made a right on

5   Grand Avenue.  The Special Agent in front of me, Special Agent

6   Matt Ryan, he initiated or put on his police lights, his

7   emergency rights and siren, and instructed the vehicle to pull

8   over.

9   Q     Did the vehicle pull over?

10  A     Did the exact opposite, accelerated rapid speed and took

11  off.

12  Q     Where were you in the line of police cars?

13  A     Right behind Special Agent Ryan who initiated the car

14  stop.

15  Q     So when the vehicle takes off, what happens next?

16  A     We pursued we followed.

17  Q     About how long?

18  A     It seemed longer than it was.  He made a quick right on

19  76th Street at a high rate of speed, traveled down that road.

20  We were right behind him.  It got to a fork in the road.  And

21  I think he waited until the last minute to make a quick turn

22  left to lose some of the people behind him.  But he had so

23  much weight in the car, you can see it's a little bit weighted

24  down in the back, it was too heavy.  He slammed into a parked

25  car blocking the street.  He got out and started running down

Proceedings                                          395

1   the street.

2   Q    After he crashed and started running on foot, what you do

3   next?

4   A    Myself and Special Agent Ryan parallelled that street,

5   came on the back end of the street in the other direction, and

6   we immediately were able to apprehend him and arrest him.

7   Q    What happened after you arrested him?

8   A    After we arrested him we, the vehicle was secured,

9   inventory search of it.  In the trunk we uncovered

10  420 kilograms of cocaine.

11  Q    After you found the cocaine in the car, what happened

12  next?

13  A    At that point we transported Mr. Cava back to our field

14  division for processing.  We secured the drugs, brought them

15  back to the field division to be inputted in our NERL, which

16  is our laboratory, following DEA policy and procedure.

17       Then the other half of the team, those that didn't

18  go back with Mr. Cava and the drugs, continued surveillance

19  back at that residence.  We were anticipating the potentially

20  three individuals in that red Explorer to return home.

21  Q    Focusing back on the warehouse at 51-18 Grand Avenue, did

22  you take any investigative steps with respect to that

23  warehouse?

24  A    During the process of us bringing the drugs back and the

25  half of the team going out on that location, there were people

Proceedings                                    396

1  sitting at that warehouse since the beginning of when these

2  activities were taking place.  In addition, we applied for a

3  New York state search warrant to search that warehouse once we

4  found the drugs in that vehicle.

5  Q    Did you get a search warrant?

6  A    We did.

7  Q    What happened after you got the search warrant?

8  A    We conducted a search later that evening.  And we

9  discovered a tremendous amount of cocaine in that warehouse.

10 Q    I'd like to stop for a second and show what you is

11 premarked for identification as Government Exhibit 204-23,

12 204-22.

13          This is 204-23, what do we see here?

14 A    I believe this is a map of the general area where this

15 took place, the activities that I just mentioned.

16 Q    Do you see the warehouse on this map?

17 A    I'm trying to see here.  It's kind of blurry actually.

18 If you point me to the right direction.

19 Q    If can you see it, you can; if you can't, it's okay.

20 A    It's kind of blurry, to be honest.

21 Q    Can we go to 204-22?  Do you recognize this?

22 A    Also map of the general area as well.  I believe at this

23 point is what I mentioned before where the incident happened.

24 Q    Which part of the incident?

25 A    Where we found the 420 kilograms of cocaine right at 51

Rivka Teich, CSR, RPR, RMR, FCRR, Official Court Reporter

Proceedings                                          397

1   74 Street, I believe -- sorry, that's the railroad crossings.

2   It's very blurry on this one.

3   Q    That's okay.  We can move on if you're having trouble

4   seeing it.

5           Let's pull up for identification 204-21.  Can you

6   see this okay?

7   A    Yes.

8   Q    What is this?

9   A    I believe this is the intersection we mentioned with the

10  car, I believe.  I can't see the street signs.

11  Q    Were you able to review this photo before today?

12  A    No, sir.

13  Q    Does it look like the intersection where the crash

14  occurred?

15  A    Yes.  I'm just looking here, it's one-way, the way it's

16  positioned.  He tried to make the quick left, where the blue

17  Volkswagen is, he would have hit that car at that point, and

18  there was a car further up, no one could get through.

19  Q    Based on reviewing this image, is this a fair and

20  accurate depiction of where the car crashed?

21  A    Yes.  It was a fork, as I mentioned.

22          MR. PILMAR:  Your Honor, I asked to move 204-21 into

23  evidence.

24          MS. GOTLIB:  No objection.

25          THE COURT:  Received.

Proceedings                                              398

1            (Government Exhibit 204-21, was received in

2    evidence.)

3    Q    Put your finger on the photo, can you show us where the

4    car went and then crashed?

5    A    I'm trying to think where 76th is.  If you're coming down

6    76th he could have kept on going this way, but at the last

7    minute he went and turned like this and hit a parked car.

8    Q    Where did he take off after hitting?

9    A    Down this street.

10   Q    What borough is this in?

11   A    Queens.

12   Q    I'd like to show you what is premarked for identification

13   204-17.  Can you see that okay?

14   A    Yes.

15   Q    If you're having trouble seeing, I can also bring a

16   laptop with the screen closer.

17   A    I think I'm good now.  It's just the map is so big you

18   lose the focus of it.

19   Q    We can come back and zoom in if you want.

20   A    I can see this fine.

21   Q    What do you see here?

22   A    This is a back side of the warehouse that I mentioned

23   earlier on 51-18 Grand Avenue.  It's a railroad spur coming

24   into the back of that warehouse.

25   Q    Is that a fair and accurate depiction how the warehouse

Proceedings                                              399

1    looked the day of the search?

2    A    Yes.

3              MR. PILMAR:  I ask to move 204-17 into evidence.

4              MS. GOTLIB:  No objection.

5              THE COURT:  Received.

6              (Government Exhibit 204-17, was received in

7    evidence.)

8    Q    Can you point out to the jury what you see in this photo?

9    A    For me, what I see, is this is the main piece of the

10   warehouse, this is a back piece of the warehouse.  Here is a

11   railroad spur.  So basically the car can come up the main

12   railroad line, it can switch onto the spur and they can wheel

13   this right in, the tarp that you see here, cover it and you

14   can work on a clandestine putting stuff in and out, doing

15   whatever you want and not being seen by anybody from above or

16   from the side or from anywhere else for that matter.

17   Q    What is this circular object in the middle of the screen

18   on the train tracks?

19   A    This right here?

20   Q    Yes, sir.

21   A    That is a train car but that particular train car is used

22   for liquids.

23   Q    Did you see the car on a day you did the search?

24   A    Yes, I did.

25   Q    Can you go into more detail into what you saw in the

Proceedings                                    400

1   warehouse when you searched it?

2   A    We searched it that same day, as I mentioned.  As you

3   came in, there were some vehicles in there.  One in particular

4   was a red minivan that had an open sliding door with drugs in

5   it.  And then as we walked around, there was a lot of tarps.

6   There was a tarp there, we pulled back a tarp, we saw a

7   tremendous amount of bricks of cocaine.

8             In addition, there was very large, 40-gallon or so,

9   garbage bins or barrels, if you will, filled with oil,

10  tremendous amount of them.

11            Then big pieces of metal, looked like cut out from

12  inside of something, all in various sizes and shapes, quite

13  dirtied and heavy.

14            Like I mentioned, the big find was over

15  1,580 kilograms inside that warehouse.

16  Q    I'd like to show what you is premarked for identification

17  as Government Exhibit 204-2, 204-4, 204-5, and 204-8.  Take

18  them one at a time, let me know when you've had a chance to

19  look at them?

20  A    I have.

21  Q    Can you see that okay?

22  A    Yes.

23  Q    204-4?

24  A    Yes.

25  Q    Do you see that okay?

Proceedings                                           401

1   A     Yes.

2   Q     204-5?

3   A     Yes.

4   Q     204-8?

5   A     Yes.

6   Q     What are these photos?

7   A     What I just mentioned, the drugs that was inside the

8   warehouse in different locations.  The two shots you saw were

9   the drugs that I saw in a car that was already parked inside

10  the warehouse.  Then the ones on the floor had tarps over

11  them, this is when the tarps were pulled off.

12  Q     Are these a fair and accurate depiction of how everything

13  looked the day you were doing the search warrant?

14  A     Minus the tarp being pulled off, yes.

15           MR. PILMAR:  I ask to move to 204-2, 204-4, 204-5,

16  204-8 into evidence.

17           MS. GOTLIB:  No objection.

18           THE COURT:  Received.

19           (Government Exhibit 204-2, 204-4, 204-5, 204-8, were

20  received in evidence.)

21  BY MR. PILMAR:

22  Q     Let's start with 204-2, what are we looking here?

23  A     As an investigator, that's one of the reasons you do

24  these investigations, to find what you're looking for.  That's

25  exactly, at that point, is a tremendous amount of bricks of

Proceedings                                402

1   cocaine that were hidden under the tarp; not hidden, but

2   covered by a tarp.

3   Q    Let's go to 204-4, what is this?

4   A    The same thing, bricks of cocaine.

5   Q    Was this in the warehouse or somewhere else?

6   A    In the warehouse.

7   Q    204-5, what are we looking at here?

8   A    Smaller amount of bricks of cocaine in the rear of a

9   minivan.

10  Q    204-8?

11  A    Also a minivan, on the side part of the minivan, with

12  bricks of cocaine in there as well.

13  Q    I'd like to show you what is premarked for identification

14  as Government Exhibit 204-15.  Do you recognize this?

15  A    Yes.

16  Q    What is this?

17  A    That's what I was mentioning earlier, the pieces of all

18  different sizes and shapes of metal that appeared to be pulled

19  off of inside the oil tank.  So there is just metal shards all

20  over the place.

21  Q    Is this how it looked that day?

22  A    Yes.

23            MR. PILMAR:  I ask to move 204-15 into evidence.

24            MS. GOTLIB:  No objection.

25            THE COURT:  Received.

Proceedings                                                    403

1              (Government Exhibit 204-15, was received in

2      evidence.)

3      Q    Can you repeat to the jury what we're looking at here?

4      A    As I mentioned earlier on, different size, shapes, of

5      metal pieces of metal that appear to have been cut out of the

6      interior part of the oil tanker, that railroad car.

7      Q    I'd like to show you what is marked for identification as

8      Government Exhibit 204-14.  Do you recognize this photo?

9      A    Yes.  Also what I mentioned earlier, the large garbage

10     pails or barrels filled with oil so I bean oil.

11     Q    Was this in the warehouse as well?

12     A    Just like that, yes.

13             MR. PILMAR:  Your Honor, I ask to move Government

14     Exhibit 204-14 into evidence.

15             MS. GOTLIB:  No objection.

16             THE COURT:  Received.

17             (Government Exhibit 204-14, was received in

18     evidence.)

19     Q    Now that the jury can see it, about how many of these

20     barrels did you find that day?

21     A    There was a tremendous, tremendous amount.  Over 20 at

22     least, I can't give an exact number, but a tremendous amount,

23     that's a lot of liquid.

24     Q    Were they all filled to the brim like we can see here?

25     A    Yes.

1           MR. PILMAR:  One moment, your Honor.

2           THE COURT:  Yes.

3    BY MR. PILMAR:

4    Q    I think you said this, how much cocaine was seized in the

5    warehouse that day?

6    A    Total amount 1,580 kilograms of cocaine, including in the

7    car and what was on the floor.

8    Q    How much was seized from the car during the traffic stop

9    where the car crashed?

10   A    420 kilograms of cocaine.

11   Q    I'd like to show what you is premarked for identification

12   as Government Exhibit 204-13.  Do you see that photo in front

13   of you?

14   A    I do.

15   Q    What is this?

16   A    That's a picture of all the kilos that were seized during

17   the enforcement actions on that day.  And they are laid out in

18   the training room of the Drug Enforcement Administration's New

19   York field division office.

20           (Continued on next page.)

21

22

23

24

25

1    DIRECT EXAMINATION

2    BY MR. PILMAR:  (Continuing)

3             MS. PILMAR:  Your Honor, I ask to move Government

4    Exhibit 204-13 into evidence.

5             MS. GOTLIB:  No objection.

6             THE COURT:  Received.

7             (Government Exhibit 204-13 received in evidence.)

