1364

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2    ------------------------------x
                                        19-CR-576(BMC)
 3    UNITED STATES OF AMERICA,
                                        United States Courthouse
 4                                      Brooklyn, New York

 5              -versus-                February 08, 2023
                                        9:30 a.m.
 6    GENARO GARCIA LUNA,

 7              Defendant.

 8    ------------------------------x

 9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                 BEFORE THE HONORABLE BRIAN M. COGAN
10                  UNITED STATES DISTRICT JUDGE
                          BEFORE A JURY
11

12    APPEARANCES

13    For the Government:      UNITED STATES ATTORNEY'S OFFICE
                               Eastern District of New York
14                             271 Cadman Plaza East
                               Brooklyn, New York 11201
15                             BY:  SARITHA KOMATIREDDY, ESQ.
                                    PHILIP PILMAR, ESQ.
16                                  MARIETOU E. DIOUF, ESQ.
                                    ERIN REID, ESQ.
17                                  ADAM AMIR, ESQ.
                               Assistant United States Attorneys
18
      For the Defendant:      BY:  CESAR DECASTRO, ESQ.
19                                  VALERIE GOTLIB, ESQ.
                                    FLORIAN MIEDEL, ESQ.
20                                  SHANNON MCMANUS, ESQ.

21
      Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
22                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
23
      Proceedings recorded by mechanical stenography.  Transcript
24    produced by computer-aided transcription.

