1200

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    ------------------------------x
                                          19-CR-576(BMC)
3    UNITED STATES OF AMERICA,
                                          United States Courthouse
4                                         Brooklyn, New York

5              -versus-                   February 07, 2023
                                          9:30 a.m.
6    GENARO GARCIA LUNA,

7              Defendant.

8    ------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                  BEFORE THE HONORABLE BRIAN M. COGAN
10                  UNITED STATES DISTRICT JUDGE
                            BEFORE A JURY
11

12   APPEARANCES

13   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  SARITHA KOMATIREDDY, ESQ.
                                   PHILIP PILMAR, ESQ.
16                                 MARIETOU E. DIOUF, ESQ.
                                   ERIN REID, ESQ.
17                                 ADAM AMIR, ESQ.
                              Assistant United States Attorneys
18
     For the Defendant:      BY:  CESAR DECASTRO, ESQ.
19                                VALERIE GOTLIB, ESQ.
                                  FLORIAN MIEDEL, ESQ.
20                                SHANNON MCMANUS, ESQ.

21
     Court Reporter:         Rivka Teich, CSR, RPR, RMR, FCRR
22                           Phone:  718-613-2268
                             Email:  RivkaTeich@gmail.com
23
     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25

PROCEEDINGS                         1201

1          (In open court.)

2          THE COURTROOM DEPUTY:  All rise.  Honorable

3   Brian M. Cogan now presiding.

4          THE COURT:  Before we have the jury in -- just have

5   a seat, please -- defendant is going to do a cross of this

6   witness.

7          MR. MIEDEL:  I am.

8          THE COURT:  As soon as I left court yesterday it

9   occurred to me I should have asked, whether you still thought

10  you needed the night off in order to do the cross given the

11  direct.

12         MR. MIEDEL:  Yes.

13         THE COURT:  That's okay.  That's fine.  I just -- I

14  don't want you to feel you have to do a cross just because we

15  had motion practice.

16         MR. MIEDEL:  That's fine, Judge.

17         THE COURT:  You still want to do it, right?

18         MR. MIEDEL:  I do.  I do.

19         THE COURT:  My concern was that I was

20  inconveniencing the witness for no reason.  If you want to

21  cross, it might feel better.

22         MS. KOMATIREDDY:  Thank you, Judge.

23         With respect to the witness after this one, I just

24  want to confirm ECF 170, that the Court was going to grant

25  that motion.

WAYNE – CROSS – MR. MIEDEL                 1202

1          MR. MIEDEL:  We don't object to that motion.

2          THE COURT:  Then I am going to grant it.

3          MS. KOMATIREDDY:  Thank you, Judge.

4          THE COURT:  Let's have the witness back and the jury

5    in, please.

6          MR. MIEDEL:  Good morning.

7          THE WITNESS:  Good morning.

8          (Jury enters.)

9          THE COURT:  Everyone be seated.  Good morning again,

10   ladies and gentlemen.  Hope you had a good evening.

11         We will have cross-examination by Mr.  Miedel.

12   CROSS-EXAMINATION

13   CROSS-EXAMINATION  (Continuing)

14   BY MR. MIEDEL:

15   Q    Good morning.

16   A    Good morning.

17   Q    The mic?  Can you hear me?

18         THE COURT:  No.  Try now.

19   Q    Good morning, Your Honor -- good morning, Ambassador.

20         THE COURT:  I think you can call an ambassador

21   "Your Honor."

22         MR. MIEDEL:  I think I can.

23         THE COURT:  People call you Ambassador, right?

24         THE WITNESS:  Ambassador occasionally, yes.

25         THE COURT:  Go ahead.

WAYNE – CROSS – MR. MIEDEL                    1203

1   Q      My name is Florian Miedel.  I represent Genaro

2   Garcia Luna.  Good morning.

3   A      Good morning.

4   Q      So you testified that you were ambassador to Mexico from

5   the end of 2011 until 2015; is that correct?

6   A      From September 2011 until the end of July in 2015, yes.

7   Q      Okay.  And as ambassador to Mexico, you were the highest

8   ranking representative of the United States in Mexico, right?

9   A      Correct.

10  Q      There is nobody higher than you representing the

11  United States in Mexico when you were the ambassador?

12  A      Correct.

13  Q      Now, one of the primary issues that the United States and

14  Mexico deal with as neighbors is the drug war, correct?

15  A      Yes.  And -- and related public security issues.

16  Q      Sure.

17         And is it fair to say that by the time that you were

18  ambassador to Mexico, Mexico was the number one source of

19  illegal drugs coming into the United States.

20  A      It was certainly the major drug focus of -- coming into

21  the United States during that period of time, yes.

22  Q      And when you were ambassador, Mexico was a close partner

23  of the United States in trying to curtail or to stop the drug

24  trafficking across the border, correct?

25  A      That is correct.

WAYNE - CROSS - MR. MIEDEL                    1204

1   Q    And it was the United States -- in the United States'

2   interest to work with Mexico, its government and its police

3   and its armed forces to that -- in that effort, right?

4   A    That is correct.

5   Q    And you worked -- you, personally, worked closely with

6   your Mexican counterparts in the Mexican government, right?

7   A    I did.

8   Q    And that included Mr. Garcia Luna, right?

9   A    Yes, it did.

10  Q    Now, you testified yesterday briefly about the Merida

11  Initiative?

12  A    Yes, the Merida Initiative.

13  Q    Merida.  Sorry.

14  A    It's okay, I had to learn too.

15  Q    Could you just explain to the jury a little bit what that

16  was?

17  A    In 2008, President Bush and President Calderon agreed

18  that there needed to be expanded cooperation between Mexico

19  and the United States, and that the United States, as part of

20  that, would provide increased assistance across a range of

21  areas to Mexico to help them strengthen their capacities to

22  work against these organized crime gangs and units that were

23  present in Mexico.

24  Q    And congress  allocated sizable funds for that effort,

25  right?

WAYNE – CROSS – MR. MIEDEL                          1205

1   A      They did.  And they -- there was a yearly appropriation.

2   Q      And as part of that initiative, there was a significant

3   amount of intelligence sharing between the two countries,

4   right?

5   A      There was a good deal of sharing of intelligence between

6   the countries, yes.

7   Q      And the United States provided funds to the government of

8   Mexico to help combat the cartels, right?

9   A      Yes, that is correct.

10  Q      As well as equipment?

11  A      There was training, there was equipment, as well as the

12  person-to-person collaboration, agency-to-agency

13  collaboration.

14  Q      And as your role as ambassador, you had direct dealings

15  with President Calderon?

16  A      I did, yes.

17  Q      And you also had direct meetings, as you testified, with

18  his ministers , correct?

19  A      Correct.

20  Q      And those ministers included Mr. Garcia Luna, right?

21  A      Correct.

22  Q      And he was the cabinet secretary in the Calderon

23  government who was most directly responsible for fighting the

24  war on drugs, right?

25  A      His -- yes, his ministry was the ministry of public

WAYNE – CROSS – MR. MIEDEL                    1206

1    security.  There were other agencies that played important

2    roles in that effort.

3    Q    Now, you testified yesterday that you met Ms. --  with

4    Mr. Garcia Luna multiple times during your year that you

5    overlapped with him, right?

6    A    Yes.

7    Q    And can I just show you what is, for identification

8    purposes, Exhibit I.

9            Has that appeared on your screen yet.

10   A    Not yet.

11   Q    Has it appeared now?

12   A    Oh, wait.

13   Q    Ambassador, do you see that photograph?

14   A    I do.

15   Q    Okay.  Is that a photograph of you meeting with

16   Mr. Garcia Luna?

17   A    It is the two of us talking.

18   Q    And is that a fair and accurate depiction of yourself and

19   Mr. Garcia Luna together?

20   A    Yes.

21           MR. MIEDEL:  Your Honor, I would move to admit

22   Defense Exhibit I.

23           MS. KOMATIREDDY:  No objection.

24           THE COURT:  Received.

25           (Defense Exhibit I, was received in evidence.)

WAYNE - CROSS - MR. MIEDEL                    1207

1   Q    Fair to say that that was one of the times that you were

2   talking with them during your time in Mexico, correct?

3   A    Yes.  It -- it looks like it was the day of the national

4   police.

5   Q    Okay.  Thank you.

6           MR. MIEDEL:  Could we also put up Defense Exhibit H.

7   Q    Now, Ambassador, yesterday you testified that sometimes

8   delegations would come to Mexico and Mr. Garcia Luna would

9   take them to demonstrate training exercises or things like

10  that, right?  Do you remember that?

11  A    I do.

12  Q    Okay.  And this photograph in front of you, is that a

13  photograph of you and Mr. Garcia Luna and other dignitaries?

14  A    Yes, it is.  It's U.S. and Mexican dignitaries.

15  Q    Okay.  And is that in front of a federal police

16  helicopter?

17  A    It is in front of a federal police helicopter that I

18  believe we delivered to the federal police.

19  Q    And is that a fair and accurate depiction of these

20  events?

21  A    Yes, it is.

22          MR. MIEDEL:  Your Honor, I move Defense Exhibit H

23  into evidence.

24          MS. KOMATIREDDY:  No objection.

25          THE COURT:  Received.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

WAYNE - CROSS - MR. MIEDEL                    1208

1        (Defense Exhibit H, was received in evidence.)

2   Q    Ambassador, could you just -- is it fair to say that

3   Mr. Garcia Luna is the person directly in the center of this

4   group?

5   A    Yes, he is.

6   Q    And you are the person standing directly to his right?

7   A    Correct.

8            MR. MIEDEL:  Okay.  Thank you.  You can take those

9   down.

10  Q    Now, you testified that members of congress would at

11  times come to visit Mexico, correct?

12  A    Correct.

13  Q    And there were also members of the executive -- American

14  executive branch, correct?

15  A    Correct.

16  Q    Such as senior members of the Obama Administration?

17  A    Correct.

18  Q    And Mr. Garcia Luna would do presentations for these

19  folks who came to visit, right?

20  A    Correct.

21  Q    And you were present for these?

22  A    Yes.

23  Q    And Mr. Garcia Luna also, to your knowledge, would meet

24  with senior members of the Central Intelligence Agency, the

25  CIA, correct?

WAYNE - CROSS - MR. MIEDEL                    1209

1    A    That's my understanding.

2    Q    And the DEA?

3    A    Yes.

4    Q    The FBI?

5    A    I think, yes.

6    Q    Okay.  Now, you said that you had met Mr. Garcia Luna

7    several times in Mexico, right?

8         I don't mean to put you on the spot, but do you

9    remember meeting Mr. Garcia Luna also in Washington, D.C. on

10   September 18th, 2012.

11   A    No, I don't.  I was in Mexico.

12   Q    Well, do you recall that there was --

13   A    I think I met with him in September -- oh.  2012.  Wait,

14   sorry.  Let me think.  I don't recall.

15   Q    Let me see if this refreshes your recollection.

16        There was a very high-level meeting in Washington,

17   D.C. about the Merida Initiative, which included high- level

18   attendees on the American side, such as Secretary of State

19   Hillary Clinton, Attorney General Holder.

20        Do you remember that.

21        MS. KOMATIREDDY:  Your Honor, objection.

22        THE COURT:   Yes, it seems to me we're quite a bit

23   beyond the scope.

24   Q    You testified about meeting Mr. Garcia Luna.  I just

25   wanted to expand the fact that that also took place in

WAYNE - CROSS - MR. MIEDEL                    1210

1    Washington, D.C.

2          THE COURT:  Okay.  I will allow it.

3    A    It's possible.  I don't remember it though.  I'd have to

4    go back and check my records.

5    Q    Okay.  No problem.

6          But it's true that even though you were stationed in

7    Mexico as the ambassador, there were times when you would go

8    back to Washington, D.C. for certain meetings, correct.

9    A    That is correct.

10   Q    And -- all right.  I'll leave it at that.

11         Now, Ambassador, you were frequently briefed by law

12   enforcement about the narcotics situation in Mexico, correct.

13   A    Correct.

14   Q    And you had, I think what you've said before, a law

15   enforcement team at the embassy?

16   A    Correct.

17   Q    What did that consist of?

18   A    The team following law enforcement included DEA and FBI

19   and the Department of Justice.  It - - if we include the

20   Merida Initiative, it also included the state department

21   section of INL, International Narcotics and Law Enforcement,

22   because they were providing and funding most of the

23   assistance.  It would include members of the defense attache's

24   office also.

25   Q    And were all these people that you just mentioned

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

WAYNE - CROSS - MR. MIEDEL                    1211

1    stationed at the embassy or would they come and go?

2    A    There were -- there were members of all of those elements

3    at the -- at the embassy, and then visitors would come and go

4    on a regular basis.

5    Q    Were you also briefed by members of the DEA who were

6    stationed at Mexico but not at the embassy?  Am I getting that

7    wrong?

8    A    Yeah, my recollection is that most of my direct briefings

9    were from people at the embassy, but it could well be that

10   people came in from consulates and other places at times to

11   join in those briefings.  But my regular dialogue was with

12   people based at the embassy.

13   Q    And the DEA had a significant presence in Mexico,

14   correct?

15   A    They did.

16   Q    And those agents that were part of the DEA that were

17   stationed in Mexico, were those all stationed at the embassy

18   or were there separate offices elsewhere around the country?

19   A    I believe there were others that were in other parts of

20   the country, but I don't remember the details, to be very --

21   to be very honest with you.

22   Q    That's okay.

23        But you -- the law enforcement personnel that

24   briefed you, they themselves received briefings from outside

25   of the embassy, correct.

WAYNE - CROSS - MR. MIEDEL                1212

1        MS. KOMATIREDDY:  Objection.

2        THE COURT:  I'll allow it.

3        If you know.

4   Q    If you know, Ambassador?

5   A    Oh.  The law -- the law enforcement agencies in -- at the

6   embassy were in regular communication with all of the members

7   of their bureau or agencies, wherever they might be in the

8   country.  And also in regular dialogue with those back in the

9   United States, including along the border.

10  Q    Okay.  And Ambassador, were you aware that the DEA

11  maintained confidential sources within the cartels?

12       MS. KOMATIREDDY:  Objection.

13       THE COURT:  Sustained.

14  Q    You're aware that the DEA worked closely with the Mexican

15  federal police, right?

16  A    Yes.

17  Q    And also with other law enforcement branches in Mexico,

18  such as the Army, Navy, right?

19  A    Yes.

20  Q    And you -- it's fair to say that, as the ambassador in

21  Mexico, you were briefed about significant events that

22  occurred in Mexico on the law enforcement area, right?

23       MS. KOMATIREDDY:  Objection.

24       THE COURT:  Do you need a sidebar?  I'm not seeing

25  it.

1              MR. MIEDEL:  Me?

2              THE COURT:  Yes.

3              MR. MIEDEL:  Sure.

4              THE COURT:  Don't say sure.  I mean, I'm sustaining

5      the objection.  Do you want to address it further?

6              MR. MIEDEL:  Yes, I'll take a sidebar.

7              THE COURT:  Okay.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1214

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  First state the objection.

5          MS. KOMATIREDDY:  Objection as to scope and

6    relevance.  And I believe it also calls for hearsay,

7    Your Honor.

8          MR. MIEDEL:  Well, the Ambassador has told the

9    government that he was briefed by law enforcement about law

10   enforcement actions and that he never received any information

11   that Mr. Garcia Luna was corrupt in any other way connected to

12   cartels and he took certain actions based on that and that's

13   sort of what I'm building up to.

14         THE COURT:  Okay.  I mean, I do not think it is a

15   hearsay problem.  It might or might not be beyond the scope,

16   but what are we going to do, call him back during the defense

17   case?

18         MS. KOMATIREDDY:  Not that, Your Honor.  But there's

19   also a 403 problem in eliciting that.  It suggests that

20   without actually talking to the DEA agent that was involved

21   is -- it is an attempt to elicit from the Ambassador the views

22   or opinions or knowledge of everyone who briefed him.

23         THE COURT:  No, I really do not think so.  I think,

24   you know, this defense that the defendant has raised in other

25   context, it really -- it cuts both ways.  I mean, it is the

1    government's whole case that the defendant was deceiving

2    everybody, right?  So naturally this defendant would not have

3    heard anything.  I am not sure how probative it is that he has

4    not heard anything, but I think it is of at least arguable

5    relevance and I do not see a 403 problem by narrowly saying it

6    did  not get up to him, right?

7            MR. MIEDEL:  He's the ambassador of Mexico;

8    something like that would obviously get up to him.

9            THE COURT:  It is an argument, I think an argument.

10   I will allow it.

11           (End of sidebar conference.)

12           (Continued on the next page.)

WAYNE – CROSS – MR. MIEDEL                1216

1           (In open court.)

2    Q    Ambassador, is it fair to say that you were -- and you

3    expected to be briefed about significant events that occurred

4    in law enforcement in Mexico?

5    A    Correct.

6    Q    And it' s also fair to say that no one from law

7    enforcement during the year that you overlapped with

8    Mr. Garcia Luna ever told you that he was corrupt?

9    A    Correct.

10   Q    Or that he took bribes from drug cartels, right?

11   A    Correct.

12   Q    Because if you had received such information, that's

13   something that you would have alerted your superiors in

14   Washington about, right?

15           MS. KOMATIREDDY:  Objection.

16           THE COURT:  I will allow it.

17   Q    Ambassador?

18   A    If there were specific credible evidence that bribes had

19   been received, yes, I and everybody would have alerted

20   Washington.

21   Q    And you wouldn't have invited delegations to Mexico to

22   meet with him and/or share sensitive information with him,

23   right?

24   A    We continued to treat Mr. Garcia Luna and other members

25   of the Mexican security team as important partners in this

1    overall effort to strengthen public security across both

2    countries.

3    Q     Right.

4          And if you had received intelligence or information

5    that Mr. Garcia Luna  was receiving bribes, you wouldn't have

6    done that, would you.

7    A     Um, I would have to put credible and verified

8    intelligence and information, because Mexico is an environment

9    with a lot of information and a lot of allegations flowing

10   around about many people.

11   Q     Sure.

12         And at some meetings that you had with

13   Mr. Garcia Luna, he briefed you on what was happening in

14   Mexico in the law enforcement world, right.

15   A     That's correct.

16   Q     And then you relied on your own law enforcement staff to

17   inform you about whether what he had told you was true, right?

18   A     Correct.

19   Q     And you never recall getting a briefing that what he told

20   you was incorrect, right?

21   A     I did get briefings that presented a broader picture of

22   what was going on in the country.

23   Q     I understand.  And I'll get to that in a minute.

24         But specifically, when he briefed you about

25   something, you would then have your law enforcement staff sort

WAYNE - CROSS - MR. MIEDEL                    1218

1   of check it out, right.

2   A     Correct.

3   Q     And you never received any briefing from your law

4   enforcement staff that suggested that what he was telling you

5   was false, right?

6   A     That is correct.

7   Q     Now, Ambassador, based on these briefings, you did get

8   the impression that there was some difference in how law

9   enforcement went after certain cartels versus others, right?

10  A     Correct.

11  Q     And that there might be an emphasis by law enforcement

12  for some cartels versus others in terms of its pursuit of

13  them, right?

14  A     Correct.

15  Q     And that was -- the information that you had, that was

16  the federal police, and that was also the military and the

17  other branches of law enforcement, right?

18  A     That is correct.

19  Q     And, in fact, you -- you -- you understood that the

20  approach of the DEA was that they would simply work with

21  whoever was going after the cartel at the time that the DEA

22  was interested in, right?

23              MS. KOMATIREDDY:  Objection.

24              THE COURT:  Sustained.

25  Q     Now, you understand as an ambassador that there are

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

WAYNE - CROSS - MR. MIEDEL                    1219

1    certain priorities that law enforcement engages in, correct?

2    A    Yes.

3    Q    There aren't always enough resources to do everything at

4    once, right?

5    A    Correct.

6    Q    So in terms of prioritizing certain targets, that may

7    depend on a number of factors, right?

8              MS. KOMATIREDDY:  Objection, Your Honor.

9              THE COURT:  Sustained.

10   Q    But well, let me ask you this.

11             It's fair to say that even though you received

12   information that there were differences in emphasis of what

13   cartels' law enforcement was going after, none of that made

14   you believe that you were dealing with a corrupt security

15   minister, right.

16             MS. KOMATIREDDY:  Objection.

17             THE COURT:  It's kind of asked and answered.  I will

18   allow it one  more time.

19   A    Okay, so would you like to repeat that, please.

20   Q    Okay.  Even though you received information that Mexican

21   law enforcement was prioritizing different targets at

22   different times, right, that did not lead you to believe that

23   Mr. Garcia Luna was corrupt?

24             MS. KOMATIREDDY:  Objection, Your Honor.

25             THE COURT:  I am allowing that one question.

WAYNE - CROSS - MR. MIEDEL          1220

1   A    Um, that is correct.  But we did believe that different

2   parts of different agencies of the Mexican government were, in

3   fact, penetrated.

