1068

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                        19-CR-576(BMC)
3   UNITED STATES OF AMERICA,
                                        United States Courthouse
4                                       Brooklyn, New York

5            -versus-                   February 06, 2023
                                        9:30 a.m.
6   GENARO GARCIA LUNA,

7            Defendant.

8   ------------------------------x

9              TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
                 BEFORE THE HONORABLE BRIAN M. COGAN
10                 UNITED STATES DISTRICT JUDGE
                         Before of jury
11

12  APPEARANCES

13  For the Government:       UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
14                            271 Cadman Plaza East
                              Brooklyn, New York 11201
15                            BY:  SARITHA KOMATIREDDY, ESQ.
                                   PHILIP PILMAR, ESQ.
16                                 MARIETOU E. DIOUF, ESQ.
                                   ERIN REID, ESQ.
17                            Assistant United States Attorneys

18  For the Defendant:        BY:  CESAR DECASTRO, ESQ.
                                   VALERIE GOTLIB, ESQ.
19                                 FLORIAN MIEDEL, ESQ.
                                   SHANNON MCMANUS, ESQ.

20

21  Court Reporter:           Rivka Teich, CSR, RPR, RMR, FCRR
                              Phone:  718-613-2268
22                            Email:  RivkaTeich@gmail.com

23  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

24

25

PROCEEDINGS                              1069

1           (In open court.)

2           THE COURTROOM DEPUTY:  All Rise.

3           THE COURT:  Have a seat.  With regard to this

4    weekend's motions.  My ruling on number 193 is this:  I'm not

5    going to let in the evidence of alleged bribery of newspapers

6    not to run derogatory articles.  I don't agree with the

7    Government's interpretation of my prior offer.  I was focused

8    on witnesses not bribing newspapers.  But forgetting about

9    that -- and I am forgetting about that -- because even if I

10   did what the Government says I did, I don't want to double

11   down on something that was wrong.  It strikes me that this is

12   purely propensity evidence.  It is not suppressing any story

13   that's connected directly to this case.  I really I don't see

14   any basis for calling it 404(b) evidence.

15           And I also don't think that the defendant opened the

16   door by showing he's in the newspapers.  They didn't say he's

17   in the newspapers in a wonderful congratulatory way; they said

18   he's well known, that was the purpose for that evidence.

19           I think it would be -- even if I thought it was

20   404(b) evidence, I would exclude it under 403 because it is

21   highly prejudicial and really doesn't have much probative

22   value as to this crime, if any probative value.

23           On the Government's letter requesting remedies, I

24   have to say Mr. Miedel, it's very bad, very bad.  I'm not

25   going to change the schedule because of it.  I'm just going to

PROCEEDINGS                                    1070

1    tell defense attorneys that, you know, you put in CJA vouchers

2    and I can cut those as a sanction.  I might.  I'm going to

3    withhold determination of that until the end of the case.  But

4    I have got to tell you, the conduct is just not careful

5    enough.  You know this is a sensitive, high-profile case.  But

6    I'm not going to change the Government's disclosure issues

7    because I do feel it was not intentional.  The first

8    disclosure was negligent.  The second disclosure was grossly

9    negligent.  If there is a third disclosure, it's going to be

10   that level of gross negligence that is interchangeable with

11   intent.  So something will have to be done at that point.  I'm

12   sure defense counsel will be more careful.

13           With regard to the ambassador today.  I have to

14   agree with the defendants, that it's just not fair to spring a

15   major witness so close to calling him.  It's not the quantity

16   of the production pertaining to the witness, it's the

17   importance of the witness.  That's a very important witness.

18   You can't tell them late last night, you know, put everything

19   else aside now and prepare for this witness.  It's not enough

20   time.

21           Government has an option here.  You can call the

22   witness and take direct and then we'll do cross tomorrow.  Or

23   you can just put him off all together until tomorrow.  What do

24   you want to do?

25           MS. KOMATIREDDY:  Your Honor, we'll just check with

PROCEEDINGS                    1071

1    the witness, if you don't mind.

2              THE COURT:  Sure.

3              MS. KOMATIREDDY:  It will likely be that we put it

4    on tomorrow.

5              THE COURT:  That completes my business.

6              I see Mr. De Castro has more business.

7              MR. DE CASTRO:  I do.  Judge, if you were going to

8    raise the technical stuff, I think that's been fixed.  Am I

9    right?  All fixed.

10             THE COURT:  Everyone sit down.

11             MR. DE CASTRO:  I have one issue, though.

12             THE COURT:  Go ahead.

13             MR. DE CASTRO:  This witness yesterday --

14   Thursday -- testified that he allegedly witnessed this event,

15   then he went to Congress and then wrote a private letter to

16   Congress, and then that Congresswoman said, can I go to the

17   press, and then that ultimately went to the press, I think is

18   what he said, then that was sort of it.

19             Now, I want to explore that -- not a lot.  I want to

20   ask the witness about that.  And when I discussed this with

21   the Government -- and they don't know what my cross is of

22   course -- I asked whether they intended to introduce the

23   actual article we're talking about.  Because an article was

24   written based on this person's report to the press.  I don't

25   think that article is in any way admissible.  I don't think

PROCEEDINGS                      1072

1   it's admissible and it's a 403 issue.

2           But I want to make sure I'm not opening the door to

3   something, because the Government said depending on your cross

4   whether we want to introduce it.  I have a copy for the Court,

5   if the Court wants to see the article.

6           I'm not doing a ton on it.  My intention was that it

7   went to the press and that a story was written and it was sort

8   of widely read.  Everybody has been reading about this since

9   2008.  This story of this kidnap has been in the Mexican

10  folklore for years now, various versions of it.  As we've seen

11  in this trial, various versions from witnesses.

12          MS. KOMATIREDDY:  May I add context, your Honor?

13          MR. DE CASTRO:  If you want the article?

14          MS. KOMATIREDDY:  The issue Mr. De Castro raises is

15  connected to the motion at ECF193, obviously your Honor has

16  noted that.

17          Here is what going on factually.  The witness from

18  Friday witnesses this event, going to Congress, the

19  Congresswoman asked if she could pass it to Proceso Magazine.

20  The witness meets from the journalist from magazine.  It is

21  widely published.

22          Of course the Government would not seek to use a

23  news article to prove its case, which is why we did not admit

24  it in direct.  However, I expect that Mr. De Castro may

25  attempt to suggest that the witness did not actually, was not

PROCEEDINGS                          1073

1   the source of the article but rather learned of the event from

2   the article.  Therefore, the date of the article and the date

3   of the witness's report to Congress are relevant.

4          This is also why, I apologize that we did not make

5   this more clear in our response, this is also why the

6   testimony about bribery is relevant.  Because it is to tamp

7   down negative press related to this case, related to Mr.

8   Garcia Luna --

9          THE COURT:  But it didn't get tamped down.  This was

10  published.

11         MS. KOMATIREDDY:  Those payments were after this.

12  The payments that the witness will testify about were after,

13  post-date.

14         THE COURT:  This triggered the plan to shut down

15  further derogatory press.

16         MS. KOMATIREDDY:  That's right, your Honor.

17         THE COURT:  Mr. De Castro, having heard that, what

18  do you want to do?  Because there is a door opening risk here.

19         MR. DE CASTRO:  I hear you.  First of all, I don't

20  think this triggers that, by the way.  I don't think that

21  witness that you, on your ruling said, oh, it's this story

22  that triggered it.  That's not -- I don't think that's

23  factually correct.

24         I was not challenging the witness in terms of

25  whether he read it and then is reporting it. I'm just bringing

PROCEEDINGS                    1074

1  out the fact that a story was written, which they already did,

2  they brought that out, and that it was widely covered.  That's

3  pretty much it.  It became this story that has been running

4  for ten years.  Essentially that's it, that's all I was doing.

5        THE COURT:  Okay.  Be careful.  If you do it that

6  way, it sounds okay.

7        MR. DE CASTRO:  Yes.

8        THE COURT:  But I obviously can't give you a

9  guarantee that you're not opening a door.

10        MS. KOMATIREDDY:  I'm a little confused, your Honor.

11  If the story is written and it's widely covered and our

12  witness who assisted Mr. Garcia Luna with bribery says that he

13  did so in order to tamp down this allegation that he met with

14  narco traffickers.  Doesn't that open the door?

15        THE COURT:  I don't think so.  Because you got the

16  bad article and it still makes the proof the subsequent

17  payments to suppress future bad articles really irrelevant to

18  the issues here, or at least not very probative of the issues

19  here.  You wanted to prove through this witness that in fact

20  he saw something, he reported it, and that an article was

21  published about it.  That's it.  That's all that I think

22  matters.  The fact that oh, well, in the future the defendant

23  took actions to make sure this wouldn't happen again, I really

24  don't see the connection to the crimes in this case.

25        MS. KOMATIREDDY:  I think, your Honor, our primary

PROCEEDINGS                    1075

1  argument was that it shows consciousness of guilt.

2          THE COURT:  It does.  I don't know if it shows

3  consciousness of guilt of the charged crimes, first of all.

4  I'm not saying that.  There are lots of reasons people want

5  publicity.  But to the extent it does, it really is outweighed

6  by the prejudicial impact, which is huge.

7          So I'm not going to let you do that.  Let's have the

8  jury, please.

9          If your witness testified that he reported it and

10 the Congressperson reported it to the press and someone said,

11 and it wasn't covered because of a payment, that I would let

12 in.

13         MS. KOMATIREDDY:  We do have a witness who will

14 testify to that, your Honor.

15         THE COURT:  But it was let in, the article appeared.

16         MS. KOMATIREDDY:  I see what you're saying.  I see.

17         Our point is, we have a witness who will testify

18 that after this they made the bribe payment.  Then another

19 witness will testify there is a decrease in press that

20 connects Mr. Garcia with drug traffickers.

21         THE COURT:  That has the problems that I have

22 identified.  I'm just saying, if this article had not run

23 about this crime because of bribery of a journalist, I would

24 let that in.  That would be very strong consciousness of

25 guilt.  What you're positing is conceivably consciousness of

PROCEEDINGS                                    1076

1     guilt, but just as conceivably not wanting to have bad press.

2              This is a week where Thursday will be off and

3     Friday.

4              I was asked by the courtroom sketch artist,

5     Ms. Rosen, if you have someone who needs to be obscured tell

6     her before she goes through all the trouble of drawing the

7     actual likeness.  We didn't do that last week.

8              (Jury enters the courtroom.)

9              THE COURT:  Everyone be seated.  Good morning ladies

10    and gentlemen.  Hope you had a good weekend.  I've been told

11    that this is one of the Thursdays that someone needs to take

12    off and we said we would do that.  I believe this is the last

13    one, but you'll let me know if I'm wrong about that.  So we

14    won't sit this week on Thursday or Friday.  We'll resume on

15    the following Monday.

16             Let's have the witness back, please.

17             (Continued on next page.)

18

19

20

21

22

23

24

25

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1077

```
 1              (Witness takes the witness stand.)

 2   FRANCISCO CANEDO ZAVALETA, called as a witness, having been

 3   previously first duly sworn/affirmed, was examined and

 4   testified previously first duly sworn/affirmed:

 5              THE WITNESS:  Good morning everyone.

 6              THE COURT:  You are still under oath, sir.

 7              Please proceed with cross-examination, Mr. De

 8   Castro.

 9              MR. DE CASTRO:  Thank you, Judge.

10   CROSS-EXAMINATION

11   Q    Good morning, Mr. Zavaleta.

12   A    Good morning.

13   Q    Am I right that you started in the federal police in

14   1993?

15   A    Yes.

16   Q    That was the federal judicial police, right?

17   A    Yes.

18   Q    And you were investigating drug trafficking

19   organizations, right?

20   A    Yes.

21   Q    During the early part of your career, you were part of

22   some elite federal police units, right?

23   A    Yes.

24   Q    You investigated and arrested members of the Gulf Cartel,

25   correct?
```

FRANCISCO CANEDO ZAVALETA - CROSS - MR. DE CASTRO    1078

1   A    Yes.

2   Q    You investigated and arrested members of the Millennial

3   Cartel as well, correct?

4   A    I investigated them.

5   Q    However, in 2000 you, along with several other officers

6   you knew, were placed on limited duty and had to undergo

7   additional training and testing, right?

8   A    I can't answer with a yes or no to that.

9   Q    In 2000 did you have to undergo additional testing?

10  A    Not just in 2000, but starting in 1997.

11  Q    So for a few years you had to do some additional testing

12  and training, correct?

13  A    Just testing.

14  Q    The types of testing we're talking about were

15  psychological testing, right?

16  A    Not just psychological ones.

17  Q    But one of them was psychological testing, right?

18  A    I affirm to that.

19  Q    There was also some polygraph testing as well, right?

20         MS. KOMATIREDDY:  Objection.

21         THE COURT:  Sustained.

22  BY MR. DE CASTRO:

23  Q    There was also evaluating of your finances and things

24  like that, right?

25  A    Socio-economical ones, yes.

*Rivka Teich CSR, RPR, RMR FCRR*
*Official Court Reporter*

1   Q    This additional testing and evaluation was part of the

2   police changes instituted by President Fox, correct?

3   A    No.

4   Q    President Fox was not the president during 1997?

5   A    No.

6   Q    Who was the president?

7   A    I don't remember.  I think it was Salinas.

8   Q    Did you know during that time period where Mr. Garcia

9   Luna was working?

10  A    No.

11  Q    Isn't it true that he was part of the federal police?

12  A    At that time, and you're referring to me personally or to

13  the gentleman?

14  Q    I'm talking about Mr. Garcia Luna.

15  A    In '97, no.

16  Q    Because then in 1998 to the year 2000 he was a supervisor

17  in the federal police, right?

18  A    Could you repeat the question?

19  Q    Because from 1998 to 2000 he was a supervisor in the

20  preventive federal police, correct?

21  A    I saw him in '99 with the preventive federal police.

22  Q    So the answer is yes, correct?

23  A    In regards to the period of time that you're asking

24  about, I can't answer with a yes or a no.

25  Q    But do you know that from 2000, around 2000, he was the

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1080

1  director of planning and operations for the federal judicial

2  police, right?

3  A    As far as I know that was starting in 2001.

4  Q    Now, you said on direct examination, despite the fact

5  that Mr. Garcia Luna's name appears and someone

6  administratively signed for him, that he was not responsible

7  for your removal, right?

8           MS. KOMATIREDDY:  Objection mischaracterizing the

9  document.

10          THE COURT:  Sustained.

11  BY MR. DE CASTRO:

12  Q    Do you believe Mr. Garcia Luna was responsible for

13  removal at least in part?

14  A    No.

15  Q    His name -- he had no involvement at all in your removal

16  from the federal police?

17  A    I cannot blame him.

18  Q    That's your testimony.  You have no ill will, you have no

19  ill will towards Mr. Garcia Luna?

20  A    No.  Even so that I reported before the local Attorney

21  General's offices and the DGCI AFI the situation, and nothing

22  ever came of that.  Because they went far from the first line

23  of investigation.  I could elaborate so that this is clearer,

24  but I don't think it makes any sense in this case.

25  Q    I'd ask you to just answer my questions okay.

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO    1081

1   A    Okay.

2   Q    In 2000 or 2001 you were asked to leave the police force,

3   correct?

4   A    August 2000.

5   Q    At that point you went to work for a local prison; is

6   that correct?

7   A    That was from May 2004 to February 2008.

8   Q    You also went and worked for a law firm, right?

9   A    Yes.

10  Q    We talked a little bit earlier about this set of testing

11  that was required, right?

12  A    Yes.

13  Q    You and your colleagues felt this was unfair, right?

14  A    Yes.

15  Q    Not only that, you felt it was illegal, right?

16  A    It was.

17  Q    And you wanted to prevent not only that, but you wanted

18  to prevent this merger of the federal police that you talked

19  about, right?

20  A    It was done.

21  Q    And again, you felt that was illegal as well, right?

22  A    It was.

23  Q    You felt there was a campaign targeting you and your

24  fellow officers, right?

25  A    I don't understand the question.

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1082

1   Q    You believed there was a campaign against you to get you

2   out of the police force, right?

3   A    Yes.

4   Q    Someone was targeting you, right?

5   A    I can't say that someone was, I don't know who that

6   someone was.

7   Q    But you believe it was someone, right?

8   A    I repeat, I can't attest to someone.

9   Q    I'm not asking you to tell me the name, I'm saying --

10           THE COURT:  Let me help.

11           He's not asking you to identify who this person is.

12   He's asking you if you believe that there was such a person,

13   whoever it was.

14           THE WITNESS:  It was a political situation.

15           THE COURT:  Can you answer my question, please?

16           THE WITNESS:  Yes.

17           THE COURT:  Okay.  Do you believe there was such a

18   person or not?

19           THE WITNESS:  Yes.

20           THE COURT:  Okay, continue.

21           MR. DE CASTRO:  Thank you, Judge.

22   BY MR. DE CASTRO:

23   Q    You said there was a political reason, whatever it was,

24   for this person to get rid of you, right?

