**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

              -against-

GENARO GARCIA LUNA, *ET AL.*,

                     Defendants.

19 CR. 576 (BMC)

**MEMORANDUM OF LAW IN SUPPORT OF**
**GENARO GARCIA LUNA'S MOTION FOR A NEW TRIAL**
**PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 4

    A.   The Charges ................................................................................................................. 4

    B.   Defense Requests Pursuant to *Brady v. Maryland*.................................................... 5

    C.   Trial Evidence ............................................................................................................. 6

            *1.*   *United States Law Enforcement and Government Official Witnesses* ........................... 6

            *2.*   *Mexican Law Enforcement Witnesses*................................................................... 9

            *3.*   *Cooperating Witnesses – Cartel Members* ................................................. 11

            *4.*   *Cooperating Witnesses – Non-Cartel Members* .......................................... 14

    D.   Jesus Zambada Garcia's Missing 3500 Material ..................................................... 17

    E.   Government's Summation and Rebuttal Summation ................................................. 18

NEWLY DISCOVERED EVIDENCE................................................................................... 19

RELEVANT LEGAL PRINCIPLES ..................................................................................... 22

    *Brady* Materials Not Produced to the Defense ....................................................... 23

ARGUMENT .......................................................................................................................... 26

    **Point I: The Government Violated Its *Brady* Obligations By Failing To Turn Over Exculpatory Documents In Its Possession Directly Responsive To The Defense's *Brady*/Rule 5(f) Demands** ................................................................................. 26

    **Point II: Newly Discovered Evidence Supports The Conclusion That The Government Violated Its *Brady* Obligations By Withholding Information That Mr. Garcia Luna's Staff Was Also Vetted by And Provided Analysis For The CIA** ...................................... 31

    **Point III: The Government Violated Its *Brady* Obligations By Failing To Disclose Impeachment Material In Its Possession Pertaining To A Critical Cooperating Witness** 33

    **Point IV: Newly Discovered Evidence Proves Hector Villarreal Hernandez Committed Perjury** ............................................................................................................ 39

            *1.*   *Mr. Villarreal Hernandez Falsely Testified That He Facilitated Mr. Garcia Luna's Bribery Of El Universal Newspaper* ..................................................... 39

            *2.*   *Mr. Villarreal Hernandez Did Not Meet with Mr. Garcia Luna In 2008 To Review Security Project Allocations* ................................................................... 43

            *3.*   *The "Bunker" Did Not Exist When Mr. Villarreal Hernandez Claimed To Have Toured It Tith Mr. Garcia Luna* .................................................................. 43

            *4.*   *Mr. Villarreal Hernandez Falsely Testified That Mr. Garcia Luna Demonstrated Pegasus While In The Bunker* ......................................................... 44

**Point V: Newly Discovered Evidence Proves Francisco Cañedo Zavaleta Committed Perjury and Did Not Witness Mr. Garcia Luna's Kidnapping** ........................................... 45

**Point VI: Newly Discovered Evidence Proves Cooperating Witnesses Communicated With One Another Prior To Trial Contradicting Testimony By Government Witnesses And Arguments Made In The Government's Summation** .................................................... 49

**Point VII: Newly Discovered Evidence Establishing Multiple Nondisclosure Violations By The Government Supports Renewed Consideration Of The Missing Jesus Zambada Garcia 3500 Material** ............................................................................................................ 53

**Point VIII: The Cumulative Effect Of The *Brady* Violations And Newly Discovered Evidence Establishing Perjury Requires That Mr. Garcia Luna Be Granted A New Trial To Prevent Manifest Injustice** ................................................................................................ 55

**CONCLUSION** ...................................................................................................................... 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland,*
  373 U.S. 83 (1963) .......................................................................... *passim*

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ..............................................................................23, 26

*Tibbs v. Florida,*
  457 U.S. 31 (1982) ........................................................................................22

*United States v. Agurs,*
  427 U.S. 97 (1976) ...............................................................................24, 26

*United States v. Avellino,*
  136 F.3d 249 (2d Cir. 1998) .................................................................24, 25

*United States v. Avenatti,*
  No. 19 Cr. 374 (JMF), 2022 U.S. Dist. LEXIS 28472 (S.D.N.Y. Feb. 15,
  2022) .........................................................................................24, 25, 38

*United States v. Bagley,*
  473 U.S. 667 (1985) .....................................................................................24

*United States v. Bonventre,*
  No. 10 Cr. 288 (LTS), 2014 U.S. Dist. Lexis 101304 (S.D.N.Y. July 24, 2014) ..................23

*United States v. Coppa,*
  267 F.3d 132 (2d Cir. 2001) ........................................................................23

*United States v. Ferguson,*
  246 F.3d 129 (2d Cir. 2001) ........................................................................22

*United States v. Forbes,*
  790 F.3d 403 (2d Cir. 2015) ........................................................................23

*United States v. Gil,*
  297 F.3d 93 (2d Cir. 2002) ....................................................................25, 26

*United States v. Li,*
  No. 18 Cr. 302 (BMC), 2020 U.S. Dist. LEXIS 203686 (E.D.N.Y. Nov. 2,
  2020) .........................................................................................24, 36

*United States v. Lincoln,*
  630 F.2d 1313 (8th Cir. 1980) .....................................................................23

iii

*United States v. Madori,*
　419 F.3d 159 (2d Cir. 2005)................................................................24

*United States v. McCourty,*
　562 F.3d 458 (2d Cir. 2009)................................................................22

*United States v. Meregildo,*
　920 F. Supp. 2d 434 (S.D.N.Y. 2013)..................................................25

*United States v. Middendorf,*
　No. 18 Cr. 36 (JPO), 2018 U.S. Dist. LEXIS 139980 (S.D.N.Y. Aug. 17.
　2018) .....................................................................................................26

*United States v. Rivas,*
　377 F.3d 195 (2d Cir. 2004)................................................................24

*United States v. Sanchez,*
　969 F.2d 1409 (2d Cir. 1992)..............................................................22

*United States v. Stewart,*
　433 F.3d 273 (2d Cir. 2006)................................................................25

*United States v. Van Nuys,*
　707 F. Supp. 465 (D. Colo. 1989).......................................................54

*Zappulla v. New York,*
　391 F.3d 462 (2d Cir 2004).................................................................26

**Statutes**

Federal Rule of Criminal Procedure 5(f) ............................................. *passim*

Federal Rule of Criminal Procedure 33 ............................................... *passim*

## PRELIMINARY STATEMENT

During the years in which he served as Mexico's Secretary of Public Security, Mr. Garcia Luna was showered with praise from every corner of the United States law enforcement and political communities.  He hosted and was hosted by United States presidents, directors of the United States Central Intelligence Agency ("CIA"), directors of the Drug Enforcement Administration ("DEA"), directors of the Federal Bureau of Investigation ("FBI"), ambassadors, and countless other United States officials.  He was the United States' key partner in Mexico, helping shepherd and account for billions of dollars of United States aid to Mexico in the countries' fights against organized crime and narcotics trafficking.

Nonetheless, years after he left Mexican government service, the United States government chose to prosecute Mr. Garcia Luna on the word of some of the world's worst criminals – cartel leaders who were personally responsible for the murder and torture of thousands and who distributed millions of kilograms of cocaine to the streets of the United States.  In February 2023, Genaro Garcia Luna was convicted of assisting the Sinaloa Cartel in its worldwide narcotics distribution network.  However, since the guilty verdict, new evidence has come to light establishing that the case against Genaro Garcia Luna was marred by multiple *Brady* violations and false testimony by critical witnesses.  The newly discovered evidence should persuade the Court that allowing his conviction to stand would be a manifest injustice. Where, as is the case here, there is a real concern that an innocent person may have been convicted, Rule 33 of the Federal Rules of Criminal Procedure bestows on district courts the power to prevent a manifest injustice by ordering a new trial.

First, the defense is now in possession of documents and information that proves that Mr. Garcia Luna and Mexico's Special Investigative Unit ("SIU") were subjected to extensive United

1

States background checks and comprehensive vetting, including polygraph examinations by the DEA and other United States government agencies.  These background investigations covered the same ground as the allegations in this case.  Moreover, this information should have been produced to the defense as *Brady* material.  *See Brady v. Maryland*, 373 U.S. 83 (1963); Federal Rule of Criminal Procedure 5(f).  Failing to produce materials in the government's possession concerning the vetting to which Mr. Garcia Luna was subjected by the United States government, which was ongoing during the time he was alleged to have been committing the charged crimes, is grounds for a new trial.

Second, the defense is now in possession of documents and information that show that the CIA vetted a separate unit of the Secretariat of Public Security ("SSP"), created by Mr. Garcia Luna, that worked to provide information and analysis to the CIA regarding narcotics trafficking and the different Mexican cartels.  This information also should have been disclosed pursuant to *Brady* and Rule 5(f).  Failing to produce information in the government's possession concerning members of Mr. Garcia Luna's staff who were vetted by and assisted the CIA during the time he was alleged to have been committing the charged crimes, is grounds for a new trial.

Third, the defense is now in possession of proof that a government witness, Hector Villarreal Hernandez, continued to commit crimes in the United States while actively cooperating with the government.  Furthermore, members of the prosecution team at the DEA as well as the United States Attorneys' Offices in Texas were made aware of the information and/or handed the evidence of his continuing criminal behavior.  These materials also should have been disclosed under *Brady* and Rule 5(f).  Failing to produce impeachment materials in the government's possession concerning Mr. Villarreal Hernandez's continued criminal activity while a government cooperator is grounds for a new trial.

Fourth, the defense can prove through newly discovered evidence that cooperating witness Hector Villarreal Hernandez testified falsely numerous times at Mr. Garcia Luna's trial. Most notably, Mr. Villarreal Hernandez claimed that Mr. Garcia Luna tried to suppress negative press coverage focused on his alleged kidnapping by Arturo Beltran Levya by bribing the publisher of one of Mexico's largest news outlets. This was not true, and Mr. Villarreal Hernandez's testimony in support of that claim can now be established as false. This newly discovered evidence of Mr. Villarreal Hernandez's false testimony is grounds for a new trial.

Fifth, the defense can prove through newly discovered evidence that every aspect of the testimony of Francisco Cañedo Zavaleta, the self-professed sole eyewitness to Mr. Garcia Luna's alleged kidnapping, was false. Mr. Cañedo Zavaleta, who had a longstanding vendetta against Mr. Garcia Luna, testified that he was a security guard at Mr. Garcia Luna's SSP headquarters. This is demonstrably false. Mr. Cañedo Zavaleta testified that he witnessed Mr. Garcia Luna's kidnapping on October 19, 2008. This is demonstrably false. This newly discovered evidence that proves Mr. Cañedo Zavaleta falsely testified before this Court is grounds for a new trial.

Sixth, the defense can prove through newly discovered evidence that despite the government's repeated assertions to the contrary, cooperating witnesses in this case communicated with each other in advance of trial through contraband cellular telephones in jail. One witness even admitted that he would lie to the government to get released and continue his drug dealing, with the added benefit of taking Mr. Garcia Luna down in the process. This new evidence of cooperator collaboration taints the government's cooperating witnesses' testimony and is grounds for a new trial.

In addition to those six grounds, in light of the disclosure violations by the government set forth here, the defense urges the Court to reexamine the government's representations during

trial that it failed to memorialize approximately 48 meetings with Jesus "El Rey" Zambada Garcia, the first ever cartel member of his stature to cooperate with the United States.

Any one of these issues standing alone would be grounds for a new trial.  However, the cumulative effect of these violations and false testimony by critical witnesses should lead the Court to conclude that there is more than just a "real concern" that Mr. Garcia Luna was convicted of charges of which he is innocent.  A trial so marred by *Brady* violations and perjurious testimony is unbecoming of the United States justice system.  Letting the verdict stand would be a manifest injustice and the Court should vacate Mr. Garcia Luna's conviction and order a new trial.

## STATEMENT OF FACTS

A.    The Charges

On December 4, 2019, a Grand Jury sitting in the Eastern District of New York returned an indictment charging Mr. Garcia Luna, the former Secretary of Public Security and member of the presidential cabinet of Mexican President Felipe Calderón, with: (1) conspiring to distribute cocaine in violation of 21 U.S.C. §§ 933, 960(b)(1)(B)(ii) and 959(d) and 18 U.S.C. §§ 3238 and 3551 *et seq.*; (2) conspiring to distribute and possess cocaine with intent to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(ii)(II) and 18 U.S.C. § 3551 *et seq.*; (3) conspiring to import cocaine in violation of 21 U.S.C. §§ 963 and 960(b)(l)(B)(ii) and 18 U.S.C. §3551 *et seq.*; and (4) making false statements in violation of 18 U.S.C. §§ 1001(a)(2) and 3351 *et seq.*  On July 30, 2020, the Grand Jury returned a superseding indictment adding a charge of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848.

