RCH/EMR/PP/AA
F. #2019R00927

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                      Docket No. 19-CR-576 (S-1) (BMC)

GENARO GARCIA LUNA,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S
MOTION FOR A NEW TRIAL

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Ryan C. Harris
Erin M. Reid
Philip Pilmar
Adam Amir
Assistant U.S. Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 2

I.    The Defendant's Indictment and Conviction ................................................................ 2

II.   The Government's Pretrial Disclosures ......................................................................... 3

III.  Facts Established at Trial .............................................................................................. 4

    A.   Senior Cartel Members Testified That the Defendant Took Bribes From and Assisted
    the Sinaloa Cartel ......................................................................................................... 4

    B.   Cartel Importers, Exporters and Local Cartel Affiliates Corroborated Senior Cartel
    Leaders' Testimony ...................................................................................................... 7

    C.   Testimony From Other Corrupt Government Officials ................................................ 9

    D.   Testimony from Non-Corrupt Government Officials .................................................. 10

IV.  The Defendant's New Trial Motion ........................................................................... 13

    A.   Motion and Memorandum of Law .............................................................................. 13

    B.   Purportedly New Factual Allegations ......................................................................... 14

         i.     U.S. Government Vetting (Defense Exs. C, F) .................................................. 14

         ii.    Schedule and Affidavit from ██████████ (Defense Ex. D) ............. 15

         iii.   Letter From Robbie Ward (Defense Ex. H) ....................................................... 16

         iv.   Affidavit from Ildefonso Fernandez Guevara (Defense Ex. L) .......................... 17

         v.    Affidavit from Jose Jorge Rincon Namorado (Defense Ex. V) .......................... 18

         vi.   Hospital Records (Defense Ex. U) ..................................................................... 18

         vii.   Affidavit from ████████ (Defense Ex. X) ............................................. 19

         viii.  2009 Mexican Attorney General Report (Defense Ex. Z) ................................. 20

LEGAL STANDARDS ........................................................................................................ 20

I.    Rule 33 ....................................................................................................................... 20

II.   Criminal Discovery .................................................................................................... 22

    A.   Brady and Giglio ......................................................................................................... 22

    B.   Prosecution Team ........................................................................................................ 23

THE DEFENDANT'S RULE 33 MOTION SHOULD BE DENIED ................................... 26

I.    The Defendant Plotted to Generate False Testimony in the ████ Affidavit, and Thus It
Does Not Justify a New Trial ..................................................................................... 26

    A.   The Government's Investigation ................................................................................. 26

         i.     Edgar Veytia, Oscar Nava Valencia and Juan Carlos Nava Valencia Deny the
         Allegations in the Affidavit ............................................................................... 26

         ii.    Evidence of the Defendant's Corrupt Scheme .................................................... 27

B.    Because the Defendant Corruptly Schemed to Obstruct Justice, the Court Should Reject His New Trial Motion ........................................................... 33

C.    The Allegations in the Affidavit are Illogical and Implausible .................................. 34

II.    The 2009 Mexican Attorney General Report Does Not Justify a New Trial ................. 37

III.    The Defendant's Claim That He Was Cleared by the U.S. Government Does Not Justify a New Trial ........................................................................................ 39

IV.    The Defendant's Allegations Against Hector Villarreal Hernandez Do Not Justify a New Trial ........................................................................................ 43

A.    Impeachment Material ................................................................................... 43

B.    Villarreal Hernandez Did Not Commit Perjury ........................................................ 50
i.    Payments to El Universal ............................................................................. 51
ii.    The Bunker ............................................................................................. 53

V.    The Defendant's Allegations Against Francisco Zavaleta Do Not Justify a New Trial. 55

VI.    The Defendant's Allegations about 3500 Material Do Not Justify a New Trial ........... 59

CONCLUSION ................................................................................................... 60

TABLE OF AUTHORITIES

CASES

Pina v. Henderson,
   752 F.2d 47 (2d Cir. 1985) ................................................................... 25

United States v. Agostini,
   280 F. Supp. 2d 260 (S.D.N.Y. 2003) ................................................... 45

United States v. Aquart,
   912 F.3d 1 (2d Cir. 2018), cert. denied, 140 S. Ct. 511 (2019) .............................. 22, 30, 44, 55

United States v. Avellino,
   136 F.3d 249 (2d Cir. 1998) ................................................................. 23, 24, 41

United States v. Avenatti,
   No. 19-CR-374 (JMF), 2022 WL 457315 (S.D.N.Y. Feb. 15, 2022).......................... 24, 25, 46

United States v. Bout,
   666 F. App'x 34 (2d Cir. 2016) ........................................................... passim

United States v. Canniff,
   521 F.2d 565 (2d Cir. 1975) ................................................................. 23, 45

United States v. Chalmers,
   410 F. Supp. 2d 278 (S.D.N.Y. 2006) ................................................... 24

United States v. Choudhry,
   330 F. Supp. 3d 815 (E.D.N.Y. Sept. 4, 2018) ........................................... 1

United States v Cook, 3:17-CR-65 (SRU),
   2019 WL 4247938 (D. Conn. Sept. 6, 2019)............................................. 60

United States v. Coppa,
   267 F.3d 132 (2d Cir. 2001) ................................................................. 22

United States v. Faltine,
   No. 13-CR-315 (KAM), 2016 WL 1700385 (E.D.N.Y. Apr. 26, 2016) ................. 45

United States v. Ferguson,
   246 F.3d 129 (2d Cir. 2001) ................................................................. 22

United States v. Forbes,
   790 F.3d 403 (2d Cir. 2015) ................................................................. 38, 40, 61

United States v. Fraser,
   206 F. App'x 100 (2d Cir. 2006) ........................................................... 42

United States v. Gambino,
  59 F.3d 353 (2d Cir. 1995) ....................................................................... 20

United States v. Hunter,
  32 F.4th 22 (2d Cir. 2022) ........................................................................ 24

United States v. Hutcher,
  622 F.2d 1083 (2d Cir. 1980) ................................................................... 23

United States v. James,
  712 F.3d 79 (2d Cir. 2013) ................................................... 14, 15, 22, 42

United States v. Locascio,
  6 F.3d 924 (2d Cir. 1993) .................................................................. 25, 47

United States v. McCourty,
  562 F.3d 458 (2d Cir. 2009) ..................................................... 21, 22, 55, 59

United States v. McPartland,
  No. 17-CR-587 (JMA), 2020 WL 7014275 (E.D.N.Y. Nov. 27, 2020) ................................... 21

United States v. Meregildo,
  920 F. Supp. 2d 434 (S.D.N.Y. 2013) ............................................ passim

United States v. Middendorf,
  No. 18-CR-36 (JPO), 2018 WL 3956494 (S.D.N.Y. Aug. 17, 2018) ............................ 25, 47

United States v. Monteleone,
  257 F.3d 210 (2d Cir. 2001) ................................................... 21, 54, 55

United States v. Moslem, 19-CR-547 (CS),
  2023 WL 5610297 (S.D.N.Y. Aug. 30, 2023) ................................... 49, 50

United States v. Muja,
  365 F. App'x 245 (2d Cir. 2010) ......................................................... 52, 53

United States v. Owen,
  500 F.3d 83 (2d Cir. 2007) ........................................................... passim

United States v. Paulino,
  445 F.3d 211 (2d Cir. 2006) ..................................................................... 40

United States v. Persico,
  No. 04-CR-911, 2008 WL 11497841 (E.D.N.Y. Aug. 28, 2008) ........................... 54

United States v. Quinn,
  445 F.2d 940 (2d Cir. 1971) ..................................................... 24, 41, 47

United States v. Robinson,
    No. 20-CR-415, 2021 WL 3003939 (S.D.N.Y. July 12, 2021) ................................................ 45

United States v. Rodriguez,
    496 F.3d 221 (2d Cir. 2007) ............................................................................................ 60

United States v. Sanchez,
    969 F.2d 1409 (2d Cir. 1992) ................................................................................... 21, 22

United States v. Spinelli,
    551 F.3d 159 (2d Cir. 2008) ............................................................................................ 23

United States v. Stewart,
    433 F.3d 273 (2d Cir. 2006) ....................................................................... 22, 25, 48

United States v. Teman,
    465 F. Supp. 3d 277 (S.D.N.Y 2020) ......................................................................... 54

United States v. Teman,
    2023 WL 3882974 (2d Cir. June 8, 2023) ................................................................. 54

United States v. Van Manen,
    No. 18-CR-030 (PAC), 2019 WL 5092013 (S.D.N.Y. Oct. 11, 2019) .................................. 21

United States v. Wong,
    78 F.3d 73 (2d Cir. 1996) ........................................................................... 23, 50, 59

## STATUTES & RULES

18 U.S.C. § 3500 ............................................................................................................. 3

Federal Rule of Criminal Procedure 33 ................................................................... 20

Federal Rule of Evidence 801(c) ............................................................................... 39

Federal Rule of Criminal Procedure 33 .......................................................... passim

U.S.S.G. § 3C1.1 ................................................................................................. 28, 30, 31

<u>PRELIMINARY STATEMENT</u>

Following a five-week trial, the defendant Genaro Garcia Luna was convicted of all counts against him.  The testimony and exhibits at trial established beyond a reasonable doubt that the defendant was a corrupt law enforcement official who took millions of dollars in bribes from the Sinaloa Cartel, Mexico's largest and most sophisticated drug trafficking organization. The defendant accepted those bribes at the same time that he met with senior U.S. leadership and broadcasted his purported commitment to fighting the cartels.  In exchange for bribes, the defendant and his allies assisted the Sinaloa Cartel.  They hand-delivered cocaine for the Sinaloa Cartel, helped arrest and kill cartel rivals, provided armed bodyguards to cartel leaders, provided intelligence on capture operations led by honest Mexican police and military forces, and provided the cartel with federal police equipment and badges.  Three witnesses testified that they personally observed the Sinaloa Cartel bribe the defendant, and many witnesses corroborated their testimony.

This Court should deny the defendant's motion for a new trial under Federal Rule of Criminal Procedure 33.  "Because motions for a new trial are disfavored in this Circuit, the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict," <u>United States v. Choudhry</u>, 330 F. Supp. 3d 815, 834 (E.D.N.Y. Sept. 4, 2018), <u>i.e.</u>, "would likely result in an acquittal," <u>United States v. Owen</u>, 500 F.3d 83, 88 (2d Cir. 2007).

The defendant does not and cannot meet that demanding standard.  As an initial matter, the Court should reject the defense argument about witness collusion, which is the product of a corrupt scheme to suborn perjury and obstruct justice.  Specifically, the government's investigation has revealed compelling evidence of a plot by the defendant to gin up false affidavits and false testimony for his new trial motion by offering money and other incentives to inmates at the Brooklyn Metropolitan Detention Center (the "MDC").

1

In addition, nearly all the other supposed "new evidence" the defendant raises now was (a) known or should have been known to the defendant prior to and during trial, (b) available with the exercise of reasonable diligence, and/or (c) not within the prosecution's possession, and thus cannot be raised in a new trial motion.

Most fundamentally, none of the new allegations raised by the defendant undermine what a mountain of credible evidence amply proved at trial. Even if the Court accepted the defense arguments as true, they leave undisturbed compelling and corroborated testimony from multiple witnesses that the defendant accepted millions of dollars in cash from and conspired to help the Sinaloa Cartel, a group he was duty bound to prosecute. Thus, because the jury's verdict is correct, and for the reasons provided below, the Court should deny the motion.

<u>BACKGROUND</u>

I.      <u>The Defendant's Indictment and Conviction</u>

On December 4, 2019, a grand jury in the Eastern District of New York returned an indictment charging the defendant with: (i) one count of conspiracy to distribute and possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841 and 846; (ii) one count of cocaine importation conspiracy, in violation of Title 21, United States Code, Sections 952 and 963; (iii) one count of international cocaine distribution conspiracy, in violation of Title 21, United States Code, Sections 959 and 963; and (iv) one count of making false statements, in violation of Title 18, United States Code, Section 1001. Law enforcement agents arrested the defendant on December 9, 2019. On July 30, 2020, a grand jury in the Eastern District of New York returned a five-count superseding indictment, which added an additional charge against the defendant for participating in a continuing criminal enterprise ("CCE") in violation of Title 21, United States Code, Section 848.

On February 21, 2023, following a five-week trial, the jury convicted the defendant of all counts against him.

II.    The Government's Pretrial Disclosures

During the pendency of this case, the government made robust disclosures far in excess and in advance of what is required by law.  The government produced more than 1 million pages of documents in discovery, including in an abundance of caution, substantial financial records that the government did not intend to use in its case-in-chief but were also not exculpatory.

In addition, the government made several disclosures in an abundance of caution to the extent they could be arguably exculpatory.  On March 1, 2021, pursuant to Brady v. Maryland and in an abundance of caution, the government produced reports regarding interviews of 25 individuals, including United States business associates of the defendant and a former DEA agent. The government also made Brady disclosures on May 1, 2022, August 12, 2022, October 26, 2022, November 2, 2022, November 28, 2022, and December 27, 2022.

On December 9, 2022, the government sent two Giglio letters to the defense, including a 41-page letter with potential impeachment information regarding 12 potential cooperating witnesses.    Significantly, the government's disclosures contained numerous allegations made by confidential sources that were uncorroborated but were nonetheless disclosed to the defense in an abundance of caution.  The government also made Giglio disclosures in letters dated December 15, 2022, and January 5, 2023, and two letters dated February 1, 2023.  In addition, a significant amount of potential Giglio information was disclosed in the government's more than 26,000 pages of 18 U.S.C. § 3500 disclosures for its cooperating witnesses, which were produced significantly in advance of trial.  Specifically, on July 5, 2022, more than six months before the trial, the government produced Jencks Act materials for Jesus "Rey" Zambada-Garcia and Tirso Martinez-Sanchez.  On October 26, 2022, more than two months before the trial, the

3

government produced Jencks Act materials for four more potential cooperating witnesses, including Harold Mauricio Poveda-Ortega and Hector Tolentino (as well as two cooperating witnesses the government did not call).  The government continued its production of Jencks Act materials on a rolling basis in December 2022 and January 2023.

III.     Facts Established at Trial

Between 2001 and 2012, the defendant was a high-ranking official in the Mexican government.  Specifically, from 2001 to 2005, the defendant was the head of Mexico's Federal Investigation Agency (known by its Spanish language acronym as "AFI").  From 2006 to 2012, the defendant served in a cabinet-level position as Mexico's Secretary of Public Security and, in that capacity, he controlled Mexico's federal police.  As proven at trial, while holding public office, the defendant used his official positions to assist the Sinaloa Cartel in exchange for multi-million-dollar bribes.

A.     Senior Cartel Members Testified That the Defendant Took Bribes From and Assisted the Sinaloa Cartel

Multiple high-level cartel members—Sergio Villarreal Barragán (a.k.a. El Grande), Oscar Nava Valencia (a.k.a. El Lobo), and Jesus Zambada Garcia (a.k.a. Rey)—testified that the defendant accepted bribes from the Sinaloa Cartel and provided intelligence, safe passage of drugs, equipment and other benefits in return.

