**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

               -against-

GENARO GARCIA LUNA, *ET AL.*,

                       Defendants.

19 CR. 576 (BMC)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**GENARO GARCIA LUNA'S MOTION FOR A NEW TRIAL**
**PURSUANT TO FEDERAL RULE OF CRIMINAL PROCEDURE 33**

## TABLE OF CONTENTS - UPDATE

Table of Authorities ............................................................................................ ii

**PRELIMINARY STATEMENT** ........................................................... 1

**ARGUMENT** .......................................................................................... 4

    **Point I: The Government's Arguments Concerning Due Diligence Are Fatally Flawed and Should be Summarily Rejected by the Court** ............................... 4

        *1. The Government's Due Diligence Arguments Are Based on a Novel Standard It Created Based on Distinguishable Law* ............................................... 5

        *2. The Government Ignores The Facts Proffered By the Defense That Compel the Court To Infer Reasonable Diligence by the Defense in Respect to the Newly Discovered Evidence* ................................................................................... 6

    **Point II: The Government's Inadequate and Selective Investigation of Only One of the Defense's Claims Reinforces That Only This Court Can Prevent A Manifest Injustice** .... 9

    **Point III: The Government Concedes That It Was Aware of the Possibility of  Mr. Garcia Luna's Vetting Yet Shockingly and Improperly Claims That It Was Under No Obligation to Seek the Materials** ............................................................... 12

    **Point IV: The Government's to Distance Itself From Liability for a *Brady* Violation While Failing to Investigate Whether the Disturbing Claims About a Critical Cooperating Witness, Reinforces That Only This Court Can Prevent Manifest Injustice** ........................................................................................... 14

        *1. Under Well Established Law the Ward Letter and Corroborating Materials Was Impeachment Material that the Government was Obligated to Disclose to the Defense Prior to Trial* ..................................................................................... 16

        *2. The Government's Failures to Discover and Disclose Impeachment Information, Concerning Mr. Villarreal Hernandez both Pre and Post Trial Violated* Brady. ............... 17

        *3. The Information In the Ward Letter Was Not Cumulative and Would Have Affected the Jury's Verdict* ............................................................................... 18

    **Point V: The Cumulative Effect of the Evidence of Mr. Villarreal Hernandez's Multiple Instances of Perjury Marred the Conviction Against Mr. Garcia Luna** ......................... 19

    **Point VI: The Government Cannot Refute the Evidence of Its Star Witness's Perjury Regarding Mr. Garcia Luna's Alleged Kidnapping** ...................................... 21

    **Point VII: The Government's Efforts to Attack the Credibility of the ▮▮▮▮ Affidavit Must Fail** .......................................................................................... 25

    **CONCLUSION** ................................................................................. 31

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brady v. Maryland,*
    373 U.S. 83 (1963)......................................................................................*passim*

*United States v. Forbes,*
    790 F.3d 403 (2d Cir. 2015) ...........................................................................5, 6

*United States v. Jorge Emilio Valdez,*
    No. 21 Cr. 91 (BMC) (E.D.N.Y.) ......................................................................16

*United States v. Owen,*
    500 F.3d 83 (2d Cir. 2007)...............................................................................5

**Statutes**

Federal Rule of Criminal Procedure 5(f) .........................................................*passim*

Federal Rule of Criminal Procedure 33 .........................................................*passim*

**PRELIMINARY STATEMENT**

The government's opposition should be rejected in its entirety.  To defend a conviction

that was marred by *Brady* violations and perjury, it invents a new Rule 33 standard and tries to

shift the Court's focus to the defendant's alleged conduct after trial and to the denials of its

incredible trial witnesses.  First, the Court should reject the new standard of due diligence

proposed by the government that is not supported by the relevant caselaw.  The correct due

diligence standard for newly discovered evidence is that the defense must proffer facts from

which the court can infer that due diligence was exercised – a standard the defense resoundingly

satisfied in its post-trial motions.

Second, its response makes clear that the government conducted little to no investigation

of the defense's claims, underscoring its clear intention to defend its conviction of Mr. Garcia

Luna at all costs.  While the government engaged in a superficial investigation into the ▮▮▮

affidavit and allegations that its cartel witnesses had improperly colluded, it apparently failed to

investigate in any meaningful way the defense claims regarding (1) its failure to disclose *Brady*

material regarding the United States' background investigations into Mr. Garcia Luna, (2) its

failure to produce *Brady* impeachment evidence in the government's possession regarding

Hector Villarreal Hernandez, (3) perjury by Mr. Villarreal Hernandez, and (4) perjury by

Francisco Cañeda Zavaleta.

Third, the government has conceded that the Letter of Understanding ("LOU") between

Mexico and the United States discovered by the defense after trial is authentic and legitimate but

has failed to provide the Court with a rational explanation as to how it failed to obtain and

produce the LOU, especially after the defense requested it and related materials ten months

before trial.  The LOU, the contract between Mexico and the United States, is clear on its face.  It

does not say that Mr. Garcia Luna or high-level officials were exempt from vetting, nor can it

refute that Mr. Garcia Luna was, in fact, vetted by multiple United States agencies.  Indeed,

vetting by the Central Intelligence Agency ("CIA"), which Mr. Garcia Luna underwent and

1

which is not refuted by the government, is predictably even more extensive and thorough than the rigorous process described in the LOU.

Fourth, under well-established law, the Ward Letter and corroborating materials was *Brady* impeachment material that the government was obligated to disclose to the defense prior to trial.  In contrast to its "investigation" of the ███ Affidavit's claims, the government here seemingly did nothing to get to the bottom of the claims made in the defense motion against Mr. Villarreal Hernandez.  Indeed, there is no evidence that the government even confronted him with the accusations set forth in the motion.  And Mr. Villarreal Hernandez's testimony was not cumulative.  He was an extremely important witness to the government's case.  By depriving the defense of its ability to demonstrate that Mr. Villarreal Hernandez was a lying, corrupt, politician who continued to commit crimes even while working with the United States, the government impaired Mr. Garcia Luna's right to a fair trial and affected the jury's verdict.

Fifth, the government tries to justify Mr. Villarreal Hernandez's perjury by describing it as mistakes.  These were not mere mistakes.  Mr. Villarreal Hernandez testified that he met with Mr. Garcia Luna in a building that had not yet been built or had even commenced construction, where he was offered to buy a product that had not been created, and where he was asked for an introduction to a man that Mr. Garcia Luna already knew very well.  Even a minimal investigation by the government would have uncovered problems with his story but it chose to proceed on nothing more than Mr. Villarreal Hernandez's word.

