UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
    UNITED STATES OF AMERICA,

                             Plaintiff,

          - against -

    GENARO GARCIA LUNA,

                          Defendant.
----------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

19-cr-576 (BMC)

**COGAN**, District Judge.

        Defendant Genaro Garcia Luna, former head of Mexico's Federal Investigation Agency ("AFT"), was convicted of participating in a continuing criminal enterprise; conspiracy to distribute and possess with intent to distribute cocaine; cocaine importation conspiracy; international cocaine distribution; and making false statements. In essence, the Government proved that Luna accepted bribes to facilitate and profit from the activities of the Sinaloa Cartel (the "Cartel"), Mexico's largest and most sophisticated drug trafficking organization. The trial took five weeks. It involved testimony from senior Cartel members and its accountant, convicted Mexican government officials, non-corrupted Mexican police officers, and U.S. law enforcement officers who had worked in Mexico during the events at issue.

        The case is before the Court on defendant's motion for a new trial. The primary claims on the motion are Brady violations and alleged false testimony by Government witnesses. The motion fails for numerous reasons, including that it is made against a backdrop – as defendant virtually concedes – of his unsuccessful efforts to bribe inmates at the Metropolitan Detention Center ("MDC") after his trial to create false evidence, which was submitted on this motion

without the knowledge of his lawyers (that is, his lawyers knew they were submitting the evidence he obtained, but they didn't know it was false). In addition, much of the "newly discovered" evidence consists of facts that were known or accessible to defendant prior to trial.

The principle points defendant makes are addressed below. The few others are entirely without substance and are denied for the reasons stated in the government's opposition.

I.      **The Affidavit of Edgardo Mejia**

Edgardo Mejia has nothing to do with this case, except he has submitted an affidavit in support of defendant's motion. Mejia has been in custody at the MDC since January of 2018. He was charged with sexual exploitation of a child; coercion and enticement; three counts of receipt of child pornography; and receipt of possession of child pornography. He pled guilty to sexually exploiting an eleven-year-old girl and her two-year-old niece by having the eleven-year-old girl create pictures of herself and her niece engaged in sex acts and sending them to him. He is awaiting sentencing. Two months after submitting his affidavit in support of defendant's motion for a new trial, he was diagnosed with a psychotic disorder with hallucinations due to a known physiological condition. According to Mejia's Presentence Investigation Report, his Sentencing Guidelines start off at life imprisonment, but his statutory maximum is 360 months.

In his affidavit, Mejia avers that he was housed at the MDC with an individual named Juan Carlos Nava Valencia, known as "El Tigre." Mejia further avers that he observed El Tigre with a cell phone, which is of course contraband in prison. He further avers that El Tigre told him that he (El Tigre) had talked on the cell phone to his brother Oscar and another individual referred to as "Edgar," who turned out to be Edgar Veytia. Oscar and Veytia were both cooperating witnesses who testified against defendant at trial. Veytia was housed with Mejia in 2022.

According to Mejia, Veytia told him (Mejia) that Veytia was in "constant contact" with El Tigre and his brother Oscar over contraband cell phones. Veytia called the Assistant U.S. Attorneys "stupid;" that they "would believe anything I say;" and that Veytia was "going to screw" defendant.

In response to the Mejia affidavit that defendant submitted, the Government interviewed El Tigre, Oscar, and Veytia. The notes of those interviews directly refute each of Mejia's claims, and all but establish that the Mejia affidavit was part of defendant's effort to solicit MDC inmates to come up with this false story.

Veytia told the Government when it investigated Mejia's affidavit that he never communicated with El Tigre or Oscar via a contraband cellphone nor told anyone that he had, and that he met El Tigre only once at the MDC when they were both briefly in the same holding room prior to an attorney visit in which they had no conversation but to introduce themselves. He also stated that he had never met or spoken to Oscar. He outright denied making the statements attributed to him in the Mejia affidavit. He stated that he did not even know that Oscar would be testifying against defendant until shortly before trial when it was publicly reported. He also denied having any communications with El Tigre or Oscar through a third party.

