THE LAW FIRM OF

# César de Castro, P.C.

ATTORNEY AT LAW

The District
111 Fulton Street - 602
New York, New York 10038
631.460.3951 Office
646.285.2077 Mobile
646.839.2682 Fax
cdecastro@cdecastrolaw.com
cdecastrolaw.com

September 25, 2024

*Via* ECF

The Honorable Brian M. Cogan
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Genaro Garcia Luna*, 19 Cr. 576 (BMC)

Dear Judge Cogan,

This Court should sentence Genaro Garcia Luna to twenty years' imprisonment.  Twenty years' imprisonment is an extremely significant and lengthy sentence.  A sentence of twenty years would represent the approximate length of Mr. Garcia Luna's entire career as a public servant to the Mexican government as a member of its intelligence agency, the federal police, and the Secretary of Public Security.  In a time when extremely lengthy sentences, even life sentences, appear commonplace as they flash across the millions of screens and prolific social media and news applications numbing our global citizens, it is important to truly understand how long twenty years is and how much can change over such a lengthy period.  Twenty years ago, the Apple iPhone had not yet even been released.  Google went public twenty years ago, and Facebook was first developed.  Twenty years ago, George Bush defeated John Kerry and sadly, Ronald Reagan passed away.  The Red Sox won its first World Series in eighty-six years and Barry Bonds was still playing baseball.  And close to twenty years ago, Your Honor was appointed to serve on this distinguished court.

Mr. Garcia Luna has been imprisoned for close to five years.  The past five years have felt like an eternity to him.  For almost every day of the past five years he and his family have endured public attacks by many different forces in Mexican society.  He has lost everything he worked for – his reputation, all of his assets, the institutions that he championed, even the independence of the Mexican judiciary – and he has been powerless to control any of it.  Just in the past five years he has lost two siblings, learned of the disability of another due to COVID-19 complications and the imposition of an arrest warrant against her, and learned that his youngest sister was jailed because of her relationship to him.  Even worse, he has spent those five years detained at the Metropolitan Detention Center ("MDC") in Brooklyn, New York.  Undoubtedly,

this Court has heard from many defendants and reviewed the work of other members of the bench in the Southern and Eastern Districts of New York regarding the inhumane conditions of the MDC.  But remarkably, Mr. Garcia Luna has made it his home and has left an indelible and positive mark on that institution.  Mr. Garcia Luna's work at the MDC represents one of the true accomplishments in a facility that makes news seemingly daily for all the wrong reasons.  Mr. Garcia Luna, from his jail cell before, during, and after COVID-19, has approached each day the same way he did when he was in the Mexican presidential cabinet or the head of the Mexican federal police.  He has tried each day to make his community better.  Mr. Garcia Luna developed, in a facility with little to no educational opportunities, a curriculum for teaching fellow inmates the necessary material for them to obtain their General Equivalency Diplomas ("GED").  He has taught and helped over 100 inmates obtain their GEDs, significantly affecting the lives of those inmates and their loved ones.  Not only does a GED help an inmate reduce his Bureau of Prisons security classification, but that education helps him open his eyes to the potential for lawful employment later in life and encourages their continued education.  This fact may be trivialized by some, but for Mr. Garcia Luna it is a shining achievement in an abyss of sorrow, and it demonstrates his true character.

Through the PSR, this submission, and the letters submitted in support of Mr. Garcia Luna, the Court will learn that he is a good person, a man devoted to his family, and a man who served his country for decades.  He has spent most of his career defending the ideals of the United States and aiding its law enforcement community.  Furthermore, when the Court analyzes in detail the sentences of other defendants, not just the two included in the government's memorandum who have abused positions of power to facilitate drug trafficking, it is clear that a sentence of life imprisonment for Mr. Garcia Luna would create an unwarranted sentence disparity.  Twenty years' imprisonment is sufficient, but not greater than necessary to achieve the aims of sentencing in 18 U.S.C. § 3553(a).

## I.      The Pre-Sentence Investigation Report, Defense Objections, and the United States Sentencing Guidelines' Advisory Range

By letter filed on May 31, 2024, Mr. Garcia Luna lodged several objections and suggested some corrections to the Presentence Investigation Report ("PSR").  ECF. No. 260.  On June 7, 2024, in an addendum to the PSR, the Probation Office made the suggested corrections and addressed each of Mr. Garcia Luna's objections to the PSR, noting the government's position.  It resolved all defense objections in favor of the government.

Mr. Garcia Luna continues to object on the grounds laid out in the May 31, 2024 letter to the Probation Office, and maintains that the appropriate advisory Guidelines range is 360 months' imprisonment to life, with a mandatory minimum sentence of twenty years' imprisonment.