8    Q    Was this cocaine submitted for analysis from the Drug

9    Enforcement Administration's laboratory?

10   A    It was.

11   Q    After this cocaine seizure, did you continue your

12   investigation?

13   A    Members of our group, they did continue this

14   investigation.

15   Q    How did this cocaine seizure on January 28, 2023 compare

16   to other seizures you have made in your career with the DEA?

17   A    At the time it was the most I've ever been part of.  It

18   was a record seizure for New York, frankly.  But having an

19   opportunity to serve in other places within DEA, I've had

20   opportunities to see more than that, but it was much later in

21   my career.  But for me that was a record I've ever done as a

22   domestic agent in the U.S.

23            MS. PILMAR:  May I have a moment, Your Honor?

24            THE COURT:  Yes.

25   Q    Sorry.  One final question.

Coleman - Direct - Pilmar                          406

1          Can you just remind us what borough the warehouse

2   was in?

3   A     In Queens.

4          MS. PILMAR:  No further questions, Your Honor.

5          THE COURT:  All right.  Any cross?

6          MS. GOTLIB:  No.  Thank you, Your Honor.

7          THE COURT:  You may step down.  Thank you.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Government's next witness.

10         MS. PILMAR:  I'd like to read another paragraph of

11  the stipulation from Government Exhibit 901, Your Honor, if

12  that's okay?

13         THE COURT:  Sure.

14         MS. PILMAR:  And we're going to be on paragraph 4

15  right now.

16         On January 28, 2023, DEA agents seized approximately

17  418 kilograms of cocaine from a minivan in Queens, New York,

18  and approximately 1534 kilograms of cocaine from a warehouse

19  in Queens, New York.  A sample of the substance seized was

20  delivered to the DEA Northeast Laboratory in substantially the

21  same condition as at the time that it was seized.

22         Government Exhibits 204-19 and 204-20 are lab

23  reports prepared Ramona Montreuil, a duly qualified chemist

24  employed by the DEA's Northeast Laboratory.  If called to

25  testify on this subject, Ms. Montreuil would testify that she

1   performed a chemical analysis of two samples of the substance

2   seized on January 28, 2023, and determined that they contained

3   cocaine hydrochloride, a Schedule II controlled substance.

4            Thank you, Your Honor.

5            The government calls Noel Moloney.

6            THE COURTROOM DEPUTY:  Raise your right hand.

7            (Witness sworn/affirmed.)

8            THE COURTROOM DEPUTY:  Please be seated.

9            State and spell your name for the court reporter.

10           THE WITNESS:  My name is Noel Moloney,

11  M-O-L-O-N-E-Y; First name, N-O-E-L.

12           (Continued on the next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1   **NOEL MOLONEY,** having been first duly sworn/affirmed, was

2   examined and testified as follows:

3   DIRECT EXAMINATION

4   BY MR. PILMAR:

5   Q    Good afternoon, sir.

6            I'm over here.  Sorry.

7   A    Oh, sorry.

8   Q    I know we're a long distance away.

9            Where are you employed?

10  A    U.S. Customs and Border Protection out of the port of

11  New York, sir.

12  Q    Is there an acronym for Customs and Border Protection

13  that you usually use?

14  A    Yes, sir.  CBP.

15  Q    How long have you been with CBP?

16  A    Nineteen years and four months, sir.

17  Q    What's your current position?

18  A    I'm a deputy chief in charge of the outbound enforcement

19  team.  Anything that's exporting out of the country, I'm

20  responsible for.

21  Q    What does that mean, you're responsible for what's being

22  exporting out of the country?

23  A    I manage a team that looks at vehicles, stolen vehicles

24  leaving the country, anything to do with foreign asset

25  controls, items like that, money, guns.

Moloney - Direct - Mr. Pilmar                409

1    Q    Does Customs and Border Protection also deal with

2    incoming items?

3    A    Yes, sir.

4    Q    And what does CBP do with respect to incoming items in

5    the United States?

6    A    We look for contraband, same thing, guns, drugs, illegal

7    people coming into the country.  We look for unlicensed items,

8    stuff that may be covered by the -- that may be broken down,

9    UL-listed items and things like -- to make sure they comply

10   with licensing for the United States.

11   Q    Where do you look for these things?

12   A    Anything, it could be in railcars, it could be in

13   containers, it could be cars, it could be on a person flying

14   into the country.

15   Q    In the course of working with CBP, have you become

16   familiar with VACIS, which is V-A-C-I-S?

17   A    Yes, sir.

18   Q    What does that system do?

19   A    It's like an x-ray system.  It's the vehicle and cargo

20   inspection system that's used at all ports of entry for any

21   type of cargo coming in, whether it's cars, trucks, containers

22   that might be coming off an airplane or sea containers.

23   Q    So when the system takes a photo, where is the cargo at

24   the time the photo is taken?

25   A    The cargo is -- right wherever the machine is placed,

Moloney - Direct - Mr. Pilmar                     410

1   that cargo is coming into that machine area.  And at that

2   point, it's taking a picture of it.

3   Q    So is that usually at the border or somewhere in the

4   middle of the United States?

5   A    That could be at any -- what they call a functional port

6   of entry, which could be an airport, could be a seaport or

7   could be the actual land border itself, whether it's the

8   northern or the southern side of the United States.

9   Q    Where are those images stored?

10  A    The VACIS images are stored on a CBP database at the port

11  of entry.

12  Q    Have you been trained with this VACIS system?

13  A    Yes, sir.

14  Q    How were you trained in this system?

15  A    I was brought into training back in the early 2000s.

16  It's a structured training for a few days.  And then you go

17  out in the field with a trained officer to make sure that you

18  know what you're doing.  And then eventually you become one of

19  the officers that does the training.

20  Q    Have you ever worked on the border yourself?

21  A    Yes, sir.

22  Q    Approximately what year did CBP begin using this VACIS

23  system?

24  A    About 1997 the system was introduced as a force

25  multiplier for CBP.

1  Q    What does that mean, "force multiplier"?

2  A    It was another tool.  We have a labor enforcement

3  structure, so that labor enforcement structure looks at

4  different -- different ways of facilitating cargo not to hold

5  people up or hold items coming in for commerce.  So the VACIS

6  system allowed us to take a look at an object and kind of

7  figure out what's inside of that based on the manifest.

8         And then, for instance, if you have a car coming in

9  a container and you take a picture, an x-ray of it, and it

10 looks like a car, chances are it's a car, you let that go

11 through.  If it doesn't look like a car, then you would be

12 sending that for an inspection.  Officers would physically go

13 in and inspect it.

14 Q    So is it fair to say these photos are taken to aid border

15 agents to find items that are not supposed to come into the

16 United States?

17 A    Correct.

18 Q    I'm showing you what's been premarked for identification

19 as Government Exhibits 209-1, 209-2 and 209-2 through -- and

20 through 6.

21        MR. PILMAR:  Sorry.  I'll be clearer for the record.

22 I apologize, Your Honor.

23        209-1, 209-2, 209-3, 209-4, 209-5 and 209-6.

24 Q    Each time you've looked at an image, if you could just

25 let us know that you've seen it, and then we'll move on to the

1    next one.

2    A    Okay, sir.

3            So I'm currently looking at -- okay.

4    Q    Without telling us each one, let's just look at all of

5    them first.

6    A    Okay.

7    Q    Sorry, just to be efficient.  Just tell us when you've

8    gotten a chance to look at it.

9    A    Okay.

10   Q    209-3.

11   A    Okay, sir.

12   Q    And 209-4, 209-5, and 209-6.

13           Generally, what are these images we're looking at?

14   A    These are railcars that normally -- they call them tanker

15   cars.  They hold everything from a liquid to a gas.  It could

16   be liquid propane, could be oil.

17   Q    And where did these -- this whole screen is taken from?

18   A    I'm sorry?

19   Q    Are these images from that VACIS system we were

20   discussing?

21   A    Yes.  This is -- this is normally what the officer

22   would -- would print up after looking at the -- at the

23   tankers.  If there's anything of interest, he's going to bring

24   this up.  And this is what -- this is the product that that

25   machine would deliver.

Moloney - Direct - Mr. Pilmar                    413

1    Q    Are these images stored in the ordinary course of CBP's

2    activities?

3    A    Yes, sir.

4    Q    Are VACIS inspections a regular practice of CBP?

5    A    Yes, sir.

6    Q    Did you have a chance to review these images prior to

7    your testimony today?

8    A    Yes.

9         MS. PILMAR:  Your Honor, I would ask to admit

10   Government Exhibit 209-1, Government Exhibit 209-2, 209-3,

11   209-4, 209-5 and 209-6 into evidence.

12        MS. GOTLIB:  No objection.

13        THE COURT:  Received.

14        (Government Exhibits 209-1, 209-2, 209-3, 209-4,

15   209-5, 209-6 received in evidence.)

16        MS. PILMAR:  Thank you.

17   Q    Can we start with Government Exhibit 201-6 for the

18   jury -- sorry, 209-6.  I apologize.

19        What are we looking at here?  Can you walk the jury

20   through this?

21   A    Sure.

22        What you're looking at is a tanker car.  Again, the

23   contents, depending as to the nomenclature of the tanker car,

24   can change.

25        So this particular car on the top left-hand corner

Moloney - Direct - Mr. Pilmar                    414

1  there, you'll see it's got the GATX.  That's the cart you're

2  about to see.  The -- just underneath that you're going to

3  have a date and a time that the image was -- was collected.

4           The next window down, which would be the middle

5  window that you see, that one there is just one particular

6  view of that car.  And then the lower window you can see is

7  just changed a little bit different.

8           So the reason it changes is, that the officer has a

9  few tools at their convenience.  It's basically changing

10 either the color or changing the palate.  It could be what

11 they call a back scatter, just giving you a different version

12 of what that -- that x-ray picture is.

13 Q    And now that we can see the picture, can you explain to

14 the jury what the point of these two middle and bottom images

15 are?  Why have them at all?  How do they help?

16 A    Okay.  So the first image that you're going to see is a

17 standard image.  So the officer is probably looking at

18 anywhere from a few to a couple hundred of these per day, per

19 shift.  So he's going to become familiar with the way that

20 these things look, what the norm would be for these -- for

21 these items.

22           So he's making sure that this particular cart that's

23 coming through, it doesn't have any anomalies that pop out,

24 any dark areas.  Darker areas would mean, in this case, that

25 they're more dense.  And if something looks out of the norm

1   from a regular cart, that would be an area of interest that

2   the officer then would send to a secondary area where

3   different officers would actually go in and do the physical

4   inspection.  So --

5   Q    One of the -- sorry.  I didn't mean to interrupt.  Go

6   ahead.

7   A    So the first picture you're seeing is exactly what would

8   come up on the image.  That's the middle picture.

9          And the lower picture, the officer has just changed

10  the palate or the way that that's being delivered to him.  I

11  shouldn't say delivered, but it's -- basically it's the same

12  image; it's just the way he's looking at it to see if there's

13  anything additional in there.

14  Q    Do you see -- withdrawn.

15         Based on your training and experience, do you see

16  any anomalies in this photograph?

17  A    No.  If I was looking at this, I would send it -- send it

18  on its way.  There's nothing in here that's of interest to me.

19         MR. PILMAR:  Can we go now to 209-1.

20  Q    What are we looking at here?

21  A    Again, you're looking at a tanker car similar to the one

22  that was previous.  This one only has one picture in it.  In

23  this particular cart here, looking at it, the two end caps

24  that are on that are very, very shaded, very, very dark.  This

25  is not normal for that type of cart.  So something has to be

1   in there.

2            The officer would then select this for a secondary

3   examination.  And that would go down, further down the line,

4   the officers would actually go in to take a look at this

5   further.

6   Q    What's the number of this car?  Like, does this car have

7   a unique identification in any way?

8   A    Yes.  It's a GATX.  If you look at the top corner

9   picture, that's it coming through the -- the window area.  On

10  this one it's GATX 124006.  If you look under where it says

11  "law enforcement sensitive," you'll see a smaller picture and

12  then the car number, 29/GATX 124006, with a check digit zero

13  to identify that that's the cart.  And he will send that

14  information further down the line to have the officers down

15  there be able to identify that and look into what he sees as

16  being abnormal.

17  Q    Can you, using your finger on the screen, draw where you

18  see the abnormalities on this picture?