25
```

MARLENE TARANTINO - DIRECT - MR. AMIR          1365

1              (In open court.)

2              THE COURTROOM DEPUTY:  All Rise.

3              THE COURT:  Let's have the jury, please.

4              I know I have a letter this morning, 40 minutes ago.

5    I'm sure the defense will respond.

6              MS. KOMATIREDDY:  Yes, your Honor.  It may make

7    sense to talk about scheduling at the morning break.  We just

8    wanted to get some sense maybe when we would have a charge

9    conference.

10             (Jury enters the courtroom.)

11             THE COURT:  Everyone be seated.  Good morning,

12   ladies and gentlemen.

13             Let's proceed.

14             MR. AMIR:  The Government recalls Officer Marlene

15   Tarantino.

16             (Witness takes the witness stand.)

17   **MARLENE TARANTINO**, called as a witness, having been previously

18   first duly sworn/affirmed, was examined and testified

19   previously first duly sworn/affirmed:

20             THE COURT:  Go ahead.

21   DIRECT EXAMINATION

22   BY MR. AMIR:

23   Q    Good morning, Officer Tarantino.

24   A    Good morning.

25   Q    Before we broke yesterday, we were speaking about a

MARLENE TARANTINO – DIRECT – MR. AMIR          1366

1    letter that you received.

2              Do you remember that?

3    A    Yes, I do.

4              MR. AMIR:  I'd like to show the witness what has

5    been marked as Government's Exhibit 105 for identification.

6    Q    Do you see the letter?

7    A    Now I do, yes.

8              MR. AMIR:  Your Honor, we move to admit Government's

9    Exhibit 105 into evidence.

10             MR. MIEDEL:  No objection, with the instruction.

11             (Government Exhibit 105, was received in evidence.)

12             THE COURT:  Right.  Ladies and gentlemen, this

13   exhibit is being received not because anything that is in it

14   is true.  You're not to take the statements made in this

15   letter as true.  It's just being offered to show why this

16   agent did what she did once the letter was sent.  All right?

17             Let's continue.

18   BY MR. AMIR:

19   Q    Did you receive this letter?

20   A    Yes, I did.

21   Q    What did you do in response to this letter?

22   A    Well, it was inquiry from the Department of Justice.  It

23   was requesting a certified copy of the defendant's alien file

24   and that we hold his application for naturalization in

25   abeyance.

MARLENE TARANTINO - DIRECT - MR. AMIR          1367

1          So when I received the letter, I began to process

2   the abeyance, meaning we held the application, not to make any

3   adjudicative decision on it, and I provided the physical file

4   to our records unit so that they could process a certified

5   copy in response to the inquiry.

6   Q     When was this letter dated?

7   A     August 6, 2019.

8   Q     You said this was a letter from the Department of

9   Justice.  Do you know which particular component it was from?

10  A     Yes.  The Eastern District of New York.

11  Q     Where is that located?

12  A     Here in Brooklyn, New York.

13  Q     You mentioned that you requested that the file be sent to

14  the Department of Justice.  Was that file ultimately sent?

15  A     Yes, it was.

16  Q     Do you know if it was received?

17  A     Yes, it was.

18  Q     Yesterday you mentioned that you serve as a liaison to

19  law enforcement as part of your role as an officer at the

20  fraud detection natural security section of the USCIS.

21          Can you describe some of the work that you do

22  serving as a liaison to law enforcement?

23  A     Sure.  So I'm currently embedded with the Document

24  Benefit Fraud Task Force.  It's -- the acronym is DBFTF.  And

25  that's a group within Homeland Security Investigations, HSI,

MARLENE TARANTINO – DIRECT – MR. AMIR          1368

1    and I assist in supporting their criminal investigations that

2    involve identity fraud and immigration document benefit fraud.

3    Q    Can you describe some the work you do to assist the task

4    force?

5    A    Sure.  So because I work for USCIS, US Citizenship and

6    Immigrations Services, I possess immigration knowledge, so I

7    provide information to them about immigration history.  I also

8    assist in interviewing.  I conduct interviews in Spanish and

9    English.  I also assist in reviewing any e-mail warrant

10   returns.  I assist in reviewing subpoena returns.  I assist in

11   reviewing financial documents.  A lot of paperwork,

12   essentially, reviewing documents.

13   Q    Yesterday we discussed question 22 of the naturalization

14   form for the defendant, which asks whether or not he's

15   committed a crime for which he was not arrested.

16        Do you ever share the answer to that question with

17   law enforcement?

18   A    Yes, all the time.

19   Q    What impact does sharing that information have with law

20   enforcement?

21        MR. MIEDEL:  Objection.

22        THE COURT:  Sustained.

23        MR. AMIR:  Sidebar, your Honor.

24        THE COURT:  Okay.

25        (Continued on the next page.)

SIDEBAR CONFERENCE                    1369

1          (Sidebar conference.)

2          THE COURT:  Is there a general impact a letter like

3   this has on law enforcement?  How does she know that?  Has she

4   seen that happen before?  What is going on here?

5          MR. AMIR:  Here she just testified that she's

6   embedded in a unit that works and shares immigration

7   information with the criminal investigators.  We think we laid

8   that foundation.

9          THE COURT:  Lay a foundation.

10          MR. MIEDEL:  I was going to object to that one also.

11   What is the relevance of that?  She doesn't know anything

12   about this other than she processed a form she saw.  She

13   testified about what the form said.

14          THE COURT:  Where are you going?

15          MS. KOMATIREDDY:  Relevance is venue for Count Five

16   where we're seeking to prove materiality both to USCIS and to

17   the investigation.

18          MR. MIEDEL:  Okay.

19          (End of sidebar conference.)

20          (Continued on the next page.)

21

22

23

24

25

1              (In open court.)

2    BY THE COURT:

3    Q    Officer Tarantino, you testified a moment ago that

4    sometimes you share the answer to question 22 with law

5    enforcement and investigators.  Do you remember saying that?

6    A    Yes, I do.

7    Q    Have you done that in the past?

8    A    Yes, I have.

9    Q    Why do you share that information?

10   A    Well, to protect the integrity of our immigration laws.

11   It's important that we provide that information as a way for

12   criminal investigators to possibly review cases, applicants

13   who may possess threat to our national security, and the whole

14   immigration process as a whole.

15   Q    In those other instances, what, if anything, happened

16   when you shared the answer to that question?

17   A    Well, in past cases I've shared the information.  I've

18   provided copies of what was filed with us, supporting

19   documentation that I deemed relevant.  A particular

20   investigative group would pursue that as a lead.  They would

21   conduct additional queries.  They would possibly interview

22   associates.  They would possibly build another case,

23   essentially, out of that.

24   Q    So what impact, if any, does the answer to that question

25   have on the criminal investigation team?

MARLENE TARANTINO – CROSS – MR. MIEDEL      1371

1   A    Well, it can be an avenue to pursue new charges of an

2   ongoing and active investigation.  It could substantiate

3   charges of an active and ongoing investigation.  It could lead

4   to other cases possibly being opened, provide additional

5   information, evidence that may have not been available to

6   criminal investigators at the time.

7   Q    You mentioned a moment ago that the -- that you received

8   a letter from the U.S. Attorney's Office requesting that an

9   immigration file be sent.

10          Do you know where that immigration file was sent to?

11  A    Yes.  It was sent to the U.S. Attorney's Office here in

12  Brooklyn.

13          MR. AMIR:  One moment, your Honor.

14          No further questions.

15          THE COURT:  Any cross?

16          MR. MIEDEL:  Briefly.

17  CROSS-EXAMINATION

18  BY MR. MIEDEL:

19  Q    Good morning, Officer.

20  A    Good morning.

21  Q    You just mentioned an alien file.  Can you tell us what

22  that is?

23  A    Sure.  Of course.  An alien file, or known as an A-File,

24  is a file that is created by USCIS, and it contains the

25  biographical information of a foreign national who is applying

MARLENE TARANTINO - CROSS - MR. MIEDEL        1372

1    for immigration benefits like a greencard or citizenship or

2    any type of other immigration -- immigrant visa application.

3    Q    You reviewed the alien, or A-File, for Mr. Garcia Luna?

4    A    I reviewed it in 2019, yes.

5    Q    And it's true that he was granted a greencard or

6    permanent residency status in 2013, correct?

7    A    To my knowledge, we approved an application for

8    adjustment of status, yes, in 2013.

9    Q    And the adjustment of status was under the alien of

10   extraordinary ability clause, right?

11            MR. AMIR:  Objection.

12            THE COURT:  Overruled.

13   A    Do I answer?

14   Q    Yes.

15   A    To my knowledge, I believe that's the category that he

16   applied under, yes.

17   Q    Normally it would take quite some time for somebody to

18   obtain a greencard after they first come to the United States,

19   right?

20   A    Not necessarily, no.  Depends.  Everybody is a

21   case-by-case basis.

22   Q    Okay.  But the classification of an alien of

23   extraordinary ability, that classification speeds up the

24   process of becoming a citizen -- or of getting a greencard,

25   right?

1    A     Again, it's a case-by-case basis, Counsel.

2    Q     Well, isn't that -- isn't that classification one that is

3    used to speed up that process?  Would you agree with that?

4    A     Again, I have not adjudicated those types of petitions.

5    Again, it's a case-by-case basis.  Every applicant is reviewed

6    on their own merits.  Every case is different.

7    Q     Well, what is an -- a classification of an alien of

8    extraordinary ability?

9             MR. AMIR:  Objection.

10            THE COURT:  Overruled.

11   A     Again, I have not worked that type of petition, so I do

12   not possess any expert knowledge in that area.  But generally,

13   it's someone that possesses more knowledge than the average

14   person in the arts, the sciences, along those lines,

15   researchers.

16   Q     And when somebody applies under that classification, that

17   has to be approved by the United States Immigration Service,

18   right?

19   A     The application will be received by USCIS.  It will be

20   reviewed and a decision will be made by an adjudication

21   officer.

22   Q     And in Mr. Garcia Luna's case, he was granted a greencard

23   based on that adjustment, right?

24   A     His application for adjustment of status was approved by

25   USCIS, yes.

EGBERT SIMON - DIRECT - MR. AMIR          1374

1    Q    Which was based on his being an alien of extraordinary

2    ability, right?

3             MR. AMIR:  Objection.  Asked and answered.

4             THE COURT:  Say it again.

5    A    Yes, that was the classification that he applied under,