4   Q    Truth is, Ambassador, though, that you considered or

5   found Mr. Garcia Luna to be a strong partner in the war on

6   drugs, right?

7   A    Correct.

8            MS. KOMATIREDDY:  Objection, Your Honor.

9            THE COURT:  Overruled.

10  Q    He was very interested, in fact, in the law enforcement

11  aspects of it, right, in your recollection?

12  A    Yes.

13  Q    He had -- he presented a plan to you about -- that he was

14  trying to get his own government to adopt, right?

15  A    He had  -- yes, he had a number of ideas that he was

16  putting forward for his government to adopt.

17  Q    And that included molding the Mexican federal police sort

18  of in the model of the American FBI, right?

19  A    That was one part of that plan, yes.

20  Q    He wanted them to be strong and independent, right?

21  A    He wanted them to be technically capable and

22  professional, in his words.

23  Q    Okay.  Now, Mr. Garcia Luna was a cabinet minister,

24  right?

25  A    Correct.

WAYNE - CROSS - MR. MIEDEL                1221

1    Q    He was in the presidential cabinet?

2    A    Correct.

3    Q    And he had a lot of people that answered to him, right,

4    to your knowledge?

5    A    Yes, correct.

6    Q    He had subordinates who themselves had subordinates,

7    right?

8    A    Mm-hm.  Yes.

9    Q    Now, in your experience, it's true that cabinet-level

10   secretaries delegate a lot, right?

11   A    Yes.

12   Q    You yourself, as an ambassador, would delegate a lot?

13   A    Yes.  I add to that several layers also.

14   Q    Sure.

15        So, for example, as the ambassador, you're not

16   personally hiring the guards in front of the embassy, right.

17   A    That's correct.

18   Q    That's done by your staff?

19   A    Yes.

20   Q    And you don't personally oversee every expenditure that

21   the embassy has for, whatever, office products, right?

22        MS. KOMATIREDDY:  Objection.

23        THE COURT:  Just because it is too much.

24        MR. MIEDEL:  Sustained.

25        THE COURT:  You have made the point.  He's

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

WAYNE - CROSS - MR. MIEDEL          1222

1   acknowledged that he delegates, and that there a bunch to whom

2   he delegates.

3            MR. MIEDEL:  That's fine.

4            THE COURT:  Let us move on.

5   Q    And if some members of your embassy staff engage  in some

6   kind of wrongdoing, like stealing office supplies, that's not

7   something -- that doesn't mean that you authorized it, right?

8   A    Correct.

9            MS. KOMATIREDDY:  Objection, Judge.

10  Q    Or that you endorsed it?

11           THE COURT:  Sustained.  Sustained.

12           The jury will disregard the answer.

13           THE WITNESS:  Sorry.

14           THE COURT:  Not your fault.

15           THE WITNESS:  I'll go slow, more slow.

16  Q    Ambassador, so you testified about this yesterday, but in

17  2012 the President Calderon Administration ended, right?

18  A    Yes.

19  Q    And a new president was elected?

20  A    Correct.

21  Q    And that new president was President Nieto ?

22  A    Yes.  Enrique  Pena Nieto.

23  Q    And the Nieto Administration was a different party than

24  the Calderon Administration, right?

25  A    Correct.

1    Q    And when the Calderon Administration ended, his cabinet

2    left with him, they left government, right?

3    A    Correct.

4    Q    And that included Mr. Garcia Luna?

5    A    Correct.

6    Q    And, in fact, you testified I think that you ran into him

7    shortly after the election at some parties or something,

8    right?

9    A    Yes.

10   Q    As a -- when he was a private citizen?

11   A    Correct.

12   Q    And you are aware that he then shortly thereafter moved

13   to the United States, right?

14   A    Yes.

15   Q    Now, yesterday you testified about that part or a

16   significant part of being an ambassador is meetings, social

17   interactions, correct?

18   A    That's correct.

19   Q    So as a diplomat, you have gone to a lot of social

20   gatherings; is that true?

21   A    I think that's true.

22   Q    Because part of your job is to build relationships with

23   your counterparts in the countries that you're in, right?

24   A    Yes.  It's a very important part.

25   Q    So you meet a lot of people?

WAYNE - CROSS - MR. MIEDEL          1224

1   A    I meet many, many people.

2   Q    And in your career, you've been invited, I assume, to the

3   homes of a lot of foreign ministers and secretaries?

4   A    Yes.

5   Q    For parties, dinner parties, that sort of thing, right?

6   A    Yes.

7   Q    And Ambassador, is it common that the homes of foreign

8   ministers that you've been in are generally reasonably nice

9   homes because they're used for throwing parties?

10  A    Yes.

11            MS. KOMATIREDDY:  Objection.

12            THE WITNESS:  Oh.

13            THE COURT:  I will allow it.

14  A    In general.  But in some countries, they provide official

15  residences for their ministers.

16  Q    But if their ministers have their own, residences,

17  then -- and you've been in those residences, right?

18  A    Yes.

19  Q    And in your experience, they've generally been reasonably

20  nice, right?

21  A    Um, I would say they're nicer than normal middle class

22  residences, yes.

23  Q    Okay.  You testified about one time that you attended a

24  dinner party at Mr. Garcia Luna's house?

25  A    Correct.

WAYNE - CROSS - MR. MIEDEL                1225

1   Q    You said that the house sort of abutted other houses, it

2   didn't have a lot of land around it, right?

3   A    Yes.

4   Q    Like, more like a townhouse?

5   A    That's my recollection, yes.

6   Q    Okay.  And you said that it was not particularly

7   extravagant or, I think you said, ostentatious, right?

8   A    Correct.

9   Q    But you do remember the fish tank, right?

10  A    I do remember the fish tank.

11  Q    Did you know that Mr. Garcia Luna was an engineer in his

12  prior life?

13           MS. KOMATIREDDY:  Objection, Your Honor.

14           THE COURT:  Overruled.

15  A    Um, I -- now that you mention that, it sounds familiar,

16  but it was not at the forefront of my memory.

17  Q    That's fine.

18           And you said that you noticed a fish tank, right, in

19  the house.

20  A    Yes.

21  Q    He didn't regale you with stories of how he built that

22  fish tank himself?

23  A    I don't remember that.

24  Q    Okay.  But it's fair to say that the house,

25  Mr. Garcia Luna's house that you visited for this dinner

WAYNE - REDIRECT - MS. KOMATIREDDY          1226

1  party, was similar to or consistent with other homes of other

2  foreign ministers that you've visited, right?

3  A    I'm being patient now.

4        Yes.

5  Q    I'm sorry, what?

6  A    "Yes" is the answer.

7        THE COURT:  He said he was being patient.  He's

8  trying to slow down so if the government has an objection,

9  they can get it in before --

10 Q    Well, there was no objection, so the answer is "yes,"

11 right?

12 A    Yes.

13 Q    Okay.  It didn't stand out to you as particularly flashy

14 or luxurious or anything like that, right?

15 A    No.

16 Q    And Mr. Garcia Luna didn't stand out that way to you

17 either, right, he wasn't wearing like a ton of Rolex watches

18 or diamonds or anything like that, did he?

19 A    No.

20        MR. MIEDEL:  Thank you, Ambassador.  I have no

21 further questions.

22        THE COURT:  Redirect?

23 REDIRECT EXAMINATION

24 REDIRECT EXAMINATION

25 MS. KOMATIREDDY:

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

WAYNE – REDIRECT – MS. KOMATIREDDY          1227

1    Q    Ambassador, I just have a few questions for you.

2              First of all, you were asked about Mr. Garcia Luna's

3    home that you visited.

4              Where was the home that you visited.

5    A    It was in Mexico City.  But to be very honest, I was

6    reading on the way to the dinner.  And as an ambassador you

7    get driven places, and so you don't always watch where you're

8    going.

9    Q    Did you go to any of Mr. Garcia Luna's other homes?

10   A    Not that I recall.

11   Q    Did you even know that he had other homes?

12             MR. MIEDEL:  Objection.

13             THE COURT:  Overruled.

14             THE WITNESS:  Objection is overruled, so I should

15   answer.

16   A    No, I was not aware that -- no, I was not aware that he

17   had other homes.

18   Q    And defense counsel asked you if the house itself stood

19   out to you.

20             Did the fish tank stand out to you.

21   A    The fish tank stood out to me.  It was a very beautiful

22   fish tank and nicely -- it had a lot of beautiful fish in it,

23   nicely maintained, yes.

24   Q    Did you make any comments to your wife afterwards?

25   A    I did.

WAYNE - REDIRECT - MS. KOMATIREDDY          1228

1            MR. MIEDEL:  Objection.

2            THE COURT:  Sustained.

3   Q    Did you see a fish tank like that in any other minister's

4   home?

5   A    I do not recall seeing a fish tank like that in -- not

6   only in any other minister's home, I don't -- in any private

7   home.  It was very beautiful.

8   Q    If Mr. Garcia Luna lived in a mansion with a zoo with

9   hippopotamuses and white tigers and lions, would that have

10  raised suspicions in your mind?

11  A    Yes.

12  Q    If he had worn Rolexes every day and fancy suits and

13  Ferragamo shoes, would that have raised suspicions in your

14  mind?

15  A    Yes.

16  Q    You were asked questions about the resources and

17  priorities of law enforcement officers.

18          Just to be clear, Mr. Ambassador, you are not a law

19  enforcement officer, correct.

20  A    Correct.

21  Q    And you did not have an investigative function in Mexico

22  City, correct?

23  A    Correct.

24  Q    You were asked questions about whether Mr. Garcia Luna

25  was responsible for fighting the war against drug cartels in

1   Mexico.  I believe your answer -- you answered that there were

2   also other agencies.

3           Who were all of the individuals who played a role in

4   fighting the war in drugs cartels in Mexico.

5   A    Well, we worked very closely with the head of the Army,

6   the head of the Navy, the Attorney General in the country, the

7   head of their version of the CIA, which was called CISEN.  We

8   worked with the secretary of gobernacion, government, which

9   was more than -- it was -- had the expansive  internal --

10  internal affairs in the country.  We don't really have an

11  equivalent in the United States.  And we would at times work

12  with the customs agency and the other agencies dealing with

13  border affairs.

14  Q    Did all those agencies work together?

15  A    At -- at times.

16  Q    And what about other times?

17  A    And other times there was a lot of in-flight --

18  bureaucratic in-flight fighting between them.

19  Q    You were asked on cross-examination about whether you

20  were briefed on how these agencies operated.  And you answered

21  that you got a briefing on a broader picture.

22          What was the broader picture.

23  A    The broader picture was that we were very much trying to

24  encourage Mexico to have a more unified and coordinated

25  approach to this effort they were undertaking against

WAYNE - REDIRECT - MS. KOMATIREDDY     1230

1   organized crime, and that there was rivalry in fighting and

2   mistrust that existed between various agencies in Mexico.

3   Q    Did you have the impression that the federal police were

4   not going after certain drug cartels?

5   A    My team's assessment was that there were -- that certain

6   of these different institutions were not effective against

7   certain cartels.  And so they had developed strategies of

8   working more closely with different agencies to go after

9   certain cartels than - - than others.

10  Q    Which cartel is the federal police not effective at?

11  A    I was briefed that they were not the preferred partner to

12  work against Beltran-Leyva and the Sinaloa Cartels.

13  Q    Finally, you were asked about the information that you

14  had when you were ambassador in 2011 and 2012.

15          Did you have access to the witness statements of

16  Sergio Villarreal Barragan.

17  A    No.

18  Q    Did you have access to the witness statement of

19  Oscar Nava Valencia?

20  A    No.

21  Q    Did you have access to the witness statements of

22  Jesus Zambada Garcia?

23          MR. MIEDEL:  Objection, Your Honor.

24          MS. KOMATIREDDY:  I only have a few more,

25  Your Honor.

WAYNE – REDIRECT – MS. KOMATIREDDY          1231

1          THE COURT:  Go ahead.  Finish it.

2    A     No.

3    Q     Did you have access to the witness statements of

4    Jesus Zambada Garcia?

5    A     No.

6    Q     Did you have access to the witness statements of Tirso

7     Martinez?

8    A     No.

9    Q     Did you have access to the witness statements of Harold

10   Poveda-Ortega?

11   A     No.

12   Q     Did you have access to the witness statements of

13   Israel Avila?

14   A     No.

15   Q     Did you have access to the witness statements of

16   Hector Villarreal Fernandez?

17          MR. MIEDEL:  Objection.

18          THE COURT:  It is enough, please.

19   Q     And Mr. Ambassador, you're aware, right, that it's the

20   U.S. Embassy in Mexico that initiated this investigation?

21   A     I might have seen that in some media reporting.

22          MR. MIEDEL:   Objection.

23          THE COURT:  Sustained.

24          MS. KOMATIREDDY:  No further questions.

25          THE COURT:  All right.  You may step down.

WAYNE – REDIRECT – MS. KOMATIREDDY          1232

1                THE WITNESS:  Thank you.

2                (Witness steps down.)

3                THE COURT:  Ladies and gentlemen, we're going to

4      take like a ten-minute break, maybe 15 minutes.  Please do not

5      talk about the case.  We will be back here in 15 minutes.

6      Thank you.

7                (Jury exits.)

8                THE COURT:  What's next for the government?

9                MS. REID:  Your Honor, the next witness will be

10     Edgar Veytia.

11               THE COURT:  All right.  15 minutes.

12               (Recess taken.)

13               (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY      1233

1          THE COURTROOM DEPUTY:  All Rise.

2          THE COURT:  Let's bring in the jury.

3          (Jury enters the courtroom.)

4          THE COURT:  Everyone be seated.

5          The Government's next witness.

6          MS. KOMATIREDDY:  The Government calls Edgar Veytia.

7          (Witness takes the witness stand.)

8   **EDGAR VEYTIA**, called as a witness, having been first duly

9   sworn/affirmed, was examined and testified first duly

10  sworn/affirmed:

11         THE COURTROOM DEPUTY:  State and spell your name for

12  the court reporter.

13         THE WITNESS:  My name is Edgar Veytia.  E-D-G-A-R,

14  V-E-Y-T-I-A.

15         MS. KOMATIREDDY:  May I inquire?

16         THE COURT:  Please.

17  DIRECT EXAMINATION

18  BY MS. KOMATIREDDY:

19  Q    Mr. Veytia, where do you live?

20  A    I live in MDC Brooklyn, New York.

21  Q    Is that a prison?

22  A    Yes, it is a prison.

23  Q    How long have you been in prison in the United States?

24  A    I've been in prison in the United States for

25  approximately six years.

1    Q    Did you ever hold public office in Mexico?

2    A    Yes, I did.

3    Q    What was the highest office you held?

4    A    I was Attorney General for the state of Nayarit, Mexico.

5    Q    For how long did you hold public office?

6    A    I hold public office for approximately nine years.

7    Q    Who are you elected to serve?

8    A    I was elected to serve the people of Nayarit, the

9    governor and the president of Mexico.

10   Q    Who did you serve?

11   A    I also assisted the narco traffickers.

12   Q    What do you mean when you say that you assisted narco

13   traffickers?

14   A    I did not detain them and I did not report them.

15   Q    As Attorney General, did you have a sworn duty to detain

16   drug traffickers?

17   A    I had a sworn duty to do so.

18   Q    As Attorney General, did you have a sworn duty to stop

19   illegal drugs like cocaine?

20   A    Yes, I did.

21   Q    As Attorney General, did you have a sworn duty to arrest

22   and prosecute drug traffickers in Mexico?

23   A    Yes, I did.

24   Q    Did you intentionally fail to carry out your duties?

25   A    Yes, I did.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY          1235

1    Q    Did you receive anything in return?

2    A    Yes.

3    Q    What did you receive?

4    A    Money.

5    Q    How much money did you receive from drug traffickers

6    during the time that you were in public office?

7    A    Approximately 2 million pesos a month.

8    Q    And in total over the course of your career?

9    A    A million dollars.

10   Q    Let's go back to the beginning.

11        Where did you grow up?

12   A    I grew up in San Diego, California.

13   Q    How long did you live in San Diego?

14   A    Approximately until I was 13 years of age.

15   Q    What happened when you were 13 years old?

16   A    I was sent to Mexico City to live with an aunt.

17   Q    Who sent you?

18   A    My mother.

19   Q    What happened next?

20   A    I came back to Tijuana and keep on studying.

21   Q    Did you move around in Mexico?

22   A    Sometimes, yes.

23   Q    Where did you ultimately end up?

24   A    I ended up in Tepic, Nayarit, Mexico.

25   Q    How old were you when you ended up in Tepic, Nayarit?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1236

1   A     Approximately 22 years of age.

2   Q     How long did you live in Tepic, Nayarit?

3   A     Twenty-five years.

4   Q     I'm going to show you what's in evidence as Government

5   Exhibit 325.

6         Can you put a circle for the jury the state of

7   Nayarit.

8   A     (Indicating.)

9   Q     That state is next to the state of Sinaloa, correct?

10  A     That's correct.

11  Q     Tepic is the capital of Nayarit?

12  A     Tepic is the capital of Nayarit, yes.

13  Q     Mr. Veytia, what is your citizenship?

14  A     I'm a U.S. citizen and I'm born Mexican.

15  Q     So you have dual citizenship?

16  A     Yes, I do.

17  Q     How far did you go in school?

18  A     I have a law degree, I have a Master's in criminology,

19  and I have an honorary Ph.D.

20  Q     When did you graduate from law school?

21  A     Late '90s.

22  Q     After graduating from law school, what did you do?

23  A     I had civil practice, I had a bus business, and I had a

24  jewelry shop.

25  Q     Did there come a time when you got involved in politics?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY      1237

1    A    Yes.

2    Q    Approximately when was that?

3    A    It was approximately in like 2007.

4    Q    What was happening in Nayarit during that time?

5    A    At that time, the elections to be the mayor of Tepic was

6    going to be conducted.

7    Q    Who was running in the election for mayor of Tepic?

8    A    The mayor of Tepic were running is then Congressman

9    Roberto Sandoval Castaneda.

10   Q    Did you get involved in his campaign?

11   A    Yes.  I was presented to him by a mutual friend.

12   Q    What did you do?

13   A    I contributed money.  I put some vehicles.  I did also

14   give him publicity material, and I also have him discounts in

15   my buses.

16   Q    Did Mr. Sandoval win?

17   A    Yes, he did.

18   Q    What happened next?

19   A    I was offered to be the director of transit.

20   Q    For the city of Tepic?

21   A    For the city of Tepic.

22   Q    When was the election?

23   A    The election was in 2008.

24   Q    Do you remember what month?

25   A    Approximately in July.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY          1238

1    Q      When did you take office?

2    A      We took office in September that same year.

3    Q      How long did you serve in that position as director of

4    transit of Tepic Nayarit?

5    A      Approximately a year, less than a year.  A year.

6    Q      Mr. Veytia, when you were conducting business in Mexico

7    as a government official, what language why you conducting

8    business in?

9    A      I'm speak the Spanish speaking language.

10   Q      When you recall events and conversations from that time

11   period, what language do you recall them in?

12   A      Spanish.

13   Q      I'm going to ask you about events and conversations from

14   the time you were a public official in Mexico.  From this

15   point forward, I'm going to ask that you speak Spanish.

16   A      Correct.

17   Q      As director of transit, how many officers worked for you?

18   A      Approximately about 200, 300.

19   Q      What were your responsibilities?

20   A      Administratively sanctioning traffic violations, road

21   signage, and archiving and keeping the police reports.

22   Q      Who was your boss?

23   A      Commander Violante.

24   Q      You called him commander.  Why did you call him

25   commander?

1    A     He came from the federal police with about 30 years of

2    experience.

3    Q     What was his prior position in the federal police?

4    A     He was the commander of the Nayarit detachment.

5    Q     Is that also known as the Yankee for Nayarit?

6    A     That's right.

7    Q     Did you observe Commander Violante interacting with other

8    federal police officers?

9    A     Constantly.

10   Q     Can you explain that further?

11   A     Well, from different ranks.  The officers would come from

12   commanders to the subordinates.  They would come by and say

13   hello.  They would ask him for work or they would just pay

14   their tribute, as he was the new secretary of public security.

15   Q     To be clear, Commander Violante was the secretary of

16   public security for the city of Tepic, correct?

17   A     Yes, that's correct.  He was named secretary of public

18   security for the municipality of Tepic.

19   Q     Did there come a time that you received direction from

20   Commander Violante about providing protection to certain drug

21   cartels?

22   A     Yes.

23   Q     Approximately when was that?

24   A     Around October, the end of October of 2008.

25   Q     What were the circumstances?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY       1240

1   A    The circumstances were the following:  He called me into

2   the office, which was right about the time right after the new

3   personnel came in and took over.  He called me to his office

4   and we were there talking, and he gave me instructions.  He

5   told me that he just gotten back from the national security

6   conference, which was for all of the secretaries of public

7   security, and he had received -- and he was there with his

8   colleagues, and he received instructions --

9              MR. MIEDEL:  Objection.

10              THE COURT:  801?

11              MR. MIEDEL:  Yes.

12              THE COURT:  Overruled.

13   A    From Mr. Genaro Garcia Luna that we had to take El

14   Chapo's side.

15   Q    What did you understand that to mean?

16   A    The instruction was that we were not to intervene within

17   the fighting between the Beltran faction and the Chapo's

18   faction.  We were not to intervene, we were not to bother

19   them, and we were not to arrest them.