25   A    To use our positions.

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1083

1    Q    They were trying to get rid of you for some political

2    reason, in your mind, right?

3    A    Yes.

4    Q    And you were –– withdrawn.  You testified on direct

5    examination about your colleague and friend Oscar Granados

6    Salero.  Do you remember that?

7    A    Yes.

8    Q    He also had to go through all this new testing, right?

9    A    I don't know.

10   Q    And he was asked to leave the police department just like

11   you, right?

12   A    I don't know.

13   Q    We can discuss that later.

14        Mr. Salero, you're aware, shared your beliefs about

15   the illegality of the merger of the federal police, right?

16   A    Yes.

17   Q    That was something you and he discussed at length?

18   A    Yes.

19   Q    You and he discussed at length the ways in which you

20   could try to prevent that merger?

21   A    No.

22   Q    In 2006 you were permitted to return to the police force

23   after six years, right?

24   A    That was at, the order that came from the judicial branch

25   of the Mexican federation.

FRANCISCO CANEDO ZAVALETA - CROSS - MR. DE CASTRO 1084

1    Q    Sir, my question was, you were permitted to go back to

2    the federal police, correct?

3    A    Yes.

4    Q    You were now back at the police but you were at the

5    lowest level officer, right, a Level C officer?

6    A    I was already officer Level C since I started my career.

7    Q    But you were in your career from 1993 until 2000 right,

8    seven years?

9    A    Yes.

10   Q    And you had stayed at the lowest level, right?

11   A    Yes.

12   Q    Now that you were back at the federal police in 2006, you

13   were -- withdrawn.

14          Now back in at the federal police in 2006 you were

15   no longer an investigating police officer, right?

16   A    Excuse me?

17   Q    When you returned to the federal police in 2006, you were

18   no longer an investigating police officer, correct?

19   A    Yes, I was.

20   Q    When you came back in 2006, you were investigating the

21   cartels?

22   A    No.  I just, I didn't have that type of function any

23   more, that's different.

24   Q    Your responsibilities were to guard a building, right?

25   A    Yes, up until a certain period of time.

1    Q    You were doing security, right?

2    A    Yes.

3    Q    You were not a supervisor, right?

4    A    No.

5    Q    You were not making decisions, correct?

6    A    No.

7    Q    You were handling the ins and outs of visitors of a

8    police officer building, right?

9    A    Among other activities, yes.

10    Q    Those other activities were to make sure people didn't

11    park in the wrong place, right?

12    A    Yes.

13    Q    To make sure they didn't bring in food to the building

14    that was not allowed, right?

15    A    Yes.

16    Q    And to stand guard?

17    A    Yes.

18    Q    And at some point you were standing guard in the building

19    in which Mr. Garcia Luna was working, right?

20    A    Yes.

21    Q    And you saw him often, right?

22    A    Yes.

23    Q    He didn't know you, right?

24    A    Yes.

25    Q    He didn't even really notice you, right?

1  A    Yes.

2  Q    Even though you and others thought maybe you even looked

3  like him?

4  A    Yes.

5  Q    He was part of the leadership that had wanted to

6  illegally merge the police, right?

7  A    I'm sorry?  I didn't understand.

8  Q    He was part of the leadership that wanted to illegally

9  merge the police, right?

10  A    They started to do it.

11  Q    He was part of the leadership that had you assigned to

12  guard an office building, right?

13  A    Through his subordinates.

14  Q    Now you saw Mr. Mr. Garcia Luna and you saw that he

15  traveled with a security detail, right?

16  A    Always.

17  Q    He had many armed guards with him, right?

18  A    The weapons were discreetly put away by the guards.

19  Q    Okay.  You couldn't see their arms, but you knew he had

20  an armed detail, correct?

21  A    Yes.

22  Q    And he and his detail traveled in armored SUVs, right?

23  A    Yes.

24  Q    And with dark tinted windows, right?

25  A    Not all the windows.

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO    1087

1   Q    Usually you don't tint the windshield, right?

2   A    Neither do the windows in the front seat, the driver and

3   the passenger seat windows.

4   Q    You talked about on direct examination how in October of

5   2018, you say you happen to witness an incident with

6   Mr. Garcia Luna and Arturo Beltran Leyva.  Do you remember

7   that?

8           MS. KOMATIREDDY:  Objection misstates the date.

9           THE COURT:  Sustained.

10          MR. DE CASTRO:  I didn't hear the date.

11          THE COURT:  It mischaracterizes the testimony.  Put

12   it again.

13   BY MR. DE CASTRO:

14   Q    You talked on direct examination, you testified about

15   something you say you saw in October of 2018, right?

16          MS. KOMATIREDDY:  Same objection, your Honor.

17          THE COURT:  It wasn't October.

18          MR. DE CASTRO:  I'm sorry?

19          THE COURT:  It wasn't October.

20          MS. KOMATIREDDY:  October 2008, your Honor.

21          MR. DE CASTRO:  Sorry.  I think it was October --

22   BY MR. DE CASTRO:

23   Q    October 2008, I'm sorry.  Let me do the question again.

24          On direct examination you talked about how in

25   October 2008 you say you happened to see an incident involving

1    Mr. Garcia Luna, correct?

2    A    Yes.

3    Q    Around 15 years ago, right?

4    A    I haven't counted how much time went by, but it was in

5    October 2008.

6    Q    So 2023 to 2008 is around 15 years, correct?

7    A    If you say so, yes.

8    Q    Okay.  You happen to be driving in the country, right?

9    A    It's not the country, it's the highway.

10   Q    The highway that goes outside of Mexico City, right?

11   A    No.

12   Q    Is it in Mexico City?

13   A    It is in Mexico City.

14   Q    Okay.  Is it near Morelos, correct?

15   A    Yes.

16   Q    Do you agree with me some people might say it's like a

17   suburb in the country?

18   A    Rural, yes.

19   Q    Rural.  Over the years you've told people what you saw,

20   right?

21   A    No.

22   Q    Well, this Government in meetings with them, what you

23   saw, right?

24   A    That was exceptionally.

25   Q    You told a Congresswoman, did you not forget that?

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1089

1   A     That was within that exceptionality; I told three people.

2   Q     What you testified to is that you saw Mr. Garcia Luna on

3   the side of the road, right?

4   A     Yes.

5   Q     What you didn't mention on direct is you believe you also

6   saw his security detail lying on the ground, right?

7   A     I saw part of that.

8   Q     On direct exam you said there were people behind the cars

9   but I didn't really see them.

10  A     That's how it was.

11  Q     That's how it was.  But now there are people on the

12  ground, lying on the ground too, right?

13  A     I saw shapes of people, but I didn't look in detail to

14  their features.

15  Q     But those shapes of people, you believed to be his

16  security detail on the ground, right?

17  A     Yes.

18  Q     You say this was happening in broad daylight, right?

19  A     Yes.

20  Q     Around noon, middle of the day, right?

21  A     Yes.

22  Q     In a populated area?

23  A     No.

24  Q     People don't live around there?

25  A     I don't know.  As you said, it's country, it's rural it's

FRANCISCO CANEDO ZAVALETA - CROSS - MR. DE CASTRO 1090

1   a rural area.

2   Q    So now it's the country, not really part of Mexico City?

3         MS. KOMATIREDDY:  Objection.

4         THE COURT:  Overruled.

5   A    It is Moralos, not Mexico City.

6         MR. DE CASTRO:  Can I ask the Government, I don't

7   know if -- we can do it.  I'm sorry.

8         Can I show what is in evidence as Government Exhibit

9   726.

10  BY MR. DE CASTRO:

11  Q    Do you remember being shown exhibit 726?

12  A    Yes.

13  Q    That arrow points to where you say this happened, right?

14  A    I'm sorry, where what happened?

15  Q    The incident with Mr. Garcia Luna that we're talking

16  about.

17  A    No.

18  Q    It did not happen here?

19  A    No.

20  Q    Okay, let's look at exhibit 727.  Do you remember being

21  shown this on direct examination by the Government?

22  A    Yes.

23  Q    Is this the area you're saying you saw what happened, or

24  is this the area that you say they turned into a little bit

25  down the road?

FRANCISCO CANEDO ZAVALETA - CROSS - MR. DE CASTRO 1091

1   A    When they did turn to go into the place, that part is

2   correct.

3   Q    Uh-huh.  Can we go back to 726 again?

4           MS. KOMATIREDDY:  You're looking for 741.

5           MR. DE CASTRO:  Thank you for your help.

6   BY MR. DE CASTRO:

7   Q    726, there is a lot of houses in that picture, aren't

8   there?

9   A    Yes.

10  Q    Looks like a well-populated area, isn't it?

11  A    That part is more populated, yes.

12  Q    You say this whole thing is happening in broad daylight

13  at 12:00 o'clock in the afternoon, right?

14          MS. KOMATIREDDY:  Objection.  Mischaracterizes the

15  testimony.

16          THE COURT:  Sustained.

17  Q    You say this is happening in --

18          THE COURT:  Mr. De Castro, you're free to walk

19  around but if you're going to, you need to put on a lapel mic.

20  BY MR. DE CASTRO:

21  Q    You say this is happening at 12:00 o'clock in the

22  afternoon, correct?

23  A    At that point, yes, it was approximately that time.

24  Q    October 19 of 2008 was a Sunday, right?

25  A    Yes.

1  Q    On Sundays that's a day where families spend together,

2  right?

3  A    Yes.

4  Q    Families are out and about doing whatever it is they do

5  on their days off, right?

6  A    Yes.

7  Q    And I think you had testified that down the street from

8  where you say you saw Mr. Garcia Luna standing, there was a

9  hotel down the road, right?

10  A    No.

11           (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   CROSS-EXAMINATION (Continuing)

2   BY MR. DE CASTRO:

3   Q    How far away was the hotel you testified about on direct?

4   A    I don't know the distance.

5   Q    Now, those shapes that you saw on the ground, you also

6   saw that or you say you saw that they were handcuffed, right?

7   A    No, I didn't say that.

8   Q    You never said that?

9   A    No.

10  Q    And you said you saw --

11          MR. DE CASTRO:  May I approach, Your Honor?

12          THE COURT:  Yes.

13          MR. DE CASTRO:  Actually, let me ask a question

14  first.

15  Q    Do you remember being interviewed by the government in

16  March of 2021?

17  A    Yes.

18  Q    And you were meeting with U.S. agents and prosecutors,

19  right?

20  A    Agents.

21  Q    And do you remember telling them that the individuals on

22  the ground appeared to be handcuffed and were not wearing

23  uniforms?

24  A    They didn't have uniforms.

25  Q    Now you do remember that they were handcuffed?

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1094

1   A    I said they were not wearing uniforms, not that they were

2   handcuffed.

3              MR. DE CASTRO:  May I approach, Judge?

4              THE COURT:  Yes.

5   Q    I'm showing you a document marked FCZ-1.  And I 'm going

6   to ask you to read just what the interpreter will translate

7   for you, the last sentence.  And then I will ask you if that

8   refreshes your recollection that you told the government that

9   the people on the ground were handcuffed.

10             Does that refresh your recollection that you told

11  the government that the people on the ground were handcuffed.

12  A    I cannot answer with a yes or a no.

13  Q    It either refreshes your recollection or it doesn't.

14             Does it refresh your recollection that you told the

15  government that the people on the ground were handcuffed.

16             MS. KOMATIREDDY:  Objection, Your Honor.  He

17  answered the question.

18             THE COURT:  Sustained.

19             Actually, I am retracting that ruling.  I think

20  Mr. de Castro is entitled to an answer as to whether or not it

21  refreshes his recollection.

22  A    Yes.  And I'd like to clarify that that issue came from

23  the fact that I interviewed the bodyguards.

24  Q    Now, you say that on the side of the road next to

25  Mr. Garcia Luna you saw someone whose nickname is La Barbie,

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

1    right?

2    A    Yes.

3    Q    And you knew that was him because you keep current on

4    drug cartel operations, right?

5    A    Yes.

6    Q    Despite not being a member of an investigation team and

7    being a part of building security, you kept current on the

8    cartel?

9    A    Yes.

10   Q    And he was holding a very large and long gun, right?

11   A    Yes, a long weapon, not very large.

12   Q    Pretty powerful gun, correct?

13   A    Yes.

14   Q    Now, you also say that Arturo Beltran-Leyva was there as

15   well, correct?

16   A    Yes.

17   Q    Standing right there, right?

18   A    Yes.

19   Q    And you recognized him because you also because --

20   withdrawn.  Sorry.

21          You recognized him again because you were keeping

22   current on cartel operations.

23   A    Yes.

24   Q    And you knew that he was one of the most ruthless cartel

25   bosses, right?

2096

1    A    One of many, yes.

2    Q    So you saw a man standing with a very powerful gun and a

3    ruthless cartel boss on the side of the road next to

4    Mr. Garcia Luna, right?

5    A    If you want to categorize them like that, yes.

6    Q    I'm just asking you for your impression, not my

7    impression.

8            Which part of that is incorrect?

9    A    Well, that's how you're categorizing them.  I mean, I

10   only saw a drug trafficker, sicario, hitman, and

11   Mr. Garcia Luna.

12   Q    And of course it looked like Mr. Garcia Luna's team had

13   been detained, right?

14   A    Yes, it seemed so or it was like that.

15   Q    And it certainly looked like to you that he was going to

16   be taken, right?

17   A    Well, yeah, no, but you know what, on the intersection of

18   the exhibit that you still have on the screen, it didn't

19   really look like he was going to be taken.

20   Q    So you, a police officer, driving by and seeing an armed

21   man and another man known for killing many, didn't think your

22   boss was in danger?

23   A    Well, when I saw the first event, I thought so.  But

24   then, when I saw the following one, which occurred on the

25   exhibit that's still on the screen, I saw him driving along,

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO 1097

1    there was no car behind him or following him, and then there's

2    a drug trafficker, the idea changed.

3    Q    Your idea changed because you say you saw Mr. Garcia Luna

4    and those same two drug traffickers in two different cars?

5    A    Well, it's -- from what I saw on the exhibit still on the

6    screen because there was no supposed intimidation and there

7    was nothing with the security detail with Mr. Garcia  Luna.

8    Q    So you keep going ahead in my story.

9         Can we go back to where you saw Mr. Garcia Luna

10   standing on the side of the road.

11   A    We go back to the first spot, okay.

12   Q    And at that point you see your boss standing next to a

13   cartel boss and a sicario, right?

14   A    Yes.

15   Q    And you see his security detail on the ground, right?

16   A    I saw the shapes.

17   Q    And you were scared, right?

18   A    When I saw that the car started following me, or that's

19   what I thought, yes, I freaked out.

20   Q    Okay, there you go again to above -- in front again.

21        Can we go back to when you see them on the side of

22   the road.  Okay?

23   A    Yes.

24   Q    You're scared at that moment because you see La Barbie

25   standing there with a gun, right?

1    A    Yes.

2    Q    And you didn't want to be seen, right?

3    A    It was impossible for them not to see me.

4    Q    You did not want to be seen, correct?

5    A    I didn't even think that.

6    Q    And you drove up the road and you did something to stand

7    out, didn't you?

8    A    Yes.

9    Q    Literally,  you got out of your car and stood up next to

10   the road, you say?

11   A    Right in front of my vehicle, I opened the hood to my

12   vehicle to see the engine.

13   Q    And that's when you say a car -- and that's when you say

14   that the cars came up from behind and stopped right next to

15   you, right?

16   A    No.

17   Q    Did the cars pull up next to you when you were standing

18   outside of your vehicle?

19   A    No.

20   Q    When did that happen?

21   A    Are you talking about the second spot?

22   Q    You're standing up next to your car.

23        Is there a third point?

24   A    No, no.  There are two spots.  The first one, you were

25   guiding me based on your story.

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO   1099

1   Q    It's all just a story, right?  So now it's my story or

2   your story?  Is that what we're doing here?

3            MS. KOMATIREDDY:  Objection.

4            THE COURT:  Sustained.

5   Q    Now, would you agree with me that a police officer is

6   really never off duty?

7   A    Yes.

8   Q    If you see something, you are there to do something,

9   right, even if you're off duty?

10  A    Not always.

11  Q    You are there, if you can protect life even if you're off

12  duty, you're supposed to step in, right, do something?

13  A    It is my duty, yes.

14  Q    There is no more important duty than to step in to

15  protect human life, right?

16  A    Yes.

17  Q    And you had just seen the head of your whole organization

18  and his bodyguards possibly being kidnapped or detained,

19  right?

20  A    The perspective changed as we got to the second point.  I

21  had already explained that to you.  Because by that point it

22  no longer looked like it was a kidnapping.

23  Q    You've learned in law enforcement, right, that

24  appearances can be quite deceiving, can't they?

25            MS. KOMATIREDDY:  Objection.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

FRANCISCO CANEDO ZAVALETA – CROSS – MR. DE CASTRO   100

1          THE COURT:  Overruled.

2     A     Not in this case.

3     Q     The guards on the ground, the shapes, could've been

4     killed, right?