B.      Defense Requests Pursuant to *Brady v. Maryland*

During his career spanning more than 20 years in Mexico's government and law

enforcement communities, Mr. Garcia Luna met with countless high-level members of United

States law enforcement, as well as appointed and elected United States government officials.  As

part of its pretrial preparation, the defense became aware that Mr. Garcia Luna and his team were

subjected to extensive vetting practices; vetting practices that addressed the very facts at issue in

this case.  Specifically, the defense had reason to believe that as part of Mr. Garcia Luna's duties

and responsibilities, including his role as the primary shepherd of the billions of dollars of aid

provided by the United States to Mexico as part of the Merida Initiative, Mr. Garcia Luna had

been subjected to background investigations, including polygraph examinations, by United States

law enforcement.  The defense sought those materials from the government.

By letter dated April 15, 2022, the defense requested from the government, *inter alia*, any

documents relating to the United States Government's vetting of Mr. Garcia Luna.  In its request,

the defense explained:

> [D]uring his time as a Mexican government official Mr. Garcia Luna had
> numerous meetings with politicians and officials in the highest levels of the
> American government.  Prior to those meetings, the United States government
> would have conducted detailed background checks of Mr. Garcia Luna to
> ensure that such meetings would pose no threat or embarrassment to the
> United States.  The results thereof and all materials generated in connection
> with such background checks should be produced to the defense.  In light of
> the fact that these meetings occurred, such background checks must have
> given United States officials sufficient comfort that Mr. Garcia Luna was not
> involved or suspected to be involved in any criminal conduct and, thus,
> constitutes *Brady* material.

Declaration of César de Castro in Support of Motion for a New Trial Pursuant to Rule 33 ("de

Castro Decl."), Exhibit ("Ex.") A at 2.  The defense further asked for "[t]he results of and all

materials generated in connection with any and all background checks concerning Mr. Garcia

Luna, including but not limited to those conducted in advance of Mr. Garcia Luna interacting

with the below listed individuals around the below listed time periods, conducted by the United

States at any point during the years 2001 through 2012." *Id.* at 5-6.

The government responded by letter on May 1, 2022, stating that "[t]he Prosecution

Team does not possess any background checks conducted on the defendant in advance of any

meetings with U.S. government officials.  To the extent the Prosecution Team acquires such

material, it will review those materials and comply with its discovery obligations."  *See* de

Castro Decl., Ex. B at 2.

C.      Trial Evidence

Mr. Garcia Luna's trial began on January 17, 2023, with the government's case lasting

until February 14, 2023.  The government called members of United States law enforcement, the

United States Ambassador to Mexico, members of Mexican law enforcement, and numerous

cooperating witnesses who were, with the exception of Hector Villarreal Hernandez, all members

of or associated with the Sinaloa Cartel or the Beltran Leyva drug organization ("BLO").

1.      *United States Law Enforcement and Government Official Witnesses*

Most of the law enforcement witnesses called by the government testified about the

existence of the Sinaloa Cartel and the United States' efforts to combat the cartel in both Mexico

and the United States.  Little, if any, of this testimony was disputed by the defense.  These

witnesses did not mention Mr. Garcia Luna or imply that he was involved in the activities of the

cartels.  As this evidence was uncontroverted, it will not be rehashed here.

The only member of United States law enforcement who testified in any meaningful way

about Mr. Garcia Luna's tenure in the Mexican government was DEA Deputy Special Agent in

Charge ("DSAC") of Texas, Miguel Madrigal, who was stationed in Mexico from 2008 until

2015.  DSAC Madrigal testified that one of the government's cooperators, Sergio Villarreal

Barragan, had told him shortly after his arrest that Mr. Garcia Luna had "business dealings" with

the cartel.  *See* Trial Transcript of *United States v. Garcia Luna*, No. 19 Cr. 576 (BMC) ("TT") at

965.  DSAC Madrigal also testified that members of Mexico's SIU, a branch of the SSP, were

trained and polygraphed by the United States.  *See* TT at 955-56.  He further testified that, while

Mr. Garcia Luna was the Secretary of the SSP, the government of Mexico and the SSP were

arresting many members of many cartels, including the Sinaloa Cartel and the BLO.  *See* TT at

1004.

Supervisory Special Agent Jose Moreno of the FBI testified about a failed attempt to

arrest Joaquin Guzman Loera in 2012.  *See* TT at 1331-48.  Agent Moreno testified that after the

raid he was able to recover and photograph the cartel's financial ledgers.  *See* TT at 1346.

However, he could not testify that Mr. Garcia Luna's name, or any references to him, were found

in those ledgers.

The next law enforcement officer of note was Ivan Carrera, DEA Supervisory Special

Agent in Dallas, Texas, who participated in Mr. Garcia Luna's arrest in Texas and was present for

Mr. Garcia Luna's post-arrest statement.  *See* TT at 1385.

The final law enforcement officer called by the government, Special Agent George Dietz,

was an investigator for the United States Attorney's Office for the Eastern District of New York

who was also present in court each day of trial.  Special Agent Dietz was called to counter

testimony elicited on cross examination from certain government cooperating witnesses that they

had been in contact with each other and had the opportunity to coordinate their testimony.

Special Agent Dietz testified that the United States Attorney's Office took steps to ensure

witnesses never communicated with one another to make sure the "integrity of the information[]

isn't contaminated by running into other witnesses, or seeing information they don't have personal knowledge of."  TT at 1424.  He also testified that there was a separation order for witnesses in custody.  *See* TT at 1425.

The government called former United States Ambassador to Mexico Earl Anthony Wayne to testify.  Ambassador Wayne, who's time in Mexico overlapped with Mr. Garcia Luna's last year as Secretary of Public Security, testified that he would meet with Mr. Garcia Luna often during that year because Mr. Garcia Luna "was one of the key members of the [Mexican] cabinet with whom we worked."  TT at 1190.  Ambassador Wayne testified generally about his understanding regarding the various Mexican law enforcement entities that targeted the cartels and the United States government's opinions about the efficiencies of those agencies.

Ambassador Wayne did not testify that he believed that Mr. Garcia Luna was corrupt, or that the United States had any indication that he was.  *See* TT at 1216.  In fact, Ambassador Wayne received numerous "significant updates" from United States law enforcement agencies and testified that if the United States had received any credible evidence that Mr. Garcia Luna was corrupt, he would have known about it.  *See* TT at 1216.  Indeed, after Mr. Garcia Luna would brief the Ambassador, his briefings would be fact checked by United States law enforcement, and Ambassador Wayne was never told that Mr. Garcia Luna's information was incorrect.  *See* TT at 1217-18.

The government also attempted to use Ambassador Wayne to establish that Mr. Garcia Luna had unexplained wealth while he was Secretary of Public Security.  Although Ambassador Wayne described dinners he had at Mr. Garcia Luna's personal residence and remembered a nice fish tank, he could not say that Mr. Garcia Luna's home was ostentatious or otherwise suggested any unexplained wealth.  *See* TT at 1196.

8

2.      *Mexican Law Enforcement Witnesses*

The government's witnesses included two members of Mexican law enforcement, Raul Arellano-Aguilera and Francisco Cañedo Zavaleta, both of whom possessed personal vendettas against Mr. Garcia Luna.

Mr. Arellano-Aguilera was a member of the federal police stationed at the Mexico City airport from 2007 until 2010.  *See* TT at 650, 681.  He testified concerning rumors about the flow of narcotics being moved through the Mexico City Airport by a "special group" of officers.  Mr. Arellano-Aguilera testified that the "special group" at the airport tried to recruit him into their operation to allow cartel drugs and money to flow through the airport, and that he had heard that Mr. Garcia Luna received portions of the bribes paid by narcotics traffickers to the police in connection with the Mexico City airport.  However, Mr. Arellano-Aguilera did not have any personal knowledge of the veracity of these rumors.  *See* TT at 668-69, 674.

In 2010, Mr. Arellano-Aguilera was unhappy when he was moved by his superiors to Nuevo León, a dangerous area of Mexico, to join an investigative unit created by Luis Cardenas Palomino.  *See* TT at 682-83.  He blamed Mr. Palomino and Mr. Garcia Luna, both of whom he disliked because they were not career officers like him, and did not "earn their way to [their] positions."  TT at 700.  Mr. Arellano-Aguilera left the police in 2011 because he "felt let down and thought the best thing would be to resign."  TT at 684.

The government also called Mexican federal police officer Francisco Cañedo Zavaleta to testify.  Mr. Cañedo Zavaleta testified that he allegedly witnessed the kidnapping of Mr. Garcia Luna by the BLO.  Mr. Cañedo Zavaleta testified that he was employed by the Mexican Attorney General's Office as a security guard, first in 2006, at the Federal Police building in Mexico City (located near the Angeles Del Pedrigal Hospital), and then in 2007, at the SSP headquarters

9

located at Avenue Constituyentes #947, Colonia Belén de las Flores, Alcaldía Álvaro Obregón, Mexico City, in 2007. *See* TT at 1047-48; Government Exhibit 711. While stationed at SSP Headquarters, Mr. Cañedo Zavaleta claimed that he would see Mr. Garcia Luna coming into the complex, including the public reception area. *See* TT at 1048.

Mr. Cañedo Zavaleta testified that on October 19, 2008, at approximately 12:00 p.m., he witnessed Mr. Garcia Luna being kidnapped by BLO leader Arturo Beltran Leyva and his lieutenant Edgar "La Barbie" Valdez Villarreal on the toll-free road from Mexico City to Cuernavaca. *See* TT at 1053-54. He testified that he saw several SUVs "stranded" on the side of the road coming from Cuernavaca, with Mr. Garcia Luna talking to Mr. Beltran Leyva and La Barbie while La Barbie was holding a long gun. TT at 1054. Mr. Cañedo Zavaleta then testified that he stopped further down the road where he witnessed the cars turn around and pass him, with Mr. Beltran Leyva in the first car, La Barbie in the second car, and Mr. Garcia Luna driving the third car. *See* TT at 1056. He further testified that upon observing his boss being kidnapped and in potential grave danger, he did not report this to any law enforcement or take any action to assist Mr. Garcia Luna or the members of his security detail who were allegedly kidnapped at gunpoint by murderous cartel members. *See* TT at 1100. Instead, after driving back to Mexico City, he reported what he had seen to opposition Congresswoman Layda Sansores San Román, submitted a letter recounting the events to her, and provided a copy to Proceso Magazine, which promptly wrote a story that garnered national attention. *See* TT at 1060-62; Defense Exhibit G, GT.

Like Mr. Arellano-Aguilera, Mr. Cañedo Zavaleta carried a personal animus against Mr. Garcia Luna. Mr. Cañedo Zavaleta, like Senator Sansores and her party, opposed Mr. Garcia Luna's "illegal unification of [Federal Ministerial Police ("AFI")] with the federal police" forces

and the imposition of more rigorous testing and background checks for the officers in that unified force.  TT at 1046.  He testified that he was let go from the AFI, an agency in the Mexican Attorney General's office ("PGR") in 2000 and reinstated by judicial order in 2006.  *See* TT at 1040.  Mr. Cañedo Zavaleta testified that he was let go because "someone" wanted him to be removed from the police force for "political reasons".  *TT* at 1082-83.

> 3.    *Cooperating Witnesses – Cartel Members*

The government called nine cooperating witnesses: Sergio Villarreal Barragan a.k.a. "El Grande", Tirso Martinez Sanchez, Hector Tolentino, Oscar Nava Valencia a.k.a. "Lobo", Israel Avila, Harold Mauricio Poveda Ortega a.k.a. "El Conejo", Hector Villarreal Hernandez, Edgar Veytia, and Jesus Zambada Garcia a.k.a. "El Rey".  With the exception of Hector Villarreal Hernandez and Edgar Veytia, all these cooperating witnesses were members of or conducted narcotics trafficking with the Sinaloa Cartel or the BLO.

The first cooperating witness called by the government was Sergio "El Grande" Villarreal Barragan.  *See* TT at 48.  Mr. Villarreal Barragan was a former police officer turned cartel member who worked for Arturo Beltran Leyva.  *See* TT at 70-71.  He testified that Mr. Garcia Luna was paid by the cartels.  *See* TT at 51.  He claimed that Mr. Garcia Luna would wait in a shopping mall parking lot in Mexico City in the middle of the workday for Mr. Beltran Leyva's men, who would pick him up and drive him to a safe house without his security detail.  *See* TT at 105, 224.  Finally, Mr. Villarreal Barragan claimed that he never spoke to the other cooperating witnesses after he was arrested in 2010.  *See* TT at 183, 193.