Villarreal Barragán was the first witness at trial.  Villarreal Barragán was "[o]ne of the main leaders" of the Sinaloa Cartel, serving as the right-hand man of Sinaloa Cartel leader Arturo Beltrán Leyva.  Trial Tr. ("Tr.") 51, 52, 57.  Villarreal Barragán designed cartel operations, carried out campaigns against cartel enemies, and expanded drug routes.  Tr. 52.

To advance its mission and "[t]o make sure it was successful in trafficking cocaine to the United States," Villarreal Barragán testified, the cartel "pa[id] Government authorities in

Mexico." Tr. 59.  Such bribes were paid "at different levels" of the government. Tr. 52, 59, 65-66.

As part of these efforts, the Sinaloa Cartel bribed the defendant too.   As Villarreal Barragán

testified:

> A. … There were two types of corruption in the Government. One
> of them is when you pay an officer and they look the other way
> and let something through. And the other type is when the officers
> take part in the activities of the organization.
>
> Q. Did the Sinaloa cartel pay the defendant Genaro Garcia Luna?
>
> A. Yes.
>
> Q. What level of participation did the defendant Genaro Garcia
> Luna have with the Sinaloa cartel's activities?
>
> A. A very important one.
>
> Q. Of the two kinds of participation that you just described for us,
> how would you characterize the defendant's participation with the
> Sinaloa cartel?
>
> A. As the second description that I mentioned.

Tr. 60.

During Garcia Luna's tenure as head of AFI, Beltrán Leyva paid the defendant

through an AFI commander.  Tr. 62, 80-81.  A few years later, Villarreal Barragán and Beltrán

Leyva began paying the defendant directly.  Tr. 104-106.  Villarreal Barragán identified where the

payments were made, provided directions to the location, and described the hiding place of the

bribe money.  Tr. 107 (payments made in safe house located near Perisur in Mexico City that was

next to a church where Beltrán Leyva visited); Gov. Trial Ex. 405 (safe house diagram); Tr. 114

(money kept in a "bedroom on the third floor … [i]n a false wall").

Villarreal Barragán explained what those bribes purchased.  The Sinaloa Cartel

received federal police uniforms, Tr. 74-75, automobiles bearing federal police insignia, Tr. 74-75,

and protection in the form of police bodyguards, Tr. 77. Villarreal Barragán received an AFI badge bearing a false name. Tr. 75-76. The Sinaloa Cartel also received intelligence, including about investigations against the Sinaloa Cartel and information about rival cartels. Tr. 63. In addition, Villarreal Barragan vividly recounted AFI officers assisting the Sinaloa Cartel by physically guarding the Sinaloa Cartel when it murdered its rivals. Tr. 79-80, 89-90.

Villarreal Barragán (as well as many other witnesses) testified how, in approximately 2008, a civil war occurred within the Sinaloa Cartel between those loyal to Beltrán Leyva and those loyal to Ismael Zambada García (a.k.a Mayo) and Joaquín Archivaldo Guzmán Loera (a.k.a. El Chapo). Tr. 167-75. Villarreal Barragán explained how Beltrán Leyva eventually kidnapped the defendant because he was unhappy that there was significant police action against the Beltráns but minimal police action against Mayo and Chapo. Tr. 174-75.

Oscar Nava Valencia (a.k.a. El Lobo) testified at length. He explained that he met the defendant twice. Tr. 491. In exchange for the defendant's assistance with cartel operations, Tr. 491, and the defendant's help with the airports and information regarding rival groups, Tr. 514, Oscar Nava Valencia provided "money and cash" totaling "more than $10 million." Tr. 491; see also Tr. 508. Oscar Nava Valencia also told the jury about a specific $2.5 million payment he paid into a pooled bribe payment going to Garcia Luna in around 2006. Tr. 515. Oscar Nava Valencia also described meeting the defendant first at Beltrán Leyva's house, Tr. 527-528, and then a second time at a carwash in Guadalajara, where the defendant was paid $3 million, Tr. 538. Echoing Villarreal Barragán, Nava Valencia testified that he had to pay bribes at multiple levels of the Mexican government. See Tr. 497 ("the federal governments, the federal highway patrol, and municipal and states and, you know, politicians here and there as well"). Further, Nava Valencia

recounted other senior Sinaloa Cartel members discussing their relationships with the defendant, including Beltrán Leyva.  Tr. 514.

Jesus Zambada Garcia (a.k.a. Rey) led the Sinaloa Cartel's operations in Mexico City, including overseeing its airport.  Tr. 1454-1455.  Zambada Garcia explained the "importance of the connections with the government" for the cartel's growth.  Tr. 1459.  To that end, Zambada Garcia recounted to the jury (a) cartel discussions about the defendant, (b) Zambada Garcia's involvement in payments to the defendant, and (c) benefits the cartel received from the federal police.  In about 2003, Beltrán Leyva offered Zambada Garcia a position as the head of government relations for the cartel.  Tr. 1459-1460.  When Zambada Garcia replied that he only had low-level government contacts, Beltrán Leyva told him, "Don't worry, I already have connections in the highest levels and with all governmental entities" including "Genaro Garcia Luna."  Tr. 1460.  Zambada Garcia also described meetings with the defendant where he was bribed by the Sinaloa Cartel.  Tr. 1460.  Such meetings took place at a French restaurant in Mexico City (Champs Elysees), and Zamabda Garcia recalled packing millions of dollars and bringing them to the restaurant.  Tr. 1473.  Corroborating Villarreal Barragán, Zambada Garcia explained that, for the bribes, the Sinaloa Cartel received "protection" and "AFI uniforms."  Tr. 1465, 1485.

B.     Cartel Importers, Exporters and Local Cartel Affiliates Corroborated Senior
       Cartel Leaders' Testimony

The jury also heard from other cartel members, like importers and exporters Harold Poveda Ortega (a.k.a. Conejo), and Tirso Martinez Sanchez (a.k.a. Futbolista), who relied on the cartel leaders' relationships with the defendant to move massive quantities of cocaine through Mexico.  Tr. 863-864.

Poveda Ortega testified that he moved "more than one million kilos" of cocaine in partnership with Beltrán Leyva and the Sinaloa Cartel.  Tr. 859.  He also testified that Beltrán

Leyva "paid government officials," Tr. 863-864, including the "federal police," Tr. 874. Poveda Ortega also testified that others who worked for Beltrán Leyva, including "Grande" (a.k.a. Villarreal Barragán) made payments. Tr. 864. In exchange for those payments, Poveda Ortega viewed himself as "protected" allowing him to travel "with extreme peace of mind." Tr. 864.

Poveda Ortega described and narrated a video showing his home being raided by federal police during the civil war within the cartel. Tr. 874. After the raid, Beltrán Leyva became enraged with the "federal police" because he had "given [the federal police] a lot of money[]." Tr. 874. In retaliation, Poveda Ortega testified, "Arturo Beltran and his security team" kidnapped the defendant in Cuernavaca. Tr. 878.

Tirso Martinez Sanchez testified that he was "responsible for the train route" in which "between 50 to 60 tons" of cocaine was moved to the United States in train cars with hidden compartments. Tr. 261-262; Gov. Trial Ex. 209-32 (tank car). Martinez Sanchez knew that other members of the cartel paid bribes to government officials to protect this train route, including the "high command at the federal police." Tr. 314.

In addition, multiple witnesses testified about the tons of cocaine trafficked to the United States by the Sinaloa Cartel, including by boat, train, and submarine. See Cain Testimony (Tr. 343-371), Coleman Testimony (Tr. 389-406), Moloney Testimony (Tr. 408-418), Hornedo Testimony (Tr. 379-389), Bagetis Testimony (Tr. 1016-1028). Further, Hector Tolentino, a Trinitarios gang leader, testified that he partnered with the Sinaloa Cartel to distribute cocaine in the Eastern District of New York through 2019. Tr. 449, 457-460, 446.

The jury also heard from Sinaloa Cartel accountant Israel Avila. In his role, he oversaw "ledgers [that] documented payments to public officials." Tr. 745. Echoing Villarreal Barragán and Nava Valencia, Avila testified that the Sinaloa Cartel paid bribes at all levels of the

Mexican government. Tr. 746 ("Federal, state and municipal."). Corroborating Villarreal Barragán, Nava Valencia, and Zambada Garcia, Avila explained that "the Sinaloa Cartel pa[id] Genaro Garcia Luna." Tr. 746. Such million-dollar payments were recorded in Avila's ledgers using the defendant's nicknames, which referenced the defendant's stutter. Tr. 746-747.[1]

### C. Testimony From Other Corrupt Government Officials

The jury also heard testimony from convicted corrupt Mexican government officials, including Edgar Veytia, the former attorney general of the state of Nayarit, and Hector Villarreal Hernandez, the former finance minister from the state of Coahuila.

Veytia described meetings with and conversations about the defendant, including how Sinaloa Cartel members had paid the defendant and communicated with the defendant about the cartel both directly and indirectly. Tr. 1238, 1241; 1253-57; 1261-1268; 1279-1280. For example, Veytia described an instance where he was attacked by members of the Sinaloa Cartel because Veytia and his government sided with Beltrán Leyva during the cartel civil war. Tr. 1261-62. During this attack, the federal police failed to respond to aid Veytia even though he called for assistance. Tr. 1264. After he survived the attack, the governor of Nayarit asked for a meeting with the defendant in Mexico City. During the meeting, one of the defendant's senior commanders, Luis Cardenas Palomino, told Veytia that his government was "doing things wrong in Nayarit, that [they] were on the wrong side, and that [they] should be on El Chapo's side." Tr. 1267.

---

[1] The defendant's occasional stutter was established by many witnesses, including Villarreal Barragán, Tr. 87-88, Nava Valencia, Tr. 541, and U.S. Ambassador to Mexico Earl Anthony Wayne, Tr. 1191. Villarreal Barragán testified that the Sinaloa Cartel referred to the defendant by the Spanish word "tartamudeo," or "stutterer." Tr. 87-88.

Villarreal Hernandez explained his involvement in a kickback scheme, and how he and his co-conspirator spent the proceeds on homes, planes, better media coverage, and gifts to politicians in Mexico in exchange for their support.  Tr. 1134-1136.  Villarreal Hernandez further explained how assets are concealed in Mexico, including that politicians' public financial statements were not actually verified.  Tr. 1139-1142.  Villarreal Hernandez also explained how, in Mexico, the federal government controls virtually all the budget for the states.  Tr. 1132.

Villarreal Hernandez described meeting with the defendant in 2009 and receiving a tour of the federal police's bunker and technology.  Tr. 1147-1148.  Villarreal Hernandez also described how the defendant wanted to speak with Mexican newspaper El Universal to improve his press coverage following reports of the defendant's kidnapping.  Tr. 1151-1152.  The defendant made arrangements to pay El Universal, and Villarreal Hernandez authenticated an invoice documenting such payment.  Tr. 1152-1155, 1158-1160; Gov. Trial Ex. 440A (payment invoice).

Last, Villarreal Hernandez described the defendant's homes, including a party at the defendant's luxury penthouse apartment in a tony neighborhood in Mexico City, Tr. 1161, as well as the defendant's "really big house" in Cuernavaca from which a helicopter took off, Tr. 1165-66.

D.      Testimony from Non-Corrupt Government Officials

The jury also heard testimony from non-corrupt police officers Raul Arellano Aguilera and Francisco Cañedo Zavaleta.  Theses witnesses saw the corruption in Mexico, knew that the defendant was part of it, and resigned because they refused to go along with it.

Raul Arellano Aguilera described the corruption he saw as a federal police officer at the Mexico City Airport, Tr. 650, where a special unit of police officers helped transfer drugs arriving by plane in exchange for cash and benefits.  Tr. 655-657 (recalling the "weird order by radio" from higher-ups at the airport that caused officers to cease investigative and enforcement

activity); Tr. 663.  He also testified that suitcases of money were brought to the airport on behalf of the Sinaloa Cartel, that proceeds were divided among members of the special unit, and that he saw firsthand a briefcase full of dollars delivered to the head of airport security.  Tr. 663, 665, 674.

Francisco Cañedo Zavaleta served as a federal police officer in Mexico between approximately 1993 to 2022, including as an officer for AFI, the agency the defendant led until 2006.  Tr. 1030, 1039-1040.  Between approximately March 2007 to May 2008, Cañedo Zavaleta was assigned, as part of the Armed Guard for the federal police, to stand guard at the federal police office in Constituyentes in Mexico City.  Tr. 1046-1047.  During that time, he recalled seeing the defendant frequently, outside the building but inside the complex, when the defendant was coming in or leaving the building.  Tr. 1047-1048. Cañeda Zavaleta also saw the defendant once inside the building at reception, while the defendant's secretary was out to lunch.  Tr. 1048-1049.

In October 2008, Cañedo Zavaleta observed the defendant being kidnapped by and meeting with senior members of the Sinaloa Cartel.  Tr. 1054-1056.  Specifically, Cañeda Zavaleta testified that on approximately October 19, 2008, he was driving from Cuatula, Morelos towards Cuernavaca, along highway 115-D, when he saw the defendant with Arturo Beltran Leyva, Edgar Valdez Villarreal, also known as La Barbie, and other individuals.   Tr. 1053-1056.   The government admitted three maps through Cañeda Zavaleta, which showed his approximate locations during his observations.  Tr. 1056-1057; Gov. Trial Exs. 741, 726 & 727.  Concerned by the sight of Mexico's foremost law enforcement official with "cartel bosses," Tr. 1095, in 2008, Cañedo Zavaleta wrote a letter reporting it to a member of Congress in Mexico, who in turn passed the information to a Mexican magazine that reported the story.  Tr. 1061-1062; Gov. Trial Ex.

738A & 738A-T at p. 7 (describing the defendant being "intercepted or summoned by an important drug lord").[2]

Finally, the jury heard from U.S. law enforcement and public officials.  U.S. law enforcement officers who were working in Mexico, like Miguel Madrigal and Jose Moreno, testified that they were trying to work with their partners in a foreign country and pass them intelligence to catch cartel leaders, only to see the defendant's federal police sabotage those efforts.

Miguel Madrigal served as a Special Agent for the Drug Enforcement Administration ("DEA") in Mexico from 2008 to 2015.  Tr. 945-946.  He testified about his experience during that time, including the failed efforts to apprehend senior cartel leadership.  Specifically, he reviewed surveillance video which showed the vehicle of "a high-ranking official within the Mexican federal police" at the home of Zambada Garcia, "a high-ranking member of the Sinaloa Cartel."  Tr. 978.  Despite reporting this information to the federal police, Zambada Garcia was not captured at the location.  Tr. 986-87.[3]

Jose Moreno served as a Special Agent with the Federal Bureau of Investigation ("FBI") stationed in Mexico between 2009 and 2014.  Tr. 1329.  He described the failed attempt to capture El Chapo Guzman.  Tr. 1331.  Moreno recounted that the U.S. government obtained intelligence about El Chapo's phone number, which allowed law enforcement to determine El Chapo's location.  Tr. 1331.  On the day of the operation to arrest El Chapo at that location,

---

[2] The government produced additional corroboration to the defense at Government Trial Exhibit 739, which showed the metadata of the letter Francisco Cañedo wrote to Congress about the defendant, confirming that the letter was written in November 2008 and last modified by "Francisco Cañedo."  Because the authenticity of the letter was not challenged, the government did not introduce this corroboration—nor its metadata witness Enrique Santos.