Sixth, the government desperately relies on its new standard to try and preclude the Court's consideration of damning evidence of Mr. Zavaleta's perjury regarding the alleged kidnapping of Mr. Garcia Luna.  The government unsuccessfully attempts to reconcile Mr. Zavaleta's account with the hospital receipt.  Under the government's new impossible scenario, Mr. Garcia Luna was kidnapped around 12:00 p.m., yet was somehow still at the hospital at 12:28 p.m., even though it was approximately 1.5 hours away, to pick up his wife from the hospital.  The hospital receipt establishes that Mr. Zavaleta's account of Mr. Garcia Luna's kidnapping was false.  Furthermore, his ISSTE document and the declarations of new witnesses

2

establish that his basis to recognize Mr. Garcia Luna and knowledge of Mr. Garcia Luna's activities was also false. Mr. Zavaleta's testimony about the kidnapping was a centerpiece of the government's case because a purported law enforcement officer, untainted by narco-trafficking, corroborated important testimony by cartel heads and thus allowed the jury to conclude that the cooperating witnesses' testimony was credible. Evidence that Mr. Zavaleta lied is crucial new evidence and warrants a new trial.

And seventh, the government's attempts to discredit the ███ affidavit, the claim on which the government spent the bulk of its response, also fell short. As it did at trial, the government relies almost exclusively on its cooperating witnesses. Ridiculously, it expects the Court to reject Mr. ███'s claims primarily because its cooperating witnesses deny the allegations. Further, it expects the Court to rely on its "investigation" that was conducted by relying primarily on Mr. Garcia Luna's former cell mate, which allegedly suggests that Mr. Garcia Luna tried to procure false information to use in a Rule 33 motion. However, the Court must evaluate if Mr. ███'s affidavit is credible looking at all of the circumstances. Absent the unreliable claims by Individual 2 and Juan Carlos Nava Valencia, there are no reasons to assume it is not. Mr. ███ is not receiving any benefit. His sentence is not being reduced. There is no evidence that Mr. Garcia Luna offered him money, or protection, or some other incentive to swear falsely in an affidavit. The Court should reject the government's objections to the ███ Affidavit. In the alternative, it should conduct an evidentiary hearing to further investigate the claims of a "scheme" advanced by the government.

## ARGUMENT

### Point I

### The Government's Arguments Concerning Due Diligence Are
### Fatally Flawed and Should be Summarily Rejected by the Court

In response to the defense's detailed allegations of multiple *Brady* violations and instances of perjury by critical trial witnesses, the government attempts to draw the Court's focus away to what it claims is a lack of due diligence on the part of the defense.  It proposes a novel legal rule that requires the Court to ignore several pieces of newly discovered evidence proving that the conviction against Mr. Garcia Luna was marred by multiple *Brady* violations and instances of perjury by critical trial witnesses.  Even using the government's heightened standard, however, the facts proffered by the defense in the post-trial motion resoundingly satisfy the defense's burden of demonstrating due diligence for proffering newly discovered evidence.

The government's arguments concerning the lack of due diligence by the defense are fatally flawed for two reasons.  First, they create an entirely new standard and burden on the defense.  The government argues that evidence that the defendant knew might have existed but could not access means such evidence cannot be raised in a Rule 33 motion.  That is not the standard.  As cited in our opening brief, the correct due diligence standard for newly discovered evidence is that the defense must proffer facts from which the court can infer that due diligence was exercised – a standard the defense resoundingly satisfied in its post-trial motion.

Secondly, the government ignores all of the facts proffered by the defense in its post-trial motion showing that the newly discovered evidence was obtained by the defense after trial despite the defense's due diligence.

4

1.      *The Government's Due Diligence Arguments Are Based on a Novel Standard It Created Based on Distinguishable Law*

The government argues, relying on *United States v. Owen*, 500 F.3d 83, 84 (2d Cir. 2007), that evidence of which the defendant was on notice cannot be raised in a Rule 33 motion because it is not newly discovered. *See* Gov't Opp at 38, 40. The government further argues, relying on *United States v. Forbes*, 790 F.3d 403, 408-09 (2d Cir. 2015), that a defendant is precluded from demonstrating reasonable diligence to obtain newly discovered evidence when he has been on notice of it. *See* Gov't Opp at 40. Critically, both *Owen* and *Forbes* are distinguishable and have narrower holdings than those suggested by the government.

The government's reliance on *Owen* is misplaced because, as made clear by the Second Circuit in *Forbes*, the holding in *Owen* "that Rule 33 does not authorize district courts to grant new trials on the basis of such evidence since it is not newly discovered, but merely newly available" (500 F. 3d at 89), is premised on the existence of a legal impediment, *i.e.*, a valid privilege. *See Forbes*, 790 F.3d at 408-09. In *Forbes* the Second Circuit held that "evidence is excluded from the meaning of 'newly discovered' under Rule 33 where (1) the defendant was aware of the evidence before or during trial, and (2) there was a legal basis for the unavailability of the evidence at trial, such as the assertion of a valid privilege." 790 F.3d at 408.

*Forbes* draws a distinction between evidence that a defendant is aware of prior to or during trial but whose unavailability is caused by a valid legal basis (the facts applicable to *Owen* and *Forbes*), and a situation where "a defendant on trial for a murder that he did not commit is aware that Witness X saw someone else pull the trigger, but cannot locate Witness X to testify to that fact at trial." *Id.* at 409. The Second Circuit clarified that in the latter scenario "[t]he unavailability of Witness X is not law based: it is not the product of a fundamental constitutional right, but rather a matter of circumstance." *Id.* The Court explains that, "[i]f the defendant is

5

later able to locate Witness X, provided that the other requirements for Rule 33 are satisfied, his testimony would be newly discovered within the meaning of Rule 33." *Id*. As discussed in detail below, while some of the newly discovered evidence proffered by the defense in its post-trial motion was known by Mr. Garcia Luna to exist, such evidence was unavailable to the defense (despite its best efforts) due to circumstances out of his control and not because of any kind of legal impediment. Knowledge of the existence of evidence without an ability to obtain that evidence, does not preclude the defense from meeting the due diligence standard.

As correctly acknowledged by the government in its section concerning the legal standards governing Rule 33, the applicable standard for due diligence in respect to newly discovered evidence is that the burden is on the defense to allege facts from a which the court can infer due diligence, nothing more.

> 2.    *The Government Ignores The Facts Proffered By the Defense That Compel the Court To Infer Reasonable Diligence by the Defense in Respect to the Newly Discovered Evidence*

The government repeatedly argues that the defense failed to proffer any facts showing due diligence to obtain the proffered newly discovered evidence prior to trial. That is simply false. The defense made it clear in public filings seeking an adjournment of the motion deadline, an *ex parte* submission regarding the same, and in its opening brief, that following the verdict in February 2023, and for months thereafter, individuals from Mexico and the United States who had never before reached out to the defense, began providing the defense with thousands and thousands of documents of which the defense had not been previously aware. The government's argument is confounding as it simply ignores an entire section of the defense's post-trial motion, entitled "Newly Discovered Evidence." That section consists of two and a half pages of facts addressing this precise issue (*see* Def. Mot. at 19-21). Furthermore, the government ignores the

additional facts proffered in the various argument points asserting newly discovered evidence as well as the information contained in affidavits in support of the newly discovered evidence. Accordingly, the defense's opening brief more than sufficiently satisfied the appropriate standard, however, the defense is more than happy to provide additional context for those facts here.