Oscar similarly stated to the Government that he had never met or spoken to Veytia and, indeed, Veytia's name was not even familiar to him. He denied communicating with El Tigre by cell phone or passing messages amongst the three of them.

El Tigre stated he had never spoken on a contraband cell phone to Oscar of anyone named "Edgar" and that he does not know Veytia, but had met him once in 2018 or 2019 in a holding cell prior to an attorney visit.

3

Mejia's own dubious background or the consistent denials from El Tigre, Oscar, and Veytia would probably each be enough reason to reject Mejia's affidavit in light of the stringent standard for a motion for a new trial. But there is much, much more. In the course of investigating the alleged statements in the Mejia affidavit, the Government discovered that defendant had contacted other inmates at the MDC and *asked them to sign an affidavit telling substantially the same story as Mejia in exchange for millions of dollars*. El Tigre alerted the Government to defendant's MDC scheme and identified the other individuals involved.

In fact, the Government didn't know it until its investigation, but it already had this information in-house. El Tigre's lawyer had communicated the information to another Assistant U.S. Attorney. With the loop closed, the prosecution team in this case interviewed the individual involved (John Doe #2), who had not only made contemporaneous notes of his conversation with defendant (submitted with the Government's opposition to defendant's motion), but had surreptitiously recorded the conversation (also submitted with its opposition to the motion), using – yes – a contraband cell phone.

The notes and the recording are just as damning as they could be. This was a clear scheme by defendant to obstruct justice through bribery – defendant started out with a $500,000 offer of a bribe, but to overcome John Doe #2's hesitation, the offer ultimately went up to $2 million. Defendant disclosed to John Doe #2 that he wanted to involve another inmate, John Doe #1, to give the same story to corroborate Mejia. He also disclosed to John Doe #2 that the Mejia affidavit was in fact false.

Defendant said he wanted more than one person backing up the fake story so it would be more convincing. Part of this, defendant made clear to John Doe #2, was that the story had to be carefully constructed so that he could fool his attorney into believing it. Defendant stated in

4

John #2's recording that the individual telling the story had to "say something convincing … in order to convince Cesar [de Castro, defendant's attorney]."

In his reply brief in support of the instant motion, defendant has little to say about the Government's investigation. About the most he can do is complain that the Government seems to have done, in his view, a better job of investigating Mejia's affidavit than of investigating other witnesses whose credibility he is attacking (again) on this motion. He also complains that this is just the word of the cooperators against the word of Mejia. But that's not true. There are contemporaneous notes from John Doe #2 and recordings of his conversations with defendant. The obstruction effort is clear.

Although the principle of *falsus in uno, falsus in omnibus* does not apply on this motion, the Government is correct that I must approach the motion with at least a modicum of skepticism in light of defendant's attempt to corrupt it. So should his lawyers, as it seems clear that they were nearly as much a target of defendant's attempted obstruction as the Government and the Court.

**II.   The "Vetting" Documents**

Defendant attempted to introduce at trial laudatory statements and opinion letters from U.S. government officials about what a great job he was doing in fighting the cartels. I excluded most of them under Fed. R. Evid. 403 because they did not go to the central issue in this case, namely, whether defendant was deceiving U.S. authorities while helping the cartels by accepting bribes, and might have confused and misled the jury. In other words, of course the United States authorities believed defendant was helping them – whether he was, or whether he was deceiving them, was the whole point of this case. In the instant motion, he has identified a few other documents that he thinks would have shown more evidence along these lines.

5

Defendant's motion includes a claim that the government failed to turn over, as Brady material, certain documents that show, or would have permitted an inference, that he passed a security check by the U.S. Government and that the U.S. Government concluded that he was "dedicated to fighting the cartels." The documents do not show that, and they do not qualify as Brady materials for a host of reasons.

The first document is a Letter of Understanding ("LOU") dated January 27, 2011, signed by defendant and the DEA's Regional Director in Mexico. It concerns a Mexican federal police unit called the Sensitive Investigation Unit. This was a selected group of Mexican police officers who were trained and polygraphed by the DEA to try to insulate the unit from the corruption that permeated Mexican law enforcement agencies. (Notwithstanding this vetting, a Special Agent for the DEA who had worked with the SIU testified at trial that the unit could still not be trusted.) The second document describes a meeting between defendant and some U.S. government officials.