## II.     Mr. Garcia Luna Has Been Subjected to Unduly Harsh and Sub-Standard Conditions While Being Incarcerated for the Entirety of the COVID-19 Pandemic at the Metropolitan Detention Center

Mr. Garcia Luna was arrested in December 2019 in Texas.  After being held in a Texas Special Housing Unit ("SHU") which incarcerates, for the most part, inmates who have committed disciplinary infractions, he was transported to the MDC in early January 2020.  His life had been

turned upside down and shortly thereafter the world was turned upside down with the commencement of the COVID-19 pandemic. Being imprisoned in the MDC during COVID, where he contracted the disease twice, was tortuous and constituted unduly harsh conditions. But the inhumane conditions did not end with the pandemic. They have continued, and the MDC continues to be frequently in the news and the subject of federal legal opinions regarding its abhorrent record for maintaining a safe and humane facility in which inmates can be detained prior to trial. Minus his short time in Texas, and a brief period at the Essex County Jail in New Jersey when the government put a jailhouse informant in his cell to record him, Mr. Garcia Luna has been imprisoned at the MDC.

The conditions under which he has been held the last five years should be considered by the Court and significantly reduce its intended sentence as a result. Furthermore, and just as significant, the Court should recognize how unusual and noteworthy it is that Mr. Garcia Luna, faced with all the struggles and tortuous conditions at the MDC, has been able to serve the MDC community honorably. Not only has he avoided any disciplinary infractions, but he has also served as a GED teacher to countless inmates, as an orderly in his unit, and an inmate that the correctional staff permits to work with minimal supervision and to service the offices of the supervisors of correctional programs. *See* Letter from N. Bullock, Unit Manager at MDC Brooklyn, and Other Education-Related Materials, Annexed Hereto at Exhibit "A." Ms. Espinosa, a correctional counselor writes that Mr. Garcia Luna "has proven to be one of the hardest working inmates that I know." *Id.*

As part of its § 3553(a) analysis, and like many other courts have done, this Court should reduce Mr. Garcia Luna's sentence for having been incarcerated at the MDC for the entire COVID-19 pandemic. Being imprisoned during the COVID-19 pandemic was not only terrifying, but also much more difficult and punitive than any other time in modern penological history. The constant security lockdowns and general conditions during the global pandemic taken together with the fact that Mr. Garcia Luna was not permitted nearly any social visits, have been grueling, punitive, and unnecessarily harsh. Mr. Garcia Luna experienced and survived the longest and most punitive series of system-wide and individual facility lockdowns in Bureau of Prisons history due to the COVID-19 pandemic and he should receive a substantial variance.

Substandard pre-sentence housing conditions are certainly relevant to a defendant's sentencing. For example, pre-pandemic, judges in this Circuit have considered the substandard conditions in the 11-South Unit of MCC and adjusted sentences accordingly. *See United States v. Behr*, No. S1 03 Cr. 1115 (RWS), 2006 WL 1586563 *5 (S.D.N.Y. Jun. 9, 2006) (imposing time-served sentence where defendant housed in MCC's 11-South Housing Unit). Harsh pre-sentencing conditions constitute collateral punishment that warrants a sentencing variance because "the punitive aspects of the defendant's confinement are increased and the deterrent effect of the defendant's confinement is also increased." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009); *see also United States v. Francis*, 129 F. Supp. 2d 612, 616-19 (S.D.N.Y. 2001) (downwardly departing because defendant spent more than thirteen months in substandard conditions including, overcrowding and inadequate hygiene).

More specifically and particularly relevant are the countless courts in this District and the Southern District of New York that have varied downward as a result of the onerous pre-

sentence detention conditions during COVID-19. *See, e.g., United States v. Battle*, 20 Cr. 349 (EK) (E.D.N.Y.) (harsh conditions tantamount to unearned disciplinary segregation or worse); *United States v. Carpenter*, 18 Cr. 362 (GRB) (E.D.N.Y.) ("I am going to find that the Guidelines have not and at this point in history cannot have considered the effects of COVID and the other problems at MDC on the quality of incarceration."); *United States v. Latney*, 18 Cr. 606 (JS)(E.D.N.Y.) (custody during COVID abnormally harsh); *United States v. Edwards*, 20 Cr. 618 (VLB) (S.D.N.Y.) (custody during COVID "unusually harsh"); *United States v. Martinez*, 18 Cr. 669 (JPO) (S.D.N.Y.) (time spent in MCC during COVID equivalent to 1.5 to 2 times the normal time); *United States v. Browning*, 20 Cr. 002 (VSB) (S.D.N.Y.) (not the fault of the BOP but concluding that there was no question that the time was more difficult); *United States v. Diaz*, 20 Cr. 305 (DLC) (S.D.N.Y.) (downward variance based on MDC COVID conditions); *United States v. Paulino*, 19 Cr. 607 (AJN) (S.D.N.Y.) (downwardly varying based on COVID prison conditions); *United States v. Rodriguez*, 19 Cr. 817 (LAK) (S.D.N.Y.) (same); *United States v. Amado-Ortiz*, 19 Cr. 923 (JMF) (S.D.N.Y.) (same).