19  A    Sure.

20           So I'm going to go on the right side first.  This

21  particular shaded area here, I'm going to go to the left.

22  This particular shaded area here.  That is not something that

23  you would normally see on this, this type of conveyance.

24           MR. PILMAR:  And so for the record, the witness has

25  circled the two dark areas of the image on the middle of the

1    screen and the left of the screen.

2    Q    If you don't normally see something like this, what could

3    that indicate to you, based on your training and experience?

4    A    Based on training, when you're going through the training

5    and you see something like this, it's much more dense.  That's

6    the way that the system is set up.  It picks out objects that

7    are very dense.  If it's very, very dense, then obviously it

8    has to be something in there that's creating that density.

9    And again, our job is to make sure nothing comes over the

10   border that's not supposed to be.

11          So in this case here, you'd send in for a secondary

12   inspection, and they would have to further investigate as to

13   what that is, either release it down because of something

14   that's either built into it or something that's inside that's

15   been embedded, built into the -- into the container.

16          MR. PILMAR:  Can we look at just one more of those

17   images, 209-2.

18   Q    What are we looking at here?

19   A    You're looking at a difference of -- it's another railcar

20   that's coming through.  This one here also has shaded areas on

21   it.  Same thing, I'd end up sending this one in to be -- to be

22   looked at as well.

23   Q    Looking at the image, do you know what the specific type

24   of anomaly is in this photograph?

25   A    No.  All I know is that the -- the two ends, as the

1  previous slide we had, are much darker than what would be the

2  norm.  At that point, then I'd have this sent in to be looked

3  at a little further.

4  Q    Do you know if any of these train cars were sent for

5  secondary inspection?

6  A    No, I don't.

7            MS. PILMAR:  May I have a moment, Your Honor?

8            THE COURT:  Yes.

9            MS. PILMAR:  No further questions, Your Honor.

10            THE COURT:  Any cross?

11            MS. GOTLIB:  No, thank you, Your Honor.

12            THE COURT:  You may step down.

13            THE WITNESS:  Thank you, folks.  Appreciate it.

14            (Witness excused.)

15            THE COURT:  Mr. Pilmar, a stipulation or a witness?

16            MS. PILMAR:  Witness, please, Your Honor.

17            THE COURT:  Okay.

18            MS. PILMAR:  The government calls Steven DeMayo.

19            THE COURTROOM DEPUTY:  Raise your right hand.

20            (Witness sworn/affirmed.)

21            THE COURTROOM DEPUTY:  Please be seated and state

22  and spell your name for the court reporter.

23            THE WITNESS:  Good afternoon.

24            My name is Steven, spelled with a V; DeMayo, D-e,

25  capital M-A-Y-O.

1    **STEVEN DeMAYO,** having been first duly sworn/affirmed, was

2    examined and testified as follows:

3    DIRECT EXAMINATION

4    BY MR. PILMAR:

5    Q    Good afternoon, sir.

6    A    Good afternoon.

7    Q    I'm over here.  Sorry.  Mr. DeMayo, I'm over here.

8         By whom are you employed?

9    A    I'm employed by the Port Authority of New York and

10   New Jersey, Office of Inspector General.

11   Q    How long have you been with the Port Authority?

12   A    About three years.

13   Q    What are your present duties and responsibilities with

14   the Port Authority?

15   A    I am a project manager for the fraud prevention division.

16   My duties include monitoring the major capital construction

17   projects, such as the ongoing renovation of JFK Airport, the

18   terminals, to prevent and detect fraud waste and abuse within

19   those capital construction projects.

20   Q    Where did you work before Port Authority?

21   A    I was employed with the United States Postal Service,

22   Office of Inspector General as a special agent.

23   Q    And anything else?

24   A    And prior to that time, from 1995 to 2006, I was a

25   special agent with the United States Customs Service, which

DeMayo - Direct - Mr. Pilmar                          420

1   following the September 11th attacks became known as

2   Immigration Customs Enforcement or ICE.

3   Q     What were your duties and responsibilities with Customs

4   and ICE?

5   A     I was a criminal investigator, and I worked in the

6   narcotics smuggling and money laundering divisions.

7   Q     And in total, how long have you been in law enforcement?

8   A     Approximately 28 years.

9   Q     Are you familiar with someone named

10  Tirso Martinez-Sanchez?

11  A     Yes, I am.

12  Q     How so?

13  A     He was the subject of a long-term narcotics smuggling and

14  trafficking investigation to which I was a case agent.

15  Q     What years were you investigating Martinez-Sanchez?

16  A     Approximately 2000 through 2006.

17  Q     And what were you -- can you give us a little more

18  detail.  What were you investigating him for?

19  A     For the importation and distribution of large amounts of

20  cocaine.

21  Q     Through any particular method or means?

22  A     Using tractor-trailers and railroad tanker cars.

23  Q     I'd like to show you what's been premarked for

24  identification as Government Exhibit 8.

25          Do you see anything on your screen?

1    A    Yes.

2    Q    Do you recognize this person?

3    A    Yes.

4    Q    Who is that?

5    A    Tirso Martinez-Sanchez.

6              MR. PILMAR:  I ask to move Government Exhibit 8 in

7    evidence.

8              MS. GOTLIB:  No objection.

9              THE COURT:  Received.

10             (Government Exhibit 8 received in evidence.)

11   Q    And I'd like to show you a photo which is in evidence,

12   Government Exhibit 42.

13             Who is this?

14   A    This is a picture of Jose Gudino-Silva.

15   Q    How are you familiar with this person?

16   A    He was also the subject of the investigation which I

17   referenced.  He was a licensed real estate broker who was

18   employed by the trafficking organization.

19   Q    Did you learn if he had any aliases?

20   A    Yes.

21   Q    What's that?

22   A    Manuel Silva and Joseph Silva, as well as El Notario.

23   Q    I'd like to discuss how the investigation started.

24             Directing your attention to December 14th, 2000,

25   were you working as an agent that day?

DeMayo - Direct - Mr. Pilmar                                422

1    A    Yes, I was.

2    Q    And what happened?

3    A    I had -- as part of an ongoing investigation, I had

4    applied for and received a federal search warrant to search a

5    premises, 12 Glasgow Avenue in Deer Park, which is in Suffolk

6    County, New York.

7    Q    And what was recovered that day?

8    A    Pursuant to the warrant, 500 kilograms or 1200 pounds of

9    cocaine, as well as various documents, cell phones and some

10   vehicles.

11   Q    How many pounds is in a kilogram?

12   A    2.2.

13   Q    So after the cocaine was seized, what investigative steps

14   did you and your other agents take next?

15   A    We analyzed different documents that were seized pursuant

16   to the warrant.  We also analyzed cell phones and subsequently

17   issued subpoenas to get phone records for those cell phones.

18   We analyzed those phone records.  We also debriefed subjects

19   that were arrested that day.

20   Q    Where did the investigation lead you next?

21   A    The investigation led us to a warehouse located in

22   New Jersey, which had been rented for the purposes of storing

23   the cocaine that was seized.  However, the tractor-trailer

24   would not fit in that warehouse, so the cocaine was ultimately

25   brought out to the house in Suffolk County.

DeMayo - Direct - Mr. Pilmar                    423

1  Q    Did you obtain any documents after identifying this
2  warehouse in New Jersey?
3  A    We did.  We determined that the warehouse had been leased
4  to an organization known as Sunshine State Enterprises.
5  Q    And do you recall the name of the person it was leased
6  to?
7  A    Joseph Silva.
8  Q    So what's the point of doing these steps of gathering
9  documents and looking at phone records?  What's the point of
10 all of this?
11 A    The objective is to further expand the investigation.
12 Given the nature and the amount of cocaine that was seized, we
13 wanted to expand the investigation, identify additional
14 coconspirators, make additional seizures, things of that
15 nature.
16 Q    So after you searched the location in Long Island and
17 identified the warehouse in New Jersey, what did you do next?
18 A    After we searched?  So after we obtained the lease
19 information for the warehouse in New Jersey, within those
20 lease documents were various phone numbers that were contact
21 numbers for the individuals that rented the warehouse.  We
22 subpoenaed phone records for those cell phone numbers that
23 were in those files, and then we analyzed the calls that were
24 made to and from those cell phones.
25 Q    Did your investigation lead you to any other locations in

1    New Jersey?

2    A    It did.  The phone records identified a real estate

3    company that had been contacted.  When we interviewed the real

4    estate company, they provided us with various files related to

5    the lease of additional warehouses.

6    Q    I'd like to show you what's been premarked for

7    identification as Government Exhibit 209-28.

8            Do you recognize this?

9    A    Yes.

10   Q    What is this?

11   A    So this is one of the warehouses that there was a folder

12   for from the real estate agency.  Upon --

13   Q    Did you go -- sorry.  I didn't mean to interrupt.  I

14   apologize.

15   A    Yes.  Upon identifying the warehouse through the records,

16   we went to -- physically went to the warehouse location and

17   observed it, at which time not only did we see the warehouse,

18   but located on the backside of the warehouse we observed two

19   railroad tanker cars that were parked on what's called a

20   railroad spur or a short little track that leads right next up

21   to the warehouse and --

22           MR. PILMAR:  Your Honor --

23   Q    I'm sorry.  I apologize.  I thought you had stopped.

24   A    Okay.

25           MS. PILMAR:  Your Honor, I'd like to move to

1    introduce Government Exhibit 209-28 into evidence.

2              MS. GOTLIB:  No objection.

3              THE COURT:  Received.

4              (Government Exhibit 209-28 received in evidence.)

5    Q    Sorry.  What are we looking at here?

6    A    So this is a photo I took of the front of the warehouse.

7    It's 7 Turner Place in Piscataway, New Jersey.

8              MS. PILMAR:  I'd like to just show for the witness

9    what's been premarked for identification as 209-29.

10   Q    What's this?

11   A    So this is the two railroad tanker cars, which I had

12   mentioned, parked on the small railroad track that leads up to

13   the side of the warehouse.

14   Q    Did you or one of the agents take this photo that day?

15   A    This was taken on the day of the search warrant, correct.

16             MS. PILMAR:  Your Honor, I ask to introduce

17   Government Exhibit 209-29 into evidence.

18             MS. GOTLIB:  No objection.

19             THE COURT:  Received.

20             (Government Exhibit 209-29 received in evidence.)

21   Q    Can you tell the jury what we're looking at here?

22   A    So obviously there's two separate tanker cars, the one

23   pictured most predominately is bearing equipment number or

24   Tanker Car No. GATX 124140.  You can see that there is some --

25   some tarps hanging over the top, as well as some scaffolding

1   surrounding the cars.

2   Q    What are these train cars sitting on?

3   A    It's a -- like a side track or a railroad spur.  It's

4   just a short piece of track that connects off of a larger

5   train line.  It allows for cars to be loaded and unloaded.

6   Q    You mentioned the GATX in the middle, and there appears

7   to be some numbers next to it.  What is that?  Why is that on

8   a train tanker car?

9   A    It's essentially like a license plate on a car; however,

10  it's not removable.  It's a permanent equipment number that's

11  affixed or assigned to that -- that particular train car.

12  Q    Did you find any drugs when you searched the location

13  this day?

14  A    No, we did not.

15  Q    After the search, what investigative steps did you take?

16  A    So we ended up linking cases up with the Drug Enforcement

17  Administration.  We came to learn that they had an

18  investigation that was somewhat paralleling the one that we

19  had and we kind of joined forces to move forward in the

20  investigation.

21  Q    I'd like to direct your attention to January 10, 2003.

22       Did anything significant happen that day?

23  A    Yes.

24  Q    What happened?

25  A    DEA, who I was now working alongside with, had received

1    information that there was a railroad tanker car that had

2    recently come into the United States from the republic of

3    Mexico.  DEA had applied for a search warrant to search that

4    tanker car.  And on January 10, 2003, myself and other law

5    enforcement, including DEA, conducted a search of the tanker

6    car.

7              MS. PILMAR:  Your Honor, can I show the jury what's

8    already in evidence as Government Exhibit 209-32.

9    Q    Do you recognize this?

10   A    Yes.  This is a photo of the tanker car we searched that

11   day, GATX 124006.

12   Q    Where were you when you searched this tanker car?

13   A    This is in a -- like a shed located in Long Island City,

14   Queens, New York.

15   Q    Who are these individuals on the right sort of bottom of

16   the screen?