6    and that petition was approved by USCIS.

7             MR. MIEDEL:  Thank you.  Nothing further.

8             THE COURT:  Any redirect?

9             MR. AMIR:  No, your Honor.  Thank you.

10            THE COURT:  You may step down.

11            (Whereupon, the witness was excused.)

12            THE COURT:  Government's next witness.

13            MR. AMIR:  The Government calls Officer Egbert

14   Simon.

15            (Witness takes the witness stand.)

16   **EGBERT SIMON**, called as a witness, having been first duly

17   sworn/affirmed, was examined and testified first duly

18   sworn/affirmed:

19            THE COURT:  Please sit down.  State your name for

20   the record and spell your name.

21            THE WITNESS:  My name is Egbert Simon.  That's

22   E-G-B-E-R-T, S-I-M-O-N.

23            THE COURT:  You may inquire.

24   DIRECT EXAMINATION

25   BY MR. AMIR:

EGBERT SIMON – DIRECT – MR. AMIR          1375

1    Q    Good morning.  Officer Simon, where do you work?

2    A    I work for U.S. Customs Border Protection, office of

3    field operations, the New York field office.

4    Q    What is your title there?

5    A    Supervisory Customs and Border Protection officer.

6    Q    Have you held any other prior positions at Customs and

7    Border Protection?

8    A    Yes.

9    Q    Can you describe those for the jury?

10   A    Previously I was a U.S. Customs and Border Protection

11   officer, and I was also a U.S. Customs and Border Protection

12   agricultural specialist.

13   Q    How long have you worked at the Customs and Border

14   Protection?

15   A    Fifteen years.

16   Q    Can you describe some of the responsibilities in your

17   current role?

18   A    So I currently supervise other officers, their day-to-day

19   operations, administrative work related to their operations,

20   and I'm also detailed to another federal agency.

21   Q    Does Customs and Border Patrol maintain flight records?

22   A    Yes.

23   Q    How are those maintained?

24   A    So per the regulations, any international flight

25   departing the United States or entering the United States must

EGBERT SIMON – DIRECT – MR. AMIR          1376

1   file their manifest with CBP 72 hours prior to the departure

2   of that flight, and during that time period, the airlines can

3   update the manifest, add any other additional passengers that

4   they get, or they can remove passengers that cancel their

5   tickets.  That's transmitted to CBP via the Advance Passenger

6   Information System, also known as APIS.

7   Q    Did you request records relating to the defendant, Genaro

8   Garcia Luna?

9   A    Yes.

10  Q    I'd like to show you what's been marked for

11  identification as Government Exhibit 605.

12          Officer Simon, do you see this?

13  A    Yes.

14  Q    What is this?

15  A    This is a person encounter list.

16  Q    Are these the travel records you requested for the

17  defendant?

18  A    Yes.

19          MR. AMIR:  Government moves to admit Government

20  Exhibit 605 into evidence.

21          MR. MIEDEL:  No objection.

22          THE COURT:  Received.

23          (Government Exhibit 605, was received in evidence.)

24  BY MR. AMIR:

25  Q    Prior to your testimony today, did you review the records

EGBERT SIMON – DIRECT – MR. AMIR          1377

1    in Government Exhibit 605?

2    A     Yes.

3    Q     What time period do these records represent?

4    A     2011 to 2022.

5    Q     I'd like to direct your attention to page 17 of this

6    exhibit.  Can you describe where the defendant traveled to on

7    December 1, 2012?

8    A     From Mexico to Miami.

9    Q     And what was the departing airport and what was the

10   landing airport?

11   A     That was Mexico City to Miami International Airport.

12   Q     Based on your review of these records, did you determine

13   if there's a country that the defendant traveled to most

14   frequently?

15   A     Yes.

16   Q     What country is that?

17   A     Mexico.

18   Q     I'd like to show you what is marked as Government Exhibit

19   605A for identification.

20         Do you recognize this?

21   A     Yes.

22   Q     What is this?

23   A     This is a depiction of the records, so all the orange

24   dots are when the defendant was in Mexico.

25   Q     Is this a fair and accurate representation of the time

EGBERT SIMON – DIRECT – MR. AMIR          1378

1    the defendant traveled to Mexico?

2    A    Yes.

3              MR. AMIR:  Government moves to admit Government

4    Exhibit 605A into evidence.

5              MR. MIEDEL:  No objection.

6              THE COURT:  Received.

7              (Government Exhibit 605A, was received in evidence.)

8              MR. AMIR:  One moment, please.

9    Q    And what do the orange dots on this screen represent?

10   A    When the defendant was present in Mexico.

11   Q    And what do the white dots represent?

12   A    When he was not inside of Mexico.

13   Q    So between December 2012 and 2019, do the orange dots

14   represent the time the defendant was in Mexico?

15   A    Yes.

16             MR. AMIR:  No further questions.

17             THE COURT:  I just -- maybe it's my monitor.  I'm

18   not seeing orange.  I'm seeing like an olive color.  Is that

19   what you're referring to?

20             MR. AMIR:  They are orange on my screen, your Honor.

21   I guess I could ask if the colored -- the dots with color

22   versus the dots that are white.

23             THE WITNESS:  Yes, the colored dots.

24             THE COURT:  What about the dots that are like in a

25   blue frame?  Do you see those?

EGBERT SIMON – CROSS – MR. MIEDEL          1379

1              MR. AMIR:  I think the blue frame is just the month

2      and year.  It might be a little hard to see.  Apologies.

3              THE COURT:  Okay.  Thank you.

4              Cross?

5              MR. MIEDEL:  Yes, briefly.

6      CROSS-EXAMINATION

7      BY MR. MIEDEL:

8      Q     Good morning.

9      A     Good morning.

10             MR. MIEDEL:  Can we go back to Exhibit 605?

11             THE COURT:  Let's have the Government put up 605

12     again, please.

13             MR. MIEDEL:  Thank you.

14             Can we just scroll up to maybe the next page.

15             THE COURT:  Page 18?

16             MR. MIEDEL:  Yes.  My screen is very blurry.  One

17     moment, your Honor.

18     Q     Sir, you see that one of the categories on this chart

19     is -- at the top it says INSP.  I assume that stands for

20     inspection, right?

21     A     Yes -- no, no.  Inspector.

22     Q     Oh, inspector.  Okay.  And do you see, if you go down

23     that column, a number of types the inspector is the global

24     entry kiosk, right?

25     A     That's correct.

EGBERT SIMON - REDIRECT - MR. AMIR      1380

1   Q    The global entry is a program that is a U.S. Customs and
2   Border Protection program, right?
3   A    Correct.
4   Q    And that program allows expedited clearance for
5   preapproved low-risk travelers to the United States, right?
6   A    Correct.
7   Q    So in order to get global entry, you have to be vetted;
8   you have to be preapproved in order to get that
9   classification, correct?
10  A    That's correct.
11            MR. MIEDEL:  Thank you.
12            THE COURT:  Any redirect?
13            MR. AMIR:  Very briefly, your Honor.
14  REDIRECT EXAMINATION
15  BY MR. AMIR:
16  Q    Officer Simon, does CBP, when conducting its vetting for
17  global entry, have access to cooperating witness statements?
18  A    No.
19            MR. AMIR:  Thank you.
20            THE COURT:  All right.  You may step down.  Thank
21  you very much.
22            (Whereupon, the witness was excused.)
23            Government's next witness.
24            MS. DIOUF:  May we have a brief sidebar before the
25  next witness.

EGBERT SIMON – REDIRECT – MR. AMIR          1381

1          THE COURT:  Yes.

2          (Continued on the next page.)

SIDEBAR CONFERENCE                    1382

1          (Sidebar conference.)

2          MS. DIOUF:  Your Honor, this next witness is Ivan

3    Carrera, a post-arrest witness statement for defendant.  We

4    move to admit only a specific part of the statement, which the

5    Court granted I just wanted to --

6          THE COURT:  Thank you.

7          (End of sidebar conference.)

8          (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IVAN CARRERA – DIRECT – MS. DIOUF                    1383

1          (In open court.)

2          MS. DIOUF:  The Government calls Ivan Carrera.

3          (Witness takes the witness stand.)

4   **IVAN CARRERA**, called as a witness, having been first duly

5   sworn/affirmed, was examined and testified first duly

6   sworn/affirmed:

7          THE COURT:  Please have a seat.  State and spell

8   your name to the court reporter, and talk right into that

9   microphone.

10          THE WITNESS:  Ivan Carrera.  I-V-A-N, C-A-R-R-E-R-A

11  DIRECT EXAMINATION

12  BY MS. DIOUF:

13  Q    Good morning, Mr. Carrera.

14  A    Good morning.

15  Q    What do you do for a living?

16  A    I'm a Special Agent for the Drug Enforcement

17  Administration.

18  Q    How long have you worked for the DEA?

19  A    Approximately 17 years.

20  Q    What is your current assignment and title?

21  A    I'm a supervisory Special Agent in DEA headquarters in

22  Arlington, Virginia.  And in my current capacity I'm an

23  executive assistant to the associate administrator for

24  business operations.

25  Q    Where were you before you were at DEA headquarters?

IVAN CARRERA – DIRECT – MS. DIOUF          1384

1    A      I was in Dallas, Texas.

2    Q      What was your title in Dallas, Texas?

3    A      I was supervisory Special Agent there.

4    Q      What were your duties and responsibilities as a

5    supervisory Special Agent in Dallas, Texas?

6    A      I supervised enforcement operations for enforcement

7    groups and oversaw the development of investigations as well

8    as the execution of enforcement operations.

9    Q      Did you focus on any particular type of investigations?

10   A      Drug trafficking investigations.

11   Q      What did do you before you were a supervisory Special

12   Agent in Dallas, Texas?

13   A      Prior to that I was supervisory Special Agent in El Paso,

14   Texas.  Before that I was a Special Agent in Bogota, Colombia,

15   and before that I was a Special Agent in Nogales, Arizona, my

16   first office.

17   Q      Are you familiar with an investigation into an individual

18   named Genaro Garcia Luna?

19   A      I am.

20   Q      How are you familiar with it?

21   A      We arrested him.

22   Q      Describe your involvement with that investigation.

23   A      So in December of 2019, the DEA Houston field office

24   reached out to our group in Dallas and requested assistance in

25   locating him and arresting him.

IVAN CARRERA – DIRECT – MS. DIOUF          1385

1    Q    Were you given anything as part of your involvement in

2    Genaro Garcia Luna's arrest?

3    A    We were given a copy of his arrest warrant issued out of

4    the Eastern District of New York.

5    Q    Directing your attention to December 9, 2019.  Were you

6    working that day?

7    A    Yes, I was.

8    Q    What was your assignment that day?

9    A    I was supervising the enforcement operation for the

10   arrest of Mr. Luna.

11   Q    Did you participate in the arrest of Genaro Garcia Luna?

12   A    Yes, I was.  I was there.

13   Q    What was your role in that arrest?