20   Q    Did you carry out those instructions?

21   A    Yes.

22   Q    How?

23              THE INTERPRETER:  Interpreter needs to clarify, if I

24   may?

25              THE COURT:  Please.

EDGAR VEYTIA - DIRECT - MS. KOMATIREDDY          1241

1    A     The shift commanders were told that they were not to

2    intervene to -- much less -- much less arrest them, and not

3    report on the people that were fighting.

4    Q     To be clear, when you say "them," who are you referring

5    to?

6    A     The Sinaloa cartel, the Chapo -- the faction that was

7    made up of Chapo, Mayo, and Macho Prieto.

8    Q     What was the level of violence in Nayarit at this time?

9    A     It was the second most violent city in Mexico.

10   Q     Did Commander Violante make any comments to you about the

11   violence?

12   A     No.

13   Q     Did Commander Violante stay in office?

14   A     No.  He resigned about the end of 2008, the beginning of

15   2009.

16   Q     Did you have an understanding of why he resigned?

17   A     Publicly it was for health reasons.

18   Q     And privately?

19   A     He had the pressure from making the decision between the

20   Beltrans and the Chapos.

21   Q     After Commander Violante resigned, who remained in their

22   positions in your office?

23   A     A director of police stayed, and I stayed as director of

24   transit.

25   Q     What do you remember happening next?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1242

1    A    After that, the special unit stopped a car that had some

2    street-level drug dealers in it that belonged to the Beltran

3    Leyvas, the Arturo Beltran Leyvas group.

4    Q    What happened next?

5    A    The next day, the two police officers were killed, as was

6    the shift commander.

7    Q    Did you go to the scene of the murder?

8    A    Yes.

9    Q    What did you see?

10   A    I saw three men who were dead and weapons, and it looked

11   like there were poles in the car, and they were all bloody.

12   They were all bloodied.

13   Q    Was the director of police on the scene?

14   A    Yes.

15   Q    Did you remain on the scene?

16   A    No, I left the scene.

17   Q    Did your position change after this incident?

18   A    Yes.

19   Q    What happened?

20   A    The then-governor of Nayarit --

21        THE INTERPRETER:  Interpreter needs to clarify, your

22   Honor.

23        THE COURT:  Yes.

24   A    Yes, the governor of Nayarit publicly accused Carlos

25   Bernal, who was the director of police, of corruption, and he

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY          1243

1    was removed from his position.

2    Q     And how did your position change?

3    A     Well, I became the director of transit and the interim

4    secretary of public security for the municipality of Tepic.

5    Q     At that time, how many people lived in the municipality

6    of Tepic?

7    A     Between 500- and 600,000 people.

8    Q     How did it compare in size to other municipalities in

9    Mexico?

10   A     Well, it's considered to have a mid to low level

11   population.

12   Q     How did the level of violence compare to other

13   municipalities in Mexico?

14   A     It was among the highest.  It was in second place.

15   Q     How did it compare to other municipalities in the world?

16          MR. MIEDEL:  Objection.

17          THE COURT:  Sustained.

18   BY MS. KOMATIREDDY:

19   Q     As acting secretary of public security in Tepic, how many

20   people did you oversee?

21   A     Approximately like 780.

22   Q     What were your responsibilities?

23   A     To safeguard the life and health of the citizens of

24   Tepic.

25   Q     Was that position a law enforcement position?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1244

1    A    Yes.

2    Q    What were your responsibilities in relation to drug

3    trafficking activities?

4    A    I should have arrested them.

5    Q    Did you arrest them?

6    A    No.

7    Q    Did you have investigative powers?

8    A    No.

9    Q    Who had investigative powers in Mexico at that time?

10   A    The Attorney Generals.  The Attorney Generals of the

11   state -- the Attorney General of the republic and the federal

12   police.

13   Q    Let's go back to when these three policemen were killed.

14   What happened after that incident?

15   A    I was asked by the then-mayor, Roberto Sandoval

16   Castaneda, to go to a meeting to meet with Arturo Beltran's

17   person in charge of Nayarit.

18   Q    Did you go?

19   A    Yes.

20   Q    How did you go about setting up that meeting?

21   A    Through a transit commander who had direct ties with

22   them.

23   Q    How long after the three policemen showed up dead did

24   this meeting occur?

25   A    Approximately less than a week.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY    1245

1  Q    Where was the meeting?

2  A    On the Periferico in our neighborhood.  I don't remember

3  its name, but it was an avenue that was adjacent to the

4  Periferico in Tepic.

5  Q    Is the Periferico also known as the Beltway?

6  A    Yes.

7  Q    Did you take anyone with you to this meeting?

8  A    No.

9  Q    When you got to the Beltway, what did you do?

10 A    When I arrived in the Beltway, I got to the place and

11 there was a black Suburban.  I saw a person outside the car,

12 and I got close and he said his boss was there.

13 Q    Where was his boss?

14 A    In the Suburban.  So I got in the Suburban.  I greeted

15 the person.  The person said his name was 02 Chilo, and he

16 said he represented the interests of Arturo Beltran Leyva in

17 Nayarit.

18 Q    At this point in the Suburban, is it just you and Chilo?

19 A    Yes.

20 Q    What happens in the conversation?

21 A    The conversation went like this:  He said he was sorry

22 about the killing the three policemen but that it had been

23 necessary since Chapo and Arturo were fighting.

24 Q    What else happened in the conversation?

25 A    He said that Arturo also said that he was sorry about the

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY          1246

1   killing of the policemen but that he should not worry because

2   he was going to be paying for all the expenses, campaign

3   expenses, for the governorship of Nayarit.

4   Q    Whose campaign expenses was Arturo going to be paying

5   for?

6   A    Roberto Sandoval's campaign for the governorship of the

7   state of Nayarit.

8   Q    Did Chilo ask for anything?

9   A    Well, not necessarily, but it was implicit there what we

10  should do, which is not arrest them and let them do what they

11  wanted.

12  Q    Why was it implicit?

13  A    They had just killed three policemen.

14  Q    Did you enter into this implicit agreement with Arturo's

15  representative in Nayarit?

16  A    It was automatically that we went to the other side of

17  the Beltran Leyvas.

18  Q    You said it was implicit.  Why didn't you write it down?

19  A    No, agreements with drug traffickers are not put in

20  writing.

21  Q    What did do you after that meeting?

22  A    I went and reported this to the mayor, Roberto Sandoval

23  Castaneda.

24  Q    What happened next?

25  A    I realized that there was a meeting between Roberto at

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY      1247

1    his sister's house with Frijol and Chilo.

2    Q    What happened at that meeting?

3    A    I was not there, but after it, Hugo Sandoval –– Hugo

4    Sandoval, who was the nephew, his nephew, said that an

5    agreement had been reached with the Beltran Leyvas.

6    Q    Now, in your conversations with Chilo in the Suburban,

7    did Chilo offer you any money apart from the campaign money

8    that he had pledged for Sandoval?

9    A    No.

10   Q    Did he eventually give you money over time?

11   A    Yes.

12   Q    Approximately how many times?

13   A    Three or four times.

14   Q    Approximately how much?

15   A    $40,000.

16   Q    What did do you with the money?

17   A    It was spent on daily activities; it was simply spent.

18   Q    Under the agreement that you reached, how did you

19   coordinate with Arturo's people to ensure that you did not

20   interfere with their activities?

21   A    Through a telephone.

22   Q    Did you communicate with Chilo directly?

23   A    No.

24   Q    How did you communicate?

25   A    Through a commander.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY          1248

1    Q      Which commander?

2    A      Sometimes it was through the transit commander, and it

3    was with Commander Valdivia.

4    Q      Was Commander Valdivia your right-hand man?

5    A      He was part of my security detail.

6    Q      Why did you have Commander Valdivia handle the

7    communication instead of communicating directly with Chilo

8    yourself?

9    A      Because he was dedicated to being there on call while I

10   was attending to other of the activities in the secretariat.

11   Q      Under this agreement of protection that you reached with

12   Arturo's people, were there times when you let Arturo's people

13   go?

14   A      Yes.

15   Q      Who was the highest level person you let go in Arturo's

16   organization?

17   A      Well, there was a hit man who was known as El Borras, and

18   he was directly one of Chilo's people in the Arturo Beltran

19   Leyva organization.

20   Q      What happened with El Borras?

21   A      El Borras had an accident, so he could have been

22   arrested, and there was a public scandal, so he was taken over

23   to the office for the secretary of public security in Tepic.

24   Q      What kind of accident did he have?

25   A      Vehicle, a car vehicle, car accident.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY    1249

1    Q    So after El Borras got into a car accident, you testified

2    that you took him back to your office?

3    A    He was taken to the transit office, yes.

4    Q    Why take him back to the office?  Why not just let him go

5    right there?

6    A    Because there was a big scandal, more people had arrived

7    there, so it was easier to fix it in an administrative matter

8    rather than taking him to the state police.

9    Q    I'm going to turn your attention to 2009, late 2009.

10            Do you remember when Arturo died?

11   A    It was approximately December 2009.

12   Q    How did you react?

13   A    Well, I thought the war was going to be over.

14   Q    Was it over?

15   A    No.  It became worse.

16   Q    Can you describe how the violence looked in Tepic at this

17   time?

18   A    Well, it turned into the fact that there were people hung

19   from bridges.  There were people who showed up skinned.  And

20   there was a particular phenomenon of the pozoles, the pozoles

21   in Tepic.

22   Q    What is the pozoles?

23   A    They were these big tins where they would put dismembered

24   parts like legs, heads, legs, and they would add some corn

25   grains to it and call it pozoles, or corn stew.

1   Q    After Arturo died, did you still have an agreement with

2   the Beltrans?

3   A    Yes.

4   Q    How did you know them?

5   A    Because Chilo called and told this to Valdivia, and he

6   said precisely that, that nothing was going to change because

7   now Hector Beltran Leyva was going to take over control of the

8   cartel.

9   Q    Under that continued agreement, did you arrest any of the

10  individuals associated with the Beltran faction of the Sinaloa

11  cartel?

12  A    No.

13  Q    Did you seize any of their drugs?

14  A    No.

15  Q    Did there come a point when your contact person for the

16  Beltrans changed?

17  A    Yes.

18  Q    Approximately when was that?

19  A    The second trimester of 2010, towards the end around May.

20  Q    Who did it change to?

21  A    To the Haches.

22  Q    The Haches?

23  A    That's correct.

24  Q    Who was H?

25  A    Hector.  It was Hector Beltran Leyva.

1    Q      Was there an H1?

2    A      Yes.

3    Q      Who was H1?

4    A      Chaugin, his last name was Lizarraga.

5    Q      Was there an H2?

6    A      Yes.  His name was Francisco Sanchez Patron -- Patron

7    Sanchez.

8    Q      What was H2's role at that time?

9    A      He was an assassin.  He represented the interests of the

10   Beltrans in Nayarit.

11   Q      Was he your new point of contact?

12   A      Yes.

13   Q      Did you ever meet someone higher up than H2?

14   A      No.

15   Q      Did you ever meet Hector Beltran?

16   A      No.

17   Q      Did you ever meet Arturo Beltran?

18   A      No.

19   Q      What was your relationship with H2 like?

20   A      It was to not arrest him, to not bother him in the

21   fighting activities that he was -- they were conducting over

22   there in Tepic.

23   Q      Can you give us an example of how you would carry out

24   your part of the agreement?

25   A      Yes.  One time he asked me through Valvivia if we could

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY          1252

1    go pick him up in a place and bring him with us, and we did.

2    We went and picked him up and brought him.

3    Q    When you say "him," who are you referring to?

4    A    H2.

5    Q    Where was he that you went and picked him up?

6            THE INTERPRETER:  Interpreter needs to clarify.

7            THE COURT:  Yes.

8            THE WITNESS:  He was on a dirt road out there almost

9    in the mountains.  We picked him up and took him to Tepic.

10   BY MS. KOMATIREDDY:

11   Q    When you picked him up and took him back to the city, did

12   you put him in handcuffs?

13   A    No.

14   Q    Were there times when you instructed other officers in

15   your police force to assist H2 and his people?

16   A    Yes, to the commanders, the shift commanders.

17   Q    What would you tell them when you heard that there was an

18   altercation over the radio?

19   A    To wait for me or to hold off for a moment, to not rush

20   to -- to not rush to go over to where the altercation was.

21   Q    Why did you give those instructions?

22   A    It was part of the agreement.

23   Q    Were you stalling?

24   A    Yes.

25   Q    What did your stalling enable H2 and his people to do?

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

EDGAR VEYTIA - DIRECT - MS. KOMATIREDDY       1253

1    A    Escape.

2    Q    In early 2011, what was your position at that time.

3    A    The beginning of 2011, I was already secretary of public

4    security for the municipality of Tepic.

5    Q    Are there any significant events that occurred around

6    that time?

7    A    Yes.

8    Q    What happened?

9    A    I had two municipal police officers kidnapped 50 meters

10   from the state checkpoint.

11   Q    To be clear, who kidnapped the police officers?

12   A    At that time we didn't know who it was until we found out

13   later.

14   Q    The two of your police officers were kidnapped?

15   A    Yes, two of the Tepic municipal police officers.

16   Q    How did you learn of the kidnapping?

17   A    I received a call from the office about the abduction of

18   the -- about the fact that the officers had gone missing, and

19   we put the alert out for them.

20   Q    What happened after you put the alert out?

21   A    After that, all the personnel went off in searching for

22   those police officers in that area.  And news was given too at

23   that time Roberto Sandoval had moved on to start his campaign

24   to be governor.  There was a new mayor.

25   Q    When you said that you put the alert out, did you alert

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY      1254

1    any other police agencies or government agencies?

2    A      Yes, yes.   The security group for the state of Nayarit.

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1255

1    DIRECT EXAMINATION   (Continuing)

2    BY MS. KOMATIREDDY:

3    Q     Who was in the security group?

4    A     The security group is made up of the Army, the Marines,

5    the federal police, the state police and municipal police.

6    Q     Did any of those agencies come to help you?

7    A     The Army.

8    Q     Did the federal police come?

9    A     No.

10   Q     Did you or your colleagues talk to H-2 about the

11   kidnapped policemen?

12   A     Yes, Valdivia spoke with H-2 to see if he knew anything

13   at the time, and he said that it had not been them.

14   Q     What did you understand that to mean?

15   A     That the Beltrans had not kidnapped them, but it was

16   the -- the Chapos.

17   Q     What did you do next?

18            THE INTERPRETER:  Interpreter needs to clarify,

19   Your  Honor.

20            THE COURT:  Yes.

21            Let me ask the interpreter.  You need not request

22   permission.  If you need clarification, just say "interpreter

23   clarifying."

24            THE INTERPRETER:  Thank you, Your Honor .

25   A     I informed the mayor and I was going to an event.  I had

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY    1256

1    been called to a security event by Governor de Manuel

2    Gonzalez.

3              THE COURT:  Everyone okay?

4    Q    Did you go to meet the governor?

5              THE INTERPRETER:  Interpreter clarification.

6    A    Yes.  I went to the security event that was held at the

7    guard station at Lagos del Country.

8    Q    Did you actually meet the governor himself?

9    A    Yes.  He was my boss.  He was my direct boss as governor.

10   And as I was the secretary of public security, he –– and he

11   was the governor, he was my direct boss.

12   Q    Where was your meeting with the governor?

13   A    Well, when the governor ended the event, his security

14   detail asked me to go to his SUV.  It was a Tahoe, a white

15   Tahoe that had gray.  And I was to go there and wait for the

16   governor, which I did.

17   Q    Did you and the governor meet inside the white Tahoe?

18   A    Yes.  And I went in.  And that's when he spoke to me

19   directly, and he asked me if I knew why the things were

20   happening to me, and if I knew who I needed to talk to, to

21   rescue the police officers.

22   Q    What did you say?

23   A    I told him, yes, that I did know who I needed to speak to

24   because it wasn't the Beltran-Leyvas who had done that.

25              And then he told me that he had just gotten back

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1257

1    from a very important meeting in Mexico City with President

2    Calderon and with the secretary of public security, Genaro

3    Luna.  And he told me that the line --

4              THE COURT:  Objection.

5    A    -- was Chapo, that the line --

6              THE COURT:   Hold on.  Hold on.  Wait.

7              Overruled.

8    A    -- that the line was Chapo.  And I was surprised and a

9    bit nervous, but I had to go rescue the police officers and so

10   I left.

11   Q    When he said "the line was Chapo," what did you

12   understand that to mean?

13   A    That we had to protect Chapo's people and not Beltran's,

14   the people we had been protecting.

15   Q    When you were in that white Tahoe with the governor and

16   he told you that, did you ask any questions?

17   A    No.  No, you don't ask for any explanations from the

18   governor.

19   Q    What did you do after that conversation?

20   A    I went back to the office and I looked for a contact,

21   somebody to speak with who represented the interests of

22   Guzman, of Chapo's, and I found it through a transit commander

23   who had been there for many years.

24   Q    What was the name of Chapo's contact person in charge of

25   at Tepic and Nayarit?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1258

1        THE INTERPRETER:  Interpreter clarification.

2    A    It was 02 Albert.  But the person who was in Tepic who

3    had carried out the kidnapping was known as Pelocho.

4    Q    Did you subsequently speak with Pelocho ?

5    A    Yes.

6    Q    How long after the conversation with the governor did you

7    get into contact with Pelocho?

8    A    I think it was about three hours, three or four  hours.

9    Q    And how did you speak with him?

10   A    The transit commander brought me a Nextel, and that's how

11   I communicated with Pelocho.

12   Q    What happened in your conversation with Pelocho?

13   A    The conversation with Pelocho, I asked him why, why he

14   was doing that, that I never disrespected him, asked him why

15   he was doing that.  And I asked him to please bring back the

16   officers alive.

17   Q    What did he say?

18   A    And he wanted me to commit myself to be with them.

19   Q    What did you understand that to mean?

20   A    To not arrest them, to not report them, and to not get

21   involved in their activities in their direct war with the

22   Beltran-Leyva group.

23   Q    What did you do?

24   A    I agreed with him.  I said:  Yes, there will be no

25   problem.  Just bring me back the police officers alive.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1259

1    Q    After the conversation ended, what happened?

2    A    The next day the police officers appeared alive.

3    Q    After that event, did you continue carrying out your

4    agreement with the Beltran Faction of the Sinaloa Cartel?

5    A    Yes.

6    Q    Why?

7    A    Because at that time the mayor had an agreement and

8    Roberto Sandoval had an agreement with the Beltran Leyvas.

9    Q    Under that agreement that you described earlier, the

10   Beltrans were supposed to pay for the gubernatorial campaign

11   of Roberto Sandoval.

12        Did they pay.

13   A    Yes.

14   Q    And in July of 2011, what happened?

15        THE INTERPRETER:  Interpreter clarification.

16   A    In July of 2011, Roberto  Sandoval Castaneda wins the

17   governorship of the state of Nayarit.

18   Q    When did he take office?

19   A    In September, September 2011.

20   Q    What office did you take at that time?

21   A    Assistant Attorney General for the state of Nayarit.

22   Q    Did you have any other designations?

23   A    Yes.  I was executive secretary for public security for

24   the state.

25   Q    And what was your responsibility as executive secretary?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1260

1    A    I was to manage the federal monies and resources and

2    distribute them for subsemon and for -- interpreter

3    correction -- and being in charge of security for the state of

4    Nayarit.

5    Q    What is subsemon?

6    A    It is a federal subsidy given to the municipalities for

7    security.

8    Q    And as Assistant Attorney General, what were your

9    responsibilities in that role?

10   A    It was the operational side, the operational side of the

11   Attorney General's office there in the state of Nayarit.

12   Q    Was it a law enforcement position?

13   A    Yes.

14   Q    After you took office as Assistant Attorney General, what

15   happened?

16         THE INTERPRETER:   Interpreter correction --

17   interpreter clarification, rather.

18   A    The attorneys for the Sinaloa Cartel who represented

19   Chapo and Mayo came to me, they approached me, it was the

20   attorney Alcala and Chaparro.  And they said that they

21   represented El Chapo.  And they wanted to buy the state of

22   Nayarit, they wanted to buy the -- the plaza, they called the

23   plaza, the state.

24   Q    How long after you took office did these attorneys for

25   the Sinaloa Cartel come to you?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1261

1    A    About a month.  A month afterwards.

2    Q    Where did you meet with them?

3    A    Right there at the Attorney General's office.

4    Q    You said that they wanted to buy the state or buy the

5    plaza.

6              What does that mean.

7    A    Buying a plaza means that you're going to be working for

8    them, that you're going to do what they ask, you're going to

9    obey them, and any crimes that they commit, you're going to

10   cover them up.