5     A     Yes.

6     Q     They could've been taken and tortured, right?

7     A     Yes.

8     Q     Because you knew the cartel did that sort of thing,

9     right?

10    A     Yes.

11    Q     Especially someone like Arturo Beltran-Leyva, right?

12    A     Well, I think any drug trafficker would, not just him.

13    Q     And you didn't immediately report that the secretary of

14    public security had possibly been kidnapped, right?

15    A     No.  But his security detail did.

16    Q     I'm going to ask you to answer what you did and stop

17    explaining every answer.

18          You didn't call for emergency responders, did you.

19    A     No.

20    Q     You didn't call for backup, right?

21    A     No.

22    Q     You didn't drive to the nearest police station to get

23    help, right?

24    A     No.

25    Q     You didn't try to get him or his guards any help, right?

Zavaleta – Cross – de Castro                    1101

1

2   A     No.

3            THE COURT:  Mr. de  Castro, moving on.

4   Q     The first thing you did is drive home to Mexico City,

5   right?

6   A     Yes.

7   Q     And you went and you spoke to your friend,

8   Oscar Granados Salero, right?

9   A     Yes.

10  Q     Someone who shared your view that the merger of the

11  federal police was illegal, right?

12  A     Yes.

13  Q     Someone who shared your views that Mr. Garcia Luna and

14  others were responsible for your dismissal, right, in 2000?

15  A     No.

16  Q     And so your next stop after your friend, Oscar, was

17  congress, right?

18  A     Yes.

19  Q     You involved a politician, right?

20  A     Yes.

21  Q     And not just congress in general, you went to a

22  particular congresswoman, right?

23  A     No.

24  Q     You were directed to Layda Elena Sansores, correct?

25  A     Layda Sansores.

Zavaleta – Cross – de Castro                    1102

1    Q     Oh, I'm sorry.

2          It's Layda.

3    A     Layda Sansores.

4    Q     And Ms. Sansores is associated with the National

5    Regeneration Movement, right?

6    A     The truth is, I don't know what party she belonged to,

7    but she -- we did go to several different people from several

8    different parties and no one  would pay any attention to us,

9    no one would listen to us until we went to a congresswoman or

10   senator, I don't remember, her name was Laura.  And she told

11   us to go to Layda Sansores, that she herself could not help

12   us.  And Layda Sansores  was the only woman who bravely

13   understood the situation and did her job.

14   Q     Sir, can I interrupt you?

15         My question was, if Ms. Sansores is associated with

16   the National Regeneration Movement, that was my question.

17         THE COURT:  He answered "I don't know."  The rest of

18   the answer is stricken.

19         Go ahead.

20   Q     Are you aware that she's the founding member with the

21   current president of Mexico, Andres Manuel  Lopez Obrador, of

22   that movement?

23   A     No.

24   Q     Are you aware that the current president ran against

25   President Fox and lost?

1   A    I'm not a politician.  I'm not a politician.  I was

2   always a police officer.  I was never interested in politics.

3           THE COURT:  He is just asking you what you are aware

4   of.  He said:  Are you aware that the current president ran

5   against President Fox and lost?

6           You can say:  Yes, I am aware, or no, I am not

7   aware.

8           That is all.

9   A    I cannot answer that because that historical event was

10  not of interest to me.  I'm sorry about that.  I was never

11  interested in politics.

12  Q    Did you vote in the election?

13  A    I don't remember.

14  Q    Were you aware at the time that President Calderon had

15  been elected in 2006?

16  A    Yes.

17  Q    Were you aware that Ms. Sansores was very anti President

18  Calderon's policies?

19  A    No.

20  Q    Now, I guess I left out one thing.

21          Before you went to congress, you also went into the

22  federal police database and pulled information from there,

23  didn't you.

24  A    No.

25  Q    You didn't pull the details of the weapons being held by

Zavaleta - Cross - de Castro                1104

1    all of Mr. Garcia Luna's security detail?

2    A    I investigated.

3    Q    You didn't call anybody for help, but you investigated

4    the bodyguards' weapons, right?

5    A    Yes.

6    Q    And you shared that with congress?

7    A    Yes.

8    Q    And Ms. Sansores wanted to release your story to the

9    press, right?

10   A    And that point was omitted.

11   Q    And she sought your permission to do so, right?

12   A    Yes.

13   Q    And to contact Proceso, right?

14   A    Just Proceso.

15   Q    And that was great for you because you and Oscar had

16   decided that you were going to try and use this story to

17   further your campaign against police reforms, correct?

18   A    I don't understand your question.

19   Q    You were happy because you and Oscar had decided that you

20   were going to try and use the story to further your campaign

21   against the illegal police reforms, correct?

22   A    No.

23   Q    Back to that meeting with the government in March of

24   2021, remember that?

25   A    Yes.

Zavaleta – Cross – de Castro                1105

1    Q    Do you remember telling the government that you and

2    Mr. Granados Salero felt this could support your cause against

3    Garcia Luna's intentions to merge the two agencies?

4    A    Under a single command, yes.

5    Q    Sure enough, Proceso published an article and featured

6    your claims, right?

7               Yes or no, sir.

8    A    No.

9    Q    There was an article published in Proceso, right?

10   A    I heard about it and I authorized it.

11   Q    And it was reported in the media all across the country,

12   right?

13   A    I don't know if it was in all the media; I just know it

14   was in the Proceso magazine.

15   Q    Now, not only did you make this oral complaint to

16   Ms. Sansores, you also submitted a letter to congress that you

17   described on direct examination, correct?

18   A    There were two.  There was one letter to congress and one

19   for the security commission.  That's why it was referred to

20   the secretary --  the national secretariat for defense, to

21   refer to them the serial numbers for the weapons and the

22   witnesses who were there.

23              THE COURT:  Okay, look, I have got to instruct the

24   witness.

25              You have to answer the questions yes or no if you

Zavaleta – Cross – de Castro                    1106

1   can reasonably answer yes or no.  You cannot elaborate at the

2   length you are going or we will be here for weeks.  All he

3   asked you was:  In addition to the oral complaint to

4   Ms. Sansores, you also submitted a letter to congress that you

5   previously testified about on direct examination; yes or no?

6            He is not asking you about the letter to the

7   security commission.  You are not saying you did not submit a

8   letter to the security commission.  He is just asking you

9   about, did you submit that one letter.

10            THE WITNESS:  Yes.

11            THE COURT:  Look, let me explain it this way.  You

12   do not have to tell everything.  You should not tell

13   everything in answer to any question.

14            If the government feels there is important

15   information that Mr. de Castro has left out, then they will

16   ask you more questions when he is done.

17            THE WITNESS:  I understand.

18            THE COURT:  All right.  Please continue,

19   Mr. de Castro.

20            MR. DE CASTRO:  Thank you, Judge.

21            Let me show you what I have marked as Defense

22   Exhibit F for identification.  Just the witness.

23   Q    Did that come up on your screen?

24   A    Yes.

25   Q    Is this the letter that you wrote?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Zavaleta – Cross – de Castro                1107

1    A    It's in English.

2             MR. DE CASTRO:  My apologies.  I meant Defense

3    Exhibit G for identification.  Sorry about that.

4    Q    Now, is that the letter?

5             We will scroll through it for you.  Okay?

6    A    Yes.

7    Q    And while it has a different person's name on it, this is

8    the letter that relates to you, correct?

9    A    Yes.

10            MR. DE CASTRO:  The defense would offer Defense

11   Exhibit G.

12            MS. KOMATIREDDY:  No objection, Your Honor.

13            THE COURT:  Received.

14            (Defense Exhibit G, was received in evidence.)

15            MR. DE CASTRO:  And Your Honor , we have a

16   translation of it that we would like to admit as Government --

17   as Defense Exhibit G with parenthetical (T) if that's

18   acceptable to the government.

19            MS. KOMATIREDDY:  No objection, Your Honor.

20            THE COURT:  Received.

21            (Defense Exhibit G-T, was received in evidence.)

22   Q    Okay.  So I'm going to put up a translated version of it,

23   and I'm going to go through some of your letter.  Okay?

24            THE INTERPRETER:  Counselor, may the interpreter

25   request the original document for translation purposes?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

Zavaleta – Cross – de Castro          1108

1          MR. DE CASTRO:  I was just going to say.

2          THE INTERPRETER:  Thank you.  I appreciate it.

3          MR. DE CASTRO:  Let me just get it.

4          THE INTERPRETER:  Thank you.

5          MR. DE CASTRO:  I've handed the interpreter

6    Government -- it's marked Government Exhibit 738-A.

7          THE INTERPRETER:  Correct.

8          MR. DE CASTRO:  For her assistance.

9    Q    So this letter is -- first, it has

10   Oscar Granados Salero's name on it, right?

11   A    Yes.

12   Q    And it's to The Honorable Congress of the Union in Its

13   Two Chambers of Senators and Deputies, right?

14   A    Yes.

15   Q    And then at the beginning, even though it's only from one

16   person, it says:  The undersigned persons, right?

17   A    Yes.

18   Q    Now, you had mentioned on direct examination that you did

19   not include in this letter that you had witnessed anything on

20   the road in Morelos, right?

21   A    Yes.

22   Q    But you did include facts about that alleged incident,

23   right?

24   A    Yes.

25   Q    Now, on page 7, in fact, you called it the "alleged real

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

1   fact," right?

2   A     Yes.

3              MR. DE CASTRO:  And if you could zoom a little bit.

4   Q     And then so you see there, it talks about Saturday,

5   October 19th, 2008, right?

6   A     Excuse me?

7   Q     You see there, it talks about last Saturday,

8   October 19, 2008, right?

9              THE INTERPRETER:  Your Honor, just for the

10  interpreter clarification, may the interpreter show him the

11  original document?

12             THE COURT:  Yes.

13  A     Yes.

14  Q     Now, and you went to Ms. Sansores a month after this

15  happened, right?

16  A     A little less than a month.

17  Q     And here it says last Saturday, on October 19th, right?

18  A     Yes.

19  Q     And then it says Garcia Luna and his 27 subjects, right?

20  A     Yes.

21  Q     And here it talks about an unspecified number of gunmen

22  or hitmen  in approximately ten fully armored suburban

23  vehicles, right?

24  A     Yes.

25  Q     And that they were subdued and blindfolded, right?

1        THE INTERPRETER:   A moment for the interpreter.

2        I'm sorry, Counselor.  Is that part of the -- oh, I

3   found it.  Thank you.

4   A    Yes.

5   Q    And, again, nowhere in here did you mention actually

6   seeing it, right?

7   A    Yes.

8   Q    Now, going back to page 1 of the document, what I'm going

9   to do here, just so you know, is, I'm going to go through

10   parts of your letter, and my question at the end is just going

11   to be really is that what's written here.  Okay?

12   A    Yes.

13   Q    So in paragraph that is marked as SECOND, it says:  We

14   request and beseech of you in the humblest manner your valued

15   intervention, so as not to be dismissed from our only source

16   of work, in an illegal, arbitrary and unjustified manner, by

17   at least supervising the exams and courses that our

18   hierarchical  superiors have posted notice of, with the aim of

19   the illegal, arbitrary and unjustified dismissal that they

20   intend, so that our families and the undersigned are not

21   doomed to misery with the consequent loss of the little

22   culture and social patrimony that we have left and possess.

23        That's what it said, right.

24   A    That's what it says.

25   Q    And in paragraph THIRD, sub (A), you write about:  The

Zavaleta – Cross – de Castro          1111

1   undersigned are hurt by the perspective that society has of

2   the public servant, having manifested textually with banners

3   in the marcha blanca, referred to as Illuminemos Mexico that

4   read the following, among other things, "let us be governed,

5   judged and taken care of by the whores, because their children

6   have failed us."  Although stated with good reason, due to the

7   bad example and behavior of some, all of us suffer.  We are

8   not all the same nor act as they do, for we the undersigned,

9   considered ourselves to be and can assure you that we are the

10  exception, based on the following.

11          And below that it says:  We, the undersigned, as

12  well as the entire society, were deceived by our bad rulers,

13  right?

14  A    Yes, it says that.

15  Q    And then on page 2, the last paragraph, it also talks

16  about the illegal, unjustified and arbitrary dismissal that

17  engulfed the families of the undersigned for many years in

18  which they were doomed to misery and the loss of their

19  material patrimony having to incur in expenses, pay defense

20  lawyers and incur debts for our support and defense, social

21  standing and cultural standing, having lost years of our

22  studies and our children for lack of the salary on which we

23  depended.  And it says that there as well, right?

24  A    Yes, it says so.

25          (Continued on the next page.)

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

PROCEEDINGS                                    1112

1              THE COURT:  Mr. De Castro, are you going to finish

2    this letter in the next five minutes or so?

3              MR. DE CASTRO:  Probably, it's just the reading; I'm

4    not going through the whole thing, of course.

5              THE COURT:  The question is when we take our break.

6              MR. DE CASTRO:  Five to ten.  Up to you, we can take

7    a break.

8              THE COURT:  Let's take our morning break, ladies and

9    gentlemen.  Come back 11:15.  Remember, do not talk about the

10   case.

11             (Jury exits the courtroom.)

12             THE COURT:  Let's temporarily excused witness.

13             (Whereupon, the witness steps down.)

14             THE COURT:  Everyone else have a seat.

15             I'm still struggling with the journalistic bribery

16   issue.  I think the reason I am is because the Government has

17   not been very specific on its proffer of what the witness

18   would say.  If the witness is going to give a general

19   understanding that money was being paid to stop coverage of

20   the defendant's connections, alleged connections, with

21   cartels, that's not good enough for me to overcome the

22   prejudicial impact.  On the other hand, if a witness is going

23   to testify, for example, let's change the evidence that we've

24   heard, but on this alleged meeting with the two drug cartel

25   members, if a witness was going to testify:  I was in a room

PROCEEDINGS                                    1113

1   with a journalist and so and so co-conspirator of the

2   defendant offered the journalist money not to run that story,

3   that's something I would probably allow in.

4            But I'm not going to allow a general impression or a

5   nonspecific conversation that money was being paid.

6            So you don't have to address it.  You can think

7   about it and see if you want to try it.

8            MS. KOMATIREDDY:  I expect the witness will testify

9   that the payment was to bribe journalists to not cover this

10  incident, specifically to address a case where the journalists

11  were saying he was kidnapped by a cartel.

12           THE COURT:  Okay.  But it's a general understanding.

13  Who said what to whom?  That's what I don't think your witness

14  can give me.  If the witness can't give me that, I'm not going

15  to have him say, oh, yes, there was an understanding that

16  money was to be paid.

17           MS. KOMATIREDDY:  Just for clarity, your Honor,

18  you're asking us to identify the declarant and the

19  conversation, which we will.

20           The Court's question is, can the witness testify

21  that either Mr. Garcia Luna or a co-conspirator specifically

22  requested a payment with respect to allegations related to the

23  kidnapping or other narco allegations?

24           THE COURT:  Other specific things that they wanted

25  suppressed.

PROCEEDINGS                                    1114

1          MS. KOMATIREDDY:  We will work on that, your Honor.

2          I also wanted to raise something for thought, with

3   Mr. De Castro's cross it appears that they are planning to

4   make the argument that the Proceso article fed all the

5   cooperators, that this person made it up, and if he has a bias

6   and that feeds everyone else's story.

7          I don't think we need to put the article itself in

8   front of the jury, I'm not seeking to do that.  I think we

9   need to have a way to refer to its contents in closings and

10  rebuttal to explain what the differences are in the contents

11  of that article and in the cooperators' testimony to rebut

12  this notion of coordinations.

13         I want to think about a way do that so it is not

14  unduly prejudicial but enables an honest conversation.

15         THE COURT:  When you think of a way to do that,

16  think of a way to explain it better.

17         MS. GOTLIB:  May I?

18         THE COURT:  Briefly.

19         MS. GOTLIB:  Just in respect to the witness as to

20  whether or not he's anticipated to testify that these alleged

21  bribes were to prevent the publishing of this specific story

22  that we're discussing now.  My understanding from the

23  materials is that this individual will testify that there were

24  numerous articles that were written about this, of which he

25  read.  And that it was after the fact that these articles came

ZAVALETA – CROSS – MR. DE CASTRO          1115

1    out that these alleged bribes were paid in an effort to

2    control the press, broadly speaking, to prevent negative, but

3    not necessarily about this specific story.

4              THE COURT:  It doesn't have to be about the specific

5    story.  But someone has got to give me something specific that

6    suppression occurred in order to distract attention from an

7    alleged relationship between the defendant and the cartels.  I

8    do not want a witness testifying:  Oh, yes, this was done.  We

9    all knew it was done.  I knew it was done.

10             If it was done, if there was an agreement, there was

11   a meeting of the minds, someone has to give me the minds who

12   met.  Okay.

13             MS. KOMATIREDDY:  I'm confident we can do that.

14   We'll work on it during the break.

15             THE COURT:  See you in a few minutes.

16             (Brief recess.)

17             THE COURT:  Let's have the jury in, please.

18             (Jury enters the courtroom.)