Tirso Martinez Sanchez was an independent drug trafficker who coordinated large shipments of cocaine from Mexico to the United States by train for the Sinaloa Cartel.  He did not offer any relevant testimony about Mr. Garcia Luna.

11

Hector Tolentino was a member of the Trinitarios street gang.  He testified about his drug sales in New York City and ties to the Sinaloa Cartel, which was substantiated by significant corroborating evidence, but did not mention Mr. Garcia Luna.

Oscar Nava Valencia was the leader of the Milenio Cartel and worked closely with both the BLO and later the Sinaloa Cartel.  He testified extensively about a large drug seizure in the port of Manzanillo in October 2007, and about a meeting in Cuernavaca between the heads of the cartel (before it fractured), allegedly attended by Mr. Garcia Luna.  Mr. Nava Valencia testified that he attended the meeting with his brother and Mr. Garcia Luna showed up in an SUV.  *See* TT at 527.  Allegedly, the purpose of the meeting was to determine what assistance Mr. Garcia Luna could provide with respect to the Manzanillo seizure.  *See* TT at 527.  Mr. Garcia Luna allegedly informed them that there was nothing he could do about recovering the drugs from the seizure.  *See* TT at 526-528.  Mr. Nava Valencia further testified that he met Mr. Garcia Luna again in 2008, at an impromptu meeting in Guadalajara two months after Mr. Nava Valencia himself had been kidnapped by Mr. Beltran Leyva.  *See* TT at 542-43.  The meeting supposedly took place in a carwash and Mr. Nava Valencia claimed to have paid Mr. Garcia Luna $500,000 for the meeting and another $2,500,000 for his protection.  *See* TT at 538, 541-542.  Guadalajara is an approximately six-hour drive from Mexico City.

The next cooperating witness to testify was Israel Avila, a real estate agent and accountant for the BLO.  *See* TT at 713.  Mr. Avila had never met Mr. Garcia Luna.  *See* TT at 774.  He testified that he created or saw Sinaloa Cartel bribe ledgers with entries for "tartamudo" and "metroletta", referring to payments to Mr. Garcia Luna.  TT at 747.  These ledgers were never presented at trial.

12

The government then called Harold Mauricio Poveda Ortega, a cocaine trafficker for the Sinaloa Cartel who imported more than 1,000,000 kilograms of cocaine to the United States, earning $300-$400 million in profit. *See* TT at 892. He testified that he was so close with Arturo Beltran Leyva that many people were "envious of the relationship", and that he had "constant contact" with him. TT at 864. But Mr. Poveda Ortega had never met Mr. Garcia Luna or even spoken to him. Nor had he overheard his mentor Mr. Beltran Leyva speak with Mr. Garcia Luna on the telephone. *See* TT at 921. Mr. Poveda Ortega also testified that he had seen Mr. Zambada Garcia one time since his arrest, and that they were transported together. *See* TT at 914.

With respect to the claim that Mr. Garcia Luna was kidnapped on October 19, 2008, most of these cooperators offered different versions from the version alleged by Mr. Cañedo Zavaleta who testified that Arturo Beltran Leyva and Edgar "La Barbie" Valdez Villarreal had personally conducted the kidnapping, and that they did so on an open road. *See* TT at 1054. Mr. Villarreal Barragan, on the other hand, testified that Mr. Beltran Leyva was not present but had ordered the kidnapping, and Mr. Garcia Luna was taken to a safehouse. *See* TT at 174. Mr. Poveda Ortega testified that he heard about Mr. Garcia Luna's kidnapping from Mr. Beltran Leyva, but could not specify when it was, or if the alleged kidnapping had already happened when he heard about it, but that it appeared to be happening in real time. *See* TT at 876-77, 901. Mr. Avila testified that he was told by his friend, Francisco Camacho, that Mr. Camacho had kidnapped Mr. Garcia Luna and was awarded a house by Mr. Beltran Leyva for doing so. *See* TT at 756.

13

4.    *Cooperating Witnesses – Non-Cartel Members*

Hector Villarreal Hernandez, Secretary of Finance to the Mexican State of Coahuila from 2008 until 2010, was also called to testify by the government as a cooperating witness.  He was supposedly not associated with the cartels in any way but had committed other crimes that led to his conviction in the United States.  *See* TT at 1129, 1133.  Mr. Villarreal Hernandez testified that he first met Mr. Garcia Luna in 2008 to review security monies allotted to Coahuila, and then a second time at the "Bunker" [the National Command and Control Center] in the beginning of 2009.  *See* TT at 1146-47.

Mr. Villarreal Hernandez described the "Bunker" as a federal building "that housed some of the most advanced intelligence systems that analyzed in real time everything that was going on in every single state."  TT at 1147.  At this second meeting in the beginning of 2009, he claims that he was shown a demonstration of the security software program called "Pegasus," which he claimed projected a member of his group's messages up on a screen for everyone to see.  TT at 1148.  He further claimed that Mr. Garcia Luna offered to sell him the software for him to purchase for the State of Coahuila.  *See* TT at 1148.

According to Mr. Villarreal Hernandez, at the "beginning of 2009" meeting, Mr. Garcia Luna also allegedly asked him and Governor Moreira Valdés to help him control his image in the media.  *See* TT at 1151.  Mr. Garcia Luna allegedly discussed the rumors that the cartels had kidnapped him.  *See* TT at 1151.  Mr. Garcia Luna asked "if there was any way to get close to" or "any way of approaching" the national and well-known newspaper, El Universal, to suppress "rumors" about his kidnapping.  TT at 1151.  Mr. Villarreal Hernandez testified that the owner of El Universal, Juan Francisco Ealy Ortiz, was good friends with Governor Moriera Valdés and that Mr. Garcia Luna asked to be connected to Mr. Ealy Ortiz.  *See* TT at 1152-54.  Mr. Villarreal

14

Hernandez testified that this conversation led Governor Moreira Valdés to contact Mr. Ealy Ortiz and broker a 25,000,000 peso monthly bribe to El Universal. *See* TT at 1154. He claimed that he personally accompanied one of Mr. Garcia Luna's subordinates to El Universal's offices for the first bribe payment, and that in return, El Universal promised that "the secretary of public securities [sic] work for the federal Government and the Mexican citizens would shine." TT at 1155. Mr. Villarreal Hernandez also testified that he paid one of the final bribe payments from Coahuila's budget on behalf of Mr. Garcia Luna, kept a copy of the invoice dated June of 2009, and brought it with him to the United States when he was fleeing charges against him in Mexico. *See* TT at 1156-58; Government Exhibit 440A.

Edgar Veytia, admitted murderer and torturer working on behalf of narcotics traffickers, as well as the former Attorney General of Nayarit, was the next cooperating witness to be called. *See* TT at 1233. Mr. Veytia testified that while Director of Transit in the City of Tepic in October of 2008, his boss Commander Violante attended a national security conference in Mexico City and was told by Mr. Garcia Luna to take El Chapo's side in the Sinaloa civil war. *See* TT at 1240. Mr. Veytia also testified that in 2011, after becoming the Secretary of Public Security for Tepic, then Governor of Tepic, Manuel Gonzalez, was told by President Felipe Calderon and Mr. Garcia Luna in Mexico City that "the line was Chapo," meaning they should take El Chapo's side in the war between the cartels. TT at 1256-57. Later in 2011, Roberto Sandoval became Governor of Nayarit and Mr. Veytia was promoted to Assistant Attorney General. *See* TT at 1259. In December of that year, after rebuffing El Chapo's lawyers' offer to purchase Nayarit, Mr. Veytia claims that his safe house was attacked and even though he called the SSP for help, only the Army came. *See* TT at 1261, 1264.

Mr. Veytia also testified that Governor Sandoval requested a meeting with Mr. Garcia Luna in Mexico City after the attack because the SSP failed to respond with assistance. *See* TT at 1256. Mr. Veytia claimed to have accompanied Governor Sandoval to the meeting. *See* TT at 1265. Mr. Veytia testified that only Governor Sandoval was allowed in the meeting with Mr. Garcia Luna, and Mr. Veytia was given a tour of the "Bunker" by Mr. Palomino instead. *See* TT at 1266. Mr. Palomino allegedly stated that the State of Nayarit was on the wrong side of the war between El Chapo and the BLO. *See* TT at 1267. Following Governor Sandoval's meeting with Mr. Garcia Luna, the Governor told Mr. Veytia that Mr. Garcia Luna was not going to help Nayarit with anything. *See* TT at 1267-68.

The final cooperating witness called by the government was Jesus Zambada Garcia, brother of the current leader of the Sinaloa Cartel, Ismael Zambada Garcia, "El Mayo". Mr. Zambada Garcia testified that he was present when his brother's attorney, Oscar Paredes, bribed Mr. Garcia Luna twice at the end of 2006 at the Champs Élysées restaurant in Mexico City. *See* TT at 1471-81. He also testified on cross examination that after his arrest, he was unable to escape or bribe his way out of prison even though Mr. Garcia Luna was a member of the President's cabinet. *See* TT at 1552-53. He also admitted on cross examination that in his proffers with the government and in prior testimony at the El Chapo trial, his recitation of events at the Champs Élysées was different than what he testified to at Mr. Garcia Luna's trial, and that his story even varied from proffer to proffer. TT at 1586-1600. Additionally, Mr. Zambada Garcia testified that he last saw Mr. Nava Valencia in 2008, Mr. Villarreal Barragan sometime after his own arrest, and Mr. Poveda Ortega once when they were transported to court together in the United States. *See* TT at 1520-21.

D.   Jesus Zambada Garcia's Missing 3500 Material

Before Jesus Zambada Garcia testified, the defense raised with the prosecution, and later

with the Court, that it believed it had not been provided with all of the *Jenks Act* material related

to Mr. Zambada Garcia.  Mr. Zambada Garcia proffered with the government at least 118 times,

but the defense was only provided notes from 70 meetings with no DEA-6 reports produced.  *See*

ECF No. 216; TT at 1440-48.  The government acknowledged the discrepancy but claimed that

"the majority of the meetings that Mr. de Castro [was] referencing happened before the Chapo

trial" – that is, trial preparation.  TT at 1443.

At Mr. Zambada Garcia's sentencing, the minutes of which were produced as *Jenks Act*

material. ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

3500-JRZG-98 at 10[1]. ████████████████████████████████████████████████████

███████████████████████████████████████████ *Id*. at 11.  As noted

above, according to the government, by the time Mr. Zambada Garcia testified at Mr. Garcia

Luna's trial he had met with prosecutors approximately 118 times.  *See* TT at 1433.  The defense

received 3500 material for only 70 of those sessions, meaning that approximately 48 meetings

generated no notes at all, purportedly because they were trial preparation.  Yet, of the 70 sessions

for which the government provided 3500 materials to the defense, 11 of them indicated on their

face that they were, in fact, trial preparation sessions.  As the defense pointed out to the Court,

the volume of production of *Jenks Act* material related to Mr. Zambada Garcia was contrary to its

experience prosecuting and defending cases and was aberrant when viewed against the

---

[1] Because Mr. Zambada Garcia's sentencing minutes are not publicly available, we are redacting the quotes from the publicly filed version of this memorandum and will provide an unredacted copy to the Court and the government *via* email.

productions related to the government's other witnesses.  *See* TT at 1442.  The following is a

chart compiled by the defense summarizing the 3500 material provided by the government for

the nine cooperating witnesses who testified at Mr. Garcia Luna's trial.

| Witness | # of Interviews Recorded | Notes Received | FBI Reports Rec'd | DEA Reports Rec'd | HSE Reports Rec'd | Total # of Reports and Notes |
|---|---|---|---|---|---|---|
| Sergio Villarreal Barragan | 66 | 24 | 20 | 16 | 0 | 60 |
| Tirso Martinez | 39 | 52 | 0 | 0 | 1 | 53 |
| Hector Tolentino | 14 | 10 | 6 | 1 | 0 | 31 |
| Oscar Nava Valencia | 38 | 22 | 1 | 23 | 0 | 46 |
| Israel Avila | 17 | 11 | 0 | 7 | 0 | 18 |
| Harold Maurico Poveda Ortega | 65 | 65 | 2 | 1 | 0 | 68 |
| Hector Villarreal Hernandez | 21 | 5 | 0 | 19 | 0 | 24 |
| Edgar Veytia | 17 | 13 | 10 | 0 | 0 | 23 |
| Jesus Zambada Garcia | 70 (per government 118 meetings) | 75 | 4 | 0 | 0 | 79 |

E.    Government's Summation and Rebuttal Summation

A centerpiece of the government's summation was its argument that the cooperators had

to be telling the truth because they corroborated each other and yet had not, with the minor

exception of Messrs. Zambada Garcia and Poveda Ortega, spoken or had the opportunity to

coordinate their stories: "[outside of Zambada Garcia and Poveda Ortega], no other witness has

talked to each other … there's no coordination here." TT at 1800. On rebuttal, the prosecutor reminded the jury of Special Agent Dietz's testimony about how the cooperating witnesses were separated and do not meet other witnesses. *See* TT at 1902.