[3] Madrigal also testified about the Sensitive Investigation Unit ("SIU"), which was a unit in the Mexican federal police that was "trained and vetted by [the U.S.] and polygraphed, and [the U.S.] work[ed] exclusively with them as far as investigations."  Tr. 956.  Notwithstanding that vetting, Madrigal explained how the SIU could not be trusted.  Tr. 956.

however, Mexican federal police appeared to sabotage the arrest.  They showed up late and without the necessary officers.  Tr. 1337-1339.  When the operation finally did begin, federal police went first to several wrong locations.  By the time they went to the home where El Chapo was located, they failed to create a perimeter.  Tr. 1343-1344.

Immigration Officer Marlene Tarantino testified about the defendant's naturalization application.  Tr. 1357.  In that paperwork, the defendant falsely denied any past criminal conduct.  Gov. Trial Ex. 102.

The former U.S. Ambassador to Mexico Earl Anthony Wayne also testified.  The jury learned that in 2011 and 2012, Ambassador Wayne and his staff knew that they could not rely on the defendant to go after the Sinaloa Cartel.  Tr. 1230 ("federal police were not going after certain cartels … Beltran Leyva and the Sinaloa Cartels").

Finally, Special Agent George Dietz introduced several photographs of the defendant's various homes.  Tr. 1412-1420.  He also testified about the government's efforts to keep witnesses separate from one another.  Tr. 1424.

IV.    The Defendant's New Trial Motion

A.    Motion and Memorandum of Law

Ten months after his conviction, on December 15, 2023, the defendant filed the instant motion for a new trial pursuant to Federal Rule of Criminal Procedure 33 (the "Motion").  Mem. 1, ECF No. 250.  The Motion wrongly asserts that "new evidence has come to light establishing that the case against Genaro Garcia Luna was marred by multiple Brady violations and false testimony by critical witnesses."  Id.  The Motion presses seven claims: (1) that the defendant and the SIU were subjected to background checks and vetting; (2) another U.S. government agency allegedly vetted a separate unit of the Secretariat of Public Security ("SSP"); (3) trial witness Hector Villarreal Hernandez allegedly committed other criminal acts for which he

could have been impeached; (4) purported inconsistencies in portions of Villarreal Hernandez's testimony; (5) affidavits submitted by the defense supposedly conflict with portions of Francisco Cañedo Zavaleta's testimony; (6) two government witnesses, Edgar Veytia and Oscar Nava Valencia, coordinated their testimony via contraband cellular telephones and communication through Oscar Nava Valencia's brother Juan Carlos Nava Valencia; and (7) the Court should "reexamine" the government's failure to memorialize certain meetings with Zambada Garcia.  Id. at 1-4.

> B.   Purportedly New Factual Allegations[4]

> > i.   U.S. Government Vetting (Defense Exs. C, F)

The defendant includes documents that purport to reflect meetings or understandings between the DEA and the defendant during his tenure as Secretary of Public Security in Mexico.  The DEA Letter of Understanding states that "selected" members of the "Sensitive Investigative Unit" program ("SIU") within Mexico would be vetted "in coordination" with the U.S., and that SIU members shall undergo a vetting process that shall include "drug test[ing]" and "polygraph examination and background questionnaire."  Def. Ex. C.  The Letter of Understanding does not state that the individuals supervising the SIU program or senior leadership within the Secretary of Public Security would be vetted or polygraphed.  The Letter of

---

[4] The defense submitted a declaration with the Motion.  ECF No. 249.  While the declaration attaches exhibits, some of which are summarized here, it provides no information about how the defense came to possess this information or what efforts the defense took to authenticate these exhibits.  The Motion likewise discusses recently obtained evidence without specifying what efforts were taken to obtain it before trial.  See, e.g., Mem. 20-21, 43, 46.  As discussed in greater detail below, that does not satisfy the defense's burden to show "due diligence on the part of the movant to obtain the evidence."  United States v. James, 712 F.3d 79, 107 (2d Cir. 2013).

Understanding is signed by the defendant and a regional director of the DEA and dated January 27, 2011.  Id. at 10.[5]

The defense also provides a document purporting to describe a meeting between U.S. government officials and the defendant in his capacity as the Secretary of Public Security.  Def. Ex. F.  While Defense Exhibit F identifies a vetted group that monitors drug trafficking,[6] id. at 5, there is no indication from the document that the defendant or senior leadership in the Secretariat of Public Security were among those allegedly vetted pursuant to this program, as opposed to the group itself.  Nor does Defense Exhibit F explain how any alleged vetting occurred or the conclusion of that alleged vetting.[7]

  ii.  Schedule and Affidavit from ████████████ (Defense Ex. D)

The defense submits a purported affidavit from ████████████, who was one of the defendant's secretaries from 2005 to 2012.  Def. Ex. D ¶ 1.  The affidavit says the defense team was not in contact with her until after the trial, although it does not explain the delay.  Id. ¶ 2.  ████ provides and attempts to authenticate supposed "agendas" of the defendant.  Id. ¶ 13.  However, ████ does not explain how or from where she obtained the agendas.  ████

---

[5] The defense states that it "obtained a copy of one of the LOUs memorializing these procedures."  Mem. 27.  But it does not explain how, when or from whom this exhibit comes, or what efforts the defense took to locate it before trial, failing its burden to show due diligence.  See de Castro Decl., Def. Ex. C; James, 712 F.3d at 107.  Given that the defendant was a signatory to the LOU, he was "or certainly should have been aware" of it, and thus, "it was not 'newly discovered' within the meaning of Rule 33."  Owen, 500 F.3d at 84 (2d Cir. 2007).

[6] Solely for the purpose of responding to this motion, the government assumes the truth of the contents of Defense Exhibit F.

[7] Again, the defense states that Defense Exhibit F was "recently obtained by the defense" without elaboration.  Mem. 32.  The defense cannot meet its burden of demonstrating diligence without showing what efforts the defendant took to obtain such records, including before trial. Given that the defendant claims to have attended the meeting, he was "or certainly should have been aware" of it, and thus, "it was not 'newly discovered' within the meaning of Rule 33."  Owen, 500 F.3d at 84.

stopped working for the defendant and the federal police agency more than a decade ago, in 2012. Id. ¶ 4.[8]  ████  does not say whether the defendant adhered to his agenda or whether, as common sense would suggest, the defendant engaged in activities not listed in or otherwise deviated from the supposed agendas, especially where such not calendared activities were of an illicit nature.

████ also describes security and protection for SSP headquarters, stating that "[o]nly SSP and Federal Police officers played a security role at SSP facilities."  Id. ¶ 7.  She distinguished between "two types of entrances: public entrances and private entrances," and noted that "public entrances consisted of: (a) a public vehicular entrance with a guard booth, and (b) the public entrances in the lobby of the building."  Id. ¶ 8.  Private entrances "were heavily controlled by Federal Police security forces and Mr. Garcia Luna's security detail."  Id. ¶ 9.  She further says that she does not recognize trial witness Francisco Cañedo Zavaleta.  Id. ¶ 12.

In addition, ████ also states that she underwent a polygraph test to be authorized to handle any sensitive DEA information.  Id. ¶ 16.  She further claims, in what amounts to multiple layers of hearsay, that she heard from another individual that the defendant had undergone a polygraph administered by the DEA.  Id.

iii.    Letter From Robbie Ward (Defense Ex. H)

The defense submits a letter from Robbie Ward, an attorney for Humberto Moreira Valdes—the former governor of the Mexican State of Coahuila.  In the February 2020 letter, Ward attempts to convince federal prosecutors with the U.S. Attorney's Office for the Western District

---

[8] According to her public Linkedin Profile, ████ ceased working for the SSP in November 2012 and began working for ICIT Holdings, a company identified by the Mexican Attorney General as allegedly involved in the defendant's money laundering.  Compl. at p. 21, United Mexican States v. Garcia Luna, https://insightcrime.org/wp-content/uploads/2021/09/2021-09-21-UIF-Garcia-Luna-Florida.pdf.  Since 2019, ████ has worked at INEGI, the National Institute of Statistics and Geography of Mexico.

of Texas to not charge her client with a crime because, according to Ward, Hector Villarreal Hernandez (a former government employee under Moreira) committed additional crimes while on bond in the United States.  Ward supports his representations through multiple levels of hearsay, snippets of records that do not support his conclusion, and a thumb drive containing hundreds of pages of untranslated documents.  Under the most generous interpretation, the letter, at most, alleges that Villarreal Hernandez took funds from a Mexican bank account in another individual's name to support his lifestyle and that Villarreal Hernandez "laundered" the money.  The letter also alleges that Villarreal's family members committed additional crimes.

iv.     Affidavit from Ildefonso Fernandez Guevara (Defense Ex. L)

The defense submits a supposed affidavit from Ildefonso Fernandez Guevara, an attorney for El Universal and its publisher Ealy Ortiz.  The affidavit contains various legal arguments and conclusory denials.  For example, Fernandez Guevara writes, "Each and every one of the statements given by Hector Villarreal Hernandez when testifying … are denied by reason that each and every one of the charges leveled against Mr. Juan Francisco Ealy Ortiz as well as against the company El Universal … in addition to being false, lacking in logic and legal validity, are clearly inconsistent, since he did not clearly and accurately refer [] to circumstances of time, manner and place[.]"  Def. Ex. L at 25.

Further, Fernandez Guevara claims that the $10 million Mexican pesos bribe payment (and the associated false invoice) that Villarreal Hernandez testified about and authenticated at trial was actually for "advertising in connection with the campaign FOR THE RECOVERY OF TOURISM."  Id. at 28 (capitals in original).  At the same time, Fernandez Guevara acknowledges that El Universal no longer possesses the underlying account records.  Id. The affidavit attaches various awards received by Ortiz "in order to demonstrate that both he and [El Universal] are institutional examples of good journalistic activity."  Id. at 30.  Finally, in an

17

attempt to show that El Universal could not have been bribed in 2011, the article lists news articles with negative coverage of the defendant a decade later: from 2020 to 2023.  Id. at 24.

> v.      Affidavit from Jose Jorge Rincon Namorado (Defense Ex. V)

The defense submits a purported affidavit from Jose Jorge Rincon Namorado, who was one of the defendant's bodyguards between 2009 and 2018.  See Def. Ex. V at 3.  Namorado states in conclusory fashion that (i) he never saw a helicopter land on Mr. Garcia Luna's home, (ii) that Garcia Luna "always" took a certain route to travel between Jiutepec and Mexico City, (iii) the defendant never went to the Champs Elysees restaurant, and (iv) that "Mr. Francisco Canedo Zabaleta" [sic] was not a member of the Federal Police's Security Department.  Id. Namorado provides no information to suggest how he would know all of the defendant's whereabouts, routes, appointments and associates.  Id.  For instance, while he states that he was his bodyguard, Namorado does not provide information about his duties or the frequency in which he served.  Nor does Namorado explain when, how or by whom he was contacted to submit the affidavit.  There is similarly no explanation by the defense as to why Namorado was not available prior to trial.

> vi.      Hospital Records (Defense Ex. U)

The defense submits an unauthenticated exhibit containing two pages that purport to be discharge paperwork for the defendant's wife Linda Cristina Pereyra Galvez from Angeles Del Pedrigal Hospital in Mexico City on October 19, 2008, the day the defendant was detained by Beltrán Leyva.  The purported paperwork has blanks for "admission diagnosis" and "surgical procedures performed" but notes that she was seen by Ana Cecilia Mendoza Becerril whose specialty is "General Surgery."  Def. Ex. U at 4.  A largely illegible later page purports to be a receipt recording the defendant's payment for his wife's hospital stay.  Id. 8-9. The defendant has not provided any explanation for why this exhibit was not available at trial, nor does it address the

fact that Pereyra Galvez in fact testified at trial but never discussed her hospital stay.  Nor has the paperwork been certified or authenticated in any way by the hospital or a financial institution.  The defendant's name is misspelled on the document that purports to be hospital discharge paperwork. See Def. Ex. U at 2.

      vii.    Affidavit from ███████████ (Defense Ex. X)

In an affidavit (the "███████ Affidavit"),[9] alleges that: (a) while he was housed with Juan Carlos Nava Valencia ("El Tigre"),[10] at the MDC between 2017 and 2019, the Affiant observed that Juan Carlos Nava Valencia had a contraband cellular telephone, Def. Ex. X ¶ 7; (b) Juan Carlos Nava Valencia told ████ that he communicated via this contraband cellular telephone with his brother Oscar Nava Valencia, who testified at trial, and an individual identified as "Edgar," id. ¶ 8; (c) ████ "later learned" that "Edgar" was Edgar Veytia, although he does not claim that Juan Carlos Nava Valencia identified "Edgar" as Veytia or otherwise identify the basis for this discovery, id.; (d) between 2020 and 2022, ████ observed Juan Carlos Nava Valencia communicate with Oscar Nava Valencia via contraband cellular telephones, id. ¶ 10; (e) while ████ was housed with Veytia in 2022 at the MDC, Veytia told ████ that "he was in constant contact" with Juan Carlos Nava Valencia and Oscar Nava Valencia via contraband cellular telephones, id. ¶ 13; (f) Veytia described the Assistant U.S. Attorneys in this matter as "stupid"

---

[9] ████ pled guilty to multiple counts of sexual exploitation of a child, coercion and enticement of a minor, and child pornography and is awaiting sentencing.  See United States v. ████████████████████████████████  Records reflect that ████ was previously diagnosed with, among other things, a "[p]sychotic disorder with hallucin[ations] due to known physiol[ogical] condition."  See 2022 Health Records, attached as Gov. Ex. 9 at 64.  ████ continued to be diagnosed with a "[p]sychotic disorder with hallucin[ations] due to known physiol[ogical] condition" as of July 24, 2023, two months after signing the affidavit at issue here. See 2023 Health Records, attached as Gov. Ex. 10 at 23.  The government seeks leave to file ████ health records under seal.