Mr. Garcia Luna's defense investigation was hampered by two extraordinary sets of facts that, despite best efforts by the defense, significantly curtailed its ability to obtain evidence prior to trial. First, Mr. Garcia Luna was arrested three months before the onset of the COVID-19 pandemic. Even handcuffed by the pandemic, the defense made significant efforts to investigate his case, contact witnesses and obtain evidence, and still was unable to obtain any of the newly discovered evidence that became available to the defense post-trial.

Even more damaging to the defense than the pandemic was the actions taken by the Mexican government to hamper Mr. Garcia Luna's defense. Immediately after Mr. Garcia Luna was arrested and detained, he and his family were denied access to any of their property located in Mexico. They were banned from utilizing the financial system in Mexico, guards were placed outside their properties that were frozen by the Mexican government, and arrest warrants were issued by federal prosecutors.[1] Anyone connected to Mr. Garcia Luna was considered an enemy

---

[1] Mr. Garcia Luna challenged the arrest warrant and actions taken by the Mexican government in what is called an Amparo, a Mexican constitutional challenge to the actions of the government. The Mexican federal prosecutors' warrant was for Mr. Garcia Luna's arrest in connection with illicit enrichment, or unexplained wealth, that the Mexican authorities claimed based on this case, came from Mexican drug cartels. Mr. Garcia Luna's Amparo proceeding had been pending since 2020 and most recently considered by the appellate court, an appeal taken by the federal prosecutor's office after Mr. Garcia Luna had prevailed below. The appeal was resolved on October 2, 2023, but we were unable to receive a copy until it was released publicly on January 31, 2024. The court held that the evidence presented by the federal prosecutors to support its warrant was insufficient, concluding that "[h]owever, there is no evidence in the investigative case file which, when freely and logically assessed, suggests both the existence of an act established by law as a crime and probable cause that the defendant committed it." *See* Decision of Resolution Court dated October 2, 2023, Annexed Hereto at Exhibit "1" (only a portion of the decision has been translated due to time constraints and the length of the decision. Should the Court like a fully translated version, the remaining parts of the opinion can be translated.). Notably, after the court issued its ruling in October 2023, the

of the state.  In fact, in March 2020, three months after his arrest and three years before trial in

this case, the Mexican president ordered the head of the Mexican Secretariat of Security and

Citizen Protection ("SSPC") to order all federal agencies to suspend from office any active

official who was linked to Mr. Garcia Luna.  *See* Letter from Secretary Alfonso Durazo and

Translation Annexed Hereto at Exhibit 2; *see also* article published in Proceso in March 2020

regarding the same, Juan Omar Fierro, *Durazo Ordesr the Separation of Officials Linked to*

*García Luna from Office*, PROCESO (Mar. 26, 2020, 9:22 p.m.),

https://www.proceso.com.mx/nacional/2020/3/26/durazo-ordena-separar-del-cargo-funcionarios-

ligados-garcia-luna-240468.html.

In fact, the President of Mexico also made this clear by discussing Mr. Garcia Luna and

this case extensively in his morning addresses to the Mexican nation, called the Mañaneras.  The

current Mexican President has given approximately 1,300 Mañaneras during his presidential

term and he has mentioned Mr. Garcia Luna and this case in more than 850 of those Mañaneras.

People connected with Mr. Garcia Luna have been imprisoned.  His former colleagues have lived

in fear, which includes his secretary who bravely executed an affidavit.  *See* Declaration of C. de

Castro in Support of Post-Trial Mot. at Ex. D.  Mr. Garcia Luna's family has also been living in

fear.  Even his sister was arrested on claims related to the allegations in this case in December

2023, and is still being detained.

Against this backdrop, those with relevant evidence, including many former law

enforcement officials and politicians, were afraid to come forward or speak to the defense for

---

current Mexican administration's Attorney General's Office issued a press release stating its intention to investigate
and potentially prosecute the judges that had ruled against them.  *See* Communiqué FGR 534/23, Oct. 3,
2023,  https://www. fgr.org.mx/en/FGR/Nacional/_rid/61/_mod/story?p=1&ord=desc&palabra=534&f=0&categoria
=Nacional&suri=http%3A%2F%2Fwww.FGR.swb%23fgr_Boletin%3A10276.

fear of retribution to themselves or their family members in Mexico.  Indeed, the witness who

provided Exhibit D to the opening brief, an affidavit in support of many categories of proffered

newly discovered evidence, specifically stated that he/she only came forward with the evidence

to the defense once the trial was over because he/she was fearful of retribution before the trial.

Shockingly, the government, despite its repeated claims of fear of retribution to its own

witnesses, included identifying information, for no legitimate purpose, about the witness who

placed himself/herself in real danger if their identity is discovered.  *See* Gov't Opp. at 16 n.8.

     The defense has more than established that it has diligently attempted to locate favorable

evidence before and after this trial.  The newly discovered evidence included in the opening brief

reflects the efforts undertaken by the defense from which the Court can infer sufficient due

diligence.  That is the standard and it has been met.  Accordingly, the Court should reject the

government's argument that the defense is procedurally barred from raising its Rule 33 claims.

<u>**Point II**</u>

**The Government's Inadequate and Selective Investigation of Only One of the Defense's
Claims Reinforces That Only This Court Can Prevent A Manifest Injustice**

     The government took ten weeks to respond to the defense's post-trial motion.  Its

opposition makes clear that it spent much of that time investigating only one of the defense's

claims, and engaged in little to no inquiry on the remainder and the most troubling of the claims

regarding failed *Brady* disclosures and perjury.  Its response not only establishes where it chose

to use its time and resources, but reinforces that it is less concerned about preventing an injustice

and more concerned about defending its investigation and conviction of Mr. Garcia Luna at all

costs.

     While the government engaged in a superficial investigation into the ████ Affidavit and

allegations that its cartel witnesses had improperly colluded, it apparently failed to investigate in

any meaningful way the defense claims regarding (1) its failure to disclose *Brady* material regarding the United States' background investigations into Mr. Garcia Luna, (2) its failure to produce *Brady* impeachment evidence in the government's possession regarding Hector Villarreal Hernandez, (3) perjury by Mr. Villarreal Hernandez, and (4) perjury by Francisco Cañeda Zavaleta.

It is clear that the government conducted no investigation into the *Brady* or perjury allegations. It has not provided the Court with a single statement or representation from the relevant witnesses regarding the following allegations, not even to deny them:

- The government failed to conduct any investigation other than to make general inquiries whether information exists that would establish that Mr. Garcia Luna was subjected to background investigations, not only when he was a member of the Mexican cabinet, but also when he was a worked at CISEN and later was the director of AFI. Ironically, the government expects the defense to discover and obtain United States government documents (in the case of the LOU) that it claims it was not aware of. The proper inquiry, however, is how the defense was able to obtain a United States government document/contract establishing that the defendant and his team were subject to extensive background investigations, and government prosecutors allegedly could not.