The LOU stated that when a police officer was selected to enter the SIU, he had to submit to a drug test, background investigation, and polygraph test. Defendant's argument is that because, at the time he signed this letter, his title was Secretary of Public Security, a cabinet-level position, he must have undergone the same vetting and polygraphing, and that this would have been exonerating evidence.

But the Letter of Understanding doesn't say that at all (and neither does defendant aver that he actually took a polygraph test, except as theoretical argument in his brief). The Letter only discusses the requirements for officers admitted into the SIU unit. Defendant was not one of those officers. Indeed, the Government produced to defendant in discovery a DEA document noting that while "polygraph tests are a DEA requirement for SIU members," defendant was "not

6

required to be polygraphed" because he was a cabinet-level official. The Government has also represented, in connection with this motion, that it has conducted an additional search of DEA records, and there is no indication that defendant was ever polygraphed.

That makes perfect sense. Cooperation between the United States and Mexican governments in pursuing the drug cartels has always been politically sensitive because the corruption in Mexico is so pervasive. Imagine what would have happened if the DEA had demanded that, as condition to cooperation, some or all members of the Mexican cabinet had to be polygraphed. The DEA might as well have asked for a polygraph of the President of Mexico – the challenge to Mexican sovereignty would have been just as apparent. Pursuit of vetting for cabinet-level officials brings to mind an adage also used in the war on drugs: "Just Say No."

But let's suppose, even in the absence of evidence and common sense, that defendant had been polygraphed, whether pursuant to the LOU or otherwise. The LOU still wouldn't warrant a new trial for numerous reasons.

First, it is expressly provided under Rule 33 that a motion for a new trial must be based on "newly discovered evidence." As the Second Circuit held in United States v. Owen, 500 F.3d 83, 89-90 (2d Cir. 2007), "[o]ne does not 'discover' evidence after trial that one was *aware of* prior to trial." In the instant case, defendant is complaining about the non-production of a document that he himself, signed years before his trial began, so of course he was aware of it. All he had to do was tell his lawyers about the LOU (and he might have mentioned that he had been polygraphed, if he had), and they could have issued a very specific Rule 16 request. Defendant complains that the Government is attempting to place a heightened standard of due diligence upon him beyond what the cases require, but it would have taken minimal diligence to just tell his lawyers he had signed the LOU. What defendant could not do is keep his knowledge

7

of the LOU in his back pocket and spring it as "newly discovered" evidence in case of a conviction.

But none of this matters because the Letter of Understanding and the document referencing the meeting aren't Brady material in the first place. The Government has demonstrated to my satisfaction that the documents were not in the possession of the prosecution team, which is of course a prerequisite. See United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998). Although the prosecution team turned over a number of documents relating to vetting, it never received the ones on which defendant is relying. The DEA agent who signed it has not been a government official since prior to the defendant's indictment and was not involved with the prosecution team or the development of the case.

Most importantly, it is beyond a stretch to argue that had the prosecution team known about and turned over these documents to defendant, they would have "likely result[ed] in an acquittal." United States v. James, 712 F.3d 79, 107 (2d Cir. 2013). As noted above, although I let some in, I excluded a lot of laudatory evidence on how various U.S. officials regarded defendant as a team player in the war against drugs. Considering that this evidence has an additional step – was defendant, in fact, vetted or polygraphed pursuant to the LOU – it is highly attenuated reasoning to suggest that this evidence would have made any difference if defendant had obtained it, either by telling his attorneys about it or getting it from the prosecution team.