However, the conditions post-pandemic have not improved. In January of this year, Judge Furman of the United District Court for the Southern District of New York, detailed the many disturbing conditions at the MDC. *See United States v. Chavez*, No. 22-CR-303 (JMF), 2024 U.S. Dist. LEXIS 1525, (S.D.N.Y. Jan. 4, 2024). In an often-quoted passage, Judge Furman wrote, citing a myriad of cases:

> the dockets of this Court and the Eastern District have been filled with cases in which defendants complain about near perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy delays in getting medical care. Contraband – from drugs to cell phones – is widespread. At least four inmates have died by suicide in the past three years. It has gotten to the point that it is routine for judges in both this District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC. Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

*Id.* In his decision, Judge Furman detailed the dreadful conditions and focused on three in particular: (1) the inordinate amount of time inmates spend in "lockdown – that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise (in Orwellian fashion the Bureau of Prisons does not refer to these periods as 'lockdowns'; instead it refers to them as 'modified operations'"); (2) the MDC's notoriously slow and sometimes "egregiously slow" medical care and mental health treatment; and (3) the MDC's deplorable physical conditions that include "mold on the walls and ceilings, contaminated drinking water, vermin infestations, mouse droppings falling through HVAC vents, and roaches and flies in the showers." *Id.* at 11-16.

Mr. Garcia Luna has endured and continues to endure the tortuous conditions of the MDC throughout the entire pandemic and the continuing and seemingly perpetual lockdowns. The pandemic and its necessary lockdowns and quarantines robbed many of us of important aspects of our lives, but Mr. Garcia Luna and his family and friends were forced to endure these uncertain times with barely any contact with those from whom they derive their strength and resolve. Despite the brutality of these conditions – ones that have caused many inmates to act out and get into trouble – Mr. Garcia Luna has received not even one disciplinary infraction. In

4

fact, he has been a model inmate.  He has made the lives of those, including the guards, better.
He has educated scores of inmates and helped them obtain their GEDs, led classes about the
damaging effects of drugs and the resources available for addiction treatment, and he has not
only served his fellow inmates as an orderly, but he also serves the MDC's guards as well.

Accordingly, this Court should consider the harsh pretrial detention conditions to which Mr.
Garcia Luna has been subjected and reduce his sentence accordingly.

### III.   Twenty Years' Imprisonment Is Sufficient But Not Greater Than Necessary to Achieve the Goals of Sentencing – Mr. Garcia Luna's History and Characteristics, Age, and the Sentences In Similar Matters Supports a Significant Variance

In addition to the conditions of his confinement, Mr. Garcia Luna's history and characteristics,
his demonstrated rehabilitation, deterrence, just punishment, and the sentences of other similarly
situated defendants favor a sentence of twenty years' imprisonment.  Mr. Garcia Luna's history
and characteristics establish that he has lived an honorable life and enjoys the support of many.
In the past five years, he has suffered immeasurable losses – unable to properly support his
family during the passing of two of his siblings, the recent disability and the issuance of an arrest
warrant for another, and the imprisonment in Mexico of his youngest sibling on account of her
association with him.  He has lost his career, his legacy has been destroyed, he remains attacked
almost daily in the Mexican press, and virtually all his family's assets have been seized.  He has
been convicted by a United States jury and faces the potential of spending the rest of his life in a
United States prison.  And even if released from a United States prison, he will likely face
extradition to Mexico to stand trial for largely similar allegations.  After all of the above, many
would lose their will.  But not Mr. Garcia Luna.  He continues to demonstrate his character by
focusing on the future, supporting his family emotionally as best he can, and working towards
and praying for a brighter future for his family and the people of his country.

The effect on his family has been obviously devastating.  And somehow, through all of this, Mr.
Garcia Luna has remained the backbone of his family and has been able to uplift them and give
them the strength to continue their lives in the face of their devastation.  Mr. Garcia Luna enjoys
the unwavering support of an intelligent and loyal wife and two incredibly intelligent, capable,
and humble children.  Both his children exemplify the traits he so ingrained in them and that they
observed in him, an exceptional work ethic and the need to give back to their communities.  All
of the letters submitted in support of Mr. Garcia Luna, even those from inmates and guards at the
MDC, contain the same thread.  They each, in their way describe an extremely hard working,
focused, generous, talented, and loving human being that cares for those around him and works
for the common good.  He takes each day as it comes and does his best to make the incarcerated
community in which he lives, a better one.