17   A    It's fellow law enforcement agents and officers.

18   Q    How many agents searched the tanker this day?

19   A    I would guess it was probably between 12 and 18 officers

20   present.

21   Q    How did you search?

22   A    We used a few methods.  First of all, just based upon the

23   structure of the tanker car, there are natural cavities or

24   spots within a tanker car that could be used to hide

25   something.  So we looked into any of those areas.

1           In addition, we, from the top of the train car,

2     opened up the top hatch, and we dredged with a -- sort of a

3     long rake, a very thick, oily yellow substance that was lining

4     the bottom of the tanker car.  We dredged it because we were

5     wondering whether or not there was anything secreted, such as

6     kilograms of cocaine that could've been underneath the oil or

7     the -- the residue.

8     Q     What was that substance like, that thick substance?

9     A     Just very think and slippery, rather pungent, and it was

10    a yellow kind of a viscous, thick material.

11    Q     Did any of the agents actually go inside the car?

12    A     No.

13    Q     Why not?

14    A     Based upon -- it's basically considered a confined space.

15    It would be hazardous to enter that area without, like, a

16    self-contained breathing apparatus, similar to like a Scott

17    pack or what a fireman might have due to, you know, possible

18    stuff in there that could be dangerous to your health.

19    Q     Was there anything else done to search the outside of the

20    car?

21    A     So I had also with me some of the U.S. Customs inspectors

22    who are -- they're routinely tasked with searching containers

23    and cars like that for contraband.  And one of the inspectors

24    said he used a laser-operated measuring device.  Basically he

25    stuck it down into the top hatch to measure the interior

1    dimensions of the railroad car.

2              Prior to the search warrant, we had obtained from

3    the manufacturer of the railroad car what the dimensions were.

4    So we knew the height, the weight and, you know, the different

5    measurements.  Using that laser measurement, it was related to

6    me that there was a -- what was described as a small

7    discrepancy on the interior dimensions of the railroad car.

8    Q    And was any further search done based on this small

9    discrepancy?

10   A    Other than a swipe to check for the residue of drugs, no.

11   Q    So what were you looking for that day?

12   A    We were looking for contraband.  We assumed it would be

13   cocaine, but contraband or any other illegal substance.

14   Q    Did you find any drugs?

15   A    No.

16   Q    What happened to this car?

17   A    So the car was thereafter released from law enforcement

18   custody.  It was returned to the railroad for ultimate

19   delivery to its intended destination, which was a warehouse in

20   Queens, New York.

21   Q    Did you later see this exact same car somewhere else?

22   A    I did.

23   Q    Where was that?

24   A    I found this car located on a railroad spur, which again

25   is a small little track, next to a warehouse in Queens,

DeMayo - Direct - Mr. Pilmar                    430

1   located at 51-18 Grand Avenue in Maspeth, Queens, New York.

2   Q    Do you recall the date you saw it again?

3   A    It was January 29th of 2003.

4   Q    What prompted you to go to this location on

5   January 29th, 2003?

6   A    I had been notified by my DEA counterparts that they had

7   executed a search warrant at that warehouse the day before,

8   which resulted in the seizure of approximately 2,000 kilograms

9   of cocaine, as well as a lot of other evidence.

10  Q    And what happened when you got to that location?

11  A    So getting to the location, the first thing -- one of the

12  first things I observed was obviously the same train car,

13  which we had searched, you know, a few weeks earlier.  I

14  believe there was one or two additional train cars also on the

15  railroad siding.  And then we also observed lots of physical

16  evidence that were inside the warehouse.

17  Q    I'd like to show you what's been premarked for

18  identification as Government Exhibit 204-23.

19       Do you recognize this?

20  A    Yes.

21  Q    What is this?

22  A    This is a overhead map, a Google map, of the -- the

23  Maspeth vicinity where the warehouse was located.

24  Q    The warehouse you saw that day in January?

25  A    Correct.

1   Q    Does this appear to be a true and accurate depiction of

2   the area in Maspeth, Queens where you were?

3   A    Yes, it does.

4         MS. PILMAR:  Your Honor, I ask to move Government

5   Exhibit 204-23 into evidence.

6         MS. GOTLIB:  No objection.

7         THE COURT:  Received.

8         (Government Exhibit 204-23 received in evidence.)

9   Q    Can you see on the map approximately where you went that

10  day on January 29, 2003?

11        If it helps we can blow up the center of the map to

12  make the main areas easier to see.

13  A    That would be helpful, just to focus in some more.

14        Yes.  Okay.

15  Q    Can you circle where you went that day?

16  A    So I believe that location where the warehouse was, there

17  were multiple sections of the address, but I believe the

18  location was approximately where that sort of banana-shaped

19  building was.

20  Q    Tell us a little bit more about the -- what you saw when

21  you got to the warehouse.

22  A    So within the warehouse there were numerous piles of,

23  like, discarded metal.  There were various, like, 55-gallon

24  drums filled with like a yellow oily substance that looked

25  identical to the substance I had seen at the search warrant I

DeMayo - Direct - Mr. Pilmar                    432

1    conducted in December of 2002 in New Jersey.

2            And I also noticed a very long, approximately

3    16-foot ribbed plastic tube, almost like a drainage pipe.  I

4    had seen the exact same type of tube at the warehouse in

5    New Jersey when I did my search warrant.

6            MS. PILMAR:  Can we show the witness what's already

7    been in evidence as Government Exhibit 204-17.

8    Q    Do you recognize this?

9    A    Yes.  So this photo is of one of the train cars that were

10   next to the warehouse at the Grand Avenue location.  You can

11   see it's pulled up next -- very close to the warehouse

12   location on that small side track.

13           MS. PILMAR:  I'd like to show the witness only

14   what's been premarked for identification as Government

15   Exhibit 209-24 and 209-25.

16   Q    Do you recognize that picture?

17   A    I do.

18   Q    And 209-25, do you recognize that picture?

19   A    I do.

20   Q    What did we just see?

21   A    So these are the -- some pictures I took of the interior

22   of the warehouse.

23           Do you want me to sort of point?

24   Q    First, did you take the pictures when the search occurred

25   that day?

1   A     No.  These were taken the following day.

2   Q     The following day.

3         But do they appear to be true and accurate

4   depictions of the pictures you took?

5   A     Oh, yes.

6         MS. PILMAR:  Your Honor, I'd ask to move Government

7   Exhibit 209-24 and 209-25 into evidence.

8         MS. GOTLIB:  No objection.

9         THE COURT:  Received.

10        (Government Exhibits 209-24, 209-25 received in

11  evidence.)

12  Q     So starting with 209-24, what do we see here?

13  A     So this is a photo I took.  This is one of the Customs

14  inspectors I had mentioned earlier.  He's holding up basically

15  two separate discarded pieces of metal.  I could draw and kind

16  of delineate them.

17  Q     Of course.

18  A     Okay.  So down here is what I call the stool.  It's

19  basically a piece of metal.  There's a large, round-shaped

20  disc on one end, a post in the middle and then a smaller disc

21  shape here.  That's one piece.

22        And then the second piece is this fan-shaped wedge,

23  as I describe it, which is also made up of metal and some

24  surface material, like a Bondo type of covering.

25  Q     What did you understand this to be that you were looking

DeMayo - Direct - Mr. Pilmar                                434

1    at?

2    A    This is various pieces that comprised what was a false

3    interior wall within the railroad tanker cars, basically

4    created a secret compartment using -- there would be

5    additional fan-shaped pieces that eventually would form a

6    circle.  I'm sorry for my crude drawing.

7    Q    No, it's all right.

8            MS. PILMAR:  Can we see what's now in evidence as

9    209-25?

10   Q    What is this?

11   A    So this is just a photo of various other pieces.  You can

12   see the fan-shaped pieces discarded.  Here is another

13   disc-shaped stool, various other fan pieces.  And over here,

14   it's a little dark, what I had described a long, rigid tube,

15   that's the tube right there.

16   Q    I'd like to show you what's already in evidence as

17   Government Exhibit 209-1.

18   A    Okay.  Thank you.

19   Q    Do you recognize this?

20   A    Yes.

21   Q    What is this?

22   A    This is a -- basically a printout of an x-ray.  At the

23   time the Customs service used something called a VACIS, which

24   is a vehicle and container inspection system.  And it's used

25   to x-ray various items, cars, vehicles, containers for

1    contraband.

2    Q    Can you read what car this is for, the identifier?

3    A    Yes.  So it's two locations, right here GATX 124006 and

4    ending in -- it's also noted right there.

5    Q    And how does this compare to the car that you had seen

6    twice in January?

7    A    So this is an image of that car that I saw twice.  This

8    image was taken December 30th of 2002.

9    Q    So based on reviewing this image and the two searches you

10   did in January, what did you determine with respect to your

11   search on January 10th, 2003?

12   A    So based upon the physical evidence, which was recovered

13   at the Grand Avenue location, as well as evidence from the

14   search in December of 2002 in New Jersey, plus the fact that

15   this x-ray image shows very dark, densely filled areas on the

16   end caps of this railroad car, I concluded that there was

17   cocaine in the tanker car during our search on

18   January 10, 2003, but we did not locate it.

19   Q    You mentioned earlier that you obtained records about

20   warehouses?

21   A    Yes.

22        MR. PILMAR:  Your Honor, with the consent of the

23   defense, I seek to introduce Government Exhibit 209-18,

24   209-19, 209-20, 209-21 and 209-22.

25        THE COURT:  Okay.  Those are received.

Proceedings                                                      436

1           (Government Exhibits 209-18, 209-19, 209-20, 209-21,

2    209-22 received in evidence.)

3           THE COURT:  Should we take our afternoon break or

4    you think you might wrap up in ten minutes?

5           MS. PILMAR:  Probably ten minutes, but this is a

6    fine point to take a break.  I don't want to --

7           THE COURT:  You do not want to inconvenience anyone?

8           MS. PILMAR:  Yes.

9           THE COURT:  Ladies and gentlemen, we will take a

10   15-minute break.  Please come back at 3:20.  Remember not to

11   talk about the case when you're all together or when you are

12   not all together.

13           (Jury exits.)

14           THE COURT:  Anything we need to talk about?

15           MR. DE CASTRO:  Maybe, Judge.  Can I just confer

16   with the government for one half a second.

17           THE COURT:  Sure.  Everyone sit down.  We are still

18   in session.

19           MS. KOMATIREDDY:  Can we get back to you at the end

20   of the break, Your Honor?  We just need to chat about it.

21           THE COURT:  Okay.  We are in recess.

22           (Recess taken.)

23           THE COURT:  Have a seat, please.

24           I understand you resolved whatever problem it was

25   that you thought you might need me for, but I got my own for

1    you.

2            I think my instruction to the jury, my ad hoc

3    instruction on sentencing was too broad.  You know, I was

4    seeking to not let the defendant have an unfair advantage by

5    distorting the role of sentencing, and I think I ended up

6    taking away something that the defendant may be entitled to.

7            So what I propose to do is, when the jury comes out,

8    I am going to say to them:  My instruction to you a few

9    minutes ago on sentencing was not precise.  To the extent you

10   find that a cooperating witness received or stands to receive

11   a benefit from giving testimony favorable to the government,

12   including a reduced sentence, you may consider such benefit in

13   evaluating the credibility of that cooperating witness.

14           That is right, right?

15           MS. KOMATIREDDY:  Yes, Your Honor, that's right.

16           MR. DE CASTRO:  Yes.

17           THE COURT:  Okay.  I will give that instruction.

18           Let's have the jury, please.

19           MS. PILMAR:  Your Honor, can the witness stay here

20   for this or would you like to --

21           THE COURT:  I think so.

22           MS. PILMAR:  Okay.

23           (Jury enters.)

24           THE COURT:  All right.  Everyone be seated.

25           Ladies and gentlemen, before we continue and finish

1   up the testimony of this witness today, I wanted to say to you

2   that I thought my instruction to you a few minutes ago about

3   sentencing was not as precise as it should have been.

4          To the extent you find that a cooperating witness

5   has received or stands to receive a benefit from giving

6   testimony favorable to the government, including a reduced

7   sentence, then you may consider such benefit in evaluating the

8   credibility of that cooperating witness.  That is when you go

9   in to deliberate after you have heard all of the evidence.