14   A    I supervised it, and I was there immediately after he was

15   arrested.  I was present at the scene.

16   Q    At some point did you interview him after he was

17   arrested?

18   A    I did.

19   Q    Did you Mirandize him prior to interviewing him?

20   A    Yes, I did.

21   Q    Did he waive his rights and agree to speak with you?

22   A    That's correct, yes.

23   Q    Was the interview recorded?

24   A    It was not.

25   Q    Why not?

IVAN CARRERA - DIRECT - MS. DIOUF          1386

1  A     The recording equipment was not functioning that day.  We

2  tried for several minutes to try to get it to work.  Mr. Luna

3  was present in the room when we were trying to get it to work.

4  And ultimately we informed him that it was not working, and he

5  agreed to continue with the interview without the recording

6  taking place.

7  Q     What was your role in the interview of the defendant,

8  Genaro Garcia Luna?

9  A     I translated.

10  Q    Are you a native Spanish speaker?

11  A    Yes, I am.

12  Q    From where?

13  A    Mexico.

14  Q    Did you ask the defendant if he'd ever met with anyone

15  from the drug trafficking groups?

16  A    Yes.

17  Q    What did he say?

18  A    He said he did not.

19  Q    Did you ask the defendant if he ever had a phone

20  conversation with drug traffickers?

21  A    Yes, I did.

22  Q    And what did he say?

23  A    He said he did not.

24  Q    Did you ask the defendant if he was aware if anyone who

25  worked under him met with drug traffickers?

IVAN CARRERA – CROSS – MS. GOTLIB      1387

1    A    I asked him that, yes.

2    Q    What did he say?

3    A    He said to his knowledge, no.

4    Q    Did you ask the defendant about his involvement with

5    Arturo Beltran Leyva?

6    A    Yes.  Specifically we asked him -- we told him he was

7    being accused of supporting the Beltran Leyva organization,

8    and he said that he never helped him, but he fought against

9    him.

10   Q    Did you ask the defendant about an individual named Ivan

11   Reyes Arzate?

12   A    I did.

13   Q    What did you ask him?

14   A    I asked him what he knew about him, and he said that he

15   did not know who that person was.

16           MS. DIOUF:  Just a moment, please, your Honor.

17           Nothing further.

18           THE COURT:  Cross.

19   CROSS-EXAMINATION

20   BY MS. GOTLIB:

21   Q    Good morning, Agent Carrera.

22   A    Good morning.

23   Q    I am Valerie Gotlib, one of the attorneys for Mr. Garcia

24   Luna.

25           Assuming, given your resume, that this isn't your

1    first time testifying or being cross-examined, but I'm just

2    going to remind you of two things, if that's okay.

3    A    Yes, ma'am.

4    Q    Thank you.

5         Please try to answer my questions with a yes or no

6    answer, and if you feel that you're not able to, just say so

7    and I could rephrase my question for you.

8    A    Okay.

9    Q    Thank you.

10        And if I ask a question that you don't understand or

11   that's not clear, please just let me know and I'm happy to

12   rephrase it for you.

13   A    Okay.

14   Q    Okay.  Thank you so much.

15        Mr. Garcia Luna's arrest was a big deal; is that

16   fair to say?

17   A    Yeah.  I guess, yeah.

18   Q    It was a high-profile arrest, given his status as a

19   former politician?

20   A    I guess we can agree with that, yes.

21   Q    Okay.  And you testified that he made a post-arrest

22   statement to you; that's correct?

23   A    Yes, ma'am.

24   Q    And there were other agents in the room with you,

25   correct?

1   A    Yes, ma'am.

2   Q    I believe it was four other agents, so five of you

3   altogether?

4   A    If I recall correctly, yes, ma'am.

5   Q    That sounds accurate?

6   A    Yes.

7   Q    He made the statement to you at the DEA Dallas division

8   office; is that correct?

9   A    Yes.

10  Q    And that office, it's pretty big?

11  A    It's a division office, so relatively speaking, it's one

12  of the bigger offices.  You have smaller offices in the

13  outlying areas, and that's the division office, yes.

14  Q    The building is multiple floors?

15  A    Yes.

16  Q    A good amount of people work there?  More than 50?

17  A    Yes.

18  Q    There are a lot of offices in that building?

19  A    Yes, ma'am.

20  Q    A lot of rooms?

21  A    Yes.

22  Q    Lots of equipment?

23  A    Yes, ma'am.

24  Q    You testified that you've been a DEA agent for 17 years?

25  A    Approximately.

1    Q     And the DEA is an agency within the Department of

2    Justice; is that correct?

3    A     Yes, ma'am.

4    Q     The justice manual, which is publicly available online,

5    contains the Department of Justice policies and procedures; is

6    that correct?

7              MS. DIOUF:  Objection.

8              THE COURT:  Scope?

9              MS. DIOUF:  Yes, your Honor.

10             THE COURT:  Sustained.

11             MS. GOTLIB:  Sidebar, your Honor?

12             THE COURT:  Okay.

13             (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                          1391

1            (Sidebar conference.)

2            MS. GOTLIB:  So the objection to the scope, it was

3   elicited on direct examination that this statement wasn't

4   recorded.  So I am eliciting the fact that the justice manual

5   has a presumption in favor of recording.

6            THE COURT:  Is that all you're going for?

7            MS. GOTLIB:  Yes, that's it.

8            MS. KOMATIREDDY:  Your Honor, it's not relevant and

9   to suggest impropriety that doesn't exist.  There is an

10  exception when the defendant agrees to be not recorded.

11           THE COURT:  That's what you'll say on redirect.

12           (End of sidebar conference.)

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

CARRERA – CROSS – MS. GOTLIB                1392

1           (In open court.)

2    BY MS. GOTLIB:

3    Q    Are you familiar with the justice manual?

4    A    Yes, ma'am.

5    Q    It provides internal guidance to agencies within the

6    Department of Justice?

7    A    Yes, ma'am.

8    Q    The justice manual states that there is a presumption

9    that all post-arrest interviews by individuals in DEA custody

10   should be recorded, correct?

11   A    That is correct.

12   Q    But Mr. Garcia Luna's post-arrest statement wasn't

13   recorded?

14   A    That's correct.

15   Q    You testified you tried several minutes to get the

16   recording equipment to work?

17   A    Yes, ma'am.

18   Q    Given the presumption, given the resources available to

19   you, you didn't think that it warranted more than several

20   minutes of trying?

21   A    We made him aware that the equipment was not operating.

22   It was not working.  Ultimately, it was his decision to

23   continue the interview without the interview being recorded.

24   Q    Got it.  So he consented to providing the statement

25   without it being recorded?

1   A    That is correct.

2   Q    Got it.  And prior to making any statements, Mr. Garcia

3   Luna was read his Miranda rights, correct?

4   A    Yes, ma'am.

5   Q    He was advised that he had a right not to make any

6   statements, right?

7   A    Yes, ma'am.  According to the instructions in the form,

8   DEA form 13B provides a list of what's necessary legally.

9   Q    Absolutely.  And I know you and I are both familiar with

10  Miranda rights.  I'm sure most people are.  But just humor

11  me --

12  A    Of course.

13  Q    -- I'm just going to ask you a couple more questions

14  about them.

15  A    Sure.

16  Q    Thank you.

17       And you advised him that he had the right to consult

18  with an attorney before making any statements?

19  A    Yes.

20  Q    And that if he did decide to make statements, which he

21  didn't have to, he was -- had the right to have an attorney

22  present with him?

23  A    Yes, ma'am.

24  Q    But he waived all those rights and said "I want to make a

25  statement to you" without speaking to an attorney first?

IVAN CARRERA - REDIRECT - MS. DIOUF          1394

1   A    He said that and he initialed each line in the form.

2   Q    Right.  He initialed each line and he said:  I want to go

3   forward, even if it's not audio recorded.

4   A    That's correct.

5   Q    Got it.

6        Did he also consent to having his residences

7   searched?

8   A    Yes.

9   Q    Did he consent to having numerous electronic devices

10  searched?

11  A    Yes.

12  Q    Did he even provide you with the password for some of

13  those devices so that you could access them?

14  A    I believe he did, yes.

15  Q    Fair to say that most people who you arrest, unless they

16  are, let's say --

17            MS. DIOUF:  Objection.

18            THE COURT:  Sustained.

19            MS. GOTLIB:  No further questions.

20            THE COURT:  Any redirect?

21            MS. DIOUF:  Very briefly, your Honor.  Thank you.

22  REDIRECT EXAMINATION

23  BY MS. DIOUF:

24  Q    Mr. Carrera, defense counsel asked you some questions

25  about the presumption of recording pursuant to the DOJ manual.

IVAN CARRERA - REDIRECT - MS. DIOUF          1395

1          Do you remember that question?

2    A    I do.

3    Q    Does the DOJ manual also have an exception for when the

4    defendant agrees not to be recorded?

5    A    Yes, it does.

6    Q    And defense counsel asked you about the consent to search

7    the defendant's electronics and his residence.

8          Do you remember those questions?

9    A    Yes, I do.

10   Q    And to be clear, this happened in December 2019; is that

11   right?

12   A    That is correct.

13              MS. DIOUF:  Thank you.  Nothing further.

14              THE COURT:  You may step down.  Thank you very much.

15              (Whereupon, the witness was excused.)

16              THE COURT:  Government's next witness.

17              MS. KOMATIREDDY:  Your Honor, the Government's next

18   witness pertains to the filings from this morning.

19              THE COURT:  Okay.

20              Ladies and gentlemen, we'll take a 15-minute break

21   so I can talk to the lawyers about a few things.  Please don't

22   talk about the case.

23              I will tell you, just in case you're wondering,

24   we're moving like lightening.  No promises, but it looks like

25   we'll be done with the trial substantially earlier than you

PROCEEDINGS                              1396

1    were told when you were selected.  Again, no promises, but it

2    looks like that.

3              (Jury exits the courtroom.)

4              THE COURT:  Be seated.

5              A little earlier receipt of that letter would have

6    been appreciated, but we'll do the best we can.

7              MS. KOMATIREDDY:  I appreciate it.  I apologize for

8    that, your Honor.  We were trying to work it out among the

9    parties.  I think we worked out many things, but there was

10   some disagreement.

11             THE COURT:  Okay.  In other words, the letter you

12   wrote is now narrowed down or is it still all in dispute?

13             MS. KOMATIREDDY:  We have asked, and I believe

14   defense intends to agree, although we don't have a signed

15   version to the authenticity of the various exhibits, and the

16   question is relevant submissions.

17             THE COURT:  Let me give you general observations.

18             First, evidence of 2012 wealth and prior to 2012 is

19   okay if it's not cumulative.  It struck me you had some things

20   in there that were duplicative; but houses, cars, things owned