11   Q    Did they offer you money for this?

12   A    Yes.  They offered me $10 million.

13   Q    Did they have the money with them?

14   A    No.  They only presented the offer.  They said that if it

15   was accepted, they would do what was needed to go come

16   through.

17   Q    How did you respond?

18   A    I heard them out, but I kind of set them to the side

19   because we were not in good terms.  And besides that, there

20   was already a commitment with the Beltran-Leyvas.

21   Q    After you brushed off Chapo's lawyers, what happened to

22   you?

23   A    Approximately in December, mid-December 2011 , there was

24   an attack on one of my safe houses and on my person.

25   Q    Can you describe for us what happened?

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1262

1    A     On that day around 1:00 or 2:00 a.m., we had decided that

2    we were going to sleep and going -- we had determined that we

3    were going to go to sleep in that house, a house in Pedregal.

4    The security detail went ahead so they could turn on the

5    lights and set up the residence.  And that's when we realized

6    there was some vehicles heading there, coming in.  It was

7    approximately 11 vehicles.

8              And about one to two minutes later, you could start

9    hearing the gun shots and the attack.  And there was a

10   confrontation between the people that were already at the

11   house, the security detail, and the vehicles.

12   Q     What did you do during this fire fight?

13   A     I was on the -- that way and there was an avenue that was

14   going in one way -- a one- way avenue.  And then we confirmed

15   that two units that were coming in front of us.  I stopped, I

16   opened the door, shots were fired.  We shot and received fire

17   as well.  The vehicle cut to the left and left.  And we went

18   on towards where we could still hear the confrontation.

19   Q     You said the vehicle left.

20             What road did it take to leave.

21   A     At that intersection, there was an adjacent avenue,

22   everything was dark over there.  It was towards the hills.

23   Q     What happened next?

24   A     We arrived at the house and the vehicles were there,

25   shots were being fired.  We had about 35 police officers there

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

1    that there were trying -- working to repel the criminals.

2    Q    Did you repel the criminals?

3    A    They left -- yes, they did leave, but they abandoned

4    their vehicles behind them.  They left weapons, they left

5    grenades and vehicles behind.  They were able to escape.  They

6    were able to recover the bodies that were strewn around and

7    leave.

8    Q    Did you have any information on who had attacked you?

9    A    Yes.  We did have a phone that we had found and we had

10   cloned the number.  So we had heard some things, we knew that

11   something was going to happen.  We didn't know the time, we

12   didn't know the way, we didn't know the place, but we knew

13   something was going to happen.

14   Q    You knew something was going to happen, but you didn't

15   know the specifics.

16           Is that because the messages were coded.

17   A    Yes.  They speak in code or they make references to

18   things, but they're not specific.

19   Q    And whose phone was it that you had cloned?

20   A    Pelocho's.  He was the one who had kidnapped the police

21   officers.

22   Q    The morning after the fire fight, what did you do?

23   A    At that time we had closed off the entire neighborhood

24   and we were checking house by house.  At that time, no one had

25   come to assist us.  Only the Army had come.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY    1264

1    Q    You said at that time no one had come to assist you.

2         During the attack, did you send out a call for help.

3    A    Yes.  The protocol, as the protocol calls for in the

4    security group in Nayarit  and like in every state, there's a

5    coordinating group that coordinates security.  And then an

6    alert is sent to all the different agencies so they can come

7    assist.

8    Q    Remind us, does that group include the federal police?

9    A    Yes.

10   Q    Did the federal police come to help?

11   A    No.

12   Q    Did you talk to anyone from the federal police after this

13   attack?

14   A    Yes.  The coordinator for the state of Nayarit, who at

15   that time was Jorge Anguiano Terriquez.

16   Q    What did you speak with Mr. Terriquez about?

17   A    I asked him if he had received the call for help.  And he

18   said they had not been able to help because they did not have

19   enough personnel in the state of Nayarit .

20   Q    Did he say anything else?

21   A    No.

22   Q    How many federal forces were stationed in the state of

23   Nayarit?

24   A    I don't have official data, but extraoficially there are

25   about 120 officers in the state of Nayarit.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1265

1    Q    And that was at that time?

2    A    Yes.

3    Q    Did you encounter Mr. Terriquez again around this time

4    period?

5    A    Yes.  We had direct contact because we had that

6    coordinating group for all different forces.

7    Q    And did any events occur?

8    A    Well, what I have is that the governor asked for a

9    meeting after the attack, for a meeting in Mexico City, with

10   Mr. Garcia Luna.

11   Q    Did you go to that meeting?

12   A    Yes.

13   Q    Who else went?

14   A    Well, that meeting in Mexico City called by the governor,

15   what we went -- it was the governor; it was the nephew of the

16   governor, Hugo Sanchez  Sandoval, who was also an ex-police

17   officer; the secretary of public security, General

18   Campos Huertas and myself.

19   Q    And when you were referring to the secretary of public

20   security, General Campos Huertas , is that for the state?

21   A    Yes, that's correct.

22   Q    So when Governor Sandoval, his nephew, the state security

23   secretary, and you went to Mexico City, where in Mexico City

24   did you go for this meeting?

25   A    We went to the general offices of the secretariat for

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY   1266

1    public security, federal.

2    Q    What happened when you arrived?

3    A    We were accompanied to the office, to Garcia Luna's

4    office.  There's a small waiting room there.  And we waited

5    there, but the only people who were allowed to go inside was

6    the governor and his nephew, Hugo Sanchez.

7    Q    What did you do?

8    A    We were offered a tour of what was known as the bunker.

9    It was a center created by the federal police.  It was this

10   bunker, which was like a crisis room for security crises.

11   Q    Who did you go on this tour of the bunker with?

12   A    It was the general, myself, two assistants, and a man who

13   was a commander or a commissioner, I don't remember, but he

14   was Luis Cardenas Palomino.

15   Q    Were you the senior  person from Nayarit in that group?

16   A    Yes, I was, because I was the assistant secretary -- the

17   Assistant Attorney General at that time, so I had the highest

18   rank.

19   Q    Can you describe for us, what did this bunker look like?

20   A    Well, there was an initial security room where we were

21   checked out.  And then some meters further in, there was

22   another room where there was a large table in the middle with

23   about 20 or more chairs around it, if I remember correctly.

24        There were glass windows on the sides.  At that time

25   they were darkened.  But once we were in, that tinted -- that

1   tint was removed, and so we were able to see many monitors on

2   the walls.

3   Q    Go ahead.

4   A    Well, they started describing, like, what each monitor

5   contains, saying:  This camera, it shows the exit from Mexico

6   City, this is a drone.  They started to explain drones to us.

7   Q    How long did that tour take?

8   A    I don't think it lasted longer than 40 minutes,

9   30-something minutes.

10  Q    How did you feel during the tour?

11          MR. MIEDEL:  Objection.

12          THE COURT:  Sustained.

13  Q    What was your impression from the information they gave

14  you?

15  A    That the federation had a great capacity for

16  investigating and for fighting crime.

17  Q    Did you have anything like that in Nayarit?

18  A    No, not that capacity; no.

19  Q    During this tour, did you speak with anyone?

20  A    Well, I was talking to some of the consultants.  And at a

21  certain point, I stepped further away from the group looking

22  at some monitors.  And at that time, Mr. Cardenas Palomino

23  came close to me and he spontaneously said to me that we were

24  doing things wrong in Nayarit, that we were on the wrong side,

25  and that we should be on El Chapo's side.

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1268

1    Q    How did you respond?

2    A    First of all, I was surprised.  Secondly, I didn't know

3    what to say.  And then I said:  Understood.

4    Q    What happened after the tour ended?

5    A    We did not meet up again in the room.  We just met up

6    where the governor and the nephew and the parking area, and

7    then we left.

8    Q    Where did you go with the governor in the parking area?

9    A    We left the federal secretariat of public security.  And

10   on the road he told me that we were not going to get any

11   material, any human resources, any equipment or anything to

12   help out the police, the police in Tepic and Nayarit.

13            And I told him what I had been told.  And he said:

14   Effectively, yeah, we are alone, this bastard isn't going to

15   help us out with anything.

16   Q    And when he referred to -- apologies for the language  --

17   "this bastard,"  who did you understand Governor Sandoval to

18   be referring to?

19   A    The secretary of public security, Mr. Garcia Luna.

20   Q    Back in Tepic, did there come a time when you became

21   alerted to a standoff?

22   A    Yes.  I had forgotten.  I had been alerted to a --

23   interpreter correction:  I've been alerted to an altercation

24   between the federal and the state police.

25   Q    How did you become aware of this altercation?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EDGAR VEYTIA - DIRECT - MS. KOMATIREDDY     1269

1    A    Through my chief of the security detail.  He told me that

2    he had heard on the radio that the state police was asking for

3    support.

4    Q    What did you do?

5    A    I -- I made myself available to go to the area of the

6    event.  And when I got there, it was at the Avenida del Valle

7    and Insurgentes.  And there was a black armored suburban

8    there.  And on the left side was the federal police.  And on

9    the left -- I mean, the right side were the state police with

10   their rifles out pointing at each other.

11   Q    So the state police and the federal police have their

12   guns out pointing at each other?

13   A    That's right.  Both of them, both of them.  The state

14   police had stopped that black armored suburban.  And the --

15   they didn't want it to go.  And the federal police wanted them

16   to leave it there and take it with them.

17   Q    Was your lieutenant, Valdivia, on the scene?

18            THE INTERPRETER:  Interpreter clarification.

19   A    Yes, the commander was there, as was the coordinator of

20   the federal forces, Jorge Anguiano Terriquez.

21   Q    Terriquez and Valdivia are on the scene.

22            What do you do.

23   A    I immediately questioned the coordinator, Terriquez, and

24   asked him why he was doing this.  I told him he was out of his

25   jurisdiction, that this was a state -- interpreter correction:

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY    1270

1    That the state had stopped this vehicle, and that he was just

2    showing off.

3              And he told me that he -- Genaro Luna had ordered

4    him, the secretary of public security, to take that unit, it

5    would allow that unit to go.

6              And I told him, I was telling him, I faced off with

7    him, I told him:  Tell those people to get out so they can

8    identify themselves and then they can leave.

9    Q    Did the people in the suburban get out of the car?

10   A    No, they didn't get out.  And the situation got very

11   tense.  It was getting very tense.  It was getting more tense.

12   And he was wanting to show me his phone.  And he's saying:  My

13   boss is ordering me to get that vehicle out of here.

14             And I said:  Hey, you're just showing off.  That

15   could be El Chapo in there, you know?  And so the situation

16   was getting very tense.  There were a lot of civilians around.

17   This was a very busy intersection.  And so I allowed that unit

18   to go.  And he told me that he would come the next day to

19   explain things.

20   Q    Did you receive any information about who was in the car?

21             THE COURT:  Objection.

22             MS. KOMATIREDDY:  I can break it down, Your Honor.

23             THE COURT:  Yes.

24   Q    Did you receive any information from the Beltrans with

25   whom you had an agreement about who was in the car?

EDGAR VEYTIA - DIRECT - MS. KOMATIREDDY       1271

1   A    Commander Valdivia had the direct connection with H-2.

2   And they had some very important information from inside

3   El Chapo's organization that possibly that inside -- that

4   there inside was El Chapo.

5                MR. MIEDEL:  Objection.

6                THE COURT:  One second.

7                Sustained.

8   Q    You testified that Commander Terriquez, Federal

9   Coordinator Terriquez, said he would come to your office the

10  next day.

11               Did he come to your office the next day.

12  A    Yes.  Yes, he did go.

13  Q    What happened when Terriquez came in to your office the

14  next day?

15  A    He told me that his boss, Mr. Genaro Luna, had to thank

16  you for the attention, but he didn't give me an explanation,

17  any explanation at all about who was inside the vehicle.  And

18  I was there waiting.  And I was there waiting.

19               And then at one moment he handed me the phone.  And

20  I put it up to my ear, and I heard him say:  Thank you.  Thank

21  you very much, you know, Mr. Terriquez is there for anything.

22  And that was it.

23               (Continued on the next page.)

24

25

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EDGAR VEYTIA – DIRECT – MS. KOMATIREDDY     1272

1    BY MS. KOMATIREDDY:

2    Q    When Terriquez handed you the phone and you heard someone

3    say "thank you, thank you very much," who was it that you

4    heard?

5    A    It was Garcia Luna.

6              MS. KOMATIREDDY:  Your Honor, may we have a sidebar?

7              THE COURT:  Yes.

8              (Continued on the next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1273

1              (Sidebar conference.)

2              MS. KOMATIREDDY:  I want to understand the

3    objection, see if I could fix it.

4              THE COURT:  I thought it was hearsay within hearsay.

5              MS. KOMATIREDDY:  Okay.

6              THE COURT:  One prong admissible, the other not.

7              MR. MIEDEL:  You also said possibly.

8              MS. KOMATIREDDY:  "Possibly" I can fix.  I see.

9    Because H2 is telling Valdivia, but they are all part of the

10   Sinaloa agreement.

11             THE COURT:  Are they?

12             MS. KOMATIREDDY:  The case presented the Sinaloa

13   civil war but also co-conspirators, there is a civil war

14   happening.

15             THE COURT:  You have one co-conspirator, but I don't

16   know who the other one is.

17             MS. KOMATIREDDY:  Sorry.  Which one is it that

18   you --

19             THE COURT:  The second one, the one that actually --

20             MS. KOMATIREDDY:  Said the statement.

21             THE COURT:  Yes.

22             MS. KOMATIREDDY:  H2 is the second under Hector

23   Beltran.  H is Hector Baltran.  H1 is Chaugin Lizarraga, first

24   lieutenant.  H2 is the second lieutenant.

25             THE COURT:  I missed that.

SIDEBAR CONFERENCE                    1274

1          MR. MIEDEL:  Judge, this has become abundantly

2     clear.  There is a war going on between the Sinaloa and the

3     Hector Beltrans.  The witness said he heard from the person

4     who speaks to H2 that H2 had heard from somebody in the

5     Sinaloa cartel that it may have been Chapo.  That is so many

6     levels of hearsay, especially among two factions that are

7     fighting each other and no longer aligned at that point.

8          THE COURT:  You've got one Sinaloa guy hearing from

9     another Sinaloa guy that someone in the Beltran Leyva camp

10    said something.  Is that what is going on?  Is that the

11    testimony?

12         MS. KOMATIREDDY:  Part of the agreement that these

13    guys have, the politicians and the drug traffickers, is

14    sharing intelligence.  So everyone here is Sinaloa; there is

15    civil war going on.  I don't know if it's that many levels of

16    hearsay.  My request is to go back to the transcript and see

17    what the answer was.  I believe H2 is the one with the

18    information who is informing Valdivia, Mr. H2's number two

19    guy, that they think El Chapo is in the car

20         THE COURT:  I'm going to sustain it on Rule 403.

21         MS. KOMATIREDDY:  I wanted to understand it.  That's

22    all.  Thank you.

23              (End of sidebar conference.)

24              (Continued on the next page.)

25

VEYTIA – DIRECT – MS. KOMATIREDDY          1275

1          (In open court.)

2          THE COURT:  We're going to take our lunch break now.

3  Come back at 1:05.  Don't talk about the case.

4          (Jury exits the courtroom.)

5          (Lunch recess.)

6  ************************************************************

7          (Afternoon session.)

8          (In open court.)

9          THE COURTROOM DEPUTY:  All Rise.

10          (Jury enters the courtroom.)

11          THE COURT:  Everyone be seated.  Sorry about the

12  late lunch, ladies and gentlemen.  Like I say all the time,

13  not like a Broadway play.

14          Okay.  Let's continue direct.

15          MS. KOMATIREDDY:  Thank you, Judge.

16  BY MS. KOMATIREDDY:

17  Q    Mr. Veytia, generally how large was the federal police

18  force?

19  A    The federal police is comprised of several thousand

20  agents.

21  Q    How large was your police force at the state level and

22  the municipal level?

23  A    We had approximately 800 agents.

24  Q    What kinds of vehicles did the federal police use?

25  A    They used four-door pickup vehicles.  They used armored

VEYTIA - DIRECT - MS. KOMATIREDDY          1276

1    vehicles known as Rhinos.  They used vehicles, charger-type

2    vehicles.  Yes.

3    Q    Anything else?

4    A    They had helicopters.  They had attack helicopters.

5    Q    Did you have those type of items, armored trucks, attack

6    helicopters, at the state level?

7    A    No.  Not during the 2012 period, no.

8    Q    At the municipal level?

9    A    No.

10   Q    What kinds of weapons did the federal police have?

11   A    They had short guns, 9-millimeter.  They had long guns

12   AR-15s.  They had access to machine guns.

13   Q    Did you have comparable weapons at the state level?

14   A    Only half of my force.

15   Q    What did the other half have?

16   A    Revolvers and shotguns.

17   Q    Do the federal police have military-style weapons?

18   A    The special group in the federal forces, they did.

19   Q    Did you have special group at the state and municipal

20   level that had military-style weapons?

21   A    No.

22   Q    Were you familiar with the budgets allocated to the

23   federal police forces and the state and municipal state police

24   forces?

25   A    Yes, I did have access.  As the executive secretary of

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

VEYTIA – DIRECT – MS. KOMATIREDDY          1277

1   the special bureau for the state of Nayarit, I did.

2   Q    How did federal police force budgets compare to state and

3   local budgets?

4   A    Well, compared to the state of Nayarit, it was like 2,000

5   to one.

6   Q    Did the federal police work with and receive assistance

7   from U.S. law enforcement agencies?

8   A    Yes.

9   Q    Were you at the state and municipal levels able to

10  receive help from U.S. law enforcement agencies on a regular

11  basis?

12  A    No.

13  Q    Why not?

14  A    States cannot enter into any kind of agreement with

15  entities from foreign countries.

16  Q    Did you ever see the defendant, Genaro Garcia Luna, in

17  the news, meeting with U.S. officials?

18  A    Yes.

19  Q    What do you remember about that?

20  A    I remember when President Obama came to Mexico, there was

21  a meeting.  There was a photo taken.  And also with the

22  higher-up chiefs of different agencies such as the DEA, CIA, I

23  saw that.

24  Q    What impression did you take from that?

25            MR. MIEDEL:  Objection.

VEYTIA - DIRECT - MS. KOMATIREDDY          1278

1      THE COURT:  Sustained.

2  Q     How did that impact you?

3      MR. MIEDEL:  Objection.

4      THE COURT:  Sustained.

5  Q     Did you have the ability to meet with president Obama and

6  the chiefs of the DEA and CIA?

7  A     No.

8  Q     After you returned from Mexico City from the meeting at

9  the bunker and the meeting between your governor and the

10  defendant, Genaro Garcia Luna, what did and the governor do?

11  A     So we had no resources, so we had to create a police

12  force out of nothing.  It was called the Nayarit Police.  Our

13  helicopter was rented, we got new uniforms, and we got an

14  armored vehicle on credit.

15  Q     What did you do with your rented helicopter and your

16  armored vehicle on credit?

17  A     Well, we tried to commit -- we tried to convey a sense of

18  security to the citizens of Nayarit.

19  Q     You said you created a new police force.  Did you

20  actually hire more police officers?

21  A     No.

22  Q     Where did you get the new police force from?

23  A     From the municipal and the state police.

24  Q     You just gave them new uniforms?

25  A     Yes.

VEYTIA - DIRECT - MS. KOMATIREDDY          1279

1  Q      Were you able to give them additional training?

2  A      We were able to do that later on, but not right then.

3  Q      Were you able to acquire new weapons?

4         THE INTERPRETER:  Could you repeat the beginning of

5  the question for the interpreter.

6  Q      Were you able to acquire new weapons?

7  A      No.

8  Q      Subsequently did you meet with someone, another

9  individual associated with Chapo named Ochoa?

10 A      The second time when they tried to buy the Nayarit plaza.

11 Q      Who is "they"?

12 A      The Sinaloa cartel, the Chapo Mayo, Nacho Prieto faction.

13 Q      Approximately when was this?

14 A      At the beginning of 2011, the first quarter.  The first

15 quarter of 2011.

16 Q      Did Ochoa talk to you about the defendant, Genaro Garcia

17 Luna?

18 A      Yes.  After this meeting was set up -- and the person who

19 set it up was Julian Venegas, who was Chapo's compadre, or

20 very good friend -- well, everyone came to the meeting, and we

21 were talking about exactly this topic, how they wanted to buy

22 the plaza.  They offered me $5 million to do that, and they

23 had brought with them $1 million to close the deal right then.

24         So my response to their representative was that 06

25 Albert, and the pelochos to try to kill me.  They had

VEYTIA – DIRECT – MS. KOMATIREDDY            1280

1    kidnapped some of my police officers.  So this was hard for

2    me.

3              Then he very energetically said, Look, in order to

4    close on this deal, I have the balls and the power to get

5    whoever I need out of Nayarit.