19             THE COURT:  Everyone be seated.  Please continue,

20   Mr. De Castro.

21             MR. DE CASTRO:  Thank you, Judge.

22   BY MR. DE CASTRO:

23   Q    Before the break we were going through a part of page two

24   of your letter, I think it's up and highlighted.  Then further

25   down in that paragraph it says:  For under the deception of

ZAVALETA - CROSS - MR. DE CASTRO          1116

1    our governing class as is customary every six years concerning

2    the purging of the police institutions of bad agents, we the

3    undersigned, found ourselves dismissed as if we were just

4    another number.

5              Did you write that?

6              THE INTERPRETER:  This is on the second page?

7              MR. DE CASTRO:  May I approach, Judge, to help the

8    interpreter?

9              THE COURT:  Yes.

10             THE INTERPRETER:  I got it.

11   A    Yes.

12   Q    Then on the next page, page three, paragraph G, here you

13   wrote:  Instead of letting police officers such as the

14   undersigned work, we have been confined to general armed guard

15   duties, actually disarmed, with the sole purpose of ensuring

16   that those who work in the installations of the office of the

17   Attorney General, PGR, and the current federal police do not

18   enter them with food or inappropriate clothing.  And that

19   vehicles of colleagues or people outside the agency do not

20   circulate or park improperly on the agency's grounds.  All

21   this is absurd.  Taking into account the preparation we have

22   in the area of investigations to combat crime, which in turn

23   has led to an increase in crime, by separating us from those

24   issues and assigning us to deal with matters other than crime.

25             Did you write that, sir?

ZAVALETA – CROSS – MR. DE CASTRO          1117

1   A     Yes.

2   Q     And on page six, at the top, five lines down.  You also

3   talk about your belief that the current secretary of federal

4   public security, which at the time was Mr. Garcia Luna, was

5   colluding with the professionalization council.  Right?

6   A     Yes.

7   Q     In paragraph C, below that, you wrote, did you not:  That

8   according to the extraordinary background experience we have

9   and because of our seniority within the institution, it is

10  unfair that we have not been given the opportunity years ago

11  for promotion within our position or rank, thus infringing to

12  our detriment the right of equality and the principles of

13  progressiveness and non-regression.

14  A     Yes.

15  Q     You testified on direct and here on cross that you didn't

16  hold Mr. Garcia Luna responsible for any -- for your firing,

17  correct?

18  A     Yes.

19  Q     But you wrote about that as well on page two, under

20  paragraph E.  Did you write:  We have a well-founded fear of

21  an illegal, unjustified, and arbitrary dismissal by high

22  commanders who currently preside over the institution that

23  employs us, and the federal public security secretariate of

24  the federal police.  These are indistinctly the same officials

25  who work in both corporations; specifically, Genaro Garcia

1   Luna, Edgar Eusebio Millan Gomez, deceased,, then it lists a

2   number of other names.

3   A    Yes.

4   Q    Then you write:  In reality, should it not be called by

5   it's acronym Garcia and Partners Family Police, who have

6   always been the same, who rotate for certain or undetermined

7   periods in the most important and relevant positions without

8   allowing anyone else.  Could this be a monopoly of power and

9   total control of the federal police for a common interest and

10  so on.

11          You wrote that as well, right?

12  A    Yes, I wrote that.

13  Q    You say you have no ill will towards Mr. Garcia Luna?

14  A    No.

15          MR. DE CASTRO:  No further questions.

16          THE COURT:  Redirect.

17  REDIRECT EXAMINATION

18  BY MS. KOMATIREDDY:

19  Q    Senor Zavaleta, on cross-examination you were asked about

20  a document that had Mr. Garcia Luna's name at the bottom.  Do

21  you remember those questions?

22  A    Oh, yes.

23  Q    If I could please have Government Exhibit 711 and 711T on

24  the screen, which are in evidence.

25          If we can go to the bottom and zoom in.  This is the

FRANCISCO CANEDO ZAVALETA – REDIRECT – MS. KOMATIREDDY   1149

1    bottom with Mr. Garcia Luna's name on the bottom, correct?

2    A    Yes.

3    Q    For the record, if we can go to the top please

4    Ms. Donovan.

5         This is the document that reinstates you in the

6    federal police, not the one that fires you, right?

7    A    Yes.

8    Q    When you were -- going back to when you were let go in

9    the 2000/2001 time frame, you were not the only person let go

10   during that time frame, correct?

11   A    Yes.

12   Q    There were approximately 700 people let go at that time?

13   A    There were very many.  I don't remember the exact amount,

14   but I wasn't the only one there were a lot of them.

15   Q    Going to the letter that Mr. De Castro went through with

16   you, Government Exhibit -- if I may, your Honor, to move in

17   Government Exhibit 738A and 738AT, which are the versions that

18   the interpreter is working off of?

19        THE COURT:  You'll take her word for it.

20        MR. DE CASTRO:  I will.  I think it's the exact

21   same.

22        THE COURT:  Received.

23        (Government Exhibit 738A & 738A-T, were received in

24   evidence.)

25        MS. KOMATIREDDY:  Thank you, Judge.

FRANCISCO CANEDO ZAVALETA – REDIRECT – MS. KOMATIREDDY                1120

1    BY MS. KOMATIREDDY:

2    Q    If we could go to the first page, please, side by side.

3              Mr. De Castro asked you in the first sentence it

4    says, the undersigned persons.  Mr. De Castro asked you:  This

5    says the undersigned persons even though it is from one

6    person.

7              Do you remember that question?

8    A    Yes.

9    Q    If we go to the top right, on the very top it says Oscar

10   Granados Salero and others, correct?

11   A    That's correct.

12   Q    And this is in the name of Oscar Granados Salero, but

13   there are details that pertain to you, correct?

14   A    Yes.

15   Q    That includes the address and the telephone number,

16   correct?

17   A    Yes.

18   Q    Ms. Donovan, can we put up 711T next to 738AT?  If you

19   can zoom in on the top of right of 738AT.

20             The address that appears is:  Emiliano Zapata Numero

21   39A, San Pedro Martir Tlalpan, Distrito Federal.  Correct?

22   A    Yes.

23   Q    14650.  Correct?

24   A    Yes.

25   Q    Going back to your reinstatement form on 711, that's the

1  same address that you lived at virtually all your life,

2  correct?

3  A    Yes.

4  Q    Emiliano Zapata Numero 39A, San Pedro Martir Tlalpan,

5  Distrito Federal, 14650.  It's all on 711T, correct?

6  A    Yes.

7  Q    On 738AT on the bottom right, there is a phone number

8  5846-7562.  Is that your phone number?

9  A    It was my home phone number.

10  Q    On your reinstatement form in 711T, you see the same

11  telephone plus the area code for cellphones in Mexico, so 55

12  area code, then 5846-7562.  Correct?

13  A    It is the same number.

14  Q    Going into the body of the letter, 738AT, go to page

15  seven.

16         Defense counsel asked you about the phrase:  Last

17  Saturday on October 19, 2008.

18         Do you remember that question?

19  A    Yes.

20  Q    The day that you saw Mr. Garcia Luna on the side of the

21  road with Arturo Beltran and La Barbie, was it a Saturday?

22  A    No.

23  Q    What was it?

24  A    Sunday.

25  Q    Why did your report say Saturday?

FRANCISCO CANEDO ZAVALETA – REDIRECT – MS. KOMATIREDDY 1222

1    A    Because it was an involuntary mistake.

2    Q    In the report it says, going into the next sentence:

3    That Genaro Garcia Luna and his escorts, consisting of

4    approximately 27 subjects and based on comments of several of

5    them in the corridors in the various facilities, the following

6    events occurred.

7           Do you see that sentence?

8    A    Yes.

9    Q    To be clear, did you personally witness the defendant

10   Genaro Garcia Luna and Arturo Beltran and Barbie on the side

11   of the road on Sunday October 19, 2008?

12   A    Yes.

13   Q    Did you take any additional steps after you witnessed

14   that event?

15   A    Yes.

16   Q    Can you explain why there is additional information in

17   this letter that is beyond what you personally witnessed?

18   A    Because I conducted an alternate investigation to confirm

19   what I believed, which would be an appointment that had been

20   agreed to rather than an abduction.

21   Q    Who did you interview as part of this investigation?

22   A    Mr. Garcia Luna's bodyguards.

23   Q    Why in this letter did you not mention that you also

24   personally witnessed the event?

25   A    Out of fear of retaliation.

1    Q    In this portion of the letter, the heading says:  Alleged

2    real fact.

3           Why did you describe it as an alleged real fact?

4    A    I'd like to repeat –- fear of retaliation, fear of what

5    that situation could lead to.

6    Q    To be clear, you testified on the stand on Thursday and

7    today about what you saw, correct?

8    A    Yes.

9    Q    Did you make any of that up in order to avoid a merger of

10   the federal police and AFI?

11   A    I didn't make anything up, everything was real.

12   Q    Did you lie to Congress in 2008?

13   A    No.

14   Q    Are you lying today?

15   A    No.

16   Q    I'm going to turn your attention to the last page of

17   738A.  If we can have 738AT for the jury, please, last

18   paragraph.

19           Senor Zavaleta, can you read that into the record?

20   A    Yes.

21   Q    Let's pause for translation.

22   A    Currently we have interviewed several of our colleagues

23   who have been assigned to various places, states of the

24   republic, who do not have the same experience in the fight

25   against organized crime and drug trafficking as the

FRANCISCO CANEDO ZAVALETA – REDIRECT – MS. KOMATIREDDY   1224

1    undersigned.  They tell us that they are afraid because they

2    have been threatened indirectly by various leaders of drug

3    cartels on the understanding that they must not intervene or

4    interfere in their interests.

5    Q    You may continue.

6           Let's pause for translation.

7    A    Even to the point where to implement road blocks or carry

8    out operations, they have to request permission from the very

9    leaders of these criminal organizations through our superiors

10   who were appointed by the current head of the federal public

11   security secretariate.  In addition, those who have the skill,

12   attitude, preparation and experience have stated that they are

13   afraid to act, since on the one hand they do not have the

14   support of their superiors.  And on the other hand, the same

15   superiors have instructed them not to go beyond the

16   fulfillment of judicial orders or warrants; i.e., presentation

17   apprehension or rearrest orders.  This can be verified with

18   the records of such orders in various states.  Since these

19   same superiors are also threatened with the death if they act

20   against themselves and their subordinates, threats which have

21   materialized as can be verified through the media.

22           Furthermore, they are legally afraid of acting; and,

23   therefore, falling into a fault, not criminal but simply

24   administrative, which would lead to their dismissal, removal

25   or termination.  And, therefore, the loss of their only source

1    of work and support for their families.

2    Q    You may continue.

3    A    The foregoing because current Article 112, paragraph B,

4    section 13 of the constitution, threatens any police subject,

5    even if they are incorruptible good police agents, with the

6    loss of his or her job, even being dismissed without

7    justification and under pretences, as it happened specifically

8    and truly with the several of the undersigned in the past.

9         But now definitively, leaving them in a total state

10   of defenselessness by the stipulations of that article, which

11   has submerged us in a bubble of suspension of rights.

12   Currently of police rights after citizen's rights, as it was

13   intended with the reform on searches without a warrant.  Given

14   all of the above, many of these colleagues told us that it is

15   better to follow that proverb that says:  If you want to

16   become an old agent, look the other way.

17        For the above written reasons, we request and

18   present our apologies.  But it is the reality for some, not

19   for us.  Because we not cannot ignore all this and it is

20   necessary to act, even if this means risking our own lives.

21        THE INTERPRETER:  May the interpreter have the last

22   part of the letter, please, on the screen.

23   A    In witness whereof, to all of you, we hereby request as

24   follows.  Sole paragraph support the undersigned and families

25   in each one of the reasons, goals, and objectives raised to

FRANCISCO CANEDO ZAVALETA – REDIRECT – MS. KOMATIREDDY 1126

1    the extent to which you can help.  Cordially and respectfully,

2    because justice, law and reason are always above force,

3    arbitrarity, and impunity.

4               That is all.

5               MS. KOMATIREDDY:  No further questions, your Honor.

6               MR. DE CASTRO:  No questions.

7               THE COURT:  The witness may step down.

8               (Whereupon, the witness was excused.)

9               THE COURT:  Government's next witness.

10              MS. REID:  Sidebar, your Honor?

11              (Continued on the next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1127

1                (Sidebar conference.)

2                MS. REID:  Your Honor, our next witness is the

3    witness that we were talking about this morning with the

4    payments to the newspaper.  We can start with him.  I don't

5    think we'll get anywhere close to that topic before lunch, or

6    we could break early.  It's up to the Court.

7                THE COURT:  Let's start with him.

8                MS. REID:  That's fine.

9                MS. KOMATIREDDY:  One thing, we have to advise him.

10   If it's possible for us to discuss it with the Court and have

11   a ruling so we could advise him on what he's allowed to

12   testify about, we'll need at some point to take a break in the

13   afternoon to do that.

14               THE COURT:  We're not going to finish him on this

15   topic before lunch, can you talk to him during lunch?

16               MS. REID:  Yes.  Thank you.

17               (End of sidebar conference.)

18               (Continued on the next page.)

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1128

1              (In open court.)

2              MS. REID:  The Government calls Hector Villarreal

3    Hernandez.

4              (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HECTOR VILLARREAL – DIRECT – MS REID          1129

1          (Witness takes the witness stand.)

2     **HECTOR VILLARREAL**, called as a witness, having been first duly

3     sworn/affirmed, was examined and testified first duly

4     sworn/affirmed:

5               THE COURTROOM DEPUTY:  State and spell your name for

6     the court reporter.

7               THE WITNESS:  Hector Villarreal, H-E-C-T-O-R,

8     V-I-L-L-A-R-R-E-A-L-L.

9     DIRECT EXAMINATION

10    BY MS. REID:

11    Q    Good afternoon.

12    A    Good afternoon.

13    Q    How old are you?

14    A    Fifty-two years old.

15    Q    In what country did you spend most of your life?

16    A    In Mexico.

17    Q    Did you ever hold public office in Mexico?

18    A    Yes.

19    Q    What positions did you hold?

20    A    In 2005 I was undersecretary of planning and budget in

21    the state of Coahuila.  After that, in 2008, I was secretary

22    of finance.

23    Q    Is Coahuila a state in Mexico?

24    A    Yes.  It is one of the 32 states in the country.

25    Q    Generally, where is it in Mexico?

HECTOR VILLARREAL - DIRECT - MS REID     1130

1   A     It is in the northern part of the country.  It shares a

2   border with the state of Texas.

3   Q     Have you pleaded guilty to any crimes in the United

4   States?

5   A     Yes.

6   Q     What were those crimes?

7   A     Conspiracy for money laundering.

8   Q     Did you engage in a conspiracy to launder money while you

9   were in public office in Mexico?

10  A     Yes.

11  Q     I'd like to show what you is in evidence as Government's

12  Exhibit 1.  Do you recognize this person?

13  A     Yes.

14  Q     Who is that?

15  A     Licenciado Genaro Garcia Luna.

16  Q     Who is that?

17  A     When I met him he was secretary of public security.

18  Q     Did you meet Genaro Garcia Luna in the course of your

19  work with the Coahuila state Government?

20  A     Yes.

21  Q     I want to talk about your background now.  Generally,

22  where did you grow up?

23  A     In Matamoros Tamaulipas.

24  Q     About how far did you go in school?

25  A     I did my Bachelor's degree.

HECTOR VILLARREAL - DIRECT - MS REID          1131

1    Q    At some point did you start working?

2    A    Yes.  I was at the institute for continuing education and

3    I ran trainings in continuing education for several federal

4    entities in Mexico.

5    Q    At some point did you meet someone named Humberto Moreira

6    Valdez?

7    A    Yes, at the end of 2003, well, end of 2002 beginning

8    2003.

9    Q    At that time, what was Humberto Moreira Valdez's role?

10   A    Secretary of education for the state of Coahuila.

11   Q    At some point did he gain a different position?

12   A    Yes.  He was the mayor of the city of Saltillo.

13   Q    Did Humberto Valdez ever get a higher office than mayor?

14   A    Yes.  He was governor of the state of Coahuila.

15   Q    When did he become the governor of Coahuila?

16   A    December 1st, 2005.

17   Q    Did that have any impact on you, when he became governor?

18   A    He named me planning and budget director in the finance

19   secretariate.

20   Q    What were your responsibilities in that role?

21   A    Planning the budget and paying for public works and

22   services for the state.

23   Q    I think you testified that there are 32 states in Mexico;

24   is that right?

25   A    That's correct.

HECTOR VILLARREAL – DIRECT – MS REID          1132

1   Q     In your role in state Government in Coahuila, did you

2   become familiar with how state budgets are funded?

3   A     Yes.

4   Q     Can you tell us about that?

5   A     The budgets for states are defined by the federal

6   Congress because we are a federal country.  And the budget is

7   sent to the states, approximately 95 percent of resources come

8   from the federal Government.