The government also focused extensively on the alleged kidnapping of Mr. Garcia Luna. It praised Mr. Cañedo Zavaleta's account as having the "hallmark of truth telling." TT at 1802. In its rebuttal summation it argued Mr. Cañedo Zavaleta's testimony again, describing it as "consistent . . . He gave you details . . . the idea that he would completely fabricate this . . . does that make any sense to you?" TT 1904.

In its defense of Mr. Villarreal Hernandez's credibility, the government highlighted his alleged tour of the "Bunker." "Hector Villarreal Hernandez is taken to the bunker in 2009 by Genaro Garcia Luna, and you remember how he describes it? It was impressive. It was intimidating, almost. So many screen[s]. They could tap my phone. Suddenly, they knew everything that I knew. And it's after the tour of the [B]unker where he says, I need you to bribe a journalist for me. He uses that to his advantage there." TT at 1823.

## NEWLY DISCOVERED EVIDENCE

As the Court knows, the trial of Mr. Garcia Luna was widely reported in the media and followed with great interest by people both in and outside the United States. Following the verdict in February 2023, several individuals, including former Mexican and United States law enforcement officials, contacted the defense with new evidence favorable to Mr. Garcia Luna. We suspect that as people learned of the nature of the evidence, or lack of evidence, against Mr. Garcia Luna, former officials and other individuals felt that they should speak out about what they knew. They came forward with material that consisted of thousands of pages of documents, audio, and video files potentially relevant to the case that the defense had never seen before and

had to diligently review.  Indeed, the Court granted the defense's request to extend the deadline

for this motion to December 15, 2023, based on an *ex parte* letter submitted to the Court on July

20, 2023, detailing the sheer volume of the materials and information received by the defense.

The first set of materials received by the defense came from former members of United

States law enforcement and a former high level Mexican government official under President

Felipe Calderon (the "Official").  This material established that Hector Villarreal Hernandez

continued to commit crimes while cooperating with the government, material that was disclosed

to the United States Attorney Office for the Western District of Texas and the United States

Attorney Office for the Southern District of Texas.  Later, the Official disclosed the existence of

this material directly to DSAC Madrigal.

The second set of new evidence received by the defense is a sworn affidavit from an

inmate at the Metropolitan Detention Center ("MDC"), who affirmed that cooperating witnesses

who testified at Mr. Garcia Luna's trial were speaking to one another on contraband cellular

telephones while incarcerated prior to the trial, and at that at least one admitted to manipulating

the government into a cooperation agreement.

The third set of materials came from sources in Mexico and consisted of, among many

other things, thousands of documents from the Office of the Secretary of Public Security.  The

first tranche of material provided to the defense consisted of 3.6 terabytes of files.  It contained

approximately 133,000 folders containing more than 980,000 files of material consisting of

documents, videos, audios, and photographs.  A second tranche consisted of 24.6 gigabytes of

documents also containing information relating to the investigations that led to the capture and

cooperation of some of the government's witnesses.  The defense continues to review and

evaluate these materials.

The remaining sets of new evidence fall into two categories, witness affidavits and exculpatory documents. Witnesses with whom we have spoken after trial have explained to the defense that they did not come forward with their information prior to the conclusion of the trial for fear of reprisal in Mexico, but that following the conclusion of the trial felt obligated to do so in hopes of being able to remedy what they view as an unjust verdict against Mr. Garcia Luna. Among the pieces of new evidence obtained by the defense are Mr. Garcia Luna's daily agendas or schedule while he was Secretary of Public Security that were prepared, kept, and utilized by his secretaries and staff. These agendas show that from 2007 through 2012, among countless other meetings with detailed attendee lists, Mr. Garcia Luna met with United States officials approximately 186 times. This included 28 meetings with elected officials and dignitaries, 8 meetings with the United States Attorney General, a meeting with a Navy Admiral, 24 working meetings with the United States Ambassadors to Mexico, 15 meetings with the CIA, 4 meetings with the ATF, 12 meetings with United States Immigration and Customs Enforcement ("ICE"), and 11 meetings with the Department of Homeland Security and other border security agencies.

Mr. Garcia Luna's agendas also show approximately 50 meetings with the DEA, the majority of which were with Joe Evans, then Regional Director for Mexico, Central America, and Canada, including one meeting at the home of Mr. Evans.

The defense team is still reviewing the voluminous information provided from the above-described sources and cannot rule out the possibility that as our review continues, we will discover even more new evidence of Mr. Garcia Luna's innocence. This new evidence will be discussed in full below in each relevant section, all of which is attached to the de Castro Declaration.

## RELEVANT LEGAL PRINCIPLES

Federal Rule of Criminal Procedure 33 provides that a district court may "vacate any judgment and grant a new trial if the interest of justice so requires."  If the district court finds that a manifest injustice would result if the guilty verdict were permitted to stand, it should vacate the judgment and order a new trial.  *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  As the *Ferguson* court poignantly stated, "[n]o harm and only good can come to our system of justice where we require the government to supply competent, satisfactory and sufficient evidence to prove an element of criminal liability.  To let a verdict stand on anything less is indeed a manifest injustice."  *Id.* at 131.

While relief under Rule 33 should be exercised sparingly, the court still enjoys broad discretion to set aside the verdict to avoid a miscarriage of justice.  *See id.* at 133 (citing *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992)).  The court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Id.* at 134.

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (quoting *Ferguson*, 246 F. 3d. at 134).  After considering the arguments made by the defendant, "[t]he trial court must be satisfied that 'competent, satisfactory and sufficient evidence' in the record supports the jury verdict."  *Id.* (quoting *Sanchez*, 969 F.2d at 1414).  To answer that question, the trial court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation."  *Id.*

Critically, when considering a motion for a new trial, the trial court "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses."  *Tibbs v. Florida*, 457 U.S. 31, 38 n.11 (1982)

(quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)); *see also United States v. Bonventre*, No. 10 Cr. 288 (LTS), 2014 U.S. Dist. Lexis 101304 at *12 (S.D.N.Y. July 24, 2014) ( "[i]n deciding whether to grant a Rule 33 motion, a judge may weigh the evidence and determine the credibility of witnesses and is not required to view the evidence in the light most favorable to the Government.") (internal citations and quotation marks omitted).

One ground for filing a motion for a new trial under Rule 33 is newly discovered evidence. *See* Federal Rule of Criminal Procedure 33(b)(1). The rule in this Circuit is that "[i]f a motion for a new trial is based on new evidence, relief under Rule 33 based on newly discovered evidence may be granted only upon a showing that (1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (internal citations and quotation marks omitted).

<u>*Brady* Materials Not Produced to the Defense</u>

The government has a duty to disclose material evidence favorable to a defendant pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Kyles v. Whitley*, 514 U.S. 419 (1995), and Federal Rule of Criminal Procedure 5(f). The Second Circuit articulated the *Brady* rule in *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) as "a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id*. at 140. The focus is on whether the exculpatory and impeachment evidence, if suppressed,

"would deprive the defendant of a fair trial." *Id.* at 135 (citing *United States v. Bagley*, 473 U.S. 667, 675 (1985)).  The government has an affirmative duty to disclose exculpatory evidence known to it even absent a specific request.  *See United States v. Agurs*, 427 U.S. 97, 108–110 (1976); *Bagley*, 473 U.S. at 682.

 "There are three components to a *Brady* violation: (1) the evidence at issue must be favorable to the accused either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the Government, either willfully or inadvertently; and (3) prejudice must have ensued." *United States v. Li*, No. 18 Cr. 302 (BMC), 2020 U.S. Dist. LEXIS 203686, at *40 (E.D.N.Y. Nov. 2, 2020) (citing *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)).

Under the first prong of the *Brady* analysis, "evidence is 'favorable' to the defendant if it undermines the Government's proof or supports a valid defense, a universe that includes both 'exculpatory information' and 'information that could be used to impeach government witnesses, so-called *Giglio* material.'" *United States v. Avenatti*, No. 19 Cr. 374 (JMF), 2022 U.S. Dist. LEXIS 28472, at *37 (S.D.N.Y. Feb. 15, 2022) (quoting *United States v. Madori*, 419 F.3d 159, 169 (2d Cir. 2005)).  "Impeachment evidence is evidence 'having the potential to alter the jury's assessment of the credibility of a significant prosecution witness'" and is, thus, considered favorable. *Madori*, 419 F.3d at 170 (quoting *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998)).  *Brady* impeachment evidence can be based on withheld information regarding the illegal conduct of a government witness.  "It is of course blackletter law that any illegal conduct of a government witness can be considered probative of bias, on the theory that the witness is likely to curry the favor of government attorneys[.]" *Li*, 2020 U.S. Dist. LEXIS 203686, at *40-41  (assuming that information concerning a witness' unlawful immigration status satisfied the

first component to an alleged *Brady* violation) (emphasis in original) (internal quotation marks and citations omitted).

For the second prong of the *Brady* analysis, for the government to have "suppressed" the information, they must have had knowledge of its existence. *See Avellino*, 136 F.3d at 255. "An individual prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Id*. at 255-56. "In the Second Circuit, a prosecutor's constructive knowledge only extends to those individuals who [or entities that] are 'an arm of the prosecutor' or part of the 'prosecution team.'" *United States v. Meregildo*, 920 F. Supp. 2d 434, 440-41 (S.D.N.Y. 2013) (quoting *United States v. Gil*, 297 F.3d 93, 106 (2d Cir. 2002)). However, the determination of who is and is not a member of the prosecution team does not rely on any physical nexus with the prosecutors trying the case. *See United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) ("It does not turn on the status of the person with actual knowledge, such as a law enforcement officer, prosecutor or other government official. In other words, the relevant inquiry is what the person did, not who the person is.")

"In determining whether another government entity acted as part of the prosecution team for all or part of a given case, courts in this Circuit consider five primary factors: 'whether the other [entity] (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings.'" *Avenatti*, 2022 U.S. Dist. LEXIS 28472 at

25

*30-31 (citing *United States v. Middendorf*, No. 18 Cr. 36 (JPO), 2018 U.S. Dist. LEXIS 139980, at *4, (S.D.N.Y. Aug. 17. 2018)).

For the third prong of the *Brady* analysis, the Court needs to analyze whether there would have been a "reasonable probability" that the defendant would have been acquitted had the suppressed evidence been produced. *See Kyles v. Whitley*, 514 U.S. at 434. "Where the evidence against the defendant is ample or overwhelming, the withheld *Brady* material is less likely to be material than if the evidence of guilt is thin." *Gil*, 297 F.3d at 103.  Things like a deadlocked jury, or multiple juror notes, should be considered to determine if the case was a close one.  *See Zappulla v. New York*, 391 F.3d 462, 471 (2d Cir 2004) ("Prosecution's failure to disclose *Brady* materials was not harmless error because the case against defendant was a close one, as shown in part by the fact that the first jury deadlocked").  If the evidence was not overwhelming, the suppressed evidence is all the more material.  *See Agurs*, 427 U.S. at 113 ("[I]f the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt").

## ARGUMENT

### Point I

**The Government Violated Its *Brady* Obligations By Failing
To Turn Over Exculpatory Documents In Its Possession
Directly Responsive To The Defense's *Brady*/Rule 5(f) Demands**

The government failed to produce to the defense DEA documents signed by Mr. Garcia Luna, DEA Regional Director Joe Evans, and the Attorney General of Mexico that constitute *Brady* material.  These documents, or Letters of Understanding ("LOUs") between the United States and Mexico establish that, at the time of his alleged offenses, the United States government performed extensive background investigations of Mr. Garcia Luna and his team.

26

Mr. Garcia Luna and his team were thoroughly vetted and cleared of any wrongdoing by the United States government on the precise issues of this trial. The defense has obtained a copy of one of the LOUs memorializing these procedures. *See* de Castro Decl., Ex. C. The government's failure to disclose the LOU obtained by the defense, any previous and subsequent LOUs, and all the materials generated by the United States government in its vetting process of Mr. Garcia Luna and his team violated the government's obligations under *Brady* and Rules 5(f) and 16 of the Federal Rules of Criminal Procedure. The violation is especially egregious because the defense specifically requested these materials from the government on April 15, 2022, nine months before trial. These materials would have been essential to the defense and could have led to a different result.