[10] Juan Carlos Nava Valencia did not testify at Garcia Luna's trial, although the government disclosed his prior statements to the defense in this matter in an abundance of caution.

and would "believe anything I say" and that Veytia said he was "going to screw" Garcia Luna, <u>id.</u> ¶ 16; and (g) ███ understood that Juan Carlos Nava Valencia, Veytia, and an unidentified "other narcotics trafficker" planned to "return to their drug cartel activities" upon their release from prison, "take over half of the cartel once they were released," and "even offered [███ a job in the cartel," <u>id.</u> ¶ 17.

viii. <u>2009 Mexican Attorney General Report (Defense Ex. Z)</u>

Finally, the defense submits unauthenticated—and largely incomprehensible—transcripts of purported intercepted phone calls and an unauthenticated letter purporting to reflect communications of an incarcerated individual named Victor Hugo Martinez Rocha from 2009. The letter, which is dated December 28, 2009, alleges, in substance, that unnamed public servants from the Mexican Attorney General's Office and the Secretariat of Public Security were "devising a plot against" the defendant. Notably, the letter was sent "with copies respectfully submitted by hand" to the defendant and other individuals. Without providing any explanation for why they were not available at trial, the defendant acknowledges that these records were sent to the defendant while he was in office and thus he was aware of this information prior to trial. <u>See</u> Mem. 52. The defendant also claims that this letter and the accompanying transcripts demonstrate that "cartel members were willing to falsely attest that they had bribed the defendant." Mem. 52.

<u>LEGAL STANDARDS</u>

I. <u>Rule 33</u>

Federal Rule of Criminal Procedure 33 permits a court, upon motion by the defendant, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Ordering a new trial is an extraordinary remedy that is "disfavored in this Circuit," and, as a result, "the standard for granting such a motion is strict." <u>United States v. Gambino</u>, 59 F.3d 353, 364 (2d Cir. 1995). "The defendant bears the burden of proving that he is

20

entitled to a new trial under Rule 33, and before ordering a new trial pursuant to Rule 33, a district court must find that there is a real concern that an innocent person may have been convicted." United States v. McCourty, 562 F.3d 458, 475 (2d Cir. 2009) (internal quotation marks omitted).

"A Rule 33 motion is not an opportunity for the district court to alter its general posture of deference 'to the jury's resolution of conflicting evidence and assessment of witness credibility.'" United States v. Van Manen, No. 18-CR-030 (PAC), 2019 WL 5092013, at *2 (S.D.N.Y. Oct. 11, 2019) (quoting McCourty, 562 F.3d at 475). "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992). "An example of exceptional circumstances is where testimony is 'patently incredible or defies physical realities,' and the district court's identification of problematic testimony does not automatically meet this standard." McCourty, 562 F.3d at 476 (quoting Sanchez, 969 F.2d at 1414). "[T]he trial judge's rejection of all or part of the testimony of a witness or witnesses does not automatically entitle a defendant to a new trial." Sanchez, 969 F.2d at 1414.

"When a defendant seeks a new trial based on trial perjury, the defendant 'must first demonstrate that the witness in fact committed perjury.'" United States v. McPartland, No. 17-CR-587 (JMA), 2020 WL 7014275, at *8 (E.D.N.Y. Nov. 27, 2020) (quoting United States v. Monteleone, 257 F.3d 210, 219 (2d Cir. 2001)). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory. Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." Monteleone, 257 F.3d at 219. Even where the defendant establishes that a witness committed perjury, however, "[s]uch a showing does not, by itself, warrant a new trial." United States v.

Aquart, 912 F.3d 1, 20 (2d Cir. 2018), cert. denied, 140 S. Ct. 511 (2019).  "If the government was unaware of the falsity at the time of trial, a new trial is warranted if the court is left with the 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"  Id. (quoting Stewart, 433 F.3d at 297); McCourty, 562 F.3d at 476 (quoting Sanchez, 969 F.2d at 1413-15 ("Even where courts in this Circuit have clearly identified perjured testimony, they have refused to grant a new trial unless the court could find that the jury 'probably would have acquitted in the absence of the false testimony.'").

"To merit relief based on a claim of newly discovered evidence, the burden is on the defendant to satisfy five elements: (1) that the evidence is "newly discovered after trial"; (2) that "facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence"; (3) that "the evidence is material"; (4) that the evidence "is not merely cumulative or impeaching"; and (5) that "the evidence would likely result in an acquittal." United States v. James, 712 F.3d 79, 107 (2d Cir. 2013).

Ultimately, a district court "must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances."  United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).

II.    Criminal Discovery

A.    Brady and Giglio

Under Brady v. Maryland and its progeny, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment."  United States v. Coppa, 267 F.3d 132, 139 (2d Cir. 2001) (citation omitted). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness."  Id.

"[U]ndisclosed information is deemed material so as to justify a retrial only if there is a reasonable probability that, had it been disclosed to the defense, the result of the proceeding would have been different.  A reasonable probability of a different result is shown when the government's failure to disclose undermines confidence in the outcome of the trial." United States v. Spinelli, 551 F.3d 159, 164–65 (2d Cir. 2008) (alterations, citations and internal quotation marks omitted).

Where the suppressed evidence is Giglio information as opposed to exculpatory evidence, this "[e]vidence of impeachment is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996) (citations and internal quotation marks omitted). "However, new impeachment evidence is not material, and thus a new trial is not required when the suppressed impeachment evidence merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." Id.

B.    Prosecution Team

The government's disclosure obligations "extend[] only to material evidence ... that is known to the prosecutor." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998).  The government "cannot be required to produce that which it does not control and never possessed or inspected." United States v. Canniff, 521 F.2d 565, 573 (2d Cir. 1975); see also United States v. Hutcher, 622 F.2d 1083, 1088 (2d Cir. 1980) ("We reject … a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about.").

A prosecutor is not deemed to control or possess documents of "every agency and individual within the federal government." United States v. Meregildo, 920 F. Supp. 2d 434, 440

23

(S.D.N.Y. 2013); see also United States v. Quinn, 445 F.2d 940, 944 (2d Cir. 1971) (rejecting argument "that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor'" as "completely untenable"); United States v. Hunter, 32 F.4th 22, 36 (2d Cir. 2022) (same); United States v. Chalmers, 410 F. Supp. 2d 278, 287-90 (S.D.N.Y. 2006) (holding "prosecution team" did not include other government agencies conducting their own investigations into the United Nations Oil-for-Food Program, including the Departments of State, Treasury, and Defense, the Central Intelligence Agency, the National Security Agency and the U.S. Congress); see also United States v. Avenatti, No. 19-CR-374 (JMF), 2022 WL 457315, at *9 (S.D.N.Y. Feb. 15, 2022) ("This rule applies not only to other federal agencies, but also to other offices within the Department of Justice, including other United States Attorney's Offices.").

 As the Second Circuit has explained, a contrary rule would be unworkable:

> [T]he imposition of an unlimited duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require [courts] to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

Avellino, 136 F.3d at 255 (internal quotation marks omitted).

Courts employ similar standards to determine whether an agency or whether an individual is a member of the prosecution team.  "In determining whether another government entity acted as part of the prosecution team for all or part of a given case, courts in this Circuit consider five primary factors: 'whether the other [entity] (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings.'"

Avenatti, 2022 WL 457315, at *10 (quoting United States v. Middendorf, No. 18-CR-36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018)).

Whether a person (such as a member of law enforcement) is part of the prosecution team depends on the level of interaction between the prosecutor and the individual.   "At its core, members of the [prosecution] team perform investigative duties and make strategic decisions about the prosecution of the case" and "may also include individuals who are not strategic decision-makers," but "does not include federal agents, prosecutors, or parole officers who are not involved in the investigation." Meregildo, 920 F. Supp. 2d at 440; see also United States v. Stewart, 433 F.3d 273, 298 (2d Cir. 2006) ("the relevant inquiry is what the person did, not who the person is.").

Courts routinely determine that individuals are not members of the prosecution team when they were not involved in the investigation and prosecution.  See, e.g., United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (reports made by FBI agents in the course of investigations unrelated to the defendants' prosecutions should not be imputed to prosecution team); Pina v. Henderson, 752 F.2d 47, 49 (2d Cir. 1985) (prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor" but did extend to a police officer who was the investigating officer on the case).

25

<u>THE DEFENDANT'S RULE 33 MOTION SHOULD BE DENIED</u>

I.   <u>The Defendant Plotted to Generate False Testimony in the ▇▇▇▇ Affidavit, and Thus It Does Not Justify a New Trial</u>

The defendant seeks a new trial by claiming that two government witnesses, Oscar Nava Valencia and Edgar Veytia, communicated via contraband cellular telephones in advance of the trial, citing the ▇▇▇▇ Affidavit.[11]  <u>See</u> Def. Ex. X.  The government's investigation has revealed that not only are the allegations in the ▇▇▇▇ Affidavit false, but also that the defendant schemed to obstruct justice and suborn perjury by seeking to bribe or corruptly convince multiple inmates at the MDC to attest to these same false allegations.

A.   <u>The Government's Investigation</u>

   i.   <u>Edgar Veytia, Oscar Nava Valencia and Juan Carlos Nava Valencia Deny the Allegations in the Affidavit</u>

▇▇▇▇ alleges in essence that while he was housed with Juan Carlos Nava Valencia ("El Tigre") at the MDC, Juan Carlos Nava Valencia had a contraband cellular telephone which he used to communicate with his brother Oscar Nava Valencia and Edgar Vetiya.  The government individually interviewed Juan Carlos Nava Valencia, Oscar Nava Valencia and Vetiya, each of whom deny ▇▇▇▇ claim, as described below.

On January 8, 2024, the government interviewed Veytia.   <u>See</u> Report of Investigation dated Feb. 5, 2024, attached as Gov. Ex. 1.  Veytia stated: (a) he has never communicated with Juan Carlos Nava Valencia or Oscar Nava Valencia via a contraband cellular telephone, nor has he ever claimed to do so; (b) he met Juan Carlos Nava Valencia on only one occasion in 2018 at the MDC, when they were both briefly placed in the same holding room prior

---

[11] The government has anonymized the names of these inmates, given that all three inmates continue to be housed at the MDC with the defendant and the associated concerns for their safety and security should their identities be publicly disclosed.

to an attorney visit and Juan Carlos Nava Valencia introduced himself, but did not otherwise converse with Veytia; (c) he has never met or spoken with Oscar Nava Valencia; (d) he has never otherwise communicated with Juan Carlos Nava Valencia or Oscar Nava Valencia either directly or indirectly through a third party; (e) he did not make the statements attributed to him in the ███ Affidavit; (f) he did not learn that Oscar Nava Valencia would be testifying against the defendant until shortly before trial when it was publicly reported; and (g) Veytia did not have a plan with Juan Carlos Nava Valencia or others to return to narcotics trafficking, nor has he ever represented as such to anyone.

On January 18, 2024, the government interviewed Oscar Nava Valencia.  See Notes dated Jan. 18, 2024, attached as Gov. Ex. 2.  Oscar Nava Valencia stated that had never met or spoken to Edgar Veytia and that Veytia's name was not familiar to him.  Oscar Nava Valencia denied communicating with Veytia or with his brother, Juan Carlos Nava Valencia, via a contraband cellular telephone, or passing messages to Veytia via Juan Carlos Nava Valencia.

On January 16, 2024, the government interviewed Juan Carlos Nava Valencia.  See Notes dated Jan. 16, 2024, attached as Gov. Ex. 3.  Juan Carlos Navia Valencia stated, in relevant part: (a) he has never spoken on a contraband cellular telephone with Oscar Nava Valencia or an individual named "Edgar;" (b) he does not know Edgar Veytia, but met him on at least one occasion in approximately 2018 or 2019, when they were both briefly placed in a holding room prior to an attorney visit and they were introduced.

ii.      Evidence of the Defendant's Corrupt Scheme

While conducting its own investigation of the ███ Affidavit's claims, the government uncovered substantial and compelling evidence that the defendant has engaged in a scheme to obstruct justice and suborn perjury by attempting to bribe inmates at the MDC, including ███ to make false allegations substantially similar to those ultimately set forth in the ███

27

Affidavit, suggesting that the ███ Affidavit is a product of this corrupt scheme.  As described

below,  witnesses and contemporaneous reports and records confirm that the defendant sought to

generate the false testimony he submitted to this Court.

a.       Juan Carlos Nava Valencia Informed the Government
about the Scheme

Juan Carlos Nava Valencia informed the government that another inmate at the

MDC ("Individual 1") said that the defendant was seeking to convince inmates at the MDC,

including Individual 1, to make false allegations in support of the defendant's motion for a new

trial.  This offer was conveyed to Individual 1 by another inmate at the MDC ("Individual 2") who

was ████████████████████ at the time.  In response, Individual 1 asked Individual

2 to memorialize in writing what the defendant was seeking Individual 1 to falsely claim.

Individual 2 subsequently provided a document to Individual 1 on behalf of the defendant

memorializing the false claims the defendant wished Individual 1 to make.  Individual 1 did not

show Juan Carlos Nava Valencia the document, but relayed the substance of the document

including that the defendant was seeking for Individual 1 to falsely claim that Juan Carlos Nava

Valencia was communicating with his brother, Oscar Nava Valencia.

The Prosecution Team subsequently learned that counsel for Juan Carlos Nava

Valencia had conveyed the information of the defendant's corrupt efforts to another member of

the U.S. Attorney's Office for the Eastern District of New York on October 6, 2023, more than

two months before the ███ Affidavit was publicly filed and its allegations about Juan Carlos

Nava Valencia were made known to the Prosecution Team.

b.       Individual 2 Confirms the Defendant's Corrupt Plot with
Contemporaneous Notes and a Recording

On February 1, 2024, the Prosecution Team interviewed Individual 2.  See Notes

dated Feb. 1, 2024, attached as Gov. Ex. 4.  Individual 2 provided the government with his

contemporaneous notes memorializing his conversations with the defendant where the defendant attempted to generate false testimony for his motion for a new trial.  See Handwritten Notes, attached as Gov. Ex. 5.  Individual 2 also provided the government with an audio recording of a conversation between Individual 2 and the defendant on or about April 12, 2023, which Individual 2 surreptitiously recorded using a contraband cellular telephone.[12]  See Audio Recording dated Apr. 12, 2023, attached as Gov. Ex. 6; see also Draft Transcript of Audio Recording dated Apr. 12, 2023, attached as Gov. Ex. 7.[13]  Based upon its interview of Individual 2, its review of Individual 2's contemporaneous handwritten notes, and its review of the audio recorded conversation, the government learned the following:

- Individual 2 was housed with the defendant at the MDC between approximately June 2022 and July or August 2023.

- In early April 2023, the defendant asked Individual 2 if he knew anyone housed in a specific housing unit at the MDC and specifically asked about Individual 1.  The defendant explained that he was submitting a motion for a new trial and asked Individual 2 to ask Individual 1, when Individual 2 and Individual 1 were together, to falsely claim that: (a) Juan Carlos Nava Valencia had a contraband cellular telephone at the MDC; and (b) Individual 1 overheard Juan Carlos Nava Valencia speaking with his brother (Oscar Nava Valencia) and with a person he identified as "Procurador," which translates in English to "Attorney," and "Fiscal," which in English translates to "Prosecutor," (and which the government submits refers to Veytia).  The defendant further asked Individual 2  to have Individual 1 claim he overheard Juan Carlos Nava Valencia telling Oscar Nava Valencia that they needed to claim that they paid the defendant for access to the Port of Manzanillo.  This same day, the defendant asked Individual 2 to himself also make these same false.  The defendant initially offered Individual 2 $500,000 to do so, but later increased the proposed bribe to $1,000,000 and then $2,000,000, with the defendant claiming that a Mexican associate of the defendant could deliver the money to someone associated with Individual 2.