- The government failed to speak with relevant members of the Drug Enforcement Agency ("DEA") regarding the existence of the LOUs and evidence related to background investigations conducted into Mr. Garcia Luna or members of his team.

10

- The government failed to speak with DEA Deputy Special Agent in Charge of Texas ("DSAC") Miguel Madrigal, who has reportedly since left the DEA, regarding the LOUs, Villarreal *Brady* materials, and or his conversation with a former high level Mexican official regarding Mr. Villarreal Hernandez prior to trial.

- The government failed to speak with relevant members of the Federal Bureau of Investigation ("FBI") or DEA regarding background investigations conducted into Mr. Garcia Luna and records of the training he received at its headquarters in Quantico, Virginia.  *See* Examples of Training Certificates Provided to Mr. Garcia Luna Annexed Hereto at Exhibit 3.

- The government failed to speak with members of the CIA regarding background investigations it conducted into Mr. Garcia Luna.

- The government failed to speak to the relevant members of the United States Attorney's Office for the Western District of Texas and never alleged that it reviewed its communications and contact with that district in connection with Mr. Villarreal Hernandez and the investigation into Mr. Garcia Luna.

- The government failed to confront Mr. Villarreal Hernandez with the evidence establishing that his account regarding the Bunker *could not* have been true.

- The government failed to confront Mr. Villarreal Hernandez that his account regarding the Pegasus software *could not* have been true.

- The government failed to confront Mr. Villarreal Hernandez regarding Mr. Garcia Luna's relationship with Juan Francisco Ealy Ortiz and how it defies logic why

Mr. Garcia Luna would have asked him or Governor Humberto Moreira to set up a meeting with Mr. Ealy Ortiz.

• The government failed to confront Mr. Zavaleta regarding the claim that new evidence has emerged that Mr. Garcia Luna *could not* have been at the location where Mr. Zavaleta claims to have seen him.

It is striking the lengths to which the government went to investigate and report on the inmates at the Metropolitan Detention Center ("MDC"), and the little to no investigation it conducted into all of the additional serious and troubling claims raised by the defense's opening brief. We submit that the government has not provided this to the Court because it either cannot defend the false testimony and withholding of information from the defense, or it simply does not want to know the truth and must defend its conviction at all costs. Under either scenario, this Court should grant Mr. Garcia Luna a new trial.

<u>**Point III**</u>

**The Government Concedes That It Was Aware of the Possibility of
Mr. Garcia Luna's Vetting Yet Shockingly and Improperly Claims
That It Was Under No Obligation to Seek the Materials**

The government has conceded that the LOU included in the defense motion is authentic and legitimate but has failed to provide the Court with a rational explanation as to how it failed to obtain and produce the LOU, especially after the defense requested it and related materials ten months before trial. Rather than attempt to quantify how many LOUs exist and what other documents related to it exist, the government responds by raising claims that are refuted by the document itself and completely illogical.

First, it claims that the Court should read the LOU together with the notes of the government's interviews of DSAC Madrigal and conclude that Mr. Garcia Luna was not subject

to vetting.  However, the contract between Mexico and the United States is clear on its face.  It does not say that Mr. Garcia Luna or high-level officials were exempt from vetting.  *See* LOU Annexed Hereto at Exhibit 4.  If that were true, they could have easily added a clause excluding high level officials or even Mr. Garcia Luna himself.  The document's silence on this point speaks for itself.  DSAC Madrigal's discussion of his time as a relatively junior DEA agent and then supervisor in Mexico does not help the government either, because it simply reflects DSAC Madrigal's belief that senior leadership was not subject to vetting.  No further detail is given because DSAC Madrigal was not of sufficient rank at the time.  The defense has provided the Court with the affidavit of Mr. Garcia Luna's secretary who was himself/herself vetted by the DEA and knew that Mr. Garcia Luna was similarly vetted.  Furthermore, the government is well aware that Mr. Garcia Luna attended training at FBI Headquarters in Quantico, Virginia as described in paragraph 3 of the LOU.  *See* Exhibit 4.

Second, the government reverts to its initial argument that because Mr. Garcia Luna knew he had been vetted, this new evidence claim is procedurally barred.  As discussed above, knowledge of a fact and being in possession of evidence to prove it are different.  In any event, the government was in a much better position to acquire evidence from U.S. government sources than the defense – which had requested it well before the trial.

Third, the government claims that even if Mr. Garcia Luna had been vetted, including through the use of polygraphs, the Rule 33 claim fails because polygraph evidence is not legally admissible.  While polygraph evidence may not be inadmissible, (1) it is still *Brady* material and should have been turned over to the defense, and (2) the LOU is much broader than simply the use of polygraph examinations.  Not only does the LOU establish a partnership between the United States (signed by Director Evans) and Mexico (signed by Mr. Garcia Luna and the

Mexican Attorney General) to combat narcotics trafficking, participation requires a thorough background investigation, not just a polygraph exam.  That background investigation was conducted by the United States government and involved "similar processes to those used by all USA federal law enforcement agencies, major metropolitan police departments in the United States of America and most of the security companies both public and private."  LOU at Paragraph 2.  As is the case for United States federal employment or an application for a security clearance to view classified United States materials, those processes are extensive, thorough, comprehensive, and sometimes take many months to complete.  Indeed, vetting by the CIA, which Mr. Garcia Luna underwent and which is not, seemingly, refuted by the government, is predictably even more extensive and thorough than the rigorous process described in the LOU.  The fact remains undisputed that Mr. Garcia Luna was extensively investigated in order to participate in hundreds of meetings with high level United States government officials in which they discussed information sensitive to the security of this nation.  The government's willful blindness to these facts and the materials generated in connection with these investigations is an affront to what is supposed to be the most fair and transparent justice system in the world.  Accordingly, the Court should reject the government's opposition and grant Mr. Garcia Luna a new trial.

## Point IV

**The Government's Attempts to Distance Itself From Liability for a *Brady* Violation While Failing to Investigate Whether the Disturbing Claims About a Critical Cooperating Witness, Reinforces That Only This Court Can Prevent Manifest Injustice**

The government makes three baseless arguments in response to the claim that it violated *Brady* by failing to turn ove0r impeachment information concerning Hector Villarreal Hernandez.  First, it argues that the letter from Robbie Ward, which includes hundreds of pages

14

of corroborating material, is not *Brady* impeachment material.  This argument ignores that the government's disclosure obligations pursuant to *Brady* and Rule 5(f) apply even if the government does not credit the information.  Second, it argues that even if the letter and accompanying materials were *Brady* material, there was no violation because the law enforcement officials who possessed the information were not part of the prosecution team.  Even if true, this argument runs afoul of the position the government took in respect to its disclosure obligations for another cooperating witness.  Moreover, its arguments in this regard are further proof of a troubling theme prevalent through the government's response, namely its failure to adequately investigate compelling evidence proffered by the defense of *Brady* and perjury violations.  Last, the government argues that even if the Ward Letter was *Brady* material that was in its possession, its failure to disclose it to the defense was immaterial as it was cumulative, and Mr. Villarreal Hernandez's testimony did not address a critical element at trial.  Again, both fail.  Evidence of continued criminal activity by a cooperating witness and his failure to disclose that activity to the government is not cumulative to testimony concerning a cooperating witness's prior bad acts as disclosed to the government.  As the sole non-violent, white collar cooperating witness Mr. Villarreal Hernandez provided testimony concerning critical elements at issue in trial.  Each of the government's arguments fails and the Court should find that the government's failure to turn over the Ward Letter violated its *Brady* obligations and resulted in an unjust conviction.