**III.     Hector Villarreal Hernandez**

    *A. Undisclosed Giglio material – the Ward letter*

Hector Villarreal Hernandez, one of the Government's cooperating witnesses, was a politician, the former Secretary of Finance from the Mexican state of Coahuila. His main purpose at trial was to testify that at the direction of his boss, Humberto Moreira Valdes, who

8

was the Governor of Coahuila, he facilitated a scheme to bribe the Mexican newspaper El Universal into providing favorable coverage of defendant based on Villarreal Hernandez's relationship with Juan Francisco Ealy Ortiz, the publisher of El Universal. Villarreal Hernandez testified to meetings and money deliveries he made to buy this favorable coverage. He had become a cooperating witness for the U.S. Attorneys' Offices in the Southern and Western Districts of Texas, and was released on bond for indictments in the latter pending further cooperation sessions. The U.S. Attorney's office in E.D.N.Y. obtained permission from one or both of those offices to call Villarreal Hernandez at defendant's trial.

Defendant claims that a February 2020 letter from Morerira Valdes's lawyer, a Texas attorney named Robbie Ward (the "Ward letter"), which Ward sent to the U.S. Attorney's Office for the Western District of Texas, constitutes Giglio material and should have been produced since it was in possession of the U.S. Attorney's Office in that district. The letter was accompanied by a thumb drive with hundreds of pages in Spanish. The Ward letter, largely based on information supplied by Moreira Valdes's Mexican lawyer (which was also included with the letter) was written in an effort to persuade the United States Attorney for the Western District of Texas that it was Villarreal Hernandez, not Moreira Valdes, who had committed illegal acts, so if anyone should be prosecuted, it should be Villarreal Hernandez. In the Ward letter, Moreira Valdes's Mexican attorney claimed some access to Mexican prosecution files. The main thrust of the letter seems to be that while a cooperating witness in Texas, Villarreal Hernandez continued to launder money from Mexico so he could live a life of luxury in Texas, thus violating the terms of either his release or any cooperation agreement he might have had with the U.S. Attorney in the Western District of Texas.

Because of the multiple levels of story transmission before the information actually

9

reached Ward, and both Ward and Moreira Valdes's Mexican attorney's spin on all of this information to dress it up as a bargaining chip for Moreira Valdes, Ward's letter is very hard to comprehend. At most, it claims that Mexican investigators had been investigating whether Villarreal Hernandez was using a bank account in Mexico in someone else's name (maybe a relative, maybe not) "to supplement his lifestyle in San Antonio" in 2017 to 2018. It purports to quote a witness statement obtained by a Mexican prosecutor who became aware of Villarreal Hernandez's money laundering. It also represents that the Attorney General of Coahuila has "publicly informed" that there are four "active complaints" against Villarreal Hernandez for fraud, false documents, theft, and public corruption. Ward's letter is full of "I believes" and "it appears" as expressed by third parties, principally Moreira Valdes's Mexican lawyer. The letter can also be understood as a finger-pointing exchange because Moreira Valdes knew that Villarreal Hernandez had been cooperating with the U.S. Government (Villarreal Hernandez had seriously implicated Moreira Valdes as a coconspirator in several frauds in the former's testimony at trial) and was trying to deflect blame onto the latter.

In the instant motion, defendant contends that if the Government had produced the Ward letter in discovery, his attorneys could have used it to impeach Villarreal Hernandez, and the result of his trial would have been different. I think not, and for a number of reasons.

First, the Ward letter is barely comprehensible and is based on nothing but multiple layers of hearsay, innuendo, and speculation. There is no reason to believe its accuracy, nor reason to believe that Villarreal Hernandez would have admitted conduct of which the letter accuses him if confronted with it at trial. Indeed, unless defendant could have given me a proffer at trial as to why the accusations against Moreira Valdes in the letter were true, I would have held that the mere existence of the letter was not a sufficient basis to ask the questions. It would

10

be like asking a police officer in a § 1983 case about unproven accusations against him in another § 1983 case. Courts regularly exclude questions about unproven allegations of collateral events as distracting and confusing to the jury under Fed. R. of Evid. 403, see Anilao v. Spota, 340 F. Supp. 224, 257 n. 39 (E.D.N.Y. 2018), and I would have done that here.