Furthermore, a detailed analysis of the sentences of individuals convicted of facilitating drug
trafficking by utilizing government power, demonstrates why a sentence of life imprisonment
sought by the government would result in an unwarranted sentencing disparity.  When the Court
analyzes the sentences of other defendants who have abused positions of power to facilitate drug
trafficking, including two presidents who each received sentences of less than life imprisonment
and multiple high ranking law enforcement officials who received sentences ranging from twelve
years to twenty-two years, it is clear that a sentence of life imprisonment for Mr. Garcia Luna

would create an unwarranted sentencing disparity and that the appropriate sentence is twenty years.

      1.    <u>Mr. Garcia Luna's History and Characteristics Establish That Twenty Years'</u>
               <u>Imprisonment is More than Sufficient to Achieve the Goals of Sentencing</u>

Mr. Garcia Luna was born in Mexico City in 1968.  He lived in Mexico City for forty-four years before emigrating after being told he and his family were in danger of cartel revenge.  His parents were lifelong residents of Mexico City and lived long lives.  Mr. Garcia Luna had a wonderful childhood.  He was raised in a household full of love by a lower middle-class Mexican family.  His father owned a transportation company, and his mother was a homemaker.  He was extremely close with his parents and was devoted to them until their deaths.  Mr. Garcia Luna's wife, Linda Cristina Pereyra Gálvez, writes about Mr. Garcia Luna's mother's illness, death, and its effect on her husband:

> I clearly remember that one of his life's wishes was to have his mother close to him and to be able to look after her, which happened to be the case.  She stayed with us until the day she died.  It was a terrible news when doctors diagnosed my mother-in-law with stomach cancer, but we always saw to it that she would get the best care.  We understood that only we could provide the care she needed, so that both of us shared in the duties of feeding her, bathing her and taking care of all her basic needs so as not to rely on a nurse.  Genaro never wanted to leave her in a hospital, and he stayed with her until her death.  She died in our home, and it was Genaro who had to hold her in his arms to turn her over to the funeral services.  He had promised his mother he would never leave her, and he fully kept his promise.

Letters in Support Annexed Hereto at Exhibit "B."

Mr. Garcia Luna had six brothers and sisters.  Put differently, he is the youngest of seven.  He lost two of his brothers before his arrest.  Tragically, Mr. Garcia Luna lost two siblings while he has been detained in this case.  His remaining sisters also suffer.  One sibling was arrested and detained earlier this year on charges somehow related to Mr. Garcia Luna.  His only other remaining sister is disabled from complications arising from COVID-19 and an arrest warrant is still outstanding against her for essentially being related to Mr. Garcia Luna.

In 1989, at the age of twenty-one, Mr. Garcia Luna worked for the Mexican CISEN, the Mexican state intelligence agency and continued to work for them until 1999.  In 1995, at the age of 27, he married Cristina Pereyra.  The Garcia Lunas have two children, son Genaro and daughter Luna.  In 2000, at the age of thirty-two, Mr. Garcia Luna was appointed as the director of the Mexican federal police (AFI) where he served for six years and grew the police force to approximately 36,000 federal police officers.  In 2006 to 2012, Mexican President Felipe Calderon appointed him to serve as Mexico's Secretary of Public Security.

During the years in which he served as Mexico's Secretary of Public Security, Mr. Garcia Luna was showered with praise from every corner of the United States and international law enforcement and political communities.  He hosted and was hosted by United States presidents, directors of the United States Central Intelligence Agency ("CIA"), directors of the Drug

Enforcement Administration ("DEA"), directors of the Federal Bureau of Investigation ("FBI"), ambassadors and countless other United States officials.  His wife writes about that time:

> Never in the history of Mexico has there been such a widespread cooperation in the area of security between Mexico and the United States as the cooperation he managed to establish when he worked as Secretary of Public Security.  Friends from those agencies were at my home with their families, sharing important moments with us.  Genaro is a person who leaves a mark on the people who have the privilege of relying on his friendship – they would always tell me that.