10          All right.  Let's continue.

11          MS. PILMAR:  Thank you, Your Honor.

12          Can we pull up what's in Government Exhibit 209-19.

13          Great.  Please zoom in on the first half of the

14   screen.  Thank you.

15   BY MR. PILMAR:

16   Q    Mr. DeMayo, can you read what the address is of this

17   document?

18   A    Yes.  It's 51-18 Grand Avenue, Maspeth, New York.

19   Q    And what is this document?

20   A    It's a lease document.

21   Q    And can you remind the jury what happened at 51-18 Grand

22   Avenue in Maspeth, New York?

23   A    That's the location where the tanker car was located and

24   the seizure of cocaine.

25   Q    I'm sorry, I don't think your microphone is on.

1          THE COURT:  Is the green light lit?

2          THE WITNESS:  No.

3          THE COURT:  Press it twice.

4          THE WITNESS:  Okay.  I'm sorry.

5   Q    Can you repeat that answer?

6          What is this document?

7   A    It's a lease document for 51-18 Grand Avenue in Maspeth,

8   New York.

9   Q    What happened at 51-18 Grand Avenue?

10  A    That's the location of the DEA search warrant where the

11  cocaine was seized, tanker car was located and pieces of trap

12  and et cetera that I testified to earlier.

13         MS. PILMAR:  And going to page 13, please.

14  Q    On the right, what company does it say is leasing this?

15  A    Four Queens Soybean Oil, Incorporated.

16  Q    Who is operated by?

17  A    Manuel Silva.

18

19              (Continued on the next page.)

20

21

22

23

24

25

DeMayo - Direct - Pilmar                    440

1              (Continued.)

2   BY MR. PILMAR:

3   Q    Do you see a signature on the right there?

4   A    Yes.

5   Q    And who is signing that?

6   A    Manuel Silva.

7   Q    For what company?

8   A    Four Queens Soybean Oil Incorporated.

9   Q    Can you remind the jury who Manuel Silva is?

10  A    That's an alias of Jose Silva.  He's the real estate

11  agent that I mentioned earlier in the testimony.

12  Q    Who was he the real estate agent for, based on your

13  investigation?

14  A    Tirso Martinez Sanchez.

15            MR. PILMAR:  Ms. Donovan, can we show the witness

16  what's in evidence as government Exhibit 209-22?

17            (Exhibit published to the witness.)

18  Q    Focusing on the top half of the first page.  What is

19  this?

20  A    This is a lease agreement as well.

21  Q    Do you see where it says location in the middle?

22  A    Yes.

23  Q    What is the location?

24  A    It is 1277 Naperville Drive, unit, I think it's I or 1.

25  Romeoville, Illinois.

DeMayo - Direct - Pilmar                    441

1   Q    Can we go to page 13, please.  And on the right side of

2   the screen, who is signing this?

3   A    Manuel Prova.  Senior Vice President.

4           MR. PILMAR:  And Government Exhibit 209-21.

5           (Exhibit published to the witness.)

6   Q    What is this document?

7   A    It's a different lease agreement.

8   Q    What is the address on this?

9   A    It says 406 Third Avenue, Brooklyn, New York.

10  Q    Based on your investigation, did you learn what address

11  this was actually for?

12  A    Yes.

13  Q    What address is that?

14  A    400 Third Avenue, Brooklyn New York.

15  Q    Is there a warehouse located at 406-Third Avenue?

16  A    No.

17  Q    Did you also gather any records regarding the train

18  cars themselves?

19  A    Yes, I did.

20          MR. PILMAR:  Your Honor, with the consent of the

21  defendant, I would seek to move into evidence Government

22  Exhibit 209-9, 209-10A, 209-11, 209-12, 209-13, 209-14,

23  209-15, 209-16, and 209-17A.

24          THE COURT:  These are received.

25          (Government's Exhibits 209-9, 209-10A, 209-11,

1  209-12, 209-13, 209-14, 209-15, 209-16, and 209-17A received

2  in evidence.)

3  Q    Did you have a chance to receive those records prior to

4  testimony?

5  A    Yes.

6  Q    Did you make a chart summarizing these records?

7  A    Yes, I did.

8  Q    Did you include any other information in the chart as

9  well?

10 A    There's -- basically the chart is comprised of all

11 those records.  Plus there's a column that was added that

12 pertains to law enforcement activity involving any of the

13 train cars.

14       MR. PILMAR:  I'd like to show the witness for

15 identification Government Exhibit 209-35.

16       (Exhibit published to the witness.)

17 Q    Do you recognize this document?

18 A    Yes.  This is the chart.

19 Q    And is it a chart for all train cars involved in your

20 investigation or just train cars for a certain area?

21 A    This chart only pertains to train cars which came to

22 either New Jersey or New York.  Warehouses.

23       MR. PILMAR:  Your Honor, at this time I'd like to

24 introduce Government 209-35 into evidence.

25       MS. GOTLIB:  No objection.

DeMayo - Direct - Pilmar                    443

1          THE COURT:  Received.

2          (Government's Exhibit 209-35 received in

3    evidence.)

4          (Exhibit published to the jury.)

5          MR. PILMAR:  Can we just highlight or call out row

6    nine?

7    Q    A little hard to see, so I'll read.  But this is for

8    tanker car DATX 124006.  What kind of information did you

9    determine about that tanker car?

10   A    So if I go, like, left to right?  Is that the best way

11   to do it?

12   Q    Sure or you can always summarize it as well.

13   A    So the chart basically has different columns.

14   Information regarding the movement of a particular tanker

15   car.  In this case, DATX 124006.  You can see there's

16   something called a sequence.  It's basically just a specific

17   number that the railroad uses to monitor the particular

18   movement of a railroad car on a particular journey.  The

19   next one I think is the direction northbound or NB is

20   northbound.  Meaning, that the car was coming from Mexico

21   into the United States.  Originating location is basically

22   the port of entry or the location along the Mexico border of

23   the U.S. where the train car entered the United States.  The

24   departure date is basically the date the car began moving.

25   The border location is, as I said, generally either Laredo,

DeMayo - Direct - Pilmar                    444

1    Texas or Brownville, Texas.  And then the approximate date

2    at U.S. border is essentially the date that the car crossed

3    into the United States.

4    Q    And what is the company that it says the destination

5    location for this car?

6    A    So the Soybean Oil is the destination.  That's the

7    51-18 Grand Avenue, Maspeth.

8    Q    Is that the company that signed for the lease at 51-18

9    Grand Avenue?

10   A    Yes, it is.

11   Q    I think you testified that was the location where all

12   of the cocaine was found?

13   A    Correct.

14   Q    And the -- we're just looking at one row here, is that

15   correct?  The DATX, this is one row?

16   A    Yes.  So that car had multiple trips to the Queens

17   warehouse.  But that row is pertaining to one of the train

18   cars.

19   Q    Based on the records you reviewed, did you conduct all

20   of these train cars to the Tirso Martinez Sanchez

21   organization?

22   A    Yes.

23            MR. PILMAR:  Your Honor, may I have a moment?  No

24   further questions.

25            THE COURT:  Any cross.

Tolentino - Direct - Reid                      445

1           MS. GOTLIB:  No, your Honor.

2           THE COURT:  All right.  You may step down.

3           (Witness leaves the witness stand.)

4           THE COURT:  What's next from the Government?

5           MS. REID:  Your Honor, the Government calls Hector

6    Tolentino.

7           (Witness Sworn.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  **H E C T O R   T O L E N T I N O,**

2              called as a witness having been

3              first duly sworn, was examined and testified

4              as follows:

5              THE COURTROOM DEPUTY:  Please, state and spell

6  your name for the record.

7              THE WITNESS:  Hector, H-E-C-T-O-R, Tolentino,

8  T-O-L-E-N-T-I-N-O.

9              THE COURT:  You may inquire.

10 DIRECT EXAMINATION

11 BY MS.  REID:

12 Q    Good afternoon.  How old are you?

13 A    31.

14 Q    I want to direct you to December 18, 2019.  Were you

15 arrested on that day?

16 A    Yes, ma'am.

17 Q    What charges were you arrested on?

18 A    Possession of drugs, possession of firearm.

19 Q    And at the time of your arrest, did law enforcement

20 seize anything from you?

21 A    Yes.

22 Q    What did they take?

23 A    They took kilos of heroin, cocaine, fentanyl, M30 pills

24 and three firearms.

25 Q    And what are M30 pills?

1   A    Roxys.  I have to cut them.

2   Q    Why did you have all those different drugs?

3   A    To sell them.

4   Q    Who gave you those drugs?

5   A    I got them from a guy named Manuel.

6   Q    And had you bought drugs from Manuel previously?

7   A    Yes, ma'am.

8   Q    About how long had you bought drugs from Manuel to

9   sell?

10  A    From 2019, like the past ten months until I got

11  arrested.

12  Q    During that approximate ten-month period, did you learn

13  what group Manuel worked for?

14  A    Yes, ma'am.

15  Q    What was that?

16  A    The Sinaloa Cartel.

17  Q    I want to talk a little bit about your background.

18  Where, primarily, did you grow up?

19  A    New York.  Dominican Republic, and Philadelphia.

20  Q    And generally why was it that you moved around those

21  locations?

22  A    My parents passed away, so I kept bouncing from family

23  to family.

24  Q    Do you have any family in Mexico?

25  A    No, ma'am.

Tolentino - Direct - Reid                           448

1   Q     Have you ever been to Mexico?

2   A     No ma'am.

3   Q     How far did you go in school?

4   A     12th grade.

5   Q     Did you finish high school?

6   A     No, ma'am, I got arrested, but I got my GED.

7   Q     What were you arrested for?

8   A     At that time, attempted robbery.

9   Q     And before you were arrested, had you ever engaged in

10  any other crimes?

11  A     Yes.  I was selling weed and ecstasy pills.

12  Q     After you were arrested for attempted robbery, did you

13  plead guilty?

14  A     Yes.

15  Q     What was your sentence?

16  A     One and a third of four.

17  Q     Is that one and a third to four years?

18  A     Yes, ma'am.

19  Q     Where did you serve that time?

20  A     Upstate New York.

21  Q     While you were in Upstate New York jails, did you join

22  any organizations?

23  A     Yes.  I became part of the Trinitarios.

24  Q     What is that?

25  A     It's a gang mainly of Dominican people that hold each

1    other down in prison.

2    Q    What does it mean to hold each other down?

3    A    Protect each other.  If one got problems, if one of

4    them got a problem, we all got a problem.  If somebody needs

5    help with anything, we help them out.

6    Q    Just to be clear, does the Trinitarios gang operate

7    outside of jail in addition to inside?

8    A    Yes, ma'am.

9    Q    Approximately when were you released from custody?

10   A    December 19, 2011.

11   Q    When you were released, what happened?  What did you

12   do?

13   A    When I first got out, I got a job.  I was working on

14   the cleaning company.  Then I got a girl pregnant and then I

15   started selling drugs again.

16   Q    What kinds of drugs?

17   A    At that time, cocaine.

18   Q    Were you -- about how much cocaine were you selling at

19   this time?

20   A    When I first started, I started like anywhere between 3

21   to 5 kilos.

22   Q    Over time, did you begin selling bigger quantities of

23   cocaine?

24   A    Yes, ma'am.

25   Q    Were you also still part of the Trinitarios gang at

1    this time?

2    A    Yes, ma'am.

3    Q    And what, if anything, else did you do as part of the

4    that gang?

5    A    I supported with money -- with money for them to buy

6    like guns.  I supplied them also with guns, money for them

7    to buy vehicles for like robberies and stuff like that.

8    Q    How did you get that money?

9    A    By selling drugs.

10   Q    Did you own guns?

11   A    Yes, ma'am.

12   Q    About how many did you have?

13   A    Around that time, 6 to 8.

14   Q    And did you ever commit any robberies on behalf of the

15   Trinitarios?

16   A    Yes, ma'am.

17   Q    What kinds of people did you rob?

18   A    Drug dealers and sometimes regular people.

19   Q    Did you ever use guns during robberies?

20   A    Yes, ma'am.

21   Q    Did you ever shoot guns during robberies?

22   A    Yes.

23   Q    Were you ever involved in other violence?

24   A    Yes shootings.

25   Q    Can you tell us about that?

Tolentino - Direct - Reid                    451

1    A    The first shooting that I was involved in was they came

2    to harm me and when the guy turned around to grab the gun, I

3    shot first.