21   by person on a public salary, I understand the inference that

22   the Government is asking the jury to draw, and I think those

23   documents are relevant to those inferences.

24             The post-2012 stuff, 2013 and forward, we've

25   discussed that in a different context, and I was reluctant to

PROCEEDINGS                          1397

1    allow it absent prove tying it to the pre 2012 context.

2              Now, it seems to me that if something was owned and

3    enjoyed pre-2012 and it continued to be owned and enjoyed

4    afterwards, I think both for the statute of limitations

5    purpose and also to reinforce the point about the pre-2012

6    inferences that the Government is trying to get the jury to

7    draw, I'd allow a little of that.  Okay?

8              I'm not inclined to allow the fish tank.  Nobody in

9    this courtroom thinks the ambassador was making it up when --

10             THE INTERPRETER:  Your Honor, we have technical

11   difficulties with the interpretation equipment.

12             THE COURT:  Seems to be going around like COVID.

13             Tell us when you've fixed it, please.

14             THE INTERPRETER:  We're ready, your Honor.

15             THE COURT:  Okay.  Both for the statute of

16   limitations purposes and to reinforce the point, 2012.

17             The fish tank, everyone knows the ambassador was

18   telling the truth that there was a remarkable fish tank.

19   Unless the Government is going to present some evidence

20   valuing fish tanks, I don't think the jury --

21             Well, let me look at the picture of the fish tank.

22   I mean, maybe if it's gold inlaid or something.

23             What exhibit is it?

24             (Continued on next page.)

25

PROCEEDINGS                            1398

1            MS. KOMATIREDDY:  Your Honor, actually, it is a

2    couple of things.  First, Your Honor has a binder, and we can

3    direct you to the right exhibit and you can look at it.

4            More importantly, in order to tie – – to place this

5    home as one of his Mexico City homes, we needed to have the

6    ambassador testify that he visited the home in Mexico City, it

7    had this feature, and that's how you tie the rest of the

8    photos of the home into it.  Otherwise, we don't have GPS data

9    or something that actually shows that that's a Mexico City

10   home.

11           So that's-- we're not trying to do this from some

12   salacious purpose.  We're not going to have the fish tank up

13   more than five seconds, but we do need to pin it all together.

14           THE COURT:   Let me look at the picture of the fish

15   tank.  What exhibit number is that?

16           MS. DIOUF:  Government Exhibit  1328.

17           THE COURT:  Okay.  I am inclined to allow that.

18           Okay.  So those are the guidelines.  And I will hear

19   from the defense as to why they think the guidelines are

20   wrong.

21           MR. DE CASTRO:  Judge, I don't know that I disagree

22   with the guidelines.

23           We received the list.  It's a pretty lengthy list of

24   stuff and -- I mean, of exhibits.  I mean, I think the witness

25   that they're intending to call next is just the person that

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                                    1399

1    said we searched stuff and found it.  We don't have any issue

2    with that.

3            But they seem to intend to just put in photos

4    without connecting them to -- I mean, an individual, I assume,

5    has to testify that this photo is the photo of, for example,

6    the fish tank in the home.  They could've done that with the

7    ambassador.  They did not.

8            THE COURT:  Right.  You are not disputing

9    authenticity, but what you are saying is that someone who

10   knows,  with knowledge, has to say, this fish tank was in this

11   home; is that what you're saying?

12           MR. DE CASTRO:  I'm saying that, yes.

13           THE COURT:  So --

14           MR. DE CASTRO:  They may have that person, I don't

15   know, because I don't know who's coming, so I have no idea.

16           MS. KOMATIREDDY:  Your Honor, a couple of things.

17           First, we're asking the jury to draw the inference

18   that it is from the defendant's home because it's on the

19   defendant's computer, and there's at least one photo of  --

20           THE COURT:  You have someone who is going to say

21   that?

22           MS. KOMATIREDDY:  That it's own the defendant's

23   computer?

24           THE COURT:  Yes.

25           MS. KOMATIREDDY:  Yes, that's what I believe defense

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                           1400

1   is going to stipulate to, that's it's on the defense -- these

2   are all coming from the defendant's computer.

3              THE COURT:  You said authenticity.  I don't think

4   you told me why it is authentic.

5              This is all from the defendant's computer.

6              MR. DE CASTRO:  That's right, it is on his computer.

7   But, you know, that's like saying every photo on my computer,

8   if I went on vacation the other day and took photos, is now

9   my -- you know, so --

10             THE COURT:  It is not quite  like that.

11             MR. DE CASTRO:  No, I know it's not.  But it's -- I

12  know we're talking about the fish tank.  I'm talking a little

13  bit more globally here in terms of everything that's on his

14  computer.  Like, there's thousands and thousands and thousands

15  of documents on his computer.

16             MS. KOMATIREDDY:  I'll just add, I think this makes

17  this easy.  There's a photo of the defendant's reflection in

18  the fish tank.  He's taking a photo of it.

19             THE COURT:   Okay.  Look, the fact that it comes

20  from his computer, while it is theoretically possible that he

21  could have taken pictures on vacation, the government, I think

22  for admissibility purposes, will have made a prima facia case

23  telephone to defendant subject to the defendant rebutting that

24  and getting in some evidence that that's not the case and it

25  wasn't his home.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                              1401

1          MR. DE CASTRO:   I mean, another example, Judge, is

2    they want to put in photos of, like, cars, for example.  He

3    has pictures of cars on his computer.  And then they want the

4    jury to just infer that they're his?  I mean, that seems way

5    out of bounds and a little bit way over prejudicial.  They

6    want to show a really nice car and say -- with no witness to

7    say that that's his?  I don't -- I mean, the fish tank is a

8    fish tank, but I mean --

9          THE COURT:  Well, there is no dispute about the

10   houses, right?  The houses are his?

11         MR. DE CASTRO:  That he has a house in Mexico City

12   and -- correct.  Right.

13         THE COURT:  The picture of the house is his house,

14   is there a dispute about that?

15         MR. DE CASTRO:   Well, they're putting a lot of

16   pictures in a --

17         THE COURT:  They're going to put less.

18         MR. DE CASTRO:  There are definitely pictures on his

19   computers of his houses, yes, yes.  But they still need a

20   witness.  They still have to properly admit it.  Just because

21   it's on his computer --

22         THE COURT:  I'm appreciating the risk of him having

23   pictures that are a property other than his.  That's a

24   possibility.

25              On the other hand, the question is, can a reasonable

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                              1402

1   inference be drawn that if it is on his computer, it is his?

2   I think your cross-examination  is going to -- well, you know

3   what your cross-examination is going to be.

4           MR. DE CASTRO:  Well, but the cross-examination of a

5   person who has no idea of anything.  This person just said, I

6   took these discs or whatever they gave them, I pulled them

7   off.  This is just an analyst.  This isn't a person that has

8   any knowledge of this case, anything.  So any question I ask

9   is going to be:  I don't know.  I don't know.  I was asked to

10  just take these photos.

11          THE COURT:  That's your point, isn't it?

12          MR. DE CASTRO:  Well, potentially.

13          THE COURT:   If I admit it, that's your point.

14          MR. DE CASTRO:  That's one point, I suppose.

15          THE COURT:  Can't the government do anything more

16  than, it was on his computer?

17          MS. KOMATIREDDY:  We can, Your Honor .  Some of the

18  cars are in his home, parked at his home.  Some are identified

19  in a bill of lading because he actually brought some of his

20  cars to the United States afterwards.  And some will be

21  declared in his Mexico official government patrimonial

22  statements.

23          THE COURT:  Okay.  I think that is more than ample

24  for admissibility purposes.  We will take it one exhibit at a

25  time because no one has had a chance to -- no one but the

PROCEEDINGS                                    1403

1   government has had a chance to review all the exhibits.  I

2   have instructed the government, don't make it cumulative.   I

3   am adding to that, don't make it be just it was on his phone.

4   Okay?  It has got to be something more.  With those

5   parameters, I think the government can proceed.

6          MR. DE CASTRO:  So just so I know how we're doing

7   this, because, I mean, my list of objectionable stuff is three

8   pages on my list.  So we're going to be at sidebar, after

9   sidebar, after sidebar.

10          THE COURT:   Well, but maybe not.

11          MS. KOMATIREDDY:  Your Honor, I can tell you our

12   plan, and it's consistent how we've -- I've at least done it

13   in other cases.

14          Our plan is by group to say with the witness:  Did

15   you review photographs of a home that was in -- appear -- you

16   know, that appeared to have a fish tank?  We don't have to --

17   our preference would be to bulk admit exhibits.  We don't have

18   to publish every one.  We can -- once the point is made, we

19   can move on.

20          THE COURT:  Okay.

21          MS. KOMATIREDDY:  And then did you review

22   photographs of a home in Jiutepec, in Cuernavaca, Morelos.

23          THE COURT:   Okay.  But you are going to have

24   subsequent that it is going to -- besides coming off his

25   computer, that it's going to tie these items to the defendant;

PROCEEDINGS                     1404

1    is that right?

2                MS. KOMATIREDDY:  Yes, Your Honor.

3                THE COURT:  Okay.  And then in that case, what I

4    want to do is, I will take them subject to connection and we

5    will make sure the government ties it up before the jury sees

6    it.

7                MR. DE CASTRO:  She just said now, like, for

8    example, did you look at a house in Cuernavaca, Morelos?

9                How does this witness know that this is Cuernavaca,

10   Morelos.

11               MS. KOMATIREDDY:  There's a -- both the -- there's

12   metadata that indicates the location of the home.  There's an

13   invitation for the defendant's fiftieth birthday party that

14   indicates the location of the home.

15               THE COURT:  She's going to put all that in.  If not

16   through that witness, then subsequently.  And then I will

17   admit it unconditionally.  But for now, I will admit it

18   conditionally.