6              And then he told me that he had arranged this

7    situation on the federal level.  Did I remember back when

8    Chavin, H1, had been killed.  Garcia Luna had been paid

9    $5 million to authorize the operation to go after Chavin

10   because he had killed Nacho Coronel's son.  And he had just

11   paid $3 million to -- exactly to be able to negotiate with all

12   of the police precincts.  This was at the federal level, the

13   federal highway police, and also to have access to the

14   Guadalajara airport so the narcotics could come in.

15   Q    During that conversation, Ochoa was offering you money,

16   right?

17   A    Yes.

18   Q    Did you take the offer?

19   A    No.

20   Q    Why not?

21   A    Because we had a commitment with the Beltrans.

22   Q    In 2012 does the defendant, Genaro Garcia Luna, leave

23   office near the end of that year?

24   A    Yes.  The president changed.

25   Q    Okay.  Now I want to talk a little more about you and

VEYTIA - DIRECT - MS. KOMATIREDDY          1281

1    some of the things you did in 2013 and forward.

2              Did you enter into a position of greater power in

3    2013?

4    A    Yes.

5    Q    What position is that?

6    A    I was elected by the local congress to become Attorney

7    General of the state.

8    Q    Is that the highest office that you held in Mexico?

9    A    That's correct.

10   Q    I'm going to take a minute to show you some photos.

11             MS. KOMATIREDDY:  Ms. Donovan, if we could please

12   start with Government Exhibit 35B, for the witness only,

13   please.

14   BY MS. KOMATIREDDY:

15   Q    Do you recognize this?

16   A    Yes.

17   Q    Approximately what time frame is this picture taken in?

18   A    That period was between 2009 to 2011.

19   Q    Is it a fair and accurate photo of you at work between

20   2009 and 2011?

21   A    Yes.  I was secretary for public security in the

22   municipality of Tepic.

23             MS. KOMATIREDDY:  Government moves 35B into

24   evidence.

25             MR. MIEDEL:  No objection.

VEYTIA - DIRECT - MS. KOMATIREDDY          1282

1            THE COURT:  Received.

2            (Government Exhibit 35B, was received in evidence.)

3            MS. KOMATIREDDY:  If we could turn to Government

4   Exhibit 35D and E for the witness only, please.

5   BY MS. KOMATIREDDY:

6   Q    Do you recognize those photographs?

7   A    Yes.

8   Q    What time frame was this -- were these photographs taken

9   in?

10  A    In 2012.

11  Q    Are these fair and accurate photographs of you in 2012?

12  A    Yes.

13           MS. KOMATIREDDY:  The Government moves 35D and 35E

14  into evidence.

15           MR. MIEDEL:  No objection.

16           THE COURT:  Received.

17           (Government Exhibit 35D & 35E, were received in

18  evidence.)

19  BY MS. KOMATIREDDY:

20  Q    If we could start with 35D.

21           Can you explain to the jury the context of this

22  photograph?

23  A    That was when the Nayarit police force was created so

24  that we could convey a sense of security for the people of

25  Nayarit.

VEYTIA – DIRECT – MS. KOMATIREDDY                    1283

1    Q     If we could turn to 35E.

2          Is that the rented helicopter?

3    A     Yes.  That was the rented helicopter, and then on the

4    other side is a motorcycle that was seized.

5          MS. KOMATIREDDY:  If we could please have for the

6    witness only 35 and 35A.

7    BY MS. KOMATIREDDY:

8    Q     What time frame are these photographs taken?

9    A     After 2013.

10   Q     Are these true and accurate photographs of you when you

11   were Attorney General?

12   A     Yes.

13         MS. KOMATIREDDY:  The Government moves 35 and 35A

14   into evidence.

15         MR. MIEDEL:  No objection.

16         THE COURT:  Received.

17         (Government Exhibit 35 & 35A, were received in

18   evidence.)

19   BY MS. KOMATIREDDY:

20   Q     Turning to 35A.  There's a portrait in the background of

21   this photograph.  Who is that portrait of?

22   A     That is the current governor at that time, Roberto

23   Sandoval Castanedas.

24   Q     Thank you.

25         After you become Attorney General, do you continue

VEYTIA - DIRECT - MS. KOMATIREDDY          1284

1    with your agreement with drug traffickers?

2    A     Yes.

3    Q     What happens during that agreement?  How do you carry it

4    out?

5    A     We carried it out by not apprehending them and by also

6    giving them information when needed to evade the justice or to

7    escape and to cover up any crime they may have committed.

8    Q     Was your main point of contact still H2?

9    A     Correct.

10   Q     Did there come a time when you began receiving monthly

11   payments?

12   A     Yes.

13   Q     Can you explain how that came about?

14   A     Commander Valdivia was arrested by the Santa Maria del

15   Oro authorities, and that's when I had to get involved

16   directly so that I could keep control of the state.

17   Q     What did you do when you got involved directly?

18   A     I grabbed the phone so I would be in direct communication

19   with H2.

20   Q     Did you come to an agreement with H2?

21   A     Yes.

22   Q     What was your agreement?

23   A     That he would pay 2 million pesos per month so that he

24   could keep control of the state.

25   Q     Did you receive that money?

VEYTIA – DIRECT – MS. KOMATIREDDY          1285

1   A     Yes.

2   Q     Who delivered it to you?

3   A     Different commanders would deliver it.

4   Q     Did you ever receive it directly?

5   A     Once or twice.

6   Q     Did you distribute that money further?

7   A     Yes.

8   Q     To whom?

9   A     We distributed to the different commanders for the

10  different sectors, to judges, journalists.

11  Q     Why?

12  A     To keep up appearances and to keep control of the state.

13  Q     Did you keep any of the money for yourself?

14  A     Yes, the leftovers.

15  Q     What did you do with the money you kept?

16  A     I bought some houses and livestock.

17  Q     Were there certain police commanders you used to carry

18  out your side of the agreement?

19  A     The most important one was Segundo Puerta.

20  Q     Did you trust all the police commanders with your orders?

21  A     Well, only those from the first command so that they

22  would in turn deliver the orders to the third or fourth

23  command.

24  Q     How did your relationship with H2 work?  How would he

25  call upon you for help?

VEYTIA – DIRECT – MS. KOMATIREDDY          1286

1   A    Through the BlackBerry.  That's how we communicated, over

2   the phone.

3   Q    Can you give us an example how he would request your

4   help?

5   A    Well, for example, if they had arrested retail sales drug

6   trafficker, then he would tell me so that we could release

7   that person or we could cover a certain situation.  He would

8   tell me what he wanted and what he needed.  For example, if

9   there had been a homicide and he needed it to be covered up,

10  then he would also tell me that.

11  Q    Did you know that H2 and his people were selling drugs in

12  Nayarit?

13  A    Yes.

14  Q    Did you stop it?

15  A    No.

16  Q    Why not?

17  A    Because we had an agreement.

18  Q    Did you know that H2 was going to murder people in

19  Nayarit?

20  A    Yes, he did tell me.

21  Q    Did you stop it?

22  A    No.

23  Q    Why not?

24  A    Because we had the agreement.

25  Q    I'm going to turn your attention to February 2017.

VEYTIA – DIRECT – MS. KOMATIREDDY          1287

1      What happened in your relationship with H2 at that

2  time?

3  A    At that time H2 was out of control.  He had just killed

4  eight young men who would sell drugs in the street.  They did

5  not belong to his organization, but they would sell.

6  Q    What did you do?

7  A    Together with other federal authorities and with the

8  government's authorization, the idea was to eliminate him.

9  Q    To be clear, when you refer to other federal authorities,

10 that was not the federal police, correct?

11 A    Correct.

12 Q    Did you and these other government officials plot to

13 capture and kill H2?

14 A    Yes.

15 Q    Did you and these other government officials, in fact,

16 capture H2?

17 A    Yes.

18 Q    Were you present when that happened?

19 A    Yes.

20 Q    Did you hear him being tortured?

21 A    Yes.

22 Q    Did you intervene?

23 A    No.

24 Q    Was he ultimately killed?

25 A    Yes.

1    Q      Why did you decide to eliminate someone who was paying

2    you bribes?

3    A      Because he was already out of control.

4    Q      After H2 was dead, did you go after anyone else?

5    A      We went after his entire organization.  We captured H9,

6    and he was also killed.

7    Q      Overall, Attorney General Veytia, how many murders have

8    you been involved in?

9    A      I am responsible of ten or more.

10   Q      Do you remember someone named Paisa?

11   A      Yes.

12   Q      Did you assist with the murder of Paisa?

13   A      Yes.

14   Q      Can you tell us about that?

15   A      H2 had already identified him as someone who would cause

16   trouble, and he told me that he was going to execute him.  And

17   I did not intervene to stop that.  But they didn't manage it.

18   He was wounded and he was at a hospital.  And he told me that

19   iff I didn't remove the police officers or the local

20   prosecutor's agents from there that things were going to get

21   really ugly, so I decided to remove the staff from there.

22   Q      So Paisa is in a hospital room, and you remove the police

23   officer who's guarding his room?

24   A      Yes.

25   Q      And what does that allow H2's people to do?

VEYTIA – DIRECT – MS. KOMATIREDDY          1289

1   A    Execute him.

2   Q    Attorney General Veytia, have you been involved in the

3   torture of anyone?

4   A    Yes.

5   Q    Can you describe who?

6   A    There was this situation where somebody who had raped and

7   killed a one-and-a-half-year-old baby girl.  He did not want

8   to tell us where some of the evidence was in order for us to

9   be able to incriminate him.  And that was when we put a bag on

10  him and poured water over.

11  Q    Is that called waterboarding?

12  A    Yes.

13  Q    Did you also use Tasers?

14  A    Yes.

15  Q    Did that individual later die?

16  A    Yes, in the penal institution.

17  Q    Were you also involved in detaining, interviewing, and

18  torturing people on behalf of H2?

19  A    Yes.

20  Q    Attorney General Veytia, were you involved in kidnapping

21  people?

22  A    Yes.

23  Q    And hiding evidence?

24  A    Yes.

25  Q    And arson?

VEYTIA – DIRECT – MS. KOMATIREDDY          1290

1    A     Yes.

2    Q     And lying in police reports and prosecutions to cover for

3    H2?

4    A     Yes.

5    Q     And stealing seized property?

6    A     Yes.

7    Q     Taking kickbacks?

8    A     Yes.

9    Q     And did you continue taking bribes from other drug

10   traffickers?

11   A     Yes.

12   Q     While you were involved in drug trafficking crimes, did

13   you travel back and forth from Mexico to the United States?

14   A     Correct.

15   Q     Why did you feel comfortable doing that?

16   A     I didn't think I would be arrested.

17   Q     What happened when you traveled to the United States in

18   March 2017?

19   A     I was arrested on March 27, 2017.

20   Q     After your arrest, did you begin providing information to

21   the U.S. government?

22   A     Yes.

23   Q     Did you plead guilty to any crimes?

24   A     Yes.

25   Q     What crime did you plead guilty to?

VEYTIA – DIRECT – MS. KOMATIREDDY          1291

1   A     To Article 959D.

2   Q     What crime is that?

3   A     It involves all acts outside of the jurisdiction of the

4   United States in order to manufacture and distribute

5   narcotics.

6   Q     Did you plead guilty because you are, in fact, guilty?

7   A     I am guilty.

8   Q     Have you been sentenced?

9   A     Yes.

10  Q     Prior to your sentencing, did the government inform the

11  judge that you had provided information to the government?

12  A     Yes.

13  Q     What sentence did you receive?

14  A     Twenty years.

15  Q     Do you hope to receive anything as a result of testifying

16  here today?

17  A     Yes.

18  Q     What do you hope to receive?

19  A     A reduction in my sentence.

20  Q     Who decides whether you receive a sentence reduction?

21  A     Just the judge who sentenced me the first time, only her.

22  Q     Has anyone promised you a sentence reduction?

23  A     No.

24  Q     When the judge decides, will the judge have seen all of

25  your testimony?

VEYTIA – DIRECT – MS. KOMATIREDDY          1292

1    A     Yes.

2    Q     All the good?

3    A     Yes.

4    Q     All the bad?

5    A     All the bad.

6    Q     Is it possible that you testify here today and you do not

7    receive any sentence reduction at all?

8    A     That's correct.

9    Q     What is your citizenship?

10   A     I am an American and a Mexican citizen.

11   Q     Can you be denaturalized?

12   A     No.

13   Q     Can you be deported?

14   A     No.

15   Q     Do you need any immigration assistance from the

16   government?

17   A     No.

18   Q     When you get out of prison, what country do you expect to

19   live in?

20   A     I have five years of supervised release here.

21   Q     Does where you live have anything to do with your

22   testimony today?

23   A     No.

24   Q     Attorney General Veytia, are you familiar with the phrase

25   "plata o plomo"?

1    A    Yes.

2    Q    What does it mean?

3    A    It means if you don't take the money, you'll get killed.

4    Q    As a law enforcement officer in Mexico, is there a third

5    option?

6    A    Of course.

7    Q    What is it?

8    A    It's a hard road to take, but it's the correct one to

9    take, and it is to carry out your duties and responsibilities

10   as you should.

11          MS. KOMATIREDDY:  No further questions.

12          THE COURT:  Cross-examination.

13          MR. MIEDEL:  Your Honor, could we have a sidebar?

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1294

1        (Sidebar conference.)



SIDEBAR CONFERENCE                    1295



11    (End of sidebar conference.)

12    (Continued on the next page.)

1          (In open court.)

2                    CROSS-EXAMINATION

3    BY MR. MIEDEL:

4    Q    Good afternoon.

5    A    Good afternoon.

6    Q    If you don't mind, I'm not going to call you Attorney

7    General Veytia.  Okay?

8              It sounds like you understand and speak English

9    quite well.  Are you going to testify in English or in

10   Spanish?

11   A    Spanish.

12   Q    Mr. Veytia, you were, as you testified, a senior

13   government official in Mexico, correct?

14   A    Yes.

15   Q    Genaro Garcia Luna was, between 2006 and 2012, federal

16   secretary of public security, correct?

17   A    Yes.

18   Q    He was essentially right below the president of the whole

19   country, correct?

20   A    Yes.

21   Q    And he was well known to the whole country, correct?

22   A    Correct.

23   Q    It was big news when he was arrested in December of 2019,

24   correct?

25   A    Correct.

VEYTIA - CROSS - MR. MIEDEL                    1297

1    Q     You were in jail at the time, right?

2    A     Yes.

3    Q     But even you knew about it?

4    A     About his arrest?  Yes.

5    Q     Now, you just testified that you were arrested on

6    March 27, 2017, when you crossed the border from Mexico into

7    the United States, right?

8    A     Correct.

9    Q     And once you're arrested, you were interviewed at length

10   by the FBI, correct?

11   A     Correct.

12   Q     You learned that there was an Indictment of narco

13   trafficking against you here in the federal court of Brooklyn,

14   right?

15   A     Yes.

16   Q     You also learned that the FBI had real evidence against

17   you?  For example, they had you tape -- they had BlackBerry

18   communications with you, right?

19          MS. KOMATIREDDY:  Objection to the characterization.

20          THE COURT:  Overruled.

21          THE WITNESS:  No.

22   Q     You did not know that?

23   A     No.

24   Q     Do you recall that in that initial interview on March 27,

25   2017, they showed you transcripts of recordings of yours?

VEYTIA – CROSS – MR. MIEDEL          1298

1    A    No.

2    Q    Let me show you, just you, what's marked as EB-2.

3         MR. MIEDEL:  Sorry.  One second.  You can take that

4    down.

5    Q    I meant EB-21.  We'll go to page 2.

6         Do you see that on your screen, sir?

7    A    No.

8    Q    Do you see it now?

9    Q    Do you see it now?

10   A    Yes.

11   Q    You see the paragraph that starts with "Veytia was

12   shown"?

13   A    Yes.

14   Q    You were shown -- is it true that you were shown

15   transcripts of BlackBerry conversations?

16   A    I don't remember.

17   Q    Okay.

18        MR. MIEDEL:  You can take that down.

19   Q    During that first interview when you were first arrested

20   on March 27, 2017, you lied a lot to the FBI, didn't you?

21   A    No.

22   Q    Isn't it true that you told them you never had any

23   interactions with the narco traffickers?

24   A    I told them I had never done that bringing drugs to the

25   United States.

VEYTIA – CROSS – MR. MIEDEL                1299

1    CROSS-EXAMINATION   (Continuing)

2    BY MR. MIEDEL:

3    Q    Isn't it true that you told them that you had no direct

4    communications with H-2?

5    A    I told them, yes.

6    Q    At some point shortly after this initial meeting with the

7    FBI, you decided you were going to cooperate with the U.S.

8    government, right?

9    A    I was talking to them since the first moment that I was

10   arrested.

11   Q    You were arrested March 27th of 2017, right?

12   A    Correct.

13   Q    And your first official meeting with agents and

14   prosecutors was on April 6th and 7th of that same year, just a

15   few -- couple weeks later, right?

16   A    Correct.

17   Q    And you understood that you needed to be honest and

18   truthful and complete, right?

19   A    Yeah, that I had to answer with the truth.

20   Q    And you had to be complete and accurate, right?

21   A    As far as I remember, yes.

22   Q    And you understood that you had to be forthcoming with

23   information?

24   A    Yes.

25   Q    And the way that these meetings worked, sometimes you

VEYTIA – CROSS – MR. MIEDEL                    1300

1    were asked specific things, correct?

2    A    Generally, they are very specific, yes.

3    Q    Sometimes they would ask you, for example, how did you

4    communicate with H-2?

5    A    Yes.

6    Q    And sometimes they would ask you more general questions,

7    like tell us about corruption in Nayarit, right?

8    A    I don't remember that.

9    Q    You don't ever remember being asked a general question;

10   is that what you're saying?

11   A    Yes, no, I don't.

12   Q    But you understood that you needed to be honest and

13   complete?

14   A    Yes.

15   Q    And not leave anything out?

16   A    As to what they would ask me, yes.

17   Q    And today you testified a fair amount about your belief

18   that Genaro Garcia Luna was somehow associated with the

19   Sinaloa Cartel, right?

20   A    Yes.

21   Q    That's why you're here today?

22   A    Yes.

23   Q    And you would agree, sir, wouldn't you, that the

24   information about the federal secretary of public security

25   working with El Chapo's cartel, that's big news, right, that's

VEYTIA - CROSS - MR. MIEDEL                    1301

1    a big -- that's an important fact?

2    A     Yes.

3    Q     I mean, establishing a link of the cartel all the way to

4    the person right below the president, that -- there's almost

5    no bigger news in this respect , right?

6    A     Possibly.

7    Q     And your -- you consider yourself a smart person, right?

8    A     Normal.

9    Q     Well, you have a law degree, right?

10   A     Yes.

11   Q     And you said you had some other higher degrees as well?

12   A     Yes.

13   Q     And you understood that the purpose of the meetings that

14   you were having with the government at that time was to try to

15   help yourself, right?

16   A     Yes.

17   Q     So if you knew that you were sitting on some very

18   explosive information, you would not have kept that to

19   yourself, would you?

20   A     The questions they were asking me were very specific.

21   Q     They asked you about corruption, correct?

22   A     Yes.

23   Q     You ended up meeting with law enforcement and the

24   prosecutors 11 times between April 2017 and the end of 2018;

25   is that correct?

VEYTIA – CROSS – MR. MIEDEL          1302

1   A    Well, I don't know if there were 11 times, but I know

2   there were many times.

3   Q    In fact, you put in an affidavit that you believed it was

4   more than 150 hours that you spent with these people?

5   A    Possibly.

6   Q    Well, if I showed you that affidavit, would that refresh

7   your recollection?

8   A    No, it's part of my motion, the 2255 that I have for

9   conflict of interests.

10  Q    Right.

11          I'm just asking you, do you recall that in that

12  affidavit you said that you were debriefed by law enforcement

13  for more than 150 hours.

14  A    Yes.

15  Q    And for you, the goal of all those meetings and

16  participating in those meetings was to get a cooperation

17  agreement, correct?

18  A    Correct.

19  Q    And eventually, what's known as a 5K letter from the

20  government, right?

21  A    Correct.

22  Q    And during those meetings, you talk all about your own

23  criminal activities, right?

24  A    Yes.

25  Q    You talked about the criminal activities of other people,

VEYTIA — CROSS — MR. MIEDEL                    1303

1    right?

2    A     Yes.

3    Q     The cartel people you worked with, right?

4    A     Yes.

5    Q     The drugs that were moved and that you helped with?

6    A     Yes.

7    Q     The killings, the kidnappings, the torture you

8    participated in?

9    A     Yes.

10   Q     You talked about the bribes that you and others received

11   from the cartels, right?

12   A     Yes.

13   Q     You talked about corruption by government employees?

14   A     Yes, local ones.

15   Q     Only local ones?

16   A     No.  And about the period between the 2013 and 2017.

17   Q     Well, you talked about judges, right?

18   A     Local ones, yes.

19   Q     You talked about the governor?

20   A     Yes.

21   Q     Talked about police commanders, right?

22   A     Yes.

23   Q     Talked about generals, right?

24   A     Yes.

25   Q     From the military?

VEYTIA – CROSS – MR. MIEDEL                    1304

1    A    Yes.

2    Q    In fact, you talked about the national secretary of

3    defense, didn't you?