9   Q     Do states have the ability to tax in Mexico?

10  A     Some they do, like automobile taxes, hospitality, and

11  tourism.

12  Q     What about property tax?

13  A     Those are municipal, they are city.

14  Q     How did Coahuila get money to fund projects in the state?

15  A     First of all, there is federal funds that are assigned

16  for different public works as part of the budget.  And a

17  second option is to get bank loans for projects.

18  Q     After you were the, I think you said, deputy secretary of

19  budget and planning in Coahuila, did you move up to a

20  different role?

21  A     Secretariate of finance.

22  Q     When did you get that role?

23  A     Maybe 2008.

24  Q     How long did you have that role?

25  A     Two years.

HECTOR VILLARREAL - DIRECT - MS REID          1133

1    Q    So between 2005 when you started in office in Coahuila

2    until about 2010, did you commit any financial crimes?

3    A    Yes.

4    Q    What kind of crimes?

5    A    We would charge commissions.  We would go over the

6    invoices for public works.

7    Q    Are you saying that you overpaid on occasion for public

8    works in Coahuila?

9    A    That's correct.

10   Q    When you overpaid, did you ever get the money back?

11   A    That's correct.

12   Q    Did you take that money as a kickback?

13   A    That's correct.

14   Q    Was Governor Moreira involved in the scheme to get

15   kickbacks?

16   A    That's correct.

17   Q    Generally, how did you and the governor get money from

18   these kickbacks?  How did you get it?

19   A    We would pay a higher commission for the public works

20   projects that we were working on.  And it was stated on the

21   same invoice.  And later on, those companies were instructed

22   as to what they had to acquire.

23   Q    Who instructed the companies on how to spend this

24   kickback money?

25   A    It was a direct instruction from the governor because the

HECTOR VILLARREAL – DIRECT – MS REID          1134

1    people in these companies were either family members or people

2    who were very close to him, or even strawmen who had been

3    assigned to those companies.

4    Q    Generally, what did you and the governor do with the

5    money that you got from these kickbacks?

6    A    We purchased properties, land, houses in Cuernavaca,

7    Mexico City, Saltillo.  We purchased planes that were from a

8    company that was part that had a partnership with the

9    governor.  We bought mass media, radio stations, TV stations,

10   shows.  We had apartments on the beach.  And a very important

11   part, which was political campaigns in Mexico.

12                   (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

HECTOR VILLARREAL – DIRECT – MS REID          1135

1    DIRECT EXAMINATION   (Continuing)

2    BY MS. REID:

3    Q    I'd like to break some of those things down.

4         You said that you bought various kinds of media; is

5    that right.

6    A    That's correct.

7    Q    Why did you do that?

8    A    Well, in addition to the fact that it was useful so that

9    we could portray a better image in the state of Coahuila,

10   meaning from the executive branch, it was also something that

11   allowed us to be able to have support and to make somebody

12   either look better or to damage somebody's reputation.

13   Q    I think you testified that on occasion you purchased

14   media outlets.

15        Did you also just make payments for a particular

16   kind of coverage.

17   A    Yes.  Yes, we made a lot of payments for coverage and not

18   only with media outlets in Coahuila, but also at the federal

19   level.

20   Q    I think you also mentioned that you used some of the

21   kickback money to buy airplanes.

22        Why did you do that.

23   A    Well, in the beginning, it was an investment, and it was

24   an agreement that the governor had reached with his partner.

25        Then secondly, it was a benefit that the governor

HECTOR VILLARREAL - DIRECT - MS REID          1136

1    provided to politicians who were running for governor.  We --

2    so that they could go from one place to the next in the

3    country and provide the -- and run their own internal

4    political campaigns.  We would help them with the planes, with

5    the marketing, with the media.  We gave them the money, the

6    public pantry for people so that they could become governors.

7    Q    And why was Governor Moreira providing benefits like

8    these to other politicians in Mexico?

9    A    It was a way to have people who owed you favors, people

10   who would later on become influential in their own

11   governmental positions within the states.  And whenever we

12   would need it, we would request their support so that we could

13   have a way to getting into the federal level.

14   Q    Over the course of this entire period, from 2005 to 2010,

15   approximately how much money did the entire kickback scheme

16   generate?

17   A    From 2006 to 2011, in which three finance secretaries

18   participated on this scheme, it would've been approximately

19   $200 million.

20   Q    How much money did you make personally from this kickback

21   scheme, approximately?  Approximately.

22   A    Approximately, we were given $2.5  million to each of the

23   eight people who participated or worked in this scheme.

24   Q    And who gave you that money?

25   A    Those were direct instructions from the governor.

HECTOR VILLARREAL – DIRECT – MS REID          1137

1    Q    And approximately how much money did Governor Moreira

2    make personally from this kickback scheme?

3    A    A little over 40 million.

4          MS. REID:  Your Honor, I know we're just a couple

5    minutes before lunch, but would this be a good time for a

6    break?  We're about to get to a new topic.

7          THE COURT:  It's not the topic, right?

8          MS. REID:  It is not the topic.  I'm happy to go --

9          THE COURT:  We should go on a little more.  We just

10   broke less than an hour ago.

11         MS. REID:  Yes, Your Honor.

12   Q    Are you familiar with something called a patrimonial

13   statement.

14   A    Yes.  It's a form that is submitted by public officers --

15   public officials, interpreter correction, that you submit at

16   the beginning of your term and you update at the end of your

17   term.

18   Q    And other than the beginning of your term and the end of

19   your term, are public officials required to make any other

20   updates to their patrimonial statements?

21   A    When there's an impact to your assets, you must send an

22   additional declaration indicating that your assets have

23   increased.

24   Q    Who is required to complete these documents in Mexico?

25   A    Within the state government is the secretariat of the

HECTOR VILLARREAL - DIRECT - MS REID          1138

1    state public services.  And at the federal level, it's the

2    secretariat for public services at the federal level.

3    Q    Are those the groups that review the documents?

4    A    They audit them and they review them.

5    Q    And to be clear, are all public officials required to

6    file patrimonial statements in Mexico?

7    A    That's correct.  It's an obligation.

8    Q    And are federal officials in Mexico permitted to work in

9    private industry at the same time that they work in the

10   federal government?

11   A    No.  When you work for the private industry, you must get

12   an authorization so that you show that there is no connection

13   at all, and that you are just working with a company and the

14   public administration.

15   Q    Now, when you were in government, did you ever complete a

16   patrimonial statement?

17   A    At the beginning of my term, I provided general

18   information.

19   Q    Did Governor Moreira Valdez ever file patrimonial

20   statements?

21   A    Yes.

22   Q    And who filled out the governor's patrimonial statements?

23   A    I did.

24   Q    And how frequently did he file those?

25   A    At the beginning, each year, and at the end.

HECTOR VILLARREAL – DIRECT – MS REID          1139

1    Q    And you're saying the beginning and end of his term, as

2    well as each year?

3    A    That's correct.

4    Q    Were the governor's patrimonial statements that you

5    filled out accurate?

6    A    No.

7    Q    In what ways were they not accurate?

8    A    They were not updated with the assets that were being

9    acquired.

10   Q    Why not?

11   A    Because the assets that he was obtaining were not being

12   added on, they were not being updated.  What we did is, we

13   would take the amount that he was making annually, and then we

14   could update any purchases within that amount and that was it.

15   Q    And did the government's actual assets exceed the salary

16   he was making as a public official?

17   A    That's correct.

18   Q    And did you ever have to provide any documents to verify

19   what was listed on his patrimonial statements?

20   A    That document was turned over to the secretary for public

21   service.  And that was a post that had been named by Governor

22   Moreira, so this made it pretty much impossible for him to

23   request any additional information from me.

24   Q    And did that individual or group ever request any other

25   information from you?

HECTOR VILLARREAL - DIRECT - MS REID          1140

1    A     Never.

2    Q     And are government officials' patrimonial statements

3    available publicly in Mexico?

4    A     That's correct, they're transparent and they are on

5    websites.

6    Q     What website?

7    A     The states and the federation have a program called

8    DeclaraNet.

9    Q     Have you ever looked at patrimonial statements on

10   DeclaraNet?

11   A     Well, the governor's and maybe some other ones.

12   Q     And were patrimonial -- are patrimonial statements posted

13   on DeclaraNet when they're filed by the public official?

14   A     My understanding is that the secretariat for public

15   service has some time at the beginning of the term to upload

16   all of the statements for all the public officials and then

17   update them to the website.

18   Q     And within that same period, are they uploaded?

19   A     That's correct.

20   Q     And are those patrimonial statements of current public

21   officials kept on DeclaraNet for years?

22   A     My understanding is that they are kept on the website

23   during the six-year term in which the official has their post.

24   And then afterwards, you are able to request any statements

25   from the national institute for access to information.

HECTOR VILLARREAL - DIRECT - MS REID          1141

1   Q    And does the secretary of public service make and keep

2   those records of patrimonial statements in the regular course

3   of its business?

4   A    That's correct.

5   Q    Now, did Governor Moreira spend the money that he got

6   from the kickback scheme in a showy manner when he was in

7   office?

8   A    No.

9   Q    Why not?

10  A    When you're a career politician, you're not going to be

11  flashy because when you have to go to a popular election, then

12  voters are not going to vote for you.

13  Q    In addition to what you've told us about the patrimonial

14  statements, did the governor take other efforts to conceal

15  some of his assets?

16  A    Well, they would be in the name of the companies or of

17  straw men, all the properties and assets that were bought,

18  that were being bought.

19  Q    And were you involved in buying houses or properties for

20  the government using straw men?

21         MS. GOTLIB:  Objection, Your Honor.

22         One word?  Relevancy.

23         THE COURT:  Can't tell you.  Overruled for now.

24  Q    Just to be clear, you bought those for the governor,

25  Governor Moreira?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

HECTOR VILLARREAL – DIRECT – MS REID      1142

1    A      Several.

2    Q      Did you ever buy houses for the governor in cash?

3    A      In Mexico, I did.

4    Q      Did you ever buy other high-value things for the governor

5    in cash?

6    A      Cars, houses, land, ranches.

7    Q      Did you ever buy anything in the United States for the

8    governor with money from the kickbacks?

9    A      Yes.

10   Q      What did you buy?

11          MS. GOTLIB:  Again, Your Honor, objection.

12          THE COURT:  Okay.  Let's have a sidebar.  Government

13   will give me a proffer.

14          (Continued on the next page.)

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                1143

1          (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4          THE COURT:  What is it all about?

5          MS. REID:  First of all, this is the witness's bad

6     acts, Your Honor.  But second of all --

7          THE COURT:  You are drawing teeth; is that it?

8          MS. REID:  No.

9          The defense has made this case all about where is

10    the money.  That's a direct quote from their opening.  And

11    from repeated cross-examination, that has been the theme.  And

12    it's very relevant, Your Honor.  They've made it relevant and

13    so it's very -- they've also asked cooperators what they did

14    with their money on other occasions; it's relevant what was

15    done with the money in this case.

16         And also, if they're asking where is the money, it's

17    important to show the jury that money sometimes is not

18    traceable in Mexico.  It is relevant.

19         THE COURT:  You are going to have to do better than

20    that.

21         I mean, first of all, is that money this money?

22         MS. REID:  Well, I think that's very clear that it's

23    not, Your Honor.  That's why I've been asking about the

24    kickbacks.

25         But the question is, can you trace all the money in

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

SIDEBAR CONFERENCE                    1144

1    Mexico when it's in cash?  He can speak to that, Your Honor.

2              THE COURT:  Call an expert.  I mean, he can speak to

3    one instance where it's not traceable.  The jury cannot in its

4    limited experience draw an inference from that, that that is

5    what happened here.

6              MS. REID:  Well, Your Honor, I understand that.

7              THE COURT:  To the extent you think that is -- if

8    that is what you are going for, just argue it to the jury,

9    right?

10             MS. REID:  Yes, Your Honor.

11             I just would highlight that, A, this has come up on

12   cross-examination of other witnesses what they did with their

13   money and, second,  these questions are about what he did with

14   the set of money for - - in a particular instance.

15             THE COURT:  If you were telling me you are bringing

16   out bad acts in order to deflate the defendant bringing those

17   bad acts, what we call drawing the teeth, I would let you do

18   that.

19             MS. REID:  We're also doing that, Your Honor.  All

20   of this witness's crimes are financial and all -- essentially

21   all of the 3500 relates to those crimes.

22             THE COURT:  I do not see how what he did with the

23   money and how it was concealed in the United States, I do not

24   see how that aids the jury in drawing that inference as to

25   this defendant without broader proof that this happens all the

SIDEBAR CONFERENCE                    1145

1    time.   Okay?   So I am going to sustain the objection.

2              MS. REID:   Yes, Your Honor.

3              (End of sidebar conference.)

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VILLAREAL – CROSS – MS. REID                1146

1        (In open court.)

2   BY MS. REID:

3   Q    I'd like to now talk about Genaro Garcia Luna.

4        During the course of your time in state government

5   in Coahuila, did you ever meet him.

6   A    Yes.

7   Q    When did you meet him?

8   A    Yes, in 2008, I went with the governor of the state of

9   Coahuila and other officials in the state to go request funds

10  for public security projects in our state.

11  Q    And what was the Genaro Garcia Luna's role at the time?

12  A    Secretary of public security.

13  Q    You told us earlier about how state budgets are financed

14  by federal money.

15       What role, if any, did the secretariat of public

16  security have in Coahuila's budget.

17  A    Congress is the one that assigns  the global budget, both

18  for the federation and for individual states.  After that, the

19  federal government assigns resources to the different federal

20  secretariats at the discretion of each secretary for new

21  projects.

22  Q    And as the secretary of public security, did Genaro

23  Garcia Luna have discretion for how money was spent for

24  security-related projects?

25  A    Yes.  With the secretary's authorization you can carry

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

VILLAREAL – CROSS – MS. REID                 1147

1   out new projects.

2   Q     And after this first meeting, were there other times that

3   you met with Genaro Garcia Luna or his staff to discuss

4   financing for security projects in Coahuila?

5   A     There was a second time we were invited to go to this

6   building where there's high security and high intelligence so

7   that we could take a tour of the building.

8   Q     What is that building called?

9   A     At the time, they called it the bunker.

10  Q     And when did you go to the bunker?

11  A     Beginning 2009.

12  Q     What was the bunker?

13  A     Well, that building housed some of the most advanced

14  intelligence systems that analyzed in real time everything

15  that was going on in every single state; for example,

16  different indexes.  And if you needed to identify a person at

17  a state, you could do that in real time.  It was a very

18  complex intelligence and security system at the federal level.

19  Q     And who gave you a tour of the bunker in 2009 ?

20  A     It was given to the governor by Licenciado Genaro

21  Garcia Luna.

22  Q     And were you present?

23  A     Yes.

24  Q     You've talked about some of the technology.

25        Was there any technology to make recordings in the

VILLAREAL – CROSS – MS. REID                1148

1   bunker.

2   A    We were offered a service with the technology where you

3   could take a cell phone, you would send a text message, and

4   then from there they could access and analyze all of your

5   calls, calls you had made in the past.  And also there was

6   this service where you could record said calls.

7   Q    What was the name of that technology?

8   A    At that time, they called it Pegasus.

9   Q    And while you were in the bunker tour, did anyone sample

10  that for you?

11  A    Yes.  We were asked to provide a cell phone from one of

12  the people who were there from the State so that they could

13  prove and show the service.  We gave them the cell phone of

14  one of the people who was there with us.  And then on the

15  screen  you could visualize and see all of the messages from

16  this person.

17  Q    And you said you were offered the technology.

18       Did you and the governor buy that.

19  A    No.

20  Q    Why not?

21  A    Well, we didn't want for the information, the people from

22  the State, to be heard or to be found that might affect us

23  later.

24       THE COURT:  Ms. Reid, at a good point.

25       MS. REID:  This is a good time.

VILLAREAL – CROSS – MS. REID                    1149

1          THE COURT:  Okay.  Lunch, ladies and gentlemen.

2   Please come back in one  hour.  That's 10 to 2.  Have a good

3   lunch.

4          (Jury exits.)

5          THE COURT:  Okay.  Recess.  One hour.

6          (Recess taken. )

7          (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VILLARREAL – DIRECT – MS. REID                    1150

1            (Afternoon session.)

2            (In open court.)

3            THE COURTROOM DEPUTY:  All Rise.

4            THE COURT:  Let's call the jury.

5            (Jury enters the courtroom.)

6            THE COURT:  Everyone be seated.  Welcome back,

7    ladies and gentlemen.

8            Please continue, Ms. Reid.

9    BY MS. REID:

10   Q    Mr. Villarreal, when we stopped for lunch you were

11   telling us about some technology called Pegasus, which you

12   choose not to buy.

13   A    Yes.

14   Q    Why were you and the governor worried about purchasing

15   that software?

16   A    Well, we thought that if we got that software system

17   then, well, it was one company that managed that in Mexico.

18   And there could be people tapping in and listening in to

19   everybody in the Government.  And that company would have all

20   the information, as would any agency that used it.