The defense's newly obtained LOU between the United States Department of Justice and the Government of Mexico regarding the operation of the DEA's SIU Program was signed on January 27, 2011, by Mr. Garcia Luna as Mexican Secretary of Public Security, DEA Regional Director Joe Evans, and Arturo Chavez Chavez as the Attorney General of Mexico. In the LOU, the parties outline how members of the SIU in Mexico were vetted, including undergoing polygraph tests by the United States, and training in Quantico, Virginia, that was funded by the United States.

Section 1(b) of the LOU states that: "[p]otential public servants shall be certified by the SSP and the PGR as honest and reliable persons, once they have successfully approves [*sic*] the vetting process conducted by the corresponding Institution." *Id.* at 6. The LOU further states that "such public servant shall take the following vetting process, which shall be guided by the DEA, in coordination with other agencies, offices and departments", and it mandates:

a.    Analysis of computer indexes such as the "*Narcotics and Dangerous Drugs Information System*" of the DEA and the "*National Crime Information Center for Evidence of Human Rights Violations or Other Derogatory Information*".

b.    Urine Test to enter the SIU Program, emphasizing that the public servants shall be subject to subsequent and random test during their assignment thereof.  Urine test which turn positive for illicit drug use in a potential public servant or in the public servant participating in the SIU program shall lead to his/her immediate non-acceptance or removal thereof.

c.    Polygraph examination and background questionnaire to enter the SIU Program, emphasizing that the public servants shall be subject to subsequent and random test during their assignment thereof.  The deceiving; relevant negative results; or the use of counter measures during the polygraph examination shall lead to the removal of the public servant from the SIU Program.  If there are justified or extenuating circumstances, the Regional Director of the DEA may request a new test for that public servant.

*Id*. at ¶2.

It is our understanding that multiple LOUs were signed between the SSP and the DEA, covering different years, in connection with each new United States congressional appropriations bill authorizing these programs and aid to Mexico – all of which would have been and still are maintained by the DEA[2] and other United States Department of Justice ("DOJ") agencies. Furthermore, a newly discovered witness who served as one of Mr. Garcia Luna's secretaries and maintained his schedule, has declared that he/she and Mr. Garcia Luna underwent lengthy and extensive polygraph examinations by members of the DEA.  *See* de Castro Decl., Ex. D.

Applying the *Brady* analysis to the LOU establishes that the government violated its obligations under *Brady* and Mr. Garcia Luna should be granted a new trial.  Not only does the LOU show that Mr. Garcia Luna was dedicated to fighting the cartels, it also demonstrates that the United States government investigated and cleared Mr. Garcia Luna at the time of these

---

[2] Saritha Komatireddy, the government's lead prosecutor at Mr. Garcia Luna's trial is in a prime position to confirm this information.  Since April 2023, Ms. Komatireddy has served as Chief of Staff for the DEA.

alleged offenses regarding the very issues litigated in this trial.  This document, along with the as of yet undisclosed materials setting out the results of background investigations and polygraph examinations of Mr. Garcia Luna and the members of the SIU, establish that the United States government investigated potential connections between Mr. Garcia Luna and narco-trafficking and concluded that he was not involved with the cartels.  Surely the United States would not have shared sensitive intelligence and national security information for years with someone that was.

Furthermore, as Ambassador Wayne testified, there were rumors swirling in Mexico about Mr. Garcia Luna's purported involvement with the cartels, but he felt assured that members of United States law enforcement had investigated those rumors and concluded they were unfounded.  The LOU makes clear that the United States had no basis to suspect Mr. Garcia Luna of crimes because of its thorough vetting process at the time of the alleged misconduct – information that would have been crucial for the jury to consider given the fact that years later the government could offer virtually no corroboration for the cartel witnesses who themselves were hunted by Mr. Garcia Luna.

With respect to the second prong of the *Brady* analysis, this exculpatory evidence was clearly undisclosed by the government.  Whether it was deliberate or inadvertent is irrelevant. As part of its request to the government for all *Brady*/Rule 5(f) material, the defense requested "[t]he results of and all materials generated in connection with any and all background checks concerning Mr. Garcia Luna, including but not limited to those conducted in advance of Mr. Garcia Luna interacting with the below listed individuals around the below listed time periods, conducted by the United States at any point during the years 2001 through 2012." de Castro Decl., Ex. A at 5-6.  This letter was also annexed to the defense's Motion to Dismiss and for a

29

Bill of Particulars.  *See* ECF No. 123 at Attachment "B".  The government responded that "[t]he Prosecution Team does not possess any background checks conducted on the defendant in advance of any meetings with U.S. government officials."  de Castro Decl., Ex. B.

That answer was insufficient.  Clearly these documents exist and were in the possession of the United States government.  The prosecution team had an obligation to search for them. Even the Department of Justice's own training manuals recognize that prosecutors are obligated to seek out exculpatory and impeachment information.  Section 9-5.001(B)(2) of the DOJ Justice Manual provides that under the law, federal prosecutors are obligated to seek exculpatory and impeachment information from all law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against a defendant. DOJ Justice Manual 9-5.001, *Policy Regarding Disclosure of Exculpatory and Impeachment Information*, details the policy prosecutors are required to follow to ensure that they fulfill their "obligation both to disclose exculpatory and impeachment information to criminal defendants and to seek a just result in every case."  JM 9-5.001(A).  The comment to the policy explains that "[w]here it is unclear whether evidence or information should be disclosed, prosecutors are encouraged to reveal such information to defendants or to the court for inspection *in camera* and, where applicable, seek a protective order from the court.  By doing so, prosecutors will ensure confidence in fair trials and verdicts."  JM 9-5.001(A).

The prosecution team did not solely consist of prosecutors from the United States Attorneys' Office for the Eastern District of New York.  The DEA spearheaded and led the investigation into Mr. Garcia Luna and was an integral member of the prosecution team.  The government was obligated to ascertain from the DEA whether it possessed any exculpatory

information concerning Mr. Garcia Luna even prior to the defense's *Brady* demands, but certainly once the demands were made specifically identifying such materials.

The existence of the LOU establishes that the government either knowingly withheld exculpatory material from the defense or consciously avoided determining whether such materials existed.  Either scenario violates *Brady* and the DOJ's own policies, resulting in a conviction irrevocably tainted by injustice.  Withholding this evidence prevented the defense from questioning multiple government witnesses not only about Mr. Garcia Luna's extensive efforts to work openly with the United States but also and more importantly, about the fact that Mr. Garcia Luna was trusted with highly sensitive information by the United States because he was thoroughly vetted *via* comprehensive background investigations.

The government's failure to produce these requested materials to the defense was a violation of its obligations under both *Brady v. Maryland* and Rule 5(f), resulting in an unjust conviction.  A new trial pursuant to Rule 33 is required to remedy this manifest injustice.

## Point II

### Newly Discovered Evidence Supports The Conclusion That The Government Violated Its *Brady* Obligations By Withholding Information That Mr. Garcia Luna's Staff Was Also Vetted by And Provided Analysis For The CIA

The defense has obtained new evidence that Mr. Garcia Luna and different members of his team (not the SIU) were separately vetted by the CIA.  Documents related to his CIA vetting and likely polygraph examinations would also constitute *Brady* material and should have been obtained and turned over to the defense.  As detailed above, during his tenure as Secretary of

Public Security, Mr. Garcia Luna met with high-ranking members of United States law enforcement regularly, including members of the CIA.  *See* de Castro Decl., Ex. E.[3]

The written SSP agenda for that meeting, also recently obtained by the defense, establishes that the parties discussed a group of 25 members of the SSP that were vetted by the CIA and trained in both Washington D.C. and Mexico City, separate and apart from the SIU group discussed in the LOU.  *See* de Castro Decl., Ex. F.  The meeting agenda highlighted how this new group monitored the cartels to analyze them and share their analysis reports with the CIA in Mexico.[4]  This is not merely cumulative.  It shows that Mr. Garcia Luna was trusted by one of the most secretive and powerful organizations in the United States and is corroborated by another piece of newly discovered evidence showing that Mr. Garcia Luna was trusted by the CIA director himself, Leon Panetta.  *See* de Castro Decl., Ex. G.  Having members of his department vetted by and working for the CIA explains why the United States government trusted Mr. Garcia Luna with sensitive information and responsibilities, despite the rumors of corruption in the Mexican government.  Additionally, the defense recently spoke to another member of Mr. Garcia Luna's secretarial staff who managed Mr. Garcia Luna's personal calendar, who confirmed that even she/he was polygraphed by the DEA, CIA and received training in the United States.

---

[3]  In an abundance of caution, because this document contains the names of members of the CIA that met with Mr. Garcia Luna, we request that the exhibit to the de Castro declaration and one other similar exhibit be filed under seal.  We will provide those exhibits to the Court *via* Email.  We see no reason why that information should not be public, however, we ask that it be filed under seal to allow the government and the Court to consider whether that information should be deemed sensitive and not be made available to the public at this time, or filed in redacted form.

[4]  While the agenda of Mr. Garcia Luna's meeting with the CIA is not being offered strictly as *Brady* material that was in the possession of the United States, the fact that he had officers being vetted by, and working for the benefit of, the CIA should have been disclosed under *Brady*.  And any documents relevant to his vetting done by the CIA should have been obtained and turned over to the defense.  The meeting took place with a CIA delegation from the United States Embassy in Mexico City.  The Embassy is clearly an arm of the prosecution because, as the government mentioned in its redirect examination of Ambassador Wayne, "it's the U.S. Embassy in Mexico that initiated this investigation".  TT at 1231.

This newly discovered evidence is further direct proof that Mr. Garcia Luna was vetted and trusted by the United States Government, and specifically the CIA.  It also shows why he was trusted by the United States – because it had thoroughly investigated the allegation and rumors of his connections to the cartel and concluded they were unfounded.  A new trial pursuant to Rule 33 is required to remedy this manifest injustice and ensure that Mr. Garcia Luna was not convicted of charges of which he is innocent.

### Point III

**The Government Violated Its *Brady* Obligations By Failing To Disclose Impeachment Material In Its Possession Pertaining To A Critical Cooperating Witness**

The government also committed a *Brady* violation by not providing the defense with impeachment material about one of its cooperating witnesses, Hector Villarreal Hernandez.  The government's failure to produce impeachment material in its possession showing that its sole white-collar and nonviolent cooperating witness had substantial credibility issues and continued to commit crimes while working as a government cooperator, violated Mr. Garcia Luna's right to a fair trial and led to an unjust result.

As described above in the Newly Discovered Evidence section, in February 2023, following the conclusion of Mr. Garcia Luna's trial, the Investigators reached out to Mr. Garcia Luna's defense team regarding trial witness Hector Villarreal Hernandez.  The Investigators had assisted the Official with the Official's representation of Humberto Moreira Valdés, the former governor for the Mexican state of Coahuila, against whom Mr. Villarreal Hernandez was also cooperating.  It is worth noting that the Official, whose Mexican government service overlapped with Mr. Garcia Luna's, was no friend of his and, in fact, often disagreed with him on important matters with respect to the governance of Mexico.  Following the Official's service for the Mexican government, the Official entered private law practice in Mexico.  In this capacity, in or

33

around 2022, the Official began representing Governor Moreira Valdés, and the Investigators were members of the Official's defense team.

During their representation of Mr. Moreira Valdés, the Official and the Investigators came to believe that Mr. Villarreal Hernandez, who had served under Mr. Moreira Valdés' administration in Coahuila, was a primary source of information for United States law enforcement in its investigation(s) of Mr. Moreira Valdés. The Official and the Investigators investigated Mr. Villarreal Hernandez's personal and business financial dealings and discovered that, during his time as a United States government cooperator, Mr. Villarreal Hernandez engaged in criminal conduct, such as money laundering, that demonstrated his lack of credibility and truthfulness. The investigation revealed, among other things, that Mr. Villarreal Hernandez unlawfully used a bank account in the name of one of his father's former employees to funnel cash to the United States in order to support his lifestyle and United States business interests. They also learned that he appeared to have received substantial cash deliveries in Texas from his father in Mexico.

Understanding that the United States government's investigation of him was being conducted largely in Texas, Mr. Moreira Valdés hired local Texas counsel Robbie Lea Ward, a former federal prosecutor, to advocate on his behalf and present to federal prosecutors the results of the information learned about Mr. Villarreal Hernandez by his defense team which, in their view, disqualified Mr. Villarreal Hernandez as a credible witness. Ms. Ward spoke with Assistant United States Attorney for the Western District of Texas, Russell Leachman, and on or about February 20, 2020, Ms. Ward's secretary hand delivered a letter to AUSA Leachman in which Ms. Ward detailed the results of the defense team's investigation related to Mr. Villarreal Hernandez. *See* de Castro Decl., Exs. H and I. Ms. Ward also attached exhibits and provided

34

AUSA Leachman with a flash drive containing the investigatory information underlying the details in the letter.  *See* de Castro Decl., Ex. H at 16.  Ms. Ward concluded the letter by explaining:

> All in all, the purpose of this proffer was to inform you of the illegal activities Mr. Villarreal has continued to conduct while in the United States, and to show you how much misinformation is reported regarding Mr. Moreira.  His attorney in Mexico, Spain and myself would like him to be able to continue with his life without worrying that the false statements and crimes committed by others will be held against him.