- At this time, the defendant also told Individual 2 that he had met with another inmate in the MDC ▮▮▮▮ and that the inmate had agreed to make similar false allegations

---

[12] Individual 2 took none of these actions at the direction or instruction of the government, nor did the government consent to or have prior knowledge of Individual 2's efforts to memorialize contemporaneously the defendant's illegal efforts.

[13] The transcriptions and translations are drafts and subject to change.

that "ET [Juan Carlos Nava Valencia, also known as "El Tigre"], his brother (L) [Oscar Nava Valencia, also known as "El Lobo"] and El Fiscal [Edgar Veytia, the former Attorney General for Nayarit] communicated over the phone and that they still conducted business." The defendant expressed concern that the inmate would forget to "tie in ET [Juan Carlos Nava Valencia] as the ring leader." The defendant told Individual 2 that the inmate had agreed to do this in exchange for money, but the defendant did not specify the amount of money to be paid. At that meeting, the defendant did not identify the inmate by name, referring to him as "El Brujo" or "Daniel." Individual 2 subsequently learned from the defendant that the inmate was Edgardo ████ the ████ Affidavit affiant. See Gov. Ex. 5.

- On or about April 12, 2023, Individual 2 audio recorded a portion of a conversation with the defendant using a contraband cellular telephone. During that recorded conversation, at the outset, Individual 2 advised the defendant that Individual 1 was working that evening. See Gov. Ex. 7 ("[H]e is going to work today."). Individual 2 then asked the defendant what he wanted Individual 2 to relay to Individual 1 so that Individual 1 could provide a convincing account to the defendant's counsel. See id. at 2 ("What do I tell [Individual 1] . . . what is it that you think . . . that I have to tell him . . . so that it sounds . . . to convince Cesar."). In response, the defendant asked Individual 2 to relay to Individual 1 that his account had to be limited to "your reality," meaning the limits of the frequency with which Individual 1 interacted with Juan Carlos Nava Valencia. The defendant then stated that Individual 1 should discuss Juan Carlos Nava Valencia's use of a contraband cell phone. See id. ("Okay about the phone . . . that he had used it . . . that I know he uses it for something . . . when I was in contact with him . . . ."). At this point, Individual 2 reiterated that Individual 1 had to "say something convincing . . . in order to convince . . . to convince Cesar [the defendant's counsel]." Id. The defendant then relayed what Individual 1 should claim: "[W]hen I was with him [Juan Carlos Nava Valencia] . . . on one occasion . . . he was saying that . . . that they should accuse him [the defendant] . . . [t]hat we paid for . . . for the port [Port of Manzanillo] . . . so that they release the load [of drugs]." Id. Individual 2 then clarified that the defendant was relaying that the above scenario concocted by the defendant should be a conversation between Juan Carlos Nava Valencia and Oscar Nava Valencia: "El Tigre was talking with his brother, and he says to his brother, 'No, no, no, no. you have to tell him that we pay him.'" Id. Individual 2 and the defendant then discussed the time period that Individual 1 should claim he overheard Juan Carlos Nava Valencia speaking with Oscar Nava Valencia. See id. ("[W]hen do you think he can say that he heard him talking with his brother?"). The defendant also stated that Individual 1 should also falsely claim that Individual 1 overheard Juan Carlos Nava Valencia speaking with Veytia. See id. ("That he spoke with the prosecutor."). Individual 2 then asked: "And what about the prosecutor? When . . . does he have to say?" Id. The defendant responded that Individual 1 should say that Juan Carlos Nava Valencia "talked to him." Id. Individual 2 then clarified: "[Y]ou want him [Individual 1] to say that he heard him [Juan Carlos Nava Valencia] talking with the prosecutor [Veytia], or that he [Juan Carlos Nava Valencia] mentioned it to him [Individual 1]." Id. The defendant then reiterated that Individual 1's account had to be grounded in the consistency of their actual interactions, so that it matched with Individual 2's account

as well.  See id.  Individual 2 then asked about what the defendant wanted Individual 2 to say, which the defendant responded was more important than what Individual 1 said.  See id. ("And what about me? I when I get together with, with Cesar. . . . I think you have more importance.").  The defendant then provided some detailed information on Veytia at Individual 2's request.  See id. (e.g., "[T]he Prosecutor is from a small state called Nayarit.").  And the defendant discussed with Individual 2 how he should state that he walked with Juan Carlos Nava Valencia, as part of establishing how he had learned the relevant information.  See id. ("That I walked with El Tigre. . . . [T]hat he spoke to me when we walked. . . . because he mentioned to me . . . a friend of his, that the prosecutor . . . .").  The defendant then stated that "[t]he worst" was that Individual 2 had to ground his account in the reality of the frequency and circumstances of Individual 2's actual interactions with Juan Carlos Nava Valencia because Individual 2 would be questioned about his account and that the government would, for example, review the security camera footage at the MDC.  See id. ("The worst is that it has to be all your truth . . . because that is what they ask you . . . 'Okay and how did you see?' 'I was there.' 'How were you there?' . . . Look at the cameras.").  The audio recording ended in the middle of the conversation.

- On or about April 15, 2023, the defendant asked Individual 2 to meet with Individual 1 and to "coach" Individual 1 on what to say to the defendant's counsel regarding Juan Carlos Nava Valencia, also known as "El Tigre."  The defendant wanted Individual 1 to claim that he walked in on a telephone conversation between Juan Carlos Nava Valencia and his brother (Oscar Nava Valencia), during which Individual 1 should say he overheard Juan Carlos Nava Valencia telling Oscar Nava Valencia to testify that they bribed the defendant for the "port issue," a reference to the Port of Manzanillo.  Individual 1 should also falsely claim that, on a different day, he observed Juan Carlos Nava Valencia talking on the telephone with "El Fiscal," which in English translates to "The Prosecutor," a reference to Veytia.  The defendant told Individual 2 that Individual 2 should tell the defendant's counsel certain details about Juan Carlos Nava Valencia.  Later that day, Individual 2 met with Individual 1 and conveyed the information relayed to him by the defendant.  Individual 2 further wrote Individual 1 a "script" of what the defendant wanted Individual 1 to say.

- On or about April 29, 2023, the defendant told Individual 2 that he should tell the defendant's counsel in this matter that Juan Carlos Nava Valencia, also known as "El Tigre," still operates and works with "El Meno" of the Jalisco New Generation Cartel.  The defendant further stated that ███ may mention "El Meno," as well.[14]  See Gov. Ex. 5 at 4, 8.

- On or about May 10, 2023, the defendant told Individual 2 the allegations the defendant intended ███ Individual 2 and others to put forward, which would show that the

---

[14] Notably, as previously discussed, the ███ Affidavit alleges that Juan Carlos Nava Valencia planned to return to "drug cartel activities" with an unidentified "other narcotics trafficker," likely a reference to El Meno, upon his release from prison.  Def. Ex. X ¶ 17.

government allowed its witnesses to communicate and align their accounts.  <u>See</u> Gov. Ex. 5 at 5.

- On or about May 13, 2023, the defendant told Individual 2 that, on May 11, 2023, ███ asked the defendant if another inmate at the MDC could participate in their corrupt scheme by also falsely claiming to know that Juan Carlos Nava Valencia had communicated with various government witnesses who testified at the defendant's trial.  The defendant further told Individual 2 that he would pay ███ for his false statements, but that ███ wanted more money.  The defendant further relayed ███ was going to meet with the defendant's counsel in this case.  <u>See</u> Gov. Ex. 5.

- Subsequently, the defendant informed Individual 2 that ███ who he had previously referred to as "El Brujo" or "Daniel," was, in fact, ███ and that ███ had met with the defendant's counsel in this case and provided an affidavit, as planned.  <u>See</u> Gov. Ex. 5, 11.

      c.    <u>Additional Evidence that the Defendant Encouraged Individual 1 and Individual 2 to Make False Allegations</u>

As part of its investigation, the Prosecution Team learned that another component of the Department of Justice acquired evidence of the defendant's corrupt scheme.  This information was learned in early May 2023, before ███ executed the ███ Affidavit and approximately seven months before the ███ Affidavit was publicly filed.  This information corroborated the statement by Individual 2, specifically that the defendant, through Individual 2, had made an offer to Individual 1 (a) to falsely state that Individual 1 overheard that cooperators were lying; and (b) to make false allegations about two individuals: Juan Carlos Nava Valencia who was housed at the MDC at the time, and Oscar Nava Valencia who was not then housed at the MDC.[15]

---

[15] Because the government's investigation is ongoing and given concerns for witness safety, the government has not set forth herein the entirety of the information that it has learned.  As set forth below, moreover, the Court need not decide the factual disputes pertaining to the ███ Affidavit in order to rule on the issues raised in the defendant's motion.  However, should the Court decide to reach those issues, the government requests that the Court hold an evidentiary hearing where the government can set forth additional evidence that it has learned about the defendant's corrupt scheme.  At the time of sentencing, moreover, the government intends to argue

Moreover, the Prosecution Team has since acquired the document previously described by Individual 2 as a script drafted by Individual 2 on behalf of the defendant for Individual 1 (the "Document").  The Document is dated April 24, 2023 and further corroborates the defendant's scheme.  <u>See</u> Document dated Apr. 24, 2023, attached as Gov. Ex. 8.  The document contains specific instructions regarding the false allegations that the defendant wanted Individual 1 to make.[16]  Notably, during his meetings with the government, Individual 2 identified the Document as the material that he provided to Individual 1 on behalf of the defendant.  <u>See</u> Gov. Ex. 5.

B.   <u>Because the Defendant Corruptly Schemed to Obstruct Justice, the Court Should Reject His New Trial Motion</u>

As demonstrated above, the government has uncovered the defendant's brazen and corrupt scheme to obstruct justice by offering to bribe or otherwise entice other inmates at the MDC to attest to false allegations regarding Juan Carlos Nava Valencia, Oscar Nava Valencia, and Edgar Veytia.  The ███ Affidavit is the product those corrupt efforts.  Evidence of the plot includes (a) at least two witnesses (Individual 2 and Juan Carlos Nava Valencia) who learned of these efforts at the time of their commission; (b) the contemporaneous notes taken by Individual 2 memorializing his conversations with the defendant about these efforts; (c) an audio recording of

---

that the Court should apply a two-point enhancement under U.S.S.G. § 3C1.1 for the defendant's efforts to obstruct justice.

[16] The Document is dated April 24, 2023, approximately one month <u>before</u> ███ signed the ███ Affidavit.  The name, email address, and telephone number for defense counsel in this matter are listed at the top of the Document.  Below defense counsel's contact information, the Document states "Luna quiere que usted diga esto" in Spanish, which in English translates to: "Luna wants you to say this."  The Document next has two sections. The first is titled "Procurador Veytia" in Spanish, which in English translates to "Attorney Veytia."  The next section of the Document is titled "Hermano," which in English translates to "Brother," a clear reference to Oscar Nava Valencia.  Below each section, the Document appears to contain instructions from the defendant on the false allegations that the defendant wanted Individual 1 to levy against Veytia and Oscar Nava Valencia, the same two government witnesses at issue in the ███ Affidavit.

a conversation between the defendant and Individual 2 where the defendant coached Individual 2, and by extension Individual 1, on what allegations they should levy against Juan Carlos Nava Valencia, Oscar Nava Valencia, and Edgar Veytia; and (d) instructions contained in the Document that were passed to Individual 1 on behalf of the defendant to craft false allegations.

Moreover, the timeline of events uncovered during the government's investigation corroborates the accounts conveyed by Individual 2 and Juan Carlos Nava Valencia.  Specifically, the fact that, in early May 2023, before the ███ Affidavit was signed, another component of the Department of Justice learned that the defendant was seeking, through Individual 2, to convince Individual 1 to provide false information about Juan Carlos Nava Valencia, Oscar Nava Valencia and a "Mexican prosecutor."  That such instructions were memorialized in the Document further corroborates that these events were occurring at the time.  Similarly, the fact that Juan Carlos Nava Valencia's attorney relayed this information to another member of the U.S. Attorney's Office for the Eastern District of New York on October 6, 2023, demonstrates the veracity of these statements, given that the ███ Affidavit was not publicly filed and thus its contents were not widely known.

The Court should not condone the defendant's illegal efforts to obstruct justice in this case and suborn perjury by giving any credence to the allegations set forth in the ███ Affidavit.  Given the significant evidence that the defendant has endeavored to commit a fraud upon the Court, the Court should take a skeptical view of the defendant's remaining arguments, which often rely on unauthenticated, never previously produced, records of questionable veracity.

C.   The Allegations in the Affidavit are Illogical and Implausible

Even setting aside the defendant's efforts to suborn perjury, the ███ Affidavit allegations do not merit a new trial.  That is because the ███ Affidavit's claims are, on their face,

illogical and implausible for several reasons, had no impact on the trial, and do not inspire any doubt in the jury verdict.

First, all three persons identified in the Affidavit—Juan Carlos Nava Valencia, Oscar Nava Valencia and Edgar Veytia—categorically and consistently deny the allegations and their accounts are consistent with, and corroborated by, one another.  Both Veytia and Oscar Nava Valencia deny ever meeting or communicating with one another at any time, directly or indirectly through Juan Carlos Nava Valencia.  Similarly, Juan Carlos Nava Valencia and Oscar Nava Valencia both deny communicating with each other via a contraband cellular telephone.  Finally, both Juan Carlos Nava Valencia and Veytia recall meeting one another briefly in a holding room prior to an attorney visit, but have otherwise not met or communicated, directly or indirectly.

Second, the allegations in the ████ Affidavit are nonsensical, in part, because there is no basis to believe that Oscar Nava Valencia and Veytia have ever had any association, relationship or communication.  The time periods in which Oscar Nava Valencia and Veytia engaged in separate drug trafficking conspiracies barely overlapped.  See Tr. 492-493 (Oscar Nava Valencia trafficked narcotics between 1996 and 2009); Tr. 1239 (Veytia first received instructions to assist drug cartels in October 2008).  Second, Oscar Nava Valencia and Veytia worked with different drug cartels.  Oscar Nava Valencia was the leader of the Milenio Cartel, which was allied with the Sinaloa Cartel.  See Tr. 492-493, 498.  Veytia, on the other hand, assisted the Beltran-Leyva Organization (and its sister organization the H-2 Cartel), which at that time was engaged in a years-long civil war with the Sinaloa Cartel.  See Tr. 1246, 1250, 1284.