       1.       *Under Well Established Law the Ward Letter and Corroborating Materials Was Impeachment Material that the Government was Obligated to Disclose to the Defense Prior to Trial*

The government's surprising claim that the information in the Ward Letter consisting of compelling evidence that Mr. Villarreal Hernandez continued to commit crimes while cooperating with the government is not *Brady* material lacks merit.  It is blackletter law that such information is material *Brady* impeachment information.  Moreover, even if the government does not credit the information as true, its obligations pursuant to *Brady* and Rule 5(f) still require such information to be disclosed to the defense.  *See, e.g., United States v. Jorge Emilio Valdez*, No. 21 Cr. 91 (BMC), ECF No. 14 at 2 (Rule 5(f) Order noting that the obligations contained in the Order "also apply to information that is otherwise subject to disclosure regardless of whether the prosecution credits it.").

Furthermore, the government's claim that the information in the Ward Letter is nonsensical does not withstand scrutiny.  The government concedes that the Ward Letter was sent to an AUSA in the Western District of Texas by defense counsel for the former Governor Humberto Moreira Valdes of the Mexican state of Coahuila.  The government characterizes the Ward Letter as "attempts to discredit Villarreal Hernandez in an effort to halt potential charges against his[2] client [Moreira Valdes]."  Gov't Opp. at 44.  However, the government describes Mr. Moreira Valdes as "Villarreal Hernandez's key co-conspirator in Mexico and the mastermind of the scheme to steal government funds" the basis for charges to which Mr. Villarreal Hernandez pleaded guilty to pursuant to a cooperation agreement with the U.S. Attorney's Office for the Western District of Texas.  Gov't Opp. at 44.  Notably, despite describing Mr. Moreira Valdes as

---

[2] Notably, the defense counsel who wrote the letter, Robbie Ward, who the government mistakenly refers to as a man (further proof of the negligent manner in which it assessed the defense's claims) is herself a former Assistant United States Attorney.

the "mastermind" of the crimes that Mr. Villarreal Hernandez committed, to date no charges have

been brought against Mr. Moreira Valdes.  The logical inference is that the failure of the U.S.

Attorney for the Western District of Texas to bring charges against Mr. Moreira Valdes for crimes

which it (and the government in this case) believes he masterminded is due to the fact that they

believe that the allegations contained in the Ward Letter potentially damaged the credibility of

their star witness against him.

> 2.    *The Government's Failures to Discover and Disclose Impeachment*
> *Information, Concerning Mr. Villarreal Hernandez both Pre and Post*
> *Trial Violated* Brady.

In contrast to its "investigation" of the ███ Affidavit's claims (discussed below), the

government here seemingly did nothing to get to the bottom of the claims made in the defense

motion against Mr. Villareal Hernandez.  Indeed, there is no evidence that the government even

confronted him with the accusations set forth in the motion, which it could easily have done in

light of his continued adjournments of sentencing.  *See United States v. Villarreal Hernandez*,

No. 14 Cr. 100 (XR) (W.D. Tx.) ECF No. 79.

While conceding that the Ward Letter was provided to both Texas prosecutors and DSAC

Madrigal, the government failed to conduct any type of investigation to determine why those law

enforcement officers who knew that Mr. Villarreal Hernandez was a cooperating witness in the

upcoming trial against Mr. Garcia Luna withheld such critical information from these

prosecutors.  It is simply implausible that the prosecution team in this case would have worked

closely with Texas prosecutors and DSAC Madrigal and no one disclosed such critical

information to them.  The only logical answer to why the government decided not to speak to

Mr. Villarreal Hernandez and DSAC Madrigal is that it did not want to know.  Learning of the

existence of this *Brady* material should have caused the government to take active steps to obtain

and disclose this evidence.  At the very least, the prosecution should have made this an issue for the Court to decide prior to trial, but it chose not to.  A fact that is particularly shocking in light of the position the government has taken in respect to the missing 3500 material for cooperating witness Jesus Zambada Garcia.

In response to the claim that it failed to disclose to the defense 3500 material for Mr. Zambada Garcia the government wrote that "[a]lthough most of those reports and notes were prepared by a different prosecution team and were unrelated to the investigation of this defendant, this Prosecution Team collected and produced them early in an abundance of caution and to assist the defense."  Gov't Opp. at 59.  It simply does not make sense that the government would elect to take this step with one cooperating witness and chose to forgo it with another, particularly where the members of the other prosecution team were present for proffers with the witness in which Mr. Garcia Luna was discussed.

### 3. *The Information In the Ward Letter Was Not Cumulative and Would Have Affected the Jury's Verdict*

The government's final argument as to why the Court should ignore its failure to disclose the Villarreal Hernandez *Brady* impeachment material is that the information was immaterial and cumulative and would not have affected the jury's verdict.  *See* Gov't Opp. at 49-50.  Both arguments fail.

The Ward Letter contains compelling evidence that while cooperating with the government, Mr. Villarreal Hernandez continued to commit crimes and failed to disclose them to the government.  This is not cumulative of the evidence of prior crimes, crimes which Mr. Villarreal Hernandez disclosed to the government and were presented to the jury at Mr. Garcia Luna's trial.  Rather, they are entirely new bad acts and ones that cast doubt on his veracity and credibility.  The cross-examination of Mr. Villarreal Hernandez was curtailed because the defense

18

did not have a good faith basis to impeach his credibility by cross-examining him about his continued criminal activity. Mr. Villarreal Hernandez was the only cooperating witness who was either not a cartel member or someone who had aided the cartel through monstrous acts of violence. He was a government official without the same kind of baggage the government's other cooperating witnesses carried and was, thus, a crucial witness. Moreover, his testimony was not supported by other corroborative evidence, which made his credibility central. Armed with the newly discovered *Brady* impeachment evidence and the new evidence obtained regarding his perjury (detailed below), the defense would have been able to completely discredit Mr. Villarreal Hernandez. The ability to accomplish this would probably have affected the jury's verdict.