      Second, the Government has also convinced me that the U.S. Attorney's Office for the Western District of Texas was not a part of the prosecution team in this case, and thus, even if the Ward letter were considered impeachment material, the prosecution team had no obligation to search other U.S. Attorney offices for such materials. See United States v. Meregildo, 920 F. Supp. 434, 440 (S.D.N.Y. 2013) ("The constructive knowledge of prosecutors is not limitless [and] does not encompass every agency and individual within the federal government."); see also United States v. Hunter, 32 F. 4th 22, 36 (2d Cir. 2022). The Government has shown that the only involvement that the Texas U.S. Attorney's Offices had in this case was to give permission for Villarreal Hernandez, their cooperating witness, to meet with the prosecution team here, and to give the team Villarreal Hernandez's formal cooperation documents so that the team could produce them to defendant, which it did. The law is clear that mere overlaps and minimal cooperation between U.S. Attorney Office's investigations do not merge the prosecution teams, even when there are joint witness interviews and limited document sharing. See United States v. Avenatti, No. 19-cr-374, 2022 WL 457315, at *10 (S.D.N.Y. Feb. 15, 2022) (C.D. Cal. USAO not part of prosecution team where both offices conducted separate investigations of the defendant but participated in joint witness interviews and engaged in limited document sharing). It is a virtually unavoidable conclusion that although the Western District of Texas turned over Villarreal Hernandez's cooperation agreement and related document to the E.D.N.Y. because of the E.D.N.Y.'s request to call him at trial, the Western District of Texas never turned over the

11

Ward letter because it correctly concluded that it had no probative value on the issue of Villarreal Hernandez's cooperation with them. And, in any event, the federal prosecutors in Texas did not participate in the prosecution team's witness interview, present the defendant's case to the grand jury, review documents gathered by the prosecution team, play a role in the development of the team's strategy, or accompany the prosecution to court proceedings. See Avenatti, 2022 WL 457315, at *10; see also United States v. Caniff, 521 F.2d 565, 573 (2d Cir. 1975) (the Government "cannot be required to produce that which it does not control and never possessed or inspected").

Third, perhaps most importantly, one more instance of money laundering would not have had any impact on the outcome of this trial because Villarreal Hernandez testified extensively about his money laundering and other crimes. The jury was made well aware that he was a serious fraudster. He started out his testimony by acknowledging that he made millions of dollars, along with Moreira Valdes ($2.5 million for the former, $20 million for the latter), through a massive kickback scheme on public works contracts that they were able to pull off because of their respective positions of Secretary of Finance and Governor. Villareal Hernandez testified that he had laundered money to get it into the United States by lying to banks; that he violated the terms of his pretrial release in Mexico by fleeing to the United States; that he engaged in other money laundering; that he transported stolen money; and that he used false documents. That was enough to give the jury whatever information on his credibility it needed. Cumulative impeachment is not a reason for a new trial. See United States v. Moslem, 19-cr-547, 2023 WL 5610297, at *4 (S.D.N.Y. Aug. 30, 2023).

Finally, Villarreal Hernandez did not supply any direct evidence on the central issue in this case – whether defendant accepted bribes from the cartel to facilitate its activities. Villarreal

Hernandez was one of 9 cooperating witnesses and 25 Government witnesses. His relatively small piece of the picture was to describe defendant's payoffs to El Universal for more favorable news coverage, and that defendant was living a life of luxury (which Villarreal Hernandez knew from attending parties at defendant's residences). Villarreal Hernandez's testimony supplied some circumstantial evidence that defendant was corrupt, but it was hardly a smoking gun compared to the other direct and much more probative circumstantial evidence of his involvement with the illegal drug business at a high level. Villarreal Hernandez's testimony was far from "the only evidence linking the defendant[] to the crime" nor would further impeachment of it "have undermined a critical element of the prosecution's case." United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)

The statements in the Ward letter are not quite as incredible as those in the Mejia affidavit, but even if the Government had some obligation to produce the Ward letter, which it did not, nothing in it would have been material to defendant's conviction.