*Id.*

As the chief Mexican law enforcement officer, he received countless national and international awards for his vigilance, including (the photographs of which are annexed hereto as an exhibit):

- ***Colombia –*** May 2011, Award from government of Colombia for his outstanding work in the fight against transnational drug trafficking.
- ***Spain –*** October 2001, Award from Spanish Order of Police Merit with Red Distinctive for his outstanding work in the fight against terrorism.
- ***Ecuador –*** May 2005, Award from National Police in recognition of his valuable contribution and cooperation.
- ***Colombia –***April 2011, Award for outstanding work in the fight against drug trafficking.
- ***United States –*** May 2006, Award from the Department of Homeland Security for his support and involvement in an initiative that led to the seizure of over $51 million.
- ***Russia –*** Award from the Ministry of Interior of Russia.
- ***Ukraine –*** Award from the Ministry of Internal Affairs of Ukraine.
- ***United States –*** June 2005, Award from the DEA in recognition for his valuable contribution in the fight against drug trafficking.
- ***Mexico –*** Award from the Attorney General's Office of the Republic of Mexico for his outstanding work to combat organized crime.
- ***Mexico –*** Awards from CISEN for excellence and award of the medal of courage.
- ***United States –*** Award from the CIA.
- ***Germany –*** September 2005, Award from INTERPOL.
- ***United States –*** April 2012, Award from CIA In Recognition of "Your Friendship, Collaboration and Support during your ten years as Secretary of Public Security".
- ***Colombia –*** Award from Colombian National Army.

- *France* **–** Award from French Police.
- *Spain* **–** Award from Spanish Police.
- *Bulgaria* **–** Award from Bulgarian Police.
- *Mexico* **–** April 2007, Award from College of National Defense.
- *United States* **–** 1999, Award from FBI National Academy.
- *United States* **–** January 2003, Award from the DEA.
- *Mexico* – October 2004, Award from INTERPOL.
- *Honduras* **–** Award from Honduran Police.
- *United Kingdom* **–** Award from the Information Commissioner's Office.
- *Monaco* **–** Award from Public Safety.
- *Spain* **–** Award from the Spanish Police.
- *Mexico* **–** Award from State Attorney's Office.
- *Panama* **–** Award from the Government of Panama.
- *Mexico* **–** Award from CISEN.
- *United States* **–** Award from the DEA.
- *Mexico* **–** April 2008, Award from College of National Defense.
- *United States* **–** May 2001, Award from the DEA.
- *Mexico* **–** December 2011, Award from Chamber of Commerce.
- *Mexico* **–** 1996, Award from CISEN.
- *China* **–** 1998, Award from the Republic of China.
- *Germany* **–** Award from German Federal Police.
- **Mexico –** 2004, Award from International Association of Law Enforcement Intelligence Analysts("IALEIA").
- **Mexico –** December 2011, Award from XXIX Mining Convention.
- *United States* **–** April 2011, Award from the International Drug Enforcement Conference ("IDEC").
- *United States* **–** December 2002, Award from U.S. Immigration and U.S. Customs Service.
- *United States* **–** January 2007, Award from DEA.
- *Mexico* **–** May 2005, Award from Chihuahua State Prison.

- **Canada –** July 2004*,* Award from Canadian Police.

- *Colombia –* July 2006*,* Award from Colombian Police.

- *Costa Rica –* October 2005, Award from Costa Rican Police.

- *Spain –* 2001, Award from Spanish Police.

- *United States –* Award from DEA.

- *Mexico –* October 2012*,* Award from CISEN.

*See* Photos of Awards Annexed Hereto at Exhibit "C."

After leaving the Mexican government in 2012, Mr. Garcia Luna spent most of his time in the United States.  He moved his entire family to the United States after he was warned about threats to the safety of him and his family as a result of his role in President Calderon's war against the cartels.  Gerardo Ruiz who worked with him in the Calderon administration writes, "at the end of his tenure he had to leave the country for security reasons.  He used that time to get a master's degree and to develop a very innovative safety rating for purposes of continuing to contribute to improve security not only in Mexico but in all countries where it can be implemented."  Exhibit B, Letter of Gerardo Ruiz Mateo.

Both his children are United States citizens and attended United States universities.  His daughter Luna obtained a master's degree and is teaching kindergarten, and his son is working and pursuing a master's degree.  He is extremely proud of his children and in particular their work ethic, humility, desires to be lifelong learners, and intentions to give back to their communities.  His son Genaro writes about the qualities his father instilled in him:

> Now that I no longer have the opportunity to have my father in my life as I once did, I'm more aware than ever of the great positive influence he has had on me. Without him as the teacher, leader, and friend who guided me through difficult times – even the one we're facing now as a family – I couldn't imagine becoming the man I am today.  I have nothing but the deepest admiration, respect, and love for my father, for all the positive influence he has had on my life, always guiding me to do the right thing, strive to be of service, and create a positive impact in my community.  For my father, the true meaning of success has always been measured by how much of a positive impact he has had on me and our family, knowing that seeing us grow would be the greatest satisfaction he could ever experience.  I hope that one day, when I have the opportunity to start building my own family, I can be even a fraction of the amazing father that he has been to me.