4    Q    And did you kill that person?

5    A    No, ma'am.

6    Q    Did you injure him?

7    A    Yes, ma'am.

8    Q    Where he was injured?

9    A    In the head.

10   Q    Were you ever arrested or charged for that?

11   A    No, ma'am.

12   Q    And approximately when was that?

13   A    That was April 2012.

14   Q    Were there ever other times that you were involved in

15   shootings?

16   A    Like four months after that, I was involved in another

17   shooting.

18   Q    Briefly can you tell us about that?

19   A    It was a fight in a club, a fight broke out.  Two days

20   later we saw them again and another fight broke out.  And

21   then I went back and I shot at the crowd.

22   Q    Was anyone killed that the?

23   A    No, ma'am.

24   Q    Was anyone injured?

25   A    No, ma'am.

Tolentino - Direct - Reid                452

1    Q    And I want to direct you to 2013.

2         Were you arrested in that year?

3    A    Yes, ma'am.

4    Q    What were you arrested for?

5    A    A shooting as well.

6    Q    And briefly what happened that led to your arrest?

7    A    Fighting in clubs then little problems, then I went

8    back over there.  There was some falling, words exchanged,

9    they passed by, like, my in-laws house.  Then I went back

10   over there and I shot them and I got arrested three days

11   later.

12   Q    Did anyone die on that occasion?

13   A    No, ma'am.

14   Q    What were you arrested for?

15   A    Attempted murder and possession of a gun.

16   Q    Were you ever convicted of a crime after that incident?

17   A    No, ma'am.

18   Q    Why not?

19   A    Because I paid the witness.

20   Q    And what did you pay him to do or not do?

21   A    I paid the victim money so he didn't show up in court.

22   Q    Were the charges dismissed?

23   A    Yes, ma'am.

24   Q    Did there come a time after that when you were arrested

25   again?

Tolentino - Direct - Reid                 453

1    A    Yes, ma'am.

2    Q    When was that?

3    A    October 2, 2014.

4    Q    What were you arrested for?

5    A    Possession of drugs and possession of firearm.

6    Q    And were you ultimately convicted of these crimes?

7    A    Yes, ma'am.

8    Q    What court was that in?

9    A    Queens Criminal Court.

10   Q    What sentence did you receive?

11   A    Five and a half years with five post.

12   Q    Buy five post, what does that mean?

13   A    Five years parole post-release.

14   Q    Where did you serve your time for that sentence?

15   A    New York State.

16   Q    While you were in custody in New York State jails, did

17   you maintain your position with the Trinitarios?

18   A    Yes, ma'am.

19   Q    What was your position within the prisons that you were

20   in?

21   A    I became the leader.

22   Q    The leader of what?

23   A    The Trinitarios.

24   Q    What did it mean that you were the leader?

25   A    I was the one, I had the last voice I was -- I had the

1  last call, calling shots, and stuff like that.

2  Q    Just to be clear.  Were you the lead Trinitario in the

3  prison that you were in?

4  A    Yes, ma'am.

5  Q    In that position, did you ever order violence?

6  A    Yes, ma'am.

7  Q    What kinds of things did you order?

8  A    A Trinitario had gotten jumped in one of his units and

9  it happened inside the unit.  When the information came out

10  to the yard, I ordered a few Trinitarios to get the three

11  guys that jumped him.

12  Q    And did that happen?

13  A    Yes, ma'am.

14  Q    Eventually, were you sent anywhere to finish your

15  sentence?

16  A    I was sent to Hill Creek.  A program facility.

17  Q    What kinds the programs are at Hill Creek?

18  A    It's drug programs and alcohol programs.

19  Q    While you were at Hill Creek, did you form a connection

20  with anyone?

21  A    Yes, ma'am.

22  Q    Who was that?

23  A    A guy named Manuel.

24  Q    And just to be clear.  Is that the same Manuel you

25  mentioned earlier?

1   A    No, ma'am.

2   Q    Now this Manuel from Hill Creek, did you ever learn

3   where he was from?

4   A    Yes, ma'am.

5   Q    Where was he from?

6   A    From Mexico.

7   Q    How did you form a connection with Hill Creek Manuel?

8   A    We used to play for the same baseball team at Hill

9   Creek and we were always talking, building about -- talking

10  about the future plans.  Like, drug stuff.  Since I was

11  arrested for drugs, he was in there for drugs.  And we used

12  to talk about drugs and stuff like that and Mexican music.

13  Because I like Mexican music.

14  Q    At some point, were you released from custody?

15  A    Yes, ma'am.

16  Q    When that was?

17  A    That was October 15, 2017.

18  Q    Did you ever see Manuel from Hill Creek again?

19  A    Yes, ma'am.

20  Q    How did that come about?

21  A    When I first got out, my wife had crashed her car prior

22  to my release.  So when I got out, the hit of the car was

23  bothering me, the bumper, and I called a friend that owns a

24  body shop.  And he told me to bring in the car the next

25  morning.  And yeah.

1    Q    And what happened after you brought the car to the body

2    shop?

3    A    When I brought the car to the body shop, he told me to

4    go pick it up in three days.  When I went, I tried to pay

5    and he told me that I don't have to pay.  Just to tip the

6    guy that was washing the car.

7    Q    Okay.  What happened when you did that?

8    A    When I went outside, I went to the back, I saw who the

9    guy was.  I had a $50 bill in my hand, waiting.  When he saw

10   me, he gave me a hug.  He said oh, he started saying what's

11   up to me.  We started talking and when we finished talking,

12   he told me to talk to Stanley like --

13   Q    Hold on one second.  So who did he see?  Who was

14   washing the car?

15   A    Manuel.

16   Q    Is that Manuel from Hill Creek?

17   A    Yes, ma'am.

18   Q    And who is Stanley?

19   A    Stanley is the owner of the body shop.

20   Q    Why did Hill Creek Manuel want you to speak to the

21   owner of the body shop?

22   A    He was riding him too hard, like work.  And he needed a

23   job because we came out on work release.  Like, you had to

24   keep a job.  And I told him why don't you just fake the job

25   and pay yourself.  But I spoke to Stanley and I told Stanley

Tolentino - Direct - Reid                    457

1    hey, this guy was locked up for heavy stuff.  He's a plug.

2    Q    What does it mean to be a plug?

3    A    A connect.  Like work.

4    Q    When you say work, what are referring to?

5    A    Drugs.  Like, he's able to get drugs and stuff like

6    that.

7    Q    And what happened next, if anything, with Hill Creek

8    Manuel?

9    A    We exchanged information, Facebook information, and I

10   went about my business.  Stanley, once he heard what I told

11   him, he started working with him.  They started working,

12   they starting doing their own thing.  Somewhere down the

13   line it went sour, and that Manuel had to go back that

14   Mexico because he had family over there.  So he went back to

15   Mexico and he reached out to me.

16   Q    Okay.  So after Manuel from Hill Creek went to Mexico,

17   was there ever a time when he introduced to someone else?

18   A    Yes, ma'am.

19   Q    Approximately when was this?

20   A    Between -- 2019.

21   Q    And who did Manuel from Hill Creek introduce you to?

22   A    To another guy named Manuel.

23   Q    And is this the person that you referred to earlier

24   from the Sinaloa Cartel?

25   A    Yes, ma'am.

Tolentino - Direct - Reid                    458

1   Q    So to make it easier, I'm going to refer to this Manuel
2   as Sinaloan Manuel.
3                    At some point, did you start speaking with
4   Sinaloan Manuel?
5   A    Yes, ma'am.
6   Q    And, generally, what happened when you first spoke with
7   Sinaloan Manuel?
8   A    When I first started talking to him, he, like, he was
9   throwing his voice off.  Like oh, talking like that.
10  Putting like a different sound to his voice.  He started --
11  we was discussing like numbers and stuff and drugs that I
12  could move.
13  Q    Okay.  And after you started speaking with Sinaloan
14  Manuel, did you start buying drugs from him?
15  A    Yes, ma'am.
16  Q    And how did you introduce yourself to him, by the way?
17  A    I introduced myself as Jose.
18  Q    And how did you speak with Sinaloan Manuel?
19  A    Through an app.  The first time it was Whats App and
20  then he told me to download an app called Signal.
21  Q    Why did you use that?
22  A    Because it deletes the call.  It doesn't record
23  anything.
24  Q    Now, when was it that you first bought drugs from
25  Sinaloan Manuel?

Tolentino - Direct - Reid                            459

1    A    Three days after the first phone call.

2    Q    When was this?

3    A    April 2019.

4    Q    What did you buy?

5    A    A kilo of fentanyl.

6    Q    How did you get it?

7    A    He sent a Dominican guy from the Bronx to bring it to

8    me in Queens.

9    Q    How much money did you pay for did?

10   A    $45,000.

11   Q    And what did you do with it?

12   A    I sold it.

13   Q    How much did you sell it for?

14   A    55.

15   Q    Why was there such a different between what you paid

16   and what you sold if for?

17   A    Because I had to make my profit.

18   Q    What was your understanding of how you could sell it

19   for so much more?

20   A    Because it was -- going around that time, it was going

21   for like 60, 65.  So I made ten points on it and I get rid

22   of it quick and get more.

23   Q    So after that first time, did you buy more drugs from

24   Sinaloan Manuel?

25   A    Yes.  That same day he was not expecting for me to pay

Tolentino - Direct - Reid                460

1   for it in cash.  He was giving it to me in consignment and

2   he sent me 10,000 pills that same day.  But after that, I

3   started getting work.

4   Q    When you say work, what are you referring to?

5   A    Cocaine, heroin, fentanyl and pills.

6   Q    What kinds pills?

7   A    M30.  Rocks.

8   Q    Where did you sell the drugs that you bought from

9   Sinaloan Manuel?

10  A    Mainly New York, but also Philadelphia.

11  Q    How, over time, did you receive drugs from Sinaloan

12  Manuel?

13  A    Tuesdays, Wednesdays, Thursdays, Fridays and Saturdays.

14  Like, those days I can receive through the mail.  And one

15  time a week from the truck.

16  Q    Okay.  Let's start with the mail.  How did you get

17  drugs through the mail?

18  A    Through the mail, I would provide an address, I give

19  them an address.  It had -- I had to provide the address

20  before Monday.  That way, Monday they could leave so I can

21  get them on Tuesday overnight.  And the one for Wednesday, I

22  had to provide on Tuesday morning so they could leave on

23  Tuesday.

24  Q    Would the drugs be concealed in any way in these

25  packages?

Tolentino - Direct - Reid                461

1   A     Yes.  They would come in like a pumpkin.  It was like a

2   shaped art thing that was painted gold, the color gold.  And

3   they would put fragile on it.  Some would be 4, 8, 10 or 12.

4   Q     What are you referring to; 4, 8, 10, or 12?

5   A     Kilos inside the figure.

6   Q     How did you get drugs from a truck?

7   A     From the truck, they would text me a time.  Then I

8   would drive to New Jersey and they would text me an address

9   or they would send me like a location.  And I go and pick it

10  up from the truck.

11  Q     When you say they, who are you referring to?

12  A     The truck driver.

13  Q     How did you get in touch with truck drivers?

14  A     Manuel would give them my information and they reach

15  out to me when they was a few hours away so that way I could

16  start heading out.

17  Q     And starting let's say in April 2019 through your

18  arrest in December 2019.  How frequently were you buying

19  drugs from Sinaloan Manuel?

20  A     Oh, every week.

21  Q     And on average, during that time period, how much

22  cocaine were you buying per week?

23  A     I would say 40.  Anywhere between 40 to 50.

24  Q     40 or 50 what?

25  A     Kilos of cocaine.

Tolentino - Direct - Reid                    462

1   Q    Did you send money -- how were you sending money to

2   Sinaloa Manuel?

3   A    I would tell him the amount that I had ready.  Let's

4   say it was $300,000.  I'd say I have $300,000, then he would

5   get the ticket.  He would tell me hold on, gave me the

6   information.  Then he would send me a serial number with a

7   number.  I would call the number, and once I called number,

8   they either pick up or text me back to say the serial

9   number.  Once I say the serial number, they send me a

10  location where to go.