19               MR. DE CASTRO:   Okay.  And so, for example, if they

20   want to put a picture of a yacht that's in Miami that was

21   purchased by other people, he doesn't even own it, and that's

22   going to come in?  I'm a little concerned about that.

23               THE COURT:  How do you tie the yacht to him?

24               MS. KOMATIREDDY:  Your Honor, that was -- I know

25   Your Honor precluded post 2012, but that was purchased in 2012

PROCEEDINGS                          1405

1   while he was still a government official, I believe.

2           THE COURT:  And you're going to show that, that it

3   was this yacht that was purchased?

4           MS. KOMATIREDDY:   Yes, it has the yacht number, I'm

5   advised.

6           MR. DE CASTRO:  And not purchased by him.

7           MS. KOMATIREDDY:  Of course not.  It was purchased

8   by another person for him.  That's the point.

9           MR. DE CASTRO:  They don't have any testimony --

10          THE COURT:  How are you going to link the person

11  purchasing it for him or him to the yacht?

12          MS. KOMATIREDDY:  We have a witness who can testify

13  to that.

14          THE COURT:  Okay.  I'm going to take it subject to

15  connection.  Okay?  And I am going to tell you, you don't have

16  to object to every one because I am only taking it subject to

17  connection.  And so I understand you are objecting to anything

18  subject to connection.  We will revisit that when the

19  government rests.

20          MR. DE CASTRO:  My request would be that  if you

21  admit  -- take them subject to connection, that none of them

22  be published because that can't be undone.

23          THE COURT:  That is just -- well.

24          MR. DE CASTRO:  They can publish them later.

25          THE COURT:  Why not?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                          1406

1         MS. KOMATIREDDY:  Well, then we're basically done

2    for the -- I just don't understand when we're going to publish

3    them.  That's the purpose of this witness is to be able to --

4         THE COURT:  Well, you have subsequent evidence

5    coming in after this witness to show these connections, right?

6         MS. KOMATIREDDY:  Sure.  We can put another person

7    on the stand just to publish them.  It's fine.

8         THE COURT:  I want to make sure that is really what

9    the defense wants.

10         MS. KOMATIREDDY:  We'll just do it Monday, I guess.

11         THE COURT:  Okay.

12         MS. KOMATIREDDY:  I mean, we're basically done for

13    the date after this.

14         MR. DE CASTRO:  I mean, schedule aside, I want them

15    to publish them when they can actually connect them.  And

16    again, I am standing here with no knowledge of who the next

17    witnesses are because they don't provide us with notice of

18    their witnesses until maybe three  days before.  And we're

19    still waiting and now they're saying they're finishing on

20    Tuesday when I had at least 30 witnesses on my list from them.

21         THE COURT:  Well, but that is a good thing, right?

22         MR. DE CASTRO:  It's a -- it's certainly a good

23    thing.  I would love to know who's coming.  I would love to

24    know what, you know --

25         THE COURT:  You're going to know because it looks

PROCEEDINGS                                    1407

1   like we're going to break shortly today.  They're going to

2   tell you what they're going to do by tomorrow morning.  And

3   then we'll finish up on Monday.

4            MS. KOMATIREDDY:  Your Honor, I have a suggestion.

5            Should we just do the slideshow for Your Honor and

6   professor the evidence so that everyone can see what the plan

7   is.

8            THE COURT:  I am taking it subject to connection

9   anyway.

10           MS. KOMATIREDDY:  Okay.

11           THE COURT:  So I am assuming there is going to be a

12  valid proffer.  But I don't see why the jury should -- if the

13  defendant is insisting, as is his right, to have that proffer,

14  then we'll show it to the jury when I get the evidence that

15  supports the linkage.

16           But I will say if the parties sit down and talk

17  about these pictures and the government tells the defense,

18  here is what we're going to say and here is where the tracing

19  is, we have very reasonable lawyers on both sides here who

20  don't want to make unnecessary work, and you will probably

21  have nine-tenths of this worked out by Monday.

22           MS. KOMATIREDDY:  I think that's right, Your Honor.

23  And I think just putting the patrimony statements and the

24  yacht aside for a minute, the evidence with respect to the

25  Mexico City home and the Cuernavaca home is already in

PROCEEDINGS                          1408

1    evidence.

2              THE COURT:  I agree.

3              MS. KOMATIREDDY:   And so at least we should -- my

4    suggestion would be to show those photos today.

5              THE COURT:  Yes.  We have foundation for those, so

6    that's okay.

7              MS. KOMATIREDDY:  Thank you, Judge.

8              THE COURT:  Okay.  Let's get the jury back in,

9    please.

10             So this is going to be like a ten-minute witness,

11   maybe a little more on cross, and then you are going to rest

12   for the day.

13             MS. KOMATIREDDY:  Yes, Your Honor.  And we just need

14   a stipulation signed.

15             THE COURT:  You have a stipulation too somewhere?

16             MS. KOMATIREDDY:  Yes.  We're just going to make

17   sure it's signed.

18             THE COURT:  Okay.

19             (Pause in proceedings.)

20             (Jury enters.)

21             THE COURT:  All right.  Everyone be seated.

22             Let's go ahead and have the government's next

23   witness.

24             MS. DIOUF:  Your Honor, before I begin, I would like

25   to read a stipulation into the record.

PROCEEDINGS                            1409

1          THE COURT:  Okay.

2          MS. DIOUF:  It is hereby stipulated and agreed

3   between the parties that Government Exhibits 1302 through

4   1329, 1332 through 1339, 1341 through 1350, 1352, 1353, 1354,

5   1355.

6          THE COURT:  Slow down for the court reporter.

7          MS. DIOUF:  Apologies.

8          1356, 1359, 1360, 1363, 1364, 1374 through 1379 ,

9   1383, 1389, 1390, 1395 through 1397, 1424, 1425, 1442 , 1444

10   through 1463, 1465, 1473 through 1477, 1481, 1482, 1487, 1494,

11   1505 through 1508, 1510 through 1512, 1515, 1516, 1523, 1528,

12   1530, 1531, 1533, 1540, 1542, 1543, 1558, 1559 and 1560 are

13   true and accurate copies of files recovered from the

14   defendant's electronic devices pursuant to a consensual

15   search.

16          The above-listed exhibits came from the following

17   devices belonging to the defendant:

18          M-12, a Toshiba external hard drive.

19          M-13, an Apple iPhone 7.

20          M-15 a BlackBerry cellular device.

21          M-16, an Apple laptop computer.

22          And M-18, an Apple desktop computer.

23          Government Exhibit 1300-A is a summary chart

24   reflecting the file paths and creation data of the

25   above-listed exhibits where applicable, as well as which

GEORGE DIETZ – DIRECT – MS. DIOUF          1410

1    device the exhibit was found on.

2              This stipulation marked as Government Exhibit 904 is

3    admissible in evidence at trial as one of 1300-A.

4              THE COURT:   Okay.  Those are all admitted pursuant

5    to the stipulation, and the stipulation itself is admitted.

6              (Government Exhibit 904, was received in evidence.)

7              THE COURT:  Next witness.

8              MS. DIOUF:  The government calls Special Agent

9    George Dietz.

10             (Witness takes the witness stand.)

11   **GEORGE DIETZ**, called as a witness, having been first duly

12   sworn/affirmed, was examined and testified first duly

13   sworn/affirmed:

14             THE COURT:  Please be seated.

15             State and spell your name into the record, please.

16             THE WITNESS:  George Dietz, G-E-O-R-G-E, D-I-E-T-Z.

17   DIRECT EXAMINATION

18   BY MS. DIOUF:

19   Q    Good morning, Mr. Dietz.

20   A    Good morning.

21   Q    And just to be clear, do you have Government

22   Exhibit 1300-A with you at the witness stand?

23   A    1300-A is the stipulation?

24   Q    The summary chart?

25   A    Summary chart, yes, I do.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

GEORGE DIETZ – DIRECT – MS. DIOUF                1411

1   Q     Okay.  What is your title, Mr. Dietz?

2   A     I am a special agent.

3   Q     And where do you work?

4   A     I work for the United States Department of Justice,

5   specifically at the U.S. Attorney's Office, Eastern District

6   of New York.

7   Q     And how long have you been a special agent for the

8   Department of Justice?

9   A     I've been at the Eastern District for almost five years.

10  Q     And generally speaking, what are your duties as a special

11  agent for the Department of Justice?

12  A     So we conduct investigations, witness interviews, gather

13  and collect evidence, provide trial support and advice to

14  prosecutors during trials, gather evidence and preserve the

15  integrity of investigations.

16  Q     What did you do before you were a special agent at the

17  Department of Justice?

18  A     I was a special agent with the Office of Inspector

19  General for the U.S. Department of Housing and Urban

20  Development.

21  Q     And what did you do before that?

22  A     Before that, I worked in the private sector.

23  Q     And before that?

24  A     Before that, I was a contractor working as an

25  intelligence specialist.

GEORGE DIETZ – DIRECT – MS. DIOUF          1412

1          And prior to that, I was in the -- I was active-duty

2     Navy for approximately eight years doing the same thing.

3     Q     What is your highest level of education?

4     A     I have a master's degree in economics with a

5     concentration in econometrics and finance.

6     Q     Special Agent Dietz, are you familiar with an

7     investigation into Genaro Garcia Luna?

8     A     I am.

9     Q     How are you familiar with it?

10    A     Because I've been supporting that investigation and the

11    trial.

12    Q     Have you reviewed electronic evidence from the Defendant

13    Genaro Garcia Luna's electronic devices as part of your role

14    in this case?

15    A     Yes, I have.

16    Q     As part of your review, Special Agent Dietz, have you

17    reviewed photos of a white house?

18    A     Yes, I have.

19          MS. DIOUF:  I'd like to show what's been marked for

20    identification to the witness only, side by side, Government

21    Exhibit 1302 and 1341.

22    Q     What are we looking at here?

23    A     We're looking at a picture of a white house.

24    Q     And based on the creation data of these photos, when were

25    they taken?

GEORGE DIETZ – DIRECT – MS. DIOUF          1413

1    A    These photos were taken in April of 2009.

2              MS. DIOUF:  I move to admit these into evidence and

3    publish.

4              MR. DE CASTRO:  Subject to the connection.

5              THE COURT:  Admitted over objection.

6              (Government Exhibit 1302, 1341, were received in

7    evidence.)

8              MS. DIOUF:  And if we could dim the lights, please.

9              Thank you, Your Honor.

10             THE COURT:  I got it.  I got it.