4    A    Yes.

5    Q    And before 2019 and those 11 meetings, not once, not once

6    did you mention the name Genaro Garcia Luna; isn't that

7    correct?

8    A    Correct.

9    Q    Did you say "correct"?

10   A    Yes.  Yes.

11   Q    Now, in January of 2019, you pled guilty, right?

12   A    Yes.

13   Q    You were still hoping to get that 5K letter, right?

14   A    Yes.

15   Q    But then sometime in 2019 you learned that the

16   prosecutors were not going to give you a cooperation

17   agreement, right?

18   A    Correct.

19   Q    And that's because they said that they could not

20   corroborate the information that you had provided, right?

21   A    I don't remember perfectly what you're saying.  I don't

22   remember that.

23           MS. KOMATIREDDY:  Your Honor, may we have a sidebar?

24           THE COURT:  Okay.

25           (Continued on the next page.)

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

SIDEBAR CONFERENCE                          1305

1    (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4    MS. KOMATIREDDY:  We moved on this, Your Honor.  The

5    defense is precluded from asking why he wasn't offered a

6    cooperation agreement.

7    MR. MIEDEL:  No, I was under the impression I

8    couldn't ask about the fact that the DEA --

9    THE COURT:  Say that again?

10   MR. MIEDEL:  That the DEA had decided he was lying,

11   that's the issue.  This is part of the sentencing.  It was in

12   the sentencing transcript that the prosecutors said that they

13   couldn't corroborate the information.

14   THE COURT:  I excluded from what the prosecutors

15   said.  What I said was that you could put in that the Judge

16   made a finding at sentencing.

17   MR. MIEDEL:  And you were talking about the Colorado

18   case.  That was a different -- different witness, different

19   person.

20   THE COURT:  Okay, then I do not remember this one.

21   MR. MIEDEL:  No, they moved to preclude the

22   determination that the DEA had decided he wasn't credible.

23   MS. KOMATIREDDY:  Our motion is very clear.  We

24   moved on two grounds, to preclude any opinion by the DEA or

25   alleged opinion on the DEA or prosecutor, and also any

SIDEBAR CONFERENCE                    1306

1   examination on why he wasn't offered a cooperation agreement.

2   It's not relevant, it's highly prejudicial, it's inviting

3   comparison of cases which, by the way, includes a comparison

4   of the Cienfuegos case, which we also moved on.

5                THE COURT:  I agree, I am going to exclude it.

6                (End of sidebar conference.)

7                (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VEYITA - CROSS - MR. MIEDEL                1307

1        (In open court.)

2            MS. KOMATIREDDY:  Judge, we also move to strike the

3    last question and answer.

4            THE COURT:  The last question is stricken.

5    BY MR. MIEDEL:

6    Q    Mr. Veyita, when you learned that you were not going to

7    get a cooperation agreement, you were devastated by that,

8    right?

9    A    Yes.

10   Q    Because that meant that you were going to face a minimum

11   sentence of ten years, right?

12   A    Yes.

13   Q    And a maximum sentence of life, right?

14   A    Yes.

15   Q    And then in September of 2019, you were sentenced, right?

16   A    Correct.

17   Q    And as you had testified on direct, the prosecutors

18   provided the judge with the information that -- about your

19   cooperation, right?

20   A    Yes.

21   Q    But you didn't get a 5K letter, right?

22   A    No.

23   Q    And your lawyer asked the judge to impose the minimum

24   sentence, which was ten years, right?

25   A    Yes.

VEYITA – CROSS – MR. MIEDEL                    1308

1    Q    And the judge ended up giving you 20 years?

2    A    Correct.

3    Q    And that was much more than you had hoped for, right?

4    A    Yes.

5    Q    And at that sentencing, you spoke and you expressed a lot

6    of remorse about what you had done, right?  You remember that?

7    A    Yes.

8    Q    But after the sentencing, you -- you filed a motion

9    against -- you filed a couple of motions against your lawyer,

10   right?

11   A    Yes.

12   Q    And you said that you weren't happy with your lawyer

13   because he had not told you about a valid defense that you

14   had, a venue, right?

15   A    Yes.

16   Q    And if you had known about that, you wouldn't even have

17   pled guilty, right?

18   A    No.

19   Q    So you're sentenced in September of 2019, correct?

20   A    Yes.

21   Q    And you've got 20 years of your life to sit in prison,

22   right?

23   A    Correct.

24   Q    And then less than three months later, Genaro Garcia Luna

25   is arrested, right?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

VEYITA - CROSS - MR. MIEDEL                    1309

1    A    I don't know the exact date.

2    Q    And then in the summer of 2020, you have a conversation

3    with your new lawyer, right?

4    A    Yes.

5    Q    And those conversations lead your lawyer to reach out to

6    these prosecutors offering you assistance against Garcia Luna,

7    correct?

8    A    Yes.  My lawyer asked me what I knew, and I told him what

9    connected me to him.

10   Q    And your lawyer sent a letter to the government

11   explaining that you could be of help, right?

12   A    I don't know the process, but I think they did meet with

13   the government.

14   Q    And then you started meeting with the government, right,

15   with these prosecutors?

16   A    Yes.

17   Q    And that's the first time that you mentioned the name

18   Genaro Garcia Luna to a federal official, correct?

19   A    First, it was to my lawyer and then to the prosecutors,

20   yes.

21   Q    And you learned that if you could provide cooperation,

22   even though you had already been sentenced, you could get

23   what's called a Rule  35, right?

24   A    Yes.

25   Q    And the Rule 35 allows your sentencing judge to

VEYITA - CROSS - MR. MIEDEL                    1310

1    reconsider your sentence and give you something different,

2    right?

3    A    Yes.

4    Q    And it's the government, the prosecutors, that write that

5    Rule 35 motion to the judge to permit that to happen, right?

6    A    I believe so.

7    Q    So without that motion that there -- they write to the

8    judge, you're stuck with your 20 years, right?

9    A    No.

10   Q    Well, the only way that you could get a sentence

11   reduction is if the prosecutors write the judge a Rule 35

12   motion, right?

13   A    I have a pending 2255.

14   Q    What do you think the 2255  is going to get you?

15   A    I don't know exactly.  I don't know exactly.

16   Q    You're a lawyer, right?

17   A    Yes.

18   Q    And you filed this motion called a 2255, right?

19   A    Yes.

20   Q    To get your plea back, right?

21   A    Yes, or a sentence reduction.

22   Q    But you know, right, that that has nothing to do with

23   whether you are resentenced pursuant to what these prosecutors

24   tell your sentencing judge?

25   A    Correct.

VEYITA – CROSS – MR. MIEDEL            1311

1   Q    So let me go back to what I asked you originally.

2         So you understand that unless these prosecutors

3   write a Rule 35 motion to your sentencing judge, your sentence

4   remains 20 years.

5         MS. KOMATIREDDY:  Objection.  Asked and answered.

6         THE COURT:  Overruled.

7   A    The 2255 has still not been resolved; it's pending.

8         THE COURT:  He is asking you a different question.

9         He is saying that the 2255 is not connected to your

10  cooperation.

11        THE WITNESS:  Yes.

12        MR. MIEDEL:  Thank you.

13        MS. KOMATIREDDY:  Sorry, Your Honor.  I ask for a

14  sidebar.

15        THE COURT:  Yes, I have to give an instruction to

16  the jury.

17        MS. KOMATIREDDY:  Sorry, Your Honor, may I please

18  approach?

19        THE COURT:  We'll talk first, then I'll give an

20  instruction.

21            (Continued on the next page.)

22

23

24

25

SIDEBAR CONFERENCE                     1312

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          MS. KOMATIREDDY:  It's little complicated in this

5     case.  His 2255 is a balance in cooperation in his part.

6          THE COURT:  How is it cooperation?

7          MS. KOMATIREDDY:  He alleges conflict of interest.

8     Alleging not getting a cooperation agreement, he sees that as

9     an alternative avenue for getting a sentence reduction.

10          THE COURT:  I did not say he was not looking for a

11     sentence reduction.  I was saying he  is not basing it on his

12     cooperation, that is true.

13          MS. KOMATIREDDY:  I think in his view, since that

14     litigation is also ongoing and we have not asked that it not

15     be, the Judge could take into account his testimony here, his

16     continued cooperation if she chooses.

17          THE COURT:  How would she do that in a 2255?

18          MS. KOMATIREDDY:  His claim, Your Honor, he was

19     wrongly deprived of the cooperation agreement and should

20     the -- should there be some --

21          THE COURT:  If counsel was ineffective and the most

22     he could get would be a resentencing.  And you are saying in

23     that resentencing, he could raise his cooperation after saying

24     that his lawyer was ineffective for not  -- for getting him a

25     cooperation agreement?

SIDEBAR CONFERENCE                    1313

1        MS. KOMATIREDDY:  That's his view, Your Honor.

2   Under resentencing, Judge Amon would be able to reconsider

3   everything.

4        THE COURT:  It is fanciful.

5        MS. KOMATIREDDY:  Okay, I'm not sure I agree.  I'm

6   telling you it's his view.

7        THE COURT:  I am saying it is fanciful.

8        MS. KOMATIREDDY:  I understand.

9        THE COURT:  It cannot happen as a practical matter.

10       MS. KOMATIREDDY:  I just think his case is very

11  different.  I don't know what is going to happen in his case.

12  I'm saying for purposes of cross-examination and impeachment,

13  that's his belief, so not simply a Rule 35 mechanism.  That's

14  my point.

15       THE COURT:  Here is what I am going to tell the

16  jury:  A 2255 motion contends that something illegal happened

17  in the underlying proceedings.  In this witness's case, he is

18  contending he did not receive effective assistance of counsel.

19  If the Court finds that on the 2255, it can resentence him.

20       MS. KOMATIREDDY:  Right.  Okay.

21       THE COURT:  And I am going to say the Rule 35, on

22  the other hand, seeks to reduce the sentence not because there

23  was any legal error, but because there are other circumstances

24  that have arisen.

25       MS. KOMATIREDDY:  Understood.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

                        SIDEBAR CONFERENCE                    1314

1              Thank you, Judge.

2              THE COURT:  Okay.

3              Right.

4              MR. MIEDEL:  Right.  I mean, 2255 cannot compel a 5K

5     letter.

6              THE COURT:  Correct.

7              MR. MIEDEL:  So --

8              THE COURT:  Correct.  I will say all of that.

9              (End of sidebar conference.)

10             (Continued on the next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VEYITA - CROSS - MR. MIEDEL                   1315

1          (In open court.)

2          THE COURT:  Ladies and gentlemen, what we are

3    talking about are two legal avenues available to someone who

4    has been convicted or pled guilty of a crime.

5          When we say "2255," that means habeas corpus.  And

6    what it stands for is that there was some constitutional error

7    in the proceedings leading up to the sentence.

8          In this witness's case, he is contending in his 2255

9    that the constitutional error was that he did not receive

10   effective assistance of counsel.  If the Judge accepts that,

11   then the Judge will resentence him.  He cannot obtain a 5K1

12   letter on that 2255 because it only deals with a legal error.

13         The other avenue we are talking about is a Rule 35 .

14   That does not require a legal error.  That simply requires a

15   Court to determine if there are new circumstances that warrant

16   a reduction of the sentence.  One of those new circumstances

17   could be the government having given a later 5K1 letter; that

18   is, a 5K1 letter that it had not given when the defendant was

19   sentenced.

20         Do we need to talk again?

21         I think that is it.

22         Okay.  Continue, please, Mr. Miedel.

23         MR. MIEDEL:  Thank you.

24   BY MR. MIEDEL:

25   Q    You testified today about your relationship with Governor

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

VEYITA – CROSS – MR. MIEDEL                    1316

1   Sandoval, right?

2   A    Correct.

3   Q    There was a time when you tape-recorded a conversation

4   with him, right?

5   A    Correct.

6   Q    And you kept that recording, right?

7   A    Yes.

8   Q    And you, in fact, turned it over to the government?

9   A    Yes.

10  Q    And the reason that you recorded that conversation was

11  because you wanted to just ensure that there was a record of

12  what had happened, right?

13  A    Correct.

14  Q    You also testified about cloning a phone.

15           Can you explain that.

16  A    A cloned phone is to have a separate phone that is a

17  mirror of the original phone.

18  Q    And if you have a cloned phone, you can listen to

19  conversations that are taking place on that phone by other

20  people?

21  A    Yes.

22  Q    You testified about this event in December of 2011 where

23  people came to your house and there was a shootout.

24           Do you remember that.

25  A    Yes.

VEYITA – CROSS – MR. MIEDEL                1317

1    Q    And do you -- you said that you had cloned Pelocho's

2    phone, right?

3    A    Yes.

4    Q    So you were listening in and you were aware that

5    something was going to happen?

6    A    That something was happening, yes.

7    Q    And you were so upset about what happened, you went out

8    and actually arrested Pelocho, right, you had him arrested?

9    A    Yes, I arrested everyone.

10   Q    Okay.  And then in 2012, isn't it true that you

11   personally organized a meeting of all the cartels that were

12   fighting each other in Nayarit?

13   A    Yes.

14   Q    You called that meeting?

15   A    Yes.

16   Q    That included H-2 and his people, right?

17   A    Yes.

18   Q    And some people from Sinaloa 's side, right?

19   A    Yes.

20   Q    And you told them to cut it out, right, cut out the

21   violence, right?

22   A    Correct.

23   Q    You said you can divide up the state, you know, you guys

24   can have one portion and you guys can have another portion,

25   but stop killing each other, right?

VEYITA – CROSS – MR. MIEDEL                1318

1   A    Correct.

2   Q    And you told them if they didn't do that, you would kill

3   them, right?

4   A    That we will go -- yeah, the group thing.

5   Q    All right.

6   A    Yes, that we would go against the group that would break

7   the peace.

8   Q    That was your meeting, you called it, and you gave the

9   order, right?

10  A    Yes.

11  Q    You said that they could continue to sell drugs however

12  they wanted, right?

13  A    Yes.

14  Q    They could continue to carry weapons for protection,

15  right?

16  A    Yes.

17  Q    But they should stop killing each other?

18  A    Yes.

19  Q    Now, Mr. Veytia, you testified that you were paid bribes

20  by the cartel over a number of years, right?

21  A    Yes.

22  Q    You were also given gifts, correct?

23  A    Yes.

24  Q    Rolex watches?

25  A    Yes.

VEYITA - CROSS - MR. MIEDEL                1319

1    Q    And you testified that you spent your money on -- I think
2    you said houses and livestock; is that right?
3    A    Yes, houses, livestock.
4    Q    Isn't it true that you owned many houses?
5    A    Yes.
6    Q    You had a house in Arboledas, right?
7    A    Yes.
8    Q    Three houses in Ciudad del Valle?
9    A    Yes.
10   Q    One in Tepic?
11   A    Yes.
12   Q    One in Guadalajara?
13   A    Yes.
14   Q    You also had a ranch in Compostela?
15   A    Yes.
16   Q    With 350 pieces of cattle, right?
17   A    Yes.
18   Q    You had a bus company?
19   A    Yes.
20   Q    You owned a house that you bought for one of your
21   daughters, right?
22   A    Yes.
23   Q    You had a large piece of land in -- near Las  Brisas?
24   A    Yes.
25   Q    You had tow trucks?

VEYITA – CROSS – MR. MIEDEL                1320

1    A      Yes.

2    Q      And then in the United States, you owned property too,

3    right?

4    A      Yes.

5    Q      You own a trust fund, you have a trust fund named

6    Sunnyside Investments, right?

7    A      I had that, yes.

8    Q      You had that.

9            And through that trust, you owned several properties

10   in the United States.

11   A      Yes.

12   Q      Now, were all these assets seized after your arrest?

13   A      The Mexican ones and proportionately all the way up to

14   2013, yes.  And the ones from here, from the United States,

15   they were sold to pay for the attorneys.

16   Q      Now, you testified on direct that you were involved in or

17   responsible for at least ten murders, right?

18   A      Ten homicides, I'm responsible for that, or more.

19   Q      Or more.

20           And you talked about an individual named Paisa,

21   right.

22   A      Yes.

23   Q      You also permitted the murder of somebody named

24   Sabanillas, right?

25   A      Yes.

VEYITA - CROSS - MR. MIEDEL                    1321

1    Q    And you would sometimes give instructions to your

2    subordinates to, quote, send someone to help, right?

3    A    Yes.

4    Q    And that would usually mean that they would be killed?

5    A    Yes.

6    Q    You also engaged in what were called staged shootouts?

7    A    Yes.

8    Q    That would be if you were going to -- you arrested

9    somebody, you would hand them a gun and let them run or

10   something, and then -- and then your people would shoot him to

11   death, right?

12   A    Yes.

13   Q    And you also talked about your participation in torture,

14   right?

15   A    Yes.

16   Q    And the one that the prosecutor brought out was that you

17   tortured a man who had -- who had raped a child, right?

18   A    He had raped and killed her.

19   Q    But you didn't just torture child rapists, did you?

20   A    No.

21   Q    In fact, you were involved in 30 to 40 different times

22   where you personally participated in torturing people,

23   correct?

24   A    I don't remember.  Not present, I didn't -- I wasn't

25   involved, but I knew about that.

VEYITA - CROSS - MR. MIEDEL                    1322

1    Q    Well, you personally tortured people yourself, right?

2    A    Yes.

3    Q    You said you liked to use electric shocks, right?

4    A    TASERs.

5    Q    With TASERs, yes?

6    A    Yes.

7    Q    And you also liked to waterboard people you were

8    torturing, right?

9    A    Yes.

10   Q    And you didn't like to use your fists or your feet,

11   right?

12   A    No.

13   Q    You preferred electric shocks and waterboarding, right?

14   A    That was used, yes.

15   Q    Can you explain to the jury why you prefer that?

16            MS. KOMATIREDDY:  Objection.

17            THE COURT:  Sustained.

18   Q    Isn't it true that you -- isn't it true that your

19   nickname was El Diablo?

20   A    Among drug traffickers.

21   Q    Which means "devil," right?

22   A    Yes.

23   Q    Isn't it true that when you were torturing people, you

24   preferred waterboarding and electric shocks because you didn't

25   want to leave any marks?

VEYITA – CROSS – MR. MIEDEL          1323

1    A    No.

2    Q    That's not true?

3    A    No.

4    Q    Do you recall meeting with the government –– I mean, you

5    met with them many times, right?

6    A    Yes.

7    Q    You met with them in 2017 ?

8    A    Yes.

9              MR. MIEDEL:  One moment.

10             THE COURT:  Mr. Miedel, unless you're going to

11   finish up in five or so.

12             MR. MIEDEL:  I will finish up in five.

13             THE COURT:  Okay.

14             MR. MIEDEL:  Sorry, give me one moment.

15             (Continued on the next page.)

16

17

18

19

20

21

22

23

24

25

EDGAR VEYTIA - REDIRECT - MS. KOMATIREDDY   1324

1        MR. MIEDEL:  I can't find it.  I will finish up in

2   less than five.  I have no further questions.

3        THE COURT:  Any redirect?

4        MS. KOMATIREDDY:  Yes, your Honor briefly.  Thank

5   you.

6   REDIRECT EXAMINATION

7   BY MS. KOMATIREDDY

8   Q    Mr. Veytia, defense counsel asked you about the houses

9   you owned, the buses, and the tow trucks.  Do you remember

10  that?

11  A    Yes.

12  Q    Were the houses in other people's names?

13  A    Yes.

14  Q    Were the buses and tow trucks in corporate names?

15  A    Yes.

16  Q    Did you identify them for the government?

17  A    Yes.

18  Q    Defense counsel asked you about the fact that you

19  recorded governor Sandoval in a meeting.  Do you remember

20  those questions?

21  A    Yes.

22  Q    Did you record your meetings with drug traffickers?

23  A    No.

24  Q    Did you take any precautions to avoid being recorded by

25  drug traffickers?

EDGAR VEYTIA – REDIRECT – MS. KOMATIREDDY    1325

1   A    I would make them come to see me; I would not go and see

2   them.

3   Q    You also communicated throughout your Lieutenant

4   Valdivia, correct?

5   A    Yes, my junior officer commander Valdivia.

6   Q    Defense counsel asked you about a truce meeting in which

7   you met with drug traffickers about dividing up the state.  Do

8   you remember those questions?

9   A    Yes.

10  Q    When you got all these drug traffickers in a room

11  together, did you arrest them?

12  A    No.

13  Q    After you made an agreement, did you take money from

14  them?

15  A    Yes.

16  Q    Did you need to take money to keep the peace?

17  A    No.

18  Q    Defense counsel asked you about whether this agreement

19  was to stop the killing, but did the killing start again?

20  A    Yes.

21  Q    Defense counsel asked you about why you didn't mention

22  the defendant, Genaro Garcia Luna, when you first sat down

23  with the government.  Do you remember those questions?