21   Q    What agency specifically were you worried about listening

22   to you?

23   A    The secretariate of public security.

24   Q    At the end of your tour of the bunker, did you meet

25   directly with Genaro Garcia Luna?

VILLARREAL – DIRECT – MS. REID          1151

1   A     Yes.

2   Q     Who was present for that meeting?

3   A     Mr. Garcia Luna, Professor Moreira and myself.

4   Q     You said Professor Moreira, is that the governor you

5   worked for, Governor Moreira?

6   A     Yes, that's correct.

7   Q     What did Genaro Garcia Luna say to you in this meeting?

8   A     He told Governor Moreira that he needed support, and if

9   he knew anybody who worked at El Universal.  Humberto told

10  Humberto Moreira that he was very good friends with the owner

11  of El Universal; and that if he needed anything at all to --

12          MS. GOTLIB:  Your Honor, objection --

13          THE COURT:  Overruled.

14  A     -- at all to just let him know.

15          He said there were some rumors that were starting to

16  circulate that he had been kidnapped by a cartel and he was

17  being related to certain people, certain people in the cartel

18  in Mexico.

19  Q     Who made that statement that they had been kidnapped or

20  rumors of being kidnapped by a cartel?

21  A     Mr. Garcia Luna about himself.

22  Q     What, if anything, did Garcia Luna ask the governor for?

23  A     That if there was any way to get close to, to, to be able

24  to say that -- he knew this wasn't real, and wanted to know if

25  there was any way of approaching El Universal.

VILLARREAL – DIRECT – MS. REID          1152

1    Q    What did the governor say?

2    A    No problem at all.

3    Q    Did the governor make any efforts to connect Garcia Luna

4    with El Universal?

5    A    Yes.  Yes, yes, he didn't have any problems doing that.

6    Q    What is El Universal?

7    A    It is the largest newspaper with the most subscriptions

8    in Mexico.

9    Q    Who owns that newspaper?

10   A    Mr. Ealy Ortiz.

11   Q    Did Ealy Ortiz own that newspaper at the time period of

12   this conversation?

13   A    That's right.

14   Q    Did you ever meet Mr. Ealy Ortiz?

15   A    Yes.

16   Q    How did you meet him?

17   A    There were several meetings in Mexico City and Saltillo

18   Coahuila.

19   Q    What was the relationship between Mr. Ealy Ortiz and the

20   governor?

21   A    He was his good buddy.

22   Q    I want to show you what is marked for identification as

23   Government Exhibit 434.  Do you recognize this?

24   A    Yes.

25   Q    What is this?

VILLARREAL – DIRECT – MS. REID          1153

1    A      It's a party Mr. Ealy Ortiz's house in Saltillo Coahuila.

2    Q      This is a photograph from that party?

3    A      That's correct.

4    Q      Were you present for that party?

5    A      Yes.

6    Q      Does this photograph fairly and accurately depict people

7    you saw at this event?

8    A      That's right.

9           MS. REID:  I'd ask that Government Exhibit 434 be

10   admitted into evidence.

11          MS. GOTLIB:  No objection, your Honor.

12          THE COURT:  Received.

13          (Government Exhibit 434, was received in evidence.)

14   BY MS. REID:

15   Q      If you can just tell us, do you see Ealy Ortiz in this

16   picture?

17   A      He's the person wearing blue in the middle.

18   Q      Is he the man wearing a blue top and blue pants in the

19   middle of the picture?

20   A      Yes.

21   Q      Is Governor Moreira in this picture?

22   A      The white shirt and dark pants.

23   Q      And where in relation to the left side of the picture is

24   he?  Can you point to him?  You can circle on your screen.

25   A      Who this?

VILLARREAL – DIRECT – MS. REID                1154

1    Q    You can touch the screen.  Can you point to us Governor

2    Moreira?

3    A    (Indicating.)

4    Q    Can you show us by touch on the screen Mr. Ealy Ortiz?

5    A    (Indicating.)

6    Q    What is this event?

7    A    If memory serves, they were saying they were announcing

8    that one Ealy Ortiz's daughters had just gotten married, was

9    going to have a child, and Ealy Ortiz was going to be the

10   compadre.

11   Q    What is a compadre?

12   A    It's a -- in Mexico it's somebody that you ask to take

13   care of your child if something happens to you, somebody who

14   is very important.

15   Q    We can take down the exhibit.  Thank you, Ms. Donovan.

16        After this, Genaro Garcia Luna asked for assistance

17   from the governor.  Did the governor broker an arrangement

18   with Mr. Ealy Ortiz on his behalf?

19   A    Yes.  He said that the agreement would be 25 million

20   pesos a month to support him.

21   Q    The 25 million pesos, who would that be paid to?

22   A    To El Universal.

23   Q    After that arrangement was made, were you ever directly

24   involved in making any payments to El Universal on behalf of

25   Garcia Luna?

VILLARREAL - DIRECT - MS. REID                1155

1    A    On behalf of -- yes, just one.

2    Q    Were you involved with the first payment?

3    A    Yes.

4    Q    What did you do?

5              THE INTERPRETER:  Ask to clarify, your Honor?

6              THE COURT:  Yes.

7    A    Humberto asked me to go to Mexico City with Mr. Sergio

8    Montanez to make the payment to start the agreement.

9    Q    Who did Sergio Montanez work for?

10   A    For Mr. Garcia Luna.

11   Q    And what did do you?

12   A    Went to Mexico City.  We went to the offices and went

13   straight to El Universal to make the arrangement happen.

14   Q    Did you go with Sergio Montanez?

15   A    That's right.

16   Q    What happened at the offices of El Universal?

17   A    The person there identified himself as Sergio Montanez,

18   and he would be the person in charge, according to his

19   instructions.  And they were looking to make sure, between --

20   that they were looking to make sure that with the

21   communication between the parties the secretary of public

22   securities work for the federal Government and the Mexican

23   citizens would shine.

24   Q    Did Sergio Montanez have any money with him?

25   A    Yes, he had a small bag with him that had cash inside.

VILLARREAL - DIRECT - MS. REID          1156

1   And he said that the rest was in the SUV in which we came.

2   Q    Did you see the cash inside the one bag?

3   A    Yes.

4   Q    How did you see it?

5   A    He opened the bag.

6   Q    Where or when did he open the bag?

7   A    When we were in the office in El Universal.

8   Q    After this, was there ever a time when you paid El

9   Universal directly on behalf of Genaro Garcia Luna using money

10  from the state of Coahuila?

11  A    That's right.

12  Q    Did you do that just one time?

13  A    Just one time.

14  Q    Did that occur because there was an issue with the form

15  with which Genaro Garcia Luna had previously been paying El

16  Universal?

17  A    It was a favor that Sergio Montanez asked because the

18  money had to be paid that day, so an invoice was made and the

19  money was paid immediately.

20  Q    Who created the invoice?

21  A    The secretary of finance.

22  Q    Were you involved in creating an invoice for that

23  payment?

24  A    I gave the order.

25  Q    Why did you give instructions for a receipt?

VILLARREAL – DIRECT – MS. REID                1157

1   A    Because I was given the order that it should be paid.

2   Q    When you managed the money for the state of Coahuila, did

3   you generally have to keep track of where the money went?

4   A    Yes.  The accounting has to be done for the accounts

5   payable.  The invoices are scanned into a system and then

6   filed.

7   Q    Generally, on other occasions when you had invoices for

8   things that you bought legitimately for the state of Coahuila,

9   what did you do with the invoices?

10  A    Well, they are scanned into a process and then they are

11  filed.  And they are to be reviewed at the end of the term or

12  when the term is again of the same Government.

13  Q    In this case, did you file digitally, scan in and file,

14  the invoice you created for the payment to El Universal on

15  behalf of Garcia Luna?

16  A    No.

17  Q    Why not?

18  A    The instruction was to not file it.

19  Q    Did you keep the invoice somewhere?

20  A    Yes.

21  Q    Where did you keep it?

22  A    All the payments that would not be consistent with the

23  accounting, I would keep them in a.  Box all the payments for

24  the public works for services, any payment that was requested

25  to be made immediately, anything that I thought could be

VILLARREAL – DIRECT – MS. REID          1158

1   harmful for the governor I stored in a separate box.

2   Q    Did that include receipts and payments for the kickback

3   scheme that you told us about earlier?

4   A    That's correct.

5   Q    I would like to now show you what is marked as Government

6   Exhibit 440A.  I showed it to defense earlier.

7            May I approach, your Honor?

8            THE COURT:  Yes.

9   Q    Do you recognize that?

10  A    It is an invoice to be paid from the secretary of

11  finance.

12  Q    Is this the invoice that you just told us about related

13  to the payment to El Universal?

14  A    That's correct.

15  Q    Did you keep this in the manner you just described in the

16  box?

17  A    That's correct.

18  Q    How is that receipt here today?

19  A    I kept the invoices at my house, and the day I came to

20  the United States I brought all of those invoices and a server

21  with me.

22           MS. REID:  Your Honor, I ask that Government Exhibit

23  440A be admitted into evidence.

24           MS. GOTLIB:  Subject to our brief objection, your

25  Honor.

VILLARREAL - DIRECT - MS. REID          1159

1    THE COURT:  Okay.  Received over objection.

2          (Government Exhibit 440A, was received in evidence.)

3    MS. REID:  If I could, your Honor, I have a scanned

4    in one, it's Government Exhibit 440.  I ask that be moved in

5    as well.

6          THE COURT:  Okay.

7          (Government Exhibit 440, was received in evidence.)

8    BY MS. REID:

9    Q    If we could just look at this.  Can you walk us through

10   what we see on the screen here under, I think it says,

11   beneficiary, what does that say?

12   A    So the beneficiary is the person who is going to be paid.

13   And it says El Universal National Journalist Company SADECV.

14   Q    Under consepto, can you tell us what that section says?

15   A    Publicity campaign to rescue tourism 2009.

16   Q    To be clear, was this a receipt for a payment for a

17   tourism campaign?

18   A    No.

19   Q    Why does it say that?

20   A    Well, because it was -- I knew who the payment was for

21   and that entity that never happened.

22   Q    Was this a receipt for the payment on behalf of Genaro

23   Garcia Luna?

24   A    A favor that Mr. Montanez asked that we pay El Universal.

25   Q    What was the amount of the payment?

VILLARREAL – DIRECT – MS. REID                 1160

1   A     10 million pesos.

2   Q     If it was 10 million, why does it say 11,500,000?

3   A     Because the 1.5 million reflected taxes in Mexico.

4   Q     What is the date of this?

5   A     June 24, 2009.

6   Q     I thought you said earlier that the arrangement was for a

7   $25 million monthly payment?

8   A     Pesos.

9   Q     Sorry, pesos.  Why did you pay 10 million pesos?

10  A     My guess is that it was a favor just to pay the

11  remainder.

12  Q     I want to -- was that the amount that you were asked to

13  pay?

14  A     That's correct.

15  Q     I want to just go to the last page of this exhibit.  On

16  the last page -- actually, if you could hold it up for us

17  also.  Is there a Post-It note on the last page?

18  A     Yes.

19  Q     What does that say?

20  A     Do not file.  Thank you.

21  Q     Why does it say that?

22  A     So it wouldn't be scanned.

23  Q     Thank you.  You can take the exhibit down.

24        Did you ever go to an apartment of Genaro Garcia

25  Luna's in Mexico City?

VILLARREAL - DIRECT - MS. REID                1161

1    A      One time.

2    Q      When was that?

3    A      In 2010.

4    Q      Where in Mexico City was the apartment?

5    A      In Santa Fe.

6    Q      Can you describe the apartment for us?

7    A      It was a luxury apartment.  It was on the last floor, it

8    was the penthouse.

9    Q      Anything else you noticed about it?

10   A      It was a beautiful apartment.  It was open.  It had a

11   big, a terrace, a very big terrace.

12   Q      Are you familiar with the Santa Fe neighborhood?

13   A      Yes.

14   Q      What kind of neighborhood is that?

15   A      It's the best place in the entire city in all of Mexico

16   City.

17   Q      How many people were at the apartment?

18   A      About 30.

19   Q      At the beginning of your time in the apartment, was there

20   a business meeting?

21   A      A talk.

22   Q      How long did you stay in the apartment?

23   A      Late into the night and a few hours in the middle of the

24   night.

25   Q      Was there any food or drink?

VILLARREAL – DIRECT – MS. REID                   1162

1    A    Yes.

2    Q    Was the food catered?  Homemade?

3    A    No, it was prepared there.

4    Q    Was there any other entertainment?

5              MS. GOTLIB:  Your Honor, objection.  Sidebar.

6              THE COURT:  Okay.

7              (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SIDEBAR CONFERENCE                    1163

1              (Sidebar conference.)

2              MS. GOTLIB:  Thank you, your Honor.  I anticipate

3    that what the Government is trying to elicit is that according

4    to this witness that at this party there were prostitutes.  I

5    believe that is highly prejudicial.  We will also note that it

6    is my understanding that this witness will also concede,

7    according to him, which doesn't make much sense, that the

8    prostitutes were there, though --

9              THE COURT:  Hang on.

10             No prostitutes, right?

11             MS. REID:  That's fine, your Honor.  That's fine.

12             THE COURT:  You were planning to let in the

13   prostitutes?

14             MS. REID:  As a way of spending money that came out

15   on cross-examination.

16             THE COURT:  No, no, no.  This and this, right.

17             MS. REID:  That's fine.

18             I want to explain to the Court, I did some leading

19   there because some of his business dealings related to

20   kickbacks which we're not getting into it.

21             THE COURT:  She's not objecting to leading; she's

22   objecting to prostitutes.

23             MS. KOMATIREDDY:  That's my fault.

24             THE COURT:  I'm not blaming anyone, but the whole

25   Government.

SIDEBAR CONFERENCE                    1164

1          MS. KOMATIREDDY:  I will say, as part of their money

2    argument -- cooperators what they spent money on.

3          THE COURT:  Cooperators are different than

4    defendants.

5          MS. KOMATIREDDY:  Fair enough.

6          (End of sidebar conference.)

7          (Continued on the next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court.)

2   BY MS. REID:

3   Q    Mr. Villarreal, while you were at this apartment, did you

4   ever speak with Genaro Garcia Luna directly about the payments

5   to El Universal?

6   A    It was during the meeting that he said something to

7   Professor Moreira, not about the payments, but he thanked him.

8   He said everything was all good, and everything was working as

9   it should.

10  Q    What did that mean to you?

11  A    That the payments were carried out as they should have

12  been.

13  Q    Was there ever a time that you went to a residence of

14  Genaro Garcia Luna anywhere else in Mexico?

15  A    Humberto lived in Cuernavaca, he had a house in

16  Cuernavaca.  And this one day I went to see him.  He asked me

17  to go with him.  He asked me to drop him off at Mr. Garcia

18  Luna house.

19  Q    Where in Cuernavaca was that?

20  A    If I remember correctly, it was called Jukitep (ph),

21  something like that.

22  Q    Why did you -- why did the governor go there?

23  A    He was going to give him a helicopter ride to Mexico

24  City.  He was going to talk with him.

25  Q    Who was going to give who a helicopter ride?

VILLARREAL – DIRECT – MS. REID                1166

1    A    Mr. Garcia Luna was going to give Humberto a ride.

2    Q    What did the house look like?

3    A    Well, it was large.  It was like a hacienda kind of a

4    house.

5    Q    What does that mean?

6    A    A really big house.

7    Q    What else about it did you notice?

8    A    Well, it was a very short amount of time.  We stopped by,

9    we went through security.  We were on a patio.  We waited for

10   him to come out and he came out.  Humberto went off with him

11   and that was it.

12   Q    What color was the house?

13   A    If I remember correctly, it was white.

14   Q    Did it have a swimming pool?

15   A    I think so.  But we weren't there for more than ten

16   minutes.

17   Q    Where did the helicopter take off from?

18   A    It was a very large patio in the back.

19   Q    During your time in the Coahuila government, did you ever

20   meet someone named Edgar Veytia?

21   A    As far as I know, he was the Attorney General and then I

22   knew Mr. Sandoval, who the governor of Nayarit, that's who I

23   knew, Sandoval.

24   Q    What is Nayarit?

25   A    Another one of the 32 states in the country.

VILLARREAL - DIRECT - MS. REID          1167

1   Q   Where was Edgar Veytia, as far as you know, the Attorney

2   General?

3   A   Nayarit.

4   Q   When is the last time you saw or spoke to Edgar Veytia?

5   A   Well, I met Mr. Sandoval in 2011.

6   Q   Do you believe you've seen or spoken to Mr. Edgar Veytia

7   since then?

8   A   No.

9   Q   You said you were secretary of finance for Coahuila until

10  2010, what did you do next?

11  A   I was Humberto's consultant as president of the P.R.I

12  party.

13  Q   What is the P.R.I. party?

14  A   It is the party that has most been in office in Mexico.

15  Q   Is it a political party?

16  A   That's correct.

17  Q   Are you also familiar with the political party called the

18  P.A.N.?

19  A   Yes.

20          THE COURT:  Wait, wait.  Do you want him to explain

21  how he knows that?  Let's put another question.