*Id.* at 17.

Mr. Moreira Valdés was never charged in the United States, a decision that appears likely to have rested in part on Mr. Villarreal Hernandez's lack of credibility.

In addition, in October 2022, prior to Mr. Garcia Luna's original scheduled trial date, the Official was contacted by Texas DSAC and trial witness Miguel Madrigal.  The Official told DSAC Madrigal, with whom the Official had worked in the past, that the Official was going to be in Houston later in October 2022.  DSAC Madrigal suggested that they see each other to say hello and for the Official to meet the DEA Special Agent in Charge ("SAC") for Texas, Daniel C. Comeaux.  In late October 2022, the Investigators drove the Official to the Houston DEA office. The Official met with DSAC Madrigal in his office but did not meet SAC Comeaux who, contrary to DSAC Madrigal's insinuation, did not know about the Official's visit and was not even in Houston that day.

During their meeting, the Official discussed with DSAC Madrigal the Official's frustrations with the government investigation against Mr. Moreira Valdés, and in particular, that it appeared to be based on information from Hector Villarreal Hernandez.  The Official informed DSAC Madrigal that Mr. Moreira Valdés' defense team had learned that Mr. Villarreal Hernandez appeared to be engaged in money laundering while a government informant and that

he was an unreliable, untruthful, and incredible witness who could not be trusted.  The Official

mentioned to DSAC Madrigal that Mr. Moreira Valdés hired local counsel who had provided the

results of their investigation into Mr. Villarreal Hernandez to Texas federal prosecutors.  The

Official offered to show DSAC Madrigal documents that demonstrated Mr. Villarreal

Hernandez's money laundering activities and other criminal conduct, but Agent Madrigal did not

accept the Official's offer.

The Official felt like DSAC Madrigal had no interest in learning more details about the

investigation into Mr. Villarreal Hernandez, and indeed appeared to become visibly nervous

during their conversation.  His face blushed and he grew uneasy in his chair, which the Official

found to be odd.  DSAC Madrigal also quickly changed the subject and did not bring it up again.

Upon information and belief, the Official traveled back from the meeting *via* a ride share taxi

ordered and paid for by DSAC Madrigal personally or the DEA.

After the conclusion of Mr. Garcia Luna's trial, the Investigators reached out to the

defense because they and the Official were shocked to learn that the United States government

had called Mr. Villarreal Hernandez as a key witness against Mr. Garcia Luna and had relied on

any information provided by him.  The Investigators were also astonished to learn that the

government did not disclose to the defense the impeachment evidence that Mr. Moreira Valdés's

team had given to the United States Attorney's Office for the Western District of Texas in 2020,

and of which Agent Madrigal had been specifically made aware in October 2022.  The

government's failure violated *Brady* because, as this Court has previously found, evidence of

illegal conduct of a government witness is impeachment material that satisfies the first

component needed to establish a *Brady* violation.  *See United States v. Li*, No. 18 Cr. 302

(BMC), 2020 U.S. Dist. LEXIS 203686, at *40-41 (E.D.N.Y. Nov. 2, 2020).

36

The Eastern District's investigation of Mr. Garcia Luna was intertwined with the Southern and Western Districts of Texas.  As 3500 material for Mr. Villarreal Hernandez showed, Eastern District of New York prosecutors attended proffers and trial prep sessions of Mr. Villarreal Hernandez conducted in the Western District of Texas.  *See* 3500-HJVH-24, 25.  Mr. Villarreal Hernandez was arrested in the Western District of Texas on February 13, 2014.  (Criminal docket for *United States v. Villarreal Hernandez*, 14 Cr. 100 (XR)).  DEA Special Agents Reed Esterak and James Cain, together with AUSA Russell Leachman, to whom the letter from Ms. Ward was addressed, conducted interviews of Mr. Villarreal Hernandez in the Western District of Texas within months of his arrest, during which Mr. Garcia Luna was discussed.  *See* 3500-HJVH-8 at 96.  Special Agent Cain was also present for Mr. Garcia Luna's arrest and post-arrest interview, which both took place in the Western District of Texas.  *See* 3500-IC-8.  And Special Agents Cain and Esterak, Texas stationed agents, were also present for preparation sessions with Mr. Villarreal Hernandez for Mr. Garcia Luna's trial conducted by Eastern District of New York prosecutors.  *See* 3500-HJVH-24, 25, 28, 29, 30, 31.

In addition, federal agents stationed in Texas must have been involved in presenting the case to the grand jury,[5] and federal prosecutors from Texas undoubtedly shared documents with prosecutors from the Eastern District.[6]

Furthermore, in or around October 2022, the existence of the *Brady* material concerning Mr. Villarreal Hernandez was directly communicated to trial witness and prosecution team member DSAC Madrigal.  From November 30, 2022, to December 19, 2022, after receiving the

---

[5] Mr. Garcia Luna was charged with making false statements in his post arrest statement.  While the defense is not in possession of the grand jury minutes, it is only logical that one of the members of the DEA present at his arrest presented these statements to the grand jury.

[6] AUSA Leachman was likely the Eastern District of New York's point of contact in the Western District of Texas.  Either he or agents stationed in Texas must have provided the Eastern District of New York with the file on Mr. Villarreal Hernandez that was turned over to the Defense as 3500 material.

information about Mr. Villarreal Hernandez's illegal activity, DSAC Madrigal met with prosecutors in the Eastern District of New York five times to review additional documents that he had shared with them, in addition to the more than 100 DEA-6 reports he had already shared.  In these meetings DSAC Madrigal provided his narrative on the climate in Mexico when he was stationed there.  *See* 3500-MM-156.  There is no question that he was a member of the prosecution team, thus satisfying the third factor articulated in *Avenatti* (*i.e.*, reviewing documents gathered by or sharing documents with the prosecution).

Prosecutors had no excuse for failing to disclose this *Brady* material to the defense. Either the prosecution team possessed the impeachment information and made the affirmative decision not to disclose it, or it failed in its duty to inquire from its law enforcement witnesses and DOJ partners whether such information existed.  Either way, this failure satisfies the second prong required for a *Brady* violation.

The cross examination of Mr. Villarreal Hernandez was curtailed because the defense did not have a good faith basis to impeach his credibility by cross-examining him about his continued criminal activity.  Mr. Villarreal Hernandez was the only cooperating witness who was either not a cartel member or someone who had aided the cartel through monstrous acts of violence.  He was a government official without the same kind of baggage the government's other cooperating witnesses carried and was, thus, a crucial witness.  Moreover, his testimony was not supported by other corroborative evidence, which made his credibility central.

Armed with the newly discovered *Brady* impeachment evidence and the new evidence obtained regarding his perjury (detailed below), the defense would have been able to completely discredit Mr. Villarreal Hernandez.  Mr. Villarreal Hernandez was an extremely important witness to the government's case.  For one, it used him to support the uncorroborated tale of Mr.

Garcia Luna's kidnapping by cartel members.  Mr. Villarreal Hernandez also offered testimony on how government officials hid money using patrimony statements, even though he had no personal knowledge about Mr. Garcia Luna's finances or whether this was done by him.

By depriving the defense of its ability to demonstrate that Mr. Villarreal Hernandez was a lying, corrupt, politician who continued to commit crimes even while working with the United States, the government impaired Mr. Garcia Luna's right to a fair trial.  The government's *Brady* violation tainted Mr. Garcia Luna's conviction, and pursuant to Rule 33, this Court should vacate the conviction and order a new trial.

### Point IV

**Newly Discovered Evidence Proves Hector Villarreal Hernandez Committed Perjury**

Newly discovered evidence conclusively establishes that Mr. Villarreal Hernandez testified falsely about material and critical trial facts.  This new evidence demonstrates that Mr. Villarreal Hernandez testified falsely that: (1) he facilitated a bribery scheme whereby Mr. Garcia Luna bribed a national newspaper for favorable stories; (2) he met with Mr. Garcia Luna in 2008; (3) he met with Mr. Garcia Luna and toured the "Bunker" in January 2009; and (4) he was shown Pegasus software by Mr. Garcia Luna during his "Bunker" visit.  Permitting Mr. Garcia Luna's conviction to stand based on this demonstrably false testimony would result in a manifest injustice.

      1.     *Mr. Villarreal Hernandez Falsely Testified That He Facilitated Mr. Garcia Luna's Bribery Of El Universal Newspaper*

One of the primary reasons Mr. Villarreal Hernandez was called as a witness by the government was his testimony that Mr. Garcia Luna asked Governor Moreira Valdés to introduce him to the governor's good friend, the publisher of El Universal, a widely read newspaper in Mexico.  According to Mr. Villarreal Hernandez, the purpose of the introduction was to allow

Mr. Garcia Luna to bribe the publisher to suppress negative stories about the alleged cartel kidnapping of Mr. Garcia Luna. This testimony was crucial for the government because it purportedly corroborated the kidnapping story advanced by other witnesses and suggested some consciousness of guilt on the part of Mr. Garcia Luna. New evidence obtained by the defense, however, establishes that this entire testimony by Mr. Villarreal Hernandez was false.

Mr. Villarreal Hernandez testified that his boss, Governor Moreira Valdés, could broker a deal between Mr. Garcia Luna and the governor's good friend, Juan Francisco Ealy Ortiz, the owner of El Universal newspaper. However, as newly acquired copies of Mr. Garcia Luna's schedules and photographs make clear, Mr. Garcia Luna already had a longstanding and close relationship with the owner of El Universal well before any alleged meeting with Mr. Villarreal Hernandez. Mr. Garcia Luna did not need an introduction. In fact, Mr. Garcia Luna met with Mr. Ealy Ortiz numerous times before 2009, when Mr. Villarreal Hernandez claims Mr. Garcia Luna needed a contact at the newspaper. Furthermore, Mr. Garcia Luna met with other members of El Universal capable of controlling content, again well before Mr. Villarreal Hernandez claims that Mr. Garcia Luna needed their help. Below is a summary chart of the meetings between Mr. Garcia Luna and Mr. Ealy Ortiz or other members of El Universal from 2007 through 2012, as memorialized in Mr. Garcia Luna's schedules:

| Date | Meeting Title | Location | Time |
|------|---------------|----------|------|
| 5/9/2007 | Meeting with Juan Francisco Ealy Ortiz | Israeli Sports Center | 2.5 hours |
| 5/16/2007 | Lunch with Juan Francisco Ealy Jr. | Bucareli No 8, corner Av. Paseo de la Reforma, Col. Centro Del. Cuauhtémo | 2.5 hours |
| 12/4/2007 | Lunch with Raymundo Riva Palacio Editorial Director of El Universal | Restaurant The Palm of Hotel Presidente Intercontinental | 3.5 hours |

| Date | Meeting Title | Location | Time |
|---|---|---|---|
| 3/3/2008 | Meeting with Juan Francisco Ealy Jr. | Constituyentes | 30 minutes. |
| 4/2/2008 | Lunch with Raymundo Rivapalacio Editorial Director of El Universal | Constituyentes | 2 hours |
| 4/17/2008 | Private Dinner with Juan Francisco Ealy, Jr. | Newspaper facilities El Universal | 2 hours |
| 7/2/2008 | Lunch with Raymundo Riva Palacio, Editor of Director of El Universal | The Palm Restaurant, Inside the hotel Intercontinental | 2 hours |
| 10/23/2008 | Meeting with Raymundo Rivapalacio Editorial Director of El Universal | Constituyentes | 1 hour |
| 2/5/2009 | Lunch with Juan Francisco Ealy Ortiz | Constituyentes | 2 hours |
| 3/3/2009 | Meeting with Juan Ealy Ortiz and Roberto Rock, editor of El Universal. | Constituyentes | 1 hour |
| 4/2/2009 | Meeting with Raymundo Rivapalacio, Editorial Director of El Universal | Constituyentes | 2 hours |
| 10/23/2009 | Dinner Honoring Juan Franciso Ealy Ortiz | Hotel Four Season | 3 hours |
| 9/28/2010 | Lunch with Juan Francisco Ealy | Restaurant Jin San Shabu Sabur | 2 hours |
| 3/2/2011 | Lunch with Juan Francisco Ealy Ortiz and Engineer Joel Ortega Cuevas | Restaurant Jin San Shabu Sabur | 3 hours |
| 5/21/2011 | Dinner honoring Juan Francisco Ealy Ortiz | Vía Reforma Park No. 2138, Lomas de Chapultepec | Started at 4:30 |

| Date | Meeting Title | Location | Time |
|------|---------------|----------|------|
| 6/17/2011 | Lunch with Editorial Directors of the Newspaper "El Universal" Attend •Roberto Rock, Editorial Director •David Aponte, Deputy Editorial Director •Francisco Santiago, Deputy Editorial Director •Alejandro Jiménez, Deputy Director of Opinion •Carlos Benavides, Justice Coordinator | Constituyentes | 3 hours |
| 10/7/2011 | Gala of 95th Anniversary of El Universal | College of San Ignacio of Loyola Vizcainas | 3 hours |
| 5/8/2012 | Lunch with Juan Francisco Ealy | Constituyentes | 1 hour |

*See* de Castro Decl., Ex. J.  Furthermore, photographs show Mr. Garcia Luna and Mr. Ealy Ortiz together in which the friendship is clear.  *See* de Castro Decl., Ex. K.