Under these circumstances, the idea that two inmates from different time periods and different drug cartels, who were not housed together while incarcerated, would, for no particular reason, reveal, through a third party Juan Carlos Nava Valencia, to one another that they

would be testifying against this defendant (which was not public knowledge), when revelations of government cooperation in prison facilities could result in significant physical harm, is implausible.  Further, the idea that any government witness who had cooperated against an associate of a violent Mexican drug cartel like the defendant could plausibly believe that they could safely return to Mexico upon their release and "take over half the cartel," presumably a reference to the Sinaloa Cartel (which neither of these witnesses were ever members of), rather than be immediately tortured and killed for their cooperation with the government, also appears highly doubtful.  Def. Ex. X ¶ 17.  Put simply, on its face, the █████ Affidavit does not withstand serious logical scrutiny.

Nor does the defendant's central argument related to the █████ Affidavit, that Oscar Nava Valencia and Veytia "affirmatively plotted to coordinate their stories," withstand scrutiny. Mem. 51.  The trial testimonies of these witnesses reflect no coordination.

Veytia's trial testimony about the defendant was confined to the following distinct events: (a) in October 2008, the Mexican Secretary of Public Security for Tepic, Nayarit told Veytia that he had received instructions from the defendant that they had to "take El Chapo's side" and "were not to intervene within the fighting between the Beltran faction and the Chapo's faction," see Tr. 1238:22-1241:20; (b) in early 2011, when several municipal police officers were kidnapped, Veytia met with the Nayarit Governor who told Veytia that the Mexican Governor had just met with Mexican President Felipe Calderon and the defendant and "that the line was Chapo," meaning that "we had to protect Chapo's people and not Beltran's, the people we had been protecting," see Tr. 1253:2-1257:18; (c) in mid-December 2011, the Nayarit Governor and the defendant traveled to Mexico City for a meeting with the defendant, during which a senior associate of the defendant, Luis Cardenas Palomino, said to Veytia that "we were on the wrong

36

side, and that we should be on El Chapo's side" and the Nayarit Governor told Veytia that, based on his meeting with the defendant, the defendant would not assist them in their battle against the Sinaloa Cartel, see Tr. 1261:23-1268:19; (d) around this same time period, the Mexican federal police engaged in an altercation with Nayarit State Police to ensure they did not search a detained vehicle possibly containing senior members of the Sinaloa Cartel, after which the defendant personally thanked Veytia on a telephone call for ensuring the vehicle was let go, see Tr. 1268:20-1272:5; and (e) in the beginning of 2011, a member of the Sinaloa Cartel met with Veytia in an attempt to bribe the defendant for preferential access to Nayarit for drug trafficking for the Sinaloa Cartel, during which the cartel member relayed that he had bribed the defendant with millions of dollars, see Tr. 1279:8-1280:21.

Oscar Nava Valencia did not testify about any of these incidents. Moreover, Oscar Nava Valencia was already arrested and in custody at the time of virtually all of these events. There was thus no overlap in content between the testimony of Veytia and Oscar Nava Valencia and the purported coordination does not exist.[17]

II.   The 2009 Mexican Attorney General Report Does Not Justify a New Trial

The defendant also errs in seeking a new trial based on an unauthenticated 2009 report purportedly from the Mexican Attorney General's Office (the "Report") that details

---

[17] Even if credited, the ███ Affidavit does not disturb evidence of multiple witnesses who testified that the defendant accepted bribes from and assisted the Sinaloa Cartel. Tr. 60, 74, 104-106, 745. As a result, the Court may deny the motion without resolving any evidentiary issue either by (a) determining that the defendant has not met its burden or (b) that the allegations in the ███ Affidavit, even if true, would not warrant a new trial. To the extent the Court believes a new trial may be warranted on the basis of the ███ Affidavit, however, the government respectfully requests an evidentiary hearing at which it may present testimony and its corroborating evidence rather than have the Court rely solely upon the ███ Affidavit. See Bout, 666 F. App'x at 38 ("Rule 33 'motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.'").

communications between an inmate incarcerated in Mexico who alleges he was pressured by Mexican government officials into accusing the defendant of being involved in drug trafficking. The Report does not warrant a new trial for at least three independently sufficient reasons.

First, by the defendant's own admission, the Mexican Attorney General's Office sent the Report to the defendant at the time the communications were intercepted and thus its contents were already known to the defendant prior to trial.  Def. Ex. Z at 34.  Evidence of which the defendant was on notice cannot be raised in a Rule 33 motion.  See Owen, 500 F.3d at 84 (denying Rule 33 motion based on evidence that the defendant knows or "should have been aware of").  Nor can the defendant explain why he did not attempt to call the relevant witnesses regarding this alleged report when he was aware of its alleged existence.  United States v. Forbes, 790 F.3d 403, 408–09 (2d Cir. 2015); United States v. Bout, 666 F. App'x 34, 38 (2d Cir. 2016) (upholding denial of Rule 33 motion where defendant "offered no evidence that he attempted to call or depose [the witness], and he has thus failed to exercise due diligence in obtaining [the witness] testimony").

Second, the Report's allegations are entirely irrelevant to this case, as the Report does not allege wrongdoing by, or even mention, any of the government's witnesses or their associates.  The defendant incorrectly claims that the Report details a conspiracy to frame the defendant by "cartel members."  Mem. 52.  Not true.  The Report alleges that "[p]ublic servants from the Attorney General's Office of the Republic and the federal Public Security Secretariat," Def. Ex. Z at 8, were orchestrating such a plot.  Not a single government witness is identified in the Report or alleged to have engaged in this purported plot.   The contents of the Report are thus irrelevant to the government's proof at trial and could not have been used at trial to impeach any of the government witnesses.

<u>Third</u>, even if it were relevant, the Report is not reliable.  It is unauthenticated, constitutes at least double hearsay, as the Report is being offered for the truth of the underlying allegations, and is not subject to any verification or cross examination.  <u>See</u> <u>Bout</u>, 666 F. App'x at 38 ("Rule 33 'motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.'"); Fed. R. Evid. 801(c).

III.     <u>The Defendant's Claim That He Was Cleared by the U.S. Government Does Not Justify a New Trial</u>

The defense errs in arguing that the government failed to turn over documents which he claims show the defendant "was dedicated to fighting the cartels" and that "the United States government investigated and cleared Mr. Garcia Luna" of any wrongdoing.  Mem. 28-33. The defendant's argument fails for four independently sufficient reasons.

<u>First</u>, the defense is wrong that the defendant was "cleared" of wrongdoing or that the documents he attaches are exculpatory.  In support of its argument, the defense attaches a Letter of Understanding, dated January 27, 2011, and signed by the defendant and the DEA's then-Regional Director in Mexico.  Def. Ex. C.  The letter states that certain Mexican police officers who are selected to enter the SIU Program (<u>i.e.</u>, the vetted Mexican unit) must submit to a drug test, background investigation and polygraph examination.  Def. Ex. C at 8.  Notably, the Letter of Understanding does not state that the defendant or any other cabinet officials are subject to such vetting or polygraph.  Along the same lines, Defense Exhibit F, a document describing an alleged meeting between the defendant and certain U.S. government officials also attached by the defendant as an exhibit, does not state that the defendant or any cabinet officials underwent vetting or polygraph examinations.  Def. Ex. F.  As the government disclosed to the defense before trial,

while "polygraph tests are a DEA requirement for SIU members," the defendant was "not required to be polygraphed," because he was a cabinet-level official.  3500-MM-156.[18]

Second, even if the defendant was polygraphed or vetted by the United States government, this information cannot form the basis for a new trial because the defendant was aware of it.  As the defense exhibits purport to show, the defendant was himself involved in discussions with the U.S. government about establishing a vetted group: Defense Exhibit F, for example, claims to show that the defendant participated in the meeting with U.S. government officials about a vetted unit and the defendant signed the Letter of Understanding regarding the DEA's vetted Special Investigations Unit.  And, of course, if the defendant himself sat down with the DEA or any other U.S. government agency for a polygraph examination, he would have been aware that this polygraph occurred.

This is fatal to his Rule 33 and Brady motion.  Evidence is not "newly discovered" when the defendant knows of it.  Owen, 500 F.3d at 84 (evidence that the defendant knows or "should have been aware of" cannot be used in a Rule 33 motion).  Nor can the defendant demonstrate reasonable diligence to obtain it when he has been on notice of it.  Forbes, 790 F.3d at 408–09; Bout, 666 F. App'x at 38 (upholding denial of Rule 33 motion where defendant "offered no evidence that he attempted to call or depose [the witness], and he has thus failed to exercise due diligence in obtaining [the witness] testimony").  Likewise, evidence is not "suppressed" under Brady "if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence."  United States v. Paulino, 445 F.3d 211, 225 (2d Cir. 2006).  Here, the defendant was aware that certain Mexican law enforcement had been

---

[18] Consistent with that disclosure, the government conferred with staff who oversee the DEA's SIU vetting program, and they confirmed there are no records of the defendant being vetted or polygraphed by the DEA.

vetted by the U.S. government, and he would know about his own polygraph.  Indeed, he attaches a Letter of Understanding he himself signed and records of a meeting he himself attended.  Thus, the defendant possessed the "essential facts" allowing him to call witnesses, subpoena documents, and investigate further.

Third, even if the defendant was vetted, the government did not violate Brady or any discovery obligations because the documents the defense attaches to its motion were not in the possession of the Prosecution Team.  To be sure, the government produced records in its possession regarding DEA vetting programs.  See, e.g., 3500-MM-156[19] (stating that the defendant and other senior officials who supervised the Mexican SIU unit "were not required to be polygraphed"); Aug. 12, 2022 Gov't Ltr. (noting that the defendant and another public official in 2007 ordered vetting examinations of public officials in preparation for a large counternarcotics operation).

But the Prosecution Team did not possess the records the defendant attaches to his motion or any other Letters of Understanding.  See Def. Exs. C & F.  Documents are not in the possession of the Prosecution Team simply because some arm of the entire U.S. government has them.  Nor are documents possessed by one agent in a law enforcement agency or office attributable to every single agent in the same agency.  See Avellino, 136 F.3d at 255–56 (rejecting as "completely untenable [the] position that 'knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.'") (quoting Quinn, 445 F.2d at 944).  The signatory of the Letter of Understanding, see Def. Ex. C, was not a member of the Prosecution Team and has not been a government official since prior to the defendant's indictment.  He did not

---

[19] Government trial exhibits and 3500/Jencks Act material were provided to the Court in advance of trial.  Upon request, the government will provide additional copies.

participate in strategy meetings regarding the prosecution; he was not on the government's Grand Jury Rule 6(e) list; he was not informed of the government's other trial witnesses; and he did not conduct any witness interviews for the Prosecution Team.  And the defense does not even attempt to allege that another U.S. government agency was part of the Prosecution Team under the relevant legal standard, arguing wrongly instead that the location of a meeting is what controls.  See Mem. 32 & n.4.[20]

  Fourth, and most critically, nothing about this supposed vetting or polygraphing casts doubt about the defendant's guilt because it is immaterial; it does not inspire a real concern that "the evidence would likely result in an acquittal." James, 712 F.3d at 107 (quotation marks and citation omitted).[21]  Even if the defendant was vetted, cleared by and working with the U.S. in his capacity as a cabinet official, the defense assumes that this means he was innocent.  See Mem. 26.  Not so.  Polygraph evidence is so unreliable it is inadmissible.  United States v. Fraser, 206 F. App'x 100, 101 (2d Cir. 2006) ("Both the United States Supreme Court and this Court have repeatedly upheld the exclusion of polygraph evidence because of its unreliability[.]").  Indeed, Ivan Reyes Azarte—head of the Mexican law enforcement unit that was vetted, polygraphed by, and working with the U.S. government—admitted to accepting bribes from and sharing intelligence with the drug cartels he was duty bound to prosecute, despite being vetted.  See United States v. Reyes Azarte, No. 20-CR-30 (BMC) (E.D.N.Y.).

---

  [20] The defendant again contends that his mere association or work with U.S. senior government officials is exculpatory.  See Mem. n.4, Def. Ex. G.  It is not, as this Court's ruling confirmed.  See ECF No. 182 at 1-2 (excluding letters by U.S. government officials made "under political circumstances" as irrelevant, hearsay, improper opinion, prejudicial and permitting few photographs of the defendant with U.S. officials given "their limited probative value").

  [21] In her affidavit, ▮▮▮▮ claims that she heard from another individual that the defendant had undergone a polygraph administered by the DEA.  Id. ¶ 16.  This assertion represents multiple layers of hearsay, would not have been admissible, and is not reliable on its face.

The evidence at trial also established that vetting was no panacea. Special Agent Jose Moreno testified how vetted members of the SIU unit sabotaged El Chapo's arrest. Tr. 1331-1339. Special Agent Miguel Madrigal testified that the DEA was still "careful" with the "vetted and polygraphed" officers, given concerns that the officers would leak valuable intelligence to the cartels. See Tr. 956-960; see also Tr. 978 (noting that Edgar Bayardo, a senior official within the federal police, met with senior cartel leaders). Trial evidence also established that the defendant was a cunning double agent, having spent much of his career at CISEN, or Mexico's CIA equivalent, Tr. 1031, 1646, adding further doubt that vetting could uncover his wrongdoing. At bottom, multiple witnesses at trial testified that they bribed the defendant on behalf of the Sinaloa Cartel. Such testimony was firsthand, corroborated, and compelling. Measured against that evidence, the defendant's supposed vetting is immaterial.

In sum, the defendant's arguments about vetting and polygraphs are factually incorrect, do not entitle him to a new trial, and should be rejected.

IV.     The Defendant's Allegations Against Hector Villarreal Hernandez Do Not Justify a New Trial

A.     Impeachment Material

The defendant also wrongly claims that a letter from Robbie Ward to the U.S. Attorney's Office for the Western District of Texas (the "WDTX Letter") contains suppressed Giglio material that justifies a new trial. The defense argument fails for three independently sufficient reasons: (1) the WDTX Letter is borderline nonsensical and does not represent impeachment material; (2) the Prosecution Team did not possess and was unaware of the WDTX Letter or its accusations; and (3) the WDTX Letter is immaterial and does not affect the jury's verdict because any potential impeachment would have been cumulative and Villarreal Hernandez's testimony did not concern any critical element at trial.

43

As background, Villarreal Hernandez was the Secretary of Finance for Governor Humberto Moreira Valdes of the Mexican state of Coahuila, Robbie Ward's client.  Tr. 1131-32. Villarreal Hernandez pleaded guilty, pursuant to a cooperation agreement, to conspiring with Moreira Valdes and others to steal public money in Mexico and launder it through a variety of sources, including into the United States.  Tr. 1133-36, 1170.  The WDTX Letter is written by defense counsel for Moreira Valdez—Villarreal Hernandez's key co-conspirator in Mexico and the mastermind of the scheme to steal government funds.  The WDTX Letter was sent to an Assistant U.S. Attorney in the Western District of Texas.