Mr. Villarreal Hernandez was an extremely important witness to the government's case. For one, it used him to support the uncorroborated tale of Mr. Garcia Luna's kidnapping by cartel members. Mr. Villarreal Hernandez also offered testimony on how government officials hid money using patrimony statements, even though he had no personal knowledge about Mr. Garcia Luna's finances or whether this was done by him. By depriving the defense of its ability to demonstrate that Mr. Villarreal Hernandez was a lying, corrupt, politician who continued to commit crimes even while working with the United States, the government impaired Mr. Garcia Luna's right to a fair trial and affected the jury's verdict.

## Point V

### The Cumulative Effect of the Evidence of Mr. Villarreal Hernandez's Multiple Instances of Perjury Marred the Conviction Against Mr. Garcia Luna

The government makes two arguments as to why the Court should deny Mr. Garcia Luna a new trial based on the newly discovered evidence of Mr. Villarreal Hernandez's perjury. Both arguments lack merit. First the government tries to justify its cooperating witness' perjury by

describing it as mistakes.  These were not mere mistakes, however.  Mr. Villarreal Hernandez testified that he met with Mr. Garcia Luna in a building that had not yet been built or had even commenced construction, where he was offered to buy a product that had not been created, and where he was asked for an introduction to a man that Mr. Garcia Luna already knew very well. Even a minimal investigation by the government with its ample resources would have uncovered problems with his story, but it chose to proceed on nothing more than Mr. Villarreal Hernandez's word.

Critically, Mr. Villarreal Hernandez, in order to be believed, built his story around a June 2009 invoice (GX 440) – an invoice he claimed memorialized the bribe arrangement between Mr. Garcia Luna and El Universal.  If Mr. Villarreal Hernandez were to claim that he met with Mr. Garcia Luna in late 2009, when the Bunker was actually completed, the invoice would corroborate nothing.  Accordingly, Mr. Villarreal Hernandez's testimony was not mistaken but purposely crafted lies to give credence to a false story.  The government simply credited the story spun by Mr. Villarreal Hernandez and made no attempt to corroborate it.

Next the government argues that even if the misstatements do qualify as perjury, the Court should ignore them because the evidence uncovering the perjured testimony is not newly discovered.  For the reasons discussed at length above, this argument also fails.  Furthermore, this argument is faulty because the defense did not know that Mr. Villarreal Hernandez was going to commit blatant perjury until after it occurred.  And the majority of the documents proving his perjury were only made available to the defense post-trial.  What is crucial here is that what may have seemed like minor inconsistencies when Mr. Villarreal Hernandez testified to them, once combined with evidence of withheld *Brady* impeachment material of his continued crimes and lying to the government, take on a new importance.  All of this information should

20

have been presented to the jury.  If it had been, this information would have caused doubt

concerning the veracity of Mr. Villarreal Hernandez's testimony, which would have affected

multiple critical elements at issue during the trial and the testimony of other witnesses.  This

doubt could have resulted in an acquittal.

 The government attempts to evade any responsibility for the failure to expose the jury to

evidence of Mr. Villarreal Hernandez's perjury by claiming that it was the defense's obligation to

expose it on cross-examination.  This argument completely ignores that the government chose

not to conduct even a minimal investigation to corroborate the information being provided by a

cooperating witness and avoid perjurious testimony.  Once again, this was either gross

negligence by the government or conscious avoidance, either scenario results in a conviction

against Mr. Garcia Luna marred by injustice.

### Point VI

### The Government Cannot Refute the Evidence of Its Star Witness's Perjury Regarding Mr. Garcia Luna's Alleged Kidnapping

 The government's efforts to discredit clear evidence of Mr. Zavaleta's perjury should be

rejected by the Court.  Once again, the government seeks to throw a procedural bar in the way of

a factual claim that would nullify a central part of the government's case at trial – the purported

kidnapping of Mr. Garcia Luna.  For the reasons stated above, that argument must fail.  The

defense did not receive the hospital records until November 2023, approximately nine months

after trial and only one month prior to filing the Rule 33 motion.  The defense has made it clear

in public filings seeking an adjournment of the motion deadline, an *ex parte* submission

regarding the same, and our opening brief, that for months following the verdict in February

2023, individuals from Mexico with whom the defense had no prior contact, provided the

defense with thousands and thousands of documents that were new to the defense.

When Proceso published the article at issue sixteen years ago, in November 2008, Mr. Garcia Luna and his family paid little attention to the claims therein.  Mr. Garcia Luna was busy serving as Secretary of Public Security and the story was absurd in their minds.  Nor was he under investigation as a result.  The story was just another in a long line of rumors that had never been substantiated – rumors that Ambassador Tony Wayne testified about at trial that even the United States government did not and could not substantiate.  Mr. Garcia Luna continued his duties normally, which included meeting with all types of United States high level officials.  He continued to greet and debrief countless United States officials.  Nothing changed.

It was not until after his arrest and close to trial that Mr. Garcia Luna and his family learned that the "kidnapping" would play a major role at the trial.  However, as noted above, by that time Mr. Garcia Luna had been arrested, detained during a global pandemic and he and his family were denied access to any of their property located in Mexico.  They were banned from utilizing the financial system in Mexico, guards were placed outside their properties that were frozen by the Mexican government, and arrest warrants were issued by federal prosecutors.  People connected to Mr. Garcia Luna were considered enemies of the state and the Mexican president ordered the head of the SSPC to order all federal agencies to suspend from office any active official who was linked to Mr. Garcia Luna.  For the next four years, the President of Mexico railed against Mr. Garcia Luna, his family and any of his allies (or anyone who dared defend him) almost daily in his speeches to the Mexican nation.  Not only were people connected to Mr. Garcia Luna suspended but some have been imprisoned.  Even the members of the judiciary that dared rule in his favor were targeted by the Mexican Attorney General's office.  Accordingly, although Mr. Garcia Luna knew that he had not been kidnapped, evidence to prove that fact was impossible to come by until after the trial, when the materials described in the

22

motion, including the hospital records, were finally accessible.  Because the defense could not obtain this evidence before trial, this claim is not procedurally barred.

Substantively, the government cannot demonstrate that the hospital record is false or that it lacks sufficient guarantees of trustworthiness.  The document bears all of the indicia of reliability and the government cannot challenge anything except that Mr. Garcia Luna's first name is spelled incorrectly and one or two immaterial fields were left blank by a hospital employee.

The government had ten weeks to investigate this document.  The United States embassy in Mexico City, about which the Court heard testimony, is only 11 miles from the hospital.  Furthermore, these purported "problems" identified by the government are actually the hallmarks of truth and reliability.  If the document was manufactured, as the government seems to suggest with no basis, then Mr. Garcia Luna's first name would be spelled correctly (Genero vs. Genaro), it would have the exact time that Mr. Zavaleta claims the kidnapping occurred (12:00 p.m. not 12:28 p.m.), and all boxes would be filled in.  The government, with its army of agents and personnel in Mexico City, has been unable to raise any meaningful challenge to this document.