B. *Villarreal Hernandez's alleged perjury*

In addition to the alleged Giglio violation concerning the Ward letter, defendant claims to have newly discovered other evidence that shows Villarreal Hernandez was lying on the stand. Most of this evidence also relates to the 10 million pesos payoff to El Universal. The evidence consists of defendant's schedules, agenda, and photographs purporting to show numerous meetings between defendant and Ealy Ortiz, the publisher of El Universal. These documents are "authenticated" by defendant's former secretary, who worked for him from 2005-2012. There is no explanation offered as to why she wasn't contacted prior to the jury verdict; or where she got the documents; or how they were created. The documents purport to show meetings between defendant and Ealy Ortiz prior to the time that Villarreal Hernandez said that his boss arranged

13

for the favorable coverage. Based on this, defendant asks this question: if he already knew Ortiz prior to the time of the payoff, why would he have needed Villarreal Hernandez and Moreira Valdes to arrange the payoff to Ortiz? Therefore, he reasons, Villarreal Hernandez must have been making the whole story up, and defendant deserves a new trial so he can confront Villarreal Hernandez with this "newly discovered" evidence.

The second piece of "newly discovered" evidence is an argumentative affidavit of Ildefonso Fernandez Guevara, a Mexican attorney for El Universal and Ealy Ortiz. Simply put, this "affidavit" is an advocacy piece. Fernandez Guevara attempts to legitimize the $10 million payment from defendant to El Universal as a bona fide payment for advertising to attract tourists, although he admits that El Universal conveniently no longer has the underlying account records to show that.

As to defendant's argument that the schedules and agendas show that he didn't need an introduction to Ortiz – assuming *arguendo* that those documents are genuine – the obvious response is that any acquaintance defendant, as a cabinet-level official in the Mexican government, might have had with Ealy Ortiz was not the same as Ealy Ortiz trusting defendant to engage in a corrupt transaction. Ortiz would have been wise to require his good friend, Moreira Valdes (the trial testimony showed they were *great* friends), to vouch for defendant's willingness to engage in a corrupt transaction. But I don't need to go that far.

First of all, I give the Guevera affidavit no more weight than the Mejia affidavit, albeit for different reasons. It's just a brief from a lawyer which happens to be sworn to. It is mere argument and opinion and contains triple layers of hearsay. I understand that the civil law system in Mexico is very different than ours, but there is no way that Guevera could take the stand in a United States Court and say anything that's in his affidavit.

14

Beyond that, some of the statements Guevera makes cannot be taken seriously. He concedes the $10 million payment to El Universal to which Villarreal Hernandez testified, but says it was part of a newspaper advertising campaign – the "Campaign for the Recovery of Tourism in 2009." That's consistent with Villarreal Hernandez's testimony about how the payment was labeled to conceal its true purpose. But think about it: why is defendant, a cabinet-level security official in Mexico, paying $10 million to a Mexican newspaper – even assuming El Universal has an international reach – to get tourists to visit Mexico?[1]

Finally, as with all of defendant's other "newly discovered evidence," I am not seeing why this evidence is "newly discovered." Defendant gives no reason why he would not have known about his schedules and agendas to show that he knew Moreira Valdes prior to delivery of the bribe to which Villareal Hernandez testified. He offers no reason why he did not contact his secretary until after the jury verdict. There is no source identified from which the schedules and agendas were obtained. And if the $10 million payment was really to attract tourists to Mexico, he could've shown that during the trial as well. Indeed, even through this motion and above-referenced documents, defendant has not shown that attracting tourism was the purpose of the $10 million payment.

---

[1] Although I am not relying on it in this decision, this practice of Mexican officials and agencies buying "advertising" in Mexico has been repeatedly identified as a source of fraud by which these officials and agencies steer media coverage in their favor and away from their corrupt activities. See, e.g., "Using Billions in Government Cash, Mexico Controls News Media," New York Times (Dec. 25, 2017), available at https://www.nytimes.com/2017/12/25/world/americas/mexico-press-government-advertising.html (specifically discussing El Universal).

15

None of these arguments are sufficient for a new trial, and defendant's motion is accordingly denied.

**SO ORDERED.**

*Brian M. Cogan*
_____
U.S.D.J.

Dated: Brooklyn, New York
August 6, 2024

16