Exhibit B, Letter of Genaro Garcia Pereyra.

His daughter Luna was recently engaged.  The MDC, despite a pending application for months, has not approved his future son-in-law's visitation request.  Sadly, they have not met.  However, his future son-in-law movingly writes about what he has learned about Mr. Garcia Luna by being with and observing his family:

I have seen the values that Mr. Genaro Garcia Luna has instilled in his family: integrity, loyalty, and resiliency. Each member of his family has exemplified these qualities in their daily lives. Additionally, they represent Mr. Genaro Garcia Luna's values of respect, services to others, and the importance of family. Luna and I met at work, where we taught in a Title 1, low-income, neighborhood city school that served a mostly minority and homeless population. Firsthand, I saw Luna's compassion, respect, and service to others through her relationships with her co-workers, her students, and their families. While working, I witnessed her integrity and resilience of teaching students who struggled with homelessness, abuse, and academic inequalities. As I started to know Luna further, she credited one person for her values and strong moral compass: her father, Mr. Genaro Garcia Luna.

Exhibit B, Letter of Kenneth Diaz.

Mr. Garcia Luna was arrested without incident on December 9, 2019. He cooperated fully and agreed to speak with agents and provided them the passwords to all of his electronic devices. He was ordered detained at his presentment in Texas. From December 9, 2019, to January 2, 2020, Mr. Garcia Luna was held in the SHU and not permitted any telephone calls or contact with anyone other than his Texas counsel. When he arrived in New York, he was again placed in the SHU and again only allowed to communicate with counsel.

After he was arrested, the Mexican government immediately denied him and his family access to the Mexican financial system. At the time of his arraignment, Mr. Garcia Luna had little to no liquid assets. He had been the majority owner of two businesses. After his arrest, both businesses lost all their contracts, and closed. As a result, this Court determined that he was unable to afford counsel and appointed the undersigned to represent him. He has been in jail at the MDC ever since.

As noted above, Mr. Garcia Luna did not then withdraw into a figurative cocoon and focus on his own problems, trials, and tribulations. Instead, he has focused on what has guided him throughout his whole life, his desire to help others and make a positive impact in his community, however small or large. While focusing on defending the charges in his case, he built a successful GED education curriculum to help those inmates at the MDC seeking education. He has helped more than 100 inmates obtain their GEDs, further their education, and reduce their security classification levels. He also tutored inmates about drug treatment options so they could live drug free. He chose to do this out of his love of teaching and desire to inspire others to be better. His teaching efforts have not only helped those students but have given him strength and inspiration.

His wife tells you:

> I know his heart and his soul and I can affirm that he still is the same person I describe herein, a man with a forthright and kind smile, who is willing to share his knowledge and to help other people no matter if he is broken inside, he will always have room to lend a hand to someone in need of a piece of advice or a hug

Exhibit B, Letter of Cristina Pereyra Gálvez.  His daughter Luna writes about her father's lifelong desire and love of learning and how he helps his fellow inmates at the MDC:

> I believe that it was my grandma's drive for new challenges that pushed my dad to start his Master's in Business Administration. I hold these years dearly in my heart, given that my dad and I were both going through similar circumstances. We would both stay up really late to study, wake up really early to go to school, and do that all over again the next day. This had never happened before, due to his work in the government; my dad worked weekends and holidays when we were growing up but now he was back from school at the same time that we were. We would get to talk about our school projects, brainstorm, and push each other to give our very best.  I have never met someone that is so eager to learn than my dad, and somehow he has found a way to inspire other people to see education as a pathway to a better future inside the Metropolitan Detention Center.  When he told me that he was starting to give classes, he asked us to send him books about math, physics, chemistry, and history because he wanted to be prepared to give the best education he could.  I think that really just sums up who my dad is: no matter where or how, he will always find a way to help someone.  No matter his circumstances or well-being, he feels the most at peace when he is able to make a difference in someone's day, and in this case someone's life.  He has been the person that has helped the most inmates to pass the GED in the history of MDC, which includes inmates who saw a positive change reflected in their sentencing since they have passed their GED.  I think that this is a testament to who my dad is: a committed community member that has the well-being of other people before his own, and who is able to create a positive change in a hopeless place.

Exhibit B, Letter of Luna Sofía García Pereyra

Many of his students have moved on to designated facilities following their sentencings. However, he teaches new students every day and many of his students are current residents of the MDC.  Attached are fourteen letters from his current students attesting to the help and inspiration Mr. Garcia Luna gives them every day.  *See* Letters from Inmate Students Annexed Hereto at Exhibit "D".  Remarkably, he has built this program while MDC remains one of this country's worst pretrial detention facilities.  This altruistic action speaks volumes to Mr. Garcia Luna's characteristics and character.  Accordingly, Mr. Garcia Luna's history and characteristics warrants a significant downward variance.