11  Q    Just to be clear.  Would you be directed to talk to

12  some other people with a serial number?  Like, a code?

13  A    Yes, ma'am.

14  Q    And after you spoke with them, would you bring them

15  money to send to Sinaloan Manuel?

16  A    Yes, ma'am.

17  Q    And did they charge you any fee for this?

18  A    Yes.  I started paying seven percent.  But since I was

19  doing it so often, I dropped down to five percent.

20  Q    Over time, did your relationship with Sinaloan Manuel

21  become close?

22  A    Yes, ma'am.

23  Q    How often did you speak with him?

24  A    Every day, ma'am.

25  Q    And what kinds of things did you talk about with

1  Sinaloan Manuel?

2  A    We talked about the business, of females, clothes

3  watches, music, and stuff like that.

4  Q    And in addition to buying drugs from him, did you ever

5  do other things for him?

6  A    I served -- I took drugs to two of his clients.  One in

7  Long Island, one in Manhattan.  Send him clothes.  I would

8  shop clothes for him, and one time I collected money for

9  him.

10 Q    Did you ever speak by video call with him?

11 A    Yes, ma'am.

12 Q    How often did you do that?

13 A    Every time he had to show me something or we were just

14 talking and stuff like that.

15 Q    At the time of your arrest in December of 2019, did law

16 enforcement seize any phones that belonged to you?

17 A    Yes, ma'am.

18 Q    Did you have more than one phone at the time of your

19 arrest?

20 A    Yes, ma'am.  About five phones.

21 Q    Why did you have so many phones?

22 A    One was a personal phone and the other one was like

23 working phones.  I had everything divided.

24 Q    What does that mean you had everything divided?

25 A    One for like the route, one to speak to Mexico, to

Tolentino - Direct - Reid                      464

1   speak to Manuel from Mexico, and stuff like that.

2   Q    And have you had the opportunity to see the phone that

3   you used to speak to Sinaloan Manuel since your arrest?

4   A    Yes, ma'am.

5   Q    Have you reviewed messages on it?

6   A    Yes, ma'am.

7   Q    How about videos?

8   A    Yes.

9   Q    And how about photos?

10  A    Yes, ma'am.

11       MS. REID:  And I want to show you just on your

12  screen what's marked for identification as Government

13  Exhibit 1219.  And then a few more.  1211A, 1215A --

14  Withdrawn.  Not 1219.

15       1215A, 1209A and 1214A.  You can take a look at

16  each of those and let me know after you've seen them when

17  you're ready.  Let me know if you recognize them.

18       (Exhibit published to the witness.)

19  Q    Do you recognize this 1219?

20  A    Yes, ma'am.

21            (Continued on the next page.)

22

23

24

25

1    BY MS. REID:

2    Q    What about 1215-A?

3    A    Yes, ma'am.

4    Q    And what about 1201-A?

5    A    Yes, ma'am.

6    Q    What about 1209-A?

7    A    Yes, ma'am.

8    Q    What about 1214-A?

9    A    Yes, ma'am.

10   Q    And what are these?

11   A    Those are pictures from my phone.

12   Q    Did you review those before testifying today?

13   A    Yes, ma'am.

14   Q    Are they fair and accurate, or exact pictures of items

15   from your phone?

16   A    Yes, ma'am.

17        MS. REID:  I ask that Government Exhibits 1219,

18   1215-A, 1201-A, 1209-A and 1214-A be admitted into evidence.

19        MR. MC MANNUS:  No objection.

20        THE COURT:  Received.

21        (Government Exhibit 1219, 1215-A, 1201-A, 1209-A,

22   1214-A, were received in evidence.)

23   Q    Let's start with 1219, looking at page one, who is this?

24   A    That's my single counter (ph) for Manuel.

25   Q    Does this reflect calls between you and another person?

Tolentino - Direct - Ms. Reid                    466

1   A    Yes, ma'am.

2   Q    Who are they with?

3   A    Manuel.

4   Q    How did you save Sinaloa Manuel's number?

5   A    Don Manuel, Tio Manuel, things like that.

6   Q    Starting on December 4, 2019, does this reflect several

7   calls between you?

8   A    Yes, ma'am.

9   Q    And I want to go to page two.  Does this continue several

10  calls over the next few days?

11  A    Yes, ma'am.

12  Q    Page three, page four, page five.  Let's go to the last

13  page, are these calls between you and Sinaloa Manuel on

14  December 18, 2019?

15  A    Yes.

16  Q    Is that the same day you were arrested?

17  A    Yes, ma'am.

18  Q    I want to go to 1214-A.  What is this?

19  A    That is a kilo of cocaine.

20  Q    How did you have this picture in your phone?

21  A    Manuel send it to me, so I could see the work I was

22  receiving.

23  Q    I want to go to 1209-A.  What is this?

24  A    That's a picture of me sending him money, I was putting a

25  picture of the money, me showing him that I was putting the

Tolentino - Direct - Ms. Reid                    467

1   money together.

2   Q    How would you package the money that you were sending?

3   A    10,000s.

4   Q    10,000-dollar packets?

5   A    Yes, ma'am.

6   Q    I want to go to 1201-A.  What are we looking at here?

7   A    This is him showing me what, how much it will come out

8   to.

9   Q    Is this like some math that he was doing?

10  A    Yes.

11  Q    Briefly, can you describe it to us?

12  A    It says Compa Jose, that's my name that he knows me as.

13  It's showing you that out of $90,000, he's taking away the

14  5 percent for me for the sending of the money, how much I will

15  have left to invest.  And on the bottom of that, it shows how

16  much that I need for the work for a package, for a package of

17  four.

18  Q    I want to start where it says 300 in the bottom left,

19  what is that referring to?

20  A    300 for OG, means cocaine.

21  Q    What does this mean?

22  A    $300 for every package, for the person gets paid for

23  packaging.  So if I do ten, they get $3,000, that person

24  that's packaging the work.

25  Q    Are you talking about individual bricks?

1   A    Yes, ma'am.

2   Q    It says 1800 times four.  What is that a reference to?

3   A    That's if I'm coming in the truck, to come in the truck

4   each kilo will be $1,800.

5   Q    What is the four a reference to?

6   A    From Mexico to California is $2,000, from California to

7   New Jersey will be 1800.

8   Q    Is it fair to say that the price changes depending on

9   where you're bringing drugs to?

10  A    Yes, ma'am.

11  Q    At the top it says under Compa Jose 90,000 minus five

12  percent.  What is that a reference to?

13  A    That means that out of the 90, they taking the 5 percent

14  for me sending the money.

15  Q    Is that for the fee that you had to pay to send the money

16  back to him?

17  A    Yes, ma'am.

18  Q    Below that 23,500.  What is that a reference to?

19  A    The price on each kilo.

20  Q    What why does it say times four?

21  A    Times four is times a kilogram.  Each box will come out

22  to $94,000.

23  Q    Is this generally the price that you would have to pay

24  for 4 kilos?

25  A    Yes, ma'am.

1  Q    I want to also now go to 1215-A, I don't think we've done

2  that yet.  Just briefly, what are we looking at here?

3  A    Right there is a number that I'm supposed to call them

4  and give them that number and they will send me a location

5  near me.  That's a serial number of a dollar.

6  Q    Does this relate to the practice you followed that you

7  described earlier for sending money to Sinaloa Manuel?

8  A    Yes, ma'am.

9  Q    I want to now show you what is marked for identification

10  as Government Exhibit 1205-A.  Just for the witness.  Do you

11  recognize this?

12  A    Yes, ma'am.

13  Q    What is this?

14  A    That is a video Manuel sent.

15  Q    And was this taken from your phone after your arrest?

16  A    Yes, ma'am.

17        MS. REID:  I'd ask to move Government Exhibit 1205

18  into evidence.

19        MR. MC MANNUS:  No objection.

20        THE COURT:  Received.

21        (Government Exhibit 1205, was received in evidence.)

22  Q    If we can play with sound once it's published for the

23  jury.

24        (Video played)

25  Q    What did we just -- first of all, what is that a video

Tolentino - Direct - Ms. Reid                    470

1    of?

2    A    That's a video of a song, saying what was doing, bringing

3    in the work from Culiacan to New York.

4    Q    Do the lyrics of that song refer to bringing from drugs

5    from Culiacan to New York?

6    A    Yes, ma'am.

7    Q    Just to be clear, did Sinaloa Manuel send you this?

8    A    Yes, ma'am.

9    Q    What is your understanding of why he did that?

10   A    We were sending each other videos.  That song was

11   explaining everything that we was doing.

12   Q    I want to show you 1204-A for identification.  Do you

13   recognize this?

14   A    Yes, ma'am.

15   Q    What is this?

16   A    That's a pill presser.

17   Q    Is this another video that you received?

18   A    Yes, I received that video from Manuel.

19        MS. REID:  I'd ask that Government Exhibit 1204-A be

20   admitted.

21        MR. MC MANNUS:  No objection.

22        THE COURT:  Received.

23        (Government Exhibit 1204-A, was received in

24   evidence.)

25        (Video played)

Tolentino - Direct - Ms. Reid                471

1    Q    What is this?

2    A    That's a pill presser that he send me so I can see how

3    the machine works making the M30s.

4    Q    What are M30s again?

5    A    The roxys, Oxycontin.

6    Q    Why did he send this to you?

7    A    Because we was planning on starting January, the plan was

8    to start making the pills over here to not take the risk

9    bringing them.  And he was showing me the machine how they

10   work, so I could see how they operate.  So he told me I could

11   get them on Ebay.  I was like, eh, I'm not getting that.  He

12   told me he would send them to me, that's how it works.

13   Q    Why didn't you want to buy a pill press on Ebay?

14   A    That was a red flag.

15   Q    Were you worried you might get caught?

16   A    Yes, ma'am.

17   Q    Over the course of your time working with Sinaloa Manuel,

18   what did he tell you about who he worked for?

19   A    He told me he was working for his compadre.

20   Q    Did he tell you anything more about who that was?

21   A    He told me his compadre was Ivan, Chapo's son.

22   Q    Who is Chapo?

23   A    Chapo, Joaquin Guzman.

24   Q    Did that person belong to any group?

25   A    The Sinaloa cartel.

1  Q    Was there ever a time when you learned more about Ivan?

2  A    Yes, ma'am.  Manuel had called me dedicating a song to me

3  from Antonio Gilal (ph).  We always call each other dedicating

4  songs.  He call me, one time there was a boat, he called me

5  dedicating a live song, a live band was playing in the back,

6  dedicating the song.  He introduced me to Ivan.  He said, this

7  is the guy, Jose from La Torre.  At first I was, how you

8  doing.  I didn't recognize who he was.  And then he saw it on

9  my face, like, that I was not like excited like, oh, you don't

10 know who is this.  I'm like, no, compa.  Saying, Ivan, el hijo

11 del senor; this is Ivan the son of the senor, the man; senor,

12 sir.  Then I was, like, it's an honor.

13 Q    When was this that Sinaloa Manuel called you to dedicate

14 this song?

15 A    2019.

16 Q    Do you remember what time of year?

17 A    No, somewhere around the summer.

18 Q    I believe you said he introduced you from Jose from

19 somewhere?

20 A    La Torre.

21 Q    What does that mean?

22 A    New York, like the Twin Towers.

23 Q    When you didn't immediately recognize the person he

24 introduced you to, what did Manuel say?

25 A    Compa, you don't know who that is?  You don't know who

Tolentino - Direct - Ms. Reid                    473

1  you're talking to?  I'm like, no.  That's my compadre, Ivan,

2  the son of senor, in Spanish.  Like, this is like the son of

3  the sir.

4  Q    What did it to mean to you who was he referring to when

5  you said the son of the sir?

6  A    The son of the boss, meaning Chapo.

7  Q    After that call, did you ever speak with Manuel more

8  about who he worked for?

9  A    Yes, ma'am.  After that I was, like, wow compa.  He

10 started telling me how Ivan is his one of his youngest boys,

11 he got nine kids, his godfather, the godfather of the kid.  He

12 kept telling me you really lucked out, you're going to be

13 good.  Never going to be miss anything.  You good, you direct.

14 Q    Did Manuel also tell you other things about how he worked

15 for the Sinaloa cartel?

16 A    Yes, ma'am.

17 Q    Did you continue working with Manuel up until your arrest

18 in December of 2019?