11             MS. DIOUF:  And now I'd like to show the witness

12   only what's been marked for identification as Government

13   Exhibit  1345.

14   Q    What are we looking at here, Special  Agent Dietz?

15   A    This appears to be a picture of the same white house.

16   Q    And when was this photo taken?

17   A    This picture was taken in October of 2009.

18             MS. DIOUF:  And I'd also like to show for the

19   witness what's marked for identification as Government

20   Exhibit 1349.

21   Q    And what are we looking at here, Special Agent Dietz?

22   A    This is another view of what appears to be the same white

23   house.

24   Q    And when was this photo taken?

25   A    This one was taken in October of 2009.

GEORGE DIETZ – DIRECT – MS. DIOUF          1414

1          MS. DIOUF:  The government moves to admit Government

2     Exhibits 1345 and 1349 and publish.

3          THE COURT:  Received over objection.

4          (Government Exhibit 1345 & 1349, were received in

5     evidence.)

6          MS. DIOUF:  And can we show 1345 as well, please.

7          I'd like to now show the witness what's been marked

8     for identification only as Government Exhibits 1342, 1343 and

9     1344.

10         And we can pull them up together if we can,

11    Ms. Donovan.

12    Q    And what are we looking at here, Special Agent Dietz?

13    A    We're looking at pictures of that same area.  The top

14    picture, the white house is in the background.  It looks like

15    there's construction going on.  The bottom picture looks to

16    be -- looks to be walls.  And then the picture on the right is

17    a building being torn down.

18    Q    And when were these photos taken?  1342 , 1343  --

19    A    Thank you.  Thank you.

20         42 and 44 were taken in October of 2009.  There's no

21    date on 43.

22         MS. DIOUF:  I move to admit these into evidence and

23    publish.

24         THE COURT:  Received over objection.

25         (Government Exhibit 1342, 1343, 1344, were received

GEORGE DIETZ – DIRECT – MS. DIOUF          1415

1   in evidence.)

2   Q    I'd like to show the witness only what has been marked --

3   and actually, Special Agent Dietz, could you circle in the top

4   left photo you're indicating where you could see the white

5   house?

6   A    Sure.

7          MS. DIOUF:  And the witness has circled the top left

8   corner of Government Exhibit 1342.

9          I'd like to show the witness only what's been marked

10  for identification as 1450, 1444 and 1448.

11         THE COURT:  Getting kind of cumulative here.

12         MS. DIOUF:  Your Honor, I only have a few more of

13  this house, and it's subject to connecting the continuity of

14  the house.

15         THE COURT:  I know.  I know.  Okay.  Go ahead.

16         MS. DIOUF:  Thank you.

17  Q    Special Agent Dietz, what do we see in these exhibits?

18  A    We're seeing this, first, 1450 is a picture of what

19  appears to be the inside of the white house.  You can see a

20  pool on the outside.

21  Q    And can you see a thatched roof in the background?

22  A    Yes, you can.

23  Q    Okay.  And what about 1444?

24  A    1444 appears to be a view from underneath that thatched

25  roof back towards the house.

1   Q    And 1448?

2   A    1448 appears to be another view from underneath that

3   thatched roof into a different direction.

4              MS. DIOUF:  I move to admit these and publish.

5              THE COURT:  All right.  Received over objection.

6              (Government Exhibit 1450, 1444, 1448, were received

7   in evidence.)

8   Q    And Special Agent Dietz, could you circle where you see

9   the thatched roof on Government Exhibit 1450?

10  A    Absolutely.

11             MS. DIOUF:  And then could we just flip briefly to

12  1444 and 1448 side by side.

13  Q    And is this the same view from under the thatched roof?

14  A    Yes.

15             MS. DIOUF:  I'd like to now show, side by side,

16  what's been marked for identification to the witness only

17  Government Exhibits 1453 and 1540.

18  Q    And what are we looking at here?

19  A    We are looking at the pool from -- on 1453 from the --

20  down on the pool from what appears to be the second floor of

21  the -- of the white house.

22  Q    And do you see any of the same objects in these photos?

23  A    Excuse me?

24  Q    Do you see any of the same objects in these photos?

25  A    Yes.

GEORGE DIETZ - DIRECT - MS. DIOUF          1417

1    Q    What do you see?

2    A    I see the thatched roof, the thatched roof area that we

3    looked at before, the pool.  There also appears to be a hot

4    tub or a jacuzzi to the left of the pool.

5          MS. DIOUF:  I move to admit these and publish.

6          THE COURT:  Received over objection.

7          (Government Exhibit 1453 & 1540, were received in

8    evidence.)

9          MS. DIOUF:  I'd like to show the witness what's been

10   marked for identification as 1458 and 1456.

11   Q    What are we looking at here?

12   A    We're looking at a view of the backyard from that white

13   house, appears to be from the second story.

14          MS. DIOUF:  I would move to admit and publish.

15          THE COURT:  Received over objection.

16          (Government Exhibit 1458 & 1456, were received in

17   evidence.)

18          MS. DIOUF:  I'd like to show the witness now what's

19   been marked for identification as Government Exhibit 1454.

20   Q    And what are we looking at here?

21   A    It's a picture of a bathroom.

22   Q    And what is in the file path of this photo?

23   A    The root file path has the name Amate (ph) in it.

24   Q    Is there a file number following that?

25   A    Amate 13.

GEORGE DIETZ – DIRECT – MS. DIOUF          1418

1      MS. DIOUF:  I move to admit and publish this photo.

2      THE COURT:  Received over objection.

3      (Government Exhibit 1454, was received in evidence.)

4      MS. DIOUF:  And I'd to show Government Exhibit 1449

5  and 1305 side by side.

6      For the witness only, yes, please.

7  Q    And what are we looking at here?

8  A    It's pictures of a driveway and a house.  The top part

9  has white walls.  They appear to be the same color as the

10 other pictures we saw.

11 Q    And does Government  Exhibit 1305 have  Amate 13 in the

12 file path?

13 A    Yes, it does.

14     MS. DIOUF:  I move to admit these and publish.

15     THE COURT:  Received over objection.

16     (Government Exhibit 1449 & 1305, were received in

17 evidence.)

18     MS. DIOUF:  Showing Government Exhibit 1447 to the

19 witness only, please.

20     1447.  Thank you, Ms. Donovan.

21 Q    What are we looking at here?

22     THE COURT:  Okay.  Too many.  It's enough.  Go on to

23 something else.

24     MS. DIOUF:  I'm showing what's been marked for

25 identification as Government Exhibit 1334.

GEORGE DIETZ – DIRECT – MS. DIOUF          1419

1    Q    What are we looking at here?

2    A    This is a picture.  I don't know who the individual is on

3    left, although he's in uniform.  And then the person on the

4    right appears to be the defendant.

5    Q    When was this photo taken?

6    A    1334?  In October of 2010.

7    Q    And what can you see in the background of this photo?

8    A    I could see what appears to be a bar with a lot of

9    bottles, and then some -- it looks like some police

10   memorabilia up on the top shelf behind them.

11        MS. DIOUF:  And so now I'd like to show the witness

12   what's been marked for identification as Government

13   Exhibit 1328.

14   Q    What are we looking at here?

15   A    We're looking at a room.  You can see what appears to be

16   that same bar off to the right.  And then there is a large

17   fish tank, appears to be built in the wall.  And up above the

18   fish tank part in the black glass, you can see somebody taking

19   a picture of the fish tank.

20   Q    What's in front of the fish tank?

21   A    It appears to be -- not appears to be.  There is a small

22   piano or a piano.

23        MS. DIOUF:  I move to admit Government Exhibit 1334

24   and 1328 and publish.

25        THE COURT:  I am receiving it subject to

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

GEORGE DIETZ – DIRECT – MS. DIOUF          1420

1    connection, but I am not publishing it.  Hold on.  Not

2    publishing it.

3              (Government Exhibit 1334 & 1328, were received in

4    evidence.)

5              THE COURT:  Please observe the guidelines we

6    discussed.

7              MS. DIOUF:  Your Honor, may we have a brief sidebar?

8              THE COURT:  Sure.

9              (Continued on the next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1421

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          MS. KOMATIREDDY:  I'm a little bit confused.   This

5     is a Mexico City house.

6          THE COURT:  How do we know it is the Mexico City

7     house?

8          MS. KOMATIREDDY:  The ambassador said he went to a

9     house in Mexico City with a large fish tank.

10         THE COURT:  How do we know this is the fish tank in

11    that house?

12         MS. KOMATIREDDY:  Because there's a photo of the

13    defendant taking a photo of the fish tank and the reflection

14    of him.  And the prior photo of him with the general, the

15    Colombian general, is dated 2010, which puts it in the time

16    period.

17         THE COURT:  Is anyone going to say who the Colombian

18    general is?  I actually thought it was a U.S. uniform.

19         MS. KOMATIREDDY:  We were actually going to -- we

20    weren't.  We were thinking we wouldn't publish that.  I didn't

21    feel it was necessary to publish that particular photo.  It's

22    just to root the time period.  But we can -- I don't know who

23    it is.

24         THE COURT:  You brought this on yourselves by giving

25    none of us any notice of what is going on, so I cannot give

SIDEBAR CONFERENCE                    1422

1   you the benefit of the doubt on that.

2          The fish tank, yes, if you see the defendant's

3   reflection.

4          MS. KOMATIREDDY:  Your Honor, the defense argued he

5   built it himself.  They made this a central issue that somehow

6   he had this large fish tank he built it himself.

7          THE COURT:  It does not refute that, that he built

8   it himself.

9          MS. DIOUF:  Also, another photo of the same bar area

10  not showing the fish tank, not showing the reflection.

11         THE COURT:  Where is the defendant in the reflection

12  of this one?

13         MS. REID:  And he's wearing the same outfit.

14         MS. KOMATIREDDY:  He's here, Your Honor.

15         And another photo that also shows him more clearly.

16         MR. MIEDEL:  I don't think you can tell from that

17  reflection that's him.

18         MS. REID:  And there's another picture where he's

19  wearing the same outfit and the reflection  is much clearer.

20         THE COURT:  Sorry, let's see the other picture.

21  That was not sufficient.

22         MS. KOMATIREDDY:  The defense claim it's a modest

23  country home.  That's the only reason we put in the basketball

24  court.

25         THE COURT:  I let you put in all the pictures of the

1    home because they fit the prior description.

2            Not enough.  Not enough.

3            Go ahead, do what you can.  Try again on Monday if

4    you get something more.

5            (End of sidebar conference.)

6            (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DIETZ – DIRECT – MS. DIOUF                 1424