24  A    Yes.

25  Q    Why didn't you?

EDGAR VEYTIA – REDIRECT – MS. KOMATIREDDY     1326

1    A     I was never asked specifically about him.

2    Q     What were you asked about in the early meetings?

3    A     The time wise 2013 to 2017, my arrest, and they focused

4    on the H2 cartel, the Hector Beltran Leyva cartel.

5    Q     Was that what your charges, your Indictment, focused on?

6    A     Yes, they were only focused on that.

7    Q     When you began cooperating with the government, did you

8    have an attorney?

9    A     Yes.

10   Q     Did your family then hire you another attorney?

11   A     Yes.

12   Q     Who did they hire?

13   A     Jeff Lichtman.

14   Q     At the time that your family hired Jeff Lichtman as your

15   attorney, were you aware of his other clients?

16   A     No.

17   Q     Did you have a conversation with Mr.  Lichtman about what

18   you could offer as part of your cooperation?

19   A     Yes, yes.  I had a conversation with him at the MDC in

20   Brooklyn.

21   Q     What did he say?

22          MR. MIEDEL:  Objection.

23          THE COURT:  Overruled.

24   Q     You may continue.

25   A     I offered to work, I offered to work be a witness in

EDGAR VEYTIA – REDIRECT – MS. KOMATIREDDY   1327

1    Chapo's case.  And his answer to me, in Chapo's case, they

2    didn't need any more information, I wasn't needed as a witness

3    in Chapo's case.  Because they were just about, in any minute,

4    ready to authorize my cooperation agreement.

5    Q    Did you later learn the identities of Mr. Lichtman's

6    clients?

7    A    Yes.

8    Q    Who did he represent?

9    A    Joaquin Loera Guzman, El Chapo.

10        MS. KOMATIREDDY:  No further questions.

11        THE COURT:  Let's break for 15 minutes.

12        Ladies and gentlemen, come back at 3:30.  Please

13   don't talk about the case.

14        (Jury exits the courtroom.)

15        THE COURT:  When we adjourn tomorrow, shortly before

16   we adjourn, I'm going to ask the Government to give me a

17   revised trial length estimate, which I think will be extremely

18   short, much shorter than we all anticipated; that's wishful

19   thinking, but I hope so.  Be ready for that discussion.

20        MS. KOMATIREDDY:  Yes, Judge.

21        THE COURT:  Fifteen minutes.

22        (Brief recess.)

23        THE COURTROOM DEPUTY:  All Rise.

24        THE COURT:  Let's have the witness back, please.

25        MR. PILMAR:  It's a new witness, your Honor.

JOSE MORENO - DIRECT - MR. PILMAR                1328

1        THE COURT:  We finished.  Okay.  Let's have the

2   jury.

3            (Jury enters the courtroom.)

4        THE COURT:  Everyone be seated.

5        Government may call its next witness.

6        MR. PILMAR:  The government calls Jose Moreno.

7            (Witness takes the witness stand.)

8   **JOSE MORENO,** called as a witness, having been first duly

9   sworn/affirmed, was examined and testified first duly

10  sworn/affirmed:

11       THE COURTROOM DEPUTY:  State and spell your name for

12  the court reporter.

13       THE WITNESS:  Jose Moreno, J-O-S-E, M-O-R-E-N-O.

14       THE COURT:  You may inquire.

15       MR. PILMAR:  Thank you, your Honor.

16  DIRECT EXAMINATION

17  BY MR. PILMAR:

18  Q    Good afternoon, sir.

19  A    Good afternoon.

20  Q    By whom are you employed?

21  A    With the Federal Bureau of Investigation.

22  Q    How long have you been with the FBI?

23  A    A little over 21 years, sir.

24  Q    What's your current title?

25  A    I'm am currently a supervisory Special Agent at the FBI

JOSE MORENO – DIRECT – MR. PILMAR          1329

1   Academy.

2   Q     What are your current responsibilities at the FBI

3   Academy?

4   A     My responsibilities are supervising the new agent

5   training classes as they come through the academy.

6   Q     Have you ever been posted abroad?

7   A     Yes, I have.

8   Q     What countries?

9   A     Mexico and Egypt.

10  Q     When did you arrive in Mexico with the FBI and when did

11  you leave?

12  A     In October of 2009, and I left in January of 2014.

13  Q     When you worked in Mexico, what generally were your

14  duties and responsibilities?

15  A     I worked drug and non-drug-related matters in cases.

16  Q     Can you get a little more specific about what you did for

17  the drug-related matters and the non-drug-related matters?

18  A     Yes.  Yes.  The drug-related matters were basically

19  following the -- attending to leads from the U.S., my U.S.

20  counterparts, and working with my DEA counterparts that were

21  there stationed in Mexico.

22        And for the non-drug-related matters, it was a

23  working everything to include kidnappings, missing persons,

24  counterterrorism matters, parental kidnappings, fugitives,

25  both drug and non-drug-related.

JOSE MORENO - DIRECT - MR. PILMAR          1330

1    Q    Where in Mexico were you based?

2    A    First I was based in Tijuana, Baja, California.

3    Q    Did you eventually move to a different location in Mexico

4    with the FBI?

5    A    Yes.  I spent three years in Tijuana, Baja, California,

6    and then one year in Monterrey, Mexico.

7    Q    Did you work on any cases involving Joaquin Guzman Loera,

8    or Chapo Guzman?

9    A    Yes, I did.

10   Q    Who was he?

11   A    Chapo Guzman was the leader of the Sinaloa cartel.

12   Q    In general, what were your goals in the cases involving

13   him?

14   A    To work with our U.S. counterparts to obtain information

15   and coordinate whatever information we had with our Mexican

16   counterparts so that they could have that information to

17   attempt to locate and arrest Chapo Guzman.

18   Q    Was arresting Chapo Guzman a significant priority for the

19   FBI at that time?

20   A    Yes, it was.

21   Q    Why was that?

22   A    Chapo Guzman was wanted in the United States.  There were

23   numerous cases against him.  And yes, he was a top priority.

24   Q    Was he a fugitive when you arrived in Mexico in 2009?

25   A    Yes, he was a fugitive.

JOSE MORENO - DIRECT - MR. PILMAR          1331

1    Q    I want to direct your attention to February 9, 2012.  Did

2    anything significant happen regarding your investigation into

3    Chapo Guzman on that day?

4    A    Yes.  On that date we received a telephone from an

5    interview that we conducted that we believed to be utilized by

6    Chapo Guzman.

7    Q    When you say you obtained a telephone, what do you mean?

8    A    A telephone number.  Sorry.

9    Q    Was this telephone number obtained from U.S. intelligence

10   or Mexican intelligence?

11   A    It was from our U.S. intelligence.

12   Q    What was the benefit of obtaining potential telephone

13   number for Chapo Guzman?

14   A    That was the most latest phone number that we believed to

15   be associated with him, and it was very important number for

16   us to have.

17   Q    And what can you do if you have a telephone number of a

18   fugitive?

19   A    If we have that telephone number, then we're able to

20   utilize equipment to track that particular telephone.

21   Q    Briefly, can you describe how the FBI or other law

22   enforcement tracks a telephone using a telephone number?

23   A    With the use of specialized equipment, you are able to

24   track that number.  Basically this equipment, in short -- and

25   I'm no expert on how it really functions -- but in short, it

JOSE MORENO – DIRECT – MR. PILMAR          1332

1    basically takes the place of a cellphone tower and utilize

2    that equipment.  We're able to obtain the exact location or

3    where that phone is pinging or it's located.

4    Q    What did you do with the information you obtained on

5    February 9, 2012?

6    A    With that information, we shared that with our FBI

7    counterparts here in the United States and in Mexico City and

8    also with DEA counterparts.

9    Q    At that time, what was the general location of the phone?

10   A    The general location of the phone was pinging in the area

11   of Cabo San Lucas, Baja, California, Big Sur.

12   Q    I'd like to put up what's already in evidence as

13   Government Exhibit 325.

14        Using your finger on the screen, can you circle

15   approximately where the phone was located at this time?

16   A    Yes.  Cabo San Lucas is located here at the end of the

17   peninsula.

18   Q    Can you do a bigger circle?

19   A    (Indicating.)

20   Q    Try one more time.

21   A    (Indicating.)That's the area of Cabo San Lucas.

22        MR. PILMAR:  For the record, the witness has made a

23   circle on the left side of the screen at the bottom of the

24   peninsula.

25   Q    I want to fast-forward a week and a half to February 18,

JOSE MORENO – DIRECT – MR. PILMAR          1333

1   2012.  Did anything significant happen on that day regarding

2   the information you provided about Chapo Guzman?

3   A     Yes.  That information was utilized by our Mexican

4   counterparts, SE MAR, which is Mexican navy, and federal

5   police to go and attempt to locate Chapo Guzman in that

6   vicinity.

7   Q     Did they locate him that day?

8   A     No, they did not locate him on that day.

9   Q     After they didn't locate him, what happened next?

10  A     After they were not able to locate him, we were able to

11  bring in the U.S. Marshals.  It was decided to bring in the

12  U.S. Marshals to come in and attempt to locate him for a

13  second time in that area.

14  Q     What was your role?

15  A     My role was to go there and coordinate with the U.S.

16  Marshals and our Mexican federal counterparts in an attempt to

17  locate Chapo Guzman.

18  Q     When you say "go there," what do you -- where are you

19  referring to?

20  A     To Cabo San Lucas.

21  Q     You traveled down to Cabo San Lucas?

22  A     Yes, I did.

23  Q     On February 21, 2012, what happened that day?

24  A     That's the day that myself and other Tijuana regional

25  office personnel from DEA arrived in Cabo San Lucas, and we

JOSE MORENO - DIRECT - MR. PILMAR          1334

1   met up with our federal counterparts from Mexico.

2   Q    Can you just tell the jury who exactly you were

3   coordinating with that day, both on the U.S. side and the

4   Mexican side?

5   A    On the side U.S. side it was the DEA and the U.S.

6   Marshals, and on the Mexican side it was federal police.

7   Q    And who -- was there a specific unit in the federal

8   police you were working with?

9   A    Yes.  It was the SIU, or the Special Enforcement Unit,

10  that we were working with and coordinating with.

11  Q    Who was the head of the SIU unit overall at that time?

12  A    My understanding it was Ivan Reyes.

13  Q    Had you met Ivan Reyes prior to that day?

14  A    Yes, I had.

15  Q    Was Ivan Reyes in Cabo San Lucas with you on February 21,

16  2012?

17  A    No, not on that date.

18  Q    Once you arrived in Cabo San Lucas on the 21st, were you

19  attempting to track Chapo Guzman's phone?

20  A    Yes.  The U.S. Marshals were attempting to track the

21  phone and try to find out the general location of where he

22  might be.

23  Q    And where from the phone tracking did it appear that

24  Chapo's phone was?

25  A    In an upscale neighborhood there in Cabo San Lucas,

JOSE MORENO - DIRECT - MR. PILMAR          1335

1    Hacienda Encantada is what it was called.

2    Q     Ultimately, what happened on February 21?

3    A     On February 21, we were unable to enter that location

4    because there was various security gates that didn't allow us

5    access, so we had to come up with another plan the next day

6    and figure out how to come in there and get into the area.

7    Q     I just want to back up for a second.

8          In this attempt to capture Chapo Guzman, were you

9    going to be doing the arresting?

10   A     No, sir, I was not going to be doing the arresting.

11   Q     Why not?

12   A     The FBI or other U.S. government agencies do not have any

13   jurisdictional powers in Mexico.

14   Q     So who was going to actually do the arrest?

15   A     The Mexican federal police.

16   Q     Was there a specific unit in the federal police that was

17   leading that operation?

18   A     It was the Special Enforcement Unit and the other federal

19   officers over there at the scene.

20   Q     What happened the next day, February 22?

21   A     The next day, early in the morning, we were able to gain

22   access to a nearby upscale hotel that we thought might give us

23   access to the location where we thought Chapo Guzman to be.

24   We were unable to get into the location we wanted to, so we

25   came up with a better plan to be executed later during that

1    day.

2    Q    What was the better plan?

3    A    Basically to come back, gather at the staging location,

4    all of us together, and then have the SIU team enter the area,

5    detain the guards at the security gates so they would allow us

6    access into the area and so that we could do the work that we

7    need to do to locate Chapo Guzman.

8    Q    In your training and experience, what are some of the

9    steps you take to set up a capture operation for a fugitive?

10   A    First you got to come up with a plan, and after that --

11   which goes over all the details of how it's going to be

12   executed.  You come up with a staging location, where you're

13   going to meet right before you execute that plan so that

14   everybody is ready to go.  And everybody goes in unison to the

15   location that is going to be targeted.

16   Q    You've mentioned a couple of times a staging location or

17   a staging area.  What's that?

18   A    A staging location is usually a place that is picked

19   nearby the target that you're going to go and do an operation

20   on, and it's in close proximity, not necessarily nearby so

21   you're not -- so they don't find out that you're there.  And

22   we utilize that to just stage one more time before we go and

23   conduct the actual operation.

24   Q    Those steps you listed that are usually successful for

25   capturing a fugitive, did you take those steps that day?

JOSE MORENO – DIRECT – MR. PILMAR                    1337

1    A    That is what we planned, yes, to take.

2    Q    When was the operation planned to start?

3    A    It was supposed to start -- we were supposed to all be

4    there at the staging location at 1:30 p.m. on the 22nd.

5    Q    Based on your training and experience, what's the

6    significance of having a start time for an operation?

7    A    Because of the nature of the operation we were going to

8    conduct and the individual we were targeting, it was vital,

9    and it was a time-sensitive operation that we needed to make

10   sure we started on time, especially because of the equipment

11   we were using, and it was tracking that phone there.  And

12   there's always a possibility of that phone moving or that

13   person moving, so we needed to make sure that we start on

14   time.

15   Q    In this case, did the operation start on time?

16   A    No, it did not.

17   Q    What happened?

18   A    At 1:30 we arrived.  We were there at the staging

19   location, and 52 of the federal police officers that were

20   supposed be there were not there.

21   Q    How many federal officers were there at that time at 1:30

22   p.m.?

23   A    Twelve of the Special Enforcement Unit team.

24   Q    And when were those other 52 officers suppose arrive?

25   A    They were supposed to be there at 1:30.

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*

JOSE MORENO - DIRECT - MR. PILMAR          1338

1    Q    And what happened next after they weren't there at 1:30?

2    A    After that we had the SIU commander or lead call them to

3    try to get them there as soon as they can.

4    Q    And what did he say and what did you say?

5    A    They told him they will be there in 20 minutes, and they

6    never showed up after 20 minutes.

7    Q    How long did it take for them to eventually show up?

8    A    Approximately an hour.

9    Q    What were you doing during this delay?

10   A    During that time, other than pressuring my SIU

11   counterpart to continue to get them out there as soon as we

12   could, I was fielding calls from Mexico City from FBI and DEA

13   executive management.

14   Q    How were you feeling during this delay?

15   A    Anxious, desperate, a little bit angry for folks not

16   being there on time, and just uneasy about this whole

17   situation.

18   Q    Why was it so important for you to move quickly?

19   A    Like I mentioned, we need to work quickly.  It's a

20   time-sensitive matter.  There's a fear of the target that

21   we're going after being able to move or go somewhere else.

22   Q    Why not just go in with the 12 federal police that you

23   had available at the time?

24   A    Going in there with the 12 SIU personnel that we had

25   would not have been a safe maneuver.  To target someone as

JOSE MORENO - DIRECT - MR. PILMAR          1339

1   high as Chapo Guzman, you cannot go in there with 12 federal

2   forces.

3   Q     So I think you said at some point the remainder of the

4   federal police units arrived?

5   A     Yes.  Approximately about an hour later, they -- the 52

6   other federal officers arrived at the staging location.

7   Q     So in total, how many Mexican law enforcement officers

8   did you have with you for this operation?

9   A     64, sir.

10  Q     How did that compare for a typical operation to target a

11  high-level target such as Chapo Guzman?

12  A     I've been in other operations before where we targeted

13  much lower targets and they had over 200 federal police

14  officers plus other equipment, like helicopters.

15  Q     So once the remainder of the officers finally arrived,

16  what happened next?

17  A     When the other officers finally arrived, we went over the

18  plan as quick as we could.  The 12 SIU federal police officers

19  make their way with us into the area.  They were able to

20  detain all the security guards at the gates, allowing us

21  access into the general area that we wanted to be in, and from

22  there the U.S. Marshals began to pinpoint the exact location

23  of Chapo Guzman utilizing the equipment.

24  Q     Why was it important for the U.S. Marshals to go in there

25  to do that?

JOSE MORENO – DIRECT – MR. PILMAR          1340

1    A    Because the U.S. Marshals are the ones who had the

2    equipment and they were the ones who were going to pinpoint

3    the exact location of Chapo Guzman.

4    Q    Is being closer to the phone valuable for pinpointing the

5    exact location?

6    A    Yes.  That equipment best works when you're very close to

7    the phone.  It gives you a real good approximate location

8    where it's at.

9    Q    Was there a point where the Marshals identified the

10   likely location of Chapo's phone?

11   A    Yes, there was.

12            MR. PILMAR:  I'd like to show for the witness only,

13   please, what has been marked as Government Exhibit 208-31.

14   Q    Can you see that on your screen?

15   A    Yes, sir.

16   Q    What are we looking at here?

17   A    This is the cul-de-sac that we -- or the U.S. Marshals

18   entered and were able to identify the -- what we thought was

19   the location of Chapo Guzman at that time.

20   Q    Is this a fair and accurate depiction of where the

21   operation took place on that day?

22   A    Yes.  This is La Camino del Estero, and the location is

23   here visible.  And I can point that to you if you want.

24            MR. PILMAR:  Your Honor, at this time seek to admit

25   Government Exhibit 208-31 into evidence.

JOSE MORENO – DIRECT – MR. PILMAR          1341

1       MR. DE CASTRO:  No objection.

2       THE COURT:  Received.

3       (Government Exhibit 208-31, was received in

4  evidence.)

5  BY MR. PILMAR:

6  Q    Now that the jury can see it, I see you've drawn a little

7  bit of a red line here on the map.

8            What does that red line indicate?

9  A    This is the entrance to La Camino del Estero, which is a

10  cul-de-sac.

11  Q    Based on the information from the U.S. Marshals, where

12  did it appear that Chapo Guzman's phone was?

13  A    The location that we believed Chapo Guzman to be in was

14  in this -- at this particular residence right here, which is

15  114.  But to be safe, because we're not 100 percent sure, they

16  wanted us -- or they wanted the SIU personnel and federal

17  forces to target this house as well.

18            MR. PILMAR:  For the record, the witness has marked

19  first the house on the left of the map and then the one

20  directly to the right of it.

21  Q    What did you tell the SIU commander on the scene about

22  where Chapo Guzman likely was?

23  A    The SIU Commander Santos was with me when the U.S.

24  Marshals pinpoint the location, and I specifically instructed

25  him to -- when he goes back to the other forces, to target

JOSE MORENO – DIRECT – MR. PILMAR          1342

1    these last two locations on La Camino del Estero, right here,

2    and that we believed him to be more likely in this last one,

3    but to target these last two.

4              And also one of the main things I went over with him

5    was the need to make sure that we secure those two areas by

6    securing the perimeter.

7    Q    Can you circle on the map which one you told the SIU

8    commander was the more likely home that Chapo Guzman was in?

9    A    Yes, this one right here (indicating).

10   Q    Did the rest of the federal police eventually come up and

11   come into this area?

12   A    Yes, sir.

13   Q    And can you draw on the screen which house they went into

14   first?

15   A    Yes.  They hit this house here first before they moved on

16   to hit the last two on the cul-de-sac.

17   Q    Was that --

18             MR. PILMAR:  And for the record, the witness has

19   indicated the third house from the left in this cul-de-sac.

20   Q    Was that part of the operational plan, to hit that house

21   that you just indicated first?

22   A    No, that was not.

23   Q    Based on your training and experience, was there any

24   reason to go to that house instead of the ones you identified?

25   A    There was never any reason to go to that house at all,

JOSE MORENO – DIRECT – MR. PILMAR                 1343

1   period.

2   Q    After they hit this house, which one did they hit next?

3   Can you draw an indication of which one they went to next?

4   A    So after this one, they went to the next one right next

5   to it, right here (indicating).

6   Q    Was that the one you believed Chapo Guzman was more

7   likely to be in?

8   A    No, that was not the one that we most likely believed

9   that he was in.

10  Q    Did they eventually enter the fourth residence, the one

11  that you have circled that he was more likely to be in?

12  A    Yes, they eventually make their way to the residence.

13  Q    How did they enter the residence?

14  A    Through the front gate.

15  Q    Based on your 20 years of law enforcement experience,

16  what, if anything, does law enforcement -- should law

17  enforcement do to cover the back of a residence?

18  A    Based on my 21 years of experience of working with the

19  FBI, every operation that I've been a part of, we always cover

20  the rear and the perimeter of a residence before we target

21  that location.