22          He said he's familiar, now what do you want to know?

23  BY MS. REID:

24  Q   Okay, in 2012 what party won the election?

25  A   P.R.I.

VILLARREAL - DIRECT - MS. REID                1168

1   Q    When the presidency changes parties, what happens to the

2   cabinet in Mexico?

3   A    A whole new team comes in to work for the president.

4   Q    Are cabinet secretaries changed?

5   A    Most of them change, 100 percent.

6   Q    What party was Calderon?

7   A    P.A.N.

8   Q    What party was Fox?

9   A    P.A.N.

10  Q    What party was Genaro Garcia Luna associated with?

11  A    With the P.A.N.

12  Q    Earlier you told us about Governor Moreira's efforts to

13  help other politicians, why did Governor Moreira want to help

14  Genaro Garcia Luna with the favor you've told us about?

15          MS. GOTLIB:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q    At some point did you learn that you were under

18  investigation in the United States for your crimes?

19  A    Yes.

20  Q    Approximately when was that?

21  A    In 2012.

22  Q    Earlier you testified about efforts you took to conceal

23  the illegal money you had taken in kickbacks.  Were you

24  concerned about being arrested for your crimes?

25  A    Yes.

VILLARREAL – DIRECT – MS. REID                1169

1    Q     What did you do when you learned that you were being

2    investigated in the United States?

3    A     I turned myself in.

4    Q     When you came to the U.S., where did you turn yourself

5    ins?

6    A     In El Paso, Texas.

7    Q     Who did you turn yourself into?

8    A     To the district of San Antonio.

9    Q     Did you bring anything with you when you came to the

10   United States to turn yourself in?

11   A     Yes.  I brought a server with all the information on it,

12   and I brought the boxes that had the invoices that I stored

13   in.

14   Q     Did that include the invoice we looked at earlier

15   Government Exhibit 440 and 440A?

16   A     That's right.

17   Q     You said you turned yourself into to the District of San

18   Antonio.  Were you arrested by Government authorities in the

19   U.S.?

20   A     Yes.

21   Q     After you were arrested, were you in jail for a while?

22   A     Yes.

23   Q     At some point did you begin meeting with members of the

24   U.S. Government?

25   A     Yes.

VILLARREAL – DIRECT – MS. REID          1170

1    Q     Were you truthful in those meetings?

2    A     Yes.

3    Q     At some point were you released on bail?

4    A     Yes.

5    Q     About how long after you turned yourself in?

6    A     Eight months.

7    Q     Did you ultimately plead guilty with a cooperation

8    agreement with the Government?

9    A     That's right.

10   Q     Did you plead guilty in two different districts?

11   A     Yes.

12   Q     What crimes did you plead guilty to?

13   A     Conspiracy to launder money.

14   Q     What is the maximum term of imprisonment you're facing on

15   that charge?

16   A     From what I understand, it's 20 years.

17   Q     Did you also forfeit property that you obtained with

18   illegal money?

19   A     That's right.

20   Q     What kind of property?

21   A     A storage, some apartments, an apartment that I had on

22   the beach.

23   Q     Did you forfeit bank accounts?

24   A     Yes, that's right.

25   Q     Under your cooperation agreement, what was your

VILLARREAL - DIRECT - MS. REID          1171

1    understanding of what you have to do?

2    A    The only obligation that I had was to talk about what I

3    talked about when I came to the United States and to tell the

4    truth.

5    Q    Have you previously testified against other public

6    officials in Mexico?

7    A    Yes.

8    Q    What, if anything, are you hoping to receive with your

9    cooperation agreement or as a result of that agreement?

10   A    A reduction of my sentence.

11   Q    Who decides your sentence?

12   A    The judge.

13   Q    Has anyone promised you that you will get a reduction in

14   your sentence?

15   A    No.

16   Q    Does any part of your cooperation agreement depend on the

17   outcome of this trial?

18   A    No.

19   Q    What does it depend on?

20   A    The judge.

21   Q    What happens if you lie here today?

22   A    I'd be committing perjury.

23             MS. REID:  One moment.

24             (Continued on next page.)

25

VILLARREAL - CROSS - MS. GOTLIB                    1172

1          MS. REID:  No further questions.

2          THE COURT:  Cross-examination.

3          MS. GOTLIB:  Thank you, Your Honor.

4    CROSS-EXAMINATION

5    BY MS. GOTLIB:

6    Q    Good afternoon, Mr. Villarreal.  I'm going to be asking

7    you some questions.

8    A    Of course.  Good afternoon.

9    Q    I'm going to apologize ahead of time.  I have terrible

10   pronunciation for Spanish words, so I apologize to everyone

11   ahead of time.

12   A    No worries.

13   Q    I would ask that you respond to all of my questions with

14   a simple yes or no answer.

15   A    Okay.

16   Q    And if you feel that you're unable to do that, just let

17   me know and I can rephrase it or just keep moving on.  So just

18   let me know if that's a problem.

19   A    Okay.

20   Q    And if at any time you don't understand a question that I

21   ask, please just say so, and I will try to make it clearer for

22   you.

23   A    Perfect.

24   Q    Thank you.

25          Now, you testified that you turned yourself in at

VILLARREAL - CROSS - MS. GOTLIB          1173

1    the U.S. border, I believe, February of 2014, correct.

2    A     Yes.

3    Q     You turned yourself in because you knew that there were

4    criminal charges against you in the United States, correct?

5    A     Yes.

6    Q     But before turning yourself in at the U.S. border, you

7    were arrested and charged with crimes in Mexico, correct?

8    A     Yes.

9    Q     And in Mexico, you were charged with making false

10   documents to obtain loans; is that right?

11   A     Yes.

12   Q     Very serious charges, fair to say?

13   A     That's right.

14         May I say something?

15   Q     I'm going to keep asking the questions, but thank you.

16         And if you're convicted of these crimes in Mexico,

17   you could serve 15 years in a Mexican prison, correct.

18   A     Yes.

19   Q     And you were released on bond in Mexico, correct?

20   A     Yes.

21   Q     You served one day in a Mexican prison before being

22   released on a bond, right?

23   A     That's right.

24   Q     And part of your bond, you had to promise to a Mexican

25   judge that you would return to answer the charges against you

VILLARREAL – CROSS – MS. GOTLIB          1174

1   in Mexico, correct?

2   A    That's right.

3   Q    But instead, the very next day after being released, you

4   turned yourself in to the U.S. border; is that correct?

5   A    Yes.

6   Q    And you were arrested in the United  States?

7   A    Uh-huh.

8   Q    Now, you testified that you had been charged and you pled

9   guilty in two  different districts to a money laundering

10  conspiracy; is that accurate?

11  A    That's right.

12  Q    But that's not all that you pled guilty to, is it?

13  A    I don't understand your question.

14  Q    Sure.

15        In addition to pleading guilty to a money laundering

16  conspiracy, didn't you plead guilty to conspiracy to transport

17  foreign money –- excuse me.  Withdrawn.

18        Didn't you plead guilty to conspiracy to transport

19  stolen money and foreign commerce, a separate crime from money

20  laundering conspiracy.

21  A    That's right.

22  Q    You forgot about that one?

23  A    No.

24  Q    You just didn't say it when asked what you had pled

25  guilty to earlier?

VILLARREAL – CROSS – MS. GOTLIB          1175

1    A    That's right.

2    Q    Okay.  And now that crime has its own separate punishment

3    that you can be subjected to, correct?

4    A    I imagine so.

5    Q    An additional five years in prison on top of the 20 years

6    you're facing?

7    A    Yes.

8    Q    Excuse me.  I didn't mean to interrupt you.

9    A    No, I imagine if you're saying that, that that is

10   correct.

11   Q    Well, sir, I appreciate that, but I need it to be coming

12   from you, not from me.

13        If I show you a document to help refresh your

14   recollection, would that assist you.

15   A    No, my question was about if they were crimes that would

16   stack.  I'm not an attorney, and so I wasn't sure.

17   Q    Understood.  Understood.  Yes.  And I'm happy to show you

18   your plea agreement --

19        THE COURT:  Ms. Gotlib, he's quite willing to accept

20   that you tell him, and you have, that they're potentially

21   consecutive.

22        MS. GOTLIB:  Thank you, Your Honor.  Moving on.

23   Q    And in addition to a potential 25 years, the judge who

24   sentences you could impose a fine of up to approximately $

25   66 million; is that correct?

VILLARREAL – CROSS – MS. GOTLIB                1176

1    A    I don't have knowledge of that fine.

2    Q    Are you aware that you could be fined in connection with

3    your sentencing?

4    A    Yes.

5    Q    And that your fine could be millions and millions of

6    dollars?

7    A    Yes.

8    Q    And you testified that you made $2.5 million  in

9    connection with the crimes that you committed; is that

10   correct?

11   A    Yes.

12   Q    And in connection with pleading guilty, you also, as you

13   told us, agreed to forfeit certain bank account, money in a

14   bank account, as well as certain properties, correct?

15   A    That's right.

16   Q    And I believe that you testified that you forfeited

17   various apartments; is that correct?

18   A    Several properties, yes.

19   Q    Several properties.

20        Fair to say you forfeited two apartment complexes.

21   A    Yes.

22   Q    And one resort and a CVS store?

23   A    That's right.

24   Q    A storage facility?

25   A    That's right.

VILLARREAL - CROSS - MS. GOTLIB          1177

1    Q     Two strip malls?

2    A     Uh-huh.

3    Q     And a Mercedes McLaren ?

4    A     That's right.

5    Q     And you acquired all of those things with money that you

6    embezzled from the Mexican government and laundered to the

7    United States ?

8    A     Yes.  No -- yes, that's right.

9    Q     Thank you.

10         And when you turned yourself in at the U.S. border,

11   they recovered $60,000 in cash and a gun from your vehicle; is

12   that correct.

13   A     That's right.

14   Q     And after you are sentenced here, you're going to be

15   deported to Mexico, correct?

16   A     If the process is that, then yes, I think that's right.

17   Q     The only way to avoid that is if the government

18   intervenes on your behalf?

19   A     It's if the immigration judge allows me to stay here.

20   Q     I see.

21         Now, I believe you testified that you were released

22   after serving  eight months in a U.S. prison; is that correct.

23   A     That's right.

24   Q     So you were released in approximately, by my calculation,

25   in late 2014?

VILLARREAL – CROSS – MS. GOTLIB          1178

1   A     That's correct.

2   Q     And since 2014 until present time, have you resided in

3   the United States?

4   A     That's right.

5   Q     And you have been able to do that because the government

6   agreed to grant you something called deferred action, correct?

7   A     I don't understand that term, "deferred action."

8   Q     Are you a citizen?

9   A     No.

10  Q     Have you applied for citizenship?

11  A     No.

12  Q     Have you applied for a visa?

13  A     No.

14  Q     What is your understanding of how you're able to reside

15  in the United States for almost a decade without making any --

16  without applying to become a citizen or having a visa?

17  A     I don't know if it's a visa, but we did request asylum.

18  Q     You requested asylum.

19        And did the government support that application.

20  A     No.

21  Q     No.

22        But you're still here.

23  A     For now.

24  Q     Have you discussed -- are you familiar with the phrase,

25  "S visa"?

VILLARREAL – CROSS – MS. GOTLIB                1179

1    A    Vaguely.

2    Q    And that's something that the government has previously

3    told you they would apply for on your behalf after your

4    sentence, correct?

5    A    No.

6    Q    You have not discussed an S visa with the government at

7    any point?

8    A    No.

9    Q    So your testimony is that you have just been allowed to

10   live here for almost a decade and you're not sure how, why

11   that is?

12   A    It's not that I don't know how.  I started the

13   immigration process when I came here.  And after that, up

14   until now, it's -- it's in process.

15   Q    So I believe earlier I had asked you if you had applied

16   for citizenship, and I believe that your response was no,

17   correct?

18   A    That's correct.

19   Q    Thank you.

20        I believe that I asked had you applied for a visa

21   and your response was no, correct.

22   A    Well, my answer to you was, if asylum is a visa, then

23   correct, yes.  If it's not a visa, then no.

24   Q    Understood.

25        But my understanding was that asylum had not been

VILLARREAL – CROSS – MS. GOTLIB          1180

1    granted for you.

2    A    No, not yet.

3    Q    And are you here alone or is your family here with you?

4    A    My family is with me.

5    Q    And did the government help get them to America?

6    A    They came over with me.

7    Q    They came over with you?

8         And -- sorry.

9    A    Yes.  As I was about to cross, they crossed before me.

10        MS. GOTLIB:  I'm sorry.  I just didn't catch that.

11   Would you mind repeating it.

12        THE INTERPRETER:  Yes.

13   A    As I was about to cross, they crossed before me.

14   Q    Because they weren't in the same car that you were in,

15   correct?

16   A    No.

17   Q    Okay.  Are you hopeful that, after you're done testifying

18   here, the government will assist in your ability to stay in

19   the United States?

20   A    I'd like to live my life  a little better.  I'd like to

21   be able to stay here.  But nobody in the government,

22   San Antonio government or here, has ever said that they will

23   help me with my immigration process.

24        MS. GOTLIB:  May I have one minute, Your Honor?

25        THE COURT:  Yes.

VILLARREAL - CROSS - MS. GOTLIB          1181

1        MS. GOTLIB:  Thank you.

2   Q    Earlier I believe you said you were not familiar with the

3   term "deferred action immigration status."

4        May I show --

5        THE COURT:  Wait, wait, wait.  We didn't get an

6   answer.

7   A    I don't understand very much about immigration matters,

8   and I'm not familiar with the term that you are using.

9   Possibly it has another meaning in a different sense, but not

10  as deferred action.

11  Q    And your understanding is, your immigration status and

12  whether or not you can stay here has nothing to do with the

13  government and whether they will support that, correct?

14  A    We have a lawyer, we hired a lawyer, and he's the one who

15  is handling our immigration cases.

16       MS. GOTLIB:  Sorry, just one minute, Your Honor.

17  Q    Okay.  And this lawyer, you spoke with him before you

18  turned yourself in to the United States at the border,

19  correct?

20  A    I spoke to him on the phone, yes.

21  Q    And he explained the --

22       MS. REID:  Objection, Your Honor.

23       MS. GOTLIB:  I'm willing to proffer I'm not going to

24  ask anything about the substance of the conversation.

25       THE COURT:  Go ahead.

VILLARREAL – CROSS – MS. GOTLIB          1182

1          Tell the witness to try to answer the questions yes

2     or no.

3          Go ahead with your question.

4          MS. GOTLIB:  Thank you.

5     Q    This isn't your first time testifying as a government

6     witness, is it?

7     A    No.

8     Q    I will come back to that.

9          I believe you testified on direct that

10    Mr. Garcia Luna approached yourself and your boss to ask for

11    assistance with El Universal; is that correct.

12    A    Yes.

13    Q    And one of the reasons that he was concerned, according

14    to you, was because a story had been reported about an alleged

15    detainment or kidnapping of him by drug traffickers, correct?

16    A    That's correct.

17    Q    Now, in the nine years that you have been cooperating

18    with the government, you have met with them numerous times; is

19    that fair?

20    A    Yes.

21    Q    More than 50 times?

22    A    I haven't counted them, but it has been many times.

23    Q    I have.  61.

24         Does that sound right to you.

25    A    Possibly.

VILLARREAL – CROSS – MS. GOTLIB          1183

1   Q    And those meetings, they were many hours at a time, some

2   of them, correct?

3   A    That's correct.

4   Q    So you have met with the government and spoken with them

5   for hours on end?

6   A    That's correct.

7   Q    Okay.  Now, the first time when you initially referenced

8   Mr. Garcia Luna to the government, that was in May of 2014

9   after having met with them for 25 times; does that sound

10  accurate to you?

11  A    It would be hard to give you a number.  It was a long,

12  long time ago.  I did meet with the government in 2014, and we

13  did talk about that topic.

14  Q    But fair to say that if I were to tell you that you had

15  25 meetings with them before you ever mentioned

16  Mr. Garcia Luna, would that -- I understand you don't know the

17  exact number, but does that sound likely to you?

18  A    Yes.

19  Q    If it would be helpful, I can read the dates for you,

20  but I'm hearing --

21            THE COURT:  No, he is accepting it.

22            Ms. Gotlib, at a convenient time, afternoon break.

23            MS. GOTLIB:  Sure.  Now would be fine, Your Honor.

24            THE COURT:  You sure?

25            MS. GOTLIB:  Yup.

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

VILLARREAL - CROSS - MS. GOTLIB          1184

1          THE COURT:  Ladies and gentlemen, 15 minutes.

2   Please do not talk about the case.

3          (Jury exits.)

4          THE COURT:  Okay.  Recess.  3:30.

5          MS. KOMATIREDDY:  Thank you, Judge.

6          (Recess taken.)

7          THE COURT:  Let's have the witness and the jury,

8   please.