In addition, counsel for El Universal has provided an affidavit that unequivocally debunks the alleged bribes alleged by Mr. Villarreal Hernandez.  *See* de Castro Decl., Ex. L.  The affidavit also confirms that the relationship between Mr. Ealy Ortiz and Mr. Garcia Luna predated the alleged introduction by Governor Moreira Valdés in early 2009.  Finally, the affidavit cites numerous negative articles by El Universal about Mr. Garcia Luna, both before and after the alleged bribes that, according to Mr. Villarreal Hernandez, were intended to ensure good press.  Accordingly, Mr. Villarreal Hernandez's testimony regarding the alleged bribe payments to El Universal was false.

2.  *Mr. Villarreal Hernandez Did Not Meet with Mr. Garcia Luna In 2008 To Review Security Project Allocations*

Mr. Villarreal Hernandez testified that he met with Mr. Garcia Luna in 2008 to review security project allocations for the Mexican State of Coahuila.  *See* TT at 1146.  Mr. Garcia Luna's newly discovered schedules show that, while Mr. Garcia Luna met with Governor Moreira Valdés on September 25, 2008, Mr. Villarreal Hernandez was not present.  Mr. Garcia Luna's schedules are very specific and would generally include all the attendees at meetings.  *See* de Castro Decl., Ex. M for examples of Mr. Garcia Luna's schedule listing meeting participants. A review of Mr. Garcia Luna's September 25, 2008 schedule, shows that Governor Moreira Valdés was accompanied by five other named officials, but not Mr. Villarreal Hernandez.  Most importantly, Mr. Villarreal Hernandez does not appear as an attendee for any meetings in Mr. Garcia Luna's schedule.  Accordingly, Mr. Villarreal Hernandez's testimony that he met with Mr. Garcia Luna in 2008 was likely false, a conclusion that is only bolstered by the irrefutable evidence of Mr. Villarreal Hernandez's falsehoods described above and below.

3.  *The "Bunker" Did Not Exist When Mr. Villarreal Hernandez Claimed To Have Toured It Tith Mr. Garcia Luna*

Mr. Villarreal Hernandez testified that the second time he met Mr. Garcia Luna was in the beginning of 2009 at the "Bunker," the well-publicized high-tech SSP command center in Mexico City.  TT at 1147.  Mr. Villarreal Hernandez testified that he accompanied Governor Moreira Valdés to Mexico City for this tour and meeting.  However, the "Bunker" had not yet been built in the beginning of 2009.  The "Bunker" was not completed until November 2009, more than ten months after Mr. Villarreal Hernandez claimed to have been there.  News reports and video footage of the opening of the "Bunker" establish that it was inaugurated on November 24, 2009.  Mr. Garcia Luna's schedule confirms this, as does a document obtained by the defense

43

including highlights of that day.  *See* de Castro Decl., Exs. N (schedule) and O (highlights).

Furthermore, Internal United States State Department cables from August 2009, provide that the

"Bunker" was anticipated to open in September 2009, taking six months from groundbreaking to

opening.  *See* de Castro Decl., Ex. P.  Groundbreaking for the "Bunker" could, at the earliest,

have commenced in March 2009.  It is therefore impossible for Mr. Villarreal to have been given

a tour of a high-tech, state of the art facility, in January 2009.  Mr. Villarreal Hernandez's

testimony about his meeting at the "Bunker" was, therefore, also false.

4.     *Mr. Villarreal Hernandez Falsely Testified That Mr. Garcia Luna
       Demonstrated Pegasus While In The Bunker*

Mr. Villarreal Hernandez also testified that during the tour of the Bunker in the beginning

of 2009, Mr. Garcia Luna showed him the controversial software Pegasus, gave a demonstration

of the software's capabilities, and offered to sell the technology to Mr. Villarreal Hernandez and

Governor Moreira Valdés.  *See* TT at 1147-58.  Newly discovered evidence establishes that Mr.

Villarreal Hernandez falsely testified about this as well.  The company that created Pegasus did

not even exist when Mr. Villarreal testified that he was offered an opportunity to buy it in 2009.

NSO Group, the creator of Pegasus, was formed a year later in 2010.  *See* de Castro Decl., Ex. Q.

The NSO Group report states that the "NSO Group was founded in 2010 with one key mission;

to make the world a safer place by assisting lawful investigations by state authorities to protect

the security and safety of citizens against major crimes and terrorism."  *Id.*  The first iteration of

Pegasus was reportedly not completed until 2011.  *See* de Castro Decl., Ex. R.  Newly discovered

evidence also establishes that the government of Mexico, the first purchaser of the software from

NSO, did not buy Pegasus until July 2011, and it was first installed in Mexico in September

2011.  *See* de Castro Decl., Ex. S.  Additionally, the SSP did not purchase Pegasus.  It was

purchased by the PGR and the Secretariat of National Defense ("SEDENA").  *See* de Castro

Decl., Exs. S and T.  Accordingly, Mr. Villarreal Hernandez also falsely testified that Mr. Garcia Luna showed him Pegasus.

In summary, the defense learned after the conclusion of the trial that a central government witness committed crimes while he worked as a cooperator – evidence of which the government failed to disclose – and it learned that this witness lied about material and crucial elements of his testimony.[7]  In other words, a witness relied upon by the government as a cornerstone of its case against Mr. Garcia Luna in fact lacked all credibility.  The defense was unable to confront Mr. Villarreal Hernandez with evidence of his lies.  If it had, it is likely that the jury would have rejected his testimony, and without him the case against Mr. Garcia Luna was significantly weaker.  Accordingly, the combination of the government's *Brady* violations with the newly discovered evidence should persuade the Court that a manifest injustice occurred, resulting in a new trial.

**Point V**

**Newly Discovered Evidence Proves Francisco Cañedo Zavaleta
Committed Perjury and Did Not Witness Mr. Garcia Luna's Kidnapping**

Since the trial, the defense has discovered new evidence that establishes that at the precise date and time that Mr. Cañedo Zavaleta claimed Mr. Garcia Luna was in the custody of the BLO, he was, in fact, in Angeles Hospital in Mexico City with his wife, paying a hospital bill and accompanying her home after surgery.  Mr. Cañedo Zavaleta's false testimony warrants a new trial.

---

[7] As discussed above, despite multiple attempts by the defense prior to the trial to obtain information from certain individuals in Mexico, it was only after the conclusion of the trial that those individuals agreed to provide information and documents to the defense, including Mr. Garcia Luna's schedules that now refute Mr. Villarrael Hernandez's testimony.  Likewise, after the conclusion of the trial El Universal issued editorials uncovering the numerous lies contained in Mr. Villarreal Hernandez's testimony.  This prompted the defense to reach out to them and ultimately obtain the affidavit.

A central thread that ran through the government's case against Mr. Garcia Luna was the allegation that he had been kidnapped by cartel members.  This was supposed to show that he was in the employ – and at the mercy of – the cartel.  Although several cartel witnesses offered a variety of differing accounts about this alleged event, the most powerful evidence came from Francisco Cañedo Zavaleta, a federal police officer in Mexico, who testified that he personally witnessed Mr. Garcia Luna and his security detail being held at gunpoint on the side of the road between Mexico City and Cuernavaca by Arturo Beltran Leyva and his cartel soldiers.  According to Mr. Cañedo Zavaleta, this gun-point seizure occurred on October 19, 2008, at around 12:00 p.m.  *See* TT at 1091.

New evidence obtained by the defense now proves that Mr. Cañedo Zavaleta committed perjury and supports the defense theory that Mr. Cañedo Zavaleta's false claims were likely part of a political strategy to discredit Mr. Garcia Luna and his attempts at unifying federal police agencies and imposing stricter standards on federal police officers.  The new evidence establishes that at 12:28 p.m. on October 19, 2008, Mr. Garcia Luna was not being kidnapped and detained by Arturo Beltran Leyva on the side of the road more than two hours away from Mexico City, but he was with his wife at Angeles Del Pedrigal Hospital in Mexico City, signing her discharge paperwork and accompanying her home after a one-night stay in the hospital following a brief surgery.  *See* de Castro Decl., Ex. U.  This hospital paperwork shows that Mr. Garcia Luna's wife, Cristina Pereyra Galvez, was admitted at 11:53 a.m. on October 18, 2008, and Mr. Garcia Luna was with her as the Responsible Party.  The next day, on October 19, 2008, she was discharged at 12:28 p.m., with Mr. Garcia Luna again signing her out as the Responsible Party.  Additionally, also on October 19, 2008, Mr. Garcia Luna paid the hospital bill with his credit card.  *See id.*

46

The hospital documents establishing that Mr. Garcia Luna *could not* have been kidnapped on October 19, 2008, do not constitute the only new evidence undermining Mr. Cañedo Zavaleta's credibility.  For example, Mr. Garcia Luna's bodyguard from March 2, 2009, through December 31, 2012, Jose Jorge Rincon Namorando, swears in an affidavit that Mr. Garcia Luna and his security detail always took the Mexico-Cuernavaca highway from Mexico City to Jiutepec, Morelos, and never used the road going to Cuautla, Morelos, where Mr. Cañedo Zavaleta insisted he saw Mr. Garcia Luna with Arturo Beltran Leyva.  *See* de Castro Decl., Ex. V. Mr. Rincon Namorando also attests that Mr. Cañedo Zavaleta was never a member of Mr. Garcia Luna's security detail or even a member of the Federal Police Security Department.  *Id.*  Now knowing that staff of the Mexican Attorney General's office did not provide security to Mr. Garcia Luna's office, Mr. Cañedo Zavaleta's perjury is all the clearer.  Mr. Cañedo Zavaleta's Institute for Social Security and Services for State Workers ("ISSSTE") document proves that he was never a member of the SSP, and as thus, would not have provided security at Mr. Garcia Luna's office.  *See* de Castro Decl., Ex. W; *see also* Ex. V and compare with Rincon ISSSTE.

Another witness who emerged after the trial is ███████████, one of Mr. Garcia Luna's main secretaries from 2005 through 2012.  ███████████ establishes that Mr. Cañedo Zavaleta also falsely testified regarding his access to Mr. Garcia Luna (presumably to establish that he could recognize him) at SSP headquarters.  Like Mr. Rincon Namorando, ███ ███████ "was reluctant to be involved, especially living and working in Mexico. However, after following the trial in the media and Mr. García Luna's unjust conviction in my view, I agreed to become involved to provide his defense team with any information I could". *See* de Castro Decl., Ex. D at ¶¶1-2.  In his/her affidavit, ███████████ attests to the following facts: (1) Mr. Garcia Luna's office was in the SSP headquarters, as was his/hers; (2)

law enforcement officers employed by the SSP were in charge of the security and protection for the offices in the building; (3) individuals not employed by the SSP would not be a part of the security for the building; and (4) he/she has never heard of Mr. Cañedo Zavaleta and did not recognize his picture, which he/she would have had he worked as a security guard in the building where his/her office was located for many years. *Id.* at ¶¶ 6-12.

As noted, the alleged kidnapping was a crucial piece of the government's case because it purported to provide a direct connection between Mr. Garcia Luna and the cartels. *See* TT at 1801-2, 1804, 1821, 1904-5. Mr. Cañedo Zavaleta was the sole witness to testify about the kidnapping who did not testify pursuant to a cooperation agreement and was not involved in massive narcotics trafficking, murder, torture, and/or corruption. The government harped on this point in its summation:

> And then the defendant gets kidnapped. That term, kidnap, is a little odd. That's what Grande called it. Because -- but you heard the whole story. You heard it from various perspectives, and you heard it from someone who actually saw it. Arturo had the defendant and his bodyguards detained on the side of the road. And you heard that from the police officer who was driving that day on that road, a police officer who knew what Arturo Beltrán and Barbie looked like, and who knew what Genaro Garcia Luna looked like because he worked for him closely, and saw it and remembered it. Officer Francisco Canedo Zavaleta. Now, you remember his testimony. It was very detailed. It was very precise. He was very literal. I submit to you that that is a hallmark of truth telling. He was very literal. He cared a lot about getting it right, which road, which stop. And he remembered everything.