First, the WDTX Letter cannot represent impeachment material because it verges on incomprehensible with accusations that are difficult to follow.  Generously interpreted, the WDTX Letter alleges that Villarreal Hernandez, while a cooperating witness in the United States, opened and used a bank account in another individual's name.  From this, the letter speculates that "investigators and prosecutors *believe* that the deposits made in the account of another person … that Mr. Villarreal uses to complement his lifestyle and to try to invest in new businesses in San Antonio, Texas, *may* derive from [] criminal activities[.]"  Def. Ex. H at 3 (emphasis added).  The WDTX Letter goes on for many more pages, including cherry-picked quotations of unknown documents, statements of what the defense attorney author "believe[s]," id. at 5, supposed quotations from investigations in Spain and Mexico, portions of accusations from an alleged victim of the theft, and accusations against Villarreal Hernandez's family members.  The WDTX Letter attempts to discredit Villarreal Hernandez in an effort to halt potential charges against his client. Def. Ex. H at 1 (arguing that despite Villareal Hernandez's "statements against Humberto Moeria," "Mr. Moeira is not responsible for any wrongdoings").

Because the WDTX Letter contains uncorroborated and nonsensical allegations, this Court would have likely precluded reference to them.  Courts in this Circuit routinely preclude cross-examination of "mere allegations."  United States v. Robinson, No. 20-CR-415, 2021 WL 3003939, at *2 (S.D.N.Y. July 12, 2021) ("the civil lawsuits contain mere allegations, they have little-to-no probative value"); United States v. Agostini, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003) (precluding cross-examination on arrests because they "are at this stage merely allegations").

Second, even if the WDTX Letter represented bona fide impeachment material, it was not suppressed because the Prosecution Team did not possess or know about it.  Prior to trial, the Prosecution Team requested witness materials from the U.S. Attorney's Offices for the Western District of Texas and the Southern District of Texas, and those offices provided proffer reports, plea agreements, and other relevant documents, which the Prosecution Team produced to the defense.  The offices did not produce the WDTX Letter to the Prosecution Team or disclose the allegations contained therein.  The government "cannot be required to produce that which it does not control and never possessed or inspected."  Canniff, 521 F.2d at 573.  Because the Prosecution Team is not deemed to control or possess documents of "every agency and individual within the federal government," the government did not violate its disclosure obligations, and a new trial is not warranted.  Meregildo, 920 F. Supp. 2d at 440; see also United States v. Faltine, No. 13-CR-315 (KAM), 2016 WL 1700385, at *10 (E.D.N.Y. Apr. 26, 2016) (holding that it was "inappropriate" to impute knowledge of an agreement between a witness and prosecutors in Arizona to the U.S. Attorney's Office for the Eastern District of New York when the prosecution team lacked knowledge of the agreement).

In apparent acknowledgment that the government did not possess or know about the WDTX Letter, the defendant argues that because Texas prosecutors and testifying DEA agent

Miguel Madrigal knew about the allegations, their knowledge should be imputed to the Prosecution Team.  Mem. 37.  Not so.

None of the relevant factors cited by the defense suggest that the Texas U.S. Attorney's Offices or Madrigal are part of the Prosecution Team.  Federal prosecutors in Texas had no relevant involvement in the defendant's prosecution.  They did not: (a) "participate[] in the prosecution's witness interview"; (b) were not "involved in presenting [the defendant's] case to the grand jury"; (c) did not "review[] documents gathered by . . . the prosecution"; (d) "play[] a role in the development of prosecutorial strategy"; or (e) "accompan[y] the prosecution to court proceedings."  Avenatti, 2022 WL 457315, at *10.  Instead, the Assistant U.S. Attorneys in Texas merely gave permission for the Prosecution Team to meet with and call Villarreal Hernandez to testify, and provided the Prosecution Team with witness material for Villarreal Hernandez so it could disclose those materials to the defendant.  The Assistant U.S. Attorneys in Texas did not know the names of other government witnesses and were not even present when the Prosecution Team met with Villarreal Hernandez.

The defense attempts to blur the relevant legal test by arguing that the Prosecution Team's investigation "was intertwined with the Southern and Western Districts of Texas."   Mem. 37.  That is neither factually true nor is it the relevant legal standard.  As courts in this Circuit have held, limited document sharing or overlapping witness interviews do not cause the Prosecution Team to subsume another office.  See Avenatti, 2022 WL 457315, at *10 (U.S. Attorney's Office for the Central District of California not part of prosecution team where both offices conducted separate investigations of the defendant but participated in five joint witness interviews and engaged in limited document sharing; "a small number of specific, discrete requests for certain materials," without engaging in any joint "review of the documents does not, without more, render

a separate United States Attorney's Office part of the same prosecution team" (alterations, citations and internal quotation marks omitted)); Middendorf, 2018 WL 3956494, at *5 (SEC not part of the prosecution team even where they conducted joint witness interviews with the U.S. Attorney's Office and charged the defendants on the same day as the U.S. Attorney's Office because the SEC was not involved in grand jury presentation, did not review documents gathered by government or share its documents and did not participate in development of prosecution strategy).[22]

Similarly, the Second Circuit has declined to impute knowledge of a witness's bad acts by one U.S. Attorney's Office to all U.S. Attorney's Offices.  See Quinn, 445 F.2d at 944 (declining to impute to the prosecution team that a government witness had been indicted in another district while trial was ongoing, rejecting as "completely untenable [the] position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor"); Locascio, 6 F.3d at 949 (declining to impute to the Prosecution Team where FBI agents in another district had evidence that the cooperating witness had committed additional crimes and denying motion for a new trial because "[e]ven assuming the reports' materiality, there is no evidence that the prosecution team in the instant case was aware of the report").

---

[22] In about 2012, Villarreal Hernandez learned he was being investigated by U.S. law enforcement authorities in Texas for money laundering. Tr. 1168-69. In 2014, Villarreal Hernandez turned himself into U.S. law enforcement.  Villarreal was charged by the U.S. Attorney's Offices in the Western District of Texas and the Southern District of Texas.  In September 2014, Villarreal Hernandez pleaded guilty in both districts pursuant to cooperation agreements. The U.S. Attorney's Office for the Eastern District of New York was not involved in these agreements and did not meet with Villarreal Hernandez until after the defendant in the instant case was charged.  DEA Special Agent James Cain, who is a member of the Prosecution Team, attended one interview of Villarreal Hernandez in 2014 and asked Villarreal questions regarding the defendant, but no follow up was conducted until 2020.  Special Agent Cain's presence in one interview does not render all of the other federal prosecutors and agents members of this Prosecution Team.  Middendorf, 2018 WL 3956494, at *5.

Similarly, Madrigal was also not involved with the Prosecution Team's investigation and prosecution of the defendant, and thus any limited knowledge he had cannot be imputed to the Prosecution Team.  Madrigal's involvement in this case was his trial testimony regarding his time stationed in Mexico, including how and why the DEA operates in Mexico and his observations of corrupt law enforcement activity there.  Tr. at 944-1015.  Madrigal did not refer any allegations of the defendant's corruption to the U.S. Attorney's Office for the Eastern District of New York; he did not participate in any strategy meetings regarding the prosecution; he was not on the government's Grand Jury Rule 6(e) list; he was not aware of the government's other trial witnesses; and he did not conduct any witness interviews for the Prosecution Team.  In other words, Madrigal did not "perform investigative duties and make strategic decisions about the prosecution of the case" and was not involved in the Prosecution Team's investigation of the defendant in any way.  Meregildo, 920 F. Supp. 2d at 441; see also Stewart, 433 F.3d at 299 (government agent who was a witness at trial not a member of the prosecution team because he was not involved "with the investigation or presentation of the case to the grand jury[, and] did not interview witnesses or gather facts, nor, with the exception of the [document he testified about], did he review documents or develop prosecutorial strategy").  In sum, Madrigal was a trial witness, not a member of the Prosecution Team.

The defendant claims that Madrigal was a member of the Prosecution Team because, during preparation sessions in advance of his testimony, he reviewed voluminous DEA documents.  Mem. 38.  Madrigal reviewed documents to ensure that he was prepared to testify and to ensure that the government fulfilled its Jencks Act obligations.  Madrigal also provided several reports he drafted when he was in Mexico so that they could be disclosed to the defense.  Madrigal did not share and review documents to generate additional leads or to prepare *other* witnesses.

Viewed in that context, because Madrigal did not "perform investigative duties and make strategic decisions about the prosecution of the case" and was not involved in the Prosecution Team's investigation of the defendant in any way, Meregildo, 920 F. Supp. 2d at 441, he was not a member of the Prosecution Team.   Thus, any knowledge he had of the accusation against Villarreal Hernandez cannot be imputed to the Prosecution Team.

       Third, and most fundamentally, the WDTX Letter could not affect the jury's verdict and there is no risk that the defendant would have been acquitted had it been disclosed because: (a) any impeachment of Villarreal Hernandez would have been cumulative; and (b) Villarreal Hernandez's testimony was limited and immaterial to the verdict.

       Even if the information in the WDTX Letter were true and admissible, it is immaterial because it is cumulative.   The government already disclosed to the defense, and the jury heard, reports of extensive criminal activity by Villarreal Hernandez  See, e.g., HJVH-3500-1 (witness stated that he and others stole money from large government contracts and laundered it into the United States); 3500-HJVH-6 (witness previously testified that he lied to banks to launder the proceeds of his scheme into the United States); 3500-HJVH-6 (witness previously testified that he left Mexico for the United States even though he was on pretrial release in Mexico); Tr. 1130 (money laundering conspiracy), 1133-42 (kickbacks), 1170 (money laundering); see also Tr. 1173 (false documents to obtain loans); 1174 (bail jumping, money laundering, and conspiracy to transport stolen money).   The jury verdict would not differ if they heard another instance of criminal activity by Villarreal Hernandez.   See United States v. Moslem, 19-CR-547 (CS), 2023 WL 5610297, at *4 (S.D.N.Y. Aug. 30, 2023) ("[E]ven if it had been withheld, it is merely cumulative impeachment material—additional fraudulent conduct [of a witness] … whose years of dishonesty and fraudulent behavior were well known to the jury.").   Here, as in Moslem, "[a]

few more instances of misconduct would have made no difference to the jury's assessment of [Villareal's] testimony." Id.

Critically, the Second Circuit has held that undisclosed impeachment material can only justify a new trial if the witness "supplied the only evidence linking the defendant(s) to the crime" or "where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case." Wong, 78 F.3d at 79. The defendant cannot meet that standard. Villarreal Hernandez's testimony was limited: he was one of nine cooperating witnesses who testified against the defendant and one of more than 25 government witnesses. Villarreal Hernandez's testimony did not address the core issue in the case—the defendant's acceptance of bribes from the Sinaloa Cartel. Villarreal Hernandez testified chiefly about (a) how the defendant paid for better news coverage; (b) visiting the defendant's residences; and (c) how money is hidden and spent in Mexico. Tr. 1151-1155, 1160-1161, 1165-1166, 1137-1138. Villarreal Hernandez did not witness the payment of bribes to the defendant by the Sinaloa Cartel, unlike Villarreal Barragan, Zambada Garcia, or Oscar Nava Valencia. Nor did he witness the ledgers documenting the defendant's bribes, unlike Israel Avila. Tr. 746-747. Put another way, this Court could strike the entirety of Villarreal Hernandez's testimony without affecting the jury verdict because Villarreal Hernandez did not supply the "only evidence linking the defendant[] to the crime"—nor did he supply any "critical element" of the government's case. Wong, 78 F.3d at 79.

Accordingly, the Prosecution Team did not violate its disclosure obligations and the WDTX Letter does not justify a new trial.

B.   Villarreal Hernandez Did Not Commit Perjury

The defendant also wrongly argues that he should be granted a new trial because newly discovered evidence proves Villarreal Hernandez committed perjury. Mem. 39-45. The defendant's accusations of perjury are unfounded. There is no evidence that Villarreal Hernandez

committed perjury, and affidavits from witnesses without personal knowledge of the facts and who were not subject to cross-examination do not show that a trial witness committed perjury. And the defendant's "newly discovered evidence" are facts that, even if assumed true, were known to the defendant prior to and during the trial. They are not properly considered under a Rule 33 motion, and the claim should be rejected.

        i.       <u>Payments to El Universal</u>

The defense first wrongly claims that meeting agendas, photographs, and an attorney letter undermine Villarreal Hernandez's testimony that the defendant paid the owner of the newspaper El Universal to suppress negative news coverage of the defendant being kidnapped by the Sinaloa Cartel. None of these documents constitute new evidence under Rule 33.

The defendant first claims that Villarreal Hernandez lied about Governor Moreira Valdes arranging for the defendant to bribe Ealy Ortiz for more favorable coverage in El Universal. Mem. 40. In support of this argument, the defendant attaches "newly discovered" schedules of the defendant which purport to show that the defendant met with Ortiz numerous times prior to 2009 and did not need an introduction to Ortiz (Def. Ex. J), photographs of the defendant and Ortiz to corroborate this fact (Def. Ex. K), and a so-called affidavit from counsel to Ealy Ortiz and El Universal denying the charges (Def. Ex. L).

None of this evidence is "newly discovered." If the defendant truly met Ortiz numerous times prior to 2009, he knew that fact prior to trial, would have told his counsel and the defense could have cross-examined Villarreal Hernandez or sought to introduce evidence of this fact. <u>See</u> <u>United States v. Muja</u>, 365 F. App'x 245, 246 (2d Cir. 2010) ("[O]ne does not 'discover' evidence after trial that one was aware of prior to trial.") (citation omitted). Further, these affidavits and schedules have no evidentiary value and do not cast any doubt on Villarreal Hernandez's testimony. The affidavit is not written by an individual with personal knowledge but

rather is by El Universal's lawyer in Mexico; it also contains multiple levels of hearsay and is replete with conclusory legalistic denials, casting further doubt on its reliability. Def. Ex. L at 25. Even if it were from Ealy Ortiz himself and bore indicia of reliability, it is not subject to cross-examination or verification in any way, and thus cannot disturb the jury's verdict. See Bout, 666 F. App'x at 38 ("Rule 33 'motions based solely upon affidavits are disfavored because the affiants' statements are obtained without the benefit of cross-examination and an opportunity to make credibility determinations.'") (citations omitted).