Instead, the government doubles down and unsuccessfully attempts to reconcile Mr. Zavaleta's account with the hospital receipt.  Under the government's new impossible scenario, Mr. Garcia Luna was kidnapped around 12:00 p.m. as their witness testified, yet was somehow still at the hospital at 12:28 p.m., approximately 1.5 hours away, to pick up his wife from the hospital.

The Court need only review Defense Exhibit F and the corresponding trial testimony to recognize the ridiculousness of this argument.  As the Court may recall, Mr. Zavaleta testified that after seeing his alleged commander being kidnapped and his security detail blindfolded and

detained on the ground, he sought no backup or assistance. *See* Trial Transcript 1099-1101. In fact, he did nothing to assist anyone. Instead, he drove back to Mexico City and spoke to a colleague who shared his hatred for Mr. Garcia Luna's policies. Following that, he contacted an opposition party senator who promptly contacted a news outlet. Defense Exhibit F was Mr. Zavaleta's rambling and incomprehensible letter to the Mexican Congress he wrote after meeting with Senator Sansores in which he stated that Mr. Garcia Luna's security detail was detained for four hours. *Id.* at 7. Instead of confronting the witness with this impossibility, the government chooses to remain ignorant and defend its conviction at all costs.

Furthermore, the Court should reject the government's weak efforts to attack the defense's additional evidence of Mr. Zavaleta's perjury regarding his access to Mr. Garcia Luna. The government takes aim at the affidavit from Mr. Garcia Luna's former security detail member José Jorge Rincón Namorado. Like Mr. Garcia Luna's secretary, he had never heard of or seen Mr. Zavaleta. And he and the secretary describe the security measures in place when Mr. Garcia Luna was Secretary of Public Security. But the most basic and important point on which Mr. Zavaleta, Mr. Namorado, and Mr. Garcia Luna's former secretary all agree is that the "federal police" provided security at SSP headquarters, federal police officers like Mr. Namorado. As noted at page 47 of the defense's opening brief, the defense has obtained new evidence of Mr. Zavaleta's true employment as reflected in the report from the Institute for Social Security Services for State Workers ("ISSSTE"). That report, which the government completely fails to address and therefore concedes, establishes that Mr. Zavaleta was never a member of the SSP or federal police at the relevant time period and, thus, would not have provided security at the SSP headquarters as he testified.

24

The hospital receipt establishes that Mr. Zavaleta's account of Mr. Garcia Luna's kidnapping was false.  Furthermore, his ISSTE document and the declarations of new witnesses establish that his basis to recognize Mr. Garcia Luna and knowledge of Mr. Garcia Luna's activities were also false.  Mr. Zavaleta's testimony about the kidnapping was a centerpiece of the government's case, because a purported law enforcement officer, untainted by narco-trafficking, corroborated important testimony by cartel heads and thus allowed the jury to conclude that the cooperating witnesses' testimony was credible.  Evidence that Mr. Zavaleta lied is crucial new evidence and warrants a new trial.

### Point VII

**The Government's Efforts to Attack the Credibility of the ███ Affidavit Must Fail**

The government disputes the ███ claim for three primary reasons.  First, the government argues that Mr. ███ must be lying because, unsurprisingly, Juan Carlos Nava Valencia, his brother, Oscar Nava Valencia, and Edgar Veytia deny engaging in the conduct of which Mr. ███ accuses them.  Second, the government relies on an "investigation" it conducted – relying primarily on Mr. Garcia Luna's former cell mate – which allegedly suggests that Mr. Garcia Luna tried to procure false information to use in a Rule 33 motion.  Last, the government claims that, in any event, the substance of the ███ Affidavit is illogical and is therefore not worthy of belief.  None of these bases is sufficient to undermine the truth and value of Mr. ███'s affidavit.  In the alternative, the Court should conduct an evidentiary hearing to flesh out the facts and circumstances of the government's allegations.

The first reason offered by the government for the Court to reject the ███ claim is that Juan Carlos Nava Valencia, Oscar Nava Valencia, and Edgar Veytia all deny that they talked to each other on contraband cell phones along with the other accusation set forth in the ███

Affidavit.  This basis for rejecting the claim is essentially worthless.  The Nava Valencia

brothers are life-long criminals, who have murdered, tortured, and assaulted numerous people,

trafficked massive amounts of drugs, and have lied and cheated their way through life.  The

notion that now – years into their cooperation – these men would admit to conduct that could

derail everything they have worked for borders on ludicrous.  Their denials mean nothing.

Similarly, Edgar Veytia, having been sentenced to 20 years for his crimes, now has the

possibility of being resentenced to time served because he testified against Mr. Garcia Luna.  He,

too, engaged in numerous crimes and personally tortured people, had people killed, and lied and

cheated without compunction.  His denial is not worth the paper it is printed on.  Of course these

men deny the ▮▮▮ allegations.  If they admitted them, their cooperation would be in peril and

they could spend the rest of their lives in prison.  Accordingly, the Court should not afford these

denials any weight.[3]

The bulk of the government's response to the ▮▮▮ Affidavit is spent on its investigation

into whether Mr. Garcia Luna improperly procured a false affidavit on his behalf.  This

investigation relied essentially on two sources: Juan Carlos Nava Valencia, and "Individual 2,"

who was a former cell mate of Mr. Garcia Luna's.  Juan Carlos Nava Valencia told the

government that he heard from another inmate, "Individual 1," that Mr. Garcia Luna had tried to

persuade Individual 1, through a third inmate, "Individual 2," to provide a statement that the

Nava Valencia brothers had spoken to each other about their testimony at Mr. Garcia Luna's

trial, and had also spoken to Edgar Veytia.  Apparently, Juan Carlos Nava Valencia told his

lawyer about this alleged overture months later, in the fall of 2023, who then reported it to

---

[3] None of the three denies possessing or using contraband cell phones, which is not surprising since cell
phones are ubiquitous inside the MDC.

Eastern District prosecutors.  *See* Gov't Opp. at 28.  The government never verified this bit of sensational hearsay by speaking to Individual 1.

The government did speak at length to Individual 2, Mr. Garcia Luna's former cell mate. For the reasons set forth below, the information provided by Individual 2 is suspect and unreliable, and should be rejected by this Court.  Individual 2[4] claims that starting in early April 2023, Mr. Garcia Luna began talking to him about an effort to have inmates, including Individual 2, claim that the Nava Valencia brothers had spoken to each other and Edgar Veytia on contraband cell phones.  Moreover, Individual 2 alleges that he took "contemporaneous" notes of these conversations with Mr. Garcia Luna, and, on April 12, 2023, partially recorded a conversation between them on a contraband phone.  Specifically, according to Individual 2, Mr. Garcia Luna was trying to get him to persuade Individual 1 to tell Mr. Garcia Luna's lawyers that he had overheard the Nava Valencia brothers speaking to each other and Veytia on cell phones. Individual 2 also claimed that Mr. Garcia Luna told him that he had met another inmate in the library and had persuaded that inmate – who Individual 2 claims ultimately turned out to be ██████████ – to make a false statement about the Nava Valencia brothers and Veytia. Individual 2 eventually provided the "contemporaneous" notes, the audio recording, and a purported "script" for Individual 1 to the government in February 2024, more than nine months after the events described therein.