2.    Mr. Garcia Luna's Age Supports a Sentence of Twenty Years' Imprisonment

At fifty-five years old, Mr. Garcia Luna presents a low risk of recidivism.  The relationship between age and crime is one of the most solid within the field of criminology.  *See* Cornelius, Caitlin V.M. and Christopher J Lynch, *Aging Out of Crime:Exploring the Relationship Between Age and Crime with Agent Based Modeling*, Society for Modeling & Simulation International (SCS) (2017), *available at* https://scs.org/wp-content/uploads/2017/06/6_Final_Manuscript.pdf.

Statistically, older adults are far less likely than younger offenders to recidivate after release. *See* U.S. Sent. Comm., *The Effects of Aging on Recidivism Among Federal Offenders* (Dec.

2017), p. 3 *available at* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders ("Age exerted a strong influence on recidivism across all sentence length categories. Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed."). As a first-time offender who has had no disciplinary infractions while incarcerated, Mr. Garcia Luna is in the category of defendants least likely to reoffend after his release. *See* U.S. Dep't of Justice Off. Of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, p. 41 (Revised Feb. 2016), *available at* https://oig.justice.gov/reports/2015/e1505.pdf. At fifty-five, having suffered the loss of almost everything he cherishes being incarcerated for the first time ever and having to endure the conditions of the MDC, Mr. Garcia Luna is unlikely to reoffend and as such, does not need more than twenty years' imprisonment to be specifically deterred.

In addition to constituting a harsher punishment for Mr. Garcia Luna due to his age, prolonged incarceration will also impose an unnecessary financial burden on the United States government. Older prisoners are much more expensive for the BOP to maintain because of health and mobility issues. *See* U.S. Dep't of Justice Off. Of Inspector Gen., *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, pp. 10-16 (Revised Feb. 2016), *available at* https://oig.justice.gov/reports/2015/e1505.pdf. Inmates over the age of 55 cost approximately three times more to incarcerate than an average adult inmate. *See* Williams BA, Goodwin JS, Baillargeon J, Ahalt C, Walter LC, *Addressing the Aging Crisis in U.S. Criminal Justice Healthcare*, J Am Geriatr Soc. 2012 Jun; 60(6):1150-1156, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3374923/?report=reader.

Furthermore, imprisoning Mr. Garcia Luna for life or the equivalent of life would deprive Mexico and Mr. Garcia Luna of the opportunity to try him on the charges pending against him in Mexico that he has denied and intends to challenge at trial. Accordingly, Mr. Garcia Luna's age supports a substantial downward variance and a sentence of twenty years' imprisonment.

      3.    <u>Sentencing Mr. Garcia Luna to Life Imprisonment Would Create an Unwarranted Sentencing Disparity Among Defendants Convicted of Abusing Power to Facilitate Narcotics Trafficking</u>

The government's conclusory argument that a sentence of life imprisonment would avoid unwarranted sentencing disparities fails on its face. In the ten lines of text provided in support of its argument, the government summarily cites two distinguishable cases and fails to provide any meaningful analysis. When the sentences of other defendants found to have abused positions of power to facilitate drug trafficking are analyzed in detail, it is clear that a sentence of life imprisonment for Mr. Garcia Luna would create an unwarranted sentence disparity and that the appropriate sentence is twenty years imprisonment.

Manuel Noriega and Juan Orlando Hernandez each controlled their respective countries, Noriega as the *de facto* leader of Panama for six years and Hernandez as the two term president of Honduras, while also facilitating massive drug trafficking. Noriega, who was instrumental to the Medellin Cartel's rise to power in the 1980s, received a sentence of forty years' imprisonment. Juan Orlando Hernandez, as Honduras's two-term president was in "a category all his own" and

"among the very most culpable [drug traffickers] ever prosecuted in the United States." *United States v. Diaz Morales, et al.*, 15 Cr. 379 (PKC) (SDNY), ECF No. 801 at 44, 49.  Hernandez received a sentence of forty-five years' imprisonment.  Mr. Garcia Luna was not the leader of a country, and his sentence should be substantially lower than, not higher than the sentences received by such leaders.