19 A    Yes, ma'am.

20 Q    During that time, generally where would you keep the

21 drugs that you bought from him?

22 A    I would keep them in an apartment in Flushing, New York.

23 Q    Is that in Queens?

24 A    Yes, ma'am.

25 Q    Did you live in that apartment?

Tolentino - Direct - Ms. Reid                    474

1   A      No, ma'am.

2   Q      What kind of apartment was it?

3   A      A stash house.

4   Q      I want to direct you to December 18, 2019.  Were you

5   arrested that day?

6   A      Yes, ma'am.

7   Q      Just briefly, can you tell us how you were arrested?

8   A      I was at home.  I was at home.  I got a call that

9   somebody, my worker, like, they were roughing him up.  He was

10  on the phone.  He was on the phone with my cousin, she was

11  like, yo, they roughing him up, get down, get down.  What you

12  mean, sure, yeah, he not picking up.

13          So I went to Flushing.  I was living in Bayside at

14  the time.  I drove to Flushing with someone else, with two

15  people.

16          First I went to the precinct because the stash house

17  right across the street from the precinct, and I asked if

18  anybody been arrested.  They said no.

19          Then I send my cousin to walk by.  I gave him a

20  phone.  The phone was open.  And I said, just keep walking and

21  look to see if you see anything.  When he was walking, he got

22  scared.  He's like, Hector there is something going on here,

23  there is something going on here.  They grabbed him up threw

24  him on the floor.

25          Then right before I was out of the car, I was at the

Tolentino - Direct - Ms. Reid                    475

1   corner of the block, I told the girl I was with, drive

2   straight, slow, make a right.  Don't want to rush you.  I

3   hopped out of the car.  I watched her drive, then I know they

4   were looking for me so I went to the opposite way.

5   Q    Were you arrested?

6   A    Yes, ma'am.

7   Q    Who arrested you?

8   A    DEA.

9   Q    After you were arrested, did you plead guilty to any

10  crimes?

11  A    Yes, ma'am.

12  Q    What did you plead guilty to?

13  A    RICO, possession of drugs, with intent to sell, cocaine,

14  heroin, fentanyl, Oxycontin, Hobbs Act robbery, discharging of

15  a firearm, possession of contraband cellphone in jail, pretty

16  much.

17  Q    Did you plead guilty with a cooperation agreement with

18  the Government?

19  A    Yes, ma'am.

20  Q    What does that agreement require of you?

21  A    For me to say the truth, testify if I have to, and

22  basically comply.

23  Q    Without that agreement, what is the minimum amount of

24  time that you're facing for your crimes?

25  A    Ten years.

1    Q    What is the maximum?

2    A    Life.

3    Q    What are you hoping to receive in exchange for your

4    cooperation with the Government?

5    A    5K.1 letter.

6    Q    What is that?

7    A    To my knowledge, it's a motion written by the prosecutor

8    to the judge so they could go below the minimum.

9    Q    Who would decide your sentence ultimately?

10   A    A judge.

11   Q    What, if anything, would happen to that agreement if you

12   lied here?

13   A    The agreement will be broken and I will get the minimum

14   or above.

15   Q    I believe you testified earlier that when you were

16   arrested, the DEA seized several drugs from you.  Where were

17   those?

18   A    In the apartment.

19   Q    Is that the apartment you told us about earlier?

20   A    The stash house in Flushing.

21   Q    I want to show you several exhibits for identification.

22   It's 207-2, 207-6, 207-7, 207-9, 207-13, 207-15, 207-17.  I

23   don't know if there is any objection to these, your Honor.

24              MR. MC MANNUS:  No objection.

25              THE COURT:  Received.

1              (Government Exhibit 207-2, 207-6, 207-7, 207-9,

2     207-13, 207-15, 207-17, were received in evidence.)

3     Q    So now that these are in evidence, let's start with

4     207-2.  Can you tell us what we're looking at?

5     A    Right there you looking at the pills, the M30 pills, the

6     Roxys, the Oxycontin.  And the one with the tapes, that means

7     they haven't been touched, that's how they came, that means

8     1,000.  The one with the brown tape, that means 1,000.

9              The one in the Ziplock bags, that means that they

10    counted and they could be either for somebody wants 200 or

11    they already took some out of a pack.

12             The other Ziplock bag on the side that's for work as

13    well.

14    Q    What is in the Ziplock bag with white in it?

15    A    That's cocaine.

16    Q    To be clear, were all these drugs inside your stash house

17    when you were arrested?

18    A    Yes, ma'am.

19    Q    I want to move on to 207-6.  What is this?

20    A    The white bag is cocaine.  And it says 481, that's

21    cocaine.  The green bag is heroin.

22    Q    207-7?

23    A    Those are orders like for the route, for the small route.

24    Q    What does that mean for the route?

25    A    Since I had separate phones, I had a route.  It was like

Tolentino - Direct - Ms. Reid                    478

1   for people to grab like 150, 200, stuff like that.

2   Q    By the way, what is fentanyl?

3   A    Fentanyl, I don't know what it's made of, but it is

4   something I was using to cut the heroin to make it stronger.

5   And I would make it stronger and make more kilos.

6   Q    Going to 207-9, what is this?

7   A    That is cocaine.

8   Q    And 207-13?

9   A    That's a presser.

10  Q    What is a presser?

11  A    That's, I use it to press the work to make the work.

12  Once I got like cocaine, I would cut it with mazucamba and

13  make more work to stretch the work.

14  Q    Would you cut it with a non-drug substance to make you

15  able to sell more drugs?

16  A    Make more money, more profit, yes.

17  Q    Finally 207-17, what is that?

18  A    Those are kilo of cocaine.

19  Q    Are these in the condition that you received them in?

20  A    Yes, ma'am.

21  Q    There is an X on some of the bricks.  What is that?

22  A    That is the stamp on them, X1.

23  Q    Who put that on?

24  A    They came like that from Mexico.

25  Q    All of the drugs that were seized from you on

1    December 18, 2019, where had you gotten those?

2    A     From Mexico.

3    Q     Were they from Sinaloa Manuel?

4    A     Yes, ma'am.

5    Q     Were they from the Sinaloa cartel?

6    A     Yes, ma'am.

7              THE COURT:  Good time to break?

8              MS. REID:  Yes, your Honor.

9              No further questions, your Honor.

10             THE COURT:  Okay, we'll continue on Monday, ladies

11   and gentlemen.

12             Please it's a long weekend --

13             MR. DE CASTRO:  Your Honor, sorry to interrupt.

14             MR. MC MANNUS:  We have no cross on this witness, if

15   that make it is easier.

16             THE COURT:  The witness is released.

17             MS. REID:  We do have a stipulation paragraph to

18   read.

19             THE COURT:  Let's have the witness taken out first.

20             (Whereupon, the witness was excused.)

21             THE COURT:  Okay.

22             MS. REID:  Reading again from Government 901

23   paragraph seven:

24             On December 18, 2019, DEA agents seized

25   approximately 6.4 kilograms of cocaine and approximately

Proceedings                    480

1   5.2 kilograms of fentanyl, among other substances, from an

2   apartment in Queens, New York.  Samples of the substances

3   seized were delivered to the DEA northeast laboratory in

4   substantially the same condition as at the time they were

5   seized.  Government Exhibit 207-22 are lab reports prepared by

6   Maolin Li, and Vadim Astrakhan.  If called to testify on the

7   subject, Ms. Li and Mr. Astrakhan Vast would testify that they

8   performed chemical analysis of samples of the substances

9   seized on December 18, 2019 and determined that they contain

10  cocaine hydrochloride a Schedule II controlled substance and

11  (N-phenyl-N-[1-(2-phenylethyl)-4- piperidinyl propanamide,

12  also known as fentanyl, a Schedule II controlled substance.

13           Thank you, your Honor.

14           THE COURT:  Back to where I was.

15           Ladies and gentlemen, it's long break.  Do not

16  succumb to temptation.  Please stay away from any coverage of

17  the case.  Do not do any research on the case, no tweeting,

18  no, if we still have MySpace, no LinkedIn, none of that having

19  to do with the case.  It becomes increasingly important that

20  you follow this instruction, that's why I give it so often.

21  We can't do this again.  We don't want anyone to get in

22  trouble.

23           Have a great weekend.  See you Monday morning 9:30

24  well rested.  Thank you for your hard work.

25           (Jury exits the courtroom.)

Rivka Teich, CSR, RPR, RMR, FCRR, Official Court Reporter

                          Proceedings                    481

1            THE COURT:  Monday morning, 9:30 a.m.  Have a good

2    weekend.

3            (Proceedings adjourned to resume on January 30, 2023

4    at 9:30 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

482

1                    I N D E X

2

3    WITNESS                                    PAGE

4

5    TIRSO MARTINEZ-SANCHEZ

6         DIRECT EXAMINATION BY MR. PILMAR         298

7         CROSS EXAMINATION BY MR. MIEDEL          327

8         REDIRECT EXAMINATION BY MR. PILMAR       339

9         RECROSS EXAMINATION BY MR. MIEDEL        339

10   ERNEST CAIN

11        DIRECT EXAMINATION BY MS. DIOUF          343

12   JAMAL HORNEDO

13        DIRECT EXAMINATION BY MR. PILMAR         379

14   MATTHEW COLEMAN

15        DIRECT EXAMINATION BY MR. PILMAR         389

16   NOEL MOLONEY

17        DIRECT EXAMINATION BY MR. PILMAR         408

18   STEVEN DEMAYO

19        DIRECT EXAMINATION BY MR. PILMAR         419

20   HECTOR TOLENTINO

21        DIRECT EXAMINATION BY MS.  REID          446

22

23

24

25

Andronikh Barna, Official Court Reporter, RPR, CRR

483

1                          E X H I B I T S

2

3

4      GOVERNMENT EXHIBIT 42                           304

5      GOVERNMENT EXHIBIT 28                           324

6      GOVERNMENT EXHIBIT 901                          341

7      GOVERNMENT EXHIBITS 201-11, 202-19, 203-21.
       203-28, 203-29, 204-19.  204-20.  205-34,
8      206-5, 206-7, 206-8, 206-9, 207-22             342

9      GOVERNMENT EXHIBITS 205-31, 205-29, 205-20,
       205-23, 205-24, 205-28, 205-26                 355
10
       GOVERNMENT EXHIBITS 205-4, 205-16, 205-1,
11     205-2, 205-10, 205-13, 205-15                  368

12     GOVERNMENT EXHIBIT 206-1                        382

13     GOVERNMENT EXHIBITS 206-2, 206-3, 206-4         385

14     GOVERNMENT EXHIBIT 204-21                       398

15     GOVERNMENT EXHIBIT 204-17                       399

16     GOVERNMENT EXHIBITS 204-2, 204-4, 204-5,
       204-8                                           401
17
       GOVERNMENT EXHIBIT 204-15                       403
18
       GOVERNMENT EXHIBIT 204-14                       403
19
       GOVERNMENT EXHIBIT 204-13                       405
20
       GOVERNMENT EXHIBITS 209-1, 209-2, 209-3,
21     209-4, 209-5, 209-6                             413

22     GOVERNMENT EXHIBIT 8                            421

23     GOVERNMENT EXHIBIT 209-28                       425

24     GOVERNMENT EXHIBIT 209-29                       425

25     GOVERNMENT EXHIBIT 204-23                       431

484

1            **E X H I B I T S** (CONTINUED)

2

GOVERNMENT EXHIBITS 209-24, 209-25                433

3
GOVERNMENT EXHIBITS 209-18, 209-19, 209-20,
4    209-21, 209-22                                    436

5    GOVERNMENT EXHIBITS 209-9, 209-10A, 209-11,
209-12, 209-13, 209-14, 209-15, 209-16, AND
6    209-17A                                           441

7    GOVERNMENT EXHIBIT 209-35                         443

8    GOVERNMENT EXHIBITS 1219, 1215-A, 1201-A,
1209-A                                            465
9
GOVERNMENT EXHIBIT 1205                            469
10
GOVERNMENT EXHIBIT 1204-A                          470
11
GOVERNMENT EXHIBITS 207-2, 207-6, 207-7,
12   207-9, 207-13, 207-15, 207-17                     477

13

14                    *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

Andronikh Barna, Official Court Reporter, RPR, CRR