```
 1              (In open court.)

 2    BY MS. DIOUF:

 3    Q    Switching topics, Special Agent Dietz.

 4              And circling back to your duties and

 5    responsibilities as a special agent with the Department of

 6    Justice, did those duties include handling government

 7    witnesses.

 8    A    Yes, they do.

 9    Q    And can you describe how you -- what your procedures are

10    for handling government witnesses?

11    A    Generally?

12    Q    Yes.

13    A    I mean, it covers a whole range of things.  Government

14    witnesses, in particular, we keep them separated.  We don't

15    have them meet with other witnesses.  We want to make sure

16    that the information that they're providing, the integrity of

17    the information, isn't contaminated by running into other

18    witnesses or seeing information that they don't have personal

19    knowledge of.

20    Q    And did you handle the government witnesses in this case?

21    A    Yes, I did.

22    Q    Did you take measures to ensure that the witnesses in

23    this case did not see or talk to each other?

24    A    Yes, we did.

25    Q    Can you describe those measures?
```

DIETZ - DIRECT - MS. DIOUF                1425

1    A    Sure.  We -- a few months before the trial even started,

2    we met with the stakeholders, DEA, HSI and the marshals to

3    discuss movement of the witnesses, both in-custody and

4    out-of-custody witnesses, to make sure that no witnesses would

5    run into each other.

6    Q    And can you describe the measures you took when witnesses

7    were being interviewed and meeting with the prosecutors to

8    prepare for this case?

9    A    Sure.  Same thing, people came in -- people came in at

10   different times, different entrances, different buildings.  We

11   always made sure that there were agents on each one of the

12   witnesses, if there were multiple witnesses in a building, and

13   tried to vary that to include doing a lot of these prep

14   sessions and interviews over the weekends.

15   Q    Were witnesses transported separately?

16   A    Yes, they were.  That's a standard, standard practice

17   with witnesses.

18   Q    Can you describe the measures you took to -- with respect

19   to in-custody witnesses?

20   A    Sure.  With in-custody witnesses, we talked to the

21   marshals, we talked to MDC.  There were separation orders

22   related to some of these custody witnesses.  And one of the

23   main things that we did was, we moved those witnesses

24   individually with agents from both the investigative agencies

25   as escorts by themselves.  Usually one -- it should have been

DIETZ - DIRECT - MS. DIOUF                    1426

1    one in-custody witness to two agents.

2    Q    What's a separation order?

3    A    So a separation order is an order filed requesting that

4    certain inmates not be put together.

5    Q    And were any witness -- did you inform any witness what

6    another witness said in this case?

7    A    No, I -- no.  We don't do that.

8    Q    Did you discuss evidence from one witness to another in

9    this case?

10   A    No.

11   Q    Do you show witnesses evidence provided by other

12   witnesses in this case?

13   A    No.

14           MS. DIOUF:  Just a minute, please, Your Honor.

15           Your Honor, we would ask to continue Special Agent

16   Dietz's direct on Monday.

17           THE COURT:  Any objection?

18           MR. DE CASTRO:  No, Judge.  No, Judge.

19           THE COURT:  And that's all the government has for

20   today; is that right?

21           MS. DIOUF:  Yes, Your Honor.

22           THE COURT:  Is the government definitely going to

23   call the agent back on Monday?  Because, you know, the defense

24   has to have an opportunity to cross, right?

25           MS. DIOUF:  Yes, Your Honor, the government intends

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                                    1427

1   to call Special Agent Dietz back on Monday.

2           THE COURT:   All right.

3           Ladies and gentlemen, this is actually good news for

4   you.  It means the government's case is going to wrap up early

5   next week.  I don't know what, if anything, the defense will

6   do because, of course, the defense has no obligation to do

7   anything at all or put in any evidence because of the

8   presumption of innocence and the government's burden of

9   proving guilt beyond a reasonable doubt, but I think it is

10  fair to say we are way ahead of where we intended to be at

11  this point.

12          So we will probably -- again, probably, because I

13  don't want anyone getting mad at me and saying, Judge, you

14  told us, but probably we will finish the government's case on

15  Monday, and then we will see where we are.  So you got the

16  afternoon off.  If you want to wait for lunch -- did you

17  cancel lunch, Quadri.

18          THE COURTROOM DEPUTY:  I did.

19          THE COURT:  Canceled it?

20          Sorry.  You're on your own for lunch.

21          Please remember the rules as we get to this later

22  stage of the case, especially.  Please do not look at any

23  media coverage of this case.  Do not communicate with anyone

24  about it.  We will see you Monday morning, 9:30, and we are

25  making great progress, like I said.  Have a good weekend.

PROCEEDINGS                                    1428

1            (Jury exits.)

2            THE COURT:   All right.  Everyone be seated.

3            You may step down.  See you Monday.

4            (Witness steps down.)

5            MS. KOMATIREDDY:  Your Honor, I had a few

6    housekeeping items.

7            THE COURT:  Okay.

8            MS. KOMATIREDDY:  First of all, with respect to

9    yesterday's transcript, we wanted to ask to seal the sidebar

10   at transcript pages 1294 to 1295 because they discuss the

11   matter with respect to Mr. Veyita that was as part of a sealed

12   motion.

13           MR. DE CASTRO:  No objection.

14           THE COURT:  All right.  I am finding that the

15   interests that the government has identified outweigh the

16   public's qualified right to access, so I am going to direct

17   the court reporter to seal those pages available only to the

18   defense and the government.

19           MS. KOMATIREDDY:  In addition, we intend --  we will

20   provide the defense with our witnesses for Monday later today.

21   We did want to ask for a defense witness list, the defense

22   exhibit list and 26.2 material.

23           THE COURT:  Right.

24           What does the defense want to tell us?

25           MR. DE CASTRO:  Well, I guess I should say that the

PROCEEDINGS                              1429

1    government's notice that they're done on Tuesday was somewhat

2    surprising, given that they originally had said about 32 trial

3    days for their case, then I think they said in the beginning

4    of jury selection it would be about 24  trial days.  We are

5    now at eight trial days.  So I had not anticipated --

6              THE COURT:  Like I said, that's a good thing.

7              MR. DE CASTRO:  It's a good thing, but I say that

8    only to say that I did not anticipate -- I anticipated at

9    least another eight days, perhaps, especially given their

10   witness list and how many sort of big witnesses were on there.

11   And so I can't really say anything right now.

12             We got the letter last night or the information last

13   night, and so we're just starting to sort of figure out what

14   the plan is.  Of course Mr. Garcia  Luna has a right to

15   testify in the case, and so we are having those conversations

16   in earnest with him.

17             THE COURT:  Do you feel comfortable in telling us

18   whether, aside from the possibility that the defendant may

19   testify, you intend to present other evidence?

20             MR. DE CASTRO:  Give me one sec, Judge.

21             THE COURT:  You don't have to, but just for

22   scheduling, it would help everyone.

23             MR. DE CASTRO:  No, of course.  No, of course.  I

24   think I can say something.

25             (Pause in proceedings.)

PROCEEDINGS                               1430

1            MR. DE CASTRO:  Judge, I would -- on that front, we

2       would say minimal.  We don't think anyone other than

3       Mr. Garcia Luna, if he were to testify, would be lengthy.

4            THE COURT:  If there is going to be anyone else,

5       please let the government know by Friday.  Okay?

6            MR. DE CASTRO:   Of course.

7            THE COURT:  And let us have a decision on whether

8       the defendant is going to testify -- it sound like the

9       government's going to rest on Monday, right?

10           MS. KOMATIREDDY:  I think so, Your Honor.

11           THE COURT:  So let us be ready on Monday, so we

12      don't lose another half a day.

13           MR. DE CASTRO:  For sure.

14           THE COURT:   Okay.  Anything else we have to cover?

15           MS. KOMATIREDDY:  This may be asking too much, but

16      is there any chance we could get a decision on whether the

17      defendant is going to testify over the weekend?  No?

18           THE COURT:  If the defendant is going to testify, it

19      is going to be Tuesday morning.  I will require the defense to

20      tell you that Monday morning.

21           MS. KOMATIREDDY:  Thank you, Your Honor.

22           THE COURT:  Any problem with that?

23           MR. DE CASTRO:  No, Judge.

24           MS. KOMATIREDDY:  And then I think we need to game

25      out when the charge conference and closings would be, should

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                          1431

1    he testify, should he not testify.

2              THE COURT:  Right.  Well, we will circulate the

3    Court's proposed charge this weekend.  And then we will have

4    our charging conference whenever the defense rests.  So it

5    could be Monday or it could be Tuesday or conceivably it could

6    be Wednesday or Thursday depending on what the defense does.

7              Can't give more than that because I don't know how

8    long the direct of the defendant would be if he's called and

9    how long the cross would be.  It could be several days.  It's

10   possible.

11             MS. KOMATIREDDY:  In the event that the defendant

12   does not testify, we would be closing Wednesday and Thursday;

13   is that fair.

14             THE COURT:  That's very possible, yes.

15             MR. DE CASTRO:  So on that front, I was going to

16   say, so, you know, from the defense perspective, we obviously

17   have to think about whether he's going to testify or not.  And

18   so plus, they are – – I don't –– you have all day Monday?  You

19   have witnesses all day Monday?

20             MS. KOMATIREDDY:  I think we have all day Monday.

21             THE COURT:   Okay.  On that representation, you

22   don't have to –– you have to tell the government Monday what

23   you're going to do, but you don't have to expect to do it

24   until Tuesday.

25             (Continued on the next page.)

PROCEEDINGS                          1432

1     MR. DE CASTRO:  I suspect they will have someone

2  substantive on Monday.  I'm going to be spending my weekend

3  with whatever that substantive witness is, I assume, so I'm a

4  little concerned about being on the spot to immediately sum up

5  when then we might sum, then you would charge, and then the

6  jury wouldn't start deliberating until the following Tuesday.

7     THE COURT:  What would you like to do?

8     MR. DE CASTRO:  My thought would be if they rest on

9  Monday or -- they said today they would rest on Tuesday

10  morning, but who knows -- and then we just sum up on the day

11  after, because it's a holiday weekend.  We just sum up on

12  Tuesday.

13     I don't know what the Government's thought is on

14  that.

15     MS. KOMATIREDDY:  This really all turns on the

16  defendant testifying.  If there's no defense case, I think we

17  should sum next week.  Having a whole week where the jury has

18  the evidence out of mind is not a good idea.

19     THE COURT:  I really agree with that.

20     MR. DE CASTRO:  Well, I hear that, but that's

21  convenient for them, they don't have to prepare for a witness

22  over the weekend and summation when they're now three weeks

23  ahead of schedule and we just learned it.

24     MS. KOMATIREDDY:  That's not true, your Honor.  I'm

25  going to be preparing the cross and the summation and the

PROCEEDINGS                         1433

1    witness.

2              THE COURT:  Let me make this easy.  I'm not going to

3    lose a week.  Okay.  If the Government rests on Monday, and

4    the defendant chooses not to put on a case, then we will

5    definitely close next week.

6              MR. DE CASTRO:  Okay.  I just want to make sure --

7    is the Court okay with sort of us closing like on -- I'm just

8    concerned about the time that the Court, having to charge the

9    jury too.  I mean, if you find -- if, for example, we sum up

10   on a Thursday, then charge them on Tuesday, because -- I don't

11   know how long their summation is.

12             THE COURT:  I think you all have a lot of talking to

13   do at each other.  I am at your disposal, okay.  But you all

14   have to know what you want to do and then you have to

15   communicate with each other so that you work out the schedule.

16             MS. KOMATIREDDY:  We will do that, your Honor.

17             I would just lay out what I expect would be the two

18   possibilities.

19             One is, should there be no defense case we expect we

20   would finish at the end of Monday.  Depending on the cross,

21   there may be some spill over to Tuesday.  I suspect our

22   evidence will be end of Monday.  If there is no defense case

23   my suggestion be we do the charge conference on Tuesday, and

24   both parties close on Wednesday.  My closing is approximately

25   two hours.  And then the Court could charge and the jury could

PROCEEDINGS                              1434

1    start deliberating.

2           Should there be a defense case, my expectation if

3    the defendant testifies on Tuesday, that would probably take

4    all day, and cross would go over into Wednesday.  And we do

5    the charge conference on Thursday and sum the next week.

6           THE COURT:  That sounds like a fine plan to me.

7    Let's operate on that assumption.

8           MR. DE CASTRO:  Okay.

9           THE COURT:  Thank you everyone.  We are adjourned.

10          (Proceedings adjourned to resume on February 13,

11   2023 at 9:30 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1435

1                      I N D E X

2    WITNESS                                  PAGE

3

     **MARLENE TARANTINO**
4
     DIRECT EXAMINATION    BY MR. AMIR       1365
5    CROSS-EXAMINATION     BY MR. MIEDEL     1371

6    **EGBERT SIMON**

7    DIRECT EXAMINATION    BY MR. AMIR       1374
     CROSS-EXAMINATION     BY MR. MIEDEL     1379
8    REDIRECT EXAMINATION  BY MR. AMIR       1380

9    **IVAN CARRERA**

10   DIRECT EXAMINATION    BY MS. DIOUF      1383
     CROSS-EXAMINATION     BY MS. GOTLIB     1387
11   REDIRECT EXAMINATION  BY MS. DIOUF      1394

12   **GEORGE DIETZ**

13   DIRECT EXAMINATION    BY MS. DIOUF      1410

14

15

16

17

18

19

20

21

22

23

24

25

1436

1                           E X H I B I T S

2        GOVERNMENT                              PAGE

3        105                                     1366

4        605                                     1376

5        605A                                    1378

6        904                                     1410

7        1302, 1341                              1413

8        1345 & 1349                             1414

9        1342, 1343, 1344                        1414

10       1450, 1444, 1448                        1416

11       1453 & 1540                             1417

12       1458 & 1456                             1417

13       1454                                    1418

14       1449 & 1305                             1418

15       1334 & 1328                             1420

16

17

18

19

20

21

22

23

24

25