22  Q    When you say "cover it," what do you mean?

23  A    When you cover it, that means that you bring your agents

24  or personnel to the rear of the residence to avoid the escape

25  of the person that you're looking for.

JOSE MORENO - DIRECT - MR. PILMAR                1344

1    Q    Based on what you could see, did the SIU cover the back

2    of the residence?

3    A    No.  I was in a position where I could see that no one

4    covered the rear of the residence.

5    Q    Why didn't you cover the rear of the residence?

6    A    Again, that wasn't my job to do.  I have no

7    jurisdictional powers in Mexico.  I cannot effect arrest, so

8    that was not my job to do.

9    Q    What happened after the SIU eventually entered the fourth

10   residence?

11   A    Approximately about ten minutes after they went to that

12   location, we drove to the front of the gate of the house, the

13   residence.

14   Q    Was Chapo Guzman inside?

15   A    No, Chapo Guzman was not inside.

16   Q    What happened next once you arrived through the front?

17   A    When I arrived through the front, I made my way into the

18   residence, where I noticed there were four individuals who had

19   been arrested.  I began to utilize my BlackBerry telephone to

20   not only videotape, but take photographs of the residence and

21   the outside of it.

22   Q    Did you see if the Mexican federal police were seizing

23   items?

24   A    Yes.

25   Q    What kind of items?

JOSE MORENO – DIRECT – MR. PILMAR          1345

1   A    Numerous items:  Telephones, ledgers, notebooks.  They

2   found weapons, grenades.

3   Q    You said you took some pictures?

4   A    Yes.  I took picture not only of everything –– most

5   everything inside the house, but a lot of the items that they

6   were bringing outside.

7         MR. PILMAR:  With the consent of the defense, your

8   Honor, I seek to move to admit Government Exhibit 208-27T.

9         THE COURT:  Received.

10        (Government Exhibit 208-27T, was received in

11   evidence.)

12        MR. PILMAR:  Can we publish that to the jury?

13   Q    And scroll to page 3 of the PDF.

14        What is this document?

15   A    This is a document with all the photographs that I took

16   with translations on the right-hand side.  And I did not write

17   those translations.  Those were done by other FBI linguists or

18   personnel.

19        MR. PILMAR:  Ms. Donovan, if we can zoom in on the

20   top photo on page 3.

21   Q    What are we looking at here?

22   A    Some of the telephones that they were bringing out from

23   the house, from the residence.

24   Q    These were all telephones found inside Chapo's residence?

25   A    Yes.

JOSE MORENO – DIRECT – MR. PILMAR          1346

1      MR. PILMAR:  You can take that down.

2          If we can scroll from pages 6 to 12 slowly.

3    Q    Generally, what do we see on the screen?

4    A    Lots of photographs of ledgers or notebooks that I took.

5    Q    What's a ledger?

6    A    A ledger is a notebook of sorts that people keep track of

7    various items that they want to keep track of transactions or

8    whatever it is that they want to document.

9    Q    And did you take pictures of many pages of ledgers on

10   that day?

11   A    I took as many pictures as I could of all the ledgers and

12   all the pages.

13   Q    What happened to all this --

14         MR. PILMAR:  I'm sorry.  Withdrawn.

15         Ms. Donovan, can we go to page 40 of the PDF.  If we

16   could focus on the bottom photograph.

17   Q    What are we looking at here?

18   A    Those are some photographs of some of the weapons that

19   were found there, with -- some of these rifles had some

20   grenade launchers as well.

21   Q    Were these inside the residence?

22   A    Yes, they were.

23         MR. PILMAR:  And finally, Ms. Donovan, can we go to

24   page 42 of the PDF.

25   Q    On the top photograph, can you tell us what we're looking

1    at here?

2    A    Yeah.  Some of the grenades for the grenade launchers and

3    even some hand grenades as well.

4    Q    What happened to all this physical evidence?

5    A    All the physical evidence was taken into custody by the

6    Mexican federal forces and taken back to Mexico City.

7    Q    Were you allowed to take the evidence?

8    A    No.  That was not our evidence to take.

9    Q    Did you participate in any further operations trying to

10   capture Chapo Guzman in the days after this?

11   A    Yes, I did.

12   Q    What happened?

13   A    After this operation, more federal troops or personnel

14   from Mexico City arrived, and there were a series of other

15   operations that were conducted, like three -- for the next

16   three days.

17   Q    Can you tell us a little bit about those?

18   A    Yes.  Some of those operations were conducted there in

19   the area of Cabo San Lucas in the areas that the U.S. Marshals

20   believed that the phone was still pinging, and so they were

21   conducted there.  And then there were also some other

22   operations that were conducted north, in the northern part in

23   Baja, California, the northern part of the state.

24   Q    Did any SIU personnel from Mexico City come to Cabo San

25   Lucas at that point?

JOSE MORENO – DIRECT – MR. PILMAR          1348

1    A      Yes.

2    Q      And who is that?

3    A      Ivan Reyes.

4    Q      That's the SIU head that you mentioned earlier?

5    A      Yes.

6    Q      What, if anything, stood out to you about these

7    operations in the days after the failed raid that we just

8    discussed?

9    A      What really stood out was the fact that there was a lot

10   more personnel and a lot more equipment.  We had Black Hawk

11   helicopters flying everywhere and we had a lot more federal

12   officers there.

13   Q      And based on your training and experience, were all those

14   Black Hawks and personnel likely to result in the capture of

15   Chapo Guzman?

16   A      If they would have been utilized at the onset, more

17   likely, yes.

18   Q      And at that time later?

19   A      Well, after that time he had already left, and we had no

20   real idea where he was.  And it did not result in the capture

21   of Chapo Guzman.

22           MR. PILMAR:  May I have one moment, your Honor?

23           THE COURT:  Yes.

24   Q      Was Chapo Guzman ever arrested in 2012?

25   A      No, he was not.

MARLENE TARANTINO – DIRECT – MR. AMIR          1349

1          MR. PILMAR:  No further questions, your Honor.

2          THE COURT:  Cross-examination.

3          MR. MC MANUS:  No cross, your Honor.

4          THE COURT:  You may step down.  Thank you very much.

5          Short witness?  It doesn't matter.  Let's start.

6          MR. AMIR:  The Government calls Officer Marlene

7   Tarantino.

8          (Witness takes the witness stand.)

9   **MARLENE TARANTINO**, called as a witness, having been first duly

10  sworn/affirmed, was examined and testified first duly

11  sworn/affirmed:

12         THE COURTROOM DEPUTY:  State and spell your name for

13  the record.

14         THE WITNESS:  Good afternoon.  My name is Marlene

15  Tarantino.  M-A-R-L-E-N-E, T-A-R-A-N-T-I-N-O.

16  DIRECT EXAMINATION

17  BY MR. AMIR:

18  Q    Good afternoon, Officer Tarantino.

19         Where do you work?

20  A    I am -- I currently work for the Fraud Detection and

21  National Security Unit known as FDNS, a component of U.S.

22  Citizenship and Immigration Services with the U.S. Department

23  of Homeland Security.

24  Q    And what's your title there?

25  A    I'm an immigration officer.

MARLENE TARANTINO – DIRECT – MR. AMIR          1350

1    Q     And what's USCIS, or the Citizenship and Immigration

2    Service's mission?

3    A     We are an administrative agency, part of Homeland

4    Security, and we grant and review immigration benefits.

5    Q     And what's the specific focus of FDNS for fraud detection

6    and national security?

7    A     We're responsible for conducting administrative

8    investigations into immigration benefit fraud.

9    Q     What are your duties as an officer at FDNS?

10   A     I am a non-law enforcement administrative investigator.

11   I investigate fraud related to different types of immigrant

12   petitions, national security cases, and naturalization, known

13   as citizenship applications.

14   Q     Have you head any prior positions?

15   A     With USCIS, yes.

16   Q     Can you describe those?

17   A     Sure.  I was an adjudicator prior to becoming an

18   immigration officer.

19   Q     And what does an adjudicator do?

20   A     An adjudicator simply is an officer that reviews any

21   pending immigration benefits applications for green cards, for

22   citizenship.

23   Q     Now, in your current role you mentioned fraud.  Can you

24   describe some examples of fraud you've encountered in

25   immigration applications?

MARLENE TARANTINO – DIRECT – MR. AMIR          1351

1    A     Well, there's various types of fraud.  Generally, because

2    we are an administrative agency, a lot of our fraud involves

3    paper-based fraud, meaning that individuals, applicants

4    provide false information on their petitions or application

5    for whichever benefit they're applying for.  Sometimes they

6    provide fraudulent documentation to the agency in support of

7    those applications and petitions.

8    Q     In your duties at FDNS, do you ever liaison with law

9    enforcement?

10   A     Absolutely.  I am currently detailed to Homeland Security

11   Investigations, so I liaison on a daily basis.  That is part

12   of our main job, essentially, our day-to-day.

13   Q     And, Officer, can you describe the process of applying

14   for citizenship to the United States?

15   A     Sure.  Essentially, to be an applicant for

16   naturalization, you have to be -- you have to meet certain

17   eligibility criteria, certain requirements set forth in

18   accordance with immigration law.

19   Q     Can you describe some of those eligibility criteria?

20   A     Sure.  An applicant for naturalization has to establish

21   that they obtained their green card, also known as lawful

22   permanent residence, lawfully, that it wasn't obtained through

23   deceit, through fraud, willful misrepresentation.  Those are

24   the requirements.

25         They have to demonstrate that they are a person of

MARLENE TARANTINO – DIRECT – MR. AMIR          1352

1    good moral character as well.  Part of that means that they

2    haven't been investigated, they haven't been arrested, they

3    pay their taxes, they care for their dependents, their

4    children.

5    Q    Are you familiar with the citizen application of the

6    defendant, Genaro Garcia Luna?

7    A    Yes, I have reviewed it.

8    Q    I'd like to show you for -- show for the witness only

9    what's been marked as Government's Exhibit 102.

10                   (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

MARLENE TARANTINO – DIRECT – MR. AMIR        1353

1    DIRECT EXAMINATION   (Continuing)

2    BY MR. AMIR:

3    Q    Officer Tarantino, do you see that?

4    A    Yes.

5    Q    Do you recognize this?

6    A    Yes.

7    Q    What is this?

8    A    This is the Form N-400, Application for Naturalization.

9    Q    Is this an exact copy of the defendant's naturalization

10   application?

11   A    Yes.

12   Q    And do you know approximately when this application was

13   submitted?

14   A    I do not know.  I would have to review the file again.

15   Q    No problem.  We'll go back to that.

16        MR. AMIR:  Your Honor, I move to admit Government

17   Exhibit 102 into evidence.

18        MR. MIEDEL:  No objection.

19        THE COURT:  Received.

20        (Government Exhibit 102, was received in evidence.)

21   Q    So I'd like to direct your attention first to page 2 of

22   this document.

23        And you mentioned that you had reviewed this

24   document before.

25        When have you reviewed this document.

MARLENE TARANTINO – DIRECT – MR. AMIR          1354

1   A     I reviewed this document sometime in 2019.

2   Q     Thank you.

3         So directing your attention to Question 8, what is

4   requested on the form there.

5   A     Date of birth.

6   Q     And what's listed under date of birth?

7   A     July 10, 1968.

8   Q     And what about Question 10, what's requested there?

9   A     Country of birth.

10  Q     And how did the defendant respond?

11  A     Mexico.

12  Q     And directing your attention to page 3, part 5 of the

13  application.

14        What's requested in this part of the form.

15  A     Information about the applicant's residence history.

16  Q     And are you able to determine what his address was at the

17  time of the application?

18  A     Yes.  He listed an address, yes.

19  Q     And can you read that, please?

20  A     Sure.

21        3301 Northeast 183rd Street, Apartment 3002,

22  Aventura, Miami-Dade County, Florida 33160.

23  Q     And what are the dates of residence listed at the time of

24  the application?

25  A     The dates of residence listed are from

1    December 1st, 2016, to present.

2    Q      I'd like to move to page 4, part 5 of the application.

3           What information is requested here.

4    A      Physical address related to residence history.

5    Q      And can you read that address?

6    A      Sure.

7           274 South Island Drive, Golden  Beach, Miami-Dade

8    County, Florida, 33160.

9    Q      And what are the dates of residence listed there?

10   A      On the application, dates of residence are listed as from

11   December 1st,  2012, to December 1st, 2016.

12   Q      And moving to page 6, part 8 of the form.

13          What information is requested in Question 1.

14   A      Information about employment and educational history.

15   Q      And the defendant -- did the defendant submit a name of

16   an employer?

17   A      Yes.

18   Q      What's that employer?

19   A      GL & Associates Consulting LLC.

20   Q      And did the defendant describe what kind of occupation

21   that was?

22   A      On the application, he listed:  Security consultant.

23   Q      Moving to page 7, part 9 of the application.

24          What information is requested here.

25   A      Trips outside of the United States in excess of 24 hours.

MARLENE TARANTINO – DIRECT – MR. AMIR        1356

1   Q    Could I ask you to read the question and answer to

2   Question 1.

3   A    Sure.

4        How many total days (24 hours or longer) did you

5   spend outside the United States during the last five years?

6        He listed:  685 days.

7   Q    And can you also read the question and answer for No. 2.

8   A    Sure.

9        How many trips of 24 hours or longer have you taken

10  outside of the United States during the last five years?

11       And he listed:  74 trips.

12  Q    Officer Tarantino, have you reviewed the defendant's

13  travel records?

14  A    Yes.

15  Q    And are you able to determine what country he primarily

16  traveled to?

17  A    Yes.  Mexico.

18  Q    Moving to page 8, part 10 of the application.

19       What information is sought in response to

20  Question G.

21  A    His current spouse's employer.

22  Q    And how is that question responded to?

23  A    As stated in the application:  Restaurant and beverage

24  operator, Los Cedros LLC.

25  Q    And directing your attention to page 14, part 12 of the

MARLENE TARANTINO – DIRECT – MR. AMIR     1357

1   application.

2       Can you read the question and answer to Question 22.

3   A   Sure.

4       Have you ever committed, assisted in committing, or

5   attempted to commit, a crime or offense for which you were not

6   arrested?

7       He marked "No" on the application.

8   Q   Moving to page 16, part 13 of the application.

9       Do you see a question related to the ability to

10  understand and read English.

11  A   Yes.

12  Q   And can you read the question and answer to that?

13  A   Well, No. 1 states:  Applicant's statement regarding the

14  interpreter.

15      And he check-marked "A," which states:  I can read

16  and understand English, and I have read and understand every

17  question and instruction on this application and my answer to

18  every question.

19  Q   And directing your attention to page 17, part  13 of the

20  application.

21      What is this section of the application about.

22  A   It's the applicant's certification, essentially attesting

23  that the contents of the application and any related

24  documentation is true and correct.

25  Q   Could I ask you to read the last sentence of the

MARLENE TARANTINO – DIRECT – MR. AMIR          1358

1    certification?

2    A     I certify, under penalty of perjury, that I provided or

3    authorized all of the information in my application, I

4    understand all of the information contained in, and submitted

5    with, my application, and that all of this information is

6    complete, true, and correct.

7    Q     And how did the defendant respond to that question?

8    A     He signed and dated the application.

9    Q     And what's the date?

10   A     June 1st, 2018.

11         MR. AMIR:  Thank you, Ms. Donovan.  You can take

12   down this exhibit.

13   Q     Now, Officer Tarantino, you testified a moment ago that

14   the defendant checked "No" in response to Question 22, which

15   asked if he has ever committed a crime.

16         What role, if any, does such an answer play in the

17   agency's review of an application.

18   A     It plays an important role because it lends to

19   eligibility requirements for good moral character as part of

20   the application process for citizenship.

21   Q     And why is good moral character important for

22   citizenship?

23   A     Well, it's a great privilege to be a citizen of the

24   United States, and USCIS strives to make sure that we

25   naturalize the right people.

MARLENE TARANTINO - DIRECT - MR. AMIR          1359

1    Q    And what steps would you have taken if the answer checked

2    were "Yes, I have committed a crime"?

3    A    Well, we would pause the application and conduct

4    additional investigation into the application, the applicant.

5    Q    And what kind of investigation would be done?

6    A    We would reach out to law enforcement, our law

7    enforcement counterparts, to see if there's any pending

8    investigations.  We will reach out to other administrative

9    agencies, conduct additional queries and databases, more of a

10   deep dive.

11   Q    You mentioned you would reach out to law enforcement when

12   an applicant checks "Yes" in response to Question 22.

13        What impact would checking "Yes" have on the

14   criminal investigators.

15        MR. MIEDEL:  Objection.

16        THE COURT:  You need a foundation.

17   Q    Are you aware of anyone checking "Yes" on the form?

18   A    Yes.

19   Q    Can you describe any examples of that?

20   A    Well, excuse me, sometimes people check "Yes" in error.

21   Sometimes applicants want to be incredibly honest and

22   forthcoming, so they'll check "Yes" if they've committed minor

23   offenses, maybe, you know, drunk-in-public charges.  Many

24   applicants want to obtain citizenship, so they're very honest

25   with the service, with USCIS.

MARLENE TARANTINO – DIRECT – MR. AMIR          1360

1   Q     And does having committed a crime automatically call for

2   the rejection of someone applying for citizenship?

3   A     Not necessarily.  However, there are permanent bars to

4   citizenship.

5   Q     What kind of crimes are permanent bars to citizenship?

6   A     Well, if you're convicted for racketeering, money

7   laundering, drug trafficking, the big crimes, the big

8   aggravated felonies, those are permanent bars.

9          Also, if you have committed crimes for which you

10  have not been arrested and they involve crimes of moral

11  torpitude or controlled substance related, those can also be a

12  bar as well.

13  Q     How did you first learn about the defendant,

14  Genaro Garcia Luna?

15  A     An inquiry from the Department of Justice was received by

16  my office.

17          MR. AMIR:  Ms. Donovan, can you show for the witness

18  only Government Exhibit 105?

19  Q     Officer Tarantino, is this the letter you received?

20  A     Yes.

21          MR. AMIR:  The government moves to admit Government

22  Exhibit 105 into evidence.

23          MR. MIEDEL:  Objection.

24          THE COURT:  You are objecting?

25          MR. MIEDEL:  Yes.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

MARLENE TARANTINO - DIRECT - MR. AMIR          1361

1          *** Proceedings  Proceedings  THE COURT:  Okay.

2     Let's send the jury home and have a sidebar.  Well, we won't

3     need a sidebar.  We will talk in open court.

4          Ladies and gentlemen, have a good evening.  Please

5     remember not to consult any publicity about the case.  Do not

6     communicate with anyone.  You all know what to do and what not

7     to do.  See you tomorrow morning at 9:30 a.m.

8          (Jury exits.)

9          THE COURT:  The witness may step down.  Come back

10    tomorrow.

11          THE WITNESS:  Thank you.

12          THE COURT:  Everyone be seated.

13          Let me here from the government -- oh, let's wait

14    for a minute.

15          (Witness steps down.)

16          MR. AMIR:  Your Honor, this is being offered --

17          THE COURT:  Wait, wait.

18          Okay.  Go ahead.  Why?

19          MR. AMIR:  Thank you.

20          This is being offered to show what steps she took in

21    response to the letter.  So this being shown only for the

22    effect on the listener and what steps she took.  And also to

23    show that the statement traveled to the Eastern District of

24    New York, which is itself a form of a verbal act akin to a

25    contract which is not hearsay, assuming that's their

1    objection.

2              MR. MIEDEL:  Well, the objection was hearsay, but

3    also relevance.

4              THE COURT:  You know, it shows why she did what she

5    did, which shows, in turn, the process that was followed.  If

6    you want, I will give an instruction to the jury that it is

7    not being offered for the truth.

8              MR. MIEDEL:  Okay.

9              THE COURT:  Let's do that first thing in the

10   morning.

11             See you tomorrow at 9:30.

12             MS. KOMATIREDDY:  Thank you, Judge.

13             MR. AMIR:  Thank you.

14             (Matter adjourned to Wednesday, February 8, 2023, at

15   9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1363

1                              I N D E X

2    WITNESS                                     PAGE

3    EARL WAYNE

4    CROSS-EXAMINATION      BY MR. MIEDEL     1203
     REDIRECT EXAMINATION   BY MS. KOMATIREDDY 1227
5
     **EDGAR VEYTIA**
6
     DIRECT EXAMINATION     BY MS. KOMATIREDDY 1234
7    REDIRECT EXAMINATION   BY MS. KOMATIREDDY 1325

8    **JOSE MORENO**

9    DIRECT EXAMINATION     BY MR. PILMAR      1329

10   **MARLENE TARANTINO**

11   DIRECT EXAMINATION     BY MR. AMIR        1350

12

13                          E X H I B I T S

14   DEFENSE                                   PAGE

15   I                                         1207

16   H                                         1209

17   GOVERNMENT                                PAGE

18   35B                                       1283

19   35D & 35E                                 1283

20   35 & 35A                                  1284

21   208-31                                    1342

22   208-27T                                   1346

23   102                                       1354

24

25