9          MS. KOMATIREDDY:  Judge, we're just trying to figure

10  out some witness logistics.  If we were to start the

11  ambassador today, his direct is only 15 minutes, ten or

12  15 minutes.

13         THE COURT:  If we have time, fine.

14         MS. KOMATIREDDY:   And then would it be okay to

15  break early so the cross is first thing in the morning?  Is

16  that okay?  I don't know if I could take it to 4:30, is my

17  point.  I don't want to stall unnecessarily.

18         THE COURT:  Yes.  I mean, if we finish this witness,

19  then start the ambassador.

20         MS. KOMATIREDDY:  Yeah.

21         THE COURT:  Maybe you will finish him, maybe you

22  won't.  But we will get to cross today and the defense will

23  have anything else.

24         MS. KOMATIREDDY:  Thank you, Judge.

25         THE COURT:  Where is our witness?

VILLARREAL – CROSS – MS. GOTLIB          1185

1           I guess I will ask the government again.

2           Where is our witness.

3           MS. REID:  I'm sorry, Your Honor.  They're getting

4    him.  We just clarified that.

5           (Jury enters.)

6           THE COURT:  Everyone be seated.  Let's continue

7    cross-examination.

8           MS. GOTLIB:  Thank you, Your Honor.

9    CROSS-EXAMINATION (Continuing)

10   BY MS. GOTLIB:

11   Q    Thank you.  Just a few more questions.  We're almost

12   done.

13          And when I refer to "Mr. Moreira," I'm going to

14   refer to him as "your boss" or "the governor," because I'm

15   afraid that I'm not saying his name correctly, so if that's

16   okay with you.

17   A    Perfect.

18   Q    Thank you.

19          So you testified that Mr. Garcia Luna came to you

20   and he came to your boss very, very upset, asking for help; is

21   that true.

22   A    Yes, he wasn't upset; he just asked for support to be

23   able to do the things.

24   Q    He asked for support to be able to do the things.

25          And didn't he tell you that he was angry about these

1   false stories that were being reported about him.

2   A     The rumors that were coming out, yes.

3   Q     The rumors that were coming out, and that the press was

4   reporting about him?

5   A     Some, some people in the press, yes.

6   Q     And he was adamant that those rumors were false, correct?

7   A     That he insisted -- that he was adamant?

8   Q     He was adamant that those rumors about him were false?

9   A     That's right.

10             MS. GOTLIB:  No further questions, Your Honor.

11             THE COURT:  All right.

12             Any redirect.

13             MS. REID:  Just briefly, Your Honor.

14   REDIRECT EXAMINATION

15   REDIRECT EXAMINATION

16   BY MS. REID:

17   Q     Mr. Villarreal, you were asked several questions on cross

18   about your immigration status and how you are currently here

19   in the United States.

20             Do you currently have a pending criminal case in the

21   United States .

22   A     That's right.

23   Q     You were also -- you testified also briefly about an

24   asylum case you had; is that right?

25   A     That's right.

VILLARREAL - REDIRECT - MS. REID          1187

1    Q    And did you testify against other Mexican public

2    officials previously?

3    A    That's right.

4    Q    You were also asked on cross about meetings you had with

5    the government.

6         Do you remember those questions.

7    A    I didn't understand the question clearly.  Sorry.

8    Q    That's okay.  Let me phrase it differently.

9         You were asked on cross-examination about times that

10   you met with the government.

11        When you met with the government, did you talk about

12   many topics.

13   A    Yes.

14   Q    And did you talk about other government officials and

15   their crimes?

16   A    Well, yes, about everything that had happened, yes.

17   Q    Did that include some of the other public officials that

18   you've testified against?

19   A    That's right.

20   Q    And back in 2014, the same year you turned yourself in to

21   the U.S., didn't you speak about Genaro  Garcia Luna at

22   length?

23   A    Yes.

24        MS. REID:  No further questions.

25        THE COURT:  All right.  You may step down.

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1188

1              THE WITNESS:  Yes, Your Honor.  Thank you.

2              THE COURT:  Government's next witness.

3              MS. KOMATIREDDY:  The government calls

4    Earl Anthony Wayne.

5              (Witness takes the witness stand.)

6    **EARL ANTHONY WAYNE**, called as a witness, having been first

7    duly sworn/affirmed, was examined and testified first duly

8    sworn/affirmed:

9              THE COURTROOM DEPUTY:  Please be seated.

10             Please state and spell your name for the court

11   reporter.

12             THE WITNESS:  Earl Anthony Wayne, W-A-Y-N-E.

13             MS. KOMATIREDDY:  May I inquire, Your Honor?

14             THE COURT:  You may if the witness can find you.

15             MS. KOMATIREDDY:  Ambassador.

16             THE COURT:  Okay.  Proceed.

17   DIRECT EXAMINATION

18   DIRECT EXAMINATION

19   BY MS. KOMATIREDDY:

20   Q    Mr. Wayne, what is your current profession?

21   A    I am currently a professor at American University and a

22   public policy fellow at the Woodrow  Wilson Center, Mexico

23   Institute.

24   Q    Did you previously serve in Mexico?

25   A    I did.  I was U.S. ambassador in Mexico from

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1189

1    September 2011 until the end of July 2015.

2    Q     Did you have other roles in the foreign service?

3    A     I did.  I was in the foreign service from 1975 until 2015

4    .

5    Q     Can you name some of the countries that you served in?

6    A     Sure.

7              I was ambassador in Argentina.  I had an

8    ambassadorial ranked position in Afghanistan.  I was assistant

9    secretary of state for economic and business affairs.  I was

10   the principal deputy assistant secretary of state for Europe.

11   I was deputy chief of mission at our Mission to the European

12   Union in Brussels,  worked at the National Security Council,

13   worked for the secretary of state,  served in Paris and Rabat,

14   Morocco, did other jobs.

15   Q     Fair to say you were a career diplomat?

16   A     Yes.

17   Q     What is the core function of a diplomat?

18   A     Diplomats work to manage relations between nations.  They

19   work to promote the interests of their country in other

20   countries and in international organizations.  They work to

21   get to know people in other countries, at times to influence

22   them or give them messages from their government.  They

23   collect information and assessments and share that back with

24   their capitals.

25   Q     Does that include meeting people?

EARL ANTHONY WAYNE - DIRECT - MS. KOMATIREDDY 1190

1  A    It certainly does.  That's a very core part of being a
2  diplomat.
3  Q    What does it mean when you meet someone?
4  A    It means that you believe that they have a role or they
5  would have information that would help you better understand
6  the country where you're working, or that they would have a
7  role where you would want to deliver a message from your
8  government or perhaps to participate in cooperation and
9  collaboration with them because it's in the interest of your
10 government to do so.
11 Q    Does meeting with someone mean that you vouch for them?
12 A    It does not.
13 Q    Did you ever meet with the defendant, Genaro Garcia Luna?
14 A    I did.  A number of times.
15 Q    In what capacity?
16 A    Well, I first called on him after I presented my
17 credentials to the president of Mexico because he was minister
18 of public security.  And he was one of the key members of the
19 cabinet with whom we worked.
20 Q    Approximately how many times did you meet with him?
21 A    Ten to 20 times for sure.
22 Q    And what was the general time frame of these meetings?
23 A    It was between September 2011 and the end of the term of
24 President Calderon, which was December 1st, 2012 .
25 Q    Did you hear him speak during these meetings?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1191

1    A    I did, yes.

2    Q    And I don't mean to be rude, but was there anything

3    distinctive about the way that he spoke?

4    A    He was difficult to understand at times.  It seemed like

5    he was mumbling, but he may have had a stutter.  My Spanish

6    was far from excellent, but it was hard to understand at those

7    times.  And he, in fact, I remember at one point, said:  I

8    know my Spanish might not be easy to understand so we have an

9    interpreter here to help.

10   Q    Did he have the ability to control this mumble or

11   stutter?

12   A    I heard him give public speeches, which I could  -- in

13   Spanish, which I could understand very clearly.

14   Q    Did you see others in meetings with him on a regular

15   basis?

16   A    Yes.  We would often meet, sometimes the embassy team,

17   representatives of different agencies and sections and the

18   leadership of the federal police.  And then when I brought

19   visitors to come to see him from the United States, he would

20   often have his full -- a large number of his team members

21   there.

22   Q    I'm going to show you a few photos.

23        MS. KOMATIREDDY:  If I could please have for the

24   witness and the jury what is in evidence as Government

25   Exhibit  1.

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1192

1   Q    Do you recognize the individual in this photograph?

2   A    I do.  That is Mr. Garcia Luna.

3        MS. KOMATIREDDY:  If we could please have Government

4   Exhibit 2, which is in evidence.

5   Q    Do you recognize the individual in this photograph?

6   A    Yes, I do.  He was a senior official with the federal

7   police and one of the minister's deputy's primary assistants.

8   Q    You saw him in those meetings?

9   A    Yes, I did.  And at public events.

10       MS. KOMATIREDDY:  If we could please have Government

11  Exhibit 3, which is in evidence.

12  Q    Do you recognize the individual in this photograph?

13  A    Yes, I do.  He was another senior member of the federal

14  police who worked very closely with our DEA.

15  Q    And did you also see him in meetings with Mr. Garcia Luna

16  and with the other individual in Government Exhibit 2?

17  A    I did.  He was in bigger meetings and sometimes in public

18  settings also, public events.

19  Q    With respect to the individual depicted in Government

20  Exhibit 3, was there anything distinctive about his

21  appearance?

22  A    Well, he had two -- he had large areas of darker skin on

23  both sides of his face, one of which you can see in this

24  photo.

25  Q    You mentioned having meetings with Mr. Garcia  Luna when

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1193

1    other U.S. officials would come to visit in Mexico.

2         Were you present during those meetings when other

3    U.S. officials were hosted by Mr. Garcia Luna in Mexico.

4    A    I was.

5    Q    Can you describe generally the types of officials who

6    would visit?

7    A    Well, the officials were generally members of the justice

8    and law enforcement community who were coming to discuss

9    progress we were making under the Merida Initiative, which was

10   the U.S. Mexico initiative for dealing with public security

11   issues.  And he would often -- he and his team would give an

12   update as to what the federal police was doing.

13   Q    What did the typ- -- what did the defendant,

14   Mr. Garcia Luna, typically do when he hosted these

15   delegations?

16   A    He would -- we would have a large meeting, a meeting in a

17   large conference room.  He would make some initial remarks.

18   He would then at times ask other members of his team to talk

19   about certain topics.  There would then be a back-and-forth.

20        Depending on the makeup of the visiting U.S.

21   delegation, he might take them to see some other facilities at

22   the federal police headquarters, particularly their national

23   intelligence center, which had been constructed but was still

24   being added to, I guess, especially in the -- it was gathering

25   intelligence and information.  And so he would often show

EARL ANTHONY WAYNE - DIRECT - MS. KOMATIREDDY 1194

1    people that very impressive facility.

2    Q    Did you go to that facility?

3    A    I did.

4    Q    Can you describe what it looked like?

5    A    It was built into the ground.  It was circular.  You

6    would enter it in a wide, flat path that sort of circled down

7    into the ground following a curve and went down to what was an

8    operation center where there were many different operations

9    going on and many different computer terminals.  And there

10   were big screens up on the walls where they could display

11   different things.

12   Q    Did you visit multiple times?

13   A    I would say I was there at least five times.

14   Q    Did anything stand out to you during those visits?

15   A    Well, there was a lot of activity going on, so there were

16   certain parts of it where people were getting calls and

17   responding to them while we were there visiting, yes.  And

18   there are different parts of the intelligence center were

19   showing different phases of what they were doing, different

20   activities from around the country.

21   Q    You mentioned that one of the things that Mr. Garcia Luna

22   would do is take people on a tour of this intelligence center.

23         Was there anything else.

24   A    Well, later on I remember -- and I -- there was also

25   under construction new science and forensic center at the

EARL ANTHONY WAYNE - DIRECT - MS. KOMATIREDDY 1195

1   police headquarters.  And I certainly remember going on a tour

2   of that when it was being built.

3           And then at times he would also take people down to

4   the federal police training facility in the south of Mexico

5   City.  And I remember particularly flying down with a number

6   of congressmen on some helicopters, Black Hawk helicopters,

7   and going down there and seeing some tactical displays by

8   members of the federal police where they were showing their

9   skills at, you know, going down ropes and working through mock

10  buildings with arms and things to show that they were breaking

11  into a place and having riot control, things like that.

12  Q    You said you attended these visits several times.

13          Did the presentation vary from time to time.

14  A    No, I think they were pretty -- it was pretty standard.

15  He would talk about the different -- the different functions

16  that they were going through.  I mean, he would give an

17  update, so over time there might be some things that have

18  happened that had changed.  But it was very much -- there was

19  a lot of consistency between the presentations.

20  Q    How did that strike you?

21  A    Well, it -- you know, it was a presentation to show the

22  progress they were making and the work that was underway, so I

23  really didn't expect there to be a lot of difference in the

24  matters that were raised and discussed during the period.  I

25  know they were still -- were still working, and they were

EARL ANTHONY WAYNE - DIRECT - MS. KOMATIREDDY 1196

1    still training people at the facility.

2           And I do remember one time meeting being  shown that

3    this was a group of young recruits that had just come in the

4    last year or so and were being trained.  And Mr. Garcia Luna

5    would mention that his ambition was to create a law

6    enforcement force that was as good as the Federal Bureau of

7    Investigation in the United States.

8    Q    And remind us, the time frame for this is 2011  to 2012?

9    A    Yes.  I arrived in September of 2011, and so it was '11

10   and ' 12, yes.

11   Q    Did you ever go to Mr. Garcia  Luna's -- one of

12   Mr. Garcia  Luna's homes?

13   A    I was invited to a dinner at his home, yes, with my wife.

14   Q    Can you tell us what you remember about that home?

15   A    Well, it was a nice home.  Not ostentatious, a nice home.

16   As I remember, it was built with not a lot of land around it.

17   The other houses next to it were fairly close.  And it was

18   multistory.

19           And I went in, we had a nice dinner.  And the one

20   thing that stood out to me was there was a very large

21   saltwater aquarium built into one of the walls.

22   Q    Why did that stand out to you?

23   A    Well, I'd never seen such a big saltwater aquarium in a

24   private home before.

25   Q    Did you see the defendant after he left office?

*Andronikh M. Barna, Official Court Reporter, RPR, CRR*

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1197

1   A    I did see him a few times at receptions and in public

2   events around Mexico City.

3   Q    At these receptions and public events, what kinds of

4   people were there?

5   A    I would say there was a representative group of the

6   political elites of Mexico City, businesspeople, congressmen,

7   officials, former officials, diplomats, a wide range of

8   people.

9   Q    Including officials from the government?

10  A    I think so.

11       MS. KOMATIREDDY:  If I could have a moment,

12  Your Honor?

13  Q    Mr. Wayne, when you described seeing Mr. Garcia Luna at

14  events after he left office, can you give us an approximate

15  time frame of when that was?

16  A    Well, it was into the new administration, and I don't

17  really remember how far into that new administration it was.

18  My -- I don't remember certainly, but I think it was soon

19  after the change of administrations.

20       MS. KOMATIREDDY:  No further questions.

21       THE COURT:  All right.  Ladies and gentlemen, we are

22  going to break now for various reasons and send you home a

23  little bit early.

24       Please remember not to talk about the case amongst

25  yourselves, stay away from any media coverage of the case.

EARL ANTHONY WAYNE – DIRECT – MS. KOMATIREDDY 1198

1    Do not do any research on Google or any other search

2 engine.

3    And do not place anything on Twitter or Facebook

4 or –– what other?  Like Instagram or anything else that you've

5 got.  Please just put it out of your mind.

6    We will see you tomorrow morning at 9:30.

7    (Jury exits.)

8    THE COURT:  Okay.  9:30 tomorrow morning.  Thank you

9 very much.  We are adjourned.

10    (Matter adjourned to Tuesday, February 7, 2023 at

11 9:30 a.m.)

1199

```
1              I N D E X

2    WITNESS                              PAGE

3    FRANCISCO CANEDO ZAVALETA
4
     CROSS-EXAMINATION      BY MR. DE CASTRO   1077
5
     REDIRECT EXAMINATION  BY MS. KOMATIREDDY 1118
6
7    HECTOR VILLARREAL
8    DIRECT EXAMINATION     BY MS REID        1129
9    CROSS-EXAMINATION      BY MS. GOTLIB     1172
10   REDIRECT EXAMINATION  BY MS. REID        1186
11
12   EARL ANTHONY WAYNE
     DIRECT EXAMINATION     BY MS. KOMATIREDDY 1188
13
14             E X H I B I T S
15   DEFENSE                              PAGE
16   G                                    1107
17   G-T                                  1107
18   GOVERNMENT                           PAGE
19   738A & 738A-T                        1119
20   434                                  1153
21   440A                                 1159
22   440                                  1159
23
24
25
```

*Rivka Teich CSR RPR RMR FCRR*
*Official Court Reporter*