TT at 1801-02.

At trial the defense tried to show that Mr. Cañedo Zavaleta's testimony was false and came from an unstable and unreliable witness with a grudge against Mr. Garcia Luna. But the defense had one arm tied behind its back. The newly discovered evidence now proves that every aspect of Mr. Cañedo Zavaleta's testimony from how he claimed to have familiarity with Mr. Garcia Luna to his account of the alleged kidnapping itself was false. Mr. Cañedo Zavaleta was

a critical witness who, as it now turns out, lied to the jury about a crucial part of the case.  Being

able to demonstrate that the sole alleged eyewitness to the kidnapping provided perjured

testimony would likely influence the jury to discredit his testimony in its entirety and result in an

acquittal.  This new evidence should cause this Court to vacate his conviction and order a new

trial.

**Point VI**

**Newly Discovered Evidence Proves Cooperating Witnesses Communicated
With One Another Prior To Trial Contradicting Testimony By Government
Witnesses And Arguments Made In The Government's Summation**

The defense has now obtained evidence that government cooperating witnesses

communicated with one another on contraband telephones while incarcerated, directly

contradicting a critical government argument in defense of its cooperators.  The defense has also

obtained evidence from Mexico establishing that as early as 2009, members of the cartel were

conspiring to frame Mr. Garcia Luna by having individuals falsely testify that El Chapo had paid

Mr. Garcia Luna a substantial bribe on a boat.  This new evidence explains how and why the

government's cooperators could testify about fabricated events in an arguably similar manner

and supports a conclusion that Mr. Garcia Luna was unjustly convicted.

Following the trial, an inmate at the MDC named ████████ contacted the defense.

Before his approach, the defense did not know of the existence of ██████ and had no

knowledge of the information he could provide.  ███████ swore in an affidavit that he was, at

times, housed with important trial witness Edgar Veytia, as well as Juan Carlos Nava Valencia

---

[8] For fear of reprisal, as he is housed at the same jail as Mr. Veytia and others are housed, we are requesting that this inmate's name be redacted in the public filing of this motion.

a.k.a. "El Tigre" (the brother of trial witness Oscar Nava Valencia).[9]  *See* de Castro Decl., Ex. X.

Oscar Nava Valencia claimed El Tigre accompanied him to a meeting with Mr. Garcia Luna.  In

his affidavit ███████ describes his time with Mr. Veytia and El Tigre, and how they would

communicate with Oscar Nava Valencia through contraband cellular telephones.  This came at a

time when the Warden of the MDC had to issue a memorandum outlining the ongoing problem

of contraband cellular telephones in the facility.  *See* de Castro Decl., Ex. Y.  ████████

affidavit also describes conversations with El Tigre and Mr. Veytia in which they discussed their

plans to return to narcotrafficking after their release.[10]  Specifically, Mr. Veytia concocted a plan

to cooperate with the government to get his sentence reduced because the prosecutors "are stupid

and will believe anything I say."  *See* de Castro Decl., Ex. X at 2.  In the same conversation,

when talking about testifying against Mr. Garcia Luna, Mr. Veytia told █████: "fuck GGL,

I'm going to screw him."  *Id.* at 2.

    At a minimum, the contents of ████████ affidavit would have been used to cross

examine both Mr. Veytia and Oscar Nava Valencia about their communications with other

witnesses while incarcerated, and their communications with other drug traffickers using

contraband cellphones.  The contents of ████████s affidavit would also have been used against

Mr. Veytia on cross examination to show his motive to lie to the government and his belief that

he could get away with it, along with his animosity towards Mr. Garcia Luna and his motive to

frame him.  Of course, the defense could have also called ████████ to testify at trial.

---

[9] Oscar Nava Valencia testified that he allegedly personally bribed Mr. Garcia Luna at a carwash in Guadalajara in 2008.  Guadalajara is a six-hour drive from Mr. Garcia Luna's office in Mexico City.  Mr. Garcia Luna's schedules show that he was never in Guadalajara in 2008, or ever, from 2007 through 2012.

[10] Additionally, on October 6, 2023, the government disclosed to the defense that it was turning over two of Mr. Veytia's cellphones and a SD card that was seized upon his arrest in 2017.  These devices consist of multiple terabytes of data, and as such, the defense has been unable to explore the extent of Mr. Veytia's drug dealing prior to his arrest.

As the Court knows, the cartel leaders and members who testified against Mr. Garcia Luna were all massive criminals who killed, tortured, kidnapped, and raped without a second thought.  Yet the case against Mr. Garcia Luna was almost exclusively built by these cooperating witnesses, who were all looking for substantial reductions to their sentences.  The only way the government could bolster the credibility of these men was to suggest that they had to be telling the truth because how could their stories otherwise align when they had not seen or spoken to each other in over a decade.  The government repeatedly made this point in summation: "[With the exception of Messrs. Zambada Garcia and Poveda Ortega being transported together] no other witness has talked to each other.  By some fluke, these guys ended up in a transit van together from prison one day, and they had a 20-minute conversation. … Even though they are apparently friends now, there's no coordination here.  It's just not there."  TT at 1800.  The government specifically called Special Agent Dietz to try to drive this point home, "Special Agent Dietz told you about how witnesses are handled by the Government.  They're separated, they don't meet other witnesses, they don't see the evidence that other people provide."  TT at 1902.  And when explaining to the jury why the cooperators should be believed, prosecutors stated that "[t]hey have to tell the truth because otherwise, their cooperation is ripped up.  And it would be very foolish for them to come in and lie to you, because they have no idea what the other witnesses are going to say."  TT at 1908.

████████'s affidavit destroys the government's central argument.  He makes clear that not only was the government's claim that the cooperators did not talk a complete fiction, he establishes that they affirmatively plotted to coordinate their stories and make plans for a narco-trafficking future.  This new evidence shows that the government's case was built on lies by these cartel leaders and suggests that Mr. Garcia Luna was likely unjustly convicted.

The second piece of new evidence showing the cartels' willingness to frame Mr. Garcia Luna comes in the form of an intercept and report detailing just this – cartel members conspiring to falsely attest that they had bribed Mr. Garcia Luna. The Mexican Attorney General's Office intercepted communications of an inmate and forwarded it to Mr. Garcia Luna's office to warn him. In intercepted jail communications that were transcribed by the Attorney General's Office, this inmate told his mother that if she did not provide Mexican authorities testimony that Mr. Garcia Luna was corrupt, they would be killed by the same people that had filed the complaint against the inmate, because these people "want to fuck over Garcia Luna". de Castro Decl., Ex. Z. Specifically, the inmate stated that he was being pressured to lie to the authorities and tell them a story that "García Luna and I met on a yacht where I handed him, García Luna, three million dollars, 'cause those are the people who've filed the complaint and want me to finger García Luna . . . as the person who took delivery of those three million dollars from drug trafficking from me, and that it came from El Chapo Guzmán". *Id*. According to this inmate, his mother needed to tell the authorities this "because if I don't testify against García Luna they're going to kill you guys." *See id*. at 3.

The plot to frame Mr. Garcia Luna would also corroborate ███████ affidavit that drug traffickers had a reason to testify falsely in order to purposefully damage Mr. Garcia Luna. This is not simply impeachment. It is direct evidence of the cartels' plan to testify falsely against Mr. Garcia Luna to exact revenge against the man who fought them for so many years. Evidence of cooperator communications through contraband cellular telephones and evidence of plots by the cartels to frame Mr. Garcia Luna would have supported the defense and affected the verdict. If it had been available before trial, it would have helped prove that the government's cooperators had reason to, and did, testify falsely. This important new evidence warrants a new trial.

**Point VII**

**Newly Discovered Evidence Establishing Multiple Nondisclosure
Violations By The Government Supports Renewed Consideration
Of The Missing Jesus Zambada Garcia 3500 Material**

Before Mr. Zambada Garcia testified, the defense complained that it had received proffer

notes as part of 3500 material from only 69 proffer meetings, even though Mr. Zambada Garcia

had met with the government at least 118 times.  *See* ECF No. 216; TT at 1440-48.  In response,

the government acknowledged the existence of the meetings and the discrepancy but claimed

that "the majority of the meetings that Mr. de Castro is referencing happened before the Chapo

trial," and were, therefore, trial preparation meetings.  TT at 1443.  However, of the 70[11]

meetings for which 3500 material was produced, only 11 indicate they were for trial preparation

sessions – and even during those meetings some notes were taken.  Crediting the government's

representations to the Court, that would mean that there were 59 trial preparation sessions for

Mr. Zambada Garcia and that only 11 of them were memorialized with notes.

In light of the disclosure violations uncovered since the trial, the government's failure to

produce 3500 material for almost *50 meetings* with Jesus Zambada Garcia, should be

reexamined ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ It is

simply not credible that there would have been close to 50 reported meetings with a cooperating

witness of this significance during which no one took notes.  This conclusion is supported by the

sheer volume of notes produced from other key cooperator meetings, where, in many cases, the

---

[11] As previously mentioned, it turns out that 70 meetings took place for which notes were produced, not 69 as the
defense had previously believed.

number of meeting notes produced to the defense far exceed the number of meetings that the witnesses had with the government.

When evaluating a potential witness's truthfulness, "[t]he prosecutor and the government agents had a similar responsibility and it is the duty of a prosecutor, himself, to evaluate the credibility of the witnesses he calls to the stand.  Indeed, an obvious purpose of the standard procedure for the FBI to write 302 reports and the DEA to prepare and keep DEA 6 reports is to have some assurance about the credibility of the information they receive in their investigations." *United States v. Van Nuys*, 707 F. Supp. 465, 470-71 (D. Colo. 1989).  *Van Nuys* goes on to hold that deliberate failure to prepare DEA-6 reports of witness interviews constituted a violation of the duty to preserve evidence that deprived defendant of right to a fair trial.  *See id.* at 470.

Mr. Zambada Garcia undoubtedly provided the government with a treasure trove of information about the cartels and, given his leadership role in the cartel, it is implausible that the government would not have memorialized the information he provided.  While the Court gave the government the benefit of the doubt when this issue was originally before it, in light of what appears to be a pattern of non-disclosure as described above, the Court should re-examine the government's contention that no notes exist from approximately 48 meetings with a crucial cartel leader.  At a minimum, the Court should order the government to detail its efforts to gather the 3500 material related to Mr. Zambada Garcia.  The government should be required to provide an explanation as to why its practices as it relates to Mr. Zambada Garcia were so different from other cooperating witnesses.  Perhaps it can satisfactorily explain the glaring discrepancies or perhaps the Court will conclude that it should have precluded Mr. Zambada Garcia's testimony as requested by the defense.  *See* TT at 1442-43.  If the Court were to determine that the

government's claims concerning the lack of 3500 material for Mr. Zambada Garcia were not credible, it should vacate Mr. Garcia Luna's conviction and order a new trial.

**Point VIII**

**The Cumulative Effect Of The *Brady* Violations And Newly
Discovered Evidence Establishing Perjury Requires That Mr. Garcia
Luna Be Granted A New Trial To Prevent Manifest Injustice**

Any one of the issues detailed above allows this Court to grant Mr. Garcia Luna's motion for a new trial pursuant to Rule 33 to prevent a manifest injustice.  However, even if, on their own, these issues are insufficient to lead the Court to vacate Mr. Garcia Luna's conviction, in totality they paint the picture of an unfair trial that resulted in an unjust conviction.  It is now clear that multiple witnesses lied to the jury.  The government failed to disclose *Brady* and *Giglio* material.  These issues are no small matter.  They affect the fairness of the trial and the proper administration of justice.  While finality is a necessary consideration for the Court, that concern must give way to ensuring that a person was not unjustly convicted.  In light of the newly discovered evidence, one cannot have confidence that the jury's verdict was correct.  To avoid a manifest injustice, the Court should vacate Mr. Garcia Luna's conviction and order a new trial.

**CONCLUSION**

For the foregoing reasons, this Court should grant Mr. Garcia Luna a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

55

Dated: December 15, 2023

César de Castro
Valerie A. Gotlib
Shannon McManus
The Law Firm of César de Castro P.C.
111 Fulton Street – 602
New York, NY 10038
(631) 460-3951
cdecastro@cdecastrolaw.com
vgotlib@cdecastrolaw.com
smcmanus@cdecastrolaw.com

Florian Miedel, Esq.
Miedel & Mysliwiec LLP
80 Broad Street, Suite 1900
New York, NY 10004
(212) 616-3042
fm@fmamlaw.com

*Counsel for Genaro García Luna*