The calendars or agendas have even less value. The defendant attaches an affidavit from an individual who states she was the defendant's secretary from 2005 to 2012. See Def. Ex. D. She claims that the schedules she attaches were created at the time of the events but does not explain how she now has access to them more than a decade later, or provide any evidence that they were not fabricated after the trial in support of this motion. Most importantly, the defendant knew the meetings he attended, knew who his assistant was, and to the extent the attached schedules are authentic and not a fabrication, knew how to obtain them before trial. Muja, 365 F. App'x at 246; Owen, 500 F.3d at 89 ("We have never before held that a new trial may be granted pursuant to Rule 33 on the basis of evidence that was known by the defendant prior to trial, but became newly available after trial, and we decline to do so here.").[23]

---

[23] The defendant also errs in arguing that Villarreal Hernandez lied about meeting the defendant with Governor Moreira Valdes in 2008. The defendant's motion attaches a purported schedule showing he met with Governor Moreira Valdes and five others, but not Villarreal Hernandez. Def. Ex. M at 4. Setting aside the questionable authenticity of the schedules, the the argument fails for two reasons: (1) defendant has known about these purported facts for more than 15 years and cannot introduce them now, Muja, 365 F. App'x at 246, and (2) it is entirely plausible that Villarreal Hernandez, as an aide to his principal (Moreira Valdes) was not listed on the schedule with some of the other individuals, or that Villarreal Hernandez met the defendant at a different meeting not noted in the schedule. A schedule omitting Villarreal Hernandez's name does not prove that Villarreal Hernandez did not attend this meeting, let alone that he purposefully lied during his testimony.

ii.      The Bunker

The defendant next wrongly claims that Villarreal Hernandez committed perjury because he testified that he (a) toured the SSP bunker, a law enforcement center, at the beginning of 2009, but that the bunker was not completed until later in 2009, and (b) that he was shown a demonstration of certain spying technology by the NSO Group that did not exist at the time of this tour.  These claims also fail.

The date the bunker opened is not newly discovered evidence.  The defendant—as the head of the SSP and a featured speaker at the bunker's inauguration, Mem. 43-44, Def. Ex. O—knew these facts before trial.  The defense could have cross examined Villarreal Hernandez on any purported discrepancy in his dates or introduced evidence of the bunker's opening in its defense case to attempt to discredit Villarreal Hernandez.   That is fatal to his Rule 33 motion. Owen, 500 F.3d at 89.[24]

Even setting that aside and assuming that Villarreal Hernandez was mistaken as to a date, however, that does not establish perjury.  Nor does it entitle the defendant to a new trial. "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony."  Monteleone, 257 F.3d at 219.  "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."  Id.  There would be no reason to intentionally lie about attending a tour of the bunker months before it opened, where the date was immaterial.  See United States v. Persico, No. 04-CR-911, 2008 WL 11497841, at *4 (E.D.N.Y.

---

[24] Moreover, Villarreal Hernandez's testimony is not necessarily in conflict with the defense exhibits.  For example, he could have been touring an early iteration of the bunker, prior to its formal opening and inauguration.

Aug. 28, 2008) (denying new trial motion where witness was confused about a date because incorrect testimony resulting from mistake or inaccuracy about a date does not constitute perjury).

By the same token, the defendant errs when he alleges that Villarreal Hernandez committed perjury in testifying about receiving a demonstration of the Pegasus spy software in the bunker in 2009.  The defendant attaches publicly available documents showing that Pegasus was completed in 2011 and that other arms of the Mexican government (and not the SSP) purchased Pegasus.  See Def. Exs. Q, R, S, and T.  Here too, the Pegasus documents are not newly discovered evidence.  As the head of the SSP and as a speaker who spoke at the bunker's inauguration, the defendant knew or was on notice of the bunker's capabilities and software.  Owen, 500 F.3d at 89.

In addition, the defense cannot show the exercise of reasonable diligence where these documents were publicly available.  See United States v. Teman, 465 F. Supp. 3d 277, 343 & n. 38 (S.D.N.Y. 2020) (evidence cannot support new trial motion where it is "a matter of public record, which [defendant] himself had the ability to, and ultimately did, locate"), aff'd, 2023 WL 3882974 (2d Cir. June 8, 2023).  That is even more true where, as here, the defense was on notice of this aspect of Villarreal Hernandez's testimony in advance of trial.  See HJVH-3500-31 (Villarreal Hernandez stated during trial preparation that the defendant gave him and others a demonstration of Pegasus during a tour of the bunker in 2009 or 2010).[25]

---

[25] Moreover, Villarreal Hernandez's testimony is not necessarily false, let alone perjury. The fact that other agencies in Mexico purchased the Pegasus software does not foreclose the possibility that the SSP had its own license for the software or that the software was shared.  See Def. Ex. P (describing bunker as a center for "multi-agency coordination").  Nor do they foreclose the possibility that an early prototype of Pegasus was used in the bunker in 2009.  And even assuming the defense is correct and Villarreal Hernandez was mistaken, there is absolutely no evidence he willfully committed perjury.  Potential misremembering of the name of spy software is the kind of "[s]imple inaccurac[y]" that does not amount to the level of perjury.  Monteleone, 257 F.3d at 219.  Indeed, neither the date of the tour, nor the name of the spy software, were material details for which there would be any reason to intentionally lie.

Even if Villarreal Hernandez had committed perjury—which he did not—the defense cannot meet its burden of showing the "jury probably would have acquitted in the absence of the false testimony." McCourty, 562 F.3d at 476 (citation omitted); Aquart, 912 F.3d at 20 (new trial warranted "if the court is left with the 'firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'"). Fundamentally, as discussed above, Villarreal Hernandez's testimony did not address the core issue in the case—the defendant's acceptance of bribes from the Sinaloa Cartel. As a result, even if the Court accepts the defense's erroneous attacks on Villarreal Hernandez's testimony, they do not inspire a real concern the jury would have acquitted in the absence of this testimony.

V.   The Defendant's Allegations Against Francisco Zavaleta Do Not Justify a New Trial

The defendant also wrongly argues that he should be granted a new trial because newly discovered evidence purportedly proves that Cañeda Zavaleta's testimony was false. Mem. 45-49. The Court should reject this claim because, as set forth below, the allegations now presented by the defendant that allegedly contradict Cañeda Zavaleta's testimony were known or should have been known to the defense. See Owen, 500 F.3d at 84. Moreover, even if the Court were to credit those allegations, which the Court should not, they would not contradict Cañeda Zavaleta's testimony and in any event do not undermine faith in the verdict.

First, the defendant errs in arguing that Cañeda Zavaleta's testimony about the defendant's kidnapping was false because it is supposedly contradicted by a hospital record. The defendant asserts that he could not have been with Arturo Beltran Leyva and other members of the Sinaloa Cartel where Cañeda Zavaleta observed him on October 19, 2008, because—as he now claims—he was with his wife at Angeles Del Pedrigal Hospital in Mexico City that day, signing her discharge paperwork after a brief surgery. Mem. 46. In support of this argument, the defendant submitted an unauthenticated exhibit that purports to be hospital discharge paperwork for the

defendant's wife on October 19, 2008, as well as a purported receipt documenting the defendant's payment for that stay.  See Def. Ex. U.

As an initial matter, the hospital record is not "newly discovered evidence."  See Owen, 500 F.3d at 84 (evidence that the defendant knew or "should have been aware of" cannot be used in a Rule 33 motion); id. at 89 (evidence is not "newly discovered" merely because it is "newly available").  The defendant provides no explanation for why the hospital paperwork was not introduced at trial, nor does he explain why the defendant's wife, who testified at length on the defendant's behalf, did not testify about her own hospitalization and discharge on October 19, 2008.  It is troubling that the defendant introduces such paperwork now despite the government's repeated requests before and during trial for reciprocal Rule 16 discovery and Rule 26.2 materials.

More fundamentally, the paperwork does not contradict Cañeda Zavaleta's testimony.  Publicly available maps confirm that Angeles Del Pedrigal Hospital in Mexico City is less than an hour and a half drive, approximately, from where Cañeda Zavaleta testified about seeing the defendant on October 19, 2008.  Thus, the defendant could also have been at Angeles Del Pedrigal Hospital and at the location where Cañeda Zavaleta saw Garcia Luna with Arturo Beltran Leyva that same day.

Second, the defendant errs in arguing that Cañeda Zavaleta's testimony was false by reference to an affidavit of Jose Namorado, who claims to have served as one of the defendant's bodyguards between March 2009 and December 2018, and who attempts to contradict the route described by Cañeda Zavaleta.  See Def. Ex. V.  This affidavit is not "newly discovered" either.  Owen, 500 F.3d at 84.  The defendant knew or should have known about his own whereabouts and who his bodyguards were.

Even if Namorado's affidavit is considered, it nevertheless fails because (a) it does not actually contradict Cañeda Zavaleta's testimony, and (b) it lacks basic indicia of reliability. Namorado claims that "Mr. Francisco Canedo Zabaleta" [sic] was not a member of the Federal Police's Security Department."  Def. Ex. V.  But Namorado's affidavit does not and cannot contradict Cañeda Zavaleta's testimony because Namorado was not even working for the defendant during the relevant time period.  Namorado states that he began working for the defendant in March 2009—or six months <u>after</u> Cañeda Zavaleta saw the defendant with Arturo Beltran Leyva and others on the road.  <u>Id</u>.  Thus, Namorado was not even employed by the defendant during the time period relevant to Cañeda Zavaleta's testimony.

Further, Namorado's affidavit is devoid of the kind of details that would help a neutral factfinder evaluate his claims.  While Namorado asserts that the defendant "always" took the Mexico-Cuernavaca highway from Mexico City to Jiutepec, and "never" took the road going to Cuautla, Morelos, the affidavit does not state: (i) how frequently Namorado accompanied the defendant on trips from Mexico City to Jiutepec; (ii) whether Namorado closely monitored the exact route that the defendant took on every such trip—including the trips that occurred before Namorado ever worked for the defendant; (iii) whether Namorado interviewed other bodyguards who would have accompanied the defendant on any such trip; or (iv) whether the defendant ever took trips outside of the view of his official bodyguards, among other things.  It also fails to address the logical possibility that the defendant did not take the route described by Cañeda Zavaleta during Namarado's tenure because the defendant no longer wished to travel along a route upon which he had previously been kidnapped.  In any event, as the Second Circuit explained in <u>Bout</u>, reliance on affidavits for defendants' new trial motions is disfavored "because the affiants' statements are

obtained without the benefit of cross-examination and an opportunity to make credibility determinations."  666 F. App'x at 38.

<u>Third</u>, the defendant claims that Cañeda Zavaleta's testimony was false because the defendant's former secretary claims to never have heard of Cañeda Zavaleta and did not recognize his picture.  <u>See</u> Def. Ex. D.  Even if the Court were to credit the secretary's reasons for not being available for the trial and accept her affidavit—which it should not, <u>Owen</u>, 500 F.3d at 89 (evidence is not "newly discovered" merely because it is "newly available"), her affidavit does not establish that Cañeda Zavaleta's testimony was false.  Cañeda Zavaleta described working outside the federal police building, and only seeing the defendant once inside the building, while the defendant's secretary (<u>i.e.</u>, the affiant) was out to lunch.  Tr. 1048-1049.  The secretary's inability to remember Cañeda Zavaleta is thus not surprising and does not render this testimony false.

Indeed, though the secretary claims that "it would be *highly unusual* for an unauthorized visitor to have been permitted access to the second-floor area outside Mr. Garcia Luna's office and certainly not an unauthorized individual who was not an SSP officer" (emphasis added), Def. Ex. D, even her affidavit does not foreclose the possibility that Cañeda Zavaleta could have been directly outside the defendant's office while she was not present. Similarly, the secretary's claims that "only SSP and Federal Police officers played a security role at the SSP facilities" and that the defendant entered the building via "a private entrance guarded and controlled by the defendant's security detail," also do not contradict Cañeda  Zavaleta's testimony that he guarded the building in his capacity as a Federal Police Officer, and that he saw the defendant "outside the building but inside the complex."  Tr. 1047-1048.

<u>Last</u>, none of the claims regarding Cañeda Zavaleta's testimony, even if credited, inspire any doubt about the jury verdict.  Cañeda Zavaleta's testimony by no means "supplied the

only evidence linking the defendant[ ] to the crime," nor did it provide a "critical element" of the government's case.  <u>Wong</u>, 78 F.3d at 79.  Indeed, the core of Cañeda Zavaleta's testimony was his observations of the defendant with Arturo Beltran Leyva during the defendant's kidnapping, an event about which Villarreal Barragan, Poveda Ortega and Avila also testified.  Unlike these and numerous other witnesses, moreover, Cañeda Zaveleta did not otherwise testify about the defendant's relationship with leaders of the Sinaloa Cartel or about his acceptance of bribes from them.  Accordingly, even without Cañeda Zavaleta's testimony, there is no "real concern that an innocent person may have been convicted."  <u>McCourty</u>, 562 F.3d at 475.

For the reasons set forth above, the facts now presented by the defendant were known, or should have been known, to the defense at the time of trial, and those facts do not contradict Cañeda Zavaleta's testimony.  As a result, the Court should reject the defendant's motion for a new trial on the basis of Cañeda Zavaleta's testimony.

## VI.   The Defendant's Allegations about 3500 Material Do Not Justify a New Trial

Six months before trial, the government produced to the defense over 100 documents (spanning about 1,200 pages) representing Zambada Garcia's Jencks Act materials. These documents included many reports and notes arising out of Zamabda Garcia's meetings related to the investigation and prosecution in <u>United States v. Guzman Loera</u>, 09 CR 466 (BMC) (E.D.N.Y.).  Although most of those reports and notes were prepared by a different prosecution team and were unrelated to the investigation of this defendant, this Prosecution Team collected and produced them early in an abundance of caution and to assist the defense.  Despite this, the defense renews its complaint, rejected by the Court at trial, that the <u>Guzman Loera</u> prosecution team did not take notes at certain meetings and that, as a result, there are no notes for certain meetings.  Mem. 53.  The Court should once again reject the claim.

"The Second Circuit has declined … to obligate the government to take notes of all interviews of potential witnesses." <u>United States v. Cook</u>, 3:17-CR-65 (SRU), 2019 WL 4247938, at *15 (D. Conn. Sept. 6, 2019) (internal citations omitted); <u>United States v. Rodriguez</u>, 496 F.3d 221, 224–25 (2d Cir. 2007) ("While Brady and Giglio … obligate the prosecutor in certain circumstances to disclose to the defense material exculpatory and impeaching information, those cases have not been generally construed to require the Government to make written notes for the defendant's benefit.").

None of the innuendo raised in the defendant's motion suggests revisiting this Court's ruling.  As a result, the Court should reject the defendant's unsupported claim that certain notes were not provided to the defense.  Mem. 54; Tr. 1444-45 (THE COURT: "I just can't draw the inference that the Government has done something wrong.  For one thing, there's so much on this witness, there's no reason to, you know, cover up or do anything like that.  And by the same token, because he is such a long-term cooperator, it's perfectly possible that a number of meetings could have been confirmatory meetings [for which no notes were taken]").

CONCLUSION

For the foregoing reasons, the Court should deny the defendant's motion for a new trial.  Because the defense's supposed evidence "is not newly discovered as a matter of law," and because, even if accepted as true, it does not undermine faith in the jury's verdict where multiple

60

unchallenged witnesses testified credibly about the defendant's acceptance of bribes from the Sinaloa Cartel, the Court may deny the motion without a hearing.  <u>Forbes</u>, 790 F.3d at 411.

Dated:  Brooklyn, New York
       March 1, 2024

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York

By:       /s/

                                          Ryan C. Harris
                                        Erin M. Reid
                                        Philip Pilmar
                                        Adam Amir
                                        Assistant United States Attorneys
                                        (718) 254-7000