---

[4] The government emphasizes ██████████'s unpleasant crimes (enticement of a minor, child pornography) and his mental health conditions – presumably to bias the Court against him – but neglects to mention that Individual 2 has pled guilty to similar crimes (ten counts of sexual crimes against minors, and production of child pornography).  *See* Gov't Opp. at 19 n.9.  Moreover, Individual 2 was charged with fraud in South Carolina, and the United States Attorney's Office for the Southern District of New York alleges that he made threatening phone calls to the person he was charged with defrauding after his arrest.  *See* ██████████████████████████████████

Individual 2's claims lack merit.  Most problematic for the government is the timeline of these events.  As detailed in the accompanying affirmation by Shannon McManus, Annexed Hereto at Exhibit 5, Mr. Garcia Luna's defense team first learned about ███████ in early March 2023.  On March 12, 2023, the defense team contacted Mr. ████'s lawyer.  On March 19, Shannon McManus met with Mr. ████ at the MDC, more than three weeks before the alleged first conversation about this topic between Individual 2 and Mr. Garcia Luna.  *Id.* During that meeting, Mr. ████ detailed the information that was eventually memorialized in the May 31, 2023 affidavit.

Individual 2's chronology makes no sense because, according to the government, Mr. Garcia Luna told Individual 2 in mid-April that Mr. ████ had agreed to speak with defense counsel, and "expressed concern that [Mr. ████ *would* forget to 'tie in [Juan Carlos Nava Valencia] as the ring leader.'"  Gov't Opp. at 30 (emphasis added).  But Mr. ████ had already met with the defense nearly a month earlier.  The government also states that "on or about May 10, 2023, the defendant told Individual 2 the allegations the defendant *intended* ████ Individual 2, and others to put forward."  *Id.* at 31 (emphasis added).  It goes on to say that "[o]n or about May 13, 2023, the defendant . . . further relayed ████ *was going to meet* with the defendant's counsel in this case."  *Id.* (emphasis added).  As discussed, however, Mr. ████ had met with defense counsel and described the events nearly two months earlier.

Individual 2 claims to have maintained contemporaneous notes of his conversations with Mr. Garcia Luna.  But they are only "contemporaneous" because he says so – that claim cannot be verified.  He turned these notes over to the government in February 2024, months after he says the conversations took place, and well after Mr. Garcia Luna's post-trial motion was filed.

28

Given the severity of his own charges, the truth is that Individual 2 had an enormous incentive to curry favor with the government and seek to get consideration at his own sentencing.

Nor does the partial audio recording Individual 2 claims to have made of a conversation with Mr. Garcia Luna shed much light. For one, it is nearly incomprehensible. Second, the translation of what can be discerned is not perfect. For example, the government's translation says that Mr. Garcia Luna stated "The worst is that it has to be all your truth". GX 7 at 10. While even that statement appears exculpatory, it sounds that he actually says "Claro es que debe ser toda tu verdad," meaning "It is clear that it has to be all your truth." Third, in light of the fact that his lawyers had met with Mr. ███ weeks earlier, it is not surprising that Mr. Garcia Luna discussed the issues of the Nava Valencia brothers and Edgar Veytia talking about their testimony with his cellmate. This was big news – it undermined a central claim by the government at his trial. Moreover, nowhere in the recording – to the extent it is understandable – does Mr. Garcia Luna ask Individual 2 or anyone else to make up false stories. To the contrary, he asks anyone who might come forward to convey their "reality," their truth. Mr. Garcia Luna did not know he was being recorded. If, according to Individual 2, he was asking Individual 2 and Individual 1 to lie for him, to make up false claims – why not be explicit?

The fact is that the government's "investigation" is sorely lacking and fails to overcome the power of the ███ Affidavit which, as noted, calls into question a central tenet of the government's arguments to the jury – that the cooperators should be believed because they had not spoken in years and had no way to coordinate their stories. The government failed to speak to Individual 1 who supposedly conveyed Mr. Garcia Luna's efforts to Juan Carlos Nava Valencia, and who Individual 2 purportedly coached. The government also did not speak to Mr. ███ and does make any claim in its Opposition that Mr. ███ now refutes his affidavit. Nor

does the government offer any evidence that Mr. ▆▆ was paid for the affidavit – as Individual 2 claims.  Presumably it examined Mr. ▆▆'s commissary account and reviewed his recorded phone calls and Corrlinks accounts in an effort to establish that he had lied.  The absence of such evidence speaks volumes about the government's "investigation."

Lastly, the government concludes that the claims in the ▆▆ Affidavit are "nonsensical" because Oscar Nava Valencia and Mr. Veytia were working for the cartels at different time periods, and on different sides of a war between the Sinaloa Cartel and the Beltran Leyva Organization.  But these three witnesses at Mr. Garcia Luna's trial were all at the MDC together.  This fact alone makes it plausible that they were discussing the case and their testimony.  Testifying at Mr. Garcia Luna's trial was one of the defining events in the lives of Oscar Nava Valencia and Edgar Veytia – their future depended in large part on how they performed.  Even if they did not know each other well during their time in the narco trade a decade earlier, their joint experience of testifying publicly at the trial made them brothers in arms, sharing a joint objective.  It is not at all "nonsensical" to assume that people who needed to be consistent in their testimony about Mr. Gacia Luna – even if that testimony covered different topics – would be interested in discussing their testimony with each other.

Ultimately, the Court must evaluate if ▆▆▆'s affidavit is credible.  Absent the unreliable claims by Individual 2 and Juan Carlos Nava Valencia, there are no reasons to assume it is not.  Mr. ▆▆ is not receiving any benefit.  His sentence is not being reduced.  There is no evidence that Mr. Garcia Luna offered him money, or protection, or some other incentive to swear falsely in an affidavit.  The Court should reject the government's objections to the ▆▆ Affidavit.  In the alternative, it should conduct an evidentiary hearing to further investigate the claims of a "scheme" advanced by the government.

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Garcia Luna a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Dated: March 19, 2024

                    _____
                    César de Castro
                    Valerie A. Gotlib
                    Shannon McManus
                    The Law Firm of César de Castro P.C.
                    111 Fulton Street – 602
                    New York, NY 10038
                    (631) 460-3951
                    cdecastro@cdecastrolaw.com
                    vgotlib@cdecastrolaw.com
                    smcmanus@cdecastrolaw.com

                    Florian Miedel, Esq.
                    Miedel & Mysliwiec LLP
                    52 Duane Street, 7th Floor
                    New York, NY 10007
                    (212) 616-3042
                    fm@fmamlaw.com

                    *Counsel for Genaro García Luna*

31