To avoid unwarranted sentencing disparities, the sentence imposed on Mr. Garcia Luna should be commensurate to the sentences received by other high ranking law enforcement officials who committed similar conduct.  Critically, most high-ranking law enforcement officials sentenced for facilitating large scale drug trafficking were also responsible for conduct much more egregious than the conduct that Mr. Garcia Luina is being held accountable for, yet they all received sentences of less than twenty-two years.[1]

General Cliver Alcalá Cordones, who received a sentence of almost twenty-two years, is more similarly situated to Mr. Garcia Luna than Noreiga and Hernandez as he was not the leader of a country at the time he engaged in criminal activity.  Alcalá Cordones, a general of the Venezuelan military directly under the president at the time, was sentenced to almost twenty-two years for his involvement in not only facilitating narcotics trafficking but also providing support to a terrorist organization "the likes of which there are few parallels."  *United States v. Maduro, et al.*, 11 Cr. 205 (AKH) (SDNY), ECF No. 178 at 38.

Likewise, Juan Carlos Bonilla Valladares, while Chief of the Honduran National Police, protected two of the largest drug traffickers in Honduras for over a decade, titles they were able to achieve largely due to the assistance provided by Valladares.  *United States v. Diaz Morales, et al.*, 15 Cr. 379 (PKC) (SDNY), ECF No. 817 at 3.  Critically, the protection that Valladares provided reportedly included directly participating in murdering a rival drug trafficker, a murder he was then tasked with investigating and the efficacy of which he boasted about to the press.  *Id.* at 5-6.  "In addition to partnering with notorious drug traffickers and carrying out acts of violence and murder on their behalf, [Valladares] also abused his official positions to protect the criminal activities of high-ranking members of [MS-13.]"  *Id.* at 6.  Valladares was sentenced to nineteen years' imprisonment.  *See United States v. Morales Diaz, et al.*, ECF No. 821.

Dino Bouterse, who at the time he committed his crimes was the son of the president of Suriname and a Surinamese Counter-Terrorism Official, was sentenced to just over sixteen years' imprisonment for attempting to provide material support to Hezbollah in addition to narcotics trafficking and firearms offenses, one of which involved a rocket launcher.  *See* SDNY USAO Press Release dated Mar. 10, 2015 available at: https://www.justice.gov/opa/pr/south-american-counter-terrorism-official-sentenced-195-months-prison-attempting-support. Similarly, while not a law enforcement officer, Fabio Porfirio Lobo, abused his power as the son of the former Honduran president Porfirio Lobo Sosa to engage in multiple drug trafficking conspiracies involving high-level politicians.  *See United States v. Lobo, et al.*, 15 Cr. 174 (LGS) (SDNY), ECF No. 252 at 8.  Lobo was held responsible for a "staggering" 4.4 tons of cocaine

---

[1] Of course, Mexican Defense Minister, General Salvador Cienfuegos Zepeda was arrested in October 2020, almost one year after Mr. Garcia Luna's arrest and likewise indicted with assisting Mexican narcotics cartels to traffic narcotics to the United States.  Reportedly, unlike the case against Mr. Garcia Luna, the government obtained corroboration for the claims of its cooperators in the form of recordings and other communication evidence. General Cienfuegos was not tried, however, instead his case was dismissed by this United States Attorney's Office and the general was permitted to return to Mexico.

and worked directly with high level drug traffickers in coordinating movement of the narcotics, in what the court described as "nothing short than state-sponsored drug trafficking." *Id.* Lobo was sentenced to twenty-four years' imprisonment. *United States v. Lobo et al.*, ECF No. 250.

The sentence imposed on Tony Hernandez is the only life sentence that the government cites in support of its argument that a life sentence for Mr. Garcia Luna would not create unwarranted sentencing disparities. However, Hernandez is distinguishable. Tony Hernandez was a drug trafficker turned Honduran politician, something he was largely able to do because his brother, Juan Orlando Hernandez, was the president of Honduras for two terms. *See United States v. Morales Diaz, et al.*, 15 Cr. 379 (PKC) (SDNY), ECF Nos. 269, 326. Tony Hernandez's crimes were not limited to drug trafficking but included arms trafficking and his involvement in multiple murders. It is understandable why the government would ask for and why a court would impose a life sentence on such an individual. *See id.* The conduct of which Mr. Garcia Luna was convicted does not include his participation, directly or indirectly, in any violence. Sentencing Mr. Garcia Luna to the same sentence as a defendant involved in multiple murders would create an unwarranted sentencing disparity. The sentences received by defendants comparable to Mr. Garcia Luna compel a sentence of twenty years.

## IV.   Conclusion

For the foregoing reasons, it is respectfully submitted that the Court sentence Mr. Garcia Luna to twenty years' imprisonment. Twenty years is more than sufficient to serve the interests of sentencing – it appropriately balances the crimes of conviction with Mr. Garcia Luna's history and characteristics, age, and the sentences of other similarly situated defendants to achieve a just and deterrent sentence.

Respectfully submitted,

/s/

César de Castro
Valerie A. Gotlib
Shannon McManus
Florian Miedel

cc:      All Parties